UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION (TOLEDO)

| | | |
|---|---|---|
| HOWARD FRANK, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | No. 3:05-cv-07393-JGC **(Consolidated)** |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) | Chief Judge James G. Carr |
| DANA CORPORATION, et al., | ) ) | |
| Defendants. | ) ) ) | **JURY TRIAL DEMANDED** |
| | ) | |

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE
SECURITIES EXCHANGE ACT OF 1934

LANDSKRONER • GRIECO • MADDEN, Ltd.
JACK LANDSKRONER (0059227)
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

Liaison Counsel

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MICHAEL J. DOWD
DEBRA J. WYMAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

## SUMMARY OF THE ACTION

1.      This securities fraud class action is brought on behalf of persons who purchased the publicly traded securities of Dana Corporation ("Dana" or the "Company") between April 21, 2004 and October 7, 2005 (the "Class Period").  Dana is a supplier of automotive parts and drive train systems for light, commercial and off-highway vehicles.

2.      This case arises out of a fraudulent scheme and wrongful course of business whereby the Company's CEO and Chairman of the Board Michael J. Burns ("Burns") and its Chief Financial Officer Robert C. Richter ("Richter") (collectively "defendants") caused Dana to issue false financial statements during 2004 and 2005.  Beginning in April 2004 and continuing through the end of the Class Period, Burns and Richter caused Dana to issue press releases and to file quarterly and annual reports with the Securities and Exchange Commission ("SEC") which misrepresented the profitability of the Company's operations and the adequacy of Dana's internal controls.

3.      Burns and Richter caused Dana to use a variety of accounting manipulations to falsify Dana's financial results during the Class Period.  These manipulations included improperly recognizing revenue, improperly valuing inventory and failing to properly account for expenses related to asset sales, executive bonuses and increased steel costs.  Burns and Richter purposefully kept investors in the dark concerning Dana's actual operating performance in order to: (i) avoid having to write down hundreds of millions of dollars of the Company's deferred tax assets; (ii) generate upward movement in Dana's stock price; (iii) induce the rating agencies to upgrade Dana's credit rating; (iv) induce key employees to remain with the Company; (v) meet the net income amounts forecasted by defendants in order to trigger defendants' bonus-related compensation[1]; (vi)

---

[1]      A substantial percentage of defendants' compensation was based upon Dana's **reported** net income and earnings per share ("EPS") during 2004-2006, regardless of Dana's **actual** net income and earnings.  For example, depending upon the EPS reported by Dana during FY04, FY05 and FY06 Burns was slated to receive as few as zero performance shares or as many as 73,730 shares

permit the Company to raise $450 million from the sale of debt securities; and (vii) avoid Board liability for having rejected an $18 per share offer made by Arvin Meritor in late 2003.

4.      In September 2005, the truth about Dana's actual operating performance began to reach the market and, as a result, the price of Dana's securities dropped precipitously.  Thereafter, defendants were finally compelled to admit that Dana's results for fiscal year 2004 ("FY04"), first quarter 2005 ("1Q05") and second quarter 2005 ("2Q05") had been falsified and that the Company's actual earnings for fiscal year 2005 ("FY05") would be less than half the amount represented by defendants during the Class Period.  Defendants have further admitted that quarterly net income reported by Dana during the Class Period was overstated by as much as 70% and that ***Dana's assets were overstated by as much as $1 billion***.

5.      On March 3, 2006, the Company was forced to file for protection under the Bankruptcy Code.  Three days later Richter suddenly "resigned" from the Company.  It was further disclosed in February 2006 that the SEC had commenced a ***formal*** investigation into Dana and its accounting practices.  Lead Plaintiffs and the Class have suffered hundreds of millions of dollars in damages as the magnitude of defendants' accounting manipulations was disclosed to the market and the price of Dana common stock – which traded as high as $21 during the Class Period – fell to $6.04 per share, a decline of more than 70%.

### INTRODUCTION AND OVERVIEW

6.      Dana was founded in 1904.  The Company was incorporated in 1905 as Spicer Universal Joint Manufacturing Company and renamed Dana Corporation in 1946.  During the post-World War II boom years, Dana expanded its operations through organic growth and acquisitions to

---

worth approximately $1.5 million at the commencement of the Class Period.  Similarly, defendant Richter was slated to receive as few as zero performance shares or as many as 22,000 shares worth approximately $500,000.  Defendants' compensation was therefore directly linked in Dana's "***reported*** financial and operating performance."

become one of the largest parts suppliers to Chrysler, GMC and Ford (the "Big 3").  However, by the mid-1990's, the Company's growth prospects stagnated as the Big 3 struggled through an industry-wide decline.

7.      In 1998, Dana's former CEO Woody Morcott caused the Company to intervene as a friendly suitor in the midst of a hostile attempt by SPX Corporation to acquire replacement parts giant Echlin.   Dana ultimately succeeded in its effort to acquire Echlin.   Following the consummation of its acquisition of Echlin, Dana attempted to consolidate the acquired assets and take advantage of the purported synergies promised to Dana shareholders in connection therewith.  However, by 2001, it was apparent to Dana's then-Chairman Joseph Magliochetti and the market that the Echlin acquisition had not rendered the desired synergies, revenue or earnings growth for Dana.  Later in 2001, the Company announced the implementation of a comprehensive restructuring plan.  However, the restructuring plan itself failed to revive Dana's operating performance and by 2003 the price of Dana's stock, which had traded over $55 per share at the time it acquired Echlin, had declined by almost 90% and was languishing at less than $7 per share.

8.      In July 2003, auto parts supplier Arvin Meritor publicly announced an offer to acquire Dana for $15 per share.  Dana's Board of Directors (the "Board") responded by refusing to engage in any meaningful dialogue with Arvin Meritor.  Even when the Arvin Meritor offer was increased to $18 per share in November 2003, Dana's Board responded by assuring Company shareholders that the offer was not in their best interests, and did not promise the degree of shareholder value that Dana management would produce for shareholders if the Company remained independent.  Utilizing defensive corporate measures, including a poison pill and the hiring financial advisors charged with ensuring that existing management would continue to maintain control over Dana's operations, the

Board successfully defeated Arvin Meritor's attempt to pay Dana shareholders $18 per share for their Dana stock.[2]

9.      In connection with their efforts to fend off Arvin Meritor's takeover attempt, Dana management assured the Company's shareholders that they were taking significant steps to enhance shareholder value.  In an attempt to demonstrate they were making good on those assurances, just days after Arvin Meritor withdrew its $18 per share cash bid in November 2003, the Board placed Dana's automotive aftermarket group on the sale block.  In response to assurances that this and other cost saving and profit enhancing steps had been taken, the price of Dana stock increased strongly during late 2003 and early 2004.

10.      On February 17, 2004, Dana announced its financial results for fiscal year 2003 ("FY03"), reporting a 220% increase in net income.  On February 20, 2004, the rating agency Fitch, Inc. initiated coverage on the Company and assigned a rating of BB with positive rating outlook based on the strength of Dana's FY03 results.[3]  According to Fitch:

> The rating reflects an improved operating profile and a strengthening balance sheet characterized by significant debt reduction and healthy cash balances.  Over the past several years, Dana has sharpened its strategic focus which has resulted in significant restructuring and divestiture programs.  Restructuring actions have led to enhanced margins while divestitures have strengthened the balance sheet.

11.      On March 1, 2004, defendant Burns became Dana's Chairman of the Board and CEO. Burns' hiring was cast as an extremely positive development, as Burns was touted as a strong

---

[2]      As of the date of this filing, shares of Dana common stock traded for less than $2 per share.

[3]      Fitch, Inc. ("Fitch") is a global rating agency, which provides opinions on the creditworthiness of issuers of debt investments.  Fitch gathers and analyzes financial, industry, market and economic information and publishes assessments of creditworthiness of securities and issuers, providing investors with the means to judge the credit quality and overall financial condition of public companies such as Dana.  A positive rating from Fitch or other rating agencies typically has a positive impact on a Company's securities.

executive who could slash costs and successfully reinvigorate Dana's improving but still somewhat moribund operating performance.

12.     By early 2004, the Dana Board, Burns and Richter were fixated on having the Company post positive results from the restructuring efforts so that the Board's assurances in connection with the efforts to thwart the Arvin Meritor takeover attempt were not perceived to be deceptive or misleading.  It was critical to Richter and Burns, personally and professionally, that they appear as having successfully stabilized Dana via cost reductions and earnings growth.

**Defendants' Class Period Violations of the Federal Securities Laws**

13.     Beginning in April 2004 and continuing through July 2005, Burns and Richter repeatedly claimed that Dana was posting "growth in [] gross margins" due to "the continued realization of benefits from our restructuring and other cost-reduction efforts."  Quarter after quarter during the Class Period defendants touted the effectiveness of Dana's cost cutting programs and lean manufacturing processes, claiming that these programs were helping the Company profitably weather the increasing raw material prices imposed upon Dana by it's vendors.  Burns and Richter assured analysts and the market that the Company would be able to "hold our [EPS] guidance . . . in spite of *whatever* we see," and that the Company's strong net income was "largely" the result of "cost reductions *more than offsetting* higher raw material prices."  In fact, defendants were causing Dana to report gross margin, EPS and net income numbers that were overstated by as much as *70%.*

14.     Throughout the Class Period, Burns and Richter also misrepresented and/or omitted the true facts about the failure of Dana's cost cutting initiatives and lean manufacturing processes, Dana's inadequate internal controls and inefficient processes, including the transfer of certain U.S. operations to plants in Europe.  Burns and Richter knew but failed to disclose that their decision to transfer certain operations to Europe resulted in the shipping of products – often weighing thousands of pounds each – by air from Europe to customers in the United States, and was causing the

Company to incur millions of dollars in unaccounted for shipping costs which precluded Dana from meeting the cost savings and gross margin forecasts disseminated to the public by defendants.

15.     Burns and Richter further misled investors by providing artificially inflated EPS forecasts that they knew were not attainable.  Burns and Richter knew via their access to and review of monthly performance review reports and quarterly Supplemental Accounting Data ("SAD") reports that Dana's operations were only modestly growing and that many of its plants were operating at a loss, and were expected to continue to do so.[4]

16.     In addition to materially overstated quarterly results of operations, Richter and Burns assured investors (by certifying under federal law in the Company's quarterly filings with the SEC) that they had conducted thorough "evaluation" of the effectiveness of the Company's "disclosure controls and procedures."  Despite their positive statements, defendants knew or were reckless in not knowing that Dana was not generating the financial results reported by defendants.  Specifically, defendants concealed that Dana's gross margins, net income and EPS were materially overstated, and that internal controls and procedures were so pervasively ineffective that *the Company's financial statements were falsified in more than a dozen different areas*.  Each quarter during the Class Period, Burns and Richter certified to the SEC and to Dana shareholders they had conducted appropriate "evaluations" of its internal controls and procedures.  In fact, Burns and Richter were aware of deficiencies in Dana's internal controls, processes and procedures, yet they repeatedly certified throughout the Class Period that each SEC Report on Form 10-Q and the FY04 Report on Form 10-K "fairly presents in all material respects, the financial condition and results of operation of the Company" and that Dana's "disclosure controls and procedures [were ]effective" even though they were not.

---

[4]     SAD reports provided Burns and Richter with access to critical information as more fully described in ¶¶46-50, *infra*.

17.     In each Report on Form 10-Q filed by Dana for 1Q04-3Q04, for instance, defendants' publicly filed certifications stated that they had "concluded that such disclosure controls and procedures are effective in providing reasonable assurance that material information relating to Dana and its consolidated subsidiaries *was made known to them*" during each quarter.  However, beginning with Dana's FY04 Report on Form 10-K, defendants' certifications were dramatically altered.  Through these revisions, Burns and Richter attempted to craft language designed to hide their knowledge of the wholesale deficiencies in Dana's internal controls and processes.  Instead of stating that they were being informed of material information as they once had, defendants' certifications blithely stated that the evaluations showed the internal controls were merely "effective."  As defendants have now admitted, they were not.

18.     Defendants also falsely represented to investors in its FY04 Report on Form 10-K and each Report on Form 10-Q filed during the Class Period that they had evaluated the Company's valuation of its deferred tax assets and that, based upon that evaluations, they expected that it was "*more likely than not* that [the Company] will generate sufficient U.S.-based taxable income to realize these deferred tax assets" thereby avoiding a valuation allowance or write-down of the assets as was necessary.  In fact, as defendants have now admitted that Dana's expected future results did not justify maintaining this asset during the Class Period.

19.     Burns and Richter also falsely assured investors that Dana's public disclosures about its financial statements were accurate and the processes, practices and internal financial and information systems controls used to create them were adequate.  Burns and Richter each executed certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 (which were included in each of the Company's Reports on Form 10-Q and its FY04 Report on Form 10-K) which attested that each such "*report does not contain any untrue statement of a material fact or omit to state a material fact* necessary to make the statements made, in light of the circumstances under which such

statements were made, not misleading" and that each such report "***fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented.***"[5]  In fact, as defendants' have now admitted, their repeated statements and omissions of material facts throughout the Class Period about Dana's historical and expected financial performance, and the adequacy of the internal accounting controls and processes used by Burns and Richter to calculate and report the results of the Company's operations and forecast its future performance were each false and misleading when made.

---

[5]      Burns and Richter affirmed that they were "***responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-15(e) and 15d-(15(e)) *for the registrant and have*:

> a)      ***[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities,*** particularly during the period in which this report is being prepared;
>
> b)      ***[e]valuated the effectiveness of the registrant's disclosure controls and procedures*** and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> c)      [d]isclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

Burns and Richter further warranted that "based on our most recent evaluation of internal control over financial reporting" [] they had disclosed to the registrant's auditors and the audit committee"

> a)      ***[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting*** which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b)      ***[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

Here, as elsewhere, emphasis has been added unless otherwise noted.

**The Truth Begins to Reach the Market**

20.     On September 15, 2005, barely even two months after reaffirming Dana's FY05 EPS guidance of at least $1.30 and claiming that Dana had generated tremendous 275% quarter to quarter earnings increase, defendants shocked the market by announcing that they were slashing FY05 EPS guidance in half because of increased steel costs and the Company's inability to adequately cut costs, that the Company was "likely" to restate its results for the 2Q05 and that the Company *might* have to write down its deferred tax assets.  On this news Dana's shares fell over 20%, on substantial trading volume of nearly 8 million shares and continued to spiral downward in the following days as the market fully absorbed this information.

21.     Shocked by this sudden and inexplicable change of circumstances, securities analysts slashed their ratings and FY05 EPS estimates for Dana and explicitly questioned defendants' credibility given that Burns and Richter had just weeks earlier reported dramatic earnings growth and portrayed the Company as having successfully overcome the impact of rising raw material costs. For instance, Wachovia securities' analyst Richard M. Kwas issued a report on September 15, 2005 stating "*Today's news was a significant body blow to a management team that already had credibility issues*."

22.     Three weeks later, on October 10, 2005, defendants again stunned investors, announcing that they were retracting their FY05 EPS guidance, eliminating nearly *$1 billion* of Dana's deferred tax assets, restating the Company's financial statements for FY04 and the first two quarters of 2005 due to "material weaknesses in [Dana's] internal controls over financial reporting."

23.     On this news, Dana's stock plummeted again, falling by 35% on record heavy trading volume of almost 9 million shares, with the Company's debt securities likewise declining by approximately 10% in reaction to this adverse news.  Securities analysts again slashed their estimates

and ratings and expressed outrage at defendants' refusal to provide any further information concerning these dramatic revelations.

**The Aftermath of Defendants' Fraud**

24.     During late 2005, the Company's credit rating was lowered twice in response to defendants' announcements.  These reductions dropped the Company's credit rating to junk bond status.  Dana also announced that the Company had completed the restatement of its FY04 and first and second quarter 2005 financial statements, and had filed its FY04 Amended Report on Form 10-K with the SEC.  The Company's restatement eliminated $44 million of Dana's after tax net income and confirmed that Dana's previously reported quarterly net income had been overstated by as much as 70%.

25.     In early 2006, defendants finally announced Dana's third quarter 2005 ("3Q05") results, including a net loss of $1.27 billion or $8.50 per share.  Defendants also quantified the write-down of the Company's deferred tax assets – nearly $1 billion.  Then, on March 3, 2006, defendants announced that Dana had filed for bankruptcy.  Three days later defendant Richter announced his "retirement" from the Company.  To ensure that he was not personally affected by Dana's bleak financial condition, defendant Burns arranged to have himself paid "incentive" bonus payments of millions of dollars for seeing the Company through bankruptcy.  In the meantime, Lead Plaintiffs and the Class have suffered hundreds of millions of dollars in damages as a result the fraudulent scheme and accounting manipulations detailed herein.

## JURISDICTION AND VENUE

26.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

27.     This Court has jurisdiction over the subject matter of this action pursuant to 27 U.S.C. §§1331 and §27 of the Exchange Act [15 U.S.C. §78aa].

28.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Dana maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

29.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### RELEVANT PARTIES

**Lead Plaintiffs**

30.     Lead Plaintiff SEIU Pension Plans Master Trust ("SEIU") is an international pension fund with participants in the United States, Canada and Puerto Rico.  SEIU provides retirement benefits to workers and their families in the health care industry, long term care industry, and public sector employees including teachers, judges, municipal employees and police and firefighters.  SEIU purchased Dana's publicly traded securities and was damaged thereby as detailed in the Certification previously filed with this Court on December 5, 2005 and attached hereto as Ex. 1.

31.     Lead Plaintiff West Virginia Laborer's Pension Trust Fund is a multi-employer benefit plan organized for the benefit of approximately 6500 participants and beneficiaries throughout West Virginia.  The West Virginia Laborer's Pension Trust Fund purchased Dana's publicly traded securities and was damaged thereby as set forth in the Certification previously filed with this Court on December 5, 2005 and attached hereto as Ex. 2.

