UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION (TOLEDO)

| | | |
|---|---|---|
| HOWARD FRANK, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | No. 3:05-cv-07393-JGC **(Consolidated)** |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) | Chief Judge James G. Carr |
| DANA CORPORATION, et al., | ) ) | |
| Defendants. | ) ) ) | |

PLAINTIFFS' SUPPLEMENTAL SUBMISSION IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

LANDSKRONER • GRIECO • MADDEN, LTD.
JACK LANDSKRONER (0059227)
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

Liaison Counsel

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
MICHAEL J. DOWD
DEBRA J. WYMAN
SAMANTHA A. SMITH
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

# TABLE OF CONTENTS

Page

I.   FIRST CIRCUIT ...........................................................................................1

    A.   Court of Appeals Decisions .................................................................1

        1.   *ACA Fin. Guar. Corp. v. Advest, Inc.*,
           512 F.3d 46 (1st Cir. 2008) ....................................................1

        2.   *Miss. Pub. Employees Ret. Sys. v. Boston Sci. Corp.*,
           523 F.3d 75 (1st Cir. 2008) ....................................................3

        3.   *N.J. Carpenters Pension & Annuity Funds v. Biogen Idec, Inc.*,
           537 F.3d 35 (1st Cir. 2008) ...................................................6

II.  SECOND CIRCUIT ....................................................................................7

    A.   Court of Appeals Decisions .................................................................7

        1.   *ECA and Local 134 IBEW Joint Pension Trust of Chi.*
           *v. JP Morgan Chase Co.*,
           553 F.3d 187 (2d Cir. 2009) ..................................................7

        2.   *Maxlin v. XL Capital, Ltd.*,
           No. 07-3749-cv, 2009 U.S. App. LEXIS 4984
           (2d Cir. Mar. 5, 2009) ...........................................................9

    B.   District Court Decisions.......................................................................9

        1.   *Caiafa v. Sea Containers Ltd.*,
           525 F. Supp. 2d 398 (S.D.N.Y. 2007)........................................9

        2.   *Heller v. Goldin Restructuring Fund, L.P.*,
           590 F. Supp. 2d 603 (S.D.N.Y. 2008)......................................12

        3.   *In re Avon Prods., Inc. Sec. Litig.*,
           No. 05 Civ. 6803 (LAK) (MDH), 2009 U.S. Dist. LEXIS 34564
           (S.D.N.Y. Feb. 23, 2009) .......................................................13

        4.   *In re Scottish Re Group Sec. Litig.*,
           524 F. Supp. 2d 370 (S.D.N.Y. 2007)......................................15

        5.   *In re Elan Corp. Sec. Litig.*,
           543 F. Supp. 2d 187 (S.D.N.Y. 2008)......................................18

III. THIRD CIRCUIT .......................................................................................20

    A.   Court of Appeals Decisions .................................................................20

**Page**

1.    *Institutional Investors Group v. Avaya, Inc.*,
      No. 06-4595, 2009 U.S. App. LEXIS 9110
      (3d Cir. Apr. 30, 2009)..................................................20

2.    *Key Equity Investors, Inc. v. Sel-Leb Mktg.*,
      No. 06-1052, 2007 U.S. App. LEXIS 21392
      (3d Cir. Sept. 6, 2007)..................................................25

B.    District Court Decisions...................................................26

      1.    *City of Hialeah Employees Ret. Sys. & Laborers Pension
            Trust Funds for N. Cal. v. Toll Bros.*,
            No. 07-1513, 2008 U.S. Dist. LEXIS 66906
            (E.D. Pa. Aug. 29, 2008)..........................................26

      2.    *In re Intelligroup Sec. Litig.*,
            527 F. Supp. 2d 262 (D.N.J. 2007) ............................27

IV.   FOURTH CIRCUIT...................................................................29

      A.    Court of Appeals Decisions .......................................29

            1.    *Cozzarelli v. Inspire Pharms. Inc.*,
                  549 F.3d 618 (4th Cir. 2008) ................................29

      B.    District Court Decisions.............................................30

            1.    *In re Bearingpoint, Inc. Sec. Litig.*,
                  525 F. Supp. 2d 759 (E.D. Va. 2007) ..................30

V.    FIFTH CIRCUIT .....................................................................32

      A.    Court of Appeals Decisions .......................................32

            1.    *Cen. Laborers' Pension Fund v. Integrated Elec. Svcs., Inc.*,
                  497 F.3d 546 (5th Cir. 2007) ................................32

            2.    *Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*,
                  No. 08-10414, 2009 U.S. App. LEXIS 7133
                  (5th Cir. Tex. Apr. 8, 2009) ..................................34

            3.    *Ind. Elec. Workers' Pension Trust Fund IBEW v.
                  Shaw Group, Inc.*,
                  537 F.3d 527 (5th Cir. 2008) ................................36

Page

4.    *Lormand v. US Unwired, Inc.*,
      565 F.3d 228; 2009 U.S. App. LEXIS 7452
      (5th Cir. Apr. 9, 2009) ............................................................38

B.    District Court Decisions.......................................................................40

1.    *Beightol v. Navarre Corp.*,
      No. 4:08cv00010-DPJ-JCS, 2009 U.S. Dist. LEXIS 6590
      (S.D. Miss. Jan. 26, 2009)........................................................40

VI.   SIXTH CIRCUIT ...........................................................................................41

A.    Court of Appeals Decisions ................................................................41

1.    *J&R Marketing, SEP v. General Motors Corp.*,
      549 F.3d 384 (6th Cir. 2008) ...................................................41

2.    *Ley v. Visteon Corp.*,
      543 F.3d 801 (6th Cir. 2008) ...................................................42

3.    *Zaluski v. United American Healthcare Corp.*,
      527 F.3d 564 (6th Cir. 2008) ...................................................44

B.    District Court Decisions.......................................................................45

1.    *Beach v. Healthways, Inc.*, No. 3:08-0569,
      2009 U.S. Dist. LEXIS 17809 (M.D. Tenn. Mar. 9, 2009) ......................45

2.    *Beaver County Ret. Bd. v. LCA-Vision, Inc.*,
      No. 1:07-CV-750, 2009 U.S. Dist. LEXIS 31375
      (S.D. Ohio Mar. 25, 2009) .......................................................47

3.    *Berlin Fin. Ltd. v. MPW Indus. Servs. Group, Inc.*,
      No. 2:07-cv-442, U.S. Dist. LEXIS 6526
      (S.D. Ohio Jan. 15, 2008) ........................................................49

4.    *Grillo v. Tempur-Pedic Int'l, Inc.*,
      553 F. Supp. 2d 809 (E.D. Ky. 2008) .......................................51

5.    *In re Am. Serv. Group, Inc.*,
      No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237,
      (M.D. Tenn. Mar. 30, 2009)......................................................53

6.    *In re Huffy Corp. Sec. Litig.*,
      577 F. Supp. 2d 968 (S.D. Ohio 2008) .....................................55

Page

7.   *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
     527 F. Supp. 2d 698 (E.D. Ky. 2007) ........................................................59

8.   *Kahn v. Ran*,
     No. 08-CV-14417, 2009 U.S. Dist. LEXIS 35474
     (E.D. Mich. Apr. 27, 2009)........................................................................60

9.   *In re ProQuest Sec. Litig.*,
     527 F. Supp. 2d 728 ( E.D. Mich. 2007)....................................................62

10.  *Ross v. Abercrombie & Fitch Co.*,
     501 F. Supp. 2d 1102 (S.D. Ohio 2007) ....................................................64

VII.   SEVENTH CIRCUIT ...................................................................................65

       A.   Court of Appeals Decisions ................................................................65

            1.   *Higginbotham v. Baxter Int'l, Inc.*,
                 495 F.3d 753 (7th Cir. 2007) ....................................................65

            2.   *Makor Issues & Rights, LTD. v. Tellabs Inc.*,
                 513 F.3d 702 (7th Cir. 2008) ....................................................67

            3.   *Pugh v. Tribune Co.*,
                 521 F.3d 686 (7th Cir. 2008) ....................................................70

       B.   District Court Decisions.....................................................................72

            1.   *Roth v. Aon Corp.*,
                 No. 04-C-6835, 2008 U.S. Dist. LEXIS 18471
                 (N.D. Ill. Mar. 7, 2008)............................................................72

            2.   *Silverman v. Motorola, Inc.*,
                 No. 07 C 4507, 2008 U.S. Dist. LEXIS 76799
                 (N.D. Ill. Sept. 23, 2008) .........................................................74

VIII.  EIGHTH CIRCUIT.........................................................................................76

       A.   Court of Appeals Decisions ................................................................76

            1.   *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*,
                 519 F.3d 778 (8th Cir. 2008) ....................................................76

            2.   *In re NVE Corp. Sec. Litig.*,
                 527 F.3d 749 (8th Cir. 2008) ....................................................77

Page

3.   *Elam v. Neidorff,*
     544 F.3d 921 (8th Cir. 2008) .................................................78

4.   *In re Ceridian Corp. Sec. Litig.,*
     542 F.3d 240 (8th Cir. 2008) .................................................80

5.   *In re Hutchinson Tech., Inc. Sec. Litig.,*
     536 F.3d 952 (8th Cir. 2008) .................................................82

IX.   NINTH CIRCUIT .................................................................83

A.   Court of Appeals Decisions ....................................................83

1.   *Glazer Capital Mgmt., LP v. Magistri,*
     549 F.3d 736 (9th Cir. 2008) .................................................83

2.   *Skechers U.S.A. Sec. Litig. v. Skechers U.S.A., Inc.,*
     No. 05-55980, 2008 U.S. App. LEXIS 8349
     (9th Cir. Apr. 10, 2008) .....................................................86

3.   *In re Syncor Int'l Corp. Sec. Litig.,*
     327 F. Supp. 2d 1149 (C.D. Cal. 2004), *aff'd in part, rev'd in part,*
     239 Fed. Appx. 318 (9th Cir. 2007).........................................87

4.   *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,*
     540 F.3d 1049 (9th Cir. 2008) ...............................................89

5.   *South Ferry LP v. Killinger,*
     542 F.3d 776 (9th Cir. 2008) .................................................90

6.   *Zucco Partners, LLC v. Digimarc Corp.,*
     552 F.3d 981 (9th Cir. 2009) .................................................93

B.   District Court Decisions.........................................................95

1.   *Backe v. Novatel Wireless, Inc.,*
     08-CV-01689-H (RBB), 2009 U.S. Dist. LEXIS 32684
     (S.D. Cal. Apr. 1, 2009) .....................................................95

2.   *FSP Stallion 1 v. Luce,*
     2:08-CV-01155-PMP-PAL, 2009 U.S. Dist. LEXIS 41592
     (D. Nev. May 1, 2009) .......................................................97

3.   *In re LeapFrog Enters., Inc. Sec. Litig.,*
     527 F. Supp. 2d 1033 (N.D. Cal. 2007).....................................98

**Page**

4.   *In re Wet Seal, Inc. Sec. Litig.*,
     518 F. Supp. 2d 1148 (C.D. Cal. 2007) ...................................................100

5.   *Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*,
     No. 06-CV-2674-PHX-RCB, 2009 U.S. Dist. LEXIS 31832
     (D. Ariz. Mar. 31, 2009) ...................................................104

6.   *Weiss v. Amkor Tech., Inc.*,
     527 F. Supp. 2d 938 (D. Ariz. 2007) ...................................................106

X.   TENTH CIRCUIT ...................................................109

     A.   District Court Decisions...................................................109

          1.   *New Jersey v. Sprint Corp.*,
               531 F. Supp. 2d 1273 (D. Kan. 2008) ...................................................109

XI.  ELEVENTH CIRCUIT...................................................110

     A.   Court of Appeals Decisions ...................................................110

          1.   *Mizzaro v. Home Depot, Inc.*,
               544 F.3d 1230 (11th Cir. 2008) ...................................................110

     B.   District Court Decisions...................................................114

          1.   *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
               560 F. Supp. 2d 1221 (M.D. Fla. 2008)...................................................114

          2.   *Gustin v. Hoffman*,
               No. 6:08-cv-57-Orl-31 DAB, 2009 U.S. Dist. LEXIS 22036
               (M.D. Fla. Mar. 9, 2009)...................................................115

          3.   *McCanna v. Eagle*,
               No. 2:08-cv-421, 2009 U.S. Dist. LEXIS 38191
               (M.D. Fla. May 5, 2009) ...................................................116

Plaintiffs submit the following digest of post *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) motion to dismiss decisions as requested by the Court at the May 18, 2009 hearing on defendants' motion to dismiss. Plaintiffs have arranged these decisions by Appellate Circuit. Due to the expressed interest of the Court at the May 18 hearing, plaintiffs also submit the attached [Proposed] Amended Consolidated Class Action Complaint for Violations of the Securities Exchange Act of 1934 ("[Proposed] Amended Complaint"), attached hereto as Ex. A. This [Proposed] Amended Complaint incorporates the information on the confidential witnesses contained on pages 48-50 of Plaintiffs' Memorandum of Law in Opposition to Defendants' Renewed Motion to Dismiss Consolidated Complaint ("Pltfs' Opp.").

## I.      FIRST CIRCUIT

### A.      Court of Appeals Decisions

#### 1.      *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46 (1st Cir. 2008)

**Facts**: This securities class action was brought by purchasers of bonds offered by Bradford College, that were later defaulted on by the college. *Id.* at 51. Plaintiffs alleged that they were misled by the official statement accompanying the offering, which concealed the college's dire financial straits and inability to pay the bond debt. *Id.* at 51-52. Plaintiffs alleged that defendants misled them by incorrectly predicting the number of applicants that would matriculate into the college. *Id.* at 62. Plaintiffs alleged that defendants' prediction was unreasonable because defendants knew (or should have known) that the college application numbers had been artificially increased due to the college's acceptance of internet applications. *Id.* Also, by the date of the official statement defendants knew that the number of deposits placed by incoming students had dropped by almost 20%. *Id.* Ultimately, the First Circuit affirmed the lower court's dismissal for failure to plead facts giving a rise to scienter. *Id.* at 52.

**Relevant Holdings**:

Scienter:       The court found that scienter was not alleged because the plaintiffs failed to include facts in the complaint indicating that defendants had contradictory information at the time the misleading statements were made to investors. *Id.* at 62-66. Moreover, the court found that the offering document that plaintiffs alleged was misleading, actually contained abundant information outlining the financial problems the college was suffering and the financial risks it faced going forward. *Id.* at 66.

Leave to Amend:       The First Circuit affirmed the denial of plaintiffs' post-judgment motion for leave to amend. The suit was originally filed six years before the district court's dismissal order and dismissed by the plaintiffs without prejudice. *Id.* at 57. The complaint was re-filed in July 2004 and amended in January 2005. *Id.* The defendants moved to dismiss in early 2005, identifying deficiencies in the amended complaint. *Id.* The plaintiffs did not move to amend then, nor did they move to amend in June 2005, after plaintiffs' counsel claimed they had uncovered "new" evidence in a document review related to the college's bankruptcy proceedings, nor did they move to amend at oral argument on October 11, 2005, or before the district court's ruling on September 30, 2006. *Id.* Plaintiffs then moved for leave to amend arguing that they were "entitled to wait and see if their amended complaint was rejected by the district court before being put to the costs of filing a second amended complaint." *Id.* The First Circuit disagreed and held that such an approach imposed "unnecessary costs and inefficiencies on both the courts and party opponents." *Id.*

**Application To *Dana* Case**: The Complaint[1] in *Dana* outlines in detail the information defendants[2] were in possession of that contradicted their statements and representations to investors.

---

[1]       Plaintiffs' Consolidated Class Action Complaint for Violations of the Securities Exchange Act of 1934 (the "Complaint").

This critical transmission of information was lacking in the *ACA Fin.* case.  Furthermore, plaintiffs here have not waited to get an advisory opinion from the court as to the sufficiency of their Complaint as did the plaintiffs in *ACA Fin.*  Plaintiffs continue to believe that the Complaint meets in all respects the requirements of the Private Securities Litigation Reform Act ("PSLRA") and have made a proffer of additional allegations should the court disagree.  The plaintiffs in *ACA Fin.* made no effort to inform the court how it would amend until after entry of the dismissal order.

> *Helwig* **Factors Alleged**:      None.

> **2.    *Miss. Pub. Employees Ret. Sys. v. Boston Sci. Corp.*,**
> **523 F.3d 75 (1st Cir. 2008)**

**Facts**:  Plaintiff, a Mississippi pension fund and purchaser of Boston Scientific stock, alleged that company executives both withheld material information about problems with the product and decisions addressing those problems, and made misleading positive statements, in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5, and other statutes.  *Id*. at 78.  Plaintiff appealed the district court's grant of defendants' motion to dismiss.  *Id*.

This case deals with the launch of a new medical product called TAXUS.  Plaintiff's most relevant allegations are that in anticipation of Federal Drug Administration ("FDA") approval in the United States defendants made positive comments about TAXUS, despite reports of problems with the device from doctors in other countries.  *Id*. at 81.  Throughout the relevant time period, defendants made affirmative statements attributing these problems to the doctors' unfamiliarity with the device.  Defendants did not correct the statements, even though they had become aware that the problem was not doctor unfamiliarity, but rather a manufacturing defect.  *Id*. at 79.  Overall,

---

[2]      The Company's Chief Executive Officer ("CEO") and Chairman of the Board Michael J. Burns ("Burns") and its Chief Financial Officer ("CFO") Robert C. Richter ("Richter") (collectively "defendants").

plaintiffs alleged that defendants withheld the information about the manufacturing defect to build

up inventory and preserve market share.  *Id*. at 79-80.  Plaintiffs also alleged that defendants knew

that the TAXUS device "'had a history of significant problems.'"[3]  *Id*. at 81.  Despite this

knowledge, defendants continued to minimize and misrepresent problems with TAXUS, including

statements in the 10-Q.  *Id*.  The manufacturing change wasn't disclosed to the public until about two

months after the defendants' approval date with the FDA.  *Id*.  Subsequent recalls of the TAXUS

device occurred.  *Id*. at 83.

**Relevant Holdings**:

<u>Scienter</u>:        The district court dismissed plaintiff's claims from which they appealed.

Applying the standards articulated in *Tellabs*, which reversed a higher standard for scienter imposed

by the prior law of the First Circuit, the court held that plaintiffs had pled claims sufficient to

withstand a motion to dismiss.  *Id*. at 93.  Given plaintiffs' specific factual allegations, the temporal

proximity between the chief operating officer's statements that the problem with the device had been

"fixed" and the third recall a week later, and the alleged insider trading, the court determined that

plaintiffs had pled enough to give rise to inferences that were at least as strong as any competing

inferences regarding scienter.  *Id*.

**Application to *Dana* Case**:  Plaintiffs in *Dana* have likewise pled specific factual

allegations and temporal proximity to withstand defendants' motion to dismiss.  As more fully stated

in Pltfs' Opp., plaintiffs allege that defendants were fully aware and knowledgeable of the ongoing

fraud during the time in which they made misleading statements and signed Sarbanes-Oxley Act of

2002 ("SOX") certificates.  Indeed, Dana Corporation (the "Company" or "Dana") admitted as much

in their restatement.  Defendants were intimately familiar with the goings-on of the Company and

---

[3]        Here, as elsewhere, citations have been omitted and emphasis added, unless otherwise noted.

consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports.  In fact, defendants comments to the market addressed the same discrete subjects that were presented in the internal reports.  Richter, for example, told investors on April 21, 2004, exactly what earnings Dana was poised to post, and denied any "discernable impact" on Company operations from steel prices.  Burns similarly insisted on July 21, 2004, that Dana's (purportedly) strong financial results showed the Company's ability to "more than offset[] higher raw material prices."  It would have been nearly impossible for defendants to be unaware of the ongoing fraud.  And, although there are no allegations of inside trading in this case, plaintiffs also pled that the nature and number of the alleged accounting manipulations, coupled with the magnitude of the fraud bolsters an inference of scienter.  Defendants in *Dana* were also highly motivated to create a false positive impression of the company as their jobs and salaries depended on the company's success.  Defendants personally benefited from their fraudulent conduct as they stood to gain millions of dollars in bonus compensation that was directly linked to Dana's reported net income and earnings-per-share.  Similarly, Dana was able to maintain its façade of financial health, enabling it to sell $450 million of debt and avoid lowered credit ratings.

The only opposing inferences offered by defendants' – explained by defense counsel broadly as anything other than fraud, such as "good faith misjudgment" or "oversight" (*see* transcript of motion to dismiss hearing on May 18, 2009 at 3:07-16) – are no more compelling as an inference of deception and fraud, and, as reiterated in the appellate decision in this case (*Frank v. Dana*, 547 F.3d 564, 571 (6th Cir. 2008)), a tie of inference must go to plaintiffs.

*Helwig* **Factors Alleged**:      Factor No. 1 – Insider trading; Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

### 3.     *N.J. Carpenters Pension & Annuity Funds v. Biogen Idec, Inc.,* 537 F.3d 35 (1st Cir. 2008)

**Facts**:  Biogen Idec Inc. conducted clinical trials and received accelerated FDA approval for TYSABRI, a promising new drug for multiple sclerosis and similar autoimmune diseases.  The price of the company stock increased as FDA approval was sought and granted.  Less than three months after the approval, on February 18, 2005, continuing clinical trials of the drug revealed that two patients had contracted a type of infection perhaps associated with the drug.  One of those patients had died.  Within ten days, on February 28, 2005, the company, after consultation with the FDA, voluntarily withdrew the drug from the market.  The share price precipitously dropped.  This federal securities class action soon followed, alleging the company and senior executives had intentionally misrepresented the safety of and the market for the drug by omission and commission.  *Id*. at 37.

The district court dismissed the complaint for failing to meet adequately the PSLRA's pleading requirements for scienter.  The First Circuit affirmed the dismissal.  *Id.*

**Relevant Holdings**:

The court affirmed the dismissal of the complaint agreeing with the district court that the plaintiffs failed to fully allege when the defendants learned of the problems/risks associated with their new drug.  *Id*. at 50.  The court found that, based on the totality of the allegations, the more compelling inference was that defendants did not learn about the serious problems associated with the drug until shortly before they announced it was being withdrawn from the market.  *Id*. at 48-50. The court was not persuaded by any information attributed to confidential witnesses as none of those witnesses could provide a time frame as to when defendants allegedly became aware of the drug's problems.  *Id*. at 52-53.

**Application To *Dana* Case**:  Here, plaintiffs pled when defendants were provided with the reports indicating Dana's financial performance was suffering and getting worse, as well as pinpointed when they attended meetings to discuss the situation.

*Helwig* **Factors Alleged**:       Factor No. 2 – Divergence between internal reports and external statements; Factor No. 6 – Disregard of the most current factual information before making statements.

## II.       SECOND CIRCUIT

### A.       Court of Appeals Decisions

#### 1.       *ECA and Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009)

**Facts**:  The basis of plaintiffs' claim in this case, in essence, was that they were defrauded by JP Morgan Chase's ("JPMC") complicity in Enron Corporation's financial scandals.  *Id*. at 193. Plaintiffs alleged that JPMC defrauded its shareholders by downplaying its Enron-related exposure, failing to disclose alleged violations of law in connection with the Mahonia (created to facilitate disguised loan transactions) and other transactions, falsely portraying itself as a low-risk company with a reputation for fiscal discipline and integrity, and improperly accounting for the Mahonia prepays as viable trades rather than as impaired loans on its financial statements (thereby failing to disclose the credit risk).  *Id*. at 193-94.  The lower court held that plaintiffs had only pled scienter sufficiently with respect to the Mahonia transactions, but those transactions were not material to the complaint.  *Id*. at 193.  The Second Circuit affirmed.

**Relevant Holdings**:

Scienter:       The court held that plaintiffs failed to adequately plead that JPMC made a materially false statement or omitted a material fact with scienter.  *Id*. at 205-06.  The Second Circuit found that defendants' statements were so general that a reasonable investor would not have depended on them as a guarantee that the investment bank would never take a step that might

- 7 -

adversely affect its reputation (for instance, that it "'set the standard for best practices in risk management techniques'").  *Id*. at 206.  Nor would an investor take such statements seriously in assessing a potential investment, for the simple fact that almost every investment bank made these sort of statements.  *Id*.  Finding that the investment bank's statements constituted a material misrepresentation would bring within the sweep of federal securities laws many routine representations made by investment institutions, the appellate court declined to broaden the scope of securities laws in that manner.  *Id.*

GAAP Violations:      The court found that plaintiffs' allegations that JPMC failed to disclose Mahonia as a related party met the PSLRA's particularity requirements but because these allegations were not accompanied by allegations of corresponding fraudulent intent, they standing alone, could not support the required inference of scienter.  *Id.* at 199-200.

Motive:      The court found that the motives plaintiffs' alleged – to maximize corporate profits, secure favorable market interest rates, to maximize compensation – in that case were too generalized to support the strong inference of scienter required.  *Id.* at 200-01.

**Application To *Dana* Case**: Here, defendants' statements concerning Dana's financial performance, and financial expectations for the future are undeniably material.  Defendants have not contended otherwise.  Unlike in *ECA*, plaintiffs here not only set forth defendants' Generally Accepted Accounting Principles ("GAAP") violations but include specific allegations that defendants received and discussed contradictory information and performed reviews of Dana's inadequate internal financial controls.  Thus, plaintiffs include the allegations of corresponding fraudulent intent found missing in *ECA*.

*Helwig* **Factors Alleged**:      None.

2.  ***Maxlin v. XL Capital, Ltd.***,
**No. 07-3749-cv, 2009 U.S. App. LEXIS 4984
(2d Cir. Mar. 5, 2009)**

**Facts**:  This is an unpublished opinion and includes no recitation of the plaintiffs' allegations. The district court dismissed the complaint finding that plaintiffs failed to plead scienter in satisfaction of the PSLRA and declined to permit plaintiffs to file a third amended complaint.  *Id.* at *2.  The Second Circuit affirmed.  *Id.* at *3.

