UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION (TOLEDO)

| | | |
|---|---|---|
| HOWARD FRANK, Individually And On Behalf Of All Others Similarly Situated, | : : : | Civil Action No. 3:05-CV-07393-JGC |
| Plaintiff, | : : | Class Action |
| vs. | : : | CHIEF JUDGE JAMES G. CARR |
| DANA CORPORATION, et al., | : : | |
| Defendants. | : : | |

SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT
OF DEFENDANTS' RENEWED MOTION TO DISMISS

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022
(212) 940-8800

-and-

Cooper & Walinski, L.P.A.
900 Adams Street
Toledo, OH 43624
(419) 241-1200

Of Counsel:
    Joel W. Sternman
    Anthony L. Paccione
    Daniel A. Edelson
    Cameron Balahan

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................................1

   A.   AWARENESS THAT STATEMENTS FALSE WHEN MADE .........................................1

   B.   MOTIVE/PERSONAL OR CORPORATE BENEFITS ...................................................2

   C.   SEC INVESTIGATIONS/CONFIDENTIAL WITNESS ALLEGATIONS ...........................2

   D.   RESTATEMENTS/MAGNITUDE OF MISSTATEMENTS.................................................2

   E.   TEMPORAL PROXIMITY .........................................................................................3

   F.   "COLLECTIVELY VIEWED"/CULPABLE VS. NON-CULPABLE INFERENCES .............3

   G.   LEAVE TO AMEND ................................................................................................3

POINT I  AS TO THE "PROPOSED" AMENDED CONSOLIDATED COMPLAINT .......................5

POINT II  AS TO ADDITIONAL SELECTED CASES ON WHICH PLAINTIFFS RELY .................7

POINT III  AS TO FORWARD LOOKING STATEMENTS AND SAFE HARBOR........................14

CONCLUSION ...............................................................................................................17

TABLE OF AUTHORITIES

CASES

*Beach v. Healthways, Inc.,*
    No. 08-CV-0569,
    2009 U.S. Dist. LEXIS 17809 (M.D. Tenn. Mar. 9, 2009) ......................................................8

*Beightol v. Navarre Corp., Inc.,*
    No. 08-CV-00010,
    2009 U.S. Dist. LEXIS 6590 (S.D. Miss. Jan. 26, 2009) ......................................................12

*City of Hialeah Employees' Retirement System v. Toll Brothers, Inc.,*
    No. 07-CV-1513,
    2008 U.S. Dist. LEXIS 66906 (E.D. Pa. Aug. 29, 2008) ......................................................8

*Gruhn v. Tween Brands, Inc.,*
    No. 07-CV-852,
    2009 WL 1542795 (S.D. Ohio June 2, 2009) ......................................................17

*Heller v. Goldin Restructuring Fund, L.P.,*
    590 F. Supp. 2d 603 (S.D.N.Y. 2008) ......................................................12

*In re Aetna Inc. Sec. Litig.,*
    No. 07-CV-4451,
    2009 WL 1619636 (E.D. Pa. June 9, 2009) ...................................................... 15-17

*In re Am. Serv. Group, Inc.,*
    No. 06-CV-0323,
    2009 U.S. Dist. LEXIS 28237 (M.D. Tenn. Mar. 30, 2009) ......................................................7

*In re Avon Prods., Inc. Sec. Litig.,*
    No. 05-CV-6803,
    2008 WL 848017  (S.D.N.Y. Feb. 23, 2009) ......................................................15

*In re Huffy Corp.,*
    577 F. Supp. 2d 968 (S.D. Ohio 2008) ......................................................7

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Serv. and Securitization,*
    No. 08-CV-10842,
    2009 WL 1444400 (S.D.N.Y. May 26, 2009) ......................................................13

*Lormand v. US Unwired, Inc.,*
    565 F.3d 228 (5th Cir. 2009) ...................................................... 7, 14-15

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
    513 F.3d 702 (7th Cir. 2008) ......................................................10

*Miss. Pub. Employees Retirement System v. Boston Scientific Corp.,*
   523 F.3d 75 (1st Cir. 2008)...........................................................................................................7

*Ross v. Abercrombie & Fitch Co.,*
   501 F. Supp. 2d 1102 (S.D. Ohio 2007) ...............................................................................8, 9

*Roth v. Aon Corp.,*
   No. 04-CV-6835,
   2008 U.S. Dist. LEXIS 18471 (N.D. Ill. Mar. 7, 2008)............................................................9

*Silverman v. Motorola, Inc.,*
   No. 07-CV-4507,
   2008 U.S. Dist. LEXIS 76799 (N.D. Ill. Sept. 23, 2008) ......................................................15

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.,*
   No. 06-CV-2674,
   2009 WL 890479 (D. Ariz. Mar. 31, 2009)...........................................................................11

## RULES

Federal Rules of Civil Procedure 7 and 15 ................................................................................ 5-6

## PRELIMINARY STATEMENT

This Supplemental Reply Memorandum is submitted in further support of Defendants'
Renewed Motion to Dismiss the Complaint in this action.

