IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Howard Frank, et al,                                              Case No. 3:05CV7393

          Plaintiffs

     v.                                                          ORDER

Dana Corporation,

          Defendant

This is a class action suit on behalf of all persons who and entities which purchased securities in Dana Corporation [Dana] between April 21, 2004, and October 7, 2005 [Class Period]. Defendants are Dana Chief Executive Officer [CEO] Michael Burns and former Dana Chief Financial Officer [CFO] Robert Richter.

Plaintiffs allege that Burns and Richter falsely represented Dana's financial health by falsifying Dana's financial results and making false statements in Dana's Securities and Exchange Commission [SEC] filings, press releases and conference calls with analysts in violation of § 10(b) of the Securities and Exchange Act of 1934. 10 U.S.C. § 78j(b). Plaintiffs allege that defendants knew these statements to be false when made, or acted with reckless disregard for the truth of Dana's financial situation. Dana later admitted that its financial reports during the Class Period suffered from accounting irregularities, and it restated those reports in 2005.

Jurisdiction arises under 28 U.S.C. § 1331 and § 27 of the Securities and Exchange Act of 1934.  Pending is defendant's motion under Fed. R. Civ. P. Rule 12(b)(6) to dismiss plaintiffs'

complaint. [Doc. 100]. For the reasons that follow, that motion shall be granted. In addition, I deny plaintiffs' request to file an amended complaint.[1]

## Background

Dana supplies axles, drive shafts, engines, frames, chassis and transmissions to major vehicle producers.[2] Class members include the SEIU Pension Master Trust, West Virginia Laborer's Pension Trust Fund, and Plumber and Pipefitters National Pension Fund.

On February 17, 2004, however, Dana announced that in fiscal year 2003 it experienced a 220% increase in net income. During the Class Period, Dana issued a series of positive financial statements, and the value of Dana's stock steadily increased. In October, 2005, Dana fell into financial ruin.

Plaintiffs' complaint states that on July 21, 2004, Dana reported $0.72 second quarter earnings per share [EPS], more than double Dana's performance during the same period in 2003. Dana projected EPS of $1.90 per share for fiscal year 2004. Dana's assurances came despite a contemporaneous rise in the price of steel and raw materials.

On October 12, 2004, Dana lowered its projected 2004 EPS to $1.60 to $1.65 per share, noting the rising price of raw materials, but it continued to project positive growth for 2005. On October 20, 2004, Dana reported positive figures, including a forty percent increase in net profits over the same period in 2003. Defendants again assured investors that Dana could offset the rising costs of materials.

---

[1] The case is before me on remand from the Sixth Circuit. *Frank v. Dana,* 547 F.3d 564 (6th Cir. 2008). The court concluded that my previous opinion applied the incorrect standard in dismissing plaintiffs' complaint for failure to plead scienter adequately. *Id.*

[2] Having filed for bankruptcy, Dana is no longer a party to this action.

2

On February 23, 2005, Dana announced positive quarterly results and reported a net income of $262 million for fiscal year 2004 – up from $183 million in 2003. Dana projected earnings of $0.17 to $0.23 per share for the first quarter of 2005 and $1.40 to $1.62 per share thereafter.

In March, 2005, Dana reduced its EPS forecast for first quarter 2005 and fiscal year 2005. In April, 2005, Dana reported earnings below its reduced estimate. Dana told investors that temporary production issues caused a dip in earnings, and that these had been resolved. On July 20, 2005, Dana reported a 275% increase in earnings over the preceding quarter, claiming that it had improved its profits through "lean manufacturing and value engineering programs." Dana made earnings projections of $1.30 to $1.45 for 2005.

On September 15, 2005, Dana reduced its prior EPS projections by half due to rising steel prices and Dana's inability to offset production costs. Dana also announced that it would restate its financial results for the second quarter of 2005 and that it anticipated writing down a deferred tax asset.[3] Dana's shares fell twenty percent in a single day, and continued to fall over the following days.

After the Class Period, Dana's dire financial situation came to light. In October 2005, Dana announced that its financial statements for 2004 and the first half of 2005 "should no longer be relied upon" and that Dana intended to restate its financial positions. Dana reported it had uncovered "material weaknesses in its internal control over financial reporting." Dana's stocks fell nearly 35%

---

[3] Plaintiffs allege Burns and Richter engaged in securities fraud by not having reduced the stated value of the deferred tax asset in earlier periods. Plaintiffs allege that defendants ignored negative factors and decreased the valuation allowance by about forty percent, thereby increasing the tax asset, when it should have reduced the tax asset.

Dana consulted its auditors about the deferred tax asset issue in October, 2005. The auditors opined that the deferred tax asset was not presented fairly in all material respects in the financial statements.

in a single day in response. On December 30, 2005, Dana issued its restated earnings for the first two quarters of 2005, reducing stated net income by $44 million. On January 17, 2006, Dana announced a loss of $1.27 billion for the third quarter of 2005. In February 2006, the SEC announced an investigation into Dana's accounting practices. Dana filed for bankruptcy on March 3, 2006.

Plaintiffs allege that defendants Burns and Richter made materially false and misleading statements about Dana's financial condition throughout the Class Period in violation of § 10(b) and Rule 10b-5 of the Securities and Exchange Act of 1934. 10 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Plaintiffs claim Dana's profits were being negatively impacted by the price of steel and other raw materials from the start of the Class Period in March, 2004. According to plaintiffs, Burns and Richter misled and deceived investors during the Class Period by falsely reporting strong earnings, declaring positive financial outlooks and touting sound internal accounting procedures.