32.     Lead Plaintiff Plumbers and Pipefitters National Pension Fund is a national pension fund operated for the benefit of more than 100,000 participants and their families.  The Plumbers and Pipefitters National Pension Fund pays retirement benefits to plumber and pipefitter workers in the building and maritime construction industries.  The Plumbers and Pipefitters National Pension Fund purchased Dana's publicly traded securities and was damaged thereby as set forth in the Certification previously filed with this Court on December 5, 2005 and attached hereto as Ex. 3.

- 11 -

**Dana Corp.**

33.     Non-party Dana is a supplier of systems and components for global light, commercial and off-highway vehicle manufacturers around the world.  The Company's products are used in cars and vans, Sport Utility Vehicles ("SUVs"), trucks, recreational vehicles ("RVs") and a variety of off-highway vehicles.  Dana operates through two main business units: (1) the Automotive Systems Group ("ASG") which manufactures drive train systems and engine power products for the automotive, light vehicle, commercial vehicle and outdoor power equipment markets; and (2) the Heavy Vehicle Technologies and Systems Group ("HVTSG"), which manufactures and sells axles, drive shafts and other components for the commercial and off-highway vehicle markets.  Dana has not been named as a defendant as it has filed for protection under the Bankruptcy Code.

**Defendants**

34.     Defendant Michael J. Burns ("Burns") was Chief Executive Officer ("CEO") and Chairman of the Board of the Company during the Class Period.  As part of his duties, Burns directed Dana's business, dealt with the Company's largest customers, knew about the actual revenue and costs being experienced by the Company and approved in principle accounting treatments utilized by defendants to falsify Dana's reported financial results.  During the Class Period, Burns participated in the issuance of false and misleading statements and failed to disclose material information about Dana's accounting practices.  As detailed in ¶¶91-130, Burns prepared and signed the Company's SEC filings, issued statements in releases and was a primary speaker on the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about the Company's business and business practices.  In conjunction with each of Dana's public financial statements filed with the SEC during the Class Period, (¶¶95, 100, 106, 113, 118, 123), Burns certified (pursuant to §302 of the Sarbanes-Oxley Act of 2002) that he reviewed the contents of the SEC and confirmed that they did "not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the

statements made, in light of the circumstances under which such statements were made, not misleading."  To ensure that the certification was not simply a hollow gesture, Burns was required to and confirmed that together with defendant Richter, he was: (i) responsible for establishing and maintaining Dana's disclosure controls and procedures; (ii) had designed such controls to ensure that material information relating to Dana's operation, including its subsidiaries, was promptly made known to Burns, Richter and the Company's senior executives; and (iii) had routinely evaluated the effectiveness of the Company's policies with regard to ensuring that he and other executives were made aware of material information.  At no time during the Class Period did Burns or Richter assert that they were aware of any material aspect of Dana's business or finances or disclosure controls and procedures that were ineffective.

35.     Defendant Robert C. Richter ("Richter") was Chief Financial Officer ("CFO") prior to and during the Class Period.  Richter announced his "retirement" from the Company on March 6, 2006, just three days after Dana filed for protection under the U.S. Bankruptcy Code.  In his role as Chief Financial Officer Richter was responsible for overseeing Dana's financial reporting, accounting and day-to-day finance.    Richter also interfaced with Dana's auditor, PricewaterhouseCoopers.  Richter worked directly with defendant Burns in overseeing Dana's operations and knew about Dana's actual performance and approved in principle the accounting treatments used to boost the Company's reported results.  During the Class Period, Richter participated in the issuance of false and misleading statements and failed to disclose material information about Dana's business performance and practices.  As detailed in ¶¶91-130, Richter prepared and signed the Company's SEC filings, participated in the issuance of statements in releases and was a primary speaker on the Company's conference calls with analysts and investors, representing himself as one of the persons with intimate knowledge about Dana's finances and business.

36.     In conjunction with each of Dana's public financial reports filed with the SEC during the Class Period, (¶¶95, 100, 106, 113, 118, 123), Richter certified (pursuant to §302 of the Sarbanes-Oxley Act of 2002) that he reviewed the contents of the filing to confirm that each report did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."  To ensure that the certification was not simply a hollow gesture, Richter was required to and confirmed that he, along with defendant Burns, was: (i) responsible for establishing and maintaining Dana's disclosure, controls and procedures; (ii) had designed such controls to assure that material information relating to Dana's operation was promptly made known to himself, Burns and the Company's senior executives; and (iii) had routinely evaluated the effectiveness of the Company's policies with regard to assuring that he and other executives were made aware of material information.  At no time during the Class Period did Richter or Burns assert that they were aware of any material negative aspect of Dana's business or finances or disclosure controls and procedures that were ineffective.

37.     Defendants Burns and Richter are liable for the false statements pleaded in ¶¶91-92, 95, 97, 100, 102-104, 106, 111, 113-115, 117-118, 121, 123, 125, 129-130, herein, as those statements were "group-published" information.  It is appropriate to treat Burns and Richter as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings and releases as alleged herein are the collective actions of the narrowly defined group of two individual defendants identified above.  Burns and Richter, each by virtue of their high-level positions with the Company, directed the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Burns and Richter were involved in drafting, producing, reviewing

and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the Exchange Act.

38.    As senior officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act, traded on the New York Stock Exchange ("NYSE") and governed by the provisions of the federal securities laws, Burns and Richter had a duty to disseminate prompt, accurate and truthful information with respect to Dana's finances, products and marketing and material facts that could effect valuation, growth and earnings, as well as to correct or amend any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  The defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

39.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchasers of Dana securities by disseminating materially false and misleading statements and concealing material adverse facts about Dana's operations.  Defendants' scheme deceived the investing public regarding Dana's operations, finances and financial statements and the intrinsic value of the Company's securities and caused Lead Plaintiffs and other members of the Class to be damaged as a result of their purchases of Dana securities at artificially-inflated prices.

**Defendants' Manipulative Accounting Practices and the Company's Lack of Internal Controls Enabled The Falsification of Dana's Financial Statements**

40.    Throughout the Class Period, defendants represented that they conducted an evaluation of the Company's internal controls on a quarterly basis and found them to be effective. Ultimately, however, as detailed in ¶¶70-90, Dana was forced to restate its financial results for FY04, 1Q05 and 2Q05 due to material and significant problems with the Company's internal

controls.  The management "reviews" that defendants represented were conducted were not designed to adequately test the internal financial controls in place, but rather were conducted in a manner designed to enable defendants to falsely represent that Dana possessed adequate internal controls when it did not.  Defendants have now admitted that the Company's internal controls were entirely *inadequate* in at least 16 different areas.

41.     During the Class Period, Richter arranged for these reviews to be conducted by the finance department's internal auditors who would visit each of Dana's plants on an annual basis, for approximately three days.  Richter was aware that these audits were conducted primarily by personnel who lacked the ability to conduct competent internal audits.  Had Burns and Richter arranged for these reviews to have been properly conducted the results thereof and truthfully reported, the manipulation of the applicable accounting rules responsible for the overstatement of Dana's FY04, 1Q05 and 2Q05 financial statements would have been discovered prior to the Class Period.

42.     The Company's reported financial results during the Class Period were false and materially overstated due to a variety of accounting manipulations made possible by the Company's deficient financial controls as more fully described herein at ¶¶70-90, which manipulations  caused the Company's financial statements to be presented in violation of Generally Accepted Accounting Principles ("GAAP").  Defendants have restated these results, thereby *admitting* that the previously reported financial results for FY04, 1Q05 and 2Q05 were false and misleading when issued, and that the Company's deficient internal financial controls were a material factor contributing to Dana's falsified financial statements.

43.     By the second quarter 2004 ("2Q04"), Burns and Richter were also causing Dana to engage in other manipulations designed to inflate Dana's reported results.  For instance, defendants extended "engineering money" to Kenworth, Peterbilt and PACCAR.  "Engineering Money" was the

term used by defendants for the off-balance credits used by Dana when it would record the full price of a sale transaction as revenue but would ***not*** record the expense associated with the simultaneous extension of Dana's commitment to pay the millions of dollars customers would necessarily incur to re-engineer the product in order to actually put it to use.

**Defendants Were Told of the Company's Actual Operating Performance and Increasing Expenses**

44.     At all times during the Class Period, defendants Burns and Richter held themselves out to investors and the market as the persons most knowledgeable at Dana about the Company's operations, performance and financial results.  As described in ¶¶34-36, *infra*, Burns and Richter held the top executive positions at the Company and were responsible for directing and managing the Company's business and approving material corporate decisions, including those relating to internal controls and financial reporting.

45.     Burns and Richter routinely communicated with analysts and investors during the Class Period and represented that they were informed of and knowledgeable about the Company's business.  As described in ¶¶93, 98, 105, 112, 116, 122, each of the defendants directly participated in each of the Company's Class Period conference calls with analysts and investors.  During these calls, defendants presented information and answered questions regarding Dana's business.

46.     In connection with his role as the CFO of Dana, Richter was responsible for Dana's accounting and finance departments daily operations and participated in the monthly Policy Committee meetings held on the 2nd floor Board Room at Dana headquarters in Toledo.  Richter also participated in the preparation and dissemination of financial and operational reports which were discussed at the monthly Policy Committee Meetings and the Annual "Hell Week" meeting held in the Fall of 2004, which reports discussed:

(a)     Total revenues and inventory;

(b)     Total return on sales; and

- 17 -

(c)     Variances in the actual performance from the forecasted net income and earnings growth.

47.     Burns and Richter received detailed information from each of the Company's plants on a monthly (and quarterly) basis outlining each plant's performance and its variances from the budget.  Each plant's internal accounting department prepared daily and weekly "tracker reports" which detailed each plant's sales, costs of goods, inventory and inter-company transfers.  These "tracker reports" were consolidated monthly by each plant into "production reports," which were part of each plant's monthly profit and loss report.  These profit and loss reports showed each plant's overall performance including total profit/loss, return on sales information and variances between each plant's budget and actual performance.  The monthly profit and loss reports were submitted on a monthly basis by each plant via email to the respective Division Controller in Toledo and were the subject of weekly and monthly meetings conducted under defendant Richter's direction.  These profit and loss reports were also discussed on a monthly basis during performance review meetings held via conference calls between plant managers and controllers and division managers and controllers working at the Company's corporate headquarters.  Between April 2004 and October 2005, a recurring topic of discussion on these calls was the inability of individual plants to meet their budgets, including plants in Lima, Ohio; Statesville, North Carolina; Pottstown, Pennsylvania and Humboldt, Tennessee.

48.     Dana's individual plants also provided SAD reports, which were profit and loss reports analyzed on a quarterly basis.  The SAD reports contained detailed explanations for the variances between the plant's actual performance and its budget.  The SAD reports were transmitted via email to the respective Division Controller in Toledo on a quarterly basis.  Defendant Richter, as CFO, was directly responsible for accounting and finance personnel company-wide and conferred with the Division Controllers no less than monthly during the Class Period about the accounting

- 18 -

manipulations detailed herein.  Indeed, both Richter and Burns certified quarterly that they were made aware of all material information, including net income, total cost of sales and variances from the forecasted net income affecting Dana's financial results.  As such, Richter and Burns have admitted that they knew, at the time of each monthly profit and loss report and quarterly SAD report, of each plant's performance, variances from the budget and the explanation of the variances.

49.     The cost cutting initiatives imposed by Dana prior to the Class Period were ineffective and failing to produce cost savings sufficient to offset the rising cost of steel.  Many of Dana's plants, including for example the Humboldt, Tennessee and Pottsville, Pennsylvania plants, for instance were simply unable to cut costs or implement manufacturing efficiencies because the manufacturing equipment they had in place was dated and inefficient.  Additionally, during FY04 and the first half of 2005, the Company was incurring millions of dollars in shipping costs in its commercial vehicle division in order to timely deliver customers' orders.  For instance, after the Statesville, North Carolina plant's production was transferred to Dana's Bruges, Belgium plant in 2004, the Company neither increased staffing at Bruges nor did it send personnel from Statesville to train the Bruges workers to assemble the heavy duty transmissions they were manufacturing.  As a result, production slowed and by 3Q04, thousands of these orders were not being timely shipped to Dana's customers.  In order to expedite delivery of its products, the Company began to ship these large heavy duty transmissions, which weighed thousands of pounds, by *air* from Europe to customers in the United States.  Similar manufacturing inefficiencies between third quarter 2004 ("3Q04") and 3Q05 caused the Company to ship, *by air*, components for heavy duty vehicles assembled at Dana's plant in Hungary to Genie, a Dana customer based in Seattle.

50.     Defendants Richter and Burns received regular reports throughout the Class Period on each plant's performance.  Thus, notwithstanding the fact that Dana's EPS forecasts and asset valuations were based upon Burns and Richter's margin forecasts of 6% net income growth,

defendants were aware by 1Q04, that fifty percent (50%) of the plants in the Company's drive shaft division (which manufactured drive shafts for heavy weight commercial vehicles sold to Mack, PACCAR and Freight Liner), were operating at a loss due, in part, to the substantial additional shipping costs necessitated by manufacturing inefficiencies.  Defendants were also aware that the Company's light axel division plants were experiencing similar problems.

51.     Burns and Richter were also responsible for directly overseeing the purchase of steel and were each ***immediately*** aware of the increased steel prices being incurred by Dana and the disastrous effect this was having on the Company's bottom line.

**Burns and Richter Knew that the FY04 and FY05 EPS Guidance They Disseminated Was Unattainable**

52.     Defendants also manipulated the Company's publicly disclosed earnings guidance by inflating the earnings forecasts submitted to Burns and Richter by the various divisions.  In the fall of 2004, all plant managers, controllers and supervisors met at the Company's headquarters in Toledo with their respective division management to present their budget and forecasts to Richter's office and to finalize the annual budget for each of the plants, which meeting was colloquially referred to at Dana as "Hell Week."  The budgets and forecasts presented to Richter and his subordinates during Hell Week were based upon the information gathered directly from the Company's customers.

53.     Beginning in 1Q04, Burns and Richter imposed a company-wide goal of obtaining a 6% increase in profit in each plant and division.  As part of their effort to create the impression that Dana had successfully turned the corner, Burns and Richter oversaw a policy whereby division personnel would not accept the actual forecasts provided by the plant personnel if they did not meet this benchmark.  Personnel therefore directed that the forecasts be increased to meet defendants' company-wide goal pronounced.  Thus, the increased forecasts were not based on the plant's ***actual***

performance, but instead were dictated by Burns and Richter before a plant's budget would be approved by finance department personnel.

54.     For instance, the forecasted net income at Dana's Lima, Ohio plant was increased to 6% despite the fact that the plant consistently operated at a loss between 2003 and 2005. Similarly, the forecasted FY04 sales for the Company's Statesville, North Carolina plant were arbitrarily increased upon receipt in Toledo by approximately 20% to meet Burns and Richters' 6% benchmark. Likewise, the forecasts for the Company's plants in the drive train division were arbitrarily increased without any reasonable basis in fact to meet defendants' benchmark despite the fact that defendants knew that 50% of the plants in this division were operating at a loss during 2004 and 2005.

55.     Hence, the FY04 and FY05 EPS guidance defendants announced to the market was not premised on the Company's **actual** operating performance or upon information obtained directly from Dana's customers, but was **manipulated** to meet the forecasts mandated by Burns and Richter and to continue to support the Company's efforts to avoid writing down its deferred tax assets which increased by more than 75%, from $512 million to $895 million, during the Class Period. Defendants knew that if they did not continue to represent that Dana's operations were stable and posting healthy net income, the Company would have to take a valuation allowance which would devastate Dana's asset base and cause a concomitant dramatic drop in Dana's credit rating and stock price.

## DANA'S FALSE FINANCIAL STATEMENTS

56.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.

57.     Dana's FY04, 1Q05 and 2Q05 results were included in Form 10-Qs/10-Ks filed with the SEC and in releases.  Dana's SEC filings represented that the financial information was a fair statement of the Company's financial results and that the results were prepared in accordance with GAAP.

58.     These representations were false and misleading as to the financial information reported because such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

59.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

**Defendants' Overstatement of Dana's Deferred Tax Assets**

60.     According to defendants, one of Dana's most significant accounting estimates relates to its valuation of deferred tax assets.  Despite being a critical component of the Company's financial statements, defendants failed to accurately and fully disclose the amount of the Company's net deferred taxes, including the amount of its valuation allowance.  This practice made Dana's operating results inconsistent with Dana's underlying business and of the business trends investors could expect based on those results and defendants' failure to disclose these practices was a violation of GAAP rules.  As a result of this practice, Dana was compelled to take a charge of $920 million to properly account for its deferred tax assets, ***which charge was so substantial it reduced Dana's total asset base by more than 10%***.

61.     Due to differences between accounting standards and the tax code, timing differences often arise between book (accounting) income and taxable income (*i.e.* a company may use a different methodology in depreciating a fixed asset for book and tax purposes).  Deferred tax refers to a future tax liability or asset resulting from these temporary differences.  A deferred tax asset or liability is initially established at the beginning of the asset's life.  Thereafter, the deferred tax asset or liability will begin to reverse.  At the end of the assets' life a deferred tax asset or liability will completely be reversed and eliminated.

62.     GAAP, as set forth in FASB Statement of Standards ("SFAS") No. 109 requires that a company recognize its deferred income taxes.  The purpose of this rule is to properly account for the expected future tax consequences of events that have been accounted for in a company's GAAP financial statements or tax returns.  Deferred tax assets and liabilities are determined based upon the net tax effects attributable to temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amount for income tax purposes and tax carryforwards.