**Relevant Holdings**:

Scienter:  The court affirmed the district court's conclusion that the collection of plaintiffs' allegations did not strongly infer scienter.  *Id.* at *4.  The district court had found that each category of plaintiffs' scienter allegations was weak and that collectively they did not add up to the required inference.  *Id.*

Leave to Amend:  The court also affirmed the district court's denial of leave to amend where the plaintiffs only summarily requested leave to amend and proffered no proposed amended allegations.  *Id.* at *6.

**Application to *Dana* Case**:  Unlike the plaintiffs in *Maxlin*, plaintiffs here have offered the court its proposed amended allegations – once in three pages of Pltfs' Opp. and also in a [Proposed] Amended Complaint which incorporates that information as allegations.  *See* Ex. A.

***Helwig* Factors Alleged**:  None.

**B.  District Court Decisions**

1.  ***Caiafa v. Sea Containers Ltd.***,
**525 F. Supp. 2d 398 (S.D.N.Y. 2007)**

**Facts**:  Plaintiffs brought claims for securities violations on behalf of a class of shareholders of Sea Containers Ltd. ("SCL").  *Id.* at 402.  Plaintiffs alleged that defendants, certain SCL officers,

materially misstated SCL's financial statements.[4]   SCL engaged in four main businesses (1) passenger and freight ferry services, (2) passenger rail service between London and Scotland, (3) ownership and leasing of large cargo-shipping containers, and (4) operation of hotels, restaurants, tourist trains and river cruise ships through Orient-Express Hotels, Ltd. ("OEH"). *Id.* at 403.  During the class period, SCL announced that it was restructuring the company by, among other things, selling certain ferry and container assets.  *Id.* at 404.   Concurrent with this announcement, SCL informed investors that the intended restructuring required a "'restructuring charge'" to income of $157 million, which included certain "'impairment charges'" relating to the sale of the ferry and container assets.  *Id.*   At the end of the class period, SCL announced that it was withdrawing completely from the ferry business resulting in an additional "'impairment charge'" of $415 million to SCL's ferry assets.  *Id*. at 405.  SCL also announced that it was taking an additional "'impairment charge'" relating to certain of its container assets and had discovered accounting errors relating to the release of foreign currency reserves related to SCL's sale of OEH shares which required SCL to restate its financial statements for three quarters reducing its previously reported gains on sales of OEH stock by $10.3 million.  *Id.*

Plaintiffs alleged that defendants failed to disclose (1) the accounting errors responsible for the restatement of SCL's financial statements; (2) that SCL's ferry and container assets were impaired and should have been written down earlier than they were; (3) that the ferry business had traded poorly in the years leading up to the class period and was adversely impacted by surging fuel prices; (4) that SCL's accounting function lacked qualified personnel in violation of GAAP; and (5) that SCL's relationship with a key joint venture partner was severely strained such that revenue from the joint venture should not have been recorded on SCL's books, or that a reserve for anticipated

---

[4]      SCL was not named as a defendant having filed for bankruptcy protection shortly after this action was filed.  *Id.* at 403 n.2.

losses should also have been recorded.  *Id.* at 405-06.  Defendants moved to dismiss arguing that

plaintiffs had not pled the falsity of the alleged misstatements, or their scienter, in satisfaction of the

PSLRA.[5]  *Id.* at 409, 412.  The court granted defendants' motion to dismiss but permitted plaintiffs

to amend their complaint.  *Id.* at 414-15.

**Relevant Holdings**:

Scienter:         Plaintiffs attempted to plead scienter by alleging defendants' motive and

opportunity to commit fraud and alleging facts that defendants' acted recklessly in making the

allegedly false and misleading statements to the market.  *Id.* at 412.  The court rejected plaintiffs'

motive and opportunity allegations finding that "alleged desires to raise additional capital in a

private placement or to maintain compliance with the financial covenants of a company loan

agreement . . . are . . . inadequate to support an allegation of intent to commit fraud."  *Id.* at 412-13.

The court also rejected plaintiffs' recklessness allegations.  The court found that plaintiffs had not

pled the existence of internal reports that indicated that SCL should have taken the impairment

charges sooner than they did.  *Id.* at 413.  While there was a restatement, the court found that there

were no supporting facts showing that the restatement was the product of fraud.  *Id.*  In essence, the

court found that plaintiffs' scienter allegations were merely that defendants violated GAAP.  These

allegations, without more, were not sufficient to infer a strong inference of scienter.  *Id.*[6]

Leave to Amend:         The court permitted plaintiffs to amend their complaint "one final"

time despite not having made a formal motion to amend nor making any proffer of the additional

information that could be included in an amended complaint.  *Id.* at 414.

---

[5]        Defendants also moved to dismiss on materiality and loss causation grounds.  Because the
court determined that falsity and scienter were not pled properly, the decision does not discuss these
other grounds for dismissal.  *Id.* at 414 n.14.

[6]        The court mentions that plaintiffs relied upon five confidential sources but does not analyze
the sufficiency of these allegations.  *Id.* at 405.

**Application to *Dana* Case**:  Here, plaintiffs do not rely only on defendants' GAAP violations to support scienter.  Plaintiffs have alleged that defendants received specific, regular information through reports and internal meetings that informed them of the peril that Dana was experiencing.  Plaintiffs also alleged that defendants represented that they personally evaluated Dana's financial controls and assured investors that they were effective and adequate to ensure that Dana's financial statements were being properly stated.  Also not present in *Caiafa*, is the proximity between the last report of good news and the announcement of the bad news.  Here, merely six weeks separates defendants' announced triumph over rising steel costs and cost cutting initiatives, and their blaming of these factors for the need to write-off nearly $1 billion in assets and restate substantial portions of Dana's net income.

     *Helwig* **Factors Alleged**:    None.

> **2.**    ***Heller v. Goldin Restructuring Fund, L.P.,***
> **590 F. Supp. 2d 603 (S.D.N.Y. 2008)**

**Facts**: Plaintiff, an investor who suffered a substantial loss from an investment in defendants' fund, contended that defendants, both verbally and in written documents, made material misrepresentations regarding the funds' capitalization, which he relied upon.  *Id*. at 608.

**Relevant Holdings**:

<u>Scienter</u>:    The court found that plaintiff adequately pled the key elements of a §10(b) claim in compliance with the PSLRA, 15 U.S.C.S. §78u-4(b).  In particular, the investor adequately alleged material misrepresentations and omissions by asserting his reliance on defendants' solicitation documents and statements, which failed to disclose that the fund was severely undercapitalized.  *Id*. at 616.  The complaint pled fraudulent intent by defendants' knowing misstatements about the funds' capitalization, particularly since defendants possessed a financial stake in the funds.  *Id*. at 620-21.  Plaintiff sufficiently pled loss causation by alleging that his loss was foreseeable and caused by the statements regarding the funds' capitalization.

**Application to *Dana* Case**:   This case is much like *Dana* where defendants issued false statements about the financial condition of the company, causing the stock to artificially inflate, only in *Heller* defendants issued false statements about a fund (instead of a corporation) in order to entice investors.  As in *Heller*, once the truth was revealed about Dana's true financial condition, the stock plummeted and plaintiffs suffered losses.  Defendants in *Dana* were likewise motivated to create a false positive impression of the company as their jobs and salaries depended on the company's success.

*Helwig* **Factors Alleged**:     Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation of defendants in the form of saving their salaries and jobs.

> **3.**     ***In re Avon Prods., Inc. Sec. Litig.,***
> **No. 05 Civ. 6803 (LAK) (MDH), 2009 U.S. Dist. LEXIS 34564**
> **(S.D.N.Y. Feb. 23, 2009)**

**Facts**:   Plaintiffs filed this class action against Avon and three of its senior officers, asserting that defendants were responsible for materially false and misleading statements during the pertinent period concerning Avon's business operations in three geographic markets – China, the United States and Mexico – and that class members were consequently injured in purchasing shares that had been artificially inflated by those corporate statements.  *Id*. at *3-*4.  Specifically, plaintiffs alleged that defendants made positive statements about their company's financial well-being during a time in which the retailers were unhappy with the company.

**Relevant Holdings**:

Scienter:     The court dismissed plaintiffs claims for various reasons, the only relevant portions of which are as follows: (1) plaintiffs could not plead facts showing that defendants knew, or should have known, of retailer distress (*id*. at *60); claims of omitted facts were actually present in the media (*id*. at *74-*75); and plaintiffs could not link defendants bad acts to a reasonably

quantifiable downturn in the company's economic performance (*id*. at *79), as sales dropped only one to two percentage points during the relevant time period (*id*. at *35).  Ultimately, plaintiffs allegations failed to connect the false and misleading statements to defendants knowledge of the falsity or misleading nature of the statements.

Safe Harbor:   The company publicly noted uncertainties about the productivity of its sales representatives which the court held sufficiently cautioned and addressed plaintiffs' allegations. *Id*. at *77.

Leave to Amend:   Plaintiffs were not granted leave to amend because they already had a previous opportunity to replead their complaint to comply with the standards of the PSLRA and they did not present any new suggestions as to how another pleading would remedy the complaint. *Id*. at 92.

**Application to *Dana* Case**:   As more fully explained in Pltfs' Opp., plaintiffs in the *Dana* case have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates.  Indeed, Dana admitted as much in their restatement.  Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports.  In fact, defendants comments to the market addressed the same discrete subjects that was presented in the internal reports.  Richter, for example, told investors on April 21, 2004, exactly what earnings Dana was poised to post, and denied any "discernable impact" on Company operations from steel prices.  Burns similarly insisted on July 21, 2004, that Dana's (purportedly) strong financial results showed the Company's ability to "more than offset[] higher raw material prices."  It would have been nearly impossible for defendants to be unaware of the ongoing fraud.

As for cautionary statements, none of Dana's statements rise to a level so as to invoke protection under the safe harbor provision. None of the statements particularly address plaintiffs' allegations of fraud, rather the statements are little more than a listing of rote general factors such as "increases in its commodity costs," "continued availability of necessary goods," and "our ability and that of our customers to achieve projected sales and production levels" applicable to any business.

With regard to leave to amend, plaintiffs, here, have identified several ways in which they could add allegations to their Complaint should the Court find it necessary. *See* Ex. A.

*Helwig* **Factors Alleged**:       Factor No. 1 – Insider trading; Factor No. 2 – Divergence between internal reports and external statements.

### 4.     *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007)

**Facts**:  Scottish Re Group ("Scottish Re") is a holding company engaged in the international reinsurance business and incorporated in the Cayman Islands, with its principal offices located in Bermuda. *Id.* at 375. The complaint alleged that defendants violated federal securities laws in connection with Scottish Re's accounting for deferred tax assets in its financial statements and its certifications of the adequacy of the company's internal controls. *Id.* Specifically, plaintiffs alleged that defendants knew, or were reckless in not knowing, that the securitization of certain assets would transfer the cash flows from those assets away from the company. *Id.* at 376. Plaintiffs alleged that defendants completed several separate financings. In December 2005, Scottish Re completed a $450 million XXX securitization through an orphaned special purpose entity, Orkney Re II, PLC, incorporated in Ireland. In May 2006, Scottish Re completed a $2.1 billion securitization of all ING Acquisition assets that had Regulation XXX and AXXX reserve requirements through a special purpose entity called Ballantyne Re PLC, also incorporated in Ireland. As a result, those assets were no longer capable of generating net income for Scottish Re impairing the company's deferred tax assets. *Id.* at 376-77. However, defendants stated repeatedly that the company maintained its

deferred tax assets based on management's estimates of the future profitability of its taxable entities, which in turn were based on current forecasts and forecasts for the period for which losses may be carried forward. *Id.* at 378.

Defendants' moved to dismiss. The district court denied in part and granted in part defendants' motion. The portion granted related to the motion filed by Scottish Re's auditors. The district court held that the claims against the company and its officers were properly stated. *Id.* at 375, 398.

**Relevant Holdings**:

Scienter:        The court found that plaintiffs had adequately pled defendants' scienter concerning their statements relating to the company's deferred tax assets and internal controls. *Id.* at 393. The court found that the complaint alleged that defendants knew about the accounting pronouncement that governed the maintenance of deferred tax assets by companies as it quoted it in its Securities and Exchange Commission ("SEC") filings; knew about the large transactions that would effect the future income of the company; knew that transaction would eliminate a block of income to the company that would be used to offset the deferred tax assets. *Id.* at 393-94. All these reasons, the court found, supported an inference that the "defendants knew, or were at the very least reckless in not knowing" that the company's deferred tax assets were not accurately stated, which in turn made the company's financial statements false. *Id.* at 394. The court concluded that "[i]t is simply not a plausible opposing inference that the Company's officers – sophisticated executives actively engaged in the planning of these transactions – were ignorant of the transactions' consequences on the Company's deferred tax assets. The Complaint adequately alleges that the Scottish Re defendants knew, or were at the very least reckless in not knowing, that the financial statements were false when made. The 'unsettled circumstances' that were created by the securitization plans were staring them in the face. Moreover, the fact that there was a large, $112

million 'surprise' valuation that allegedly wiped out a year's worth of the Company's earnings also provides some circumstantial evidence of scienter." *Id.*

Moreover, the court held that "***[t]his is not a case where plaintiffs are pleading fraud based on changed circumstances that were unforeseen by defendants at the time they made their statements. Rather, plaintiffs have cited contemporaneous circumstances (none of which changed), of which the Scottish Re Defendants' were aware, and which made their failure to take an earlier valuation allowance tantamount to conscious misbehavior sufficient to support a strong and cogent inference of scienter***." *Id.*

Confidential Witness Allegations:    The court also found sufficient plaintiffs' allegations based on information attributed to confidential witnesses.  The court found that the complaint contained sufficient allegations about these witnesses to determine that they were in positions to know the information attributed to them.  *Id.* at 392.

SOX Certifications:    The court also found that plaintiffs had pled enough facts to infer that defendants were "reckless in their failure to discover and disclose" the company's internal control weaknesses.  *Id.* at 395.  Specifically, plaintiffs' allegations from confidential witnesses that the controls within the company were faulty were adequate to strongly infer defendants' scienter.  *Id.*

**Application To *Dana* Case**:  Defendants, here, also failed to timely take a valuation allowance against Dana's deferred tax assets.  Here, defendants also indisputably knew and understood the consequences of the rising steel costs to Dana's current and future revenue streams.  Here, defendants also blamed the need to take the tardy valuation allowance and wipe out the $1 billion asset on factors that were not new or unexpected but that had been plaguing the company since before the class period.  Here, unlike in *Scottish Re*, defendants **lowered** the existing valuation allowance against the deferred tax assets during the class period in an effort to post larger quarterly profits.  Defendants, here, as in *Scottish Re*, knew "or were at the very least reckless in not knowing"

that the deferred tax assets reported quarterly by Dana were not fairly stated.  Notably, the *Scottish Re* court found that scienter was stated by ***either*** actual knowledge or recklessness leaving no doubt that the court did not determine that statements concerning the deferred tax assets were forward-looking statements for which the plaintiff must plead actual knowledge to satisfy the PSLRA's pleading requirements.  Tellingly, there is no discussion of whether these statements were forward looking anywhere in the opinion.  The reason is clear – it is because the safe harbor specifically excludes statements made in a company's historical financial statements where deferred tax assets, and the associated valuation allowances are included.  Likewise, defendants' statements concerning Dana's deferred tax assets are not subject to the actual knowledge requirement.

*Helwig* **Factors Alleged**:      Factor No. 2 – Divergence between internal reports and external statements on the same subject; Factor No. 6 – Disregard of the most current factual information before making statements.

### 5.  *In re Elan Corp. Sec. Litig.,* 543 F. Supp. 2d 187 (S.D.N.Y. 2008)

**Facts**:  Plaintiff investors filed a class action securities fraud suit alleging that defendants, a bio-technology company and several of its officers and directors, made material misrepresentations and omissions regarding the safety, commercial viability, and projected market share of a drug to treat multiple sclerosis.  *Id*. at 194.  Defendants moved to dismiss.

**Relevant Holdings**:

<u>Scienter</u>:      The investors claimed that they purchased securities at prices that were inflated due to defendants' misstatements regarding expected revenues from the drug, that the drug was a potential treatment for all Multiple Sclerosis ("MS") patients without restriction, and the drug's safety profile.  *Id*. 194-95.  The investors claimed that these statements were fraudulent for several reasons, including that they did not reveal that the drug had inherent immunosuppressive effects, caused severe adverse events, and was usable for only a very limited MS patient population.

*Id.* at 199.  In particular, the investors failed to allege that information available to defendants during the class period constituted evidence of a statistically significant relationship between the drug and certain opportunistic infections.  *Id.* at 214.  Further, the court found that plaintiff's allegations as to motive were insufficient because it's reasons – motivation to make a profit, to avoid bankruptcy, or to finance the successful launch of a product – are reasons for any corporation to be motivated and therefore do not support in inference of scienter.  *Id.* at 216.

  **Application to *Dana* Case**:   This case is not applicable to the *Dana* case.  In *Elan*, plaintiffs essentially failed to allege that defendants knew that the alleged misrepresentations they were making were indeed misleading.  *See id.* at 214.  In *Dana*, however, plaintiffs have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates.  Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports.  In fact, defendants comments to the market addressed the same discrete subjects that was presented in the internal reports.  Richter, for example, told investors on April 21, 2004, exactly what earnings Dana was poised to post, and denied any "discernable impact" on Company operations from steel prices.  Burns similarly insisted on July 21, 2004, that Dana's (purportedly) strong financial results showed the Company's ability to "more than offset[] higher raw material prices."  It would have been nearly impossible for defendants to be unaware of the ongoing fraud.  The only opposing inferences offered by defendants' – explained by defense counsel broadly as anything other than fraud, such as "good faith misjudgment" or "oversight" (*see* transcript of motion to dismiss hearing on May 18, 2009 at 3:07-16) – are no more compelling as an inference of deception and fraud, and,

as reiterated in the appellate decision in this case (*Dana*, 547 F.3d at 571), a tie of inference must go to plaintiffs.

   *Helwig* **Factors Alleged**:  Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

## III. THIRD CIRCUIT

   A.  **Court of Appeals Decisions**

     1.  ***Institutional Investors Group v. Avaya, Inc.*,**
        **No. 06-4595, 2009 U.S. App. LEXIS 9110**
        **(3d Cir. Apr. 30, 2009)**

   **Facts**: Defendant Avaya Inc. ("Avaya") sells communications products and services. Plaintiffs alleged Avaya, through its Chairman and CEO, and its CFO, "(1) affirmatively denied unusual price competition was occurring during the class period, despite knowing there was price competition that was hurting profit margins; and (2) issued baseless financial projections and positive portrayals to the market despite knowing the projections and portrayals were impossible to fulfill in light of intense price competition and problems with the company's 'go-to-market' (GTM) strategy." *Id.* at *2. Specifically plaintiffs alleged a "two-pronged fraud scheme to increase Avaya's stock price." *Id.* at *14. First, plaintiffs alleged that defendants "denied that Avaya was offering unusual price discounts and that its profit margins were being impaired. Plaintiffs contended the 'true facts' show Avaya was in fact encountering serious pricing pressures and was forced to grant unusually large discounts in negotiations with clients, which would manifest themselves in less-profitable contracts booked in subsequent quarters (since the negotiation process 'regularly lasted months'), eviscerating margins. Second, plaintiffs alleged the financial projections Avaya released were false or misleading because defendants knew the projections could not be achieved because of unusual pricing discounts and declining sales due to Avaya's sales force realignment under the GTM strategy, which impaired both earnings and revenues." *Id.* at *14-*15.

The district court granted defendants' motion to dismiss for three reasons: "(1) some statements defendants allegedly made were 'forward-looking' and protected under the PSLRA's Safe Harbor provision; (2) other alleged statements were not actionably false or misleading; and (3) with respect to remaining statements that may have been actionable, shareholders failed to plead facts giving rise to a strong inference of scienter as the PSLRA requires." *Id.* at *19. The Third Circuit affirmed in part and reversed in part and remanded for proceedings consistent with their opinion. *Id.* at *1-*2.

**Relevant Holdings**:

<u>Scienter</u>:      Plaintiffs alleged that defendants repeatedly assured analysts and investors that, although there was pressure in the market, there were no significant changes to the pricing environment. However, plaintiffs alleged that defendants "knew of or recklessly disregarded the fact that competition was forcing unusually large 20% to 40% price discounts that were hurting profit margins." *Id.* at *72. Plaintiffs also asserted that the magnitude of the missed forecasts and their temporal proximity to defendants' assurances, also support a strong inference of scienter.

Plaintiffs argued that the "core operations inference, the magnitude of the miss, and its temporal proximity do not stand alone, but instead 'bolster' the 'true facts' alleged – the confidential witness reports," an analyst report, and defendants' alleged admissions. In response, defendants contended "none of the [confidential witnesses] claimed to have had any connection to or communication with [defendants], or knowledge about the information or records to which [defendants] had access." According to defendants, the confidential witnesses "offered no factual basis to show that [defendants] knew, or were reckless regarding the risk that, their statements were false or misleading when made." *Id.* at *72-*73.

The court rejected defendants arguments finding that "[i]t is true that Shareholders do not point to any particular document or conversation that would have informed Peterson or McGuire of

unusual discounting during the class period.  The existence of such a direct link would fortify Shareholders' allegations that defendants' statements about discounting were knowingly or recklessly false.  But the Supreme Court has made clear that plaintiffs' allegations of scienter 'need not be irrefutable, *i.e.*, of the smoking-gun genre.'  [*Tellabs*, 551 U.S. at 323-24.]  Instead, our inquiry is 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter.'  [*Id*. at 321-22.]  Accordingly, as with all totality-of-the-circumstances tests, analysis is case specific.  It will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter.  *See* [*South Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ('*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation.'); *see also In re Cabletron Sys., Inc.*, 311 F.3d 11, 32 (1st Cir. 2002)] "('Each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template.')."  *Institutional Investors*, 2009 U.S. App. LEXIS 9110, at *73-*74.  The court held that the totality of the facts alleged by shareholders established a strong inference of scienter with respect to McGuire's March denials of unusual pricing pressure.  *Id*.

The court found "most powerful," plaintiffs allegations of the CFO's repeated denial to analysts that Avaya was discounting.  *Id*. at *75.  "Because of the context (specific analyst queries) and content (consistent denials of unusual discounting) of McGuire's statements, the possibility that McGuire was ignorant is not necessarily exculpatory.  Even if McGuire were not aware of the full extent of the unusual discounting, or the entirety of the other circumstances alleged by Shareholders, he might be culpable as long as what he knew made obvious the risk that his confident, unhedged denials of unusual discounting would mislead investors.  *See* [*In re Advanta Corp. Sec. Litig.*, 180 F.3d at 525, 535 (3d Cir. 1999)] (explaining that allowing recklessness to serve as a sufficient basis

for liability "promotes the policy objective[] of discouraging deliberate ignorance"); [*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d at 702, 704 (7th Cir. 2008)] ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk."). Given the specificity and repetition of the analysts' questions, McGuire's position as Chief Financial Officer, and the alleged state of Avaya's business at the time the questions were asked, there was a strong inference that McGuire's behavior reached this threshold of recklessness." *Institutional Investors*, 2009 U.S. App. LEXIS 9110, at *78-*79.

The court concluded that, "[h]ere, the centrality of operating margins to the 'Avaya story,' the magnitude and pervasiveness of the alleged discounting, and the proximity of the March statements to the end of the quarter and the release of Avaya's disappointing results, all diminish the plausibility of innocent explanations for McGuire's flat denials of unusual pricing – for example, that developments subsequent to the statements account for the mediocre results, or that the discounting would not have been apparent to McGuire at the time analysts asked about it.  As the plausibility of these benign explanations shrinks, the cogency of the culpable explanation – that McGuire either knew his denials of discounting were false or recklessly disregarded the obvious risk of their falsity – correspondingly grows." *Id.* at *83.

Confidential Witness Allegations:     Finding that the Third Circuit law pre-*Tellabs* remained viable, the court found that "[i]n the case of confidential witness allegations, we apply that requirement by evaluating the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.' [*Cal. Publ. Employees Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004)]. If anonymous source allegations are found wanting with respect to these criteria, then we must discount them steeply. This is consistent with *Tellabs's* teaching that 'omissions and ambiguities count against inferring

scienter' under the PSLRA's particularity requirements.  [*Tellabs*, 551 F.3d at 324-25].  If, on the other hand, a complaint's confidential witness allegations are adequately particularized, we will not dismiss them simply on account of their anonymity." *Institutional Investors*, 2009 U.S. App. LEXIS 9110, at *55-*56.  The court found that the allegations attributed to confidential witnesses met this test.  *Id.* at *57, *66.

Insider Trading:        The court found that while plaintiffs alleged that defendants engaged in improper trading, that those allegations did not "enhance" the inference of scienter.  *Id.* at *107-08.

**Application to *Dana* Case**:   Defendants, here, also argue that plaintiffs have not alleged a direct link between the negative internal information at Dana and defendants.  Even if defendants are correct (which they are not), *Institutional Investors* makes clear that such a link is not required to establish a strong inference of scienter.  Plaintiffs here allege that defendants repeatedly denied to analysts and investors that Dana was suffering ill-effects from rising steel prices.  Indeed, defendants' statements proclaim such problems were "overcome" at Dana.  However, like in *Institutional Investors*, the cost of steel was central to the profitability at Dana.  Defendants' adamant and repeated denials strongly infer that they were paying close attention to the effects of the steel costs on Dana's financial performance.  Additionally, defendants proclaimed that Dana was free from the rising costs ill-effects but six weeks later they blamed these costs for the need to write off nearly $1 billion in assets.  The totality of these allegations, like in *Institutional Investors*, strongly infer that defendants knew the bad news long before it was disclosed to investors.