Plaintiffs adopt an unusual approach in analyzing the multitude of post-*Tellabs* decisions
they discuss in their 126 page Supplemental Submission ("Pls. Supp. Sub."). They either cut and
paste or vary in immaterial ways the rationale for characterizing decisions adverse to their
position as inapplicable or decisions favorable to their position as applicable. *See* Exhibit L to
the June 22, 2009 Supplemental Declaration of Joel W. Sternman ("Sternman Supp. Decl.") for a
listing of decisions that Plaintiffs seek to brush aside or embrace in this manner. Plaintiffs
appear to believe that repetition of the same self-serving assertions, or variations thereof, under
the heading "Application to *Dana* Case" in their Circuit by Circuit presentation of the multitude
of decisions discussed will serve to reinforce the persuasiveness of their assertions as if, in the
words of Bellman in Lewis Carroll's *The Hunting of the Snark,* "What I tell you three times is
true."[1]

In addressing issues relating to scienter (addressed at pages 8-23 of Defendants' June 8,
2009 Supplemental Memorandum ("Defs. Supp. Mem.")), Plaintiffs repeatedly characterize the
allegations of the Complaint as follows:

## A.   AWARENESS THAT STATEMENTS FALSE WHEN MADE

[Plaintiffs] have adequately pled that defendants were fully aware and
knowledgeable of the ongoing fraud during the time in which they made

---

[1]   Lewis Carroll, The Hunting of the Snark: Fit the First – The Landing

"Just the place for a Snark!" the Bellman cried, As he landed his crew with care;
Supporting each man on the top of the tide, By a finger entwined in his hair.

"Just the place for a Snark!  I have said it twice: That alone should encourage the crew.
Just the place for a Snark!  I have said it thrice: What I tell you three times is true."

misleading statements and signed SOX certificates. Indeed, Dana admitted as much in their restatement. Defendants were intimately familiar with the goings-on of the company and consistently had the most current financial information about Dana due to its streamlined reporting process, which involved daily and weekly "tracker reports," monthly plant-specific "production reports," monthly profit-and-loss reports, and SAD reports. In fact, defendants comments to the market addressed the same discrete subjects that was presented in the internal reports. Richter, for example, told investors on April 21, 2004, exactly what earnings Dana was poised to post, and denied any "discernable impact" on Company operations from steel prices. Burns similarly insisted on July 21, 2004, that Dana's (purportedly) strong financial results showed the Company's ability to "more than offset[] higher raw material prices." It would have been nearly impossible for defendants to be unaware of the ongoing fraud.

The foregoing language, verbatim or with immaterial variations, appears following the discussion of 49 decisions in Plaintiffs' Supplemental Submission. *See* Sternman Supp. Decl. Ex. L at 1-3.

### B.     MOTIVE/PERSONAL OR CORPORATE BENEFITS

Defendants were also highly motivated to create a false positive impression of the company as their jobs and salaries depended on the company's success. Defendants personally benefited from their fraudulent conduct as they stood to gain millions of dollars in bonus compensation that was directly linked to Dana's reported net income and earnings-per-share. Similarly, Dana was able to maintain its facade of financial health, enabling it to sell $450 million of debt and avoid lowered credit ratings.

4 decisions. *See* Sternman Supp. Decl. Ex. L at 4.

### C.     SEC INVESTIGATIONS/CONFIDENTIAL WITNESS ALLEGATIONS

An ongoing investigation by the SEC, and available supportive testimony from confidential witnesses . . ., further add to an inference of scienter.

9 decisions. *See* Sternman Supp. Decl. Ex. L at 5.

### D.     RESTATEMENTS/MAGNITUDE OF MISSTATEMENTS

[P]laintiffs have adequately pled that the nature and number of the alleged accounting manipulations, coupled with the magnitude of the fraud bolsters an inference of scienter. Here, Dana had to restate six quarters of accounting manipulations, and . . . . suddenly wrote off [its] deferred tax benefits.

12 decisions. *See* Sternman Supp. Decl. Ex. L at 6.

**E.      TEMPORAL PROXIMITY**

> The proximity of the fraudulent statements also give rise of scienter.   For
> example, as late as the end of July, 2005, defendants were crowing about stellar
> 2Q05 results – highlighting a phenomenal 275% increase in net income over
> 1Q05, and again reassuring investors that the procedures and controls in place
> ensured the accurate reporting of Dana's financial results. And yet, within just a
> month-and-a-half of these announcements, the bottom dropped out.   On
> September 15, defendants acknowledged that instead of earning $1.30-$1.45 per
> share in 2005, Dana now expected to garner no more than $0.70 per share.

7 decisions. *See* Sternman Supp. Decl. Ex. L at 7.