According to plaintiffs, defendants based their erroneous assertions about projected earnings on overly optimistic forecasts and unrealistic assumptions. Among these, Burns and Richter set a company-wide goal of a six percent increase in profit beginning in the first quarter of 2004. This goal, plaintiffs allege, flew in the face of the fact that several of Dana's plants, including those in ,Lima, Ohio, Statesville, North Carolina, had been operating at a loss. Despite such knowledge, or with reckless disregard of that information, defendants, according to plaintiffs' allegations, Richter and Burns retained and imposed their unattainable and, and, *vis-a-vis* the investing public, misleading goal of a six percent increase in profits.

To show that the defendants knew, or acted in reckless disregard of what they should can could have known, plaintiffs point to monthly Policy Committee meetings, monthly and quarterly

reports detailing the financial performance of individual plants, and internal weekly "tracker" accounting reports from each plant. Plaintiffs attest that production reports were submitted via email by each plant to Division Controllers at the Toledo headquarters, and that the directors received quarterly Supplemental Accounting Data [SAD] reports with explanations of each plant's budget and its actual performance.

Plaintiffs fail, however, to allege specific facts to show that any of these materials came to the defendants' attention. They make no allegation about any conversation, document, report or meeting that would give rise to the conclusion that Burns and Richter knew or recklessly disregarded facts indicating that the financials were false when issued.

Plaintiffs also allege that Burns and Richter knowingly caused Dana to issue quarterly and annual financial statements that did not disclose the significant and material deficiencies that existed in the Company's internal accounting controls. While defendants contend that those internal "weaknesses" played a major role in the company's collapse, the plaintiffs do not assert facts giving rise to an inference, much less specifically alleging, that the defendants were aware of that situation when they were making their allegedly false representations to investors.

In August, 2007, I dismissed plaintiffs' complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to adequately plead scienter. *Frank v. Dana,* 525 F. Supp. 2d 922, 928 (N.D. Ohio 2007), *rev'd*, 547 F.3d 564 (6th Cir. 2008). In its reversal of my decision, the Sixth Circuit held the Private Securities Litigation Reform Act [PSLRA] requires a plaintiff to show that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" for plaintiffs' complaint to survive a Rule 12(b)(6) motion. *Frank v. Dana,* 547 F.3d 564, 571 (6th Cir. 2008). The court found I had erred

when I had stated that plaintiffs must "establish an inference of scienter that is more plausible and powerful than competing inferences of defendants' state of mind." 525 F. Supp. 2d at 928.

The Sixth Circuit remanded without further comment on my application of the pleading standard to the facts. It also expressly reserved judgment on whether I properly dismissed plaintiffs' complaint without considering the plaintiffs' request, made informally in briefs, for leave to amend in lieu of outright dismissal.

Following the Sixth Circuit's opinion, defendants filed the pending motion to dismiss plaintiffs' consolidated complaint.

## Discussion

### 1. Whether Plaintiffs' Complaint Adequately Pleads Scienter Under the PSLRA

The PSLRA imposes heightened requirements on plaintiffs at the pleading stage to "screen out" lawsuits with "no factual basis." *Miller v. Champion Enterprises,* 346 F.3d 660, 691, 692 (6th Cir. 2003). Under the PSLRA, a plaintiff's complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" to adequately plead scienter. 15 U.S.C. § 78u-4(b)(2). Pleading any fraud claim requires greater particularity, *see* Fed. R. Civ. P. 9(b), but the PSLRA requires an "even higher standard or pleading scienter in a securities-fraud case." *Ley v. Visteon Corp.,* 543 F.3d 801, 809 (6th Cir. 2008).

The first issue is whether plaintiffs' complaint adequately pleads scienter for a claim under § 10(b) of the Securities Exchange Act of 1934 in light of the PSLRA's heightened pleading requirements.

Section 10(b) makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device." 15 U.S.C. § 78j(b).

The Securities and Exchange Commission has further interpreted § 10(b) as making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim under § 10(b), a plaintiff must allege that: 1) defendant made a "misstatement or omission of material fact"; 2) the statement was "in connection with the purchase or sale of securities"; 3) defendant acted with scienter; 4) plaintiff "justifiably relied" on the statements; and 5) the statements "proximately cause[d] the plaintiff's injury." *Zaluski v. United Am. Healthcare Corp,* 527 F.3d 564, 571 (6th Cir. 2008). The required state of mind includes "knowing and deliberate intent to manipulate, deceive, or defraud" and recklessness. *Ley v. Visteon Corp.,* 543 F.3d 801, 809 (6th Cir. 2008).

### A. The "Strong Inference" Standard After *Tellabs*

In *Tellabs v. Makor Issues & Rights,* 551 U.S. 308, 319-320 (2007), the Supreme Court resolved a circuit split over the meaning of the PSLRA's "strong inference" standard.  The Court prescribed a three-step analysis for determining the adequacy of a complaint. First, a court must "accept all factual allegations in the complaint as true." *Id.* at 322. Second, courts must "examine the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss."*Id.*

Third, to determine whether "the pleaded facts give rise to a 'strong' inference of scienter, a court must take into account plausible opposing inferences." *Id.* This is a "comparative inquiry" that requires a court to consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" and determine which is more probable. *Id.* A complaint

survives a motion to dismiss only if "a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* at 324 (emphasis added). Where "two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Frank, supra,* 547 F.3d at 571.

Prior to *Tellabs,* the Sixth Circuit had concluded that the "'strong inference' requirement means that plaintiffs are only entitled to the most plausible of competing inferences." *Helwig v. Vencor,* 251 F.3d 540, 553 (6th Cir. 2000); *see also Fidel v. Farley,* 392 F.3d 220, 227 (6th Cir. 2004). In *Tellabs,* the Supreme Court expressly rejected this standard. 551 U.S. at 324.