63.     A deferred tax asset is reduced by a valuation allowance if "based on the weight of available evidence, it is ***more likely than not*** (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized."  SFAS No. 109, ¶17e (emphasis in original).  A company makes this determination by balancing positive and negative evidence to determine whether or not it will generate enough income in the foreseeable future to realize its entire deferred tax asset.  In making its determination, a company is to consider among other factors its past operating results, the existence of cumulative losses in the most recent fiscal years, forecasted future taxable income and adverse unsettled circumstances.  "Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years."  SFAS No. 109, ¶23.  A valuation allowance disclosure allows an investor to

determine what management's expectations are about the company's deferred tax assets' reliability and future taxable income.

64. Despite the extensive negative evidence indicating that all of Dana's deferred tax assets would not be realizable, defendants failed to properly record a timely and adequate valuation allowance to account for the value of the Company's net deferred taxes in order to avoid causing Dana's disappointing earnings to be even worse. During the Class Period, Dana reported net deferred tax benefits as follows:

| (in millions of $) | Deferred Tax Benefits, net of Valuation Allowance |
| --- | --- |
| 1Q04 | information not provided in 10Q |
| 2Q04 | 512 |
| 3Q04 | 742 |
| 4Q04 | 850 |
| 1Q05 | 861 |
| 2Q05 | 895 |

65. According to the Company's FY04 Form 10-K, Dana's management, including defendants Burns and Richter, represented they had analyzed all available evidence as of December 31, 2004, in determining the reliability of the net deferred tax assets and concluded that Dana more likely than not would be able to realize its net deferred tax assets. Accordingly, defendants' assessment caused Dana to fail to provide for a full valuation allowance in preparing its results. This representation was false. In reaching the conclusion that a greater allowance was not required, defendants opted to ignore years of underperformance and numerous indications that Dana's future results would not support the tax deferred asset valuation.

66. Defendants made the determination that Dana did not have to provide a full valuation allowance during the Class Period despite their awareness or reckless disregard of the following negative evidence:

(a)    The manufacturing industry in which Dana operates is highly dependent upon raw materials, most notably steel.  Accordingly, the price of steel has a dramatic effect on the Company's overall operations impacting the Company's gross profits, earnings and its cash flow. During the fourth quarter of 2003, as a result of limited capacity and high demand, the price of steel began to climb substantially.  The increase in price continued throughout 2004, impacting Dana most significantly in the second half of 2004.   Indeed, according to the Motor & Equipment Manufacturers Association – a Washington DC-based lobbying organization for suppliers of which Dana was a member and on whose Board the Company's former CEO sat – by October 2004 the price of cold-rolled steel jumped 75% and the price for hot-rolled steel skyrocketed 120%.

(b)    In an effort to manage and reduce its costs, Dana had arranged to centralize its purchasing operations and its supply base prior to the Class Period.  As a result, Dana was dependent on single (or few) sources for some of its materials, giving Dana's vendors a great deal of authority as far as price setting as the Company often did not have an alternative source for its raw material supplies.  Thus, due to supply shortages and a limited supply base, Dana was compelled to accept the steel surcharges imposed by its vendors above and beyond the contractual rates that existed between Dana and its vendors.

(c)    During the Class Period, Dana's centralized purchasing group in Toledo handled the negotiations and contractual agreements with material vendors, including steel vendors. The contracts included the amount of steel surcharges imposed by vendors.  By the beginning of the Class Period the suppliers adopted a "take it or leave it" approach with Dana, in that they refused to negotiate with Dana on the surcharge imposed.   Ultimately, Dana was forced to accept the surcharges imposed by its vendors as it had no viable alternative source of supply for many of its raw materials.

(d)     Due to challenges faced by the automotive industry, Dana had been unable to fully recover the increase in its commodity costs as a result of price reduction pressure from its major customers.  Dana is highly dependent upon a few customers for a significant share of its business.  Sales to Ford, General Motors and DaimlerChrysler accounted for nearly 50% of the Company's sales in 2004.  These three major customers refused to accept higher prices from Dana which reflected the increase in material costs being forced upon Dana by its steel vendors.  As Dana is highly dependent upon business from these customers, the Company had no choice but to acquiesce and fully absorb the substantial additional costs.

(e)     The increase in the cost of commodities combined with the Company's inability to recoup these increased costs led to deterioration in the Company's gross margin and profit, as its cost of sales increased due to the increase in the cost of raw materials.  Dana's gross margin declined from 9.3% for 2002 to 8.0% for 2004 – a reduction of 14%.  Because Dana business operated on such a thin margin, this reduction in the Company's gross profit had a profound impact on the amount of gross income the Company was earning and would earn in the future.  Thus, the decline in Dana's profit margin was a significant negative factor affecting the Company's future net income upon which maintenance of the deferred tax assets was dependent.

(f)     The increase in the cost of commodities combined with the Company's inability to recoup these increased costs also led to deterioration in the Company's working capital position.  From 2000 to 2004, Dana's cash flow from operating activity dramatically declined ***by almost 95%*** from $984 million in 2000 to $55 million in 2004.  The chart below reflects Dana's decline in its cash flow position over the past several years:



**Dana Corp's Cash Flow from Operating Activities from 2000-2004**
**(in millions of $)**

The marked decline in the Company's working capital was the direct result of its declining margins and revenue, and also was a negative factor which would effect future net income performance and the maintenance of Dana's significant deferred tax assets.

(g)      The overall decline in the industry led to a similar decline in Dana's earnings before interest, taxes, depreciation and amortization ("EBITDA").  The chart below reflects Dana's decline in its EBITDA from 1997-2004:



Dana Corp's EBITDA from 1997-2004
(in millions of $)

67.    In fact, rather than increase its valuation allowance during the Class Period based upon all of this negative evidence, amazingly defendants caused the Company to do the exact opposite and decrease its valuation allowance both in terms of total dollar amount and as a percentage of its total deferred tax assets by approximately 40%. The chart below demonstrates the decline in Dana's valuation allowance:

| (in millions) | 2003 | 2004 |
|---|---|---|
| | | |
| Deferred Tax Assets | 1,867 | 1,662 |
| Valuation Allowances | (609) | (387) |
| Net Deferred Tax Assets | 1,258 | 1,275 |
| | | |
| **Valuation Allowance as a % of Total Deferred Tax Assets** | **32.6%** | **23.3%** |

68.    Moreover, defendants caused Dana to substantially decrease its valuation allowance at the same time one of its rivals was increasing its valuation allowance to fully reserve for that

company's deferred tax assets.  In the fourth quarter 2004 ("4Q04"), Delphi Corp. – one of Dana's competitors – recorded a valuation allowance of $4.7 billion against all of the company's U.S. deferred tax assets as of December 31, 2004.  According to Delphi, it took the charge due to a change in the company's assessment of the recoverability of its deferred tax assets that occurred in 2004.  The charge was as a result of both the downturn in Delphi's own operations and the current U.S. operating outlook for the industry.  Although Dana faced the same industry challenges as Delphi, defendants failed to cause Dana to take the same type of charge for FY04 or for the first two quarters of 2005.

69.     Ultimately, in a press release on September 15, 2005, defendants were forced to reveal that they would be assessing the Company's ability to utilize its U.S. deferred tax assets and whether the Company would be required to take a write-down of these assets.  On October 10, 2005, defendants caused the Company to announce that it would have to write down its deferred tax assets, which write down required the establishment of tax valuation allowance against *all* of the Company's U.S. and U.K. deferred tax assets - $920 million.  This tremendous charge impacted the Company's 3Q EPS by a *negative* $6.15 per share.  The charge also sent a harsh signal to investors that, in contradiction to defendants' Class Period assurances, Dana had not anticipated generating enough future taxable income to utilize its deferred tax assets.

**Defendants' Multi-Faceted Falsification of Dana's Financial Statements and the Resulting SEC Investigation**

70.     During the Class Period, defendants used various manipulations which further caused Dana to falsely report earnings, and to violate GAAP and SEC rules by overstating Dana's revenues and net income and by understating its operating expenses.  In addition, contrary to defendants' representations and certifications, Dana had grossly deficient internal and financial controls.

71.     Due to the accounting improprieties at Dana, the Company is now the target of a *formal* SEC investigation.  Dana has also now been forced to admit to the above manipulations which misstated Dana's financial information for 2004-2Q05 by the following amounts:

| (in millions, except EPS) | 1Q 2004 | 2Q 2004 | 3Q 2004 | 4Q 2004 | 1Q 2005 | 2Q 2005 |
|---|---|---|---|---|---|---|
| | | | | | | |
| Net Income/(Loss) As Originally Reported | 65 | 110 | 40 | (133) | 18 | 51 |
| Adjustment | (7) | (10) | 2 | (5) | (2) | (21) |
| Net Income/(Loss) As Restated | 58 | 100 | 42 | (138) | 16 | 30 |
| | | | | | | |
| Diluted EPS As Originally Reported | $0.43 | $0.73 | $0.27 | ($0.89) | $0.12 | $0.34 |
| Adjustment | ($0.04) | ($0.07) | $0.01 | ($0.03) | ($0.01) | ($0.14) |
| Diluted EPS As Restated | $0.39 | $0.66 | $0.28 | ($0.92) | $0.11 | $0.20 |
| | | | | | | |
| **Overstatement % of Net Income or Loss** | **12%** | **10%** | **(5.0%)** | **3.6%** | **12.5%** | **70%** |

**Accounting Manipulations Identified by Dana's Own Audit Committee During Its 2005 Investigation**

72.     After defendants announced the Company's 2Q05 results, the Board's Audit Committee initiated an investigation into the treatment of pricing agreements in Dana's commercial vehicle division.  The Audit Committee found that the Company had no discernable internal controls, immediately hired outside counsel and conducted nearly 100 interviews of finance and accounting personnel company-wide in an effort to divine the extent of the Company's control deficiencies.  This investigation identified a wide variety of accounting manipulations that permeated almost every aspect of the Company's financial statements which permitted defendants to understate Dana's earnings and overstate Dana's net income and EPS.

73.     Many of defendants' accounting manipulations involved improper accounting for the Company's accruals in violation of GAAP.  Defendants engaged in "cookie jar" accounting by improperly using the Company's accrual accounts to manage its earnings, including by recording

- 30 -

excessive accruals in quarters where Dana was on track to exceed its targeted earnings and then drawing down the accrual in quarters when it was on track to miss targets, thus increasing reported EPS.

74.     GAAP requires that accruals be made only when it is probable that a loss has been incurred and the amount can be reasonably estimated.  *See* SFAS No. 5, ¶8.  Moreover, as former SEC chairman Arthur Levitt stated in a speech given on 9/28/98:

> Problems arise, however, when we see large charges associated with companies restructuring.  These charges help companies "clean up" their balance sheet – giving them a so-called "big bath."
>
> Why are companies tempted to overstate these charges?  When earnings take a major hit, the theory goes Wall Street will look beyond a one-time loss and focus only on future earnings.
>
> And if these charges are conservatively estimated with a little extra cushioning, that so-called conservative estimate is miraculously reborn as income when estimates or future earnings fall short.
>
> When a company decides to restructure, management and employees, investors and creditors, customers and suppliers all want to understand the expected effects.  We need, of course, to ensure that financial reporting provides this information.  But this should not lead to flushing all the associated costs – and maybe a little extra – through the financial statements.

75.     Defendants made a practice of manipulating accrual accounts.  After making excessive accruals, defendants would use the excess accrual at a later time when the Company would otherwise fail to meet earnings targets.  In addition to their improper accrual accounting, defendants engaged in a variety of other accounting manipulations during the Class Period.  Defendants' accounting manipulations included:

(a)     ***Customer pricing*** – Defendants caused Dana to improperly recognize revenue based on an oral agreement with a customer rather than in accordance with the contractual terms and company performance.  The Company restated its 1Q and 2Q05 results due to this GAAP violation reducing its pretax income by $3 million and $11 million, respectively.  Per GAAP, as set forth in SEC Staff Accounting Bulletin ("SAB") No. 101, *Revenue Recognition in*

*Financial Statements*, revenue is recognized when it is realized or realizable and earned.  One of the criteria that must be met in order for revenue to be recognized is that persuasive evidence of an agreement must exist.  In general, this criteria is best met by written evidence of the agreement.  A company is not permitted to recognize revenue based upon an oral agreement, if its customary business practice requires a signed written agreement before recognizing revenue.  SAB No. 101.

    (b)  ***Cost Deferrals*** – Defendants also caused Dana to improperly capitalize cost overruns at certain of its plants in anticipation of being able to recover the cost overruns from its customers or suppliers.  As these claims were not supported by contractual arrangements, these costs should have been expensed when incurred.  The Company restated its 4Q04 results and its 1Q and 2Q05 results due to this GAAP violation reducing its pretax net income by $3 million, $3 million and $6 million, respectively.

    (c)  ***Payments from suppliers*** – Defendants caused Dana to improperly account for the sale certain of its assets.  First, defendants improperly recorded as income cash the Company received pursuant to asset sales prior to passing of the title of the asset being transferred.  Second, defendants improperly failed to defer a portion of the revenue Dana derived from certain of its asset sales with a leaseback.  Under GAAP, Dana was required to defer the income associated with the related leaseback over the life of the lease rather then immediately recognizing all of the revenue upon the execution of the sale.  The Company restated its FY04 results and its 1Q and 2Q05 results due to this GAAP violation reducing its pretax income by $9 million and $2 million, respectively for FY04 and 1Q05, and by increasing its 2Q05 pretax income by $1 million.

    (d)  ***Supplier pricing and charges*** – Defendants caused Dana to improperly account for the cost of the Company's inventory by failing to accrue for liabilities owed to its suppliers per its contractual obligations.  Under GAAP, "[t]he primary basis of accounting for inventories is cost, which has been defined generally as the price paid or consideration given to

acquire an asset. As applied to inventories, cost means in principle the sum of the applicable expenditures and charges directly or indirectly incurred in bringing an article to its existing condition and location." Accounting Research Bulletin ("ARB") No. 43, Chapter 4, *Inventory Pricing*, ¶4. The Company restated its 2Q04 and 4Q04 results and its 1Q05 and 2Q05 results due to this GAAP violation reducing its pretax net income by $1 million in both 2Q04 and 4Q04 and by $2 million in both 1Q05 and 2Q05.

(e) ***Accrual accounts*** – Defendants caused Dana to improperly account for its contingent liabilities in at least the following ways: (i) failing to accrue for 2004 employee bonus obligations that were earned in 2004 and instead expensing them in 2005 when the obligations were paid; (ii) improperly reducing a probable liability for a legal matter; and (iii) by failing to properly calculate the amount of an environmental liability by excluding certain required cost in the calculation of the obligation. The Company restated its 4Q04 results due to these GAAP violations increasing its pretax loss by $8 million. GAAP requires that accruals be made when it is probable that a loss has been incurred and the amount can be reasonably estimated. *See* SFAS No. 5, ¶8.

(f) ***LIFO inventory valuation*** – Defendants caused Dana to improperly calculate its LIFO index for 2004 by failing to include material surcharges capitalized into inventory. The Company restated its 4Q04 results due to this GAAP violation increasing its pretax loss by $19 million. Under GAAP, "[t]he primary basis of accounting for inventories is cost, which has been defined generally as the price paid or consideration given to acquire an asset. As applied to inventories, cost means in principle the sum of the applicable expenditures and charges directly or indirectly incurred in bringing an article to its existing condition and location." ARB No. 43, ¶4.

(g) ***Steel surcharges*** – Defendants caused Dana to improperly account for the cost of its inventory by expensing the costs associated with its steel surcharges at the time the amounts were invoiced rather than including them in the cost of its inventory and expensing them

- 33 -

at the time the inventory was sold.  The Company restated its reported results due to this GAAP violation increasing its 3Q04 pretax income by $5 million and reducing its 1Q05 and 2Q05 pretax income by $3 million and $4 million, respectively.  Under GAAP, a company will include normal freight, handling costs, and amounts of wasted materials (spoilage) in the cost of inventory.  ARB No. 43, ¶¶5-5A.

(h) *Income tax corrections related to subsidiary stock sale* – Defendants caused Dana to improperly fail to eliminate a tax liability in connection with a subsidiary stock sale.  The Company restated its 3Q04 results due to this GAAP violation increasing its 3Q04 net income by $5 million.

**Known Prior Period Accounting Manipulations**

76.  In addition to the many admitted accounting violations discussed above, Dana's restatement of its financial statements included correction of errors that had been identified earlier but were not corrected as they were deemed to be immaterial at the time.  These adjustments are as follows:

(a) *Interest expense* – In periods prior to 3Q04, defendants caused the Company to improperly under accrue interest expense associated with its accounts receivable securitization program.  In 3Q04, Dana took a charge in order to recognize the cumulative impact of the amounts by which the prior periods were under accrued.  In its restatement, the Company removed the charge from 3Q04 and recorded the amounts in the periods in which the interest expense was payable.  The Company restated its FY04 results due to this GAAP violation increasing its pretax income by $7 million.

(b) *Insurance recoveries* – In 2004, Dana received insurance proceeds related to a settlement agreement with its insurance company in connection with asbestos claims made against the Company.  A portion of the insurance recovery related to future asbestos claims.  The

Company was unable to record liabilities related to these future claims because, pursuant to SFAS No. 5, the amounts could not be reasonably estimated.  Despite being unable to estimate the liability associated with these claims, defendants caused Dana to immediately recognize the total amount of the insurance recovery into income upon receipt in violation of GAAP's matching principle as set forth in FASB Statement of Financial Accounting Concepts ("FASCON") No. 6. which requires that the income generated from the insurance recovery be matched with the associated liability.  In its restatement, the Company deferred the portion of the insurance settlement that related to future claims and began recognizing the insurance proceeds in the periods in which the company recognized the asbestos claims to which the recovery related.  The Company restated its FY04 results due to this GAAP violation reducing its pretax income by $6 million.