***Helwig* Factors Alleged**:        Factor No. 1 – Insider Trading at a suspicious time or in an unusual amount; Factor No. 2 – Divergence between internal reports and external statements on the same subject; Factor No. 3 – Closeness in time of an allegedly fraudulent statement or omission and

the later disclosure of inconsistent information; Factor No. 6 – Disregard of the most current factual information before making statements.

2.    ***Key Equity Investors, Inc. v. Sel-Leb Mktg.*,
No. 06-1052, 2007 U.S. App. LEXIS 21392
(3d Cir. Sept. 6, 2007)**

**Facts**:  Plaintiffs brought a class action securities case against defendants that was dismissed at the lower court.  *Id*. at **1.  Plaintiffs sought appeal and the appellate court affirmed.  *Id*.  Plaintiffs' securities claims were based on defendant Sel-Leb Marketing's ("Sel-Leb") numerous statements regarding the financial performance of the company, including within SEC forms and in a press release.  *Id*. at **2.  The statements generally expressed financial growth and optimism in the company's near future, including significant increases in sales and earnings.  *Id*.  A few months later, the company reported a weakened financial health, including production problems and unforeseen difficulties in obtaining the information needed to make financial disclosures.  *Id*.  Eventually, the company disclosed that it was not in compliance with its line of credit from Merrill Lynch and would be delisted from Nasdaq.  *Id*.

**Relevant Holdings**:

This is an unpublished opinion.

<u>Scienter</u>:  The court found that because as almost all statements identified by plaintiffs as misleading were vague projections about the company's financial growth or general optimism about its financial health, and such vague positive portrayals were not actionable.  *Id*. at **13-**17.  The Court held that even though the complaint adequately identified defendants' earnings statements as materially misleading, plaintiffs failed to accompany these statements with sufficient allegations of scienter.  *Id*.  Plaintiffs primarily relied on allegations of defendants' motive and opportunity to commit fraud, with the inference that defendants had a motive to overstate earnings because they needed to meet the requirements necessary to sustain the Merrill Lynch credit in order to continue

operating. *Id.* However, the court held the complaint was bereft of any facts supporting this conclusion – such as what particular information was hidden, what financial figures were manipulated, and when any of the defendants knew of or implemented such fraudulent devices. *Id.* As such, plaintiffs' allegations failed to raise an inference of scienter to support its securities allegations and the lower court's dismissal was affirmed.

**Application to *Dana* Case**:   This case is not applicable to the *Dana* case.   To begin, plaintiffs do not primarily rely on motive and opportunity as did the plaintiffs in *Key Equity*. Further, Dana did not make any statements that are unactionable projections.  Unlike *Key Equity*, the *Dana* plaintiffs have specifically pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates.

***Helwig* Factors Alleged**:       Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

**B.      District Court Decisions**

**1.      *City of Hialeah Employees Ret. Sys. & Laborers Pension Trust Funds for N. Cal. v. Toll Bros.*, No. 07-1513, 2008 U.S. Dist. LEXIS 66906 (E.D. Pa. Aug. 29, 2008)**

**Facts**:  Plaintiffs filed a class action securities case that alleged defendants made written and oral statements regarding current conditions, as well as forward-looking statements, that were material misrepresentations about Toll Brothers, which failed to disclose the negative developments that were adversely impacting the business. *Id*. at *3.  Specifically, plaintiffs alleged that during the class period, defendants made material misrepresentations and omitted material facts in public written and oral statements about Toll Brothers' revenues, growth and stock, as well as consumer demand for luxury homes built by Toll Brothers.  *Id*. at *4.

**Relevant Holdings**:

<u>Safe Harbor</u>:    The court rejected defendants' argument that their statements were protected forward looking statements based on historical performance and hard data because to consider such an argument would require the court to make a factual determination – ***an inappropriate exercise at the motion to dismiss stage of litigations***.  *Id*. at *8.  Plaintiffs had sufficiently pled that several material adverse facts existed during the time future projections were made rendering the projections unreasonable.  *Id*.  The court held that because defendants' forward looking statements included misrepresentations about then-existing facts or facts that had already transpired, the safe harbor provision did not apply.  *Id*. at *11.

**Application to *Dana* Case**:    This case is applicable to *Dana* because, like Toll Brothers, defendants' statements regarding Dana's projected earnings included misrepresentations about Dana's then-existing financial condition.  Like *City of Hialeah*, the safe harbor doctrine does not apply to Dana's statements.  This Court should, likewise, reject any invitation to make an inappropriate factual determination of defendants' statements.

*Helwig* **Factors Alleged**:    Factor No. 1 – Insider trading; Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – The self-interested motivation of defendants in the form of saving their salaries or jobs.

> 2.    ***In re Intelligroup Sec. Litig.*,**
>       **527 F. Supp. 2d 262 (D.N.J. 2007)**

**Facts**:  Plaintiffs alleged that defendant company (a company that assists a variety of other companies with setting up and maintaining various kinds of e-commerce) knowingly issued false and misleading financial statements as a means to artificially inflate the company's stock.  *Id*. at 272.  After issuing a press release announcing it would have to restate its financials – the Company's stocks dropped causing plaintiffs to suffer losses and file this suit.  *Id*.

**Relevant Holdings**:

Scienter:        With regard to scienter, the court found the following: defendants had no motivation outside typical goals and aspirations common to the business community (*id*. at 341-42) and such typical goals did not raise an inference of scienter; resignations of two individual defendants did not support scienter as the resignations were sporadic and plaintiffs did not allege the resignations were associated with the alleged fraud (*id*. at 347-48); GAAP violations were not enough to support scienter as plaintiffs did not allege that defendants knew about the GAAP violations (*id*. at 350-51) – the bulk of the errors resulted from a spread sheet wherein one faulty entry results in a multitude of changes (*id*. at 371-72), and the violations resulted in understatements of the company's financials rather than overstatements (*id*.); SOX certifications did not establish scienter because plaintiffs were unable to plead that defendants knew or consciously avoided exposure to the information that rendered their certifications erroneous (*id*. at 355); confidential witness testimony did not support the fact that defendants knew, or should have known, that misstatements were being made or that internal controls were failing (*id*. at 367-68).

**Application to *Dana* Case**:   This case is not applicable to the *Dana* case.  Plaintiffs in *Intelligroup* overwhelmingly failed to connect the misleading statements and defendants' knowledge of the falsity.  *Id.* at 350-51, 355, 367-68.  As more fully explained in Pltfs' Opp., plaintiffs in the *Dana* case have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements.  Further, the facts of *Intelligroup* are distinguishable Intelligroup's stock actually dropped several times during the class period in response to defendants' alleged false-positive statements.  *Id.* at 299, 302.

**_Helwig_ Factors Alleged**:      Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation of defendants.

IV.    **FOURTH CIRCUIT**

A.    **Court of Appeals Decisions**

1.    *Cozzarelli v. Inspire Pharms. Inc.*,
       **549 F.3d 618 (4th Cir. 2008)**

**Facts**:  This case involves claims that a pharmaceutical company and three of its directors violated federal securities laws.  *Id.* at 620.  Plaintiffs' primary allegation is that defendants committed securities fraud by overstating the prospects for an experimental drug that Inspire was developing to treat dry eye disease.  *Id.*  Specifically, plaintiffs alleged that defendants intentionally misrepresented that the drug trial would be successful, ultimately leading to FDA approval of the drug in question.  *Id.* at 622-23.

The district court dismissed the complaint finding that it neither pled the falsity of any of the challenged statements nor defendants' scienter.  *Id.* at 625.  The Fourth Circuit affirmed the dismissal, assuming that falsity was satisfied and holding that scienter was not properly pled.  *Id.*

**Relevant Holdings**:

Scienter:        The court found that no inference of scienter existed because the inference that the defendants acted to protect their competitive advantage was the more powerful and compelling inference.  *Id.* at 626.  Moreover, while acknowledging that a "smoking-gun" is not required, plaintiffs alleged no internal documents that contradicted defendants' public representations which the court noted makes inferring scienter more troublesome.  *Id.*

Insider Trading:        The court also rejected the insider trading allegations finding that the defendants did not sell an unusual amount of stock, when stock holdings and vested options were considered.  *Id.* at 628.  Additionally, defendants increased their stakes in Inspire during the class period by acquiring vested options.  *Id.*

SOX Certifications:   With no other basis for scienter, the court found that plaintiffs' bare allegation that defendant CEO lied when she executed the SOX certifications was insufficient to support the required scienter.  *Id.* at 628 n.2.

Leave to Amend:   The court affirmed dismissal with prejudice because the plaintiffs failed to do more than make a cursory request to amend in a footnote of their brief opposing the motion to dismiss, and in their objection to the recommendation of the magistrate judge.  *Id.* at 630.

**Application To *Dana* Case**: Here, plaintiffs have pled the critical transmission of contradictory information to defendants absent in *Cozzarelli*.  Plaintiffs also plead facts indicating why the SOX certifications signed by defendants were false and recklessly executed.  Finally, unlike in *Cozzarelli*, plaintiffs here have made a detailed proffer to substantiate their request for an opportunity to amend the Complaint should the court dismiss it.  *See* Ex. A.

***Helwig* Factors Alleged**:   Factor No. 1 – Insider trading at a suspicious time or in an unusual amount.

### B.      District Court Decisions

#### 1.      *In re Bearingpoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759 (E.D. Va. 2007)

**Facts**:  Class action plaintiff investors in the stock of Bearingpoint brought an action against the former officers of the corporation, alleging that the officers published false financial information concerning the corporation and made misrepresentations and omissions concerning a goodwill impairment charge.  *Id.* at 761.  The officers moved to dismiss the complaint.  The investors contended that the corporation's financial statements contained material errors, and that the officers failed to disclose lax internal controls and dysfunctional accounting systems.  *Id.* at 768-69.  The investors also asserted that the corporation overpaid for foreign acquisitions and misrepresented the timing and magnitude of the goodwill impairment charge resulting from the acquisitions.  *Id.* at 770-71.

**Relevant Holdings**:

Scienter:        The court found that plaintiffs' allegations did not give rise to an inference of scienter  with respect to defendants' disclosures regarding the state of its internal controls.  *Id*. at 770.  The court found that plaintiffs' allegations did not sufficiently link intent to defraud on the part of any particular defendant to any particular statement regarding internal controls.  *Id*. at 769-70.  Specifically, plaintiffs failed to allege that any individual at BearingPoint knew of the problems with the internal controls prior to their announcement warning investors of the ongoing problems with its controls (after which the corporation restated its losses and consistently warned investors of ongoing problems with its controls).  *Id*. at 770, 772-73.  The court found it significant that BearingPoint filed an amended 10-Q disclosing problems with internal controls just ten days after filing a 10-Q providing that there were no problems, reasoning that a company with the intent to deceive investors would not file an amended 10-Q announcing problems with its internal controls just weeks before a securities offering.  *Id*. at 770.  Further, the corporation accurately reported an event triggering goodwill impairment occurred that would result in a material charge, and plaintiffs made no allegations that the officers had prior knowledge of the magnitude of that charge.  *Id*. at 771-72.  At most, the investors alleged mismanagement and poor business judgment with no evidence of fraudulent intent.  *Id*. at 775.

**Application to *Dana* Case**:   This case is not applicable to the *Dana* case.  As more fully explained in Pltfs' Opp., plaintiffs in the *Dana* case have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates, sufficiently linking knowledge and the misleading statements.  Plaintiffs in *Bearingpoint* did not make such allegations linking knowledge to the statements.

- 31 -

*Helwig* **Factors Alleged**:      Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

## V.      FIFTH CIRCUIT

### A.      Court of Appeals Decisions

#### 1.      *Cen. Laborers' Pension Fund v. Integrated Elec. Svcs., Inc.,* 497 F.3d 546 (5th Cir. 2007)

**Facts**:   Plaintiffs brought claims against defendants for violations of §10(b) of the Exchange Act.   Integrated Electrical Services ("IES") provided electrical contracting services in the United States through a network of more than 40 subsidiary companies.   Despite its extensive use of subsidiaries, which were managed regionally, IES held itself out as an integrated company and filed consolidated financial statements. Starting in April 2003, IES made various statements expressing confidence in the company's financial status, and over the next 16 months the company's stock price generally increased.   In early August 2004, IES publicly disclosed that it could not release its quarterly earnings numbers on time due to an ongoing evaluation of certain projects. Later in August 2004, the company acknowledged that "material weaknesses" in the company's internal controls might require restatement of prior financial figures. Ultimately, IES restated its financial results for three periods: fiscal year 2002, fiscal year 2003, and the first two quarters of fiscal year 2004.   *Id.* at 549.

The district court dismissed the complaint finding that it did not sufficiently plead scienter. *Id.* at 550.   While the Fifth Circuit found that some elements of scienter existed, it held that the totality of the allegations failed to meet the PSLRA's requirements.   *Id.* at 555.

**Relevant Holdings**:

GAAP Violations:      The court found that the complaint described in detail the GAAP violations.   *Id.* at 552.   Those GAAP violations included the restatement of 2002, 2003 and the first

two quarters of 2004 financial results, and the acknowledgment that there were "material weaknesses" in the company's internal controls. *Id.* at 549. These allegations "provide some basis to infer scienter" but standing alone do not establish scienter. *Id.* at 552.

Confidential Witness Allegations:   The court rejected plaintiffs' allegations as insufficiently particular. *Id.* Acknowledging that confidential source statements are a "permissible basis on which to make an inference of scienter," the court found that the lack of any alleged job descriptions, responsibilities and dates of employment counted against the weight to be afforded the information attributed to the witnesses. *Id.*

SOX Certifications:   The court adopted the Eleventh Circuit's reasoning concerning the import of SOX certifications in assessing whether a strong inference of scienter is pled. Thus, where allegations exist that a defendant executed a SOX certification when he had "reason to know, or should have suspected" that the financial statements contained material misstatements because of the existence of "red flags," then a scienter inference was proper. *Id.* at 555. The court found plaintiffs' allegations lacking because they failed to "explain the link between these statements about the internal controls and the actual accounting and reporting problems that arose." *Id.*

Insider Trading:   The court rejected plaintiffs' allegations of insider trading as to one defendant but not the other. *Id.* at 553-554. As to the rejected allegations, the court found that because the defendant retained a large portion of his holdings, an inference of scienter was not plausible. *Id.* at 553. However, the court found that plaintiffs' allegations that the other defendant set up a trading plan pursuant to Rule 10b5-1 as a rouse to permit his trading of a large portion of his stock in a non-suspicious manner contributed to an inference of scienter as to that defendant. *Id.* at 554.

Leave to Amend:   The court also affirmed the denial of leave to amend. *Id.* at 556. Rejecting defendants' arguments that plaintiffs merely asked "in passing" to amend their complaint

"to fix any infirmity," the court found that plaintiffs did provide some indication of the new allegations that would be included in a proposed amended complaint. *Id.* However, those new facts, the court found, would not cure the lack of properly pled allegations of scienter. *Id.*

**Application To *Dana* Case**: Like in *Cen. Laborers*', plaintiffs' here set forth in detail defendants violations of GAAP, including the reasons for the restatement, the specific internal controls that were lacking, and the amounts each quarter defendants overstated Dana's net income. Plaintiffs also detail the adverse internal information that defendants received and discussed with other Dana personnel. In doing so, plaintiffs also detail why defendants' SOX certifications were made recklessly. Finally, plaintiffs proposed amendment to the Complaint adds additional detail concerning the confidential witnesses that in all respects meet the particularity requirements outlined by the Fifth Circuit, and provide the vital bridge of communication between Dana's plants and defendants.

*Helwig* **Factors Alleged**:    Factor No. 1 – Insider trading at a suspicious time or in an unusual amount; Factor Two – Divergence between internal reports and external statements on the same subject; Factor Six – Disregard of the most current factual information before making statements.

> ### 2. *Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*, No. 08-10414, 2009 U.S. App. LEXIS 7133 (5th Cir. Tex. Apr. 8, 2009)

**Facts**: Plaintiffs brought a class action alleging securities fraud and common law fraud claims against defendants for allegedly making material misrepresentations and omissions of fact in connection with a self-tender offer to purchase certain convertible TXU Corp. securities (the "tender offer") in 2004. *Id.* at \*2. Specifically, plaintiffs alleged that defendants fraudulently misrepresented the timing and magnitude of a planned stock repurchase program and dividend

increase in order to induce the plaintiffs to participate in the tender offer.  *Id*.  The district court dismissed plaintiffs fraud claims and the appellate court affirmed.

**Relevant Holdings**:

Scienter:  The appellate court affirmed the lower court's decision.  In relevant part, the court held that the close proximity of the dividend increase to the end of the tender offer, though it provided some support for an inference of scienter, was insufficient, without more, to establish a strong inference of the requisite intent under federal securities law.  *Id*. at *22.  Further, none of the statements made by the corporation – a news release and a power point presentation – supported a compelling inference of fraud as plaintiffs made no allegations that management was aware or should have been aware that TXU planned to increase the dividend at the particular time period.  *Id*. at *23.

**Application to *Dana* Case**:   *Flaherty* is distinguishable because here, and as more fully explained in Pltfs' Opp., plaintiffs have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates.  Indeed, Dana admitted as much in their restatement.  Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports.  Not only that, the nature and number of the alleged accounting manipulations, coupled with the magnitude of the fraud bolsters an inference of scienter.  Here, Dana had to restate six quarters of accounting manipulations, and took a $44 million hit to reported net income.  Moreover, Dana suddenly wrote off a stunning $1 billion in deferred tax benefits, despite having increased them from $512 million to $895 million in the space of just one year.

*Helwig* **Factors Alleged**:      Factor No. 2 – Divergence between internal reports and external statements.

3.    ***Ind. Elec. Workers' Pension Trust Fund IBEW v.***
***Shaw Group, Inc.,***
**537 F.3d 527 (5th Cir. 2008)**

**Facts**:  Plaintiffs alleged that defendants violated the Exchange Act by misrepresenting the financial health of Shaw Group, Inc. ("Shaw").  Shaw provides engineering, design and construction services to the energy, chemical and environmental industries, as well as federal, state and local governments.  *Id.* at 531.  Plaintiffs alleged that defendants manipulated Shaw's financial statements in a variety of ways.   First, plaintiffs alleged that Shaw artificially inflated its earnings by manipulating the purchase method of accounting in connection with two acquisitions. Second, Shaw is alleged to have prematurely recognized revenue on long-term engineering, procurement and construction contracts by exploiting the percentage of completion method of accounting in violation of GAAP. Third, plaintiffs alleged that Shaw failed to disclose material issues affecting the viability of a major construction project. Fourth, plaintiffs claimed that the company overstated its backlog of contracts to give a false impression that demand for its services was higher than it actually was. Finally, plaintiffs alleged that Shaw delayed paying vendors or did not pay them at all as a device to improve its reported cash flow.  *Id.* at 532.

Defendants moved to dismiss for failure to satisfy the PSLRA's pleading requirements for securities fraud cases.  The district court denied the motion without a written opinion but granted interlocutory review.  *Id.*  The Fifth Circuit reversed the dismissal holding that the complaint failed to allege facts from which a "strong inference of scienter" may be drawn against the defendants.  *Id.*

**Relevant Holdings**:

GAAP Violations:      The court noted that GAAP violations, without more, can not support a strong inference of scienter.  *Id.* at 534.  The court found that while plaintiffs alleged that defendants

accounting manipulations amounted to "hundreds of millions of dollars," there was no restatement of the financial results, nor did it allege that the company received qualified opinion from Shaw's auditor, never reported that Shaw was the victim of any accounting irregularities and did not suffer a liquidity crisis "as might have been expected if massive accounting fraud had occurred." *Id.* at 532.

Confidential Witness Allegations:   Many of plaintiffs' allegations of GAAP violations were grounded in information from confidential sources.  However, in each instance, the court found these allegations lacking sufficient details from which it could be inferred that the source was in a position to know the information attributed to it.  *Id.* at 537-42.

SOX Certifications:   Because plaintiffs were not able to allege that defendants knew about, or recklessly disregarded, information concerning the accounting manipulations that plaintiffs' alleged, their allegations concerning defendants' execution of SOX certifications also did not contribute to an inference of scienter.  *Id.* at 545.

Insider Trading:      The court also rejected plaintiffs' allegations relating to defendants' trades in Shaw stock.  In each instance the defendants sold after the expiration of a lock-up period, and made sales in line with past trading practices.  These factors negated plaintiffs' inference that the sales were suspiciously timed and made in unusual amounts.  *Id.* at 543-44.

**Application To *Dana* Case**:  Here plaintiffs allege a large restatement of Dana's net income, a massive write-off of assets, a liquidity crisis that sent Dana into bankruptcy, defendants' knowledge of, or reckless disregard for, the absent internal controls meant to fortify the accuracy of Dana's financial statements and receipt of information foretelling Dana's doom that remained concealed from investors by defendants – none of which was alleged in *Ind. Elec.*  Indeed, plaintiffs allege factors – restatement and liquidity crisis – that the Fifth Circuit observed would be "expected" where accounting fraud had taken place.  Furthermore, plaintiffs here allege the essential link between defendants and the adverse nonpublic information that was also missing in *Ind. Elec.*

***Helwig* Factors Alleged**:      Factor No. 1 – Insider trading at a suspicious time or in an

unusual amount; Factor No. 2 – Divergence between internal reports and external statements on the

same subject; Factor No. 6 – Disregard of the most current factual information before making

statements.

4.      ***Lormand v. US Unwired, Inc.,***
***565 F.3d 228; 2009 U.S. App. LEXIS 7452***
***(5th Cir. Apr. 9, 2009)***

**Facts**:  Plaintiff brought securities class action on behalf of persons who allegedly (1) bought

the common stock of US Unwired, Inc. ("US Unwired") at prices falsely inflated by the defendants'

material misrepresentations and (2) suffered economic loss when the true facts about the company's

operations and programs were publicly disclosed and its stock price declined as a result.  *Id.* at *1-

*2.  Defendants misrepresentations involved the implementation of its subprime cellular telephone

subscriber programs and defendants' drastic alteration of the relationship between US Unwired and

the Sprint network, of which US Unwired is an affiliate.  *Id.* at *2.  Plaintiff's case was dismissed by

the lower court and the Fifth Circuit reversed and remanded in part.  *Id.*

**Relevant Holdings**:

Safe Harbor:  The Fifth Circuit held that the district court erred in applying the safe harbor

provisions because the complaint adequately alleged that defendants knew their statements were

misleading.  *Id.* at *40.

Scienter:  The Fifth Circuit found scienter was established as plaintiff adequately alleged

defendants knew their statements were misleading when they pled that defendants publicly predicted

that the subprime programs would bring long-range benefits and success, even though they knew the

programs were a colossal mistake and would be economically disastrous.  *Id.* at *69-*71.  Plaintiff's

partial reliance on post-class period facts does not amount to "fraud by hindsight," but rather those

later events serve[d] to corroborate admissions of contemporaneous knowledge that "defendants

knew earlier what they chose not to disclose until later." *Id.* at *71-*72. The court held that the inference of intentional deception was equally as compelling as any other inference (defendants offered inferences of lack of knowledge – *i.e.* that the information was material or subject to public disclosure – and mistake – *i.e.* that they didn't intend to deceive the public), and the tie goes to the plaintiff. *Id.* at *70, *72.

**Application to *Dana* Case**:

Safe Harbor: The statements made in *Lormand* that were not protected under safe harbor are not unlike the vague and boilerplate statements made in the *Dana* case. For example, the *Lormand* court held the following were too vague: Sprint "may make decisions that adversely affect our business;" "[p]roblems with Sprint[]'s internal support systems could cause" delays and costs to customer service. *Id.* at *47. Further, statements limited in scope ("can adjust the program," "delays and costs to customer service,") and limited temporally ("from time to time") were equally insufficient. *Id.* at *47-48. The statements in *Dana* are little more than a listing of rote general factors such as "increases in commodity costs," "continued availability of necessary goods," and "our ability and that of our customers to achieve projected sales and production levels" applicable to any business. The fact that Dana made these same statements repeatedly through out the class period makes it a boilerplate statement. *Id.* at *42 ("As further evidence that the disclaimer is mere boilerplate, the disclaimer, only with slight variations, was used in conjunction with each alleged misrepresentation the district court exempted from analysis under the safe harbor provision."). *Id.*

Scienter: As in *Lormand*, plaintiffs in *Dana* have fully alleged that defendants knew that their statements were misleading. Indeed, Dana admitted as much in their restatement. The only opposing inferences offered by defendants, such as "good faith misjudgment" or "oversight" (*see* transcript of motion to dismiss hearing on May 18, 2009 at 3:07-16) – are just as compelling as

an inference of deception and fraud, and, as reiterated by the *Lormand* court above, a tie of inference must go to plaintiffs.

*Helwig* **Factors Alleged**:       Factor No. 1 – Insider trading; Factor No. 2 – Divergence of internal reports and external statements.

**B.    District Court Decisions**

**1.    *Beightol v. Navarre Corp.*,**
**No. 4:08cv00010-DPJ-JCS, 2009 U.S. Dist. LEXIS 6590**
**(S.D. Miss. Jan. 26, 2009)**

**Facts**: Plaintiff alleged that defendant Navarre Corporation, Inc. ("Navarre") and its executives made a series of misleading financial statements from 2003 through 2005 which grossly overstated the company's profits resulting in artificially inflated stock prices during that period. *Id.* at *1.  In June 2005, Navarre restated its earnings for several previous quarters explaining that expenses related to defendant Paulson's incentive-based deferred compensation plan should have been recorded as charges to income in the fiscal quarter ending December 31, 2003; $ 2.5 million more in expenses were recorded for the quarter ending on June 30, 2004; and a $ 2.4 million tax benefit was removed from its third quarter 2005 income and added to common stock. *Id.* at *1-*2.