**F.      "COLLECTIVELY VIEWED"/CULPABLE VS. NON-CULPABLE INFERENCES**

> The only opposing inferences offered by defendants' – explained by defense
> counsel broadly as anything other than fraud, such as "good faith misjudgment"
> or "oversight" . . . are no more compelling as an inference of deception and fraud,
> and, as reiterated in the appellate decision in this case . . ., a tie of inference must
> go to plaintiffs.

7 decisions. *See* Sternman Supp. Decl. Ex. L at 8.

**G.      LEAVE TO AMEND**

> [P]laintiffs here have offered the court its proposed amended allegations . . . .

7 decisions. *See* Sternman Supp. Decl. Ex. L at 9.

But, as even Plaintiffs at times seem to recognize, characterization of the Complaint by

counsel in memoranda or in oral argument is not what matters. The particularized facts set forth

in the Complaint itself control the issue of pleading sufficiency; not, as Plaintiffs persist in

asserting, speculative inferences drawn from conclusory assertions supported solely by the

wishful thinking of Plaintiffs or their counsel. As stated in the August 2007 Decision, 525 F.

Supp. 2d at 932:

> This Court, ultimately, must evaluate all these factors together and ask,
> "would a reasonable person deem the inference of scienter at least as strong as
> any opposing inference?" *Tellabs, supra*, 127 S.Ct. at 2511.  Plaintiff asserts that

various documents informed defendants of Dana's financial difficulties, but he cites no specific basis for such knowledge. Although the positions of Burns and Richter as CEO and CFO are relevant, they alone cannot establish scienter. On the other hand, although the lack of insider trading, and therein a palpable lack in motive for making knowingly fraudulent statements, is relevant, that alone also cannot eliminate plaintiff's claims. Ultimately, however, an assessment of all the factors, coupled with the absence of specific facts in the context of otherwise conclusory allegations, persuades me that plaintiff has failed adequately to allege scienter.

Nowhere does the Complaint plead particularized facts supported by documents or credible sources to support its assertions that, for example:

- "Defendants were fully aware and knowledgeable of the ongoing fraud" during the Class Period;

- "'Weekly tracker reports,' monthly plant specific 'production reports,' monthly profit-and-loss reports, and SAD reports" with information inconsistent with statements by Defendants were received and reviewed by them during the Class Period;

- "It would have been nearly impossible for Defendants to be unaware of the ongoing fraud;"

- "Defendants personally benefited from their fraudulent conduct;"

- "An ongoing investigation by the SEC, and available supporting testimony from confidential witnesses . . . further add to an inference of scienter;"

- "[T]he nature and number of the alleged accounting manipulations, coupled with the magnitude of the fraud [the restatement and the valuation allowance writing off Dana's deferred tax assets] bolsters an inference of scienter;"

- The opposing inferences offered by Defendants, such as "good faith misjudgment or oversight . . . are no more compelling [than] an inference of deception and fraud."

The foregoing sets forth the essence of Plaintiffs' arguments here. In contrast, the Complaint itself and the relevant authorities show that such arguments are without foundation. As noted in the August 2007 Decision, no particularized facts are alleged to support the existence of information in documents or discussions that would have informed Defendants of Dana's financial difficulties, no insider trading is alleged and, in general, "the absence of specific facts

4

in the context of otherwise conclusory allegations," leads to the conclusion that Plaintiffs have "failed adequately to allege scienter." 525 F. Supp. 2d at 932.

In their repetitive purported distinctions between the Complaint here and the decisions they seek to distinguish, Plaintiffs rely almost exclusively on their willingness to assert, without any reasoned analysis, that the complaints at issue in those cases reflect different circumstances or are otherwise lacking in the purported factual foundation on which the Complaint in this action rests. But, as shown herein and in our prior filings, Plaintiffs' willingness to assert their distinctions "three times" or more, does not make them true.

## POINT I

### AS TO THE "PROPOSED" AMENDED CONSOLIDATED COMPLAINT

For some reason, Plaintiffs have steadfastly avoided filing a motion to amend the Complaint, as required by Rules 7(b) and 15(a) of the Federal Rules of Civil Procedure, apparently recognizing that the showing required by such motion would be detrimental to their position. Despite this, they seek to gain some benefit by claiming they could amend if it became necessary to do so. Pages 62-65 of their February 7, 2008 Opening Brief to the Sixth Circuit referred to information from CW 1-5 that, Plaintiffs claimed, could strengthen the Complaint.[2] Then, at page 29 of their May 1, 2008 Sixth Circuit Reply Brief, Plaintiffs proclaimed that "[t]he five CWs – and there are many more . . . – occupied positions within Dana that gave them access to the information alleged."