Though *Tellabs* defined the standard for evaluating the sufficiency of a complaint under the PSLRA, the factors to consider when applying the *Tellabs* standard remain viable. *Ley, supra,* 543 F.3d at 810. Those factors are:

1) insider trading at suspicious time or in unusual amount;

2) divergence between internal reports and external statements on same subject;

3) closeness in time of allegedly fraudulent statement or omission and later disclosure of inconsistent information;

4) evidence of bribery by top company official;

5) existence of ancillary lawsuit charging fraud by company and company's quick settlement of that suit;

6) disregard of most current factual information before making statements;

7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with high degree of sophistication;

8) personal interest of certain directors in not informing disinterested directors of impending sale of stock; and

8

9) self-interested motivation of defendants in form of saving their salaries or jobs.

251 F.3d at 552.

## B. Whether Plaintiffs' Complaint Gives Rise
## to a Strong Inference of Scienter

Plaintiffs claim the following allegations demonstrate scienter: 1) defendants' positive statements to the market diverged from contemporaneous internal reports documenting financial troubles; 2) defendants' disclosure of financial ruin closely followed allegedly fraudulent statements of financial health were followed closely in time by disclosure of financial ruin; 3) the magnitude of defendants' misstatements; 4) defendants were motivated to commit fraud by a desire to make their company appear financially healthy; 5) Richter's retirement shortly after the restatement of financials; 6) defendants certified their false financials as required by the Sarbanes-Oxley Act, 15 U.S.C. § 7241(a); and 6) the SEC began an investigation of Dana for securities violations.

### i. Divergence of Internal and External Reports

Plaintiffs argue that defendants received regular internal information concerning financial problems, but their public statements failed to reflect that information. Under *Helwig,* "disregard of the most current factual information" while making positive statements to the market is an indicia of scienter. *Helwig, supra,* 251 F.3d at 552. In *City of Monroe Employees Retirement System v. Bridgestone Corp,* 399 F.3d 651, 684 (6th Cir. 2004), the court stated that misleading financial presentations provide a strong inference of scienter.

Plaintiffs' complaint states Burns and Richter had access to various internal records, including: financial and operational reports discussed at monthly and annual meetings; monthly reports from plants outlining performance; weekly and daily "tracker reports" and monthly "production reports" stating each plant's profits and losses; SAD reports analyzing profit and loss

9

on a quarterly basis; and other regular reports indicative of financial status and future prospects throughout the Class Period.

Plaintiffs, however, have failed to plead facts indicating that Burns and Richter were themselves in fact aware of the contents of these reports when they made public statements about Dana's financial health. The complaint fails to state when the reports were prepared, when Burns and Richter received them, whether they actually reviewed them, and how the information contained in these reports varied from Dana's public statements. The vagueness of these allegations detracts from their significance vis-a-vis defendants' scienter. *See Helwig, supra,* 251 F.3d at 565 (complaints containing conclusory allegations are insufficient).

### ii. Magnitude and Nature of Defendants' Misstatements

Plaintiffs allege that the magnitude of defendants' misstatements suggests they knew their statements of financial health were false when made, or that defendants recklessly disregarded contrary evidence. During the Class Period, Dana issued financial statements that exaggerated its financial health, and by restating their financials Dana admitted that the prior financials were false when issued. *Dana, supra,* 525 F. Supp. 2d at 929.

The Sixth Circuit has suggested that financial errors may be so "simple, basic, or pervasive in nature" or "so great in magnitude" that the errors must have been obvious to the defendants when made. *Ley, supra,* 543 F.3d at 812; *see also PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 685 (6th Cir. 2004) (considering the magnitude and nature of accounting issues but holding that plaintiff's allegations were not so egregious as to warrant an inference of scienter).[4]

---

[4] There is arguably conflicting Sixth Circuit precedent on this point. In *Fidel v. Farley,* 392 F.3d 2202, 231 (6th Cir. 2004) ("[w]e decline to follow the cases that hold that the magnitude of the financial fraud contributes to an inference of scienter"). However, the court reasoned that inferring scienter from the magnitude of the financial fraud "would eviscerate the principle that accounting errors *alone* cannot justify a finding of scienter." *Id.* (emphasis

Courts generally will not infer scienter based on the magnitude of errors alone without other facts indicating scienter. *In re Goodyear,* 436 F. Supp. 2d 873, 903-904 (N.D. Ohio 2006) ("accounting errors alone cannot support a finding of scienter"); *Mizzaro v. Home Depot,* 544 F.3d 1240, 1247 (11th Cir. 2008) (dismissing complaint where plaintiff "relie[d] exclusively on the widespread nature of the fraud and the purported amount of the fraud" to establish scienter); *see also In re Ceridian Corp. Sec. Lit.,* 542 F.3d 240, 246 (11th Cir. 2008) (The number of violations and magnitude of restatements does not, alone, "give rise to an inference that defendants are at least severely reckless.").

The magnitude and nature of defendants' misstatements and errors combined with other indicia of scienter, however, can strengthen the inference of scienter. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 271 (3d Cir.2009 (reversing dismissal of complaint and considering the magnitude of the alleged fraud as one factor).

Plaintiffs allege that Dana's net income, after tax, for the restated periods was leveraged by $44 million. Dana admitted, after the Class Period, that its financial statements during the Class Period were false when issued. Plaintiffs allege that Dana overstated its first quarter 2004 net income by twelve percent, its second quarter 2004 net income by ten percent, its fourth quarter 2004 net income by 3.6%, its first quarter 2005 net income by 12.5% and its second quarter 2005 net income by seventy percent.