      (c)    ***European benefit plan costs*** – Prior to 2004, defendants caused the Company to fail to properly record expenses related to its pension liabilities at two of its international locations.  The Company was required to accrue for these liabilities in the period the related benefits were earned by the employees but failed to do so.  SFAS No. 5, ¶8.  In 4Q04, defendants caused Dana to take a charge in order to recognize the cumulative impact of the amounts by which the prior periods were under accrued.  In its restatement, the Company removed the charge from 4Q04 and recorded the charge in the period in which the expenses were incurred. The Company restated its 4Q04 results due to this GAAP violation increasing its pretax loss by $13 million.

      (d)    ***Intercompany accounts*** – Prior to 2004, the Company had not appropriately reconciled certain of its intercompany accounts.  In 4Q04, defendants caused Dana to take charge in order to adjust its intercompany accounts.  In its restatement, the Company removed the charge from 4Q04 and recorded the charge in the period in which the out-of-balance positions arose.  The Company restated its 4Q04 results due to this GAAP violation increasing its pretax loss by $13

million.  Under GAAP, as part of preparing consolidated financial statements, a company must eliminate its intercompany transactions (*i.e.*, transactions such as sales and purchases that take place between different divisions or subsidiaries within the same consolidated group).  ARB No. 51, ¶6.

(e)     *Inventory reserves* – Defendants caused Dana to improperly account for the cost of its inventory by failing to include amounts related to slow moving and obsolete inventory in the price of its inventory in violation of GAAP.  ARB No. 43, ¶¶5-5A.  In its restatement, the Company restated its 2Q04 results by reducing its net income by $5 million in order to increase its inventory allowances in the proper period.  The Company restated its 2Q04 results due to this GAAP violation reducing its pretax income by $9 million.

(f)     *Warranty reserves* – Defendants caused the Company to fail to timely account for its warranty liability in accordance with SFAS No. 5.  Despite information being available earlier to defendants that demonstrated that Dana was permitted to reduce its warranty liability, the Company failed to timely reduce its reserve related to its warranty liability and instead delayed benefiting from this reserve reduction until 3Q04.  In its restatement, the Company removed the reserve reduction from 3Q04 and recorded the benefit in the period in which the circumstances changed that permitted the reduction to be taken.  The Company restated its 3Q04 results due to this GAAP violation reducing its pretax income by $9 million.[6]

(g)     *Income tax corrections related to deferred taxes for state income taxes* – In 2004, the Company began to recognize deferred taxes for its state income taxes.  However,

---

[6]     Dana also adjusted its 2Q05 results due to its accounting for its warranty liability reducing its net income by $4 million.  According to the Company, this adjustment relates to a reversal of a reduction in its warranty expense which was improperly recorded as a change in estimate in the period as well as to account for a change in the Company's method of accounting for its warranty obligations.

defendants caused Dana to improperly account for these deferred taxes.  First, defendants caused the Company to fail to timely record its deferred taxes in the proper period.  Second, defendants caused the Company to fail to timely record its valuation allowance and tax reserves related to its deferred state taxes in the proper period as more fully described in ¶¶60-69.  The Company restated its FY04 results due to this GAAP violation reducing its net income by $6 million.

(h)     *Discontinued operations* – In its restatement, the Company admitted to several errors involving its discontinued operations.  First, defendants again caused Dana to improperly account for its reserves in violation of SFAS No. 5 by failing to timely account for its reserves for sales returns, warranty & excess inventory.  In 4Q04, Dana took a charge in order to correct its reserve balances.  In its restatement, the Company removed the charge from 4Q04 and recorded the amounts in the prior periods to which they relate.  Second, defendants caused the Company to recognize a lower loss on the sale of its discontinued operations in 2004 as the Company's adjustments to its reserve accounts in the prior periods caused the Company to recognize a lower basis in the net assets sold.  The Company restated its 4Q04 results due to this GAAP violation reducing its net loss by $9 million.

**Dana's Restatement Is an Admission of Falsity**

77.     As detailed above, the fact that Dana revised and restated downward its net income is an admission that the financial statements originally issued and approved by defendants were false when they were reported and that the misstatements were material.

78.     Pursuant to GAAP, as set forth in APB Opinion No. 20, the type of restatements and revisions announced by Dana were to correct for material errors in previously issued financial statements.  APB No. 20, ¶¶7-13.  The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not

impossible, to generate the numbers when restatement occurs.  APB No. 20, ¶14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements.  Dana's restatements and revisions were not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements approved by defendants. Thus, the restatements and revisions are an admission by defendants that Dana's previously issued financial results and defendants' public statements regarding those results were false and misleading.

**Defendants' GAAP Violations and Restatement Were Material**

79.     Defendants' false and misleading Class Period statements and omissions regarding Dana's accounting were material, particularly in light of SEC guidance on materiality.  SEC SAB Topic 1M, Materiality, summarizes GAAP definitions of materiality.[7]  Among other items, SAB Topic 1M say: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative, considerations.  For example, if a known misstatement would cause a significant market reaction that reaction should be taken into account in determining the materiality of the misstatement.

SAB Topic 1M further states:

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

\*       \*       \*

• Whether the misstatement masks a change in earnings or other trends.

_____

[7]     SAB Topic 1M, Materiality, represents the codification of certain Staff Accounting Bulletins, including SAB No. 99, Materiality, as of May 9, 2003.  SAB No. 99 was effective August 12, 1999.

- Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise.

* * *

- Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

80. SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

81. Defendants' misstatements, by their own admission, satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

**Dana's Financial Statements Violated Fundamental Concepts of GAAP**

82. Due to these accounting improprieties, defendants caused the Company to present its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b) The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASCON No. 1, ¶34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASCON No. 1, ¶40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the

enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASCON No. 1, ¶50);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASCON No. 2, ¶¶58-59);

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASCON No. 2, ¶79); and

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered FASCON No. 2, ¶¶95, 97.

83.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**Defendants' Violations of SEC Regulations Related to Dana's
Inadequate Internal Controls**

84.     Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "A. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and] B. devise and maintain a system of internal controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP]." 15 U.S.C. §78m(b)(2)(A), (B).  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as

authorized, to record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

85.     In Dana's 1Q04 Form 10-Q filed on April 29, 2004, defendants made the following representation:

> *Disclosure Controls and Procedures* - Our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) have evaluated Dana's disclosure controls and procedures, as defined in the SEC rules, as of the end of the first quarter and have concluded that *such controls and procedures are effective in providing reasonable assurance that material information relating to Dana and its consolidated subsidiaries was made known to them during the period covered by this report*.

> *Internal Controls* - Our CEO and CFO are responsible for the accuracy of the financial information that is presented in this report. *To meet their responsibility for financial reporting, they have established internal control procedures which they believe are adequate to provide reasonable assurance that Dana's financial statements are reliable and prepared in accordance with generally accepted accounting principles in the United States and that the company's assets are protected from loss*.

86.     Defendants made substantially similar representations in each of the Form 10-Qs and Form 10-Ks filed during the Class Period.  Beginning with 1Q04 and continuing through 2Q05, defendants represented in each SEC filing that the Company's disclosure controls and procedures and its internal controls over financial reporting were "effective."  Further, defendants Burns and Richter as the CEO and CFO signed certifications pursuant to §302 of the Sarbanes-Oxley Act of 2002 attesting to the effectiveness of Dana's controls and procedures.

87.     Moreover, defendants made these representations despite all of the information available to them in 2004 concerning known prior period accounting manipulations.  In light of the variety of manipulations that were discovered during 2004 such as the under accrual of the Company's interest expense or its out-of-balance intercompany accounts, defendants knew or should have known during 2004 that Dana's internal controls may not be effective such that further evaluation of the controls would be necessary before making a representation that they were effective.

- 41 -

88.     Defendants' Class Period representations were false as the Company's disclosure controls and procedures were not effective.  Defendants' violated §13(b)(2)(A) of the Exchange Act by failing to ensure that the Company maintained adequate internal controls in order to ensure that Dana's financial statements were prepared in conformity with GAAP and that its public filings were accurate.

89.     Defendants have now admitted that the Company's disclosure controls and procedures and its internal controls during the Class Period were inadequate and ineffective.  In Dana's Amended Form 10-K for FY04 filed on December 30, 2005, defendants admitted to the following concerning Dana's disclosure controls and procedures and internal controls, including to the following material weaknesses in the Company's internal controls over financial reporting that existed as of December 31, 2004:

*Disclosure Controls and Procedures -*

*            *            *

The investigations are now complete, and management, under the direction of our CEO and CFO, has re-evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of December 31, 2004.  ***Based upon this re-evaluation and the investigations described above, and as a result of the material weaknesses discussed below under "Management's Report on Internal Control Over Financial Reporting (Restated)," management, including our CEO and CFO, has concluded that our disclosure controls and procedures were not effective as of December 31, 2004.***

*            *            *

*Management's Report on Internal Control Over Financial Reporting (Restated) -*

*            *            *

In connection with its assessment of our internal control over financial reporting described above, management has identified the following material weaknesses as of December 31, 2004:

*(1) We **did not maintain an effective control environment** at our Commercial Vehicle business unit.*  Specifically, there were inadequate controls to prevent, identify and respond to improper intervention or override of established policies, procedures and controls by management within the Commercial Vehicle

business unit.  This improper management intervention and override at this business unit allowed the improper recording of certain transactions with respect to asset sale contracts, supplier cost recovery arrangements, and contract pricing changes to achieve accounting results that were not in accordance with GAAP and journal entries which were not appropriately supported or documented.  Additionally, financial personnel in the unit failed to report instances of inappropriate conduct and potential financial impropriety to senior financial management outside the unit.  This control deficiency affected primarily accounts receivable, accounts payable, accrued liabilities, revenue, other income, and other direct expenses.

*(2) Our financial and accounting organization* **was not adequate** *to support our financial accounting and reporting needs.*  Specifically, lines of communication between our operations and accounting and finance personnel were not adequate to raise issues to the appropriate level of accounting personnel and we did not maintain a sufficient complement of personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP commensurate with our financial reporting requirements.  This control deficiency resulted in ineffective controls over the accurate and complete recording of certain customer contract pricing changes and asset sale contracts (both within and outside of the Commercial Vehicle business unit) to ensure they were accounted for in accordance with GAAP.  The lack of a sufficient complement of personnel with an appropriate level of accounting knowledge contributed to the control deficiencies noted in items 3 and 5 below.

*(3) We* **did not maintain effective controls** *over the completeness and accuracy of certain revenue and expense accruals.*  Specifically, we failed to identify, analyze, and review certain accruals at period end relating to certain accounts receivable, accounts payable, accrued liabilities, revenue, and other direct expenses to ensure that they were accurately, completely and properly recorded.

*(4) We* **did not maintain effective controls** *over reconciliations of certain financial statement accounts.*  Specifically, our controls over the preparation, review and monitoring of account reconciliations primarily related to certain inventory, accounts payable, accrued expenses and the related income statement accounts and certain intercompany balances were ineffective to ensure that account balances were accurate and supported with appropriate underlying detail, calculations or other documentation, and that intercompany balances appropriately eliminate.

*(5) We* **did not maintain effective controls** *over the valuation of certain inventory and related costs of goods sold.*  Specifically, we did not maintain effective controls over the computation and review of our LIFO inventory calculation to ensure that appropriate components, such as the impact of steel surcharges, were properly reflected in the calculation.

\*        \*        \*

In the Original Form 10-K, management concluded that we maintained effective internal control over financial reporting as of December 31, 2004.  However, as a result of the restatements described above, management has

- 43 -

determined that the above material weaknesses existed as of December 31, 2004. *As a result of these material weaknesses, management has concluded that we did not maintain effective internal control over financial reporting as of December 31, 2004, based on criteria established in "Internal Control – Integrated Framework" issued by the COSO. Accordingly, management has restated this report on internal control over financial reporting*.

90.     Dana's lack of adequate internal controls rendered Dana's Class Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP.  Nonetheless, throughout the Class Period, Burns and Richter knowingly caused the Company to issue quarterly and annual financial statements which did not disclose the existence of the significant and material deficiencies in the Company's internal accounting controls and falsely asserted that Dana's financial statements complied with GAAP.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

91.     On April 21, 2004, defendants caused Dana to issue a release entitled, "Dana Corporation Reports Stronger first-Quarter Results" announcing first quarter 2004 ("1Q04") results. The release emphasized Dana's "*85 percent quarter-over-quarter improvement*" in profit from continuing operations, stating:

> Dana Corporation (NYSE: DCN) today announced that its 2004 first-quarter sales were $2.3 billion compared to $2.0 billion during the same period last year. *Net income for the quarter totaled $63 million, or 42 cents per share, compared to net income of $41 million, or 28 cents per share, for the period in 2003*. First-quarter 2004 net income included $2 million of unusual net gains on the sale of Dana Credit Corporation (DCC) assets, while income during the same period last year included $10 million in comparable gains.

> "We are very pleased with the continued progress demonstrated by our first-quarter performance," said Dana Chairman and CEO Mike Burns. "*Our profit improvement was driven by a combination of higher production volumes, new business programs, and the continued realization of benefits from our restructuring and other cost-reduction efforts*."

> First-quarter sales were up 17 percent over the comparable period last year. While 2004 sales benefited from $125 million of currency translation, *the majority of the sales increase was driven by new business programs and higher production volumes in the principal markets served by Dana, particularly the North American heavy-truck sector*.

- 44 -

***Profit from continuing operations*** - those operations not included in the company's proposed divestiture of its aftermarket business - ***was $50 million, or 33 cents per share, in the first quarter of 2004***, compared to $36 million or 25 cents per share during the first quarter of 2003. Excluding the unusual gains from DCC asset sales, ***this represents an 85 percent quarter-over-quarter improvement***.

"Our improved profitability was evident in a higher operating margin," Mr. Burns said. "In fact, our margin improvement would have been even better if not for continued launch-related costs in our structures group. While these costs are not yet fully behind us, we took further actions to address the remaining issues in the first quarter and are confident that we will see improvement in the second quarter."

92.     The April 21, 2004 release reiterated Dana's previously announced FY04 EPS guidance:

"The first quarter was not without its challenges, including launch costs and industry-wide steel surcharges," he added. "And yet, we met our expectations in spite of these challenges. There will always be bumps in the road, but we remain committed to achieving our goal of earnings per share of at least $1.90 in 2004."

93.     On April 21, 2004, defendants hosted a nationwide conference call with analysts and investors to discuss Dana's operations, prospects and 1Q04 results.  Burns and Richter each spoke during the call and addressed analysts' and investors' questions and concerns.  During the call, Richter reiterated that "[f]rom a liquidity standpoint, we continue to be in excellent shape" and that because of Dana Corp's continuing strong operating performance "2004 should also be another good year for cash generation," as Dana was poised to post "earnings per share of at least $1.90 per year [which] works out to 285 million in net income."  When specifically asked to confirm that steel prices would have "no discernable impact" on earnings, Richter responded by stating that defendants would be able to, in fact, "***hold our guidance where it is, in spite of whatever we see***."

94.     Securities analysts reacted favorably to Dana's positive financial results and defendants' favorable statements.  Himanshu Patel of JP Morgan also issued a report on April 22, 2004 reiterating defendants' statements that "Dana is poised to benefit from strong industry tailwinds for the remainder of the year . . . ."  Securities analysts at Prudential Equity Group, LLC and Morgan

- 45 -

Stanley also responded by immediately issuing reports which upgraded Dana and included increased

FY04 EPS noting that the upgrades were based on the strength of Dana's 1Q04 financial results.

      95.     On April 29, 2004, defendants caused Dana to file with the SEC its quarterly Report

on Form 10-Q for 1Q04, which report was signed by defendant Richter.

         (a)     The Report on Form 10-Q contained Dana's 1Q04 financial results,

including EPS of $0.42 per share;

         (b)     The Report on Form 10-Q stated that defendants had conducted an

evaluation of the Company's internal controls and found them to be adequate, noting:

ITEM 4. CONTROLS AND PROCEDURES

*Disclosure Controls and Procedures* - **Our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) have evaluated Dana's disclosure controls and procedures, . . . and have concluded that such controls and procedures are effective in providing reasonable assurance that material information relating to Dana and its consolidated subsidiaries was made known to them during the period covered by this report**.

*Internal Controls* - Our CEO and CFO are responsible for the accuracy of the financial information that is presented in this report. To meet their responsibility for financial reporting, they have established internal control procedures which they believe are adequate to provide reasonable assurance that Dana's financial statements are reliable and prepared in accordance with generally accepted accounting principles. . . .

     In the first quarter, we continued our review of our internal control documentation in preparation for management's assessment of internal control over financial reporting and the accompanying independent auditors' attestation report that will be a part of our annual report on Form 10-K for the fiscal year ended December 31, 2004.

     **There were no changes in Dana's internal controls over financial reporting identified in connection with the evaluation by the CEO and CFO that occurred during Dana's first quarter that have materially affected or are reasonably likely to materially affect Dana's internal controls over financial reporting**.

         (c)     The Report on Form 10-Q contained certifications by defendants Burns and

Richter which stated:

     1.     I have reviewed this quarterly report on Form 10-Q of Dana Corporation;

2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact*** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant*** as of, and for, the periods presented in this report;

4. ***The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-15(e) and 15d-(15(e)) ***for the registrant and have***:

   a) ***[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

   b) ***[e]valuated the effectiveness of the registrant's disclosure controls and procedures*** and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) [d]isclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. ***The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting***, to the registrant's auditors and the audit committee of the registrant's board of directors:

   a) ***[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

   b) ***[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

*      *      *

In connection with the Quarterly Report of Dana Corporation (the "Company") on Form 10-Q for the quarter ended March 31, 2004, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), ***each of the***

*undersigned officers of the Company certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 200[2], that to such officer's knowledge*:

1.      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and

2.      *The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company* as of the dates for the periods expressed in the Report.