**Relevant Holdings**:

Scienter:       Plaintiffs' allegations regarding defendants' knowledge of their misleading statements (causing defendants to have to restate their earnings), the timing of defendants' fraudulent acts with stock fluctuations and defendants' self-interested motivation in the form of a compensation package combined with corporate accounting practices that deviated from GAAP procedure gave rise to an inference of scienter. *Id.* at *9-*10.  That plaintiff purchased stock between the alleged under-reporting and the restated reporting lends credence to his allegations. *Id.* at *12.

**Application to *Dana* Case**:    This case is applicable to *Dana* as plaintiffs have likewise pled that (1) defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements; (2) that defendants acts caused the stock to plummet

- 40 -

whereby plaintiffs suffered financial losses; and (3) that defendants had self-interested motivation not only by way of compensation packages but so that Dana would be able to maintain its façade of financial health, enabling it to sell $450 million of debt and avoid lowered credit ratings.  These allegations are also in addition to allegations that defendants' corporate accounting practices deviated from GAAP procedures.  Indeed, the numbers in *Dana* are much more staggering:  Where Navarre restated its earnings lodging $ 2.5 million more in expenses and removing a $2.4 million tax benefit (*id*. at *12), Dana took a $44 million hit to reported net income and suddenly wrote off a stunning $1 billion in deferred tax benefits, despite having increased them from $512 million to $895 million in the space of just one year.

*Helwig* **Factors Alleged**:    Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation of defendants in the form of saving their salaries and jobs.

## VI.    SIXTH CIRCUIT

### A.    Court of Appeals Decisions

#### 1.    *J&R Marketing, SEP v. General Motors Corp.*, 549 F.3d 384 (6th Cir. 2008)

**Facts**:  Plaintiffs brought claims for violations of §§11 and 12(a)(2) of the Securities Act of 1933.  Plaintiffs alleged that defendants made misleading statements or omissions in the offering documents associated with a bond offering undertaken by GMAC.  *Id.* at 387.

Defendants moved to dismiss arguing that plaintiffs lacked standing to bring their claims and that they had no duty to disclose the alleged omitted information.  *Id.*  The district court agreed and dismissed the complaint.  The Sixth Circuit affirmed.  *Id.*

**Relevant Holdings**:    The court undertook no analysis relating to any issues relevant here.  Plaintiffs' claims against GMAC did not include a scienter element nor did the court address issues relating to forward-looking statement or the application of the PSLRA's safe harbor provision.

- 41 -

*Helwig* **Factors Alleged**:      None.

**2.**      ***Ley v. Visteon Corp.*,**
          **543 F.3d 801 (6th Cir. 2008)**

**Facts**:  Plaintiffs brought a securities class action against Visteon Corporation ("Visteon"), senior executives of Visteon, and Visteon's auditor Price Waterhouse Cooper for securities violations.  *Id*. at 804.  Visteon is a wholly owned subsidiary of Ford Motor Company that was spun-off as separate publicly traded company.  Pursuant to it's spin-off into the public market, Visteon filed a spin-off prospectus and SEC financial statement regarding its financial condition.  *Id*. at 805.  Plaintiffs alleged that the spin-off prospectus and financial statement contained false and misleading information that deceived the investing public and plaintiffs into purchasing artificially inflated securities.  *Id*.

**Relevant Holdings**:

<u>Scienter</u>:      The Sixth Circuit affirmed the lower court's dismissal and held that plaintiffs did not adequately allege scienter.  With regard to scienter as to Visteon and the individual defendants, the Sixth Circuit held that there was no inference of scienter for the following reasons: plaintiffs' allegations failed to show that the corporation and its officers acted recklessly in making misleading statements to the public regarding Visteon's financial condition (*id*. at 813); public statements by the corporate officers, such as a statement that the company "had a solid year," was not probative of scienter as they were too vague and out of context (*id*. at 812); defendants' statements were not sufficiently linked to knowledge of the alleged accounting irregularities and plaintiffs did not properly allege that the accounting irregularities were simple or pervasive or of such a great magnitude so as to have been obvious to defendants (*id*.); and defendants' alleged motive to avoid default on a loan note raised an inference of scienter (*id*. at 813-14).

Confidential witnesses:      Although the court held that confidential witness testimony may be considered in evaluating scienter, plaintiffs did not plead confidential witness testimony with sufficient particularity to justify consideration.  *Id*. at 811.

**Application to *Dana* Case**:    This case is not applicable to the *Dana* case.  In *Ley*, the issues that plaintiffs alleged were concealed from the market were not only disclosed by Visteon, but were reported on by market analysts.  *Ley v. Visteon*, No. 05-CV-70737-DT, 2006 U.S. Dist. LEXIS 65326, at *15-*19 (E.D. Mich. Aug. 31, 2006).   For example, Visteon disclosed and analysts reported that Visteon "could not easily divest unprofitable business inherited from Ford" (*id*. at *14), its labor costs could impact its ability to compete (*id*. at *15), it owed Ford price reductions and those reductions would impede its ability to compete (*id*. at *16-*17), it would remain dependent on Ford for the majority of its business and Ford was its largest customer (*id*. at *17), and that it relied on and paid Ford for its IT services (*id*. at *18-*19).   Despite these disclosures and reports, the Visteon stock continued to climb until the end of the class period (from 2000 to 2005) when Visteon stated that it suffered a significant loss.  *Id*. at *4-*5.  Consequently, the lower court dismissed plaintiffs' claims since the information had been made credibly available to the market.  *Id*. at *21. Moreover, the accounting errors that plaintiffs alleged created an inference of scienter were so complicated (involving "retiree health care benefit plans, pension expenses related to special termination benefits for the European market, and complicated calculations regarding earning of foreign subsidiaries dealing with foreign currency movements against the U.S. dollar") the attorneys could not easily decipher or describe the specifics of the accounting errors.  *Id*. at *23.  Further, the errors totaled only slightly over 5% of its revenue so, the court did not agree that it was such a great magnitude so as to make the errors obvious.  *Id*.  That aside, the court did not think that a note offering (*id*. at *25), a statement that the company had a "solid year" in 2002 (*id*. at *26) and the SOX certifications from 2003 (*id*. at *26-*27) raised a strong inference of scienter.

Clearly this is not the case in *Dana* where defendants purposefully released positive statements about Dana's financial condition into the market when it knew that Dana was suffering dramatically from market factors defendants told investors the company had "overcome." Moreover, the plaintiffs in *Ley* failed to plead that defendants ever received or discussed internal reports that contradicted their public statements. *See, e.g.*, ¶¶2, 32, 53, 79-80 to the Amended Class Action Complaint for Violations of Federal Securities Laws filed in *Ley v. Visteon*, attached hereto as Ex. B. The Complaint here sets forth this information exchange in great detail.

*Helwig* **Factors Alleged**:   Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

> ### 3.   *Zaluski v. United American Healthcare Corp.*, 527 F.3d 564 (6th Cir. 2008)

**Facts**:   Plaintiffs alleged that defendants' failure to disclose "consulting" payments made to a state senator violated GAAP and rendered defendants' SEC filings false and misleading in violation of the federal securities laws. *Id.* at 567-69.

The district court dismissed the complaint finding that none of the alleged false and misleading statements were material and that defendants had no duty to disclose the allegedly omitted information. The Sixth Circuit affirmed. *Id.* at 567.

**Relevant Holdings:**

The issue in this case involved the materiality of the alleged false and misleading statements. The court found that none of the alleged false statements were the sort "that give rise to a duty to disclose" and thus no claim for violating the federal securities laws could be stated. *Id.* at 573-77.

**Application to *Dana* Case**:   *Zaluski* has no application to the issues raised here. Plaintiffs allege that defendants falsely reported Dana's financial results, and the factors which were effecting those results. Defendants have made no argument that these statements are immaterial, nor could

they. *Zaluski* did not involve the overstatement of a company's financial results and its analysis of materiality has no application to the sort of misstatements plaintiffs' complaint details.

       *Helwig* **Factors Alleged**:     None.

**B.**     **District Court Decisions**

       **1.**       ***Beach v. Healthways, Inc.*,**
              **No. 3:08-0569, 2009 U.S. Dist. LEXIS 17809**
              **(M.D. Tenn. Mar. 9, 2009)**

**Facts**:  Plaintiffs brought claims against defendants for violations of §§10(b), 20A and 20(a) of the Exchange Act.  Plaintiffs alleged that Healthways participated in Phase I of a Medicare Health Support ("MHS") pilot program which set for its goal a 5% savings target in disease  management services.  Plaintiffs alleged that, under the terms of the contract between the company and the government, failure to meet the 5% savings target would obligate the company to reimburse the government for millions of dollars in fees paid to the company over the course of the pilot program and would also make the company's participation in Phase II of the program highly unlikely.  In January of 2008, the government revised its savings target for the MHS program from 5% cost savings to a break-even target.  *Id.* at *4-*5.

       Plaintiffs alleged that defendants knew, and failed to disclose, that the company was not meeting, and would not be able to meet, either the 5% cost savings target or the revised break-even savings target of the MHS Pilot Programs.  Plaintiffs alleged that defendants also knew, and failed to disclose, that the company's failure to meet those targets could result in the company's having to reimburse millions of dollars in fees.  Plaintiffs alleged that defendants knew, and failed to disclose, that the company's participation in the second phase of the MHS Pilot Programs (and anticipated revenue therefrom) was extremely unlikely because of this failure to achieve target savings.  Plaintiff alleged that, to the contrary, defendants led the public to believe that participation in the second phase of the MHS program was likely.  *Id.* at *5-*6.

Defendants moved to dismiss the complaint arguing that the complaint failed to plead falsity and scienter in satisfaction of the PSLRA, defendants had no duty to disclose information about individual customer contracts, that certain of defendants' statements were protected by the PSLRA's safe harbor provision and plaintiffs failed to state a claim for insider trading. *Id.* at *3. The court denied defendants' motion. *Id.* at *2.

**Relevant Holdings**:

Scienter: The court found that the complaint adequately alleged scienter. *Id.* at *13-*14. The court found that plaintiffs had alleged that defendants had actual knowledge of the falsity of the alleged misrepresentations and omissions.

Safe Harbor: The court found that defendants were not protected by the safe harbor provision. Defendants' statements were not forward looking but statements of present or historical facts, and were made with actual knowledge of their falsity. *Id.* at *12. Whether adequate cautionary language accompanied the statements is based upon an assessment of what was known about the particular statement at the time it was made. *Id.* On a motion to dismiss the court is obligated to accept plaintiffs' allegations which, in this case, overcome the safe harbor defense. *Id.*

Insider Trading: Plaintiffs made claims that certain defendants traded Healthways shares while in possession of materially adverse nonpublic information. The court did not discuss these allegations in assessing whether scienter was properly pled. The court held that plaintiffs had adequately alleged that defendants sold Healthways stock while in the possession of adverse material nonpublic information contemporaneously with members of the proposed class. *Id.* at *16-*17.

**Application To *Dana* Case**: The *Beach* court found plaintiffs' allegations of the internally known but concealed information well-pled despite that none of the information was attributed to confidential witnesses. *See*, *e.g.*, ¶¶41-57 of the Consolidated Class Action Complaint For Violations of Federal Securities Laws filed in *Beach v. Healthways, Inc.*, attached hereto as Ex. C.

Plaintiffs' consolidated complaint follows this same practice.  As in *Beach*, plaintiffs' allegations here put into defendants' hands, the information that plaintiffs claim was concealed from investors. These allegations are sufficiently detailed to pass muster under the PSLRA.

*Helwig* **Factors Alleged**:      Factor No. 1 – Insider trading at a suspicious time or in an unusual amount; Factor No. 2 – Divergence between internal reports and external statements on the same subject; Factor No. 6 – Disregard of the most current factual information before making statements.

> **2.    *Beaver County Ret. Bd. v. LCA-Vision, Inc.*,
> No. 1:07-CV-750, 2009 U.S. Dist. LEXIS 31375
> (S.D. Ohio Mar. 25, 2009)**

**Facts**: Plaintiff claimed that defendants made repeated false and misleading guidance projections and engaged in false financial reporting throughout the class period – specifically, that they assured the investing community that the health of the business was strong, that revenue growth would be 20-25%, and that the defendant company would continue to capture market share from its key competitor.  *Id.* at *3.  According to plaintiff, defendants knew otherwise because their internal computerized tracking system, known as Mozart, showed that business was declining in early 2007 and continued to do so until October 2007 when the defendant reported "disastrous" third quarter 2007 results and suspended its 2007 guidance.  *Id.*  Plaintiff claimed that the class members in this action lost hundreds of millions of dollars as the LCA stock collapsed from a high of $50.69 per share to a low of $15.58 during the Class Period.  *Id.*  Defendants moved to dismiss plaintiffs' §10(b) claim for several reasons, those relevant here were for safe harbor and scienter.

**Relevant Holdings**:

<u>Safe Harbor</u>:    The court held that because defendant used meaningful cautionary statements specifically addressing how laser vision surgery in uniquely impacted by economic factors and consumer confidence, safe harbor applied.  *Id*. at *42-*44.

Scienter:        Although plaintiff adequately alleged defendants' financial results constituted a misrepresentation to the extent they were restated (*id*. at *50), the court did not find that plaintiffs' allegations gave rise to an inference of scienter. (*id*. at *76-*77).  Plaintiffs' allegations of GAAP violations with regard to lifetime warranties were not simple or pervasive (*id*. at *57); plaintiffs' allegations of improper accounting related to bad debts did not show knowledge or an intent to deceive by defendants (*id*. at *60-61); plaintiffs' allegations did not show that defendants knew of accounting irregularities at the time they signed their SOX certificates (*id*. at *62); plaintiffs' allegations did not show that individual defendants had knowledge about the accounting irregularities despite their positions and access to information (*id*. at *65-*66); plaintiffs' allegations with regard to company bonuses were too vague to constitute self-motivation of the individual defendants (*id*. at *73-*74).

Leave to Amend:        The court denied plaintiffs' request for leave to amend, as a footnote in the last sentence of plaintiffs' brief did not provide enough information about why relief was sought. *Id*. at *79-*80.

**Application to *Dana* Case**:   This case is not applicable to the *Dana* case.  As more fully explained in Pltfs' Opp., plaintiffs in the *Dana* case have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates.   Indeed, Dana admitted as much in their restatement.  Further, plaintiffs have adequately pled that the nature and number of the alleged accounting manipulations, coupled with the magnitude of the fraud bolsters an inference of scienter.  Here, Dana had to restate six quarters of accounting manipulations, and took a $44 million hit to reported net income.  Moreover, Dana suddenly wrote off a stunning $1 billion in deferred tax benefits, despite having increased them from $512 million to $895 million in the space of just one year.  Plaintiffs have also adequately alleged that defendants personally benefited from their fraudulent conduct as

they stood to gain millions of dollars in bonus compensation that was directly linked to Dana's reported net income and earnings-per-share.  Similarly, Dana was able to maintain its façade of financial health, enabling it to sell $450 million of debt and avoid lowered credit ratings.

With regard to leave to amend, plaintiffs, here, have adequately explained over several pages (not just a mere footnote as in *Beaver County*) why leave to amend may be appropriate and have submitted a [Proposed] Amended Complaint incorporating that information.  *See* Pltfs' Opp. at 47-50; Ex. A.

*Helwig* **Factors Alleged**:       Factor No. 1 – Insider trading; Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

> **3.**  ***Berlin Fin. Ltd. v. MPW Indus. Servs. Group, Inc.*,**
> **No. 2:07-cv-442, U.S. Dist. LEXIS 6526**
> **(S.D. Ohio Jan. 15, 2008)**

**Facts**:  Plaintiffs, minority shareholders in MPW Industrial Services Group, Inc. ("MPW"), brought a class action alleging violations of §§14(a) and 20(a) of the Exchange Act, and various Ohio statutory claims on behalf of a class of minority shareholders. *Id.* at *4.  Plaintiffs alleged that defendants made material omissions in a proxy statement issued to shareholders as part of a process of taking MPW private through its merger with a private company. *Id.*  Specifically, plaintiffs alleged that defendants failed to disclose a valuation of one of MPW's key assets resulting in the shareholder's approving a lower share price for their MPW shares than they otherwise would have approved had the valuation been known to them.  *Id.* at *12.  Defendants moved to dismiss plaintiffs' §14(a) claim for several reasons, the only relevant reason here was for failure to allege specific facts in satisfaction of the PSLRA showing why the omission rendered the proxy statement misleading. *Id.* at *16.  The court dismissed plaintiffs' §14(a) claim holding that the complaint did not satisfy the particularity requirements of the PSLRA. *Id.* at *26.

**Relevant Holdings**:

Confidential Witness Allegations:    The court found that plaintiffs' one paragraph describing the existence of the omitted asset valuation was not properly supported.  This paragraph specifically alleged that the information plaintiffs were relying on was based upon conversations that plaintiffs' counsel had with two confidential witnesses after the going-private transaction was completed.  *Id.* at *18.  The court found that the paragraph "provides nothing to support the reliability of the first source and fails to set forth the specific information obtained from that individual."  *Id.* at *19.  As to the second source, alleged to be a  managing director and senior analyst at Baird and Company – a regional investment banking firm and majority owner of MPW's asset in question – the court found that the allegation that the second source "had access to" an undescribed person in the finance department at Baird who told the second source about a "book" Baird had on this key asset existed lacked the required particularity. *Id.* at *19-*20.  Specifically, the court found the allegation lacking because it contained no facts indicating that Baird's "book" contained a valuation exceeding $10 million on MPW's asset or any valuation whatsoever. *Id*. at *21.  The court also found that the second source lacked firsthand knowledge of the information that was being attributed to it raising credibility issues. *Id*. at *22.

**Application To *Dana* Case**: *Berlin*'s holdings concerning confidential witnesses are not applicable to our case.  Here, plaintiffs allege abundant information concerning the confidential witnesses, including their positions within Dana, when they worked for Dana, what their job duties were, what reports they drafted, what information was contained in the reports that they drafted, when those reports were generated and to whom they were submitted, what information was discussed within Dana concerning the reports that the witnesses were privy to, drafted and transmitted to defendants and how often those meetings occurred.  None of these allegations are contained in *Berlin*.

*Helwig* **Factors Alleged**:       Factor No. 2 – Divergence between internal reports and external statements.

4.       ***Grillo v. Tempur-Pedic Int'l, Inc.*,**
            **553 F. Supp. 2d 809 (E.D. Ky. 2008)**

**Facts**:  Plaintiffs filed suit alleging a fraudulent scheme whereby defendants made false and misleading statements regarding Tempur-Pedic's earnings, growth, and retail business strength.  *Id*. at 811-12.  Plaintiffs argued that their complaint demonstrated a strong inference of scienter as a result of the following: (1) defendants' receipt of monthly financial reports, defendants' positions in the company, and defendants' SOX certifications, as evidence that defendants were informed about the health of Tempur-Pedic's business; (2) defendants' admissions that the demand for its products during the class period was not as strong as they led investors to believe; (3) Tempur-Pedic's manipulation of its bottom-line financial results by not allowing personnel to process returns; and (4) defendants' motive and opportunity to commit fraud as evidenced by the suspicious insider trading. *Id*. at 818.

**Relevant Holdings**:

Scienter:       Plaintiffs did not allege facts sufficient to give rise to a strong inference that, when defendants made the alleged misrepresentations, they did so with at least a conscious disregard of the falsity of the information.  *Id*. at 819-20.  Assertions concerning the monthly reports that defendants received were too conclusory, and allegations regarding accounting violations lacked sufficient detail (plaintiffs merely stated that defendants has access to and receipt of reports without alleging the content of the reports).  *Id*.  Further, plaintiffs failed to allege sufficient facts to show that defendants' trading was unusual or suspicious.  *Id*. at 821.  Motion to dismiss granted.

**Application to *Dana* Case**:   This case is not applicable to the *Dana* case.  As more fully explained in Pltfs' Opp., plaintiffs in the *Dana* case have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading

statements and signed SOX certificates.   Indeed, Dana admitted as much in their restatement.

Defendants were intimately familiar with the goings-on of the company and consistently had the

most current financial information about Dana due to its streamlined reporting process, which

involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly

profit-and-loss reports, and SAD reports.   In fact, defendants comments to the market addressed the

same discrete subjects that were presented in the internal reports.   Richter, for example, told

investors on April 21, 2004, exactly what earnings Dana was poised to post, and denied any

"discernable impact" on Company operations from steel prices.   Burns similarly insisted on July 21,

2004, that Dana's (purportedly) strong financial results showed the Company's ability to "more than

offset[] higher raw material prices."   It would have been nearly impossible for defendants to be

unaware of the ongoing fraud.   The proximity of the fraudulent statements also give rise of scienter.

For example, as late as the end of July, 2005, defendants were crowing about stellar 2Q05 results –

highlighting a phenomenal 275% increase in net income over 1Q05, and again reassuring investors

that the procedures and controls in place ensured the accurate reporting of Dana's financial results.

And yet, within just a month-and-a-half of these announcements, the bottom dropped out.   On

September 15, defendants acknowledged that instead of earning $1.30-$1.45 per share in 2005, Dana

now expected to garner no more than $0.70 per share.   An ongoing investigation by the SEC, and

available supportive testimony from confidential witnesses (*see* Pltfs' Opp. at 47-50), further add to

an inference of scienter.

   *Helwig* **Factors Alleged**:      Factor No. 1 – Insider trading; Factor No. 2 – Divergence

between internal reports and external statements; Factor No. 9 – Self-interested motivation in the

form of saving their salaries and jobs.

5.    *In re Am. Serv. Group, Inc.*,
No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237,
(M.D. Tenn. Mar. 30, 2009)

**Facts**: Plaintiffs alleged that when they purchased or held American Service Group's ("ASG") stock, defendants engaged in and/or materially assisted in a scheme and course of business to artificially inflate the value of stock by manipulating the costs and revenues of subsidiaries, as reported in their consolidated financial reports. *Id.* at *4-5. These practices are alleged to have misled investors about ASG's and its subsidiaries' actual financial performance and condition. *Id.* This unlawful scheme included false and misleading statements about ASG's ability to control its subsidiaries' costs and to earn profits on ASG's subsidiaries' government contracts to provide medications and medical services to inmates at federal and state prisons as well as at local jails. *Id.* Plaintiffs also alleged that ASG's statements of financial success were based upon revenue and earnings growth that were calculated in violation of GAAP. *Id.* Plaintiffs further alleged that the defendants engaged in a fraud on the market and that defendants Catalano and Taylor engaged in unusual insider trading after these practices had artificially inflated ASG's stock value. *Id.*

**Relevant Holdings**:

The court concluded that collectively, plaintiffs' factual allegations were sufficiently specific to give rise to a strong inference of recklessness in defendants' misrepresentations, omissions and unlawful business practices. *Id.* at *161.

Scienter:        In relevant part, the court held that plaintiffs adequately pled that the following gave rise to an inference of scienter:  A divergence between internal reports and external statements as based on plaintiffs' allegations that ASG favorably cited the existence of internal controls while their restatement found there was a lack of controls (*id*. at *138-39); the investigation of defendants' business practices by a county attorney and the settlement of a related action in Florida (*id*. at *140-41); disclosure of accounting information in such a way so as to confuse rather

than illuminate the company's financial condition (by referring to accounting improprieties as "net" or "cumulative") (*id.* at *141-42); signed SOX certificates during the relevant time period (*id.* at *144-45); GAAP violations (*id.* at *155); motivation in the form of financial pressure and motive to secure promotion and enhance compensation (*id.* at 156-57); and supportive testimony from anonymous sources (*id.* at 160).

Confidential Witness Allegations:    The court held that specific allegations from confidential witnesses is relevant to the scienter analysis (*id.* at 160).   At this stage of litigation, hearsay testimony from confidential witnesses is a sufficient basis on which to allege facts in a complaint, and the naming of such sources is not required.   *Id.*

**Application to *Dana* Case**:   This case is applicable to *Dana.*   To begin, plaintiffs here similarly plead a divergence between internal reports and external statements.   As more fully stated in Pltfs' Opp., defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements.   Like the defendants in *Am. Serv. Group*, Dana also admitted these facts in their restatement.   In *Dana*, there is an ongoing investigation by the SEC; signed SOX certifications evidencing the self-interested motivation in the form of financial pressure and personal benefit as well as supportive testimony from confidential witnesses.   *See* Pltfs' Opp. at 47-50.   In addition, the nature and the magnitude of the fraud adds to the inference of scienter as Dana had to restate six quarters of accounting manipulations, and took a $44 million hit to reported net income and suddenly wrote off a stunning $1 billion in deferred tax benefits, despite having increased them from $512 million to $895 million in the space of just one year.   The proximity of the fraudulent statements also add to the inference of scienter.   For example, as late as the end of July, 2005, defendants were crowing about stellar 2Q05 results – highlighting a phenomenal 275% increase in net income over 1Q05, and again reassuring investors that the procedures and controls in place ensured the accurate reporting of Dana's financial results.   And yet, within just a month-and-a-

half of these announcements, the bottom dropped out.  On September 15, defendants acknowledged that instead of earning $1.30-$1.45 per share in 2005, Dana now expected to garner no more than $0.70 per share.

These facts together raise an inference of scienter at least as compelling as any opposing inference.  Indeed, the only opposing inferences offered by defendants – explained by defense counsel broadly as anything other than fraud, such as "good faith misjudgment" or "oversight" (*see* transcript of motion to dismiss hearing on May 18, 2009 at 3:07-16) – are no more compelling as an inference of deception and fraud, and, as reiterated in the appellate decision in this case (*Dana*, 547 F.3d at 571), a tie of inference must go to plaintiffs.

*Helwig* **Factors Alleged**:        Factor No. 1 – Insider trading; Factor No. 2 – Divergence between internal reports and external statements on same subject; Factor No. 5 – Existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; Factor No. 6 – Disregard of the most current factual information before making statements; Factor No. 7 – Disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; Factor No. 9 – Self-interested motivation of defendants.