Following remand to this Court and the filing of Defendants' renewed motion to dismiss, Plaintiffs, at page 47 of their April 20, 2009 Opposition, noted their willingness to amend, but

---

[2]    Defendants' April 14, 2008 Sixth Circuit Brief at pages 47-52 demonstrated why the paltry descriptions of CW 1-5 fell far short of the strictures of the PSLRA. *See* Sternman Supp. Decl. Ex. M for the referenced excerpts from the parties' Sixth Circuit Briefs.

only in the event the Court determined that their August 2006 Complaint "does not meet the pleading standards imposed by the PSLRA." Representing that they had "material that could be added to an amended complaint . . . should the Court determine that it is necessary to assure compliance with the PSLRA," they set forth "a sample of additional information that can be added to the Complaint." *Id.* at 48. In addition, Plaintiffs represented that there were "myriad witnesses" who could add even more "substance" to the Complaint:

> These are just a few of the myriad witnesses whose specific recollections added substance to the complaint, and whose responsibilities and job positions could be added via amendment should this court so desire. *Id.* at 50.

The culmination of this strategy of improperly expanding the record by references to CW 1-5, despite the silence of the Complaint and Plaintiffs' decision not to make a proper motion to amend, appears in their June 8, 2009 Supplemental Submission. There, attached as Exhibit A, is an unsigned "Proposed" Amended Complaint that includes new paragraphs about CW 1-5 practically identical to their descriptions in Plaintiffs' Sixth Circuit Brief. Other than the renumbering of the paragraphs that follow and certain changes in the names of counsel, this "Proposed" pleading remains identical to the Complaint filed in August 2006. Significantly, no motion, no signature by counsel, and no additional CWs beyond the "sample" previously provided accompany this "Proposed" pleading. The only explanation offered for its attachment to Plaintiffs' Supplemental Submission is as follows: "Due to the expressed interest of the Court at the May 18 hearing, Plaintiffs also submit the attached [Proposed] Amended Consolidated Complaint . . . as Ex. A. (p. 1)."

While, at the May 18 hearing, the Court did inquire as to Plaintiffs' intention to amend, we do not believe that its comments can be read to invite the filing of a "Proposed" pleading, unaccompanied by the requisite motion and supporting memorandum that would enable Defendants to determine whether, and if so how, to oppose that motion. Plaintiffs' failure to file

a motion and supporting memorandum should not be rewarded by deeming that "Proposed" pleading at issue on this renewed motion.

For the reasons previously set forth at pages 22-27 of our May 1, 2009 Reply Memorandum, Plaintiffs have no right to amend; their assertions as to CW 1-5 remain as insufficient in this "Proposed" pleading as they were in Plaintiffs' prior briefs; any amendment would be futile and, as a result, dismissal of the Complaint (and the "Proposed" Amended Complaint, to the extent considered by the Court), should be with prejudice and without leave to amend.

## POINT II

### AS TO ADDITIONAL SELECTED CASES ON WHICH PLAINTIFFS RELY

Pages 24-29 of Defendants' June 8, 2009 Supplemental Memorandum anticipated Plaintiffs' reliance on four decisions – *US Unwired, Boston Scientific, American Service Group* and *Huffy.* A review of the complaints in those actions (June 8, 2009 Sternman Decl. Exs. A-D), showed why those decisions cannot be read to support denial of Defendants' renewed motion to dismiss. In short, those complaints set forth particularized facts sufficient to meet the applicable pleading requirements; by contrast, no comparable factual foundation can be found in the Complaint at issue here. As a result, Plaintiffs' arguments here find no support in those decisions.[3]

Similarly, Plaintiffs' Supplemental Submission also characterizes numerous other decisions as "applicable to the *Dana* case." As shown in the examples below, those decisions provide no meaningful support for the denial of Defendants' renewed motion to dismiss.

---

[3] *See* Pls. Supp. Sub. pp. 3-6, 38-40 and 53-59.

For example, *Beach v. Healthways, Inc.,* No. 08-CV-0569, 2009 U.S. Dist. LEXIS 17809 (M.D. Tenn. Mar. 9, 2009) (Pls. Supp. Sub. pp. 45-47), addresses scienter only briefly. Following a description of *Tellabs,* it concludes as follows:

> The Court finds that, viewing the Complaint as a whole, Plaintiff has sufficiently alleged facts rendering an inference of scienter at least as likely as any plausible opposing inference. Thus, for purposes of a motion to dismiss, Plaintiff has sufficiently alleged scienter. Whether a jury ultimately finds scienter is a matter for a later time.

Significantly, the complaint in *Healthways* alleges that defendants received proceeds in excess of $28.2 million from their insider sales during the class period and that such sales were out of line with their prior practices of selling company shares. *See* Sternman Supp. Decl. Ex. N.

*City of Hialeah Employees' Retirement System v. Toll Brothers, Inc.,* No. 07-CV-1513, 2008 U.S. Dist. LEXIS 66906 (E.D. Pa. Aug. 29, 2008) (Pls. Supp. Sub. pp. 26-27), devotes less than one page to its scienter discussion, most of which describes the principles of *Tellabs.* As to the allegations of the complaint, the court states:

> Plaintiffs have alleged that Defendants' stock sales were unusual in scope and timing, and the court finds that these insider trading allegations are pled with the particularity required by the PSLRA . . . . In their motion, the individual defendants have offered an explanation other than fraud for the scope and timing of Defendants' stock sales: diversification. The individual defendants argue that the purpose of the stock sales by them was diversification of their investments. The court has considered this opposing inference, and finds that a reasonable person would find that the inference of scienter is at least as strong as this opposing inference offered by Defendants.