Plaintiffs also assert that Dana grossly overestimated its deferred tax assets. Dana reported deferred tax benefits of $512 million in second quarter 2004, $742 million in third quarter 2004 and $895 million in second quarter 2005. When a company believes that it will more likely than not fail

---

added). This latter statement suggests that in *Fidel* the court only held that the magnitude of the alleged fraud cannot establish scienter absent other indicia of knowledge or recklessness.

to generate sufficient income in the future to realize its deferred tax assets, it must use a "valuation allowance." During the Class Period, plaintiffs allege, defendants caused Dana to decrease, rather than increase, Dana's valuation allowance by approximately forty percent.

The degree and significance of the divergence between the financial statements, as reported, and the restated financials constitute plaintiffs' most significant factual assertions regarding scienter. But, standing alone, they are not sufficient to avoid dismissal under the *Tellabs* standard.

Defendants point to their reference to weak internal controls, to which they attribute the financial mismanagement that led to Dana's collapse and bankruptcy. They do not allege, however, that the defendants had prior knowledge of those weaknesses or the risks they posed to the company's well-being. The absence of such allegations diminishes substantially the significance of the magnitude of the divergence in assessing the adequacy of plaintiffs' contentions regarding scienter.

### iii. Temporal Proximity

Plaintiffs allege that the close proximity between Dana's positive financial statements and its disclosure of financial ruin support an inference that the defendants knew that the financial results were false when made, or recklessly disregarded the truth.

An "allegedly fraudulent statement or omission" quickly followed by "disclosure of inconsistent information" can indicate scienter. *Helwig, supra,* 251 F.3d at 552; *see also Ley, supra,* 543 F.3d at 810. Courts, however, will not infer scienter solely because a defendant issued a corrective disclosure quickly after a misstatement. *Fidel v. Farley,* 392 F.3d 220, 232 (6th Cir. 2004) ("[w]ithout more, inferring scienter from [ ] temporal proximity . . . is nothing more than

speculation"); *see also Elam v. Neirdorff,* 544 F.3d 921, 930 (8th Cir. 2008) (considering temporal proximity but concluding that it cannot be the sole basis for inferring scienter).

In this case, the Dana's rapid about-face could plausibly support an inference of scienter. As of the end of July, 2005, defendants reported a 275% increase in net income in second quarter 2005 over first quarter 2005. Defendants stated that its lean manufacturing and value engineering programs were producing substantial results. By September 15, 2005, however, Dana's financial picture had drastically changed: Dana insisted that it had succumbed to the rising steel costs it previously claimed to have overcome, and indicated it would likely restate previously reported financials and reported that its fiscal year 2005 financials were overstated by 100%. Three weeks later, Dana disclaimed its prior financials as unreliable and admitted that its internal control over financial reporting was flawed.

There are three possible explanations for this about-face. First, Dana was healthy in July 2005 and in ruin by September-October. This explanation, however, is not plausible in light of Dana's own admissions of severe accounting errors during the Class Period. Second, the about-face could indicate that Dana suddenly discovered its accounting errors in October, 2005. This explanation does not assume any fraudulent intent because sudden discovery does not mean that earlier irregularities were the result of fraud or improper concealment. Third, the about-face could indicate that Dana discovered defendants' fraud in October, 2005, and acted quickly in response. The about-face, therefore, could support an inference that defendants acted with fraudulent intent if plaintiffs' complaint as a whole supports such interpretation.

### iv. Motive

Plaintiffs allege that defendants were motivated to commit fraud by a desire to protect Dana's profitability and receive high bonuses. Defendants respond that this does not constitute an adequate motive, and further argue that plaintiffs' complaint suffers because plaintiffs do not allege insider trading.

In *Tellabs, supra,* 511 U.S. at 326, the Court stated that "[w]hile it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference . . . the absence of a motive allegation is not fatal." All allegations, including those concerning motive, "must be considered collectively." *Id.* Where a complaint does not show motive, other allegations tending to show scienter must simply be stronger. *Florida State Bd. of Admin v. Green Tree Financial Corp,* 270 F.3d 645, 660 (8th Cir. 2001).

Plaintiffs' allegations that defendants wanted Dana to appear financially healthy and sought bonuses contribute little to nothing to the scienter inference. In *Ley,* the court stated, "All corporate managers share a desire for their companies to appear successful. That desire does not comprise a motive for fraud." 543 F.3d at 813 (quoting *PR Diamonds, supra,* 364 F.3d at 690); *accord ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co,* 553 F.3d 187, 198 (2d Cir. 2009); *Cozzarelli v. Inspire Pharmaceuticals Inc,* 549 F.3d 618, 627 (4th Cir. 2008); *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,* 537 F.3d 527, 544 (5th Cir. 2008); *In re Ceridian Corp. Securities Litigation,* 542 F.3d 240, 247 (8th Cir. 2008); *Glazer Capital Management LP v. Magistri,* 548 F.3d 736, 748 (9th Cir. 2008). Plaintiffs do nothing more than describe the ordinary motives of corporate executives to perform their jobs well and be rewarded accordingly. As such, they do not significantly strengthen the inference of scienter.