96.     The statements made in the April 21, 2004 release and conference call and Dana's 1Q04 Form 10-Q were each false and misleading when issued.  The true facts, which were then known to and/or recklessly disregarded by defendants based upon their access to and review of internal Dana data, were:

(a)     that Dana's 1Q04 net income and EPS were overstated by $7 million and $0.04, respectively, or 12% as detailed in ¶¶70-90;

(b)     that Dana's "profit improvement" and EPS reported by defendants for 1Q04 was false and was, in material part, generated through the accounting manipulations detailed in ¶¶70-90;

(c)     Burns and Richter also oversaw the purchase of steel from Dana's corporate headquarters in Toledo, Ohio and were each immediately aware of the increased steel prices being incurred by Dana, the Company's inability to pass these costs onto the Company's customers and the disastrous effect this was having on the Company's bottom line.  Prior to the commencement of the Class Period, Dana's steel vendors such as Metaldyne began imposing "surcharges" on steel which were as much 10% above what the Company had been paying under existing contracts.  Dana had no choice but to pay these surcharges or risk interruption of its steel supply which was vital to the manufacture the Company's products.

(d)     that Burns and Richter had not evaluated and reasonably concluded that, as of March 31, 2004, Dana's controls and procedures were effective in providing reasonable assurance

- 48 -

that material information relating to the Company and its consolidated subsidiaries was made known to them during 1Q04;

(e)     that Burns and Richter failed to disclose all of the significant and material weaknesses in the design or operation of Dana's internal controls which were reasonably likely to adversely affect the Company's ability to record, process and report financial data;

(f)     that defendants caused the Company to maintain inadequate controls to prevent, identify and respond to improper intervention with or the disregard of established policies, procedures and controls within the commercial vehicle business unit which allowed for the improper recording of transactions with respect to asset sale contracts, supplier cost recovery arrangements and contract pricing changes that were not in accordance with GAAP and lacked any reasonable support or documentation, as detailed in ¶¶70-90;

(g)     that general control deficiencies allowed defendants to manipulate accounts receivable, accounts payable, accrued liabilities revenue, other income or direct expenses such that the Company's financial results for 1Q04 were presented in violation of GAAP and have been restated as described in ¶¶70-90;

(h)     that the communication between the Company's diverse operations and accounting and finance personnel were not adequate to ensure the appropriate level of accounting knowledge, experience and training in the application of GAAP;

(i)     that the Company's internal controls relating to the preparation and review and monitoring of account reconciliations for inventory accounts payable and accrued expenses were unable to ensure that the balances were accurate and supported by appropriate calculations or documentation;

(j)      that the Company did not maintain effective controls over the computation and review of its inventory calculations to ensure that such assets were accurately reported in compliance with GAAP;

(k)      that Burns and Richter's falsely certified that Dana had adequate internal and disclosure controls to prevent the publication of inaccurate financial statements, as demonstrated, in part, by the disclosure and control deficiencies and admitted by defendants.  The Company's internal control and process deficiencies were so pervasive that the Audit Committee was compelled to retain outside counsel and engage in almost 100 interviews with operational and financial management personnel in each of the Company's business units to fully assess the inadequacy of Dana's internal controls;

(l)      that the defendants' EPS guidance was not reasonably attainable.  As set forth in ¶¶46-55, defendants directed the level of forecasted net income to a rate not representative of the Company's actual experience nor which could be reasonably expected based upon their access to and review of detailed performance review reports from each plant, but rather was manipulated to a level necessary to (i) meet the EPS expectations predetermined by Burns and Richters; and (ii) avoid the write-off of Dana's substantial deferred tax assets;

(m)      that Burns and Richter's certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, demonstrate that they each had actual knowledge of the true facts at the time Dana's 1Q04 financial results were published by virtue of the information they had purportedly obtained and investigations they had purportedly completed before those results were released to the public, as stated in their certifications, or were reckless in not having gained such actual knowledge by failing to obtain the information or conduct the investigations described in their certifications; and

(n)     that as a result of (a)-(m) above, defendants had no reasonable basis to believe and did not in fact believe that Dana would generate FY04 net income and EPS of $285 million and $1.90, respectively.

97.     On July 21, 2004, prior to the opening of the market, defendants caused Dana to issue a release concerning the Company's financial results for the 2Q04.  The release was entitled "Dana Corporation Reports Significantly Improved Operational Results" and reported EPS of $0.72, as compared to 2Q03 EPS of $0.35.  The release reiterated FY04 EPS guidance of "at least" $1.90, stating:

> Dana Corporation (NYSE:DCN) today announced that its 2004 second-quarter sales were $2.3 billion, compared to $2.0 billion during the same period last year.  ***Net income for the quarter (including $33 million of unusual net gains) totaled $108 million, or 72 cents per share.  This compares to net income (including $5 million of unusual net gains) of $52 million, or 35 cents per share, for the period in 2003***.
>
> "***We are pleased to have delivered another solid quarter of operational performance with net income, exclusive of unusual items, up 60 percent***," said Dana Chairman and CEO Mike Burns.  "At the same time, we're far from satisfied and continue to pursue greater focus, integration, and productivity in line with our commitment to meeting the needs of our global customers."
>
> *       *       *
>
> "Our solid sales growth contributed to stronger bottom-line results," Mr. Burns said.  "In addition, ***we continued to see growth in our gross margin*** – both year-over-year and sequentially by quarter – ***as we achieved further cost efficiencies*** and made progress in addressing the launch costs associated with our structures programs.  ***It's important to note that these improvements were achieved in spite of the higher cost of steel and certain other raw materials that we experienced during the quarter***."
>
> *       *       *
>
> "Excluding our unusual items and the results of businesses held for sale, ***our net income from continuing operations improved by more than 60 percent during the first half of 2004, compared to the same period last year***," Mr. Burns said.  "Again, this improvement was largely the result of new business and strong production volumes in our principal markets."

- 51 -

98.　　On July 21, 2004, Burns and Richter convened a nationwide conference call with analysts and investors to discuss Dana's 2Q04 results.  Burns and Richter each spoke during the call and addressed analysts' questions and concerns.

(a)　　During the call Richter noted that "the bottom line . . . was up from 52 million last year to 108 million this year . . . [and] that excluding the unusual items, earnings from continuing operations were up over 60% from the first half of last year."  Richter further stated that "**we're sticking to our number of a $1.90 per share for 2004**.  And to be clear that the number excludes the unusual items we've talked about today and any other unusual items we might have in the second half, including the gain on the sale of the aftermarket business."

(b)　　During the call, Burns attributed the dramatic increase in net profit from $47 million in 2Q03 to $75 million in 2Q04, as "largely the result of new business, strong production volumes in our principle markets and cost reductions" which were " more than offsetting higher raw material prices."

(c)　　Burns reiterated Dana's reported 2Q04 net income and EPS of $108 million and $0.72, respectively, stating:

> I'll begin with a brief overview of our second-quarter numbers.  Our second-quarter sales were 2.3 billion, compared to 2 billion during the same period last year.  **Net income for the quarter, which included 33 million of unusual net gains, totaled to 108 million or 72 cents a share**.  This compares to net income, including 5 million of unusual net gains of 52 million of 35 cents per share for the period in 2003.
>
> 　　　　*　　　*　　　*
>
> Bob will talk more about the unusual items later, but to suffice it to say at this point, that we're happy to have the additional income.  But we're also pleased that even without these unusual items, **we still achieved second-quarter net profit of 75 million, or 50 cents per share, which is up substantially over last year's 47 million or 31 cents per share**.  This improvement **was largely the result of new business, strong production volumes in our principal markets and cost reductions more than offsetting higher raw material prices**.
>
> 　　　　*　　　*　　　*

- 52 -

Thanks Bob.  Before we move to the Q&A session, let me first summarize a few of the key points from today's call.  First, our second-quarter performance was solid, *highlighted by the 60% profit increase*, excluding unusual items on sales growth of 16%.

(d)     When questioned by analyst Chris Lesaso of Credit Suisse First Boston about 3Q04 EPS, Richter stated:

**Chris Ceraso, Credit Suisse First Boston**:

Hi, thanks.  It's Chris Ceraso.  A couple of quick questions.  First, just about everybody who has reported so far this quarter, has guided lower for Q3.  *Bob are you comfortable with the 38 cents consensus that's out there right now*?

*        *        *

**Bob Richter: [Dana Corporation – CFO, VP, chairman-Dana Credit Corp.]**

*I wouldn't think it would be as low as 38 cents*.

99.     In response to this favorable news, the price of Dana's stock rose approximately 4% as several securities analysts issued reports on July 21, 2004, including Prudential Equity Group, LLC, and J.P. Morgan, reiterating the information disseminated by defendants and raising price targets and FY04 EPS estimates for Dana.

100.     On July 26, 2004, Dana filed with the SEC its 2Q04 Report on Form 10-Q.  The 2Q04 Report on Form 10-Q contained Dana's 2Q04 financial results and was signed by defendant Richter:

(a)     The  Report on Form 10-Q expressly stated that *the value of Company's deferred tax assets, as of June 30, 2004, totaled $512 million*, that defendants had evaluated the carrying value of these assets on a quarterly basis and that Dana expected to generate sufficient income to realize the tax benefits from these assets:

*Deferred tax assets at June 30, 2004, net of valuation allowances, totaled $512*.  We evaluate the carrying value of deferred tax assets quarterly.  Excluding the capital loss carryforward, the most significant portion of our deferred tax assets relates to the tax benefits recorded for U.S.-based other post-employment employee benefits (OPEB) and net operating loss (NOL) carryforwards, in the U.S.  Although full realization of our deferred tax assets is not assured, *based on our current*

- 53 -

*valuation, we believe that it is more likely than not that we will generate sufficient U.S.-based taxable income to realize these deferred tax assets during the NOL carryforward period and the periods in which the OPEB payments will be deducted on tax returns*.

(b)     The Report on Form 10-Q also included a representation by Burns and Richter that they had conducted an appropriate evaluation of the Company's internal controls and procedures and found them to be adequate, noting:

ITEM 4.  CONTROLS AND PROCEDURES

*Disclosure Controls and Procedures – **Our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) have evaluated Dana's disclosure controls and procedures, as defined in the SEC rules, as of the end of the second quarter and have concluded that such controls and procedures are effective in providing reasonable assurance that material information relating to Dana and its consolidated subsidiaries was made known to them during the period covered by this report**.*

*Internal Controls – **Our CEO and CFO are responsible for the accuracy of the financial information that is present in this report ... they have established internal control procedures which they believe are adequate to provide reasonable assurance that Dana's financial statements are reliable and prepared in accordance with generally accepted accounting principles in the United States and that the company's assets are protected from loss***.  These procedures are reviewed by Dana's internal auditors in order to monitor compliance and by the independent auditors as necessary to support their audit work. . . .*

During the second quarter, we continued to document our financial and related information systems (IS) controls.  Testing of controls at the facility level of our continuing operations began during the quarter and we are approximately 40% complete with that testing.  Testing of the corporate level controls will begin in the third quarter.  A process for evaluating exceptions identified during testing has been developed to determine their potential significance.  The most frequent exceptions identified to date have been in the areas of documentation and segregation of duties.  In the IS area, the most common exceptions have related to access controls and change controls.  The process of evaluating identified exceptions includes an assessment of which exceptions have the potential, if not remediated, to become significant deficiencies or material weaknesses – either individually or when aggregated.  We are currently expecting to remediate most of these exceptions and, ***to date, we have not identified any which we believe represents a material weakness.  We have implemented processes to track the identified exceptions, monitor remediation plans and re-test for control effectiveness***.

There were no changes in Dana's internal controls over financial reporting identified in connection with the evaluation by the CEO and CFO that occurred

during Dana's second quarter that have materially affected or are reasonably likely to materially affect Dana's internal controls over financial reporting.

(c)     The Report on Form 10-Q also contained certifications executed by Burns and Richter pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 which was identical in all material respects to those set forth in ¶95(c).

101.    The statements made in the July 21, 2004 release and conference call and Dana's 2Q04 Form 10-Q were each false and misleading. The true facts, which were then known to and/or recklessly disregarded by defendants based upon their access to and review of internal Dana data, were:

(a)     that Dana's 2Q04 net income and EPS were overstated by $10 million and $0.07, respectively, or 10% as detailed in ¶¶70-90;

(b)     the beginning of the Class Period, Dana's financial reports did not reflect that the Company was not accounting for millions of dollars of credits that had been granted to its specialized truck manufacturing customers, including Crane Carrier;

(c)     the increased steel costs being paid by Dana in the form of surcharges as high as 10% were not reflected in Dana's reported financial results for 2Q04, but rather were hidden from the market via side agreements and special deals or so-called "give backs," entered into with commercial truck manufacturing customers, including Navistar, PACCAR and Kenworth, which arrangements were not accounted for in compliance with GAAP but were instead designed to and did have the effect of artificially inflating Dana's reported revenue, margins and net income;

(d)     in order to allow Dana to post the net income growth reported in its FY04, 1Q05 and 2Q05 financial statements, defendants Richter and Burns together with senior facilities executives, including senior financial employees such as Kalamazoo facility CFO Allen Bau entered into secret "price agreements" with Dana customers, including Kenworth, Navistar, Peterbilt, PACCAR, Ford, GMC and Chrysler, which "side arrangements" were not set forth in

customer purchase orders or sales invoices.  These side arrangements were not properly included on Dana's financial statements and enabled defendants to report revenue and income on total invoice amounts, notwithstanding the significant credits of 15% to 25% that were incurred;

(e)       that Dana's purported cost reductions were not offsetting higher raw material prices, but rather Burns and Richter were endorsing a corporate-wide policy which allowed for the failure to properly account for increased material costs via the use of special side arrangements including "give backs" and "engineering money";

(f)       accounting personnel were directed by those operating under Richter to enter customer pricing data into the Oracle data system without the 15%-25% credit incurred by and associated with a particular sale in order to artificially inflate Dana's 2Q04 net income and EPS;

(g)       defendants caused the Company to maintain inadequate controls to prevent, identify and respond to improper intervention with or the disregard of established policies, procedures and controls within the commercial vehicle business unit which, allowed for the improper recording of transactions with respect to asset sale contracts, supplier cost recovery arrangements and contract pricing changes that were not in accordance with GAAP and lacked any reasonable support or documentation, as detailed in ¶¶70-90;

(h)       general control deficiencies allowed for defendants to manipulate accounts receivable, accounts payable, accrued liabilities revenue, other income or direct expenses such that the Company's financial results for 2Q04 were presented in violation of GAAP and have been restated as described in ¶¶70-90;

(i)       the communication between the Company's diverse operations and accounting and finance personnel were not adequate to ensure the appropriate level of accounting knowledge, experience and training in the application of GAAP;

(j)      defendants caused the Company to fail to identify, analyze and review accruals at 2Q04 relating to accounts receivable, accounts payable, accrued liabilities revenue and other direct expenses to ensure that they were accurately and completely and properly recorded;

(k)      the Company's internal controls relating to the preparation and review and monitoring of account reconciliations for inventory accounts payable and accrued expenses were unable to ensure that the balances were accurate and supported by appropriate calculations or documentation;

(l)      the Company did not maintain effective controls over the computation and review of its inventory calculations to ensure that such assets were accurately reported in compliance with GAAP;

(m)      that Burns and Richter had not disclosed all of the significant and material weaknesses in the design or operation of the Company's internal controls which were reasonably likely to adversely affect Dana's ability to record, process and report financial data;

(n)      Burns and Richter's certifications that Dana had adequate internal and disclosure controls to prevent the publication of such errors were also false, as demonstrated, in part, by the disclosure and control deficiencies defendants now admitted.  The Company's internal control and process deficiencies were so pervasive at least that the Audit Committee was compelled to retain outside counsel and engage in almost 100 interviews with operational and financial management personnel in each of the Company's business units to fully assess the inadequacy of Dana's internal controls;

(o)      that Burns and Richter were provided with monthly and quarterly financial reports from each of the Company's plants on sales, gross margins, and other results, as described in ¶¶46-50 such that each of them had information about each plant's actual performance which

contradicted the net income and EPS of $103 million and $0.72, respectively, reported by Dana for 2Q04 and FY04 EPS forecasts of $1.90 made by Burns and Richter;

(p)     the EPS guidance Burns and Richter announced during the Class Period was inflated and not reasonably attainable.  As set forth in ¶¶46-55, defendants directed the level of forecasted net income to a rate not representative of the Company's actual experience nor which could be reasonably expected based upon information received directly from Dana's customers, but to a level necessary to: (i) meet the EPS expectations predetermined by Burns and Richter; and (ii) avoid the write-off of Dana's substantial deferred tax assets;

(q)     Burns and Richter's certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, demonstrate that they each had actual knowledge of the true facts at the time Dana's 2Q04 financial results were published by virtue of the information they had purportedly obtained and investigations they had purportedly completed before those results were released to the public, as stated in their certifications, or were deliberately reckless in not having gained such actual knowledge by failing to obtain the information or conduct the investigations described in their certifications;

(r)     that Dana had not reported "another solid quarter of operational performance with net income, exclusive of unusual items, up 60%," but rather had generated the "stronger bottom-line results" and gross margins by utilizing the accounting gimmickry detailed in ¶¶70-90;

(s)     that based upon defendants' evaluation of Dana's internal controls and procedures, Burns and Richter were aware, as described in ¶¶46-55, 60-69, that it was not more probable than not that Dana would generate sufficient U.S.-based taxable income and continued valuation of its deferred tax assets at or above $500 million; and

(t)     that as a result of (a)-(s) above, defendants had no reasonable basis to believe and did not in fact believe that Dana would generate 3Q04 EPS of $0.38 or FY04 net income and EPS of $285 million and $1.90, respectively.