### 6.    *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968 (S.D. Ohio 2008)

**Facts**:  This litigation arose out of Huffy's acquisition of Gen-X, a Canadian manufacturer of snowboards, in-line skates, golf clubs, hockey equipment and other types of sporting goods.  *Id.* at 973.  Plaintiffs alleged that the acquisition was a "disaster," because Gen-X's costs were not controlled, its inventory was in a state of disarray, its invoices had not been collected and its bills were unpaid.  Plaintiffs also contended that the defendants thereafter misrepresented the value of the assets Huffy had acquired and the impact of the acquired product lines on Huffy's revenue and earnings and that those misrepresentations caused Huffy's securities to trade at an inflated price.

Plaintiffs also categorized failings of Huffy, prior to the acquisition of Gen-X and the beginning of the class period, including investing in the manufacture of fad scooters that it could not sell, failing in its efforts to purchase the assets of its former competitor, Schwinn, and having its largest customer, Kmart, which accounted for more than one-third of its sales, declare bankruptcy. *Id.* at 974-75.

In addition, plaintiffs contended that the defendants deliberately misled investors, by permitting Huffy to violate certain GAAP by doing the following: overvaluing the trademarks, goodwill and other assets of Gen-X; improperly booking deferred tax assets acquired from Gen-X; improperly accounting for customer deductions, credits, accounts receivable and inventory reserves; violating GAAP's segment reporting requirements; and improperly recognizing and reporting revenue. *Id.* at 977 n.6.

Defendants moved to dismiss arguing that plaintiffs did not plead falsity or scienter in satisfaction of the PSLRA, and that they were protected from liability by the PSLRA's safe harbor provision. *Id.* at 983. The court granted in part and denied in part defendants' motion. *Id.* at 1022.

**Relevant Holdings**:

Scienter:     The court found that plaintiffs' allegations relating to defendants' alleged failure to conduct due diligence did not support a strong inference of scienter. *Id.* at 999. However, "[w]ith respect to the other three categories of allegedly false statements (the value of the assets acquired from Gen-X; the performance of Gen-X after the acquisition and its impact on Huffy's financial results; and Huffy's financial results and condition, and its future prospects for profitability), this Court is of the opinion that the inference of scienter is as compelling as that of non-fraudulent intent. As an initial matter, the Court notes that each of the Defendants had access to Huffy's financial information as a result their positions. Indeed, D'Aloia is alleged to have spent a substantial portion of his time on Gen-X, from August, 2003, forward. In addition, Huffy conceded

in its bankruptcy filing that it had become aware of Gen-X's mounting losses soon after the acquisition had been completed. Indeed, the statements set forth in Huffy's bankruptcy filing are fully supported by a number of the confidential witnesses or informants relied upon by the plaintiff in their amended complaint. Before Huffy's results for the Third Quarter of Fiscal Year 2002 were announced, Huffy had been investigating Gen-X's problems with accounts receivable and payable, without a satisfactory resolution, yet the Gen-X acquisition continued to be trumpeted as a success. Moreover, the Plaintiffs alleged that many of the alleged falsehoods impact upon core financial transactions. Courts have held that the more central a fact is to a company's core operations the more likely its executive acted with scienter." *Id.* at 999-1000. The court found that the complaint adequately alleged a strong inference of scienter, which it set forth required a pleading of reckless, or actual knowledge for forward-looking statements. *Id.* at 986-90.

GAAP Violations:    Acknowledging that GAAP violations alone cannot support a strong inference of scienter, the court also found plaintiffs' allegations that defendants violated GAAP to be properly stated. *Id.* at 991, 1016-20. Of the many GAAP violations alleged, the plaintiffs alleged that defendants improperly maintained deferred tax assets. *Id.* at 1016-17. The court found these statements to be properly pled. The court also found plaintiffs' allegations that defendants' restatement of the company's financial statements to be properly stated. *Id.* at 1017-18.

Safe Harbor:    As discussed above, plaintiffs alleged that defendants improperly maintained deferred tax assets on the company's books. While the court spilled much ink discussing and analyzing statements it found to be protected by the safe harbor, not included in that discussion was any mention of the defendants' deferred tax assets. *Id.* at 989-90, 1013-15. Indeed, the court recognized that "[u]nder §21E(b)(2)(A), a forward-looking statement 'included in a financial statement prepared in accordance with generally accepted accounting principles' is excluded from the safe harbor. 15 U.S.C. §78u-5(b)(2)(A)." *Id.* at 990.

Confidential Witness Allegations:    The court found that the reasoning set forth and the result reached by the Seventh Circuit in *Tellabs*, on remand, and endorsed in *In re Amgen, Inc. Sec. Litig.*, 544 F. Supp. 2d 1009 (C.D. Cal. 2008) to be persuasive.   Specifically, "when deciding whether to consider the statements attributed to confidential or anonymous witnesses in the Amended Complaint, as part of the calculus to be applied to determine whether the Plaintiffs have complied with the pleading requirements contained in the PSLRA, this Court will examine the descriptions of each of those individuals' jobs to ascertain whether any would have been in a position to have gained first hand knowledge of the facts attributed to him or her, and the detail of the information each is reported to have provided. In addition, the court will consider whether the statements attributed to confidential witnesses have been corroborated."  *Id.* at 933.  The court ultimately found that the allegations attributed to confidential witnesses met this standard.  *Id.* at 1000 n.32.

**Application To *Dana* Case**: Here, plaintiffs also allege that defendants improperly maintained deferred tax assets and committed accounting malfeasance that required Dana to restate its financial statements. *Huffy* supports plaintiffs' argument that because the deferred tax assets were reported in Dana's historical financial statements, they are statutorily excluded from the safe harbor's umbrella.  As in *Huffy*, plaintiffs include adequate allegations of defendants' access to information contradicting the picture being painted for investors, and that the impact of steel prices on Dana's business was a central focus at the company, in particular for defendants.  As a result, a strong inference of scienter has been pled.

***Helwig* Factors Alleged**:    Factor No. 2 – Divergence between internal reports and external statements on the same subject; Factor No. 3 – Closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; Factor No. 6 – Disregard

of the most current factual information before making statements; Factor No. 8 – The personal interest of certain directors in not informing disinterested directors of an impending sale of stock.

### 7.  *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 527 F. Supp. 2d 698 (E.D. Ky. 2007)

**Facts**:  Plaintiffs alleged that defendants made false and misleading statements or omissions when:  (1) defendant falsely represented that it abided by all applicable federal and state laws and regulations regarding its practices concerning unused drugs; (2) defendant issued false financial statements, which were based on financial practices which failed to comply with GAAP; (3) defendant failed to disclose in a timely manner a contract dispute, which ultimately caused defendant to post a 51% decline in profits; and (4) defendant made false and misleading statements regarding its transition to a Medicare program.  *Id*. at 702.

**Relevant Holdings**:

The court held that plaintiffs ultimately failed to plead facts showing a causal connection between the statements and the subsequent drop in stock prices (such as a public statement regarding the falsity of the statements).  *Id.* at 706-07, 710-11.  Plaintiffs' allegations also failed to establish that the truth about the alleged accounting violations was ever revealed or disclosed to the market so as to cause a corresponding drop in Omnicare's stock price.  *Id*. at 707.

**Application to *Dana* Case**:  This case is not applicable to the *Dana* case.  In the *Dana* case, plaintiffs have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates.  Here, the truth about the ongoing fraud was revealed to the market through Dana's restatement, wherein it admitted accounting improprieties.  Indeed, Dana had to restate six quarters of accounting manipulations, and took a $44 million hit to reported net income.  Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly

"tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports. In fact, defendants' comments to the market addressed the same discrete subjects that were presented in the internal reports. Richter, for example, told investors on April 21, 2004, exactly what earnings Dana was poised to post, and denied any "discernable impact" on Company operations from steel prices. Burns similarly insisted on July 21, 2004, that Dana's (purportedly) strong financial results showed the Company's ability to "more than offset[] higher raw material prices." It would have been nearly impossible for defendants to be unaware of the ongoing fraud.

*Helwig* **Factors Alleged**:      Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

8.      ***Kahn v. Ran***,
         **No. 08-CV-14417, 2009 U.S. Dist. LEXIS 35474**
         **(E.D. Mich. Apr. 27, 2009)**

**Facts**: This securities fraud action arose out of plaintiffs' investment of a total of $ 847,000 in the TIM Fund. The TIM Fund was organized to make a loan on a revolving line of credit in the maximum amount of $ 9 million with a five year maturity ("the Loan") to Biltmore Financial, LLC ("Biltmore Financial"), an entity that is wholly owned by Biltmore Properties Corporation ("Biltmore Properties"). *Id*. at *2. Plaintiffs alleged that their investment advisor, Gary Ran ("Ran"), made oral representations that the loan would be secured by collateral that would have a value of at least three times the outstanding principal balance of the Loan, but that these assertions were false. *Id*. Plaintiffs further alleged that defendants failed to disclose that the Biltmore Properties and its affiliated entities were in the midst of a financial crisis, could not obtain financing elsewhere, and that the $9 million Loan was to be used to pay off other lenders rather than to develop and sell residential properties. *Id*. Specifically, plaintiffs alleged that Ran knew of the Biltmore's distressed financial condition because he is a close family member to the principals of the

entity, and therefore had an insider status that gave him actual knowledge regarding the poor financial condition of the Biltmore entities. *Id*. at *8. Even if Ran didn't know that the statements and oral representations were materially false and misleading, plaintiffs pled that defendants acted recklessly because they failed to perform due diligence with respect to the TIM Fund. *Id*. at *3, *8. Also, Biltmore sent a letter to the investors, boasting of a "high level" of collateral, even though four months later, there was a revelation of a lack of collateral. *Id*. at *9. Defendants filed a motion to dismiss for several reasons, the most relevant being that the plaintiffs failed to plead scienter as required by the PSLRA.

**Relevant Holdings**:

Scienter:        Defendants argued that plaintiffs had only pled that Ran had the motive (a $300,000 placement fee plus services fees) and the opportunity (a close familial relationship providing insider status) to make materially misleading statements, and that motive and opportunity are not enough to establish scienter. *Id*. at *23. However, the court found that a "reasonable person" could deem Ran's close familial ties to the investors of the Biltmore Entities sufficient to show that he knew of the Biltmore Entities' precarious financial position, at the time he solicited plaintiffs to invest in the TIM Fund, and such inference is "at least as compelling" as any other inference that could be drawn. *Id*. at *24-*25. The court held that this alone established scienter and that any question as to whether Ran had actual knowledge of the problems facing Biltmore was a question of fact not appropriate at the motion to dismiss stage. *Id*. at *25.

**Application to *Dana* Case**:    Like the plaintiff in *Kahn*, plaintiffs here have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements. Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-

specific "production reports," monthly profit-and-loss reports, and SAD reports.  In fact, defendants' comments to the market addressed the same discrete subjects that were presented in the internal reports.  Richter, for example, told investors on April 21, 2004, exactly what earnings Dana was poised to post, and denied any "discernable impact" on Company operations from steel prices.  Burns similarly insisted on July 21, 2004, that Dana's (purportedly) strong financial results showed the Company's ability to "more than offset[] higher raw material prices."  Any reasonable person would agree that it would have been nearly impossible for defendants to be unaware of the ongoing fraud.  As stated in *Kahn*, any question as to **actual** knowledge is not appropriate at this stage of litigation.

*Helwig* **Factors Alleged**:      Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

### 9.     *In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728 ( E.D. Mich. 2007)

**Facts**:  Plaintiff investors alleged securities violations against defendants for making false and misleading statements regarding revenue and earnings, causing its stock to artificially inflate.  The corporation's stock fell sharply when the corporation issued a restatement of previously reported earnings after accounting improprieties were disclosed in a Form 8-K that the corporation filed with the SEC.  *Id.* at 732.

The complaint included allegations from two confidential witnesses.  *Id.* at 738.  Both were employed as Senior Financial Analysts for defendants and had been involved in preparing various financial reports for the company.  *Id.* at 738-39.  The court found it appropriate to consider the allegations of the two confidential informants to the extent they were consistent with or otherwise supportive of other evidence of scienter.  *Id.* at 740.

**Relevant Holdings**:

<u>Scienter</u>:       Contrary to defendants' claims, the court found that the complaint adequately alleged scienter – actionable misrepresentation.  Specifically, the court found that (1) magnitude of fraud, (2) divergence between reported financials and actual financials, (3) GAAP violations, (4) lack of internal controls, (5) that fraud occurred in the main business, (6) signed SOX certifications, and (7) motive to inflate stock prices to achieve successful secondary offering gave rise to a compelling inference of fraud.  *Id.* at 745.

<u>SOX Certifications</u>:   The court held that the signed SOX certifications were the most significant evidence of scienter because they provided evidence either that defendant knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate.  *Id.* at 743.

**Application to *Dana* Case**:  Plaintiffs in the *Dana* case similarly plead actionable misrepresentation.  As more fully stated in Pltfs' Opp., defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements – actionable misrepresentation.  Dana also admitted these facts in their restatement.  In *Dana*, defendants signed SOX certifications evidencing the fraud and had self-interested motivation in the form of financial pressure and personal benefit.  In addition, the nature and the magnitude of the fraud adds to the inference of scienter as Dana had to restate six quarters of accounting manipulations, and took a $44 million hit to reported net income and suddenly wrote off a stunning $1 billion in deferred tax benefits, despite having increased them from $512 million to $895 million in the space of just one year.  There is also an ongoing investigation by the SEC, and available supportive testimony from confidential witnesses.  *See* Pltfs' Opp. at 47-50.

**Helwig Factors Alleged**:      Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

> **10.**    ***Ross v. Abercrombie & Fitch Co.*,**
> **501 F. Supp. 2d 1102 (S.D. Ohio 2007)**

**Facts**: Plaintiffs alleged that defendants misrepresented the corporation's financial performance and that the stock traded at artificially high levels based on the allegedly false information provided to the investment community.  *Id.* at 1114.  The stock price fell significantly when defendants subsequently reported a decline in the corporation's gross margin, prompting this class action lawsuit.

**Relevant Holdings**:

Scienter:        The court denied defendants' motion to dismiss.  A strong inference of scienter is shown through plaintiffs' allegations that defendants knew about, yet failed to disclose, Abercrombie's declining gross margins and storewide markdowns throughout the class period. *Id*. at 1117.

**Application to *Dana* Case**:   As more fully explained in Pltfs' Opp., plaintiffs in the *Dana* case have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates.  Indeed, Dana admitted as much in their restatement.  Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports.  In fact, defendants' comments to the market addressed the same discrete subjects that were presented in the internal reports.  Richter, for example, told investors on April 21, 2004, exactly what earnings Dana was poised to post, and denied any "discernable impact" on Company operations from steel prices.

Burns similarly insisted on July 21, 2004, that Dana's (purportedly) strong financial results showed the Company's ability to "more than offset[] higher raw material prices."  It would have been nearly impossible for defendants to be unaware of the ongoing fraud.  The proximity of the fraudulent statements also give rise of scienter.  For example, as late as the end of July, 2005, defendants were crowing about stellar 2Q05 results – highlighting a phenomenal 275% increase in net income over 1Q05, and again reassuring investors that the procedures and controls in place ensured the accurate reporting of Dana's financial results.   And yet, within just a month-and-a-half of these announcements, the bottom dropped out.  On September 15, defendants acknowledged that instead of earning $1.30-$1.45 per share in 2005, Dana now expected to garner no more than $0.70 per share.

*Helwig* **Factors Alleged**:      Factor No. 1 – Insider sales; Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

## VII.   SEVENTH CIRCUIT

### A.      Court of Appeals Decisions

#### 1.      *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007)

**Facts**:  Plaintiffs brought a §10(b) claim against defendants for misrepresenting the financial health of Baxter International, Inc.  *Id.* at 755.  Plaintiffs alleged that defendants overstated the company's financial results even though they knew that Baxter's Brazilian subsidiary was overstating its revenue to the corporate office.  *Id.* at 758.  The district court dismissed the complaint. The Seventh Circuit affirmed.[7]

---

[7]      The Court's opinion contains a very brief and general statement of the facts alleged in the complaint.

**Relevant Holdings**:

Confidential Witness Allegations:   The court found that under *Tellabs* courts "must discount allegations that the complaint attributes to five 'confidential witnesses'" because "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences." *Id.* at 756-57.

Insider Trading:   The court further rejected an inference of scienter stemming from allegations that defendants sold their stock knowing the concealed negative information. *Id.* at 759. The court found that plaintiffs had failed to allege that the sales were "abnormally high" for Baxter's managers as a whole and that the alleged sales occurred before plaintiffs' alleged information about the fraud made its way from Brazil to Baxter's corporate headquarters. *Id.*

**Application To *Dana* Case**:  This decision's analysis of confidential witness allegations conflicts with the Sixth Circuit's decision in *Ley*, 543 F.3d 801 because it assumes that the allegations attributed to the confidential witnesses are false, and was criticized by a subsequent Seventh Circuit panel in *Makor Issues*, 513 F.3d 702.  The main problem in *Higginbotham* was that the fraud was occurring in a Brazilian subsidiary of Baxter and the plaintiffs did not plead an adequate link showing that defendants were informed of the Brazilian activities.  Not so here. Plaintiffs allege that the fraud was occurring within the United States and that defendants were regularly informed about the financial performance of all of Dana's plants.  This information comes from individuals drafting and sending the reports of this performance to defendants, and participating in meetings where the information was discussed.

***Helwig* Factors Alleged**:   Factor No. 1 – Insider trading at a suspicious time or in an unusual amount; Factor No. 2 – Divergence between internal reports and external statements.

2.      *Makor Issues & Rights, LTD. v. Tellabs Inc.*,
        *513 F.3d 702 (7th Cir. 2008)*

**Facts**:  The complaint alleged that Tellabs is a manufacturer of equipment used in fiber optic cable networks; its principal customers are telephone companies.  By the beginning of the class period, Tellabs's principal product, accounting for more than half its sales, was a switching system called TITAN 5500.   The product was almost 10 years old when Tellabs, through its CEO, announced that the 5500's successor product, TITAN 6500, was "available now" and that Sprint had signed a multi-year, $100 million contract to buy the 6500, though in fact no sales pursuant to the contract closed until after the period covered by the complaint. The same announcement added that despite the advent of the 6500, sales of the 5500 would continue to grow.  *Id.* at 706.  Throughout the class period, defendants told investors that Tellabs growth was "robust" and that "customers are embracing" the 6500 and that sales of the 5500 were "still going strong."   While defendants announced a reduction in Tellabs sales estimates, defendants told investors that "interest in and demand for the 6500 continues to grow" and "we are satisfying very strong demand and growing customer demand [for the 6500, and] we are as confident as ever – that may be an understatement – about the 6500," and that Tellabs was not experiencing "any weakness at all" in demand for the 5500.  *Id.*  Yet, according to plaintiffs, from the outset of the class period Tellabs had been flooding its customers with tens of millions of dollars worth of 5500s that the customers had not requested, in order to create an illusion of demand.  The company had to lease extra storage space in January and February to accommodate the large number of returns.  *Id.*

Eventually defendants were forced to announce further reductions in sales projections because its customers were "exercising a high degree of prudence over every dollar spent."  *Id.*  But it reiterated that the demand for the 6500 was "very strong."  *Id.*  In April it said "we should hit our full manufacturing capacity [for the 6500] in May or June to accommodate the demand we are seeing. Every thing we can build, we are building and shipping.  The demand is very strong."  *Id.* at

706-07.  However, by June Tellabs announced a major drop in revenues due to reduced sales and massive product returns.  Plaintiffs alleged that the deterioration in Tellabs sales demand had been well under way when the class period began, and that defendants knew it.  *Id.* at 707.

This opinion is the result of the remand by the Supreme court in *Tellabs* to consider whether the plaintiffs' allegations of securities fraud in violation of §10(b) of the Exchange Act, create the "strong inference" of scienter, as defined by the Supreme Court in its opinion.  *Id.* at 704.  The court found that scienter was properly pled and reversed the district court's dismissal of the complaint. *Id.* at 712.

**Relevant Holdings**:

Scienter:        The court determined that, "[t]he critical question, therefore, is how likely it is that the allegedly false statements that we quoted earlier in this opinion were the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive or a reckless indifference to whether the statements were misleading." *Id.* at 709.  The court determined that, "[i]t is exceedingly unlikely.  The 5500 and the 6500 were Tellabs's most important products.  The 5500 was described by the company as its "flagship" product and the 6500 was the 5500's heralded successor.  They were to Tellabs as Windows XP and Vista are to Microsoft. That no member of the company's senior management who was involved in authorizing or making public statements about the demand for the 5500 and 6500 knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel our incredulity." *Id.*

The court also rejected defendants' argument that because no defendants were alleged to have realized a personal, financial benefit from the fraud, that scienter was negated.  *Id.* at 710.  Specifically the court held that, "[t]he argument confuses expected with realized benefits. [The CEO] may have thought that there was a chance that the situation regarding the two key products would

- 68 -

right itself.  If so, the benefits of concealment might exceed the costs. Investors do not like to think

they're riding a roller coaster.  Prompt disclosure of the truth would have caused Tellabs's stock

price to plummet, as it did when the truth came out a couple of months later. Suppose the situation

had corrected itself.  Still, investors would have discovered that the stock was more volatile than

they thought, and risk-averse investors (who predominate) do not like volatility and so, unless it can

be diversified away, demand compensation in the form of a lower price; consequently the stock

might not recover to its previous level.  The fact that a gamble – concealing bad news in the hope

that it will be overtaken by good news – fails is not inconsistent with its having been a considered,

though because of the risk a reckless, gamble."  *Id*. at 710.

The court concluded by finding that the non-culpable inferences defendants asserted "either

a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series

of false statements – are far less likely than the hypothesis of scienter at the corporate level at which

the statements were approved, the latter hypothesis must be considered cogent.  And at the top of the

corporate pyramid sat Notebaert, the CEO.  The 5500 and the 6500 were his company's key

products.  Almost all the false statements that we quoted emanated directly from him.  Is it

conceivable that he was unaware of the problems of his company's two major products and merely

repeating lies fed to him by other executives of the company?  It is conceivable, yes, but it is

exceedingly unlikely."  *Id.* at 711.

Confidential Witness Allegations:   The court also found that plaintiffs' allegations

attributed to confidential sources were pled with enough particularity to infer that the witnesses were

in a position to know what the complaint said they knew.  *Id.* at 712.  The court distinguished the

holding in *Higginbotham* which indicated that confidential witness statements should be "steeply

discounted"  chiefly because the allegations in that case were that the fraud was occurring in a

foreign subsidiary and no information from the confidential sources tied knowledge of the fraud to

the parent company  *Id.* at 711.  In *Makor Issues*, plaintiffs' confidential sources were described in "convincing detail" such that it was inferable that these people were in a position to know "first hand" the facts attributed to them.  *Id.* at 712.  While naming the sources "would be better . . . the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions."  *Id.*

        **Application To *Dana* Case**:  Here, plaintiffs' allegations also infer that it was "exceedingly unlikely" that defendants were not aware that Dana's revenues would not support the maintenance of Dana's deferred tax assets or the peril Dana would suffer when it wrote-off those assets – the biggest asset on its financial statements.  It is equality unlikely that defendants would not be aware that raw steel prices continued to greatly diminish Dana's financial performance despite the measures defendants told investors overcame any negative effects from the rising steel prices.  Like defendants in *Makor Issues*, defendants here gambled that Dana would ride the wave long enough to avoid the write-down of its largest asset.  That they realized no tangible personal profit from this gamble, does not negate the inference of scienter cogently and strongly inferred from the collection of plaintiffs' allegations.

        ***Helwig* Factors Alleged**:     Factor No. 2 – Divergence between internal reports and external statements on the same subject; Factor No. 6 – Disregard of the most current factual information before making statements.

**3.     *Pugh v. Tribune Co.*,**
**521 F.3d 686 (7th Cir. 2008)**

        **Facts**:  Plaintiffs brought this action for violations of §§10(b) and 20(a) of the Exchange Act after it was disclosed that two of Tribune's publications had overstated their circulation to manipulate the cost they could charge for advertising.  Tribune is a media and entertainment company engaging in newspaper publishing, television and radio broadcasting, and other entertainment ventures.  Plaintiffs alleged that the circulation rates of Newsday, operated as a New

York subsidiary of Tribune, and Hoy, a division of Newsday, were manipulated.  These are 2 of the at least 11 daily newspapers that fall under Tribune's umbrella.  *Id.* at 690-91.

Plaintiffs alleged that Newsday and Hoy overstated their circulation figures by using such schemes as phony hawking programs, false affidavits that understated returns and overstated net sales, and directions to subordinates to pay distributors for bogus deliveries of newspapers.  In addition, many copies of the two papers were merely dumped, or delivered to people who had not paid for them.  The overstated circulation numbers resulted in Newsday and Hoy charging higher advertising rates than would have been charged otherwise.  Tribune's internal investigation revealed that the true circulation of Newsday and Hoy was roughly 80 percent and 50 percent, respectively, of what was reported.  *Id.* at 691.  After internal and criminal investigations, defendants announced that Tribune would take a $90 million charge against earnings associated with the manipulated circulation figures and overcharging of advertising fees.  *Id.* at 690.

The district court dismissed the complaint finding that plaintiffs had failed to allege a strong inference of scienter.  *Id.* at 692.  The Seventh Circuit affirmed.

**Relevant Holdings**:

Scienter:        The court found that plaintiffs failed to plead any specific facts linking knowledge of the fraudulent circulation numbers to defendants.  *Id.* at 694.  Instead, plaintiffs' allegations rested on the notion that defendants "must have known" about the fraud because they had general access to the information.  *Id.*  These allegations were insufficient.

Insider Trading:        The court rejected plaintiffs' allegations that defendants stock sales boosted an inference of scienter.  *Id.* at 695.  While defendants were alleged to have exercised stock options, they are not alleged to have sold the shares they purchased through their exercise.  *Id.*

Leave to Amend:        The court affirmed the denial of leave to amend because the proposed additions to the complaint would not cure the lack of scienter alleged.  *Id.* at 698.