*Id.* at *15. As set forth in ¶ 146 of the complaint in that action, the insider defendants sold more than "14.1 million shares of their Toll Brothers stock for over $617.7 million in insider trading proceeds."[4] *See* Sternman Supp. Decl. Ex. O.

---

[4] *See also, Ross v. Abercrombie & Fitch Co.,* 501 F. Supp. 2d 1102 (S.D. Ohio 2007) (Pls. Supp. Sub. 64-65), cited in the August 2007 Decision at 525 F. Supp. 2d at 931, in noting the absence of insider trading allegations in the Complaint here:

In *Roth v. Aon Corp.,* No. 04-CV-6835, 2008 U.S. Dist. LEXIS 18471 (N.D. Ill. Mar. 7, 2008) (Pls. Supp. Sub. pp. 72-74), the court denied defendants' motion to reconsider its pre-*Tellabs* denial of defendants' initial motion to dismiss.  The claims in *Aon* arose out of an investigation of the insurance brokerage industry by the New York State Attorney General involving, among other things, (i) "contingent commissions," "a practice in which brokers such as Aon received payments from insurers based on the overall volume or profitability of business that brokers placed with those insurers," and "steering and clawback arrangements," under which Aon brokers would direct business to insurance companies that had purchased reinsurance from an Aon affiliate, thereby creating an opportunity for the receipt of additional commissions and gaining a competitive advantage over other brokers. *Id.* at *2, *4-6.

The particularized facts set forth in the complaint in *Aon* were supported by forty-four attached exhibits including, among other things, internal memoranda, emails and handwritten notes

> that illustrate Defendants' direct involvement in the alleged schemes.  Through their assertions and supporting documents, Plaintiffs demonstrated that the Defendants were not passive bystanders, but instead had an intimate knowledge of Aon's business operations, performance, financial results and contingent arrangements.   We find, then, that the Complaint supports an inference of Defendants' knowledge, awareness and involvement in the alleged schemes.

*Id.* at *14-15.  The wealth of supporting material for the particularized facts alleged in the *Aon* complaint has no counterpart in the Complaint here.   Moreover, the court in *Aon* analyzed

---

> Finally, it is noteworthy that plaintiff does not allege insider trading on the defendants' part.  While such trading is not required to establish a § 10(b) claim of fraud, it can be a strong indicator of fraud-related knowledge and intent. *See, e.g., Ross v. Abercrombie & Fitch Co.,* 501 F. Supp. 2d, 1102, 1116 (S.D. Ohio 2007) ("In addition, the Court finds that the allegations regarding the timing and extent of the individual Defendants' sales of stock further substantiate a strong inference of scienter.")

defendants' strong motive to conceal the company's contingent commission, steering and clawback practices from analysts and investors as well as from its own clients.

In *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 513 F.3d 702 (7th Cir. 2008) (Pls. Supp. Sub. pp. 67-70), the Seventh Circuit, following remand by the United States Supreme Court, again vacated a lower court judgment dismissing a complaint alleging misrepresentations relating to sales of and prospects for the principal products of a fiber optic cable manufacturer. Noting that the complaint in *Makor* set forth in detail information attributed to twenty-six confidential sources purporting to substantiate defendants' knowledge of the fraud, the Seventh Circuit stated:

> The confidential sources listed in the complaint . . . are numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify . . . . The information that the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources.

*Id.* at 712. Here, the Complaint itself contains no confidential sources whatsoever, and the paltry descriptions of CW 1-5 in the "Proposed" Amended Complaint fall far short of the descriptions referred to in *Makor* and the strictures of the PSLRA.

At issue in *Makor* were statements by defendant CEO to the effect that sales of the company's principal product were increasing and that interest in and demand for the next generation of that product were continuing to grow as well. The court was understandably incredulous that any member of senior management commenting on the demand for the company's two most important products would not have known that the statements in question were false: "no plausible story has yet been told by the defendants that might dispel our incredulity." 531 F.3d at 709. In particular, as to defendant CEO, the court stated:

> The 5500 and 6500 were his company's key products. Almost all the false statements that we quoted emanated directly from him. Is it conceivable that he was unaware of the problems of his company's two major products and merely

10

repeating lies fed to him by other executives of the company?  It is conceivable, yes, but it is exceedingly unlikely.

*Id.*

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.,* No. 06-CV-2674, 2009 WL 890479 (D. Ariz. Mar. 31, 2009) (Pls. Supp. Sub. pp. 104-06), involved claims arising from the alleged intentional manipulation of stock option grants by back dating them to provide recipients, including defendants, a more profitable exercise price.  The effect of this improper practice was to understate Apollo's expenses and thereby overstate its earnings. Following an internal investigation by a special committee of the board, various senior executives resigned and a restatement was issued.  Defendants, members of Apollo's senior management, were actively involved in the pricing and issuance of options and were significant beneficiaries of the back dating practice.  The court, discussing in detail applicable Ninth Circuit precedent following *Tellabs,* concluded as follows:

> Although it is a close call, when read together, a number of allegations support a finding that the inference of [improper] back dating is "at least as compelling as any opposing inference of innocent bookkeeping error."