14

Defendants make much of plaintiffs' failure to plead insider trading. The Sixth Circuit, has, however, "never held that the absence of insider trading defeats an inference of scienter." *PR Diamonds, Inc., supra,* 364 F.3d at 691; *see also Mizzaro, supra,* 544 F.3d at 1253 ("We emphasize that suspicious stock sales are not necessary to create a strong inference of scienter."); *Grillo v. Tempur-Pedic Intern, Inc.,* 553 F. Supp. 2d 809, 821 (E.D. Ky. 2008) (faulting plaintiffs for failing to show insider trading, but only because plaintiffs claimed that defendants had engaged in insider trading). A plaintiff may adequately plead scienter without pleading insider trading. *Lormand v. US Unwired, Inc.,* 565 F.3d 228, 255 n.17 (5th Cir. 2009) (finding that plaintiff adequately plead scienter without evaluating allegations of insider trading).  Plaintiffs' failure to allege insider trading does not harm their complaint; it merely requires that they show scienter by other means.

### v. Richter's Retirement

Plaintiffs argue that defendant Richter's retirement shortly after Dana disclosed its true financial situation adds to the scienter inference.

Even when a resignation closely follows disclosure of improper accounting practices, the mere fact of the resignation and its proximity to the disclosure gives little support to an inference of scienter. *Zucco Partners,* 552 F.3d at 1002 (9th Cir); *In re Bearing Point,* 525 F. Supp. 2d at 777-78 (E.D. Va.). A resignation more strongly supports scienter where plaintiff pleads facts indicating that the resignation "should be viewed with unusual suspicion." *Albert Fadem Trust v. Am. Elec. Power Co., Inc.* 334 F. Supp. 985, 1014 (S.D. Ohio 2004) (resignation one month after damaging public disclosure does not support strong inference of scienter). Multiple resignations may indicate that a company is engaging in "house-cleaning" and may strongly support scienter. *In re AM. Serv. Group, Inc.* 2009 U.S. Dist. LEXIS 28237, at *159 (M.D. Tenn.) (defendant corporation's firing of

two executives and the resignation of members of the company's audit committee, along with "sweeping internal reforms" indicates fraud.).

In this case, Richter's retirement contributes little if anything to the scienter inference. Plaintiffs point to the fact and timing of his departure, but allege nothing else about that event supportive of scienter. His was a single retirement, not a "house-cleaning." Departure of a CFO immediately following a company's financial collapse is suggestive of either scapegoating or *sepuku.* Whether being shoved off the plank or jumping ship on his own, a CFO whose watch ended in a company's foundering was hardly likely to remain on board. Richter's sudden departure does not give rise to an inference of scienter on his part.

### vi. SOX Certifications

Plaintiffs claim that the certifications required by Sarbanes-Oxley Act [SOX], 18 U.S.C. § 1514A, and signed by the defendants are a factor adding to the scienter inference. Senior executives of public companies must certify the accuracy of quarterly and annual financial reports, identify the executive's basis for making the certification, certify that the signatory is "responsible for establishing and maintaining internal controls,"' and confirm that the signatories have "evaluated the effectiveness of the issuer's internal controls." 15 U.S.C. § 7241(a); *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,* 537 F.3d 527, 544-45 (5th Cir. 2008).

Absent extrinsic facts that defendants recklessly signed the SOX statements, false SOX statements contribute nothing to the scienter inquiry. *Id.* at 545; *Ley, supra,* 543 F.3d at 812; *see Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006); *In re Ceridian Corp. Securities Litigation, supra,* 542 F.3d at 248 (district court properly ignored false SOX statements because "a showing in hindsight that the statement were false does not demonstrate fraudulent

intent"); *Glazer Capital Management LP v. Magistri,* 549 F.3d 736, 747 (9th Cir. 2008) (requiring extrinsic facts that defendants were "severely reckless" in signing false SOX statements for them to be probative).

Courts reason that considering false SOX statements would effectively create strict liability in every case where signatories "made an accounting error or auditing mistake" by "eviscerating the pleading requirements for scienter set forth in the PSLRA." *Indiana Elec. Workers' Pension Trust Fund IBEW, supra,* 537 F.3d at 545. For a false SOX statement to be relevant, plaintiffs must plead facts indicating that "the officer who signed the certification had 'reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.'" *Id.* (quoting *Garfield v. NDC Health Corp,* 466 F.3d 1255, 1266 (11th Cir. 2006).

In this case, plaintiffs rely on the statements alone; they do not plead facts indicating that defendants were reckless as to the SOX statements. The SOX statements, therefore, are not probative of scienter.

### vii. SEC Investigation

Plaintiffs assert that the fact that the SEC is investigating Dana's accounting practices is probative of scienter.

Courts take the view that an SEC investigation that has not resulted in charges or any finding of wrongdoing cannot support an inference of scienter. *Cozzarelli v. Inspire Pharmaceuticals,* 549 F.3d 618, 628 n.2 (4th Cir. 2008) (pending SEC investigation is "too speculative to add much, if anything, to an inference of scienter"); *In re Hutchinson Technology, Inc. Securities Litigation,* 536 F.3d 952, 962 (8th Cir. 2008) (pending SEC investigation not probative). In *In re Ceridian, supra,*

542 F.3d at 248, the court held that the district court properly gave no weight to an ongoing SEC investigation where "no hearing or adverse findings ensued." If anything, the court noted, the fact that the SEC investigated but found no evidence of fraud suggests that there was none. *Id.*

Likewise, in this case, the SEC's investigation into Dana's conduct does not add to the scienter inference.

### viii. Plaintiffs' Allegations as a Whole

Ultimately, I must ask, taking all relevant factors together, "would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs, supra,* 551 U.S. at 362. Two cases with significant factual similarities are instructive. In *Institutional Investors Group,supra,* 564 F.3d at 280, the court reversed in part and remanded dismissal of plaintiff's complaint, and in *Ley, supra,* 534 F.3d at 814, the Sixth Circuit affirmed dismissal.