102.     On October 12, 2004, in an effort to slowly deflate the price of Dana stock without bringing substantial attention to their fraud, defendants caused Dana to issue a release revising the Company's FY04 EPS estimates from $1.90 per share to a range of $1.60 to $1.65 per share, excluding non-recurring items.  The defendants cited rising steel costs and lower production volumes as the catalyst for the lowered guidance.  On this news, Dana's stock dropped 10% per share on heavy trading volume of more than 3 million shares.

103.     On October 20, 2004, defendants caused the Company to issue a release containing Dana's 3Q04 financial results, including net income and EPS of $60 million and $0.40, respectively, representing an increase of approximately 40% over 3Q03, excluding unusual items.  The release stated:

> Dana Corporation (NYSE:DCN) today announced third-quarter sales of $2.1 billion, compared to $1.9 billion during the same period last year.  Net income for the quarter totaled $40 million, or 27 cents per share, compared to $61 million, or 41 cents per share, for the period in 2003.
>
> *          *          *
>
> Excluding unusual items, third-quarter 2004 net income was $60 million, or 40 cents per share, compared to $43 million, or 29 cents per share for the period last year.  Third-quarter 2004 results, however, included the impact from several positive tax developments, including the adjustment of the company's effective tax rate for the year to 31 percent.  The reduction in the effective rate reflects, among other items, credits for research and development costs.  In addition, a tax benefit of $24 million was recorded to recognize the utilization of capital loss carryforwards related to the settlement of certain issues with tax authorities, as well as adjustments associated with the finalization of the prior-year's tax returns.

104.     The October 20, 2004 release reiterated defendants' revised FY04 EPS guidance noting the increase in the cost of steel.  The release stated:

> Looking Ahead

On Oct. 12, Dana revised its expectation for 2004 earnings per share, excluding unusual items, from $1.90 per share to a range of $1.60 to $1.65 per share. The full-year effect of unusual items, such as the sale of DCC assets and the divestiture of the company's automotive aftermarket businesses, cannot reasonably be quantified at this time and was excluded from this guidance.

"We believe that raw material costs will continue to adversely affect us, at least in the near term," Mr. Burns said. "As we move into 2005, however, we can expect more of an offsetting benefit from our cost reduction programs. These include the consolidation of our purchasing function, the accelerated deployment of lean manufacturing techniques, and the standardization of administrative processes throughout the company."

"At the same time, we are not solely focused on cutting costs," he said. "We are equally committed to growing our top line faster – we've added significantly to our book of new business over the last three months, the heavy-truck and off-highway markets continue to grow, and we are focused on expanding our global footprint."

105. On October 20, 2004, defendants also hosted a conference call with analysts and investors to discuss Dana's business operations, prospects and 3Q04 results. Burns and Richter each spoke during the call and had an opportunity to address analysts' and investors' questions and concerns. During this call Burns emphasized the importance of the cost-cutting measures put into place at the Company and represented that defendants were successfully "***consolidating our purchasing activities, implementing lean manufacturing initiatives, value engineering efforts we talked about, and the standardization of Company-wide processes***."

106. On November 9, 2004, Dana filed with the SEC its 3Q04 Report on Form 10-Q. Defendant Richter signed the Report on Form 10-Q.

(a) The 3Q04 Report on Form 10-Q stated that the ***Company's deferred tax assets, as of September 30, 2004, totaled $742 million*** and again represented that Burns and Richter had evaluated the carrying value of these assets and that they expected Dana to generate sufficient income to realize the tax benefits from these assets:

Deferred tax assets at September 30, 2004, net of valuation allowances, totaled $742. We evaluate the carrying value of deferred tax assets quarterly. Excluding the capital loss carryover, the most significant portion of our deferred tax assets relates to the tax benefits recorded for U.S.-based other post-employment

employee benefits (OPEB) and net operating loss (NOL) carryforwards in the U.S. *Although full realization of our deferred tax assets is not assured, based on our current evaluation, we believe that it is more likely than not that we will generate sufficient U.S.-based taxable income to realize these deferred tax assets during the NOL carryforward period and the periods in which the OPEB payments will be deducted on tax returns.  This assessment is based on our current forecast of future operating profitability in the U.S. and our ability to employ acceptable strategies to increase revenues and/or reduce costs in the U.S.*  This forecast could change as a result of changes in the competitive, operating, economic or regulatory environment and we may be required to provide a full or partial valuation allowance against these deferred tax assets in future periods.

> (b)     The 3Q04 Report on Form 10-Q discussed defendants' evaluation of the

Company's internal disclosure controls and found them to be adequate, noting:

ITEM 4. CONTROLS AND PROCEDURES

*Disclosure Controls and Procedures* — ***Our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) have evaluated Dana's disclosure controls and procedures, ... and have concluded that such controls and procedures are effective in providing reasonable assurance that material information relating to Dana and its consolidated subsidiaries was made known to them during the period covered by this report***.

*Internal Controls* — Our CEO and CFO are responsible for the accuracy of the financial information that is presented in this report. To meet their responsibility for financial reporting, they have established internal control procedures which they believe are adequate to provide reasonable assurance that Dana's financial statements are reliable and prepared in accordance with generally accepted accounting principles in the United States and that the company's assets are protected from loss. These procedures are reviewed by Dana's internal auditors in order to monitor compliance and by the independent auditors as necessary to support their audit work. In addition, our Audit Committee, which is composed entirely of independent directors, meets regularly with management, our internal auditors and the independent auditors to review accounting, auditing and financial matters. The Audit Committee and the independent auditors have free access to each other, with or without management being present.

During the third quarter of 2004 testing of controls at our significant operating facilities was completed for both financial and information systems (I.S.) controls.  We are in the process of remediating the exceptions found and conducting re-tests where necessary to ensure that proper controls are in place. Those exceptions identified as having the most significance will be given priority in terms of re-testing. The most frequent exceptions have been found in the areas of account reconciliations, formal review and approvals, segregation of duties, and documentation. Limited testing of corporate level controls has been done. Corporate level controls will be tested during the fourth quarter and some testing may need to be done in early 2005. ***Management is continuously assessing the results of testing***

*to determine if exceptions that have not been remediated might rise to the level of significant deficiencies or represent a material weakness.* The results of corporate level control testing and exceptions that have not been remediated will be considered at year end to determine whether significant deficiencies or a material weakness exists at that time.

There were no changes in Dana's internal controls over financial reporting identified in connection with the evaluation by the CEO and CFO that occurred during Dana's third quarter that have materially affected or are reasonably likely to materially affect Dana's internal controls over financial reporting.

(c)     The 3Q Report on Form 10-Q contained certifications by Burns and Richter pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 identical in all material respects to those set forth in ¶95(c).

107.    The October 12, 2004 release, the October 20, 2004 release and conference call and 3Q04 Form 10-Q were each false and misleading.  The true facts, which were then known to and/or recklessly disregarded by defendants based upon their access to and review of internal Dana data, were:

(a)     that Burns and Richter were provided with monthly and quarterly financial reports from each of the Company's plants on sales, gross margins, and other results, as described in ¶¶46-50 such that each of them had information about each plant's actual performance which contradicted the net income and EPS of $60 million and $0.40, respectively, reported by Dana for 3Q04 and the revised FY04 EPS of $1.60-1.65 claimed by defendants;

(b)     Burns and Richter also oversaw the purchase of steel from Dana's corporate headquarters in Toledo, Ohio and were each immediately aware of the increased steel prices being incurred by Dana, the Company's inability to pass these costs onto the Company's customers and the disastrous effect this was having on the Company's bottom line.  Prior to the commencement of the Class Period, Dana's steel vendors such as Metaldyne began imposing "surcharges" on steel which were as much 10% above what the Company had been paying under existing contracts.

Dana had no choice but to pay these surcharges or risk interruption of its steel supply which was vital to the manufacture the Company's products;

(c)     the increased steel costs Dana paid in the form of surcharges as high as 10% were not reflected in Dana's reported financial results for 3Q04, but rather were hidden from the market via side agreements and special deals or so-called "give backs," entered into with commercial truck manufacturing customers, including Navistar, PACCAR and Kenworth, which arrangements were not accounted for in compliance with GAAP but were instead designed to and did have the effect of artificially inflating Dana's reported revenue, margins and net income;

(d)     in order to allow Dana to post the net income growth reported in its 3Q04 financial statements, defendants Richter and Burns together with senior facilities executives, including senior finance employees such as Kalamazo facility CFO Allen Bau entered into secret "price agreements" with Dana customers, including Kenworth, Navistar, Peterbilt, PACCAR, Ford, GM and Chrysler, which "side arrangements" were not set forth in customer purchase orders or sales invoices.  These side arrangements were not properly included on Dana's financial statements and enabled defendants to report revenue and income on total invoice amounts, notwithstanding the significant credits of 15% to 25% that were incurred;

(e)     accounting personnel were directed by those operating under Richter to enter customer pricing data into the Oracle data system without the 15%-25% credit incurred by and associated with a particular sale in order to artificially inflate Dana's 3Q04 net income and EPS;

(f)     the communication between the Company's diverse operations and accounting and finance personnel were not adequate to ensure the appropriate level of accounting knowledge, experience and training in the application of GAAP;

(g)      defendants caused the Company to fail to identify, analyze and review accruals at 3Q04 relating to accounts receivable, accounts payable, accrued liabilities revenue and other direct expenses to ensure that they were accurately and completely and properly recorded;

(h)      the Company's internal controls relating to the preparation and review and monitoring of account reconciliations for inventory accounts payable and accrued expenses were unable to ensure that the balances were accurate and supported by appropriate calculations or documentation;

(i)      the Company did not maintain effective controls over the computation and review of its inventory calculations to ensure that such assets were accurately reported in compliance with GAAP;

(j)      that Burns and Richter had been apprised that the financial information systems controls, including those at Toledo headquarters were significantly deficient in over a dozen areas, which deficiencies were the very factors which had allowed these defendants to manipulate Dana's reported income during 3Q04;

(k)      Burns and Richter falsely certified that Dana had adequate internal and disclosure controls to prevent the publication of such errors, as demonstrated, in part, by the disclosure and control deficiencies defendants now admitted.  The Company's internal control and process deficiencies were so pervasive at least that the Audit Committee was compelled to retain outside counsel and engage in almost 100 interviews with operational and financial management personnel in each of the Company's business units to fully assess the inadequacy of Dana's internal controls.

(l)      as set forth in ¶¶52-55, defendants directed the level of forecasted net income to a rate not representative of the Company's actual experience nor which could be reasonably expected based upon information received directly from Dana's customers, but to a level necessary

to: (i) meet the EPS expectations predetermined by Burns and Richter; and (ii) avoid the write-off of Dana's substantial deferred tax assets;

        (m)    the EPS guidance Burns and Richter announced during the Class Period was inflated and not reasonably attainable.  As set forth in ¶¶46-55, defendants directed the level of forecasted net income to a rate not representative of the Company's actual experience nor which could be reasonably expected based upon information received directly from Dana's customers, but to a level necessary to: (i) meet the EPS expectations predetermined by Burns and Richter; and (ii) avoid the write-off of Dana's substantial deferred tax assets;

        (n)    that based upon defendants' evaluation of Dana's internal controls and procedures, Burns and Richter were aware, as described in ¶¶46-55, 60-69, that it was not more probably than not that Dana would generate sufficient U.S.-based taxable income and continue valuation of its deferred tax assets at or above $740 million; and

        (o)    that as a result of (a)-(n) above, defendants had no reasonable basis to believe and did not in fact believe that Dana would generate FY04 EPS of at least $1.60.

108.    On November 23, 2004, as a result of Burns and Richter's assurances of Dana's stabilizing margins and improving prospects, Fitch upgraded the Company's credit rating to BB+. This upgrade was based upon defendants' statements that the Company was improving its operational performance:

> Operationally, Dana continues to make progress (EBITDA margins improved to 6.9% from 5.3% in 2002 for the 12 months ended Sept. 30, 2004) with results being somewhat slowed by high commodity prices and the impacts associated with the rapid ramp-up of commercial vehicle volumes.  This rapid increase in volumes has led to the emergence of inefficiencies throughout the commercial vehicle supply chain, with the impact being felt particularly in the area of working capital management.  Fitch anticipates that these in-efficiencies should be temporary and that margins will stabilize and eventually improve.  This change, along with ongoing new business wins, should lead to improved performance in 2005 to include the generation of free cash flow.

109.    On December 7, 2004, Fitch again upgraded Dana's credit rating to BBB- based upon defendants' announcement that the $1 billion sale of the Company's Automotive Aftermarket Group had been completed.

110.    On December 10, 2004, based upon defendants' continuing representations of Dana's stabilized operating performance and improved prospects, defendants were able to sell $450 million of Dana's debt pursuant to a Registration Rights Agreement which provided that the Company would file a registration statement to exchange the notes for registered notes on or before July 15, 2005.

111.    On February 23, 2005, defendants issued a release reporting Dana's 4Q04 and FY04 financial results.  Burns also confirmed Dana's improving prospects noting that FY05 "full-year earnings guidance is $1.40 to $1.62 per share," which stated:

Fourth-Quarter Results

Dana posted fourth-quarter sales of $2.3 billion in 2004, compared to $2.1 billion in the same period of 2003.  This increase was primarily due to new business and strong sales to commercial vehicle customers, while favorable currency effects added $73 million.

*       *       *

Full-Year Results

Sales increased to $9.1 billion in 2004 from $7.9 billion in 2003, primarily due to net new business of over $400 million, strong commercial and off-highway vehicle markets, and favorable currency effects of $300 million.

***Full-year net income was $82 million, or 54 cents per share, compared to $222 million, or $1.49 per share, in 2003***.  Unusual items of $180 million in 2004 included the $195 million of charges recorded in the fourth quarter plus $15 million of net gains reported earlier in the year.  Net income in 2003 included $39 million of unusual gains on divestitures and debt repurchases.

Excluding unusual items, net income in 2004 was $262 million, or $1.73 per share, compared to $183 million, or $1.23 per share, in 2003.  ***The margin on higher sales and benefits from the company's cost-reduction initiatives, as well as tax benefits, more than offset the impact of increased raw material costs***.

- 66 -

"Despite very challenging industry conditions, we made good progress year over year," said Burns.  "We had to contend with increased steel costs, which net of recoveries was $70 million after tax, mostly in the second half of year."

112.    On February 23, 2005, Burns and Richter hosted a nationwide a conference call with analysts and investors to discuss Dana's business operations, prospects and Burns and Richter each spoke during the call and had an opportunity to address analysts' and investors' questions and concerns.  During the call Burns emphasized that Dana made "important operational progress and strengthened our financial foundation last year."  One of the important factor was by using "the proceeds from the sale of the after market business we've strengthen[ed] our balance sheet, and in doing so we regained our investment grade credit rating."  Richter stated that "[a]s for net income our full-year guidance as a range, in earnings-per-share of $1.40 to $1.62. . . . [O]ur guidance for Q1 [05] is a range of $0.17 to $0.23 a share."  When asked about the FY 05 EPS guide and whether this would be a "clean number for '05," Richter responded without qualification – "Yes."

113.    On March 9, 2005, Dana filed with the SEC its FY04 Annual Report on Form 10-K which was signed by defendants Burns and Richter.

(a)    The Report on Form 10-K represented that *the Company's deferred tax assets, as of December 31, 2004, totaled $715 million* and, that defendants had evaluated the carrying value of these assets on a quarterly basis and that, based upon information then currently available to them, they expected Dana to generate sufficient income to realize the tax benefits from these assets.

(b)    The Report on Form 10-K further confirmed that Richter and Burns had conducted an evaluation of the Company's internal disclosure controls and found them to be adequate, noting:

Management's Report on Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting.  In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley

Act, management conduced an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on this assessment, management has concluded that, as of December 31, 2004, Dana's internal control over financial reporting was effective***.

(c)     The Report on Form 10-K further confirmed and contained certifications executed by Burns and Richter pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 which were identical in all material respects to those certifications set forth in ¶95(c).

114.    On March 23, 2005, defendants announced a 40-50% reduction in Dana's 1Q05 EPS outlook to $0.11-$0.13 and a decrease in FY05 EPS to $1.30-$1.45.  Although defendants confirmed that Dana was experiencing higher than expected steel costs as well as some component shortages and lower than expected light-vehicle production rates, Burns noted that "***we will see a substantial improvement in the second quarter***," while continuing to conceal the truth about defendants' manipulation of Dana's costs and expenses, as detailed in ¶¶70-90.  In response to this disclosure, the price of Dana securities declined by nearly 5%.

115.    On April 20, 2005, defendants reported Dana's 1Q05 results.  The release included 1Q05 net income and EPS of $18 million and $0.12, respectively.  Burns and Richter confirmed that Dana's production issues were "behind us," reaffirmed FY05 EPS guidance of $1.30-$1.45 and stated:

> Dana Corporation (NYSE:DCN) today announced that its 2005 first-quarter sales were $2.5 billion, compared to $2.3 billion during the same period last year. Net income for the quarter totaled $18 million, or 12 cents per share, versus $65 million, or 43 cents per share, for the period in 2004.

> *          *          *

> Dana Chairman and CEO Mike Burns said 2005 first-quarter earnings were impacted by several external factors.  "The single greatest factor impacting our earnings was roughly $32 million in additional steel costs that we incurred compared to the first quarter of 2004," he said.  "This is an after-tax number and is net of what we've recovered from our customers."

> "In addition, this year's results were affected by a component shortage from a principal supplier, which resulted in reduced shipments of heavy-duty axles in

March," Mr. Burns said.   "The component shortage also affected the operating efficiency in our Heavy Vehicle group and led to significantly higher levels of inventory on other related components."

"Finally, the performance of our Automotive Systems Group was impacted by lower production on many of our key light vehicle platforms in North America."

"Against this challenging backdrop, we are stepping up our focus on those items within our control," Mr. Burns said.   "This means accelerating our cost-reduction actions to deliver savings to the bottom line, despite external challenges. We are also working hard to grow our top line.  During the quarter, we were awarded net new business that will add approximately $60 million to the full-year 2005 sales."