**Application To *Dana* Case**:  Again, plaintiffs here plead the transmission of the negative information to defendants that was missing in *Pugh*.  Plaintiffs' allegations do not rest on the assumption that defendants "must have known" but that defendants were specifically informed and participated in discussions concerning the problems occurring at Dana.

*Helwig* **Factors Alleged**:      Factor No. 1 – Insider trading at a suspicious time or in an unusual amount.

### B.      District Court Decisions

#### 1.      *Roth v. Aon Corp.*,
No. 04-C-6835, 2008 U.S. Dist. LEXIS 18471
(N.D. Ill. Mar. 7, 2008)

**Facts**: Plaintiffs alleged that defendants violated the Exchange Act by failing to disclose Aon's reliance on "contingent commissions" to support its increasing reported net income. Contingent commissions refers to a practice in which brokers such as Aon received payments from insurers based on the overall volume or profitability of business that brokers placed with those insurers.  Through these arrangements insurance brokers would allegedly direct or steer business to insurers willing to use their services when buying reinsurance in order to generate a large influx of margin revenues that came in the form of commission payments. *Id.* at *2-*3.

In the months leading up to the class period, Aon's financial performance began to  waver. With this in mind, plaintiffs alleged the defendants sought to change the market's perception of Aon's disappointing financial performance. As it turned out, contingent commission arrangements, as an expense-free source of revenue, provided a reasonable solution.  These arrangements allowed Aon to allegedly report higher earnings because the revenue generated from contingent commissions was pure profit. For the defendants, this was quite an incentive, and contingent commission arrangements soon became the core of Aon's business model.  By failing to disclose the magnitude of and the amount of income generated by the company's contingent commission, steering and clawback arrangements, which resulted in millions of dollars of 100% margin commission revenues

for the company, the defendants allegedly inflated the company's expected income and revenue growth, and misled analysts and investors. *Id.* at *5-*6.

Their first motion to dismiss having been denied, defendants sought reconsideration of that decision in light of *Tellabs*. *Id.* at *10. The court denied defendants' motion finding that the complaint adequately alleged scienter under the new *Tellabs* standard. *Id.* at *29.

**Relevant Holdings**:

Scienter:      The court found that plaintiffs had alleged that defendants were directly involved in and knew about the contingent commission and steering arrangements. *Id.* at *14. Plaintiffs attached several internal documents to the complaint that evidenced defendants' participation in these activities. *Id.*[8]  While these allegations supported a strong inference of scienter, plaintiffs needed to also plead that defendants knew, "or would realize under the circumstances," that failure to disclose those facts would mislead investors. *Id.* at *15.  The court found that adding to a strong inference of scienter was defendants' motive to hide the practices from their clients or risk extreme negative impact to its relationships with its clients. *Id.* at *17-*18. Additionally, the court found compelling defendants' desire to maintain higher credit and debt ratings for the company by projecting a financially sound picture supported by a solid business plan. *Id.* at *16.  Significantly, the court found these motives compelling even in the absence of any insider trading by defendants.

GAAP Violations:      Adding to the strong inference of scienter were plaintiffs' allegations describing defendants' GAAP violations. *Id.* at *19-*22.  The court found significant the magnitude of defendants' overstatement of Aon's net income as much as 20%  – even without any restatement

---

[8]      This is an unusual situation where copies of certain Aon internal documents were publicly available because of an investigation and complaint filed by the Office of the New York Attorney General.

by the company – coupled with allegations of defendants' responsibility for reporting and certifying Aon's financial results to provide a "strong, cogent inference" of scienter. *Id.* at *22.

**Application To *Dana* Case**:  The Complaint here likewise contains detailed allegations of defendants' GAAP violations as well as defendants' responsibility for the proper reporting and certification of Dana's financial results.  Additionally, defendants' GAAP violations here are more egregious amounting to as much as a 70% overstatement of Dana's net income, a near $1 billion write off and a $44 million restatement.  These allegations, in conjunction with the allegations of defendants' receipt and discussion of negative information, support a strong inference of scienter. As in *Roth*, the absence of insider trading by defendants is of minimal importance.

***Helwig* Factors Alleged**:     Factor No. 2 – Divergence between internal reports and external statements on the same subject; Factor No. 5 – Existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; Factor No. 6 – Disregard of the most current factual information before making statements.

> **2.**     ***Silverman v. Motorola, Inc.*,**
> **No. 07 C 4507, 2008 U.S. Dist. LEXIS 76799**
> **(N.D. Ill. Sept. 23, 2008)**

**Facts**:  Plaintiffs brought this class action securities case against defendants for artificially inflating the value of Motorola, Inc. ("Motorola") stock by issuing statements omitting important facts and containing material misrepresentations about the company's future.  *Id.* at *2.  Plaintiffs alleged that defendants issued a number of false-positive statements about Motorola's financial results, its financial outlook, the continued success of the RAZR, and the launch of the 3G phones, causing its stock to artificially inflate.  *Id.* at *5-*6.  During this same time period, plaintiffs alleged that defendants made material misstatements about the continued success of the RAZR (intentionally omitted the fact that Motorola slashed the price of the RAZR during the third quarter of 2006), and the extensive problems and delays associated with the 3G rollout.  *Id.* at *24, *28.

**Relevant Holdings**:

Scienter:       The court found an inference of scienter as to the defendants that were the executives in charge of the mobile devices division as the court found it would be almost inconceivable for executives in their positions (with staff meetings or calls every week to monitor the division) to not know about the problems facing the division.  *Id*. at \*39-\*40.

Safe Harbor:   The court held that misleading statements of present fact located among forward looking statements or puffery does not shield the misleading statements from scrutiny.  *Id*. at \*27-\*28, \*30-\*31.  However, statements involving cautionary language of the company's ability to continue to increase profitability and market share in its wireless handset business, the company's ability to introduce new products and technologies in a timely manner, and the company's ability to purchase sufficient materials, parts and components to meet customer demands were protected by the safe harbor rule.  *Id*. \*32-\*33.  Further, extensive and specific risk factors (described in eight pages of their SEC 10-k filings) discussing in great detail past and potential issues were also protected.  *Id*. at \*36.

**Application to *Dana* Case**:   As more fully explained in Pltfs' Opp., plaintiffs in the *Dana* case have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates.  Indeed, Dana admitted as much in their restatement.  Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports.  In fact, defendants' comments to the market addressed the same discrete subjects that were presented in the internal reports.  Richter, for example, told investors on April 21, 2004, exactly what earnings Dana was poised to post, and denied any "discernable impact" on Company operations from steel prices.

Burns similarly insisted on July 21, 2004, that Dana's (purportedly) strong financial results showed the Company's ability to "more than offset[] higher raw material prices." It would have been nearly impossible for defendants to be unaware of the ongoing fraud.

With regard to forward looking statements, none of Dana's statements rise to a level so as to invoke protection under the safe harbor provision. Unlike in *Silverman*, none of the statements particularly address plaintiffs' allegations of fraud, rather the statements are little more than a listing of rote general factors such as "increases in commodity costs," "continued availability of necessary goods," and "our ability and that of our customers to achieve projected sales and production levels" applicable to any business.

*Helwig* **Factors Alleged**:       Factor No. 1 – Insider trading; Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

## VIII.   EIGHTH CIRCUIT

### A.      Court of Appeals Decisions

#### 1.      *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778 (8th Cir. 2008)

**Facts**: Defendants made public statements regarding a clinical trial and its potentially favorable impact on the manufacturer's revenue. *Id*. at 781. The manufacturer's stock price dropped significantly after the clinical trial proved unfavorable. *Id*. Plaintiffs alleged securities fraud claims arising from the drop in stock price and the favorable statements made about the clinical trial. *Id*. The lower court dismissed plaintiffs' case and the Eighth Circuit affirmed for failure to provide the detail necessary to support their allegations.

**Relevant Holdings:**

Scienter:       The allegations in the plaintiffs' complaint did not provide the level of detail necessary to support their allegation that defendants made misrepresentations of material fact.

Plaintiffs did not sufficiently allege facts showing that defendants made positive statements about the clinical trial even though they knew that the clinical trial was not going well, nor did it set forth facts giving rise to a strong inference that defendants should have known that the trial was not going well. *Id*. at 782-83.

Confidential Witness Allegations: The court held that plaintiffs' confidential witness testimony by three former employees was insufficient as it was rumor-based testimony that failed to allege how the employees had gained access to such information. *Id*. at 782.

Leave to Amend: The district court did not err in denying plaintiffs leave to amend their complaint because plaintiffs did not demonstrate how pleading the additional facts could cure the pleading deficiencies. *Id*. at 783-84.

**Application to *Dana* Case**: This case is not applicable to our case as plaintiffs in *Crowell Trust* failed to allege the factual link between the negative information (rendering defendants' statements about the company false) and transmission of that information to defendants. *Id*. at 782. Plaintiffs' allegations in *Crowell Trust* were essentially based on rumors learned by low level employees who would ordinarily not have access to such information. *Id*. at 783. In *Dana*, and as more fully explained in Pltfs' Opp., plaintiffs have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates. Plaintiffs' allegations are not rumor-based information as in *Crowell Trust*.

***Helwig* Factors Alleged**: Factor No. 1 – Insider trading; Factor No. 2 – Divergence between internal reports and external statements.

## 2. *In re NVE Corp. Sec. Litig.*, 527 F.3d 749 (8th Cir. 2008)

**Facts**: Plaintiffs filed a securities class action alleging that defendants made false or misleading statements about a novel computer memory technology (MRAM). *Id.* at 751. The

corporation's stock price fell after a third party abandoned its attempt to manufacture MRAM devices and the corporation announced that it would instead pursue licensing its intellectual property thereby prompting plaintiffs to file this suit. *Id.* The lower court dismissed plaintiffs' claims without leave to amend and plaintiffs sought appeal on that basis.

**Relevant Holdings**:

Leave to Amend:     The lower court dismissed plaintiffs' complaint without leave to amend and the appellate court affirmed finding that plaintiffs did not articulate how they would change or revise their complaint to cure the pleading deficiencies. *Id.* at 752.

**Application to *Dana* Case**:   This case does not apply to our case because plaintiffs, here, have identified several ways in which they could add allegations to their complaint should the court find it necessary. *See* Pltfs' Opp. at 47-50; Ex. A.

***Helwig* Factors Alleged**:     None.

> 3.    ***Elam v. Neidorff*,**
> **544 F.3d 921 (8th Cir. 2008)**

**Facts**:  Plaintiffs brought this action for violations of §10(b) of the Exchange Acts against Centene Corporation ("Centene") and certain of its executives.  Centene is a healthcare company that acts as an intermediary between the government and Medicaid recipients in the states in which Centene has contracts. *Id.* at 925.  Centene provides programs and related services to the Medicaid recipients. *Id.*  Plaintiffs alleged that defendants misrepresented Centene's financial results by manipulating the estimate of "incurred but not reported" medical costs on Centene's financial statements. *Id.*  Plaintiffs alleged that this estimate is a central component of the company's financial results. *Id.* at 929.  Plaintiffs alleged that six weeks after assuring investors that that Centene's business was healthy and that no change to the earnings estimates was necessary, defendants surprised investors with the news that the company's earnings would be sharply lower going forward and that its results for the current quarter were substantially down. *Id.* at 926.

Defendants moved to dismiss the complaint. The district court dismissed the complaint finding that plaintiffs had failed to plead that defendants had "misrepresented a material fact or acted with scienter." *Id.* The Eighth Circuit affirmed.

**Relevant Holdings**:

Scienter:        The court found plaintiffs did not plead that defendants knew or had access to information contradicting their public statements. *Id.* at 929. The court rejected plaintiffs' arguments that because defendants' misrepresentations concerned the company's core operations, scienter could be inferred absent allegations of defendants' access to inconsistent information. *Id.* at 930. Because plaintiffs merely asserted that the withheld information "must have" been known to defendants, even though the misstatements concerned very important factors to the company, the required scienter inference was not sustainable. *Id.* Although only six weeks separated defendants last false statements and the revelation of the truth, the court could not infer scienter simply on that basis alone. *Id.* at 930.

Insider Trading:        The court found that defendants' stock sales did not lead to an inference of scienter because the sales represented only a small portion of the defendants' holdings and were made pursuant to a pre-determined trading plan. *Id.* at 928.

**Application to *Dana* Case**: While plaintiffs here also allege that merely six weeks separated defendants' false statements and their disclosure of Dana's disastrous business condition, plaintiffs also allege defendants receipt and discussion throughout the class period of negative internal information was withheld from investors. Unlike *Centene*, Dana was forced to restate its financial results, and admit that the company had no discernible internal controls. Furthermore, defendants were required to write off nearly $1 billion of Dana's assets as a result of the negative business conditions that defendants told investors six weeks earlier the company had "overcome." No similar write-off was required of Centene.

*Helwig* **Factors Alleged**:       Factor No. 1 – Insider trading at a suspicious time or in an unusual amount; Factor No. 3 – Closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information.

### 4.    *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240 (8th Cir. 2008)

**Facts**:  Plaintiffs alleged that defendants Ceridian and Ceridian's then CEO, CFO and Controller orchestrated "'a massive accounting scheme to inflate Ceridian's financial results and its stock price'" by exploiting a weak or corrupt system of internal controls to commit numerous violations of GAAP.  *Id*. at 245.  The complaint alleged that Ceridian announced that it was restating its financial statements five times in 2004 and 2005 resulting from a variety of unrelated errors and rule changes involving numerous accounting issues.  Plaintiffs alleged that defendants calibrated the restatements to "leak this information in bits and pieces to walk the stock price down, thereby avoiding the catastrophic impact of a single cumulative disclosure of massive accounting violations." *Id*.  As a result, Ceridian's initial reported earnings were significantly overstated from the third quarter of 2003 through the third quarter of 2004.  The SEC began investigating Ceridian's accounting practices in early 2004.  *Id.* at 243.

The district court dismissed the complaint finding that the complaint did not set forth a strong inference of scienter.  *Id.*  The Eighth Circuit affirmed.  *Id.* at 244.

**Relevant Holdings**:

GAAP Violations:       Repeating the principle that GAAP violations alone will not support a strong inference of scienter, the court rejected plaintiffs' argument that because of the sheer number of GAAP violations and the magnitude of the restatement, severe recklessness was inferred.  *Id.* at 246. Without more, the court found, the inference that mistakes were made by accounting personnel that went undetected because of the faulty internal controls is more compelling.  *Id.*

Confidential Witness Allegations:   The complaint set forth allegations based upon information from confidential witnesses.   However, the court found these allegations lacking because several of the witnesses left the company prior to the class period, or the information they offered concerned accounting issues pre-dating the class period.  *Id.* at 247-48.

SOX Certifications:   The court also found that plaintiffs' allegations concerning the defendants execution of SOX certifications did not add to an inference of scienter.  *Id.* at 248.  Like other circuit courts, the court found that the execution of these certifications only add to an inference of scienter where the plaintiffs alleged that they were executed knowing that the company's internal controls were faulty or the financial statements misstated, or were executed with reckless disregard to those issues.  *Id.*  The court found that plaintiffs' complaint included no such allegations.  *Id.*

Insider Trading:      The court found that plaintiffs' allegations of defendants' insider trading did not aid an inference of scienter.  *Id.* at 246-47.  Specifically, the court found that these allegations were tempered because defendants sold "in the money" options about to expire, sold their stock prior to the false statements alleged to have inflated the stock price and that defendants had increased their stakes in the company during the class period.  *Id.* at 247.  The court also found that because the executive closest to the alleged accounting errors did not sell any stock, the insider trading allegations as a whole did not give rise to or support a strong inference of scienter.  *Id.*

**Application To *Dana* Case**:  Unlike in *Ceridian*, plaintiffs here set forth in detail defendants' violations of GAAP – which were not the result of rule changes and unrelated errors – including the reasons for the restatement, the specific internal controls that were lacking, and the amounts each quarter defendants overstated Dana's net income.  Plaintiffs also detail the adverse internal information that defendants received and discussed with other Dana personnel.  In doing so, plaintiffs also detail why defendants' SOX certifications were made recklessly.

***Helwig* Factors Alleged**:       Factor No. 1 – Insider trading at a suspicious time or in an unusual amount; Factor No. 2 – Divergence between internal reports and external statements on the same subject; Factor No. 6 – Disregard of the most current factual information before making statements.

### 5.       *In re Hutchinson Tech., Inc. Sec. Litig.,* 536 F.3d 952 (8th Cir. 2008)

**Facts**: Plaintiffs alleged that defendants violated §10(b) of the Exchange Act by misrepresenting Hutchinson's financial health and earnings prospects.  *Id.* at 958.  Hutchinson manufacturers and supplies parts for computer hard drives.  *Id.* at 955.  Five customers made up 90% of Hutchinson's revenues during the class period.  *Id.*  Plaintiffs alleged that defendants misrepresented the level of demand for its products from its customers and the company's ability to meet that stated demand.  *Id.* at 959.  The plaintiffs also alleged that defendants overstated the company's earnings by failing to properly account for the increasing level of defective product being returned.  *Id.* at 959-60.  Plaintiffs alleged that defendants eventually were forced to admit that the company's earnings were suffering due to lower demand and a "shift in product mix."  *Id.* at 957.

The district court dismissed the complaint.  The Eighth Circuit affirmed finding that the plaintiffs failed to plead the falsity of any of defendants' alleged false and misleading statements in satisfaction of the PSLRA.  *Id.* at 961.  The Eighth Circuit specifically declined to pass judgment on whether the complaint pleaded scienter.  *Id.*

**Relevant Holdings**:

Leave to Amend:       The Eighth Circuit agreed with the district court that the plaintiffs' proffered new allegations would not bring the complaint into compliance with the PSLRA thus rendering futile any further amendment to the complaint.  *Id.* at 962.

**Application to *Dana* Case**:   Here plaintiffs' proffered amendment more than satisfies the PSLRA and the confidential witness allegation requirements in this circuit as set forth in *Ley*.

Additionally, plaintiffs allege abundant details outlining defendants receipt of information telling them that Dana's financial performance was suffering.  Moreover, defendants here restated Dana's financial statements and internal controls disclosures, and wrote-off nearly $1 billion in assets, none of which occurred in *Hutchinson*.

>    *Helwig* **Factors Alleged**:      Factor No. 1 – Insider trading at a suspicious time or in an unusual amount.

## IX.      NINTH CIRCUIT

### A.      Court of Appeals Decisions

#### 1.      *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008)

**Facts**: Plaintiffs brought claims for violation of §10(b) of the Exchange Act in connection with three alleged misstatements in a merger agreement attached to the Form 10-K filed defendant InVision Technologies, Inc. ("InVision").  *Id.* at 741.  InVision is a company that makes explosive detection systems used to screen checked baggage at airports.  It sold these systems nationally and internationally.  *Id.* at 739. After 9/11, InVision's business increased dramatically and merger talks with General Electric ("GE") were undertaken.  *Id.*  Ultimately, InVision and GE agreed to merge and an agreement was signed.  During the course of due diligence related to the merger, GE discovered that InVision may have violated the Foreign Corrupt Practices Act ("FCPA") in connection with certain foreign sales transactions.  *Id.* at 740.  InVision informed the SEC and Department of Justice ("DOJ") of the possible FCPA violations discovered by GE, and also informed investors about the discovery and its possible delay of the consummation of the GE merger.  After an investigation by the SEC and DOJ, InVision announced that it entered into a non-prosecution agreement with the DOJ and agreed to pay an $800,000 fine, and that the SEC had agreed to accept an offer of settlement from the company.  *Id.*  That same day the merger was consummated.  Three months later, the SEC issued a cease and desist letter formally accepting

InVision's settlement offer.  This cease and desist letter outlined the FCPA violations and faulted

InVision for failing to maintain proper internal controls and failing to properly train its foreign sales

agents.  *Id.*

      Plaintiffs alleged that defendants, including InVision's CEO, fraudulently represented in the

merger agreement that InVision was not in violation of any laws.  *Id.* at 741-42.  After permitting the

plaintiffs an opportunity to amend their complaint after the first motion to dismiss was granted, the

defendants again moved to dismiss.  The district court granted defendants' motion finding that

plaintiffs had failed to plead falsity and scienter in satisfaction of the PSLRA.  The district court also

denied plaintiffs' request to amend its complaint again.  *Id.* at 740.  The Ninth Circuit affirmed the

dismissal finding that scienter was not properly pleaded, and that further amendment by plaintiff

would not cure this defect.  *Id.* at 749.

      **Relevant Holdings**:

      <u>Scienter</u>:      The court found that plaintiffs had failed to plead any facts to demonstrate that

the defendant CEO was personally aware of the illegal payments or that he was actively involved in

the details of InVision's Asian sales through which the illegal payments were made.  *Id.* at 745.

Acknowledging that in certain circumstances allegations that a defendant knew about a particular

transaction or business situation because of its importance to a company can demonstrate a strong

inference of scienter, the court rejected plaintiffs' inference that the defendant CEO must have

known about the illegal transactions.  Instead the court found that the transactions were discrete and

could have been easily hidden from the defendant thus making them transactions that were not

"prominent enough" nor that it "would be 'hard to believe'" that the defendant did not know about

them.  *Id.* at 746-47.  The court also rejected plaintiffs' inference that because GE was able to easily

discover the illegal transactions in due diligence reviews that defendant knew of them finding that it

creates an inference that defendant "should" have known about the transactions which is not

sufficient for the PSLRA. *Id.* at 748. Finally, the court rejected plaintiffs' inference that the admissions in the settlement agreements that InVision entered into with the SEC and DOJ create a strong inference of scienter. *Id.* The court found these "admissions" to be largely legal conclusions and not factual statements and importantly did not indicate that the defendant had personal knowledge of the illegal transactions, only that someone at InVision did. *Id.* at 749.

SOX Certifications:    The court adopted the reasoning of the Eleventh and Fifth Circuits holding that the signing of SOX certifications is "'only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements.'" *Id.* at 747. Because the plaintiff had failed to plead facts inferring that the SOX certifications were signed recklessly, the SOX certifications, were "not sufficient, without more, to raise a strong inference of scienter" on the part of the defendant CEO. *Id.*

Leave to Amend:        The court found that denying plaintiffs an opportunity to amend again was not an abuse of discretion because the proffered new facts would not permit the plaintiff to properly plead scienter. *Id.* at 749.

**Application to *Dana* Case:**    Here, unlike in *Glazer*, plaintiffs do plead facts showing that defendants were personally aware of the negative information concerning Dana's financial performance, the problems the company was experiencing, that the cost-cutting measures were not working and that many of its plants were operating at a loss. Also, unlike in *Glazer*, plaintiffs pled that defendants were reckless in signing the SOX certifications, that they later admitted that the internal controls they told investors protected the veracity of Dana's financial reporting were not effective, and in some cases non-existent. Moreover, the importance of the deferred tax asset to Dana's reported financial results is indisputably "prominent enough" not to have escaped defendants' attention and that it "would be 'hard to believe'" that defendants were unaware of factors negatively effecting that $1 billion asset.

*Helwig* **Factors Alleged**:        None.

      **2.**    ***Skechers U.S.A. Sec. Litig. v. Skechers U.S.A., Inc.,***
                **No. 05-55980, 2008 U.S. App. LEXIS 8349**
                **(9th Cir. Apr. 10, 2008)**

**Facts**: Plaintiffs alleged that defendants misrepresented the level of sales demand at Skechers when they knew that sales were declining and being covered up by shifting the delivery of product to earlier periods.  *Id.* at *7-*10.  The district court dismissed the complaint.  The Ninth Circuit affirmed the dismissal in a 2 to 1 decision.[9]  The dissenting judge filed an opinion explaining why he would reverse the district court's dismissal.

    **Relevant Holdings**:

    This is an unpublished opinion.

    <u>Scienter</u>:        The majority found that plaintiffs had not alleged scienter in satisfaction of the PSLRA because they failed to plead "the link" between negative internal information and the defendants.  The court rejected as inadequate allegations based on two confidential witnesses finding that the allegations failed to describe the contents of the reports, who drafted them and how the confidential witnesses were in a position to know that defendants received them.  *Id.* at *4-*7.  The dissent, however, found these same allegations to describe a "complex pattern of fraud" that was corroborated by numerous confidential witnesses.  *Id.* at *7-*13.

    <u>Insider Trading</u>:        The majority also rejected as insufficient plaintiffs allegations of defendants' stock sales.  *Id.* at *4-*7.  The majority found that these sales amounted to an insignificant portion of the defendants' holdings and there were not suspicious.  *Id.*  The dissent, however, found the timing of these sales – at the peak of Skechers stock price – to be an indicator of

---

[9]      This decision is an unpublished opinion and contains very little by way of a description of the complaints allegations.

scienter.  *Id.* at *10-*13.  While the amount of the sales was not significant, the timing of the sales

considered with the totality of the remainder of plaintiffs allegations, strongly inferred scienter.  *Id.*

**Application To *Dana* Case**:  Again, plaintiffs here plead the necessary link between the

negative internal information and defendants.  Moreover, plaintiffs rely on confidential witnesses

who prepared and sent the information to defendants.

***Helwig* Factors Alleged**:        Factor No. 1 – Insider trading at a suspicious time or in an

unusual amount; Factor No. 2 – Divergence between internal reports and external statements on the

same subject; Factor No. 6 – Disregard of the most current factual information before making

statements.

> **3.      *In re Syncor Int'l Corp. Sec. Litig.*,**
> **327 F. Supp. 2d 1149 (C.D. Cal. 2004), *aff'd in part*,**
> ***rev'd in part*, 239 Fed. Appx. 318 (9th Cir. 2007)**

**Facts**:  Plaintiffs alleged that the defendants made statements attributing the corporation's

overseas earnings to a variety of legitimate business practices, while omitting any mention of illegal

payments that were being made to physicians and foreign officials.  *Id*.  Plaintiffs alleged that these

statements artificially inflated the company's stock price because the public would not have

purchased the stock if they were aware of the circumstances surrounding the improper commissions.