*Id.* at *24.  In light of various factors, such as the complaint's detailed description of the personal involvement of various defendants in the options granting process as well as their receipt of substantial proceeds from the exercise of options and sales of the resulting shares – more than $82 million by defendant Nelson; nearly $8 million by defendant Norton; $5 million by defendant Gonzales; and more than $3.5 million by defendant Blair – the court concluded as follows:

> collectively the [complaint's] allegations as to defendants Nelson, Gonzales, Norton and Blair . . . create an inference greater than the sum of [their] parts, that they acted with knowledge or were at least deliberately indifferent as to the falsity of their statements regarding accounting for stock-based compensation expenses and the existence of internal controls in that regard.

*Id.* at *42.

Finally, certain of the PSLRA decisions that Plaintiffs discuss – *e.g., Beightol v. Navarre Corp., Inc.*, No. 08-CV-00010, 2009 U.S. Dist. LEXIS 6590 (S.D. Miss. Jan. 26, 2009) (Pls. Sup. Sub. pp. 40-41) and *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603 (S.D.N.Y. 2008) (Pls. Sup. Sub. pp. 12-13) – address complaints by plaintiffs that traded in securities in actual reliance on the misrepresentations or omissions they allege, often as a result of "face to face" contacts between the parties.  In contrast, the vast majority of class action complaints, including the Complaint here, assert "fraud on the market" claims which involve companies subject to the disclosure and reporting requirements of the federal securities laws whose shares are traded on national securities exchanges (or other efficient markets).

The complaints in fraud on the market actions rarely involve allegations of plaintiffs' actual reliance the alleged fraudulent misrepresentations or omissions; instead, as alleged in ¶¶ 143-44 in the Complaint here, they seek the benefit of a presumption of reliance:

### AS TO APPLICABILITY OF PRESUMPTION OF RELIANCE
### FRAUD-ON-THE MARKET DOCTRINE

143.  At all relevant times, the market for Dana's publicly traded securities was an efficient market for the following reasons, among others:

(a)     Dana's securities met the requirements for listing, and were listed and actively traded on the NYSE, which is a highly efficient and automated market;

(b)     As a regulated issuer, Dana filed periodic public reports with the SEC and the NYSE;

(c)     Dana regularly communicated with public investors via established market communications, including through regular disseminations of releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

12

(d)     Dana was followed by numerous securities analysts employed by major brokerage firms, including Prudential Equity Group, LLC, Credit Suisse First Boston and Morgan Stanley who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

144. As a result of the foregoing, the market for Dana's publicly traded securities promptly digested current information regarding Dana from all publicly available sources and reflected such information in the prices of Dana's publicly traded securities.  Under those circumstances, all purchasers of Dana's publicly traded securities during the Class Period suffered similar injury through their purchase of Dana's publicly traded securities at artificially inflated prices and a presumption of reliance applies.

In most fraud on the market cases, counsel for plaintiffs, engaged on a contingent fee basis, provide the "information and belief" on which the claims of securities fraud are based.  For example, in at least fourteen of the decisions cited in Plaintiffs' Supplemental Submission, the Coughlin Stoia firm was counsel for plaintiffs.  Indeed, since the passage of the PSLRA, that firm (or its predecessor) has filed a significant number of the fraud on the market actions against public companies and their senior management.

Because plaintiffs in fraud on the market actions do not premise their claims on their review of and actual reliance on the misstatements claimed to be materially misleading, the factual allegations of such complaints rest primarily – if not exclusively – upon the investigation, intuition and creativity of their counsel and, in some circumstances, are even borne of so called free portfolio monitoring arrangements, a practice that "fosters the very tendencies toward lawyer-driver litigation that the PSLRA was designed to curtail."  *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Serv. and Securitization, LLC,* No. 08-CV-10842, 2009 WL 1444400, *2 (S.D.N.Y. May 26, 2009).

For these reasons, among others, complaints such as the one at issue in this action should be scrutinized with heightened skepticism.  Similar fraud on the market complaints, resulting from the "investigation" of counsel retained on a contingent fee basis, frequently are filed

whenever a public company whose shares are traded on an efficient market announces bad news and the price of its shares falls. Sometimes those complaints have merit; other times, they do not. In our view, the Complaint in this action reflects a misguided attempt to utilize information and belief pleading to characterize the acts of the former CEO and CFO of Dana as fraudulent under the federal securities laws when, in fact, there is no basis to do so.