In *Institutional Investors Group,* the court concluded that plaintiffs had successfully plead facts giving rise to a strong inference of scienter as to certain statements about pricing. 564 F.3d at 280. First, the court looked to the "content and context" of the defendant's pricing statements. In calls to analysts, the defendant denied widespread and unusual discounting "in response to repeated questions about pricing by analysts." *Id.* at 269. When asked what the pricing "environment is out there right now," the defendant responded that the "[p]ricing environment is not significantly different. I mean there are people that will buy a deal from time to time, but in general the pricing environment has been fairly stable." *Id.* The defendant fielded similar questions twice more within a week and provided the same response. *Id.*

The court distinguished defendant's statements about pricing from cases where defendants make incorrect statements about earnings. As the court explained, one cannot assume that a

"defendant must have known its earnings projections were false because of the existence of unusual price reductions" because "earnings are the bottom-line result of many different components, only one of which is pricing." *Id.* at 270.

Defendant's denials of price discounting, however, supported a strong inference of scienter because defendant was a chief financial officer and he was "specifically asked, directly and repeatedly, whether the company's pricing has held steady despite the competitiveness of the market." *Id.* Plaintiffs' "failure to identify the precise means by which [defendant chief financial officer] would have learned of the discounting was not determinative."*Id.* at 274. A court, however, could not draw as strong an inference from statements about earnings because one cannot as readily assume that the defendant had knowledge or recklessly disregarded facts about all the components of an earnings statement. *Id.* at 270.

The court also emphasized the importance of the analysts' repeated "focused" questions as supporting a strong scienter inference. If the parties had relied only on general assertions about management's awareness of day-to-day operations, the court suggested, it would have been less likely to infer that the chief financial officer knew or should have known that his statements were false. *Id.*; s*ee also Metzler GMBH v. Corinthian Colls., Inc,* 540 F.3d 1049, 1068 (9th Cir. 2008) ("management's general awareness of the day-to-day workings of the company's business does not establish scienter – at least absent some additional allegation of specific information conveyed to management and related to the fraud"); *ACA Fin Guar. Corp v. Advest, Inc.,* 512 F.3d 46, 62-63 (1st Cir. 2008) (plaintiffs' allegations inadequate because they did not include details about whether defendants knew of information contradicting their statements when they made them).

19

In *Institutional Investors* the court considered several other factors in considering scienter. Plaintiffs alleged that the discounting, which defendants denied, was of "a substantial magnitude." 564 F.3d at 270. Not only was defendant company "offering discounts to an unusually large number of customers," the discounts caused a "steep decline in [defendant company's] all-important margins." *Id.* at 270-271. If the misstatements had been of lesser magnitude, the court noted "nonculpable ignorance might  [have been] the more likely explanation." *Id.* at 270. Defendant company's "drastically shrinking" margins became a problem at the same time defendant's chief financial officer  denied discounting, making it "at least as likely as not that [the chief financial officer] would have discovered the massive discounting, if he had not already done so." *Id.* at 271.

In *Institutional Investors* the court also looked to the close temporal proximity between the denials of discounting and the release of disappointing end-of-quarter results. *Id.* at 272. Defendant made statements denying discounting between March 2 and 7, the second quarter ended on March 31, and defendant company issued its disappointing second quarter results on April 19. The brief span of six weeks, the court reasoned, diminished the plausibility of innocent explanations, such as "that developments subsequent to the [March] statements account for the mediocre results, or that the discounting would not have been apparent to McGuire at the time analysts asked about it." *Id.* at 272.

Plaintiffs also alleged insider trading, but the court concluded that these allegations did not enhance the inference of scienter because there was nothing suspicious about the defendants' trading practices. *Id.* at 279.

This case involves inherently more volatile and less predicable data – future earnings predictions, rather than false statements of readily ascertainable operational practices, as in

*Institutional Investors.* This factual distinction between the allegations in that case and in this case is crucial.

In *Ley, supra,* 543 F.3d at 814, the Sixth Circuit concluded that plaintiffs failed to plead scienter adequately. First, plaintiffs alleged that, according to an anonymous source at defendant company, the company intentionally violated Generally Accepted Accounting Principles by improperly booking supplier rebates to create an appearance of lower costs. 543 F.3d at 811. The court gave these allegations little weight because plaintiffs' allegations were "too vague and conclusory" and plaintiffs failed to allege who "knew about the alleged accounting improprieties and what, when, where, and how they knew." *Id.* The same can be said here.

 Second, plaintiffs alleged that the defendant stated in early 2003 that it "had a solid year in 2002" while internally acknowledging that the company was "not doing well." *Id.* The court viewed this statement, however as "corporate optimism" or puffery, and did not consider it probative of scienter. *Id.*

Plaintiffs in *Ley* alleged that the nature and magnitude of the accounting improprieties were such that the defendants' statements of financial health must have been either knowing or reckless. 543 F.3d at 812. The court, however, concluded that the accounting errors – which involved retiree benefit plans, rebates, tax matters, freight expenses, material surcharges, and other diverse aspects of defendants' finances – were not "so 'simple, basic, or pervasive in nature' to have been obvious to the defendants." *Id.* (quoting *PR Diamonds*, *supra*, 364 F.3d at 684). The court also noted that the errors affected a "low percentage of change to total revenue" – 5.68% – during the Class Period. *Id.* The court concluded that the nature and magnitude of the irregularities, even if considered, were not such that defendants must have been reckless. *Id.*

Third, like in this case, company restated its financials, admitting "$108 million in accounting errors which understated net losses by in excess of $60 million." *Id.* at 805.