\*          \*          \*

Outlook

Commenting on the company's near-term outlook, Mr. Burns said, "Our full-year guidance remains $1.30 to $1.45 per share."

He continued, "As we put the recent component shortage behind us, and address other operational issues that have held back margin expansion in the Heavy Vehicle group over the past two quarters, we expect to more fully benefit over the remainder of the year from the strong demand anticipated in the North American commercial vehicle market."

"In the case of the Automotive Systems Group, the dominant issue has been the effect of higher steel prices," Mr. Burns added.   "The good news is that the market price for raw steel has decreased in recent months and demand appears to be moderating.  Although the price we pay for forgings and other parts with high steel content has been slow to follow the decrease for a variety of reasons, we remain hopeful that we'll see less pressure on steel and other material price increases during the balance of the year.  Therefore, if light-duty production schedules for the balance of the year do not change significantly, *we expect that our accelerated cost reduction efforts will lead to improved performance in this group as well*."

116.   On April 20, 2005, defendants hosted a conference call with analysts and investors to discuss Dana's operations, prospects and 1Q05 results.  Burns and Richter each spoke during the call and had an opportunity to address analysts' and investors' questions and concerns.  During the call Burns emphasized that Dana's "key goals" had been to achieve profitable sales growth at twice the rate of the global vehicle market with more customer and geographic distribution and that was "in fact happening."

- 69 -

117.    On April 26, 2005, defendants caused Dana to file a Registration Statement and Prospectus (collectively, the "Prospectus") in connection with the sale of $450 million of debt securities.  The Prospectus incorporated by reference the Company's SEC filings, including its FY04 Report on Form 10-K and 1Q05 Report on Form 10-Q, which were false and misleading as detailed in ¶¶70-90.  The exchange period closed on May 26, 2005.

118.    On May 6, 2005, Dana filed with the SEC its quarterly report on Form 10-Q for 1Q05 which was signed by defendant Richter.

(a)    The Report on Form 10-Q represented that defendants had completed an evaluation of the Company's internal disclosure controls and found them to be adequate, stating:

ITEM 4.  CONTROLS AND PROCEDURES

*Our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) have evaluated Dana's disclosure controls and procedures, as defined in the SEC rules, as of the end of the first quarter and have concluded that such controls and procedures are effective.*

There were no changes in Dana's internal control over financial reporting identified in connection with the evaluation by the CEO and CFO that occurred during Dana's first quarter that have materially affected or are reasonably likely to materially affect Dana's internal controls over financial reporting.

(b)    The Report on Form 10-Q again contained certifications by Burns and Richter, pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 which were identical in all material respects to those certifications set forth in ¶95(c).

119.    The February 23, 2005 release and conference call, the FY04 Report on Form 10-K, the April 20, 2005 release and conference call, the April 26, 2005 Prospectus and 1Q05 Report Form 10-Q were each false and misleading.  The true facts, which were then known to and/or recklessly disregarded by defendants based upon their access to and review of internal Dana data, were:

(a)    that Burns and Richter were provided with monthly and quarterly financial reports from each of the Company's plants on sales, gross margins, and other results, as described in ¶¶46-50 such that each of them had information about each plant's actual performance which

contradicted the FY04 net income and EPS of $262 million and $1.73, respectively and the 1Q05

net income and EPS of $18 million and $0.12, respectively reported by Dana;

(b)     that Dana's net income and EPS for FY04 were overstated by $5 million and

$0.03, respectively or nearly 4% and the Company's 1Q05 net income and EPS was overstated by

$2 million and nearly 13% as detailed in ¶¶70-90;

(c)     that Dana was not in fact meeting its sales growth forecasts during 1Q05, but

rather was artificially depressing its costs and expenses in an effort to raise over $450 million in

badly needed cash;

(d)     the increased steel costs Dana paid in the form of surcharges as high as 10%

were not reflected in Dana's reported financial results for FY04 and 1Q05, but rather were hidden

from the market via side agreements and special deals or so-called "give backs," entered into with

commercial truck manufacturing customers, including Navistar, PACCAR and Kenworth, which

arrangements were not accounted for in compliance with GAAP but were instead designed to and

did have the effect of artificially inflating Dana's reported revenue, margins and net income;

(e)     in order to allow Dana to post the net income growth reported in its FY04,

and 1Q05 financial statements, defendants Richter and Burns together with senior facilities

executives, including senior finance employees such as Kalamazo facility CFO Allen Bau entered

into secret "price agreements" with Dana customers, including Kenworth and Navistar, Peterbilt,

PACCAR, Ford, GM and Chrysler, which "side arrangements" were not set forth in customer

purchase orders or sales invoices.  These side arrangements were not properly included on Dana's

financial statements and enabled defendants to report revenue and income on total invoice amounts,

notwithstanding the significant credits of 15% to 25% that were incurred;

(f)     accounting personnel were directed by those operating under Richter to enter customer pricing data into the Oracle data system without the 15%-25% credit incurred by and associated with a particular sale in order to artificially inflate Dana's net income;

(g)     that Burns and Richter had not disclosed all of the significant and material weaknesses in the design or operation of Dana's internal controls which were reasonably likely to adversely affect the Company's ability to record, process and report financial data;

(h)     Burns and Richter falsely certified that Dana had adequate internal and disclosure controls to prevent the publication of such errors, as demonstrated, in part, by the disclosure and control deficiencies defendants have now admitted.  The Company's internal control and process deficiencies were so pervasive at least that the Audit Committee was compelled to retain outside counsel and engage in almost 100 interviews with operational and financial management personnel in each of the Company's business units to fully assess the inadequacy of Dana's internal controls;

(i)     defendants caused the Company to maintain inadequate controls to prevent, identify and respond to improper intervention with or the disregard of established policies, procedures and controls within the commercial vehicle business unit which, allowed for the improper recording of transactions with respect to asset sale contracts, supplier cost recovery arrangements and contract pricing changes that were not in accordance with GAAP and lacked any reasonable support or documentation, as detailed in ¶¶70-90;

(j)     general control deficiencies allowed for defendants to manipulate accounts receivable, accounts payable, accrued liabilities revenue, other income or direct expenses such that the Company's financial results for FY04 and 1Q05 were presented in violation of GAAP and have been restated as described in ¶¶70-90;

(k)     the communication between the Company's diverse operations and accounting and finance personnel were not adequate to ensure the appropriate level of accounting knowledge, experience and training in the application of GAAP;

(l)     defendants caused the Company to fail to identify, analyze and review accruals at FY04 and 1Q05 relating to accounts receivable, accounts payable, accrued liabilities revenue and other direct expenses to ensure that they were accurately and completely and properly recorded;

(m)     the Company's internal controls relating to the preparation and review and monitoring of account reconciliations for inventory accounts payable and accrued expenses were unable to ensure that the balances were accurate and supported by appropriate calculations or documentation;

(n)     the Company did not maintain effective controls over the computation and review of its inventory calculations to ensure that such assets were accurately reported in compliance with GAAP;

(o)     Burns and Richter's certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, demonstrate that they each had actual knowledge of the true facts at the time Dana's FY04 and 10-Q financial results were published by virtue of the information they had purportedly obtained and investigations they had purportedly completed before those results were released to the public, as stated in their certifications, or were reckless in not having gained such actual knowledge by failing to obtain the information or conduct the investigations described in their certifications;

(p)     that based upon defendants' evaluation of Dana's internal controls and procedures, Burns and Richter were aware, as described in ¶¶46-55, 60-69, that it was not more

probable than not that Dana would generate sufficient U.S.-based taxable income and continued

valuation of its deferred tax assets at or above $850 million; and

> (q)     that as a result of (a)-(p) above, defendants had no reasonable basis to

believe and did not in fact believe that Dana would generate FY04 EPS of $1.30-1.45, respectively.

120.    On June 17, 2005, Prudential Equity Group, LLC, issued a report following meeting

with defendants, which report stated:

> After meeting with Dana's management this week, our confidence is increased in the
> positive changes enacted by the new CEO (now in his second year) and in our
> outlook for 2006 earnings.  Short-term execution and supply issues within HVTSG
> have been resolved, the backlog is likely to continue expanding, and steel and other
> costs are likely to improve in 2006.

121.    On July 20, 2005, defendants caused Dana to report its 2Q05 financial results:

> (a)     The July 20, 2005 release emphasized the "significant improvement" in

Dana's operating results, including Dana's 2Q05 net income of $85 million, a 275% increase over

1Q05.  The release further stated:

> Dana Corporation (NYSE: DCN) today reported financial results for the second
> quarter of 2005, which showed significant improvement over results for the first
> three months of the year. Second-quarter highlights included:
>
> - Sales of $2.6 billion were up 6 percent from the first quarter of 2005;
>
> - The addition of $215 million in net new business for the years 2005 to 2007 raised
> total net new business for this period to $1.3 billion;
>
> - ***Higher sales and cost savings drove operating profit improvements of 53 percent
> in the Automotive Systems Group and 48 percent in the Heavy Vehicle
> Technologies and Systems Group***; and
>
> - Net income, exclusive of unusual items, increased to $53 million, or 35 cents per
> share, compared to $18 million, or 12 cents per share, during the first three months of
> 2005.  Unusual items in the second quarter included a net charge of $5 million
> related to enactment of new Ohio tax legislation and a $3 million net gain from the
> sale of certain Dana Credit Corporation (DCC) assets.  With these unusual items, net
> income totaled $51 million, or 34 cents per share.
>
> "***In the face of continuing industry-wide challenges, Dana people have
> made significant progress in strengthening our company,***" said Dana Chairman
> and CEO Mike Burns.   "***Specifically, our lean manufacturing and value***

- 74 -

*engineering programs are delivering tangible results as evidenced by the substantial profit improvement from last quarter*."

"Our cost reduction and efficiency programs are essential. But equally important to achieving our goals is our aggressive pursuit of steady top-line growth," Mr. Burns said. "To this end, we are extremely pleased to report that we have added another $215 million in the second quarter to our increasingly strong – and diverse – book of new business."

(b)  The July 20, 2005 release reaffirmed Dana's revised FY05 EPS guidance, noting:

*"We are encouraged by the profit improvement we've achieved since last quarter,"* Mr. Burns said. "And we believe there is considerable opportunity to achieve additional cost savings and process efficiencies as our efforts gain more momentum."

"Production schedules for North American heavy trucks continue to be stronger than expected and, as a result, we are raising our estimate for full- year 2005 production to 310,000 units from 293,000 units. The off-highway market segments we serve are also expected to remain strong for the rest of the year," he said. "We're also expecting to benefit from subsiding steel costs, which will be particularly important to the Automotive Systems Group."

"However," Mr. Burns continued, "given the uncertainty surrounding North American light vehicle production in the second half of the year, we are lowering our 2005 production forecast to 15.5 million units from 15.7 million units. We are also concerned about the possible impact on sales if the dollar continues to gain strength. As a result, *our earnings expectations for the full year remain unchanged at a range of $1.30 to $1.45 per share*."

122.  On July 20, 2005, defendants hosted a conference call with analysts and investors to discuss Dana's operations, prospects and 2Q05 results.  Burns and Richter each spoke during the call and had an opportunity to address analysts' and investors' questions and concerns.  During the call, Burns emphasized that after a modest start in FY05, Dana was continuing to post improved performance, noting:

- "After earnings of just $0.12 in the first quarter and leaving our guidance at the range – in a range of 1.30 to a 1.45 in earnings per share we clearly needed to raise our performance to a higher level.  Quarter on quarter we did that.  *Sales grew 6% and earnings for the automotive systems and heavy vehicle groups were up 53% and 48% respectively*."

- "*Our heavy vehicle group will clearly benefit from the continuing strength of our commercial and off-highway vehicle markets*.  Both business units but particularly automotive systems should benefit from reduced steel costs which, of course, would take some pressure off of our earnings."

123.    On July 29, 2005, Dana filed with the SEC its quarterly report on Form 10-Q for 2Q05 signed by defendant Richter.

(a)    The Report on Form 10-Q confirmed the $895 million valuation of Dana's deferred tax assets, stating:

Deferred tax assets at June 30, 2005, net of valuation allowances, approximated $895, including $741 of U.S. federal and state deferred income taxes; which we evaluate the carrying value of deferred tax assets quarterly. Excluding the capital loss carryforward, the most significant portion of our deferred tax assets relates to the tax benefits recorded for U.S.-based other post-employment employee benefits (OPEB) and net operating loss (NOL) carryforwards in the U.S.  "Although full realization of our deferred tax assets is not assured," *based on our current evaluation, we believe that realization is more likely than not achievable through a combination of improved operating results and changes in our business operating model*.

(b)    The Report on Form 10-Q also confirmed that defendants had completed conducted an evaluation of the Company's internal disclosure controls and found them to be adequate, stating:

ITEM 4. CONTROLS AND PROCEDURES

*Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures – Our Chief Executive Officer (CEO) and Chief Financial Officer (CFO) have evaluated Dana's disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the Exchange Act), and have concluded that such controls and procedures are effective as of the end of the period covered by this quarterly report*.

*Changes in Internal Control over Financial Reporting –* On June 1, 2005, we outsourced certain of our human resources services to IBM. We have not yet fully tested internal controls applicable to this change. This change is part of our cost reduction initiative for administrative costs.  During 2005, we will perform appropriate testing to ensure the effectiveness of internal controls as they relate to the reliability of financial reporting and the preparation and fair presentation of our published consolidated financial statements.

There were no other changes that occurred during the quarter ended June 30, 2005 that have materially affected or are reasonably likely to materially affect Dana's internal control over financial reporting.

(c)    Contained certifications by Burns and Richter pursuant to §§302 and 906 of

the Sarbanes-Oxley Act of 2002 that:

1.    I have reviewed this quarterly report on Form 10-Q of Dana Corporation;

2.    *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact* necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant* as of, and for, the periods presented in this report;

4.    *The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures* (as defined in Exchange Act Rules 13a-15(e) and 15d-(15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-(f) and 15d-15(f) *for the registrant and have*:

a)    *[d]signed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

b)    [d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    *[e]valuated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    [d]isclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      *The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting*, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)      *[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

b)      *[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting*.

*      *      *

In connection with the Quarterly Report of Dana Corporation (the "Company") on Form 10-Q for the quarter ended June 30, 2005, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), *each of the undersigned officers of the Company certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 200[2], that to such officer's knowledge*:

1.      The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and

2.      *The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company* as of the dates for the periods expressed in the Report.

124.    The July 20, 2005 release and conference call and the 2Q05 Report on Form 10-Q were each false and misleading when made.  The true facts, which were then known to and/or recklessly disregarded by defendants based upon their access to and review of internal Dana data were:

(a)      that Burns and Richter were provided with monthly and quarterly financial reports from each of the Company's plants on sales, gross margins, and other results, as described in ¶¶46-50 such that each of them had information about each plant's actual performance which contradicted the 2Q05 income and EPS of $53 million and $0.53, respectively;

(b)      that Dana's net income as EPS for 2Q05 were overstated by $21 million and $0.14, respectively *or 70%*, as detailed in ¶¶70-90;

(c)      Burns and Richter also oversaw the purchase of steel from Dana's corporate headquarters in Toledo, Ohio and were each immediately aware of the increased steel prices being incurred by Dana, the Company's inability to pass these costs onto the Company's customers and the disastrous effect this was having on the Company's bottom line.  Prior to the commencement of the Class Period, Dana's steel vendors such as Metaldyne began imposing "surcharges" on steel which were as much 10% above what the Company had been paying under existing contracts. Dana had no choice but to pay these surcharges or risk interruption of its steel supply which was vital to the manufacture the Company's products;

(d)      defendants caused the Company to maintain inadequate controls to prevent, identify and respond to improper intervention with or the disregard of established policies, procedures and controls within the commercial vehicle business unit which, allowed for the improper recording of transactions with respect to asset sale contracts, supplier cost recovery arrangements and contract pricing changes that were not in accordance with GAAP and lacked any reasonable support or documentation, as detailed in ¶¶70-90;

(e)      general control deficiencies allowed for defendants to manipulate accounts receivable, accounts payable, accrued liabilities revenue, other income or direct expenses such that the Company's financial results for 2Q05 were presented in violation of GAAP and have been restated as described in ¶¶70-90;

(f)      the communication between the Company's diverse operations and accounting and finance personnel were not adequate to ensure the appropriate level of accounting knowledge, experience and training in the application of GAAP;

(g)      defendants caused the Company to fail to identify, analyze and review accruals at 2Q05 relating to accounts receivable, accounts payable, accrued liabilities revenue and other direct expenses to ensure that they were accurately and completely and properly recorded;

(h)      the Company's internal controls relating to the preparation and review and monitoring of account reconciliations for inventory accounts payable and accrued expenses were unable to ensure that the balances were accurate and supported by appropriate calculations or documentation;

(i)      the Company did not maintain effective controls over the computation and review of its inventory calculations to ensure that such assets were accurately reported in compliance with GAAP;

(j)      Burns and Richter falsely certified that Dana had adequate internal and disclosure controls to prevent the publication of such errors were also false, as demonstrated, in part, by the disclosure and control deficiencies defendants have now admitted.  The Company's internal control and process deficiencies were so pervasive at least that the Audit Committee was compelled to retain outside counsel and engage in almost 100 interviews with operational and financial management personnel in each of the Company's business units to fully assess the inadequacy of Dana's internal controls;

(k)      as set forth in ¶¶52-55, defendants directed the level of forecasted net income to a rate not representative of the Company's actual experience nor which could be reasonably expected based upon information received directly from Dana's customers, but to a level necessary to: (i) meet the EPS expectations predetermined by Burns and Richter; and (ii) avoid the write-off of Dana's substantial deferred tax assets;

(l)      Burns and Richter's certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, demonstrate that they each had actual knowledge of the true facts at the time Dana's 2Q05 financial results were published by virtue of the information they had purportedly obtained and investigations they had purportedly completed before those results were released to the public, as stated in their certifications, or were reckless in not having gained such

actual knowledge by failing to obtain the information or conduct the investigations described in their certifications;

(m)     that based upon defendants' evaluation of Dana's internal controls and procedures, Burns and Richter were aware as detailed in ¶¶46-55, 60-69 that it was not more probable than not that Dana would generate sufficient U.S.-based taxable income and continued valuation of its deferred tax assets at or above $860 million; and

(n)     that as a result of (a)-(m) above, Burns and Richter had no reasonable basis to believe and did not in fact believe that Dana would generate 3Q05 EPS of $0.38 or FY05 EPS of $1.30-$1.45.