*Id*. at 1154.  The lower court dismissed plaintiff's allegations as to all defendants – the Ninth Circuit

reversed holding that plaintiffs offered enough evidence to show that three of the defendants knew

that illegal payments were being made but did not mention that fact, and that by attributing the

corporation's success to legitimate practices, they implicitly and falsely warranted that there were no

illegal practices occurring.  239 Fed. Appx. at 320-21.

**Relevant Holdings**:

The lower court granted defendants' motion to dismiss, finding that plaintiffs failed to satisfy

the requirements of the PSLRA with respect to the §10(b) and Rule 10b-5 violations.  Specifically,

the lower court held that plaintiffs failed to sufficiently allege scienter as to most of the individual defendants because there was no evidence that they had knowledge of the illegal payments, and the officers' incentives to strengthen the stock price did not alone establish scienter.  327 F. Supp. 2d at 1166-67.  Although plaintiffs did sufficiently plead that three of the defendants either possessed actual knowledge or acted with deliberate recklessness with regard to the illegal payments, the lower court thought they failed to sufficiently plead that any of the statements were false and misleading.  *Id*. at 1171-72.  However, on appeal the Ninth Circuit reversed the lower courts dismissal of the securities class action claims against the three defendants because plaintiff's allegations of defendants' fraudulent conduct at a company that stated it was in compliance with material laws and regulations was sufficient to give rise to an inference of scienter.  239 Fed. Appx. at 320-21.

SEC Investigation:   The lower court held that it is appropriate to consider the SEC investigations in evaluating scienter.  327 F. Supp. 2d at 1162.  The Ninth Circuit did not disturb this holding on appeal.

Scienter/Confidential Witness Allegations:   The lower court held confidential witness testimony combined with an order from the SEC established scienter as to four individual defendants.  *Id*.  The lower court also held that plaintiffs are not required to plead details to the extent that they jeopardize confidentiality of the source.  *Id*. at 1158.  The Ninth Circuit affirmed the lower court's opinion on appeal, holding (in relevant part) that allegations by a confidential witness of defendants fraudulent conduct was sufficient to raise an inference of scienter.  239 Fed. Appx. at 320-21.

**Application to *Dana* Case**:   Plaintiffs allegations in *Dana* show knowledge similar to those in *Syncor*.  As more fully explained in Pltfs' Opp., plaintiffs in the *Dana* case have sufficiently pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates.  Indeed, Dana admitted as much in

their restatement.  Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports.  In fact, defendants comments to the market addressed the same discrete subjects that was presented in the internal reports.  Richter, for example, told investors on April 21, 2004, exactly what earnings Dana was poised to post, and denied any "discernable impact" on Company operations from steel prices.  Burns similarly insisted on July 21, 2004, that Dana's (purportedly) strong financial results showed the Company's ability to "more than offset[] higher raw material prices."  It would have been nearly impossible for defendants to be unaware of the ongoing fraud.

Like *Syncor*, this court may consider the SEC investigation and confidential witness testimony in evaluating scienter.

*Helwig* **Factors Alleged**:    Factor No. 2 – Divergence between internal reports and external statements;  Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

### 4.    *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008)

**Facts**:  In this securities class action, plaintiffs alleged that defendants falsified financial aid applications and manipulated student enrollment data to increase federal fund entitlements, and that such fraud resulted in an artificial inflation of the corporation's stock price.  *Id*. at 1055-56.

**Relevant Holdings**:

The Ninth Circuit affirmed the dismissal of the lower court as plaintiffs did not adequately plead loss causation, scienter or falsity of the alleged misleading statements.  Plaintiffs' attempted to establish loss causation through a newspaper story and a press release failed because neither could reasonably be read to reveal to the market the alleged widespread fraud which caused the stock price

to fall.  *Id*. at 1064-65.  Further, the requisite strong inference of scienter was not established by unsuspicious stock sales (*id*. at 1067), the mere existence of a complex computer system that tracked enrollment (*id*. at 1068), or use of accounting practices which defendants may or may not have known were questionable (*id*. at 1068-69).  Also, plaintiffs' allegations of defendants' fraudulent practices were too vague and general to establish falsity.  *Id*. at 1070-71.

**Application to *Dana* Case**:   *Metzler* is not applicable to *Dana* as the plaintiffs in *Metzler* did not allege that defendant knowingly or recklessly used fraudulent accounting practices (*id*. at 1069) or were aware that their acts were fraudulent or that their statements to the contrary were false (*id*. at 1070).  However, as more fully explained in Pltfs' Opp., plaintiffs here have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates.  Indeed, Dana admitted as much in their restatement.  Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports.  In fact, defendants comments to the market addressed the same discrete subjects that was presented in the internal reports.

***Helwig* Factors Alleged**:        Factor No. 1 – Insider trading; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

### 5.   *South Ferry LP v. Killinger*, 542 F.3d 776 (9th Cir. 2008)

**Facts**:  Plaintiffs alleged that defendants, Washington Mutual ("WAMU") and several of its tops officers, including WAMU's President and CEO, and Executive Vice President and CFO, made misrepresentations to investors in violation of §10(b) of the Exchange Act.  *Id.* at 779-80.  WAMU is a publicly-traded financial services company that serves individuals and small businesses, offering consumer banking, mortgage lending, commercial banking, and other services.  *Id.* at 780.

- 90 -

Specifically, plaintiffs alleged that defendants made materially false or misleading statements concerning WAMU's ability to manage MSR-related and pipeline risk, related to WAMU's mortgage lending activities, during the class period.  Plaintiffs also alleged that the individual defendants repeatedly assured investors that the natural hedge and additional securities and derivative hedges would allow WAMU to thrive in an environment where interest rates were increasing, and that defendants assured investors that WAMU had fully integrated the information systems that are central to WAMU's ability to maintain and update their various hedges in a timely fashion during periods of interest rate volatility. According to plaintiffs, WAMU was unprepared for the interest rate volatility that occurred later because it failed to integrate its information systems to permit it to keep a close watch on the hedges that it maintains.  *Id.* at 781.

Defendants moved to dismiss.  The district court found that *South Ferry* satisfied the PSLRA's heightened pleading standard by inferring that defendants had knowledge of WAMU's difficulties with their information systems "because of the nature of the statements they [Defendants] were making and the nature of these specific alleged operational problems," relying on *In re Northpoint Commc'ns Group, Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 998 (N.D. Cal. 2001), for the principle that it may be inferred that facts critical to a business's "core operations" or important transactions are known to key company officers.  The district court granted defendants' motion for interlocutory certification to consider whether the core operations inference provided an adequate basis for a strong inference of scienter.  *South Ferry*, 542 F.3d at 781-82.  The Ninth Circuit vacated the district court's opinion and remanded the matter for consideration of the issue consistent with its opinion.  *Id.* at 786.

**Relevant Holdings**:

Scienter:　　　The issue in this case was the role allegations that defendants, because of their positions, knew about facts effecting the "core operations" of a company and whether those

allegations can support a strong inference of scienter.  *Id.* at 783.  After evaluating several previous Ninth Circuit decisions, the court concluded that "allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances.  First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is 'cogent and compelling, thus strong in light of other explanations.'  [*Tellabs*, 551 U.S. at 323-24].  This view takes such allegations into account when evaluating all circumstances together.  Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information, as in [*Sparling v. Daou*, 411 F.3d 1006 (9th Cir. 2005)] and [*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004)].  Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter.  [*See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2007)]."  *Id.* at 785-86.

      **Application to *Dana* Case**:   Here, plaintiffs allege that defendants undoubtedly knew about the rising costs of steel and how it was effecting Dana.  Indeed, defendants spoke about this issue during each of the quarterly conference calls alleged in the Complaint.  Moreover, plaintiffs alleged that defendants themselves were responsible for negotiating the price Dana paid for the steel it needed for its operations, and were informed about and discussed the price impact, and mitigating measures being taken within Dana to address the rising steel costs.  Plaintiffs do not allege bare allegations that because of defendants' positions they "must have known" about the troubles facing Dana.  Plaintiffs go further and alleged the bridge between defendants' roles as the senior most executives, and spokespeople at Dana, and the concealed deteriorating financial condition at Dana

due to the rising costs of a vital raw material.  These allegations are akin to those in *Daou* and *Oracle* which were found to support a strong inference of scienter.

    *Helwig* **Factors Alleged**:    None.

        **6.**    ***Zucco Partners, LLC v. Digimarc Corp.,***
                  **552 F.3d 981 (9th Cir. 2009)**

    **Facts**:  Plaintiffs alleged securities violations against defendant, whose business centers on providing secure personal identification documents (such as drivers licenses) through digital watermarking technology, for purposefully manipulating its financial prospects by capitalizing internal software development expenditures instead of expensing them.  *Id*. at 987-88.  Specifically, plaintiffs alleged that defendant capitalized on its asset balance sheet ordinary payroll costs that it paid to its software engineers and other employees so as to avoid recognizing these expenses on its income statements.  *Id*. at 988.  Defendant also failed to recognize ordinary expenses incurred by improperly moving or retaining these expenses in its inventory or property and equipment accounts as purported "project development expenses."  *Id*.

    **Relevant Holdings**:

    Scienter/Confidential Witness Allegations:    The lower court dismissed and the Ninth Circuit affirmed.  The court did not find an inference of scienter as plaintiffs allegations relied primarily on the statements of six confidential witnesses that were not pled with sufficient particularity.  *Id*. at 992.  As such, the confidential witness testimony had to be described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.  *Id*. at 995.  The court also held that where a complaint alleges confidential witness testimony in addition to other factual information, the plaintiff need only provide "an adequate basis" that the confidential witness believed defendants statements were false.  *Id*.

    With regard to scienter, the court also held (in relevant part) that falsity alone cannot create an inference of scienter (*id*. at 1001); a plaintiff must allege sufficient information regarding

resignations so as to distinguish between a suspicious change in personnel and a benign one (*id*. at 1002); SOX certificates alone do not raise a strong inference of scienter (*id*. 1003-04); and generalized and bare  assertions of motive are insufficient to create and inference of scienter (*id*. at 1004-05).

**Application to *Dana* Case**:   *Zucco* is not applicable to the *Dana* case.  For starters, in *Dana* plaintiffs do not primarily rely on confidential witness testimony.  Rather, plaintiffs make available supportive testimony from confidential witnesses (*see* Pltfs' Opp. at 47-50) that would add to many other factors that establish an inference of scienter.  Indeed, since plaintiffs offer this testimony ***in addition*** to many other factual allegations, the confidential witness testimony need only provide "an adequate basis" that the confidential witness believed defendants statements were false.  552 F.3d at 995.  As stated in Pltfs' Opp., plaintiffs could easily provide such testimony.

With regard to plaintiffs other factual allegations, plaintiffs here (unlike *Zucco*) have adequately pled scienter.  In *Dana*, defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates. Indeed, Dana admitted as much in their restatement.  Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to Dana's streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports.  In fact, defendants comments to the market addressed the same discrete subjects that was presented in the internal reports.  It would have been nearly impossible for defendants to be unaware of the ongoing fraud.  The proximity of the fraudulent statements also give rise of scienter.  For example, as late as the end of July, 2005, defendants were crowing about stellar 2Q05 results – highlighting a phenomenal 275% increase in net income over 1Q05, and again reassuring investors that the procedures and controls in place ensured the accurate reporting of Dana's financial results.  And yet,

within just a month-and-a-half of these announcements, the bottom dropped out.  On September 15, defendants acknowledged that instead of earning $1.30-$1.45 per share in 2005, Dana now expected to garner no more than $0.70 per share.  An ongoing investigation by the SEC, and available supportive testimony from confidential witnesses (*see* Pltfs' Opp. at 47-50), further add to an inference of scienter.

*Helwig* **Factors Alleged**:      Factor No. 1 – Insider trading; Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

### B.      District Court Decisions

#### 1.      *Backe v. Novatel Wireless, Inc.*, 08-CV-01689-H (RBB), 2009 U.S. Dist. LEXIS 32684 (S.D. Cal. Apr. 1, 2009)

**Facts**:  Plaintiffs alleged that defendants engaged in a fraudulent scheme to inflate Novatel's stock value so that defendants could unload their stock in the company for a profit, as Novatel's executives had lost a fortune on their Novatel holdings in the preceding six years due to business prospects drying up in the telecom industry.  *Id.* at *6.  Plaintiffs alleged that Novatel's success was largely dependent on its ability to supply wireless modems to its two largest customers, Sprint and Verizon, which in 2006 accounted for 38.2% and 19.7% of Novatel's revenue respectively.  *Id.* "[D]efendants knew that the market was particularly sensitive to information about these customers" and "[s]trong financial results would surely spur an increase in Novatel's stock price whereas any negative information regarding these customers would reduce it."  *Id.* at *7.  Throughout the class period, defendants made false and misleading statements concerning Novatel's market share and financial results, failed to disclose material information about its contracts with Sprint, and failed to disclose that Novatel was prematurely shipping products in order to meet or exceed Wall Street expectations causing Novatel to improperly recognize revenue.  *Id.*

**Relevant Holdings**:

Scienter:        The court held that plaintiffs adequately alleged that defendants acted knowingly or with reckless disregard when making materially false or misleading statements.  *Id.* at *39.  Further, the court held that plaintiffs' allegations regarding SOX certifications, violations of GAAP and defendants' positions in corporate management all added to a strong inference of scienter.  *Id.* at *35, *39-*40.  Specifically with regard to GAAP violations the court held that "a restatement of financial results based on GAAP violations, and the simplicity of the accounting principles violated, [the alleged] GAAP violations just as likely support an inference of scienter as an inference of innocent and unknowing behavior."  *Id.* at *39.

**Application to *Dana* Case**:        This case is similar to the *Dana* case as plaintiffs have likewise pled that defendants knew of the misleading statements, signed SOX certifications and committed GAAP violations.  Indeed, as stated by the *Backe* court, defendants' GAAP violations alone support an inference of scienter.  *Id.* at *39.  Plaintiffs here however have also pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates.  Indeed, Dana admitted as much in their restatement. Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports.  In fact, defendants' comments to the market addressed the same discrete subjects that was presented in the internal reports.

Further, plaintiffs have adequately pled that the nature and number of the alleged accounting manipulations, coupled with the magnitude of the fraud bolsters an inference of scienter.   Here, Dana had to restate six quarters of accounting manipulations, and took a $44 million hit to reported

net income.  Moreover, Dana suddenly wrote off a stunning $1 billion in deferred tax benefits, despite having increased them from $512 million to $895 million in the space of just one year.

*Helwig* **Factors Alleged**:       Factor No. 1 – Insider trading; Factor No. 2 – Divergence of internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

> **2.    *FSP Stallion 1 v. Luce*,**
> **2:08-CV-01155-PMP-PAL, 2009 U.S. Dist. LEXIS 41592**
> **(D. Nev. May 1, 2009)**

**Facts**:  Plaintiffs were several limited liability companies that invested in tenant-in-common ("TIC") interests in the Stallion Mountain Country Club ("Stallion Mountain").  *Id*. at *3.  Plaintiffs alleged that certain defendants conspired to fraudulently induce investors to purchase Stallion Mountain at an inflated price through a private placement memorandum ("PPM") which offered up to $24,480,000 in TIC interests.  *Id*. at *4.  Plaintiffs alleged that the PPM contained false statements and omissions with respect to a certain time period, including the historical performance representations and the cash flow projections.  *Id*. at *5.  Specifically, plaintiffs alleged that defendants possessed additional documentation, including internal operating budgets, at the same time as the PPM was being prepared, that contained revenue and cash flow figures that were materially lower than those in the cash flow projections.  *Id*.  Plaintiffs filed federal securities claims, control person liability, and several supplemental state law claims.  Defendants moved to dismiss the federal securities claims, arguing among other things, that plaintiffs failed to plead scienter as required by the PSLRA.  *Id*. at *8.  Defendants' motion to dismiss was denied.

**Relevant Holdings**:

<u>Scienter</u>:       As to scienter, the court found that the plaintiffs adequately alleged facts supporting a strong inference of scienter.  *Id*. at *15-*16.  Plaintiffs allegations that the defendants had experience and knowledge of the relevant golf market, and that defendants had in their

possession at the time they were preparing the PPM contrary negative information in the form of the appraisal and the internal operating budget was enough to give rise to an inference of scienter. *Id.*

Safe Harbor:   Because plaintiffs allegations show that any cautionary language was contrary to defendants' knowledge of the financial condition of the country club, defendants were not afforded any protection for their statements. *Id.* at *18-*19.

**Application to *Dana* Case**:   Like plaintiff in *FSP*, plaintiffs here have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements.   As for any potential cautionary statements, similarly, none of defendants' statements rise to a level so as to invoke protection.   None of the statements particularly address plaintiffs' allegations of fraud, rather the statements are little more than a listing of rote general factors such as "increases in commodity costs," "continued availability of necessary goods," and "our ability and that of our customers to achieve projected sales and production levels" applicable to any business.

*Helwig* **Factors Alleged**:   Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

### 3.   *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033 (N.D. Cal. 2007)

**Facts**:  Plaintiffs alleged that defendants made false and misleading statements and concealed material adverse information about (1) the negative effects of the then newly-introduced competing Mattel, Inc. ("Mattel") PowerTouch product on its flagship LeapPad product sales, and (2) the "severe" supply chain and distribution problems experienced by  LeapFrog.  LeapFrog sells its LeapPad products primarily to retailers.  During the class period its three largest retail customers were Wal-Mart, Target, and Toys 'R Us.  Customer requirements are fulfilled as orders come in from these retailers.  LeapFrog's annual sales grew rapidly prior to the class period. *Id.* at 1038.

Plaintiffs alleged that LeapFrog's distribution and supply-chain infrastructure and related information technology systems were "rudimentary and inadequate" and were negatively impacting LeapFrog's ability to distribute products to its customers and to forecast product needs and financial results. LeapFrog relies primarily on third-party logistics suppliers to handle the distribution operations from its warehouses. Plaintiffs alleged that during the class period defendants knew that LeapFrog "had numerous problems with third party logistics suppliers not delivering products on time to customers." *Id.* at 1039.

Defendants moved to dismiss citing several grounds. The court dismissed the complaint, but granted plaintiffs leave to amend. The court held that plaintiffs had failed to plead loss causation for certain of their allegations, that falsity and scienter were not pled, that the safe harbor protected certain of defendants' forward-looking statements and that some of the alleged misstatements were inactionable corporate puffing.

**Relevant Holdings**:

Scienter:        With regard to plaintiffs' allegations concerning Leapfrog's supply chain and warehouse distribution problems, the court found that plaintiffs did not plead facts sufficient to satisfy the PSLRA's falsity or scienter requirements. *Id.* at 1043. The court found that plaintiffs' allegations were "largely vague," were "made without specific reference to time" and failed to connect any individual defendant to knowledge of the falsity of any statement they were alleged to have made. *Id.*

Safe Harbor:   The court found that certain of defendants' statements relating to projected earnings and investments in its supply-chain management system will yield future efficiencies. *Id.* at 1046. The court then found that defendants provided specific and meaningful warnings concerning the risks associated with meeting the projected earnings and the pitfalls associated with implementing the operational software in its warehouses. *Id.* at 1047. In any event, the court

determined that plaintiffs had not pled actual knowledge by any of the defendants and thus even if the warnings were inadequate, plaintiffs' allegations were still insufficient. *Id.* at 1048.

Insider Trading:       The court rejected plaintiffs' inference of scienter associated with defendants' stock sales because the complaint did not allege how the timing of the sales by any of the defendants was linked to any of the misrepresentations or omissions pled. *Id.* at 1052. Additionally, all the trades were made pursuant to pre-determined trading plans thus undermining an inference of scienter. *Id.* at 1052 n.16.

Leave to Amend:       Because amendment would not be futile, the court granted leave to amend even though plaintiffs had previously been given an opportunity to cure deficiencies outlined by the court's decision on a previous motion to dismiss. *Id.*

**Application to *Dana* Case**:   Plaintiffs' allegations tying defendants to the negative internal information at Dana are detailed, specific as to time and outline how defendants' statements to the market concerning Dana's internal controls, "overcoming" the rising steel prices and viability of the projected earnings were false and made with the required level of scienter.  The warnings defendants gave here concerning the various factors effecting Dana's business were seriously undermined by defendants' statements to investors that those risks had been conquered.  Such tempering statements are not mentioned in *Leapfrog*.

***Helwig* Factors Alleged**:       Factor No. 1 – Insider trading at a suspicious time or in an unusual amount; Factor No. 2 – Divergence between internal reports and external statements on the same subject; Factor No. 6 – Disregard of the most current factual information before making statements.

### 4.    *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007)

**Facts**:  Plaintiffs brought claims for violations of §§10(b) and 20(a) of the Exchange Act on behalf of a class of shareholders of Wet Seal, Inc. ("Wet Seal"). *Id.* at 1151.  Wet Seal is a specialty

retailer that sells clothing to young women, specifically teenagers.  *Id.*  Plaintiffs alleged that defendants made several misrepresentations to investors concerning Wet Seal's "turn-around plan," which was dependant on the success of its back-to-school clothing line, which would permit Wet Seal to recapture its customer base, avoid closing 50 stores and put the company back on the road to profitability.  *Id.* at 1153-54.  Plaintiffs alleged that defendants knew that because of infighting between the new fashion designer and the president of the Wet Seal division, the new promising line was not designed but was instead crafted together using "an old and failed" line of clothing from another designer, and as a result that the back-to-school line would not be well received and the turn-around plan would not be successful.  *Id.* at 1154.  Plaintiffs alleged that defendants knew that they were going to have to take a $75 million impairment charge associated with the closure of 50 unprofitable stores but delayed taking that charge to boost Wet Seal's reported financial results.  *Id.* at 1160-62.  Plaintiffs alleged that certain defendants sold large portions of their Wet Seal shares knowing that the turn-around plan was failing and would drive Wet Seal into further financial peril.  *Id.* at 1155.

Defendants moved to dismiss arguing that plaintiffs failed to plead their claims in satisfaction of the PSLRA for a variety of reasons.  The court granted defendants' motion, and because it had previously granted plaintiffs an opportunity to amend their complaint, dismissed the action with prejudice.

**Relevant Holdings**:

<u>Scienter</u>:      The court rejected plaintiffs' allegations that because of the importance of the success of the back-to-school line, that defendants knew that the line was a knock-off of a failed line from a different designer and not the work of the famous designer defendants told investors was responsible for their new product.  The court found that while the line was indisputably important to Wet Seal, plaintiffs alleged no facts indicating that defendants knew that the line was not being

designed by their hired designer. *Id.* at 1171, 1175. In other words, it was not "patently incredible" that defendants would not know the details of the design process. *Id.* The court also rejected plaintiffs' allegations that defendants were motivated to portray Wet Seal in the most favorable light so that they could secure financing for the company. *Id.* at 1174. The court found that, without more, this motive was too general and applicable to all corporate executives to support scienter. *Id.*

GAAP Violations:     The court found that plaintiffs had failed to properly allege any GAAP violations. *Id.* at 1160-63. Essentially, the court found that while plaintiffs alleged that defendants waited too long to take the $75 million impairment charge, they alleged no facts showing that defendants were aware that the charge was being delayed or that the charge was even necessary. *Id.* at 1161. The court went on to find that the GAAP violations allegations did not add to an inference of scienter because plaintiffs failed to allege any facts indicating defendants' involvement in the improper accounting. *Id.* at 1163.

Internal Reports:     The court also rejected plaintiffs' allegations that defendants had access to "real time" reports which showed Wet Seal's deteriorating financial condition. *Id.* at 1175. The court found that plaintiffs had failed to plead what information was contained in the reports available to defendants that contradicted their public statements. *Id.* at 1176.

Confidential Witness Allegations:     The court found these allegations to be insufficient because plaintiffs did not allege the witnesses job duties or how people in their positions would be privy to the information attributed to them. *Id.* at 1172-73.

Insider Trading:     Acknowledging that insider trading is not required to plead scienter, the court found that because plaintiffs did not allege that the non-selling defendants received a personal benefit from the fraud that "it is unreasonable to infer fraud" as to those defendants. *Id.* at 1177. The court also rejected plaintiffs' allegations concerning the trading by the selling defendants because, based upon the circumstances of the case, the plaintiffs needed to plead – and did not – that

these defendants were in possession of non-public information when they traded in order to properly allege that the "innocent explanation" offered to investors for these trades were misrepresentations. *Id.* at 1179-80.

Safe Harbor:   The court determined that the majority of the alleged misstatements were either inactionable corporate puffery or forward-looking statements accompanied by meaningful cautionary language.  *Id.* at 1167-68.[10]

Leave to Amend:      The court dismissed the complaint without leave to amend reasoning that because plaintiffs failed to request leave to amend and failed to proffer any information about what additional facts could be added by way of amendment, and that plaintiffs had been given one previous opportunity to amend their complaint following a motion to dismiss, that dismissal with prejudice was appropriate.  *Id.* at 1181.