**POINT III**

**AS TO FORWARD LOOKING STATEMENTS
AND SAFE HARBOR**

Certain of the cloned "Application to *Dana* case" portions of Plaintiffs' Supplemental Submission address materiality and the Safe Harbor provisions of the PSLRA. Thus, Plaintiffs erroneously contend that Defendants concede the materiality of all of the statements in issue. *See, e.g.,* Pls. Supp. Sub. p. 8 ("[H]ere defendants' statements concerning Dana's financial performance, and financial expectations for the future are undeniably material. Defendants have not contended otherwise.") Both this statement and its nearly identical variations are untrue. To the contrary, Defendants expressly contest the materiality of statements of general corporate optimism, which are non-actionable as a matter of law. *See* Defs. May 1, 2009 Reply Mem. p. 20.

Plaintiffs also assert that the cautionary language that accompanied Defendants' forward looking statements was "boilerplate" and therefore inadequate. Pls. Supp. Sub. p. 39, relying primarily on *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009). In *US Unwired*, the court found the statutory safe harbor inapplicable because, under Fifth Circuit precedent, plaintiffs had alleged defendants' actual knowledge that their statements were false when made, supporting those allegations by exhibits attached to the complaint including various internal company documents. 565 F.3d at 244, 254. Precedent in the Sixth Circuit, contrary to that in the

14

Fifth Circuit, establishes that adequate cautionary language provides an absolute shield from liability regardless of whether the statements in issue are adequately alleged to have been knowingly false when made. *See* decisions cited in Defs. May 1, 2009 Reply Mem. p. 21. Moreover, unlike the Dana cautionary language, the language in *US Unwired* was inadequate because it merely cautioned investors about "limited, general, and vague risk to customer satisfaction and to US Unwired's independent discretion." *Id.* at 246. In contrast, Dana warned investors that factors affecting Dana's business could cause results to differ materially from what was forecast. *See* Defs. April 1, 2009 Mem. pp. 25-32; and May 1, 2009 Reply Mem. pp. 18-20; Paccione Decl. Exs. D-W.

Other decisions discussed by Plaintiffs reinforce the fact that Defendants' statements are protected by the PSLRA's safe harbor provisions. *See In re Avon Products, Inc. Sec. Litig.*, No. 05-CV-6803, 2008 WL 848017, *18 (S.D.N.Y. Feb. 23, 2009) (Pls. Supp. Sub. pp. 13-15) (warnings regarding "general economic and business conditions" found to be sufficient); *Silverman v. Motorola*, No. 07-CV-4507, 2008 U.S. Dist. LEXIS 76799, *33-34 (N.D. Ill. Sept. 23, 2008) (Pls. Supp. Sub. pp. 74-76) (warnings regarding 18-20 risk factors such as "the company's ability to continue to increase profitability" and "the company's ability to purchase sufficient materials, parts and components to meet customer demand" deemed sufficient). Dana's cautionary language, which was more specific than the warnings in *Avon* and *Silverman*, is sufficient to trigger the PSLRA's safe harbor provision because warnings need only "mention 'important factors that could cause actual results to differ materially'" from predictions. *Id.* (internal citation omitted).

In *In re Aetna Inc. Sec. Litig.*, No. 07-CV-4451, 2009 WL 1619636 (E.D. Pa. June 9, 2009), plaintiffs alleged that defendants knowingly misled investors about the prospects of

15

Aetna, a diversified health care benefits company, by assuring them that it practiced "disciplined pricing" to hold down costs when, in fact, it was merely under-pricing its competition. According to plaintiffs, Aetna, which forecasted profitability based upon a medical cost ratios (MCR) or measurement of costs against premiums charged to insureds, touted its artificially low MCR when, in fact, it had no hope of sustaining its ability to underprice its competition. *Id.* at *1-2. Plaintiffs alleged that after driving up the price of Aetna's stock for years by touting disciplined pricing as the key to its low MCR, defendants announced in 2006 that Aetna's MCR would be much higher than expected, after which its stock price fell. *Id.* at *4.

To support its allegations, the complaint relied on confidential witnesses, including a process leader for national accounts, who claimed that Aetna was willing to lose money on new contracts; an underwriting analyst who claimed the company was accepting high risk customers at unacceptably low premiums; and an underwriter who claimed the company's rates were not sustainable relative to its costs. *Id.* at *3-4. In addition, the complaint alleged insider trading by defendants. *Id.* at *13-14.

In dismissing the complaint, the court found that the statements about which plaintiffs complained either were immaterial or forward-looking statements that were not actionable because accompanied by adequate cautionary language. First, the court agreed that defendants' statements concerning "disciplined pricing" were forward-looking because the phrase meant achieving premium yields in line with projected costs, a statement of future performance. *Id.* at *22. Next, the court held that statements that the company was committed to "disciplined pricing" and that the company adhered to a "risk-adjusted pricing strategy" were examples of corporate puffery because these are "vague" statements of "corporate optimism" upon which reasonable investors would not have relied. *Id.* at *25. In the alternative, the court also found

16

that defendants' statements were protected by the Safe Harbor provisions of the PSLRA because defendants cautioned that profitability could be affected by the company's "ability to forecast . . . costs" and that "there can be no assurance regarding the accuracy of medical cost projections assumed for pricing purposes." *Id.* at *26.