Fourth, plaintiffs in *Ley* alleged that defendants had a motive to make the company to appear successful and specifically to raise additional capital to avoid defaulting on existing notes. *Id.* at 813. The court disregarded allegations about defendants' desire to make their companies appear successful. *Id.* The court did not weigh heavily even plaintiffs' more specific allegations about avoiding default, noting the plaintiffs failed to allege "any particularized facts or details" linking the notes offering to the alleged fraud. *Id.* The court concluded that plaintiffs' allegations, taken as a whole, were inadequate to support a scienter inference. *Id.* at 814.

The totality of the alleged facts in this case is more similar to those in *Ley* than those alleged in *Institutional Investors*. Like plaintiffs in *Institutional Investors,* plaintiffs here make allegations about temporal proximity and the magnitude of error. Unlike in *Institutional Investors*, however, defendants' false statements of financial health were not made in response to repeated, focused questions from analysts about a specific matter like the pricing environment. In this case, defendants' allegedly fraudulent statements relate to the company's overall earnings and the overall effectiveness of the company's response to negative market factors like the increase in raw materials prices.

As the court in *Institutional Investors* notes, it is more difficult to infer executives acted with knowledge or recklessness as to truthfulness when the statements involve a synthesis of many factors. 564 F.3d at 270. Because of the nature of the statements at issue, the inference of scienter is weaker than that in *Institutional Investors.*

Plaintiffs' allegations here are similar to those found insufficient in *Ley*. Plaintiffs in both cases rely on the magnitude of the misstatements and a quick about-face by the company. In *Ley* the court concluded that the substantial accounting errors, amounting to $108 million, did not contribute much to the inference of scienter because they were not so basic and pervasive as to be obvious. Dana's accounting errors were likewise very substantial. But the defendants offer a countervailing nonculpable explanation: weak internal controls.

Plaintiffs assert that defendants acted to make their company appear healthy, and, as in *Ley*, this alleged motive is not a compelling reason to find fraud.

One potentially distinguishing fact is Richter's sudden and premature retirement. As noted above, sudden departure of a single executive is not evidence, without more detailed allegations about the circumstances of the departure than are found here, of scienter.This fact does not compel a different conclusion than that in *Ley*.

Plaintiffs have not shown that an inference of fraud is at least as strong as other explanations for Dana's situation – nonculpable conduct, ordinary negligence or innocent error are the more probable explanations for the facts alleged in the complaint.

## 2. Applicability of PSLRA "Safe Harbor" Provision

Defendants argue that even if plaintiffs adequately plead scienter, provisions of the PSLRA shielding defendants from liability for forward-looking statements protect them from liability. *See* 15 U.S.C. § 78u-5(c)(1)(A) ("safe harbor" for forward-looking statements). Because I conclude plaintiffs' complaint does not adequately plead scienter, I need not determine whether the safe harbor provision applies.

## 3. Whether Plaintiffs' Complaint Adequately States Control Person Liability

Plaintiffs also allege that defendants are liable as controlling persons of Dana under § 20(a) of the Securities and Exchange Act of 1934, which provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce that act or acts causing the violation or cause of action.

15 U.S.C. § 78t(a).

For a § 20(a) claim, plaintiffs must establish that 1) "the 'controlled person' must have committed an underlying violation of the securities laws or rules and regulations promulgated thereunder"; and 2) "the 'controlling person' defendant in a Section 20(a) claim must have directly or indirectly controlled the person liable for the securities law violation." *PR Diamonds, supra,* 364 F.3d at 696.

Plaintiffs must adequately allege either Dana corporation or the defendant directors controlled persons who committed an underlying securities violation. *Id.* Plaintiffs need not name Dana as a defendant to establish control person liability against its directors. *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 285 (3d Cir. 2006).

Plaintiffs' § 20(a) claim fails for two reasons. First, plaintiffs have not plead an underlying securities violation. In *PR Diamonds,* the court affirmed dismissal of plaintiff's complaint, holding that plaintiff did not state a § 20(a) claim because it failed to plead scienter as to the individual defendants and their bankrupt non-party company. 364 F.3d at 696; *see also Ley, supra,* 542 F.3d at 818 (affirming dismissal of plaintiff's § 20(a) claim where the complaint failed to allege a predicate securities violation). As described above, plaintiffs do not sufficiently plead a violation of securities law by Dana, its employees, or the individual defendants.

24

Second, plaintiffs do not adequately plead that defendant directors acted with the requisite state of mind for a § 20(a) violation. Section 20(a) does not allow for liabiliy when the controlling persons acted in good faith or did not induce the violations. 15 U.S.C. § 78t(a). Plaintiffs assert that simply because the defendant directors are executives of Dana, defendants are liable as controlling persons under § 20(a). Plaintiffs' complaint does not provide a basis for concluding that Burns and Richter were not acting in good faith or they induced the alleged fraud at Dana. Plaintiffs' § 20(a) claim fails.

### 4. Leave to Amend

Plaintiffs have not filed a motion for leave to amend under Rule 15(a) of the Federal Rules of Civil Procedure. In their briefs, however, plaintiffs informally request leave to amend and describe proposed testimony of five Confidential Witnesses [CW 1 through 5]. Plaintiffs claim these informants, all former Dana employees, provide evidence supporting the inference of scienter on the defendants' part. Plaintiffs have also attached a proposed amended complaint to Plaintiffs Supplemental Opposition to Defendants' Motion to Dismiss. [Doc. 111, Exhibit A].