**Defendants' Fraud Begins to Unravel**

125.    On September 15, 2005 – ***barely two months*** after announcing a 275% quarter to quarter earnings increase and ***reaffirming FY05 earnings guidance of $1.30-$1.45 per share*** – defendants admitted their prior representations about FY05 EPS had been overstated by 100% by ***slashing FY05 earnings guidance*** to no more than $0.70 per share.  Defendants further shocked the market by revealing that the Company was "likely" to restate its previously reported financial statements and that defendants were "assessing" whether a write-off of Dana's deferred tax assets was necessary.  The release stated:

> Dana Corporation (NYSE:DCN) today announced that it has revised its 2005 full-year earnings outlook to a range of $90 million to $105 million, or approximately 60 to 70 cents per share, from its previously announced range of $196 million to $219 million, or $1.30 to $1.45 per share.  In both cases, the outlook excludes gains and losses on divestitures and asset sales, and other unusual items.

> The company is assessing whether, as the result of the change in earnings outlook, it will be required to write down its U.S. deferred tax assets.  A write-down of U.S. deferred tax assets and the consequent inability to record similar tax benefits in the future would not have a cash impact, but would have a direct negative impact on the revised 2005 full-year earnings outlook set forth above.  At June 30, the company's U.S. deferred tax assets totaled approximately $740 million.  The revised outlook includes approximately $60 million of tax benefits on domestic losses in the second half.

Dana Chairman and CEO Michael J. Burns said that this reduction reflects a reassessment of the company's full-year outlook after reviewing its preliminary results through the end of August.  These results indicate that the company is being negatively impacted by continued higher-than-expected costs for steel and other materials, as well as increased energy costs.  In addition, the company's Commercial Vehicle business has been unable to achieve projected cost reductions and is experiencing significant manufacturing inefficiencies.  For these reasons, the company expects that the Commercial Vehicle unit's performance in the balance of the year will be substantially below previous projections.

*       *       *

Company Likely to Restate Second-Quarter 2005 Financial Statements

Dana also announced that it will likely restate its second-quarter 2005 financial statements, primarily to correct inappropriate recognition of price increases in its Commercial Vehicle business during the second quarter.

Based on a preliminary internal review, the company believes that the potential restatement could result in an after-tax reduction of approximately $10 million to $15 million in second-quarter income.

126.    In reaction to this news, the price of Dana stock dropped more than 20% on September 15, 2005 alone on substantial volume of almost 8 million shares, more than eight times the average trading volume.  The Company's stock continued to fall in the days immediately following the defendants' announcement, declining another 10% as these adverse facts and their impact leaked into the market.

127.    Surprised by the September 15, 2005 announcement, securities analysts immediately challenged defendants' credibility.  For instance, Wachovia securities' analyst Richard M. Kwas issued a report on September 15, 2005 stating "***Today's news was a significant body blow to a management team that already had credibility issue***."

128.    Fitch responded to the September 15, 2005 announcement by downgrading Dana's debt to BB+ and placed the Company on Rating Watch – Negative.

129.    Only three weeks later, on October 10, 2005, the other shoe dropped when defendants issued a release announcing that Dana's financial statements could "no longer be relied upon" and that the Company would be restating its FY04, 1Q05 and 2Q05 financial statements and writing off

- 82 -

its deferred tax assets.  Noting that the restatement would not as previously indicated be confined just to its 2Q05 financial statements, the release stated:

> Dana's management and the Audit Committee of the Board of Directors have determined, as a result of their ongoing internal investigations, that the company did not properly account for certain items during 2004 and the first and second quarters of 2005.  As a result, management and the Audit Committee have concluded that Dana's financial statements for these periods should no longer be relied upon and that restatements will be required for these periods.  The primary purpose for the restatements is to correct issues involving customer pricing and transactions with suppliers in Dana's Commercial Vehicle business.

130.    Contrary to defendants' repeated Class Period assurances that defendants had assessed the Company's internal controls and found them to be adequate and that the financial information contained in Dana's Reports on Form 10-Q's and FY04 Form 10-K "clearly reported in all material respects the financial condition and result of operations of the Company," the October 10, 2005 release confirmed the fact that "***the company believes that there are material weaknesses in its internal control over financial reporting***."

131.    In reaction to the these startling revelations, the price of Dana's shares dropped nearly 35%, or $3.15 per share, on record heavy trading of almost 9 million shares.  Dana's debt securities similarly declined by approximately 10% in reaction to this news.  Securities analysts responded by again slashing their FY05 EPS estimates and expressing their exasperation with defendants' deceit and steadfast refusal to provide any further information concerning the October 10, 2005 announcement.

### THE AFTERMATH OF DEFENDANTS' FRAUD

132.    On October 18, 2005, defendants announced they expected to reduce Dana's previously reported net income by as much as $25-$45 million after tax:

> Although the investigation is not yet complete, and the effect of the above restatements may require the restatement of financial statements for prior periods, the company currently expects that the net aggregate reduction in net income for all periods to be restated will be between $25 million and $45 million after tax.

133.    In reaction to defendants' recent announcements about its accounting chicanery, Fitch downgraded Dana's to BB- "based on the company's deteriorating operating results, accounting and financial control issues, and sustained higher debt levels."  On December 30, 2005, defendants caused Dana to issue a release admitting the prior financial statements issued for FY04, 1Q05 and 2Q05 were false when issued that defendants repeated statements during the Class Period about the adequacy of Dana's internal controls were likewise false when made.  The release stated:

> Dana Corporation (NYSE:DCN) announced today that it has completed the restatements of its financial statements for the first two quarters of 2005, the year 2004, and prior years, and has filed amended annual and quarterly reports for the applicable periods with the U.S. Securities and Exchange Commission.  Specifically, the company has filed a Form 10-K/A for the fiscal year ended Dec. 31, 2004, and Forms 10-Q/A for the quarters ended March 31 and June 30, 2005.

> As a result of these restatements, **the total reduction in net income after tax for all periods restated was $44 million**.

> **The primary items in the restatements impacting the reduction in aggregate net income were inappropriate recognition of certain customer pricing increases and supplier reimbursement costs in the company's Commercial Vehicle business**, which prompted internal investigations.  As announced on Dec. 23, the reduction was also affected by a correction to the prior calculation of the company's 2004 LIFO inventory reserves with respect to steel surcharges.

> *        *        *

> "We are pleased to have completed our review and the filing of our restated financials." said Dana Chairman and CEO Michael J. Burns.   "During our investigations, **we identified material weaknesses in our system of internal control over financial reporting and we have taken – and will continue to take – appropriate actions to remediate these weaknesses**."

134.    Defendants also caused Dana to file an Amended FY04 Report on Form 10-K, which was signed by both Burns and Richter and admitted that "**as a result of the material weaknesses discussed below . . ., management, including our CEO and CFO, has concluded that our disclosure controls and procedures were not effective**. . . ."

135.    On January 17, 2006, defendants caused Dana to issue a release announcing its 3Q05 results, a net loss of *$1.27 billion* or $8.50 per share.  Defendants also reported that the Company had been compelled to write off a massive $1 billion of the Company's assets, stating:

> The company provided a valuation allowance, as announced on October 10, 2005, against its net U.S. deferred tax assets during the third quarter.  The one-time impact of providing this allowance was a reduction in net income of $918 million in the period, which represents the restated net U.S. deferred tax assets at the beginning of the third quarter and also includes $13 million for a similar allowance against the company's U.K. tax assets.  The valuation allowance was recorded because, based on its current outlook, Dana believes it is no longer more likely than not that the company will be able to utilize these tax assets.  This action does not affect the company's ability to use these tax assets later if justified by future profitability in the U.S. and U.K.

136.    On February 27, 2006, defendants announced that the Company was in discussions with banks and financial institutions regarding financing alternatives available to Dana.  Two days later, on February 29, 2006, defendants issued a release reporting that Dana had defaulted on $21 million of interest payments on its debt.

137.    On March 3, 2006, defendants announced that Dana had filed for bankruptcy.  Following the Company's declaration of bankruptcy, Richter announced his "retirement" from the Company.  Burns, on the other hand, arranged to have himself paid large "incentive" bonus payments of millions of dollars for guiding the Company through bankruptcy.  Defendants' fraudulent scheme has inflicted hundreds of millions of dollars of damage upon Lead Plaintiffs and the Class while simultaneously driving Dana into bankruptcy.

## LOSS CAUSATION/ECONOMIC LOSS

138.    During the Class Period as detailed herein, defendants engaged in a scheme to deceive the market and in a course of business that artificially inflated the price of Dana securities and operated as a fraud or deceit on Class Period purchasers of Dana's securities, by misrepresenting the Company's actual financial results, business success, and future business prospects, and omitting information concerning the Company's deficient internal financial controls and inefficient and costly

manufacturing processes. Defendants achieved this façade of success, growth, and strong future business prospects via the misrepresentations detailed herein, at ¶¶91-125, including improperly inflating Dana's reported quarterly net income by as much as 70% and misrepresenting Dana's future prospects. When defendants' misrepresentations and fraudulent conduct were disclosed to the market, Dana's stock price fell precipitously as the artificial inflation created by defendants' misrepresentations and wrongful course of business came out of the Company's stock price. As a result of both their purchases of inflated Dana securities' during the Class Period – and the subsequent deflation of those securities – Lead Plaintiffs and other members of the Class suffered damages under the federal securities laws.

139.    Defendants' false and misleading statements and omissions had their intended effect, causing Dana equity and debt securities to trade at artificially inflated levels throughout the Class Period, with Dana's stock price reaching as high as $21.75 per share. That inflation was removed from Dana's securities in a series of disclosures. On September 15, 2005, defendants announced that Dana would "likely" restate its financials for 2Q05, write-off portions of its assets and reduce FY05 EPS forecasts. These public revelations communicated that Dana's business was not performing at the level previously described by defendants. Investors and the market were surprised by these disclosures, and, as a result Dana's stock price fell almost 23%, on unusually high volume, from $12.78 on September 14, 2005 to $9.86 per share on September 15, 2005. However, the revised guidance announced on September 15, 2005 was itself inflated and unattainable, and did not reflect the truth about Dana's operations and previously reported financial performance. Thus, the market had yet to learn the full extent of the problems with Dana's business.

140.    On October 10, 2005, Dana announced that it was retracting its FY05 guidance, restating its FY04, 1Q05 and 2Q05 financial statements and writing down its tax deferred assets. In

response to this announcement, the Company's debt series declined approximately 10%, while Dana common shares plummeted 35%, trading over 8 million shares on October 10, 2005 alone.

141.    The price decline in Dana's securities as a result of defendants' September 15, 2005 and October 10, 2005 disclosures was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the decline in the price of Dana's securities negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic issues, industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.  On September 15, 2005, when the defendants announced that the Company was cutting its FY05 guidance, probably restating its 2Q05 financial results and looking into whether Dana could maintain its deferred tax assets, Dana's stock price dropped 23% while the Standard and Poor's Index actually *increased* – by 0.05%.  Likewise, although Dana's stock fell 35% in response to defendants' announcement on October 10, 2005 that the Company was retracting its FY05 guidance, restating its FY04, 1Q05 and 2Q05 financial results and writing down its deferred tax assets, the Standard and Poor's Index decreased by 0.72% during the same time-frame!  In sum, as the truth about defendants' business performance was revealed to the market, the Company's stock price plummeted, the artificial inflation came out of the stock, and plaintiffs and other members of the Class were damaged, suffering substantial economic losses.

142.    The damages, suffered by plaintiffs and other members of the Class was a direct result of (a) defendants' fraudulent scheme to artificially inflate Dana's stock price during the Class Period, and (b) the subsequent significant decline in the value of Dana's stock when defendants' prior misrepresentations and other fraudulent conduct became known to the market.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD-ON-THE-MARKET DOCTRINE

143.    At all relevant times, the market for Dana's publicly traded securities was an efficient market for the following reasons, among others:

(a)    Dana's securities met the requirements for listing, and were listed and actively traded on the NYSE, which is a highly efficient and automated market;

(b)    As a regulated issuer, Dana filed periodic public reports with the SEC and the NYSE;

(c)    Dana regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Dana was followed by numerous securities analysts employed by major brokerage firms, including Prudential Equity Group, LLC, Credit Suisse First Boston and Morgan Stanley who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

144.    As a result of the foregoing, the market for Dana's publicly traded securities promptly digested current information regarding Dana from all publicly available sources and reflected such information in the prices of Dana's publicly traded securities.  Under these circumstances, all purchasers of Dana's publicly traded securities during the Class Period suffered similar injury through their purchase of Dana's publicly traded securities at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

145.    Plaintiffs bring this action as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all persons who purchased Dana publicly traded securities (the "Class") on the open market during the Class Period.  Excluded from the Class are defendants, directors and officers of Dana and their families and affiliates.

146.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Dana had more than 149 million shares of stock outstanding, and over $450 million of debt outstanding owned by thousands of persons.

147.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions, which may affect individual Class members include:

        (a)    Whether the 1934 Act was violated by defendants;

        (b)    Whether defendants omitted and/or misrepresented material facts;

        (c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

        (d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading.

## NO SAFE HARBOR

148.    The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the

- 89 -

statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Dana who knew that those statements were false when made.

### FIRST CLAIM FOR RELIEF

**For Violation of §10(b) of the 1934 Act
and Rule 10b-5 Against Burns and Richter**

149.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

150.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

151.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Dana securities during the Class Period.

152.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Dana as specified herein.

153.     These defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Dana's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Dana securities during the Class Period.

154.     The defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or were reckless to the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were made knowingly or with recklessness for the truth, and for the purpose and effect of concealing Dana's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its publicly traded securities.

155.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Dana's publicly traded securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's publicly traded securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by

defendants during the Class Period, plaintiffs and the other members of the Class acquired Dana securities during the Class Period at artificially high prices and were damaged thereby as demonstrated, in part, by the declines in the price of the Company's stock following its September 15, 2005 and October 10, 2005 announcements.

156.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Dana was experiencing, which were not disclosed by defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Dana securities, or, if they had acquired such securities during the Class Period, would not have done so at the artificially inflated prices which they paid.

157.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

158.    As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Dana securities during the Class Period.

### SECOND CLAIM FOR RELIEF

**For Violation of §20(a) of the 1934 Act**
**Against Burns & Richter**

159.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

160.    By reason of their direct and substantial management position and responsibilities during the Class Period, Burns and Richter were "control persons" of Dana within the meaning of §20 of the Exchange Act, 15 U.S.C. §78, as they had the power and influence to control Dana and other employees of Dana exercised that control to cause the Company to engage in the conduct and

improper practices complained of herein, including the preparation and dissemination of the Company's releases and SEC filings.  Each of the defendants was directly involved in the day-to-day operations of the Company, and privy to undisclosed information concerning Dana, and the Company's financial reporting.

## PRAYER

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such equitable, injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  August 15, 2006             LERACH COUGHLIN STOIA GELLER
                                       RUDMAN & ROBBINS LLP
                                    DARREN J. ROBBINS
                                    MICHAEL J. DOWD
                                    DEBRA J. WYMAN


                                              s/ DARREN J. ROBBINS
                                    _____
                                    DARREN J. ROBBINS (168593)
                                    655 West Broadway, Suite 1900
                                    San Diego, CA  92101
                                    Telephone:  619/231-1058
                                    619/231-7423 (fax)

                                    Lead Counsel

- 93 -

LANDSKRONER • GRIECO • MADDEN, LTD.
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

Liaison Counsel for Plaintiffs

O'DONOGHUE & O'DONOGHUE LLP
LOUIS P. MALONE
4748 Wisconsin Avenue, N.W.
Washington, DC  20016
Telephone:  202/362-0041
202/362-2640 (fax)

Additional Counsel for Plaintiffs

S:\CasesSD\Dana Corp\AMENDED CONSOL CPT.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DARREN J. ROBBINS
DARREN J. ROBBINS

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail: DarrenR@lerachlaw.com

# Mailing Information for a Case 3:05-cv-07393-JGC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joseph M. Callow, Jr.**
  jcallow@kmklaw.com arox@kmklaw.com;ddaddesa@kmklaw.com

- **Jack Landskroner**
  jack@landskronerlaw.com debra@landskronerlaw.com

- **Ann L. Lugbill**
  alugbill@choice.net

- **Darren J. Robbins**
  e_file_sd@lerachlaw.com

- **Keith W. Schneider**
  kwschneider@ms-lawfirm.com kwschneider@ms-lawfirm.com;jsecrest@ms-
  lawfirm.com;jbryan@ms-lawfirm.com;abalent@ms-lawfirm.com;snichelson@ms-lawfirm.com

- **Scott D. Simpkins**
  sdsimp@climacolaw.com sdsimp@climacolaw.com

- **Debra J. Wyman**
  debraw@lerachlaw.com hectorm@lerachlaw.com;miked@lerachlaw.com

- **David W. Zoll**
  david@toledolaw.com christy@toledolaw.com;sue@toledolaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
District 1199J-New Jersey Health Care Employers Pension Fund
9-25 Alling Street
Attn: Barbara A. Small
Newark, NJ 07012
```