**Application To *Dana* Case**:   Unlike in *Wet Seal*, plaintiffs, here, allege much more than bare GAAP violations to support scienter.  Plaintiffs' allegations put the timely adverse information into defendants' possession.   In *Dana*, defendants also admit through their restatement that Dana's financial statements were false when made and that, in fact, the internal financial controls were severely lacking in a variety of areas – something defendants represented to investors they personally assured were present.   There was no restatement in *Wet Seal* and no allegations that defendants there recklessly executed SOX certifications.  Furthermore, it is "patently incredible" that defendants would not have been aware of the need to write-off of Dana's $1 billion deferred tax assets by at least July 2005 when they told investors that Dana had conquered the negative effects of

---

[10]      The opinion provides very little discussion of the "cautionary language" and what made it meaningful in the context of the case.  The court notes, ***in evaluating scienter***, that the defendants warned investors of the possibility that the turn-around plan would fail, stores would have to be closed, and as a result an impairment charge relating to those closed stores would need to be taken. *Id.* at 1164-65.  Presumably, it is this same language that is the "meaningful cautionary language" the court as referring to in expressing its safe harbor holding.

rising steel costs and were successfully cutting costs.  The abrupt about-face defendants took here, without citing any new factors causing the drastic charge in Dana's fortunes, is also absent in *Wet Seal*.  Because of the multitude of other allegations of scienter, the lack of insider trading here adds nothing to the analysis.  In *Wet Seal*, the plaintiffs alleged no other basis for the defendants' scienter making the absence of stock sales more important.  Finally, plaintiffs here made a specific proffer of new facts that could be added to an amended complaint should the court determine that is necessary, and include those new allegations in the [Proposed] Amended Complaint.  *See* Ex. A.

> *Helwig* **Factors Alleged**:       Factor No. 1 – Insider trading at a suspicious time or in an unusual amount; Factor No. 2 – Divergence between internal reports and external statements on the same subject; Factor No. 6 – Disregard of the most current factual information before making statements; Factor No. 9 – The self-interested motivation of defendants in the form of saving their salaries or jobs.

> **5.      *Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*,
> No. 06-CV-2674-PHX-RCB, 2009 U.S. Dist. LEXIS 31832
> (D. Ariz. Mar. 31, 2009)**

> **Facts**: Plaintiff alleged securities violations against defendants for intentionally manipulating stock option grants to Apollo Group's officers, directors and employees to provide them with a more profitable exercise price and to under-report defendant's expenses and thereby overstate defendant's earnings.  *Id*. at  *5.  Defendants filed a motion to dismiss, arguing, among other things, that plaintiff has not adequately pled scienter.  *Id*. at *62.

> On June 28, 2006, a Lehman Brothers analyst published an article questioning Apollo's option grant history.  *Id*. at *13.  Apollo responded by issuing a news release, basically stating that it had not backdated options.  *Id*. at *14.  Several weeks later, Apollo disclosed that it had received a subpoena from the United States Attorney of the Southern District of New York, requesting documents relating to its stock option practices.  *Id*.  Apollo, then, appointed a special committee to

oversee a review of it's stock option practices. *Id*. The committee retained independent counsel who in turn retained forensic accountants. *Id*. Soon thereafter, Apollo received a letter from the SEC announcing and informal investigation and requesting documents. *Id*. at *15. Due to the ongoing investigation, Apollo was unable to timely file its 10Q. *Id*. On October 18, 2006, Apollo issued a news release basically admitting the backdating and mentioning a possible restatement of the company's financial statements. *Id*. at *15-*16. Following that announcement, Apollo's stock price fell "'22.0% in one day to a 4-year low of $37.55[.]" *Id*.

**Relevant Holdings**:

Scienter:      The court held that in taking the appropriate holistic view of plaintiff's allegations, plaintiff raised an inference of scienter as to certain defendants due to their heightened involvement and knowledge of the alleged scheme. *Id*. at *117. The totality of these allegations supports a finding that plaintiff has adequately pled that defendant either knew of the backdating, or was deliberately reckless in not knowing of the backdating. *Id*. at *20. The inference of scienter was at least as compelling as any opposing innocent inference, such as an innocent bookkeeping error. *Id*.

**Application to *Dana* Case**:   Plaintiffs in the *Dana* case have equally pled defendants were involved and fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements and signed SOX certificates. Indeed, Dana admitted as much in their restatement. Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports. In fact, defendants comments to the market addressed the same discrete subjects that was presented in the internal reports. Richter, for example, told investors on April 21, 2004, exactly what earnings Dana was poised to post, and

denied any "discernable impact" on Company operations from steel prices.  Burns similarly insisted on July 21, 2004, that Dana's (purportedly) strong financial results showed the Company's ability to "more than offset[] higher raw material prices."  It would have been nearly impossible for defendants to be unaware of the ongoing fraud.  The only opposing inferences offered by defendants' – explained by defense counsel broadly as anything other than fraud, such as "good faith misjudgment" or "oversight" (*see* transcript of motion to dismiss hearing on May 18, 2009 at 3:07-16) – are no more compelling as an inference of deception and fraud, and, as reiterated in the appellate decision in this case *Dana*, 547 F.3d at 571, a tie of inference must go to plaintiffs.

*Helwig* **Factors Alleged**:    Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

> **6.**    ***Weiss v. Amkor Tech., Inc.,***
> **527 F. Supp. 2d 938 (D. Ariz. 2007)**

**Facts**:  Plaintiffs brought claims for violation of §10(b) of the Exchange Act against Amkor Technology, Inc. ("Amkor") and certain of its executives.  Plaintiffs alleged that defendants violated the federal securities laws by manipulating the stock option grants made to Amkor executives to back date those options to dates where the stock was trading at its lowest levels to minimize the expense associated with the granting of these options recorded on Amkor's books thus permitting the company to report higher net income.  *Id.* at 941-42.  Plaintiffs also alleged that defendants made stock option grants to its employees shortly before positive earnings announcements.  *Id.*  After a variety of companies revealed in the Spring of 2006 that they were being investigated for stock option improprieties, Amkor announced that it was undertaking an internal investigation into whether stock option back dating practices had occurred at the company.  *Id.* at 942.  The investigation revealed that back dating practices had occurred at Amkor and that as a result Amkor's net income had been overstated by $108 million between 1998 and 2006.  The company restated its

financial statements as a result of the discovery. *Id.* The SEC launched an investigation and brought formal charges against Amkor's General Counsel relating to certain insider trades and option grants. *Id.* at 943. Plaintiffs also alleged that defendants misrepresented Amkor's profitability, customer demand and growth prospects informing investors that the company was experiencing a resurgence in customer demand for its cell phone products. *Id.* at 943. Within six months, defendants announced that the company was in fact experiencing weak demand for its products and that customer forecasted orders did not materialize. *Id.*

Defendants moved to dismiss the complaint primarily arguing that plaintiffs had not properly pled loss causation. *Id.* at 945-48. The court agreed with defendants that loss causation was not pled properly, and also found that the complaint's scienter allegations were lacking. The complaint was dismissed with prejudice as the plaintiffs had three opportunities to satisfy the PSLRA's requirements. *Id.* at 956.

**Relevant Holdings**:

Scienter:        The court rejected as a basis for scienter the fact that Amkor restated its financials because, without more, GAAP violations are insufficient to support a strong inference of scienter. *Id.* at 948-50. The court found plaintiffs' allegations lacking because they did not allege any facts tying the defendants to the accounting improprieties nor allegations that the defendants knew that the stock option manipulation was causing Amkor's financial statements to be inaccurate. *Id.* at 949.

Sox Certifications:      The court also rejected as a basis for inferring scienter the fact that defendants signed SOX certifications. *Id.* at 950. Because the plaintiffs did not allege that the defendants received specific reports or attended meetings designed to keep them specifically informed of the company's financial situation, the SOX certification allegations were not compelling. *Id.*

<u>Confidential Witness Allegations</u>:     The court found these allegations lacking because the plaintiffs did not allege how the witnesses came to learn the information attributed to them or how their job duties would have put them in a position to know the information.  *Id.* at 953-55.

<u>Safe Harbor</u>:   The part of plaintiffs' claim based upon statements concerning Amkor's forecasted financial results, customer demand and material costs was dismissed because the court found that those statements were forward-looking statements protected by the PSLRA safe harbor provision.  *Id.* at 955.

**Application to *Dana* Case**:   Here, plaintiffs allege that defendants were well-informed about Dana's financial situation when they signed the SOX certifications.  Unlike in *Weiss*, plaintiffs allege what information defendants received, in which reports, when and from whom this information was obtained and that Dana's difficulties were routinely discussed.  Moreover, plaintiffs here allege specifically how each confidential witness that provided this information came to know it, *i.e.* these witnesses drafted and sent the reports in question and attended the meetings were the issues were raised.  While the court in *Weiss* found that certain of defendants' statements were protected by the safe harbor, the warnings at issue here can not similarly be found to have sufficiently informed Dana's investors that the "possible" conditions that could befall Dana were then present and negatively effecting the company's profitability.  Moreover, defendants here tempered their "warnings" by proclaiming victory over the very conditions that they "warned" investors about.

*Helwig* **Factors Alleged**:     None.

X.      **TENTH CIRCUIT**

    A.      **District Court Decisions**

        1.      ***New Jersey v. Sprint Corp.*,**
              **531 F. Supp. 2d 1273 (D. Kan. 2008)**

    **Facts**: Plaintiff filed a securities class action against Sprint for making misleading statements in various Sprint SEC filings because those materials failed to disclose a multitude of facts (primarily that Sprint had entered into new employment contracts with its top two executives to insure the long-term employment of those executives were misleading when made because Sprint failed to disclose the possibility or inevitability that the employment of those executives in all likelihood would be terminated as a result of certain tax shelters entered into by the executives) that a reasonable investor would have considered important in making a decision to purchase Sprint securities. *Id*. at 1275.

    **Relevant Holdings**:

    <u>Scienter</u>:        The court found that the allegations in the state's complaint were sufficient to permit a reasonable person to draw an inference of scienter that was cogent and as compelling as any opposing inference.  The allegations permitted an inference that the corporation and the board of directors, at the time the pertinent statements concerning the directors' long-term employment were made, knew the devastating tax liability faced by the directors; knew that, in all likelihood, the Internal Revenue Service would one day determine that the shelters utilized by the directors were invalid and would come to collect the liability; knew that the liability would bankrupt the directors; and knew that, as a result, the directors' continued ability to lead the corporation was in grave doubt. *Id*. at 1281-82.  Defendants' opposing inference that they executed the employment contracts because they sincerely hoped to retain defendants was insufficient because it focused on isolated facts rather than all facts alleged; defendants' opposing inference was not inconsistent with

plaintiffs' allegations; and their inference did not fully address the statements made in the SEC filings (that Sprint expected long term employment of the top two executives).  *Id*. at 1282-83.

**Application to *Dana* Case**:  Like plaintiffs in *New Jersey*, plaintiffs in *Dana* have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements.  Dana not only admitted as much in their restatement, it would have been nearly impossible for defendants to be unaware of the ongoing fraud as defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports.  In fact, defendants' comments to the market addressed the same discrete subjects that were presented in the internal reports.

Moreover, the only opposing inferences offered by defendants – explained by defense counsel as "anything other than fraud," such as "good faith misjudgment" or "oversight" (*see* transcript of motion to dismiss hearing on May 18, 2009 at 3:07-16) – are no more compelling as an inference of deception and fraud.  And, as reiterated in the appellate decision in this case, where there is a tie of inferences, the draw must go to plaintiffs.  *Dana*, 547 F.3d at 571.

***Helwig* Factors Alleged**:     Factor No. 2 – Divergence between internal reports and external statements.

## XI.     ELEVENTH CIRCUIT

### A.     Court of Appeals Decisions

#### 1.     *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230 (11th Cir. 2008)

**Facts**:  Plaintiffs brought claims for violations of §10(b) of the Exchange Act against Home Depot and certain of its officers and directors.  Home Depot sells "a wide assortment of building materials, home improvement and lawn and garden products" and obtains its merchandise from

third-party vendors. By contract, these vendors grant Home Depot a credit, commonly known as a "return-to-vender" or "RTV" chargeback for defective merchandise. *Id*. at 1240. Some of Home Depot's vendor contracts allow the company to "process an RTV chargeback for defective merchandise and then dispose of the merchandise (rather than return it to the vendor)[.]" *Id*. Plaintiffs alleged that "[w]hen an RTV chargeback is processed, the Company makes an adjustment to 'cost of goods sold' in an amount that offsets or negates the original cost." Thus, "[l]egitimate RTV chargebacks have no impact on a company's financial results." *Id.* at 1241.

Plaintiffs alleged that defendants used illegitimate RTV chargebacks to inflate earnings. Plaintiffs allege that illegitimate RTVs can be used to reduce "shrink," which is retail-industry lingo for inventory that is lost or damaged due to shoplifting, employee theft, store use, or damage by store employees. Plaintiffs alleged that "[t]he proper accounting treatment for shrink is to write-down the missing product to zero, which cuts directly into a company's earnings and operating margin." *Id*. A company may fraudulently reduce shrink by classifying missing inventory as defective and receiving an RTV chargeback for that amount under a destroy-in-field provision. Second, a company can fraudulently claim an item is defective and receive an RTV chargeback under a destroy-in-field provision, and then sell the product to a customer. According to the amended complaint, this species of fraud produces "100% pure profit (because the fraudulent RTV offset[s] the cost of the merchandise)." The amended complaint alleged that Home Depot stores routinely processed fraudulent RTV chargebacks as part of a "companywide scheme" to boost profits. *Id.*

The district court dismissed the amended complaint finding that it failed to satisfactorily plead scienter. The Eleventh Circuit affirmed. *Id.* at 1235.

**Relevant Holdings**:

Confidential Witness Allegations:      The plaintiffs relied on several confidential witnesses in their complaint. The court concluded that "the weight to be afforded to allegations based on

statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider. Confidentiality, however, should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Id.* at 1240.

Scienter:        The court found that plaintiffs' complaint established that Home Depot processed improper RTV chargebacks and that the confidential witness allegations sufficiently set forth how the witnesses would be in a position to know the information that was attributed to them. *Id.* at 1247. However, the court found that plaintiffs did not plead that defendants knew about, or were reckless in not knowing about, the improper chargebacks happening in Home Depot's stores. *Id.* The complaint contained no allegations that defendants directed that the chargebacks occur or that the fact that such chargebacks were occurring was discussed with any of the defendants. *Id.* at 1247-48, 1250-51. While the complaint cites to certain documents, the court found the allegations lacking because who wrote and received the document was not pled, and the fraudulent intent of the document was dependant upon one confidential witness's interpretation of it. *Id.* at 1248-49.

Sox Certifications:        The court found that scienter can be inferred from SOX certifications if the person signed those certifications recklessly. *Id.* at 1252. "A certifier would be severely reckless . . . only if he had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions." *Id.* Because plaintiffs alleged that only one inventory check turned up evidence of the RTV fraud and was unclear when this inventory audit was conducted, it was insufficient into infer that the fraud was a wide-spread phenomenon that should have been discovered during defendants' SOX evaluations. *Id.* at 1252-53.

Insider Trading:        The plaintiffs did not allege that any defendant engaged in any stock transactions during the class period.   Acknowledging that *Tellabs* does not require insider trading allegations to support an inference of scienter, the court determined that the absence of such sales should be assessed in light of the remaining allegations of fraud.   *Id.* at 1253 n.3.   In *Mizzaro*, the court determined that the absence of such allegations in that case weighs against an inference of scienter.   *Id.* at 1253.

Leave to Amend:        The court determined that leave to amend was properly denied because the proposed new facts to be added to the complaint would not cure the lack of scienter.   *Id.* at 1255-56.

**Application To *Dana* Case**: Plaintiffs' allegations here directly link the negative information concerning Dana's business to defendants, the main deficiency in the *Home Depot* case. In *Home Depot*, the fraud was occurring in Home Depot's stores.   Here, the fraud was occurring at Dana's headquarters.   Dana's plants reported their actual financial results to defendants at corporate headquarters.   Defendants undertook quarterly reviews of the internal controls of the company to determine whether the results being reported to them were free from material error.   Each quarter defendants signed the SOX certifications assuring investors that their reviews uncovered no reason to doubt that Dana's financial control systems were functioning properly.   In *Home Depot*, the lack of insider trading was a factor based upon the facts alleged in that case.   Here, the lack of trading is unimportant because plaintiffs plead the transmission of the contradictory information to defendants, something that *Home Depot* lacked.   Furthermore, there are many reasons why defendants did not trade – no vested options, tax reasons, not wanting to draw attention to themselves – that also must be considered in assessing the weight to give the absence of any trading.

***Helwig* Factors Alleged**:        Factor No. 2 – Divergence between internal reports and external statements.

B.      **District Court Decisions**

1.      ***Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.,***
        **560 F. Supp. 2d 1221 (M.D. Fla. 2008)**

**Facts**:  Plaintiffs alleged that defendants knowingly, falsely, and misleadingly made public statements regarding defendant's backdating stock option practice, accounting practice, and earnings forecast.  *Id*. at 1231.  Because plaintiffs could not establish that defendant was actually backdating it's stock options or how defendant's statements about it's stock option practice was misleading (*id*. at 1233), and because defendant provided sufficient cautionary language regarding risks and uncertainties (*id*. at 1236, 1238), plaintiffs claims were dismissed.

**Relevant Holdings**:

Safe Harbor:   The court held that defendant's warning of risks and uncertainties was cautionary and fit the definition of a forward-looking statement.  *Id*. at 1236, 1238.

**Application to *Dana* Case**:    This case does not apply to *Dana* as it is an options backdating case, involving unique facts by which a stock option is reported as being granted on one date but has actually been backdated weeks or months to a date when the stock was trading at a lower price.  *Id*. at 1227.  To the extent defendants attempt to analogize this case with regard to it's holding on forward looking statements, it is equally inapplicable.  Defendants in *Goodman Life* issued a cautionary statement warning of risks and uncertainties similar to that actually realized (*id*. at 1235-36) and another identifying the oral statement as forward looking (*id*. at 1238).  Defendants in *Dana* have done no such thing.  Rather, *Dana* defendants made several ***oral*** statements concerning Dana's future earnings that were not particularly identified as forward-looking.  This removes them from the safe harbor's umbrella.

***Helwig* Factors Alleged**:      Factor No. 2 – Divergence of internal reports and external statements.

2.      ***Gustin v. Hoffman*,**
        **No. 6:08-cv-57-Orl-31 DAB, 2009 U.S. Dist. LEXIS 22036**
        **(M.D. Fla. Mar. 9, 2009)**

**Facts**:  Plaintiffs alleged that between April 2003 and February 2006, the defendants, or the

entities they allegedly controlled, engaged in a fraudulent scheme which raised more than $20

million from approximately 300 investors.  Specifically, the defendants' entities offered investments

in point-of-sale debit and credit card terminals.   While investors were ostensibly given the

opportunity to purchase the terminals outright, all of the investors apparently entered into lease-back

agreements with one or more of the defendants' entities.  Once an investor "purchased" one or more

terminals and entered into the lease-back agreement, the defendants' entities were supposed to place

the terminals at retail establishments. Investors were promised a monthly return of $50 for each

terminal they owned, amounting to a 12% annual return over a five year period.  These monthly

returns were to be paid out of the transactions fees earned by the terminals.  After the lease period,

the defendants' entities were obligated to repurchase the terminals from the investors at the original

purchase price. *Id.* at *4-*5.

Plaintiffs alleged that the defendants' entities made a number of misrepresentations to the

investors in connection with the foregoing investments.  These misrepresentations include the fact

that the monthly lease payments were guaranteed by a six-month reserve fund and that the

defendants' entities maintained a sinking fund to pay for the eventual repurchase of the terminals

after the lease period.   According to plaintiffs, there were no such reserve or sinking funds.

Furthermore, many of the terminals were never placed with merchants and even those that were did

not generate sufficient funds to make the lease payments. Instead, the defendants' entities allegedly

used recent investors' purchases to pay the monthly lease payments due to previous investors.

Eventually, the defendants' entities stopped making the monthly payments. When investors started

making demands for their lease payments or for the repurchase of their terminals, the scheme unraveled. *Id.* at \*5-\*6.

Defendants moved to dismiss the complaint arguing that it did not properly plead scienter. *Id.* at \*8.  The court denied defendants' motion. *Id.* at \*16.

**Relevant Holdings**:

Scienter:        The court found that the complaint pled a strong inference of scienter based upon plaintiffs' allegations that defendants knew that, from its inception, the company was operating at a deficit that was widening. *Id.* at \*14.  Adding to the inference of scienter were plaintiffs' allegations that one of the defendants had been convicted of fraud and that two of defendants' companies had been cited for violations of two states' securities laws but that defendants continued to offer the same investment opportunities in different states. *Id.*

**Application To *Dana* Case**: While *Gustin* is factually distinguishable, scienter is found because the plaintiffs alleged that defendants knew adverse facts that were concealed from investors. Plaintiffs, here, allege the same circumstances.   The Complaint sets forth what information defendants received, from whom, when it was sent and discussed and how it contradicted the public picture defendants drew of Dana for investors.

*Helwig* **Factors Alleged**:       Factor No. 2 – Divergence between internal reports and external statements on the same subject; Factor No. 6 – Disregard of the most current factual information before making statements.

3.        *McCanna v. Eagle*,
No. 2:08-cv-421, 2009 U.S. Dist. LEXIS 38191
(M.D. Fla. May 5, 2009)

**Facts**:  This action arose out of a number of business arrangements between plaintiff Richard E. McCanna, defendant Gregory W. Eagle, and Steven Knight. *Id.* at \*1.  Plaintiff alleged that, through the course of their business relationship, defendant violated the Exchange Act and several

state statutes.  *Id*.  Defendant represented himself to plaintiff as an experienced real estate investor with adequate holdings and wealth to secure loans for the funding of a third party's real estate project.  *Id*. at *2.  Plaintiff entered into a contract with defendant whereby he agreed to give half of his interest in the project to defendant in exchange for defendant's agreement to put up adequate property as collateral for a $200 million loan for the project.  *Id*. at *2-*3.  Plaintiff subsequently made two loans to defendant in relation to another investment property before finding out that defendant had misrepresented the value or the collateral in the original project agreement.  *Id*. at *3.  Although defendant represented that he fully owned three parcels of land pledged as collateral, defendant actually owned 36% or less of a beneficial interest in each parcel.  *Id*.

**Relevant Holdings**:

<u>Scienter</u>:  The court found that plaintiff sufficiently pled scienter.  Plaintiff adequately alleged that defendant knowingly misled plaintiff by overstating his ownership interest in three properties by 66% to 80%.  *Id*. at *15.  Defendant's misrepresentations induced plaintiff to sell defendant a portion of his interest in the project, sign a personal guarantee for the loan, and lend defendant over half a million dollars.  *Id*.  The court held it was at least as likely that the defendant intended to deceive the plaintiff when he knowingly overstated his ownership interests in the three properties as any other opposing inference.  *Id*.  Defendant's motion to dismiss was denied.

**Application to *Dana* Case**:   Like plaintiff in *McCanna*, plaintiffs here have adequately pled that defendants were fully aware and knowledgeable of the ongoing fraud during the time in which they made misleading statements.  The only opposing inferences offered by defendants – explained by defense counsel broadly as anything other than fraud, such as "good faith misjudgment" or "oversight" (*see* transcript of motion to dismiss hearing on May 18, 2009 at 3:07-16) – are no more compelling as an inference of deception and fraud, and, as reiterated in the appellate decision in this case (*Dana*, 547 F.3d at 571), a tie of inference must go to plaintiffs.

     *Helwig* **Factors Alleged**:    Factor No. 2 – Divergence between internal reports and external statements; Factor No. 9 – Self-interested motivation in the form of saving their salaries and jobs.

DATED:  June 8, 2009

    COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
    MICHAEL J. DOWD
    DEBRA J. WYMAN
    SAMANTHA A. SMITH


                s/ Debra J. Wyman
    ———————————————————
    DEBRA J. WYMAN

    655 West Broadway, Suite 1900
    San Diego, CA  92101
    Telephone:  619/231-1058
    619/231-7423 (fax)

    Lead Counsel for Plaintiffs

    LANDSKRONER • GRIECO • MADDEN,
      LTD.
    JACK LANDSKRONER (0059227)
    1360 West 9th Street, Suite 200
    Cleveland, OH  44113
    Telephone:  216/522-9000
    216/522-9007 (fax)

    Liaison Counsel

    O'DONOGHUE & O'DONOGHUE LLP
    LOUIS P. MALONE
    4748 Wisconsin Avenue, N.W.
    Washington, DC  20016
    Telephone:  202/362-0041
    202/362-2640 (fax)

    Additional Counsel for Plaintiffs

S:\CasesSD\Dana Corp\BRF00059628-supp submission.doc

CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2009, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to the e-mail addresses

denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the

foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on June 8, 2009.


s/ Debra J. Wyman
DEBRA J. WYMAN

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:debraw@csgrr.com

# Mailing Information for a Case 3:05-cv-07393-JGC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joseph M. Callow , Jr**
  jcallow@kmklaw.com,ddaddesa@kmklaw.com

- **Jack Landskroner**
  jack@landskronerlaw.com,debra@landskronerlaw.com,drew@lgmlegal.com

- **Ann L. Lugbill**
  alugbill@murphypllc.com,lisajohnsoncincinnati@gmail.com

- **Darren J. Robbins**
  e_file_sd@csgrr.com

- **Keith W. Schneider**
  snichelson@ms-lawfirm.com

- **Scott D. Simpkins**
  sdsimp@climacolaw.com

- **Samantha A. Smith**
  ssmith@csgrr.com,e_file_sd@csgrr.com

- **Joseph P. Thacker**
  thacker@cooperwalinski.com,j.sternman@kattenlaw.com,baker@cooperwalinski.com,anthony.paccione@kattenlaw.com

- **Debra J. Wyman**
  debraw@csgrr.com,hectorm@csgrr.com,miked@csgrr.com

- **David W. Zoll**
  david@toledolaw.com,angela@toledolaw.com,christy@toledolaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Plumbers & Pipefitters National Pension Fund
Landskroner Grieco Madden, Ltd.
1360 West 9th Street, Ste. 200
Cleveland, OH 44113

SEIU Pension Plans Master Trust
Landskroner Grieco Madden Ltd
1360 West 9th Street, Ste. 200
Cleveland, OH 44077

West Virginia Laborers Pension Trust Fund
Landskroner Grieco Madden, Ltd.
1360 West 9th Street, Ste. 200
Cleveland, OH 44113
```