The same principles should apply here. As in *Aetna*, the Court should find that statements concerning the effect of the cost of steel on Dana's profitability, Dana's cost-reduction efforts and its plans for improved efficiency are forward-looking, non-actionable statements of corporate optimism. *Id.* at *25; Defs. May 1, 2009 Reply Mem. p. 20; *see, e.g.,* Comp. ¶¶ 104 ("raw material costs will continue to adversely affect us . . . however, we can expect more of an offsetting benefit from our cost reduction program.") 105 (forecasting improved performance by "consolidating our purchasing activities, implementing lean manufacturing activities, value engineering efforts we talked about and the standardization of Company-wide processes.") and 115 ("the dominant issue has been the effect of higher steel prices . . . we expect that our accelerated cost reduction efforts will lead to improved performance in this group as well."). Additionally, even assuming the forward-looking statements at issue were material, they were accompanied by adequate cautionary language and, thus, are non-actionable. *Aetna*, 2009 WL 1619636, at *26; Defs. April 1, 2009 Mem. pp. 25-32; Defs. May 1, 2009 Reply Mem. pp. 18-20.

## CONCLUSION

Earlier this month, in *Gruhn v. Tween Brands, Inc.*, No. 07-CV-852, 2009 WL 1542795 (S.D. Ohio June 2, 2009), the court dismissed a amended class action complaint alleging, among other things, violations of the federal securities laws arising from management's concealment of the cannibalization of the customer base of one of a company's retail divisions in favor of another division. According to plaintiffs, defendants had issued materially false statements or

17

failed to disclose adverse facts during the class period concerning the company's sales and earnings. Following the issuance of a press release indicating decreasing sales in one of the company's divisions and an announcement that the company would be converting stores of one division into stores of the other, the price of the company's stock fell substantially. In dismissing the amended complaint with prejudice, the court, analyzing many of the same authorities on which the parties to this action rely, concluded as follows:

> [The] amended consolidated complaint fails to allege scienter sufficiently. The factual allegations pled, viewed cumulatively, suggest probable negligence (falling short of recklessness) and raise some limited inference of scienter. But the former does not fall within the claim pled, and the latter simply does not rise to the required level of a strong, or powerful inference of scienter.

> \*       \*       \*

> Plaintiffs' amended consolidated complaint devotes a considerable portion of its text to presenting allegations that Defendants knew that Tween Brands' projections were false, primarily by repeatedly emphasizing that Rayden, Carbone and Stevens had access to extensive company data on sales, forecasted sales, and markdowns, including daily and weekly reports and market analysis reports . . . But allegations that Defendants "'could regularly track' sales data contradicting the [targeted] forecasts[s], accompanied by 'a general assertion about what [plaintiffs] think the data showed,' is insufficient to plead scienter without 'hard numbers or other specific information.' . . . Plaintiffs' assumptions and conclusions therefore do not present the requisite strong inference of scienter.

> \*       \*       \*

> Taking into account the collective allegations by Plaintiffs targeting scienter – the general statements concerning insider data from company reports and meetings, the number and percentages of stock traded, the fact that apparently only one insider engaged in purportedly suspicious trading, and the lack of context surrounding the timing of the sales *(i.e.,* no trading history) and taking into account all plausible inferences, including opposing inferences arising therefrom, this Court cannot say under the totality of the circumstances that the amended consolidated complaint raises a strong inference of the necessary or requisite scienter. The pleading simply does not create a strong inference of recklessness or present actual knowledge on Defendants' part, to the extent either is required. The Court must therefore conclude that Count One of the amended consolidated complaint fails to state a securities violation under the PSLRA's heightened pleadings standards.

\*   \*   \*

Because Plaintiffs have already filed one amended complaint without curing the deficiencies of their pleading and noting that they have not moved to amend their pleading again, the Court concludes that in light of the Sixth Circuit's characterization of the purposes of the PSLRA, dismissal with prejudice as opposed to permitting amendment or dismissal without prejudice is warranted.

*Id.* at \*8-11.

For the reasons set forth herein, as well as those previously set forth, Defendants' renewed motion should be granted in all respects and judgment entered dismissing the Complaint with prejudice and without leave to replead.

Dated:  June 22, 2009                    Respectfully submitted,

**KATTEN MUCHIN ROSENMAN LLP**

By:  _____
     Joel W. Sternman *(pro hac vice)*
     Anthony L. Paccione *(pro hac vice)*
     Daniel A. Edelson *(pro hac vice)*
     Cameron Balahan
     575 Madison Avenue
     New York, NY 10022
     (212) 940-8800
                -and-
     **COOPER & WALINSKI, L.P.A.**
     900 Adams Street
     Toledo, OH 43624
     (419) 241-1200

     **Attorneys for Defendants Michael J. Burns
     and Robert C. Richter**