After the Supreme Court's ruling in *Tellabs*, it may be an open question whether the PSLRA constricts the traditional liberality of amendment under Rule 15. Under Rule 15(a)(2), the general rule is that courts have discretion to grant leave to amend and should "freely give leave when justice so requires." Prior to *Tellabs*, however, the Sixth Circuit suggested that the purposes of the PSLRA – a statute intended to "screen out" securities class action lawsuits that "have no factual basis" – would be frustrated if district courts were "required to allow repeated amendments to complaints." *Miller, supra,* 346 F.3d at 691-692; *see also In re Champion Enterprises, Inc. Securities Litigation,* 145 F. Supp. 2d 871, 872 (E.D. Mich. 2001); *In re Bristol-Myers Squibb Securities Litigation,* 228

F.R.D. 221, 229 (D.N.J. 2005). At least one court has suggested that, in light of the Supreme Court's decision in *Tellabs*, "Rule 15 applies in the normal course" in securities fraud cases because the PSLRA does not expressly "modify the liberal amendment policy of Rule 15(a)." *ACA Financial Guaranty Corp., supra*, 512 F.3d at 56.

Even if Rule 15 applies with full force, I retain broad discretion to deny leave to amend. Courts generally may deny leave to amend "where there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'" *Morse v. McWhorter,* 290 F.3d 795, 800 (6th Cir. 2002) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

I deny leave to amend for two independent reasons.

First, plaintiffs' failure promptly to exercise their absolute right under Rule 15(a)(1)(A) simply to file an amended complaint prior to receipt of a responsive pleading – which does not encompass a motion to dismiss, *e.g.*, *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 574 (6th Cir. 2008) – has caused extensive delay. If plaintiffs had filed an amended complaint in response to the original motion to dismiss, many of the intervening proceedings – including their appeal – would have been avoided. Here, as in *ACA Financial, supra,* 512 F.3d at 57, plaintiffs dilatory request to amend has created "delays, inefficiencies, and wasted work" for all involved.

A court, moreover, can deny leave to amend when a plaintiff chooses to request leave informally in a brief, rather than filing a Rule 15(a) motion. *Begala v. PNC Bank, Ohio Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000) ("An open request for the Court to permit amendment to cure deficiencies, once the Court identifies those deficiencies, will not defeat a meritorious motion to

dismiss pursuant to Rule 12(b)(6). . . . Plaintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies."); *see also Evans v. Pearson Enters, Inc,* 434 F.3d 839, 853 (6th Cir. 2006); *Darby v. Century Bus. Serv., Inc.,* 96 Fed. Appx. 277, 286 (6th Cir. 2004); *PR Diamonds, supra,* 364 F.3d at 699.

Second, the plaintiffs' attempt to amend would likely be futile. *See Darby, supra,* 96 Fed. Appx. at 286 (courts deny leave to amend due to futility); *n re Hutchinson Tech., Inc., Sec. Litig.,* 536 F.3d 952, 962 (8th Cir. 2008) (affirming denial of leave to amend because proposed amendments would not improve complaint).

After *Tellabs,* courts must "discount allegations from confidential witnesses" if the plaintiffs do not provide enough information about the witnesses to assess the witness's basis of knowledge and veracity, or to determine what plausible opposing inferences the witness testimony may support. *Higginbotham v. Baxter,* 495 F.3d 753, 756-57 (7th Cir. 2007). "Vague and conclusory" statements by confidential witnesses add little to a scienter inference. *Ley, supra,* 543 F.3d at 811. If plaintiffs identify the confidential witnesses with sufficient particularity and denominate "what, when, where, and how they knew" the alleged facts, confidential sources are not "altogether irrelevant." *Id.*

In *Ley,* the Sixth Circuit found the allegations of a confidential witness, a former senior finance director at defendant company, contributed nothing to the scienter inference. *Id.* The confidential witness would have testified that the defendants intentionally caused financial irregularities to "falsely improve the Company's financial condition" on paper and that the company would "defer" surcharges and "not account for them it its financial statements." *Id.*

In this case, plaintiffs proffer allegations by five confidential witnesses. CW 1, a senior accountant, states that Dana's major customers refused to absorb the increased costs of metal and freight, that these costs began impacting Dana in 2002, and that the customers' refusals made the six percent profit-margin mandate unrealistic. CW 2, a plant controller at two of Dana's plants from 2001 to 2005, states that throughout 2004 and 2005 the inability of plants to achieve their budgeted numbers was an ongoing topic of discussion and concern. CW 3, an accountant, and CW 4, a sales specialist, corroborate concerns about plants meeting their budgeted numbers, state that budget forecasts were unrealistically high, and assert that steel pricing negatively affected plant performance throughout the Class Period. Plaintiffs indicate that there are other witnesses who could add substance to the complaint. CW 5, a sales secretary worked with sales staff affected by problems at the Bruges, Belgium, plan and informed customers of growing steel costs during the Class Period.

None of the proposed testimony sheds light on Burns's and Richter's level of participation the various meetings or their likely, much less actual familiarity with the materials and topics encompassed therein. The Confidential Witness testimony, like the rest of plaintiffs' complaint, relies on the assumption that simply because Burns and Richter were executives, they must have known of Dana's problems as they were occurring. This is insufficient.

In light of plaintiffs' failure to exercise their automatic right to amend in the face of a motion to dismiss, subsequent failure to seek leave formally to amend, the resulting delay and futility of the proposed amendments, denial of leave to amend and dismissal with prejudice are appropriate. *Cozzarelli, supra,* 549 F.3d at 630 (affirming dismissal with prejudice where plaintiffs requested leave to amend without a formal motion); *Central Laborers' Pension Fund v. Integrated Electric*

*Servs., Inc.,* 497 F.3d 546, 556 (5th Cir. 2007) (affirming dismissal with prejudice where amendment would have been futile).

### Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT defendants' motion to dismiss be, and the same hereby is granted.

So ordered.


s/James G. Carr
James G. Carr
Chief Judge