**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Plumbers & Pipefitters National Pension                    Case No. 3:05CV7393
      Fund, et al.,

          Plaintiff

    v.                                                                         **ORDER**

Michael Burns, et al.,

          Defendants


This is a securities fraud case in which plaintiffs,[1] Plumbers & Pipefitters National Pension

Fund ( P&P) and West Virginia Laborers Pension Trust Fund (WVL), claim defendants, Michael

Burns and Robert Richter, made false or misleading disclosures in financial statements related to

Dana Corporation (Dana) securities and bonds.

Pending is plaintiffs' motion for class certification (Doc. 166). For the reasons that follow,

I grant plaintiffs' motion in part, and set futher proceeding in part.

Jurisdiction exists under 28 U.S.C. § 1331.

### Background[2]

Plaintiffs claim Burns and Richter, former Dana officers, violated 15 U.S.C. §§ 78j(b),

78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5 of the Securities Exchange Act of 1934 (the Act).

Plaintiffs allege Burns and Richter made false statements and material omissions regarding Dana's

---

[1] Unless otherwise noted, this opinion will refer to these lead plaintiffs, who seek
certification as class representatives, as plaintiffs.

[2] *See also Frank v. Dana Corp.*, 646 F.3d 954, 957-958 (6th Cir. 2011); *Frank v. Dana
Corp.*, 547 F.3d 564, 567-569 (6th Cir. 2008).

financial disclosures in violation of Rule 10b-5. Plaintiffs also allege that, as controlling persons, defendants caused other Dana employees to make false statements in violation of § 20(a) of the Act.

Burns served as Dana's chief executive officer, and Richter as its chief financial officer. In those positions, both signed Dana's financial filings with the Securities and Exchange Commission during the fiscal-year quarters included in the proposed class period (April 21, 2004 through October 7, 2005). Defendants also disclosed Dana's quarterly earnings during press releases and conference calls, and signed Dana's § 302 certificates in compliance with the Sarbanes-Oxley Act.[3] Defendants further assured investors that Dana used accounting controls that complied with generally accepted accounting principles.

During the class period, Dana stated that it managed to earn profits despite drastic and sudden increases in steel prices.[4] Dana told investors that, despite the increases, it could continue to profit due to improved cost efficiencies.

Based on Dana's positive financial statements, the value of Dana's securities steadily increased over the class period. Dana released positive reports for both projected and actual earnings. Further, defendants assured investors that Dana had implemented improved accounting controls. Burns also made several optimistic statements to investors regarding Dana's profitability and growth during this time. Plaintiffs claim these statements were false or misleading.

---

[3] Pursuant to 15 U.S.C. § 7241, Dana's Sarbanes–Oxley certifications stated that the financial report "does not contain any untrue statement of material fact," and that each of the financial statements "fairly present[s] in all material respects" the company's financial condition during the reporting period.

[4] Due to world-wide economic conditions, the price of steel increased between seventy-five and 120 percent in 2004.

Contrary to the public statements, some of Dana's divisions had suffered major adversity during the class period. Fifty percent of the company's drive shaft division operated at a loss, and its light axle division saw drastic decreases in profitability. Despite the losses, defendants issued mandates to their subordinates that each factory increase earnings by six percent each year.

On September 15, 2005, defendants announced (entirely unexpectedly from the perspective of the stock and bond markets) that, because of the rising cost of steel, Dana would reduce its earnings projections by fifty percent. It also announced it would likely restate its financial statements for the second quarter of 2005, and write down substantial tax-deferred assets. Dana's stock prices fell twenty percent on the day of the announcement.

On October 10, 2005, defendants announced that investors should no longer rely on Dana's financial statements from fiscal-year 2004 or from the first half of fiscal-year 2005. They told investors they would likely revise and reissue those statements. They stated that Dana had discovered "material weaknesses" in its accounting systems and internal accounting controls. On the day of that announcement, Dana's stock prices fell thirty-five percent and continued declining thereafter.

On December 30, 2005, defendants reissued Dana's earnings statements for the first two quarters of fiscal-year 2005. In the statements, it reduced its reported net income by $44 million. Then, on January 17, 2006, Dana reported a $1.27 billion loss for the third quarter of 2005 and reduced its tax-deferred assets by $918 million through an evaluation allowance.

In February, 2006, the Securities and Exchange Commission announced it would formally investigate Dana's accounting structure and reporting policies. Dana thereafter defaulted on millions of dollars of debt and filed for bankruptcy on March 3, 2006. Richter retired the same day.

3

Plaintiffs sued, alleging defendants knew, or recklessly disregarded facts from which they should have known that various statements and documents were materially false or misleading. Thus, plaintiffs alleged, defendants violated applicable provisions of the Act and its accompanying regulations.

Defendants filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6), asserting that plaintiffs failed to plead adequately a case of securities fraud under Rule 10b-5. I granted the motion, deciding that plaintiffs had failed to plead fraud, and specifically scienter, under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA) and Fed. R. Civ. P. 9(b). *Frank v. Dana Corp.*, 525 F. Supp. 2d 922, 931 (N.D. Ohio 2007), *rev'd*, 547 F.3d 564 (6th Cir. 2008).

Reversing, the Sixth Circuit held that I had misstated the law as it then stood. *Frank v. Dana Corp.*, 547 F.3d 564, 567-569 (6th Cir. 2008). The court vacated my decision and remanded for me to redecide the motion under the correct standard. *Id*. Thereafter, I again dismissed the complaint, holding plaintiffs had inadequately pled their case. *Frank v. Dana Corp.*, 649 F. Supp. 2d 729, 745 (N.D. Ohio 2009), *rev'd*, 646 F.3d 954 (6th Cir. 2011).. The Sixth Circuit once more disagreed, holding that plaintiffs had adequately pled a case under the Act. *Frank v. Dana  Corp.*, 646 F.3d 954, 957-958 (6th Cir. 2011).

Now back before me, plaintiffs seek to certify the class as:

All persons who purchased the publicly-traded securities of Dana Corporation ("Dana" or the "Company") between April 21, 2004 and October 7, 2005 ("Class Period"), and who were damaged thereby.[5]

---

[5] Excluded from the Class are defendants and members of their immediate families, any entity in which a defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of any such excluded party.

4

Plaintiffs also requested that I appoint the law firm Robbins Geller Rudman & Dowd, LLP, as class counsel.

In supporting their motion, plaintiffs provided declarations from William T. Sweeney, Jr., of P&P, and Steven L. Smith, of WVL. In their declarations, Sweeney and Smith asserted that both P&P and WVL have "monitored the progress of the litigation[,]" have "been kept informed of . . . major developments," and that each "is committed to continuing to take an active role in overseeing and monitoring this litigation for the best interest of the entire class." (Doc. 166, ex. 3-4).

Plaintiffs also provided a declaration from Jane D. Nettesheim, a financial economist. In her declaration, she presented an economic analysis in support of her conclusion "that the market for Dana common stock during the Class Period was open, developed[,] and efficient[,]" and "that the market for Dana Bonds was efficient throughout the Class Period." (Doc. 166, ex. 5).

Defendants opposed the motion for class certification with a declaration from their financial economist, Andrew Roper. In his declaration, Roper stated that Nettesheim failed to analyze adequately the efficiency of the market in which Dana bonds traded. He stated Nettesheim did not follow generally accepted economic principles, her declaration contained biased analysis, and she otherwise failed to provide adequate reasoning and analysis regarding the efficiency of the market for Dana bonds. (Doc. 171).

## Discussion

To succeed in a securities fraud case under Rule 10b–5, plaintiffs must prove: 1) a material misrepresentation; 2) scienter (deceptive intent); 3) a connection with the purchase or sale of a security; 4) reliance; 5) economic loss; and 6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–342 (2005).

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal–Mart Stores, Inc. v. Dukes*, — U.S. —, —; 131 S.Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)). To obtain class-certification, a potential class of securities-fraud plaintiffs must prove they satisfy all of the requirements of Fed. R. Civ. P. 23(a), and at least one of the conditions under Fed. R. Civ. P. 23(b). *See*, *e.g.*, *Wal–Mart*, *supra*, — U.S.at —, 131 S.Ct. at 2551; *Erica P. John Fund, Inc. v. Halliburton Co.*, --- F.3d ----, ----; 2013 WL 1809760, *2 (5th Cir. 2013).

The Supreme Court discussed the rationale behind Rule 23(a):

> [A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members. Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.

*Wal–Mart Stores*, *supra*, 131 S.Ct. at 2550 (internal quotations and citations omitted).

In this case, in addition to demonstrating numerosity, commonality, typicality, and adequacy of representation, plaintiffs must show that common questions will predominate, as provided by Rule 23(b). *Halliburton Co.*, *supra*, — F.3d at —, 2013 WL 1809760 at *2. Thus, plaintiffs must show "the questions of law or fact common to class members predominate over any questions affecting only individual members," and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3).

In opposing the motion, defendants argue that plaintiffs have failed to show that: 1) they will adequately represent the class; 2) the proposed representatives' claims are typical of those of the class; and 3) common questions of fact and law will predominate the case.[6]

The Supreme Court recently stated that Rule 23 "does not set forth a mere pleading standard." *Comcast Corp. v. Behrend*, --- U.S. ----, ----; 133 S. Ct. 1426, 1432 (2013). The plaintiffs, rather, must actually prove each requirement of Rule 23(a), and at least one of the bases in Rule 23(b). *Id*. When deciding whether plaintiffs have met the class-certification prerequisites under Rule 23(a), a court must undertake a "rigorous analysis," which will frequently "overlap with the merits of the plaintiff's underlying claim." *Id*. (quotation omitted). However, the court should only consider the merits of the case to the extent that they overlap with the class-certification question. *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, --- U.S. ----, ----; 133 S.Ct. 1184, 1194–1195 (2013). Analysis under Rule 23(b) requires at least as searching an inquiry, and possibly more so, than that under Rule 23(a). *Comcast*; *supra*, 133 S. Ct. at 1432.

---

[6] Defendants do not dispute that the proposed class meets Rule 23(b)'s numerosity requirement (defendants' brief in opposition to this motion only mentions numerosity in passing in one instance). (*see* Doc. 170, p 8). There is no particular number necessary to meet the numerosity requirement of Rule 23, nor does the class number need to be known with precision. *See Rodriguez ex rel. Rodriguez v. Berrybrook Farms, Inc.*, 672 F.Supp. 1009, 1013 (W.D. Mich.1987). In any event, I find the class sufficiently numerous. *See In re One Bankcorp Securities Litigation*, 136 F.R.D. 526, 529 (D. Maine 1991) (the court may make a common-sense judgment in favor of numerosity based on the number of outstanding shares).

Defendants, likewise, do not argue that plaintiffs have failed to present issues common to the proposed class (again, they only mention this requirement once, in passing). (*See* Doc. 170, p 7). They focus, rather, on whether common answers to those questions will predominate. Regardless, I find that plaintiffs have presented issues common to all purchasers of Dana securities. Those issues include, *inter alia*, whether defendants purposely or recklessly made false or misleading statements that artificially inflated the price of Dana securities. *See*, *e.g.*, *One Bankcorp*, *supra*, 136 F.R.D. at 529.

Despite the rigorous analysis that a court must undertake at this stage, at least one court in this Circuit has recently stated that "class certification in cases where [the] 'fraud-on-the-market' doctrine applies is 'routine' because 'each investor's loss usually can be established mechanically, [and] common questions predominate . . . .'" *Wilkof v. Caraco Pharm. Laboratories, Ltd.*, 280 F.R.D. 332, 337 (E.D. Mich. 2012) (quoting *Schleicher v. Wendt*, 618 F.3d 679, 683 (7th Cir. 2010)). With these principles in mind, I now turn to defendants' arguments.

### 1. Adequacy of Plaintiffs' Representation

Defendants first argue that plaintiffs made misrepresentations regarding the formation of their Pension Trust Fund Group (PTFG) and failed to oversee the actions of proposed class counsel. They claim this demonstrates that plaintiffs would not fairly and adequately protect the interests of the class within the meaning of Rule 23(a)(4). They also claim that, due to conflicts of interest, proposed class counsel could not adequately represent the proposed class's interests, as required by Rule 23(g)(1)(B) and 23(g)(4).

### a. Plaintiffs' Alleged Misrepresentations & Lack of Knowledge

Defendants allege plaintiffs lack knowledge about the case and have made several misrepresentations throughout the course of this case, showing that plaintiffs should not serve as class representatives.

"An understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery are sufficient to meet" the adequacy requirement under Rule 23(a)(4). *Silverman*, *supra*, 259 F.R.D. at 173 (a plaintiff need not demonstrate extensive knowledge about the legal or factual details of their cause of action to be deemed an adequate class representative).

Contrary to defendants' arguments, I find plaintiffs have kept adequately informed of the case and have sufficiently participated in it. *See, e.g.*, Smith Depo. at 21:4-8 (testifying that WVL is not entitled to any additional recovery as class representative; *id.* at 22:2-9; 28:9-23; 107:18-108:15 (explaining that WVL has a fiduciary duty to other investors in the class: "as we prosecute our claim, we are, in fact, prosecuting the claim" for "all the members of the class"); Sweeney Depo. at 37:8-38:5 (testifying that P&P acts as a fiduciary to the class, which includes hiring competent counsel and ensuring all class members are treated equitably in the distribution of any recoveries).

Regardless, as discussed further in § 1(b), *infra*, plaintiffs have retained adequate class counsel (Robbins Geller), and properly hired separate counsel (O'Donoghue) to oversee Robbins Geller's work. Not only is this strong evidence that plaintiffs seek fairly and adequately to represent the proposed class members but it, at least to some degree, insulates the representatives from claims that they have not sufficiently kept informed of the facts of the case. *See Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 373 (1966) (verification of a complaint in a stockholder derivative action was valid even though the plaintiff lacked personal knowledge of the claims asserted and did not understand the underlying financial transactions described in the complaint.); *Wells v. HBO & Co.*, 1991 WL 131177, *6 (N.D.Ga.1991) ("[m]ost courts follow the rationale set forth in *Surowitz* in rejecting challenges to the adequacy of representation based on his or her ignorance of the facts or theories of liability").[7]

_____

[7] *See also In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. 687, 696 (N.D. Ga. 2002) ("The Defendants argue that the lead Plaintiffs are inadequate class representatives because they are unfamiliar with the allegations of the Amended Complaint and are unfamiliar with, unwilling to or unable to discharge their obligations as class representatives. No useful purpose would be served in addressing the Defendants' arguments as to each of the proposed class representatives. The basic flaw of the Defendants' analysis is that the alleged deficiencies of the proposed class representative are irrelevant in a fraud on the market case such as this which is prosecuted by

9

In any event, I have reviewed defendants' specific allegations and find they do not show plaintiff would not fairly and adequately represent the class:

Defendants allege that:

1)    In separate certifications, plaintiffs stated that they had "reviewed a complaint and authorized its filing" when, in fact, the only complaint reviewed was one bearing little, if any, resemblance to the complaint that PTFG subsequently filed in August 2006. Representatives from plaintiffs neither read nor reviewed the complaint, either before it was filed or at any time in the six years since.

The fact that plaintiffs may not have reviewed the complaint that counsel eventually filed does not necessarily show they lack knowledge about the case. As discussed above, what is important is that plaintiffs have a basic understanding of the case and that they monitor and direct the attorneys' actions. Based on their deposition testimony, plaintiffs have demonstrated this basic understanding.

2)    In a joint declaration (Doc. 22-1) PTFG representatives affirmed they "intended to continue to work with one another." Despite this affirmation, plaintiffs' representatives testified they had no intention of coordinating with the other unless instructed to by counsel.

I find this argument unpersuasive. As in any lawsuit that involves joint or coordinated representation, I would expect two plaintiffs to seek their counsels' advice regarding when, and to what extent, they should communicate.

3)    In addition, the Joint Declaration stated, on "personal knowledge," that PTFG had "conferred amongst themselves . . . in connection with our prosecution of the litigation." But, at their respective depositions, plaintiffs representatives who signed the joint declaration denied personal knowledge of any such meeting or conference. In fact, plaintiffs' representative acknowledged that the January 2006 joint declaration was misleading on this point.

---

able and experienced counsel.").

At depositions, plaintiffs' representative readily admitted this statement was a mistake. It does not appear to me that, when considered with respect to the case as a whole, plaintiffs intended to mislead the court or defendants. Without more, I find this insufficient to show that plaintiffs lack the credibility and trustworthiness to serve as class representatives.

4)      Although the joint declaration denied that PTFG was aggregated by counsel solely to create a large financial interest in order to obtain appointment as lead plaintiff, plaintiffs' representatives who signed the Joint Declaration denied any personal knowledge as to why the respective plaintiff pension funds chose to pursue joint appointment as lead plaintiffs.

I find this argument unpersuasive. The fact that plaintiffs did not know the exact legal reasoning behind counsels' effort to aggregate claims under the PTFG does not show they have abandoned their role in overseeing the litigation. Rather, it merely shows, as I would expect in a complicated securities case, that they have not delved deeply into the legal reasoning of each decision made by counsel. As discussed *infra* in this section, plaintiffs were not required to do so.

6)      Demonstrating lack of familiarity with this action, WVL's representative did not know that the SEC had taken no action against Defendants; lacked knowledge that another potential representative had not joined plaintiffs in seeking class certification; that PTFG's claim in the Dana bankruptcy proceeding had been withdrawn; that a related derivative action had been filed; that any settlement discussions had taken place; and, until the day before his deposition, that a related action had been filed.

I agree with plaintiffs that these contentions are largely irrelevant to the inquiry. Although plaintiffs lacked familiarity with related actions, this does not show they lacked knowledge of defendants' alleged conduct in this case. Put simply, I would not expect each representative to know each aspect of every case related to this one. What is important is that plaintiffs have sufficient knowledge of this case to represent adequately the interests of the class. They have done so here.

**b. Representation Through Counsel**

Defendants contend that plaintiffs have improperly relied on representation of outside counsel, O'Donoghue & O'Donoghue, to monitor Robbins Geller. They claim that, because Robbins Geller will eventually pay O'Donoghue through a settlement or judgment, those law firms' interests align, which creates a conflict of interest between plaintiffs and the proposed class members. Thus, O'Donoghue has had no real incentive to monitor and oversee the actions of Robbins Geller. Defendants additionally contend that the fact O'Donoghue has acted as intermediaries cannot satisfy plaintiffs' fiduciary responsibilities to oversee Robbins Geller's work.

To obtain class certification, plaintiffs must demonstrate they will fairly and adequately protect the interests of the class. Rule 23(a)(4); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Macula v. Lawyers Title Ins. Corp.*, 264 F.R.D. 307, 308 (N.D. Ohio 2009) ("plaintiff bears the burden of proof in arguing that a potential class should be certified."). This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products*, *supra*, 521 U.S. at 625 (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157-158 n. 13 (1982)).[8] Generally, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). This assures that plaintiffs

---

[8] *See also Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 562 (6th Cir. 2007) (quoting *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 628 (6th Cir. 2007) ("'It is well established that in complex actions such as securities actions . . . a great deal of reliance on the expertise of counsel is to be expected.'"); *In re Louisiana-Pacific Corp. ERISA Litig.*, 2003 WL 23537936, *6 (D. Or. 2003); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1239, 1243 (N.D. Cal. 2000) ("[A] particular evil of past securities litigation was the control that plaintiff's counsel exercised over large aggregated masses of clients, who minimally supervised their lawyers through unwieldy steering committees.").

12

will vigorously prosecute the case on behalf of the absent class members. *See Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-1188 (10th Cir. 2002).

I agree with plaintiffs' argument that it was wholly proper for them to retain and rely on outside counsel in fulfilling their duty to protect the interests of the class by monitoring Robbins Geller. *See Silverman*, 259 F.R.D. at 173; *United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 655 (W.D. Okla. 2012) ("Nor does Lead Plaintiff's reliance on the expertise of counsel adversely impact its ability to serve as an adequate class representative. On the contrary, the primary criterion for determining whether representation is adequate is  whether the representative, through qualified counsel, vigorously and tenaciously protected the interests of the class.") (internal quotations omitted).

By hiring different attorneys, plaintiffs ensured, as best they could, that they would adequately monitor Robbins Geller. This is so because, as currently situated, the Robbins Firm will owe professional and ethical duties[9] to the class as a whole, while the O'Donoghue firm owes these duties only to P&P.[10] Thus, O'Donoghue must diligently oversee Robbin Geller's work in representing the class to fulfill its duty to provide competent representation to P&P. Robbin Geller, in turn, must provide competent representation to the class as a whole. This provides a system of checks, and balances the power between plaintiffs and Robbins Geller.[11]

---

[9] Most importantly, to provide competent representation, avoid actual or apparent conflicts of interest, and pursue the action in a way consistent with their client's best interests.

[10] The analysis is the same for WVL's outside counsel.

[11] The fact that both firms may eventually recover their fees out of the same settlement or judgment does not change their ethical or professional duties to their clients.

13

Moreover, by retaining additional and independent counsel, the plaintiffs have provided additional support to my finding that they will represent the class adequately.

### c. Adequacy of Proposed Class Counsel

Defendants also claim the Robbins Firm's close relationship with P&P shows that the Robbins Firm may favor this client, and thus may not fairly and equally represent all of the proposed class members. Specifically, defendants note that the Robbins Firm, under a monitoring agreement, overlooks the P&P fund and recommends to its administrators when the Robbins believes a violation of the securities laws has occurred. In addition, the Robbins Firm has represented P&P in other class actions similar to this case. When P&P decides to pursue those actions, it normally retains the Robbins Firm to prosecute the case. Thus, defendants contend, "[t]he sheer number of cases arising from the relationship between P&P and the Robbins Firm supports a strong inference of a close relationship between them likely to undermine P&P's incentive to monitor the Robbins Firm."

Courts have routinely rejected attacks on the propriety of portfolio monitoring agreements such as the one between P&P and Robbins Geller. *See, e.g.*, *United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 655 (W.D. Okla. 2012) (concluding that the "Monitoring Agreement here does not adversely impact Lead Plaintiff's ability to adequately represent the class in this case, nor does it create a potential conflict of interest impairing its ability to do so"); *In re UTStarcom, Inc. Sec. Litig.*, No. C-04-04908 JW, 2010 U.S. Dist. LEXIS 48122, at *28 (N.D. Cal. May 12, 2010) (rejecting the contention that a "portfolio monitoring agreement renders a plaintiff inadequate to represent a class").[12]

---

[12] *See also Aerospace, & Agr.*, *supra*, 497 F.3d 615, 628 (6th Cir. 2007) ("courts customarily demand evidence of improper incentives for the class representatives or class counsel-such as a promise of excessive attorney fees in return for a low-cost, expedited

14

In addition, P&P was under no obligation to retain Robbins Geller to pursue claims it identified the monitoring agreement, which negates any argument that its interests directly align with P&P. Absent any real showing that Robbins would favor P&P, I reject this argument.[13] In fact, at least one court has recently held that such a monitoring agreement might favor adequacy of the counsel retained to monitor a fund, because the firm's ongoing relationship with the fund would depend on its performance in the litigation. *Local 703, I.B. of T. Grocery v. Regions Fin. Corp.*, No. CV 10-J-2847-S, 2012 U.S. Dist. LEXIS 82135, at *22 (N.D. Ala. 2012).[14]

I am convinced that plaintiffs, through counsel, have pursued, and fully intend to continue pursuing, this action consistent with the proposed class members' rights. *See Amchem Products*, *supra*, 521 U.S. at 625-626. Plaintiffs have thus far demonstrated that they can and will vigorously prosecute the class's interests. For instance, plaintiffs, with the help of Robbins Geller, have twice successfully appealed this court's orders granting defendants' motion to dismiss. Additionally, plaintiffs and Robbins Geller have participated in extensive discovery, including producing thousands of pages of documents and providing representatives to sit for depositions.

Plaintiffs have thus established Robbins Geller will adequately and fairly represent the rights of the proposed class. *See In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 310 (S.D.N.Y. 2010)

settlement-before abandoning the presumption that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands.").

   [13] *See*, *e.g.*, *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 49-50 (S.D.N.Y. 2012) (concluding that the fact that TRSL, a large fund, had been lead plaintiff in a number of cases prosecuted by lead counsel, a prominent plaintiffs' securities firm, was not in and of itself indicative of any improper relationship).

   [14] *See also Chesapeake Energy Corp.*, *supra*, 281 F.R.D. at 655 (citing *In re Am. Italian Pasta Co. Sec. Litig.*, 2007 WL 927745 (W.D. Mo. 2007)) ("At least one court has found the absence of a monitoring agreement might be seen as demonstrating a lack of diligent investment oversight.").

(adequacy prong satisfied when lead counsel had "been intimately involved in prosecuting [the] action from its beginning stages, including investigating the claims, filing an amended complaint, successfully defending a motion to dismiss [and] pursuing the current class action certification"). I note that Robbins Geller has substantial experience litigating similar class action claims, which favors finding the firm adequate to represent the proposed class. *See Beattie*, *supra*, 511 F.3d at 563. For these reasons, I find that Robbins Geller does not have a conflict of interest with the proposed class and has shown it will adequately represent the class. *See id*.

### d. The Amount Plaintiffs Seek to Recover in Relation to Attorney Fees

Defendants also claim that, because the amount plaintiffs seek to recover is far lower than the amount of potential attorneys' fees, plaintiffs will not have a strong incentive to pursue vigorously the interests of the absent class plaintiffs whom they represent. *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 96-97 (S.D.N.Y. 2010). Plaintiffs seek to recover about $33,000, which is relatively small in relation to potential attorneys' fees.

Defendants, however, have failed to demonstrate that the value of $33,000 to the investment plans is so nominal in relation to the amount of potential fees that it supports the inference that the proposed class representatives would abdicate their fiduciary duties to the class. Nor have they shown that this consideration might cause proposed class counsel to take control of the litigation from plaintiffs. To the contrary, plaintiffs filed declarations stating that the amount is substantial to their funds. They have also provided declarations stating that they understand that, if certified as class representatives, they will owe fiduciary duties to absent class members. They know this includes a duty to (perhaps most importantly) hire and monitor competent counsel, remain apprised of the case, and ensure all class members are treated fairly. In sum, defendants have failed to provide

16

any evidence showing plaintiffs will abdicate its fiduciary duties to the class, and their arguments amount to nothing more than mere speculation.

## 2. Typicality of Plaintiffs' Claims

Defendants argue that plaintiffs' claims are not typical of the proposed class for three reasons. First, defendants claim P&P did not rely on the integrity of the market because they purchased Dana securities in an attempt to replicate the Standard and Poors 500 index. Second, they state WVL did not rely on the integrity of the market because it purchased the stocks as part of a blend investment account comprising of a hybrid of investments in small and mid cap stocks (SMID). Finally, defendants argue that, regardless of whether plaintiffs' claims are typical of other purchasers of Dana stocks, they cannot represent purchasers of Dana bonds because they did not purchase the bonds themselves.

### a. P&P's Replication of an S&P 500 Index

Defendants argue that, because plaintiffs did not rely on the integrity of the market in purchasing common during the class period, their claims are not typical of those of absent class members within the meaning of Rule 23(a)(3).

In *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988), the Supreme Court discussed the presumption of reliance that plaintiffs' seek to use:[15]

> An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

---

[15] As discussed in §3, *infra*, plaintiffs must also show that Dana stocks and bonds traded in efficient markets to use the fraud-on-the-market theory and its presumption of reliance. *See Halliburton Co.*, *supra*, 131 S. Ct. at 2185 (quoting *Basic*, *supra*, 485 U.S. at 248 n. 27).

Thus, plaintiffs may rely on this fraud-on-the-market theory in showing that their claims are typical of the proposed class members' claims; *i.e.*, they all relied on the same misrepresentations. *See Basic*, *supra*, 485 U.S.at 247.

However, the Court in *Basic* also held defendants my rebut this presumption of reliance:

Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market
price, will be sufficient to rebut the presumption of reliance.

*Id.* at 248.

Defendants seek to show P&P did not rely on the fair market price of stocks it bought because it sought to replicate the S&P 500 index. Thus, defendants argue, plaintiffs would have purchased the stocks regardless of their price, and, in fact, would have purchased the stocks at any price.

Other courts have rejected similar arguments. In *Wilkof*, *supra*, 280 F.R.D. at 340, the court rejected the defendants' position that institutional investors had an inherent conflict of interest with individual investors. In that case, the plaintiffs sought to certify a class that included  institutional investors, such as the Vanguard Group and State Street Global Advisors. *Id*. The defendants argued that the "institutional investors do not rely on statements or press releases made by a company, but rather rely on "quantitative analyses of stocks" that include metrics such as a company's financial statements, the market price of stocks, a stock's inclusion in an index, a stock's growth, and other "statistical data.'" *Id*.

In rejecting the argument, the court stated that, "because index purchasers seek only to match the index and exclude other considerations . . . index purchasers rely *exclusively* upon the market to impound any representations (including misrepresentations) into securities' prices." *Wilkof*, *supra*,

18

280 F.R.D. at 340 (quoting *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 602 (C.D. Cal. 2009) (emphasis in original)). Therefore, despite the fact that a plaintiff relies on a sophisticated institution in making its investment decisions:

> 'this does not render [plaintiff] atypical with respect to this position as class representative because [it] may have relied unwittingly on the same misrepresentations that may also have induced other investors to buy the stock. If the defendant perpetrated a fraud on the market, then even the most sophisticated investor would be deceived.'

280 F.R.D. at 34 (quoting *Michaels v. Ambassador Grp., Inc.*, 110 F.R.D. 84, 89 (E.D.N.Y.1986) (internal citation omitted)).

> As the Ninth Circuit had earlier explained:

> A purchaser on the stock exchanges may be either unaware of a specific false representation, or may not directly rely on it; he may purchase because of a favorable price trend, price earnings ratio, or some other factor. Nevertheless, he relies generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price whether he is aware of it or not, the price he pays reflects material misrepresentations. Requiring direct proof from each purchaser that he relied on a particular representation when purchasing would defeat recovery by those whose reliance was indirect, despite the fact that the causational chain is broken only if the purchaser would have purchased the stock even had he known of the misrepresentation.

*Blackie v. Barrack*, 524 F.2d 891, 907 (9th Cir. 1975).

For these same reasons, I reject defendants' arguments that plaintiffs, as investors relying on institutional guidance in making their investments, did not rely on the integrity of the market. Defendants sought to match a predetermined index of securities. As other courts have recognized, a purchasing based strategy that attempts to replicate an index directly relies on the market. *See Countrywide*, *supra*, 273 F.R.D. at 602 ("[B]ecause index purchases seek only to match the index and exclude other considerations (such as, for example, reliance on nonpublic information or other idiosyncratic motivations), index purchases rely exclusively upon the market to impound any

19

representations (including misrepresentations) into securities' prices. This is close to perfect reliance on market price-setting").[16]

In sum, "index purchases pose no typicality concern[,]" and when institutional investors rely on a stock's inclusion in an index or try to replicate that index, they fundamentally rely on the assumption that the market provided reliable information in adjusting the price of the stock. *Countrywide*, *supra*, 273 F.R.D. at 602. Thus, this does not provide a basis to deny class certification.

### b. WVL's Use of an SMID

Defendants likewise argue that WVL's investment strategy shows it did not rely on an efficient market when it purchased Dana common stock. Alliance Bernstein, one of WVL's investment managers, purchased 14,600 shares of Dana common stock on WVL's behalf in November, 2004, using an SMID blend investment account comprising a hybrid of investments in small and mid cap stocks. Its investment strategy was based on "seek[ing] to exploit market inefficiencies" which, according to Alliance Bernstein, "exist because, contrary to the 'efficient market hypothesis,' the market is not a perfectly humming machine." Because it admittedly sought to exploit an inefficient market in purchasing Dana stock, defendants argue, WVL cannot now claim that market was efficient.

I reject these arguments for the same reasons discussed in §2(a). The fact that WVL may have believed, right or wrong, that it could exploit market inefficiencies does not establish whether the market was in fact efficient. In addition, WVL relied generally on the market price, and

---

[16] *See also In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 579 (N.D.Cal. 2009) (accord); *In re WorldCom*, 219 F.R.D. at 281–282 ("swiftly reject[ing]" a number of arguments, including the proposition that index purchases are atypical).

specifically on the assumption that the market price reflected only truthful information. Although plaintiff may have sought to exploit small "inefficiencies" in the market, this does not establish that those inefficiencies would lead to a factual determination in this case that the market as a whole, and with respect to the specific misstatements defendants allegedly made, was inefficient. However, defendants could presumably present such evidence at summary judgment, or to the trier of fact, in an attempt to negate a finding that the market was efficient. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-1287 (D.N.J. 1989)[17]; *see also Simpson v. Specialty Retail Concepts*, 823 F. Supp. 353, 355 (M.D.N.C. 1993) (the efficiency of the market is a question of fact; plaintiffs presented sufficient evidence to survive a motion for summary judgment on this issue).

### c. Plaintiffs' Representation of Bondholders

Defendants also argue plaintiffs only purchased Dana stock, and they cannot therefore represent purchasers of Dana bonds because plaintiffs' claims are not typical of those members of the proposed class.

Defendants cite two cases in support of their position that a stock purchaser may not represent a bond purchaser. *In re One Bancorp Sec. Litig.,* 136 F.R.D. 526, 531-532 (D. Maine 1991); *Cohen v. Uniroyal, Inc.,* 77 F.R.D. 685, 693 (E.D. Pa. 1977). In *Bancorp*, the court held, without analysis, that "[p]laintiffs have failed to establish that that the claims of the named

---

[17] Defendants do not argue that plaintiffs failed to show, under the *Cammer* factors, that the market for Dana stock was inefficient. In fact, defendants did not analyze the factors with respect to the efficiency of Dana's stock (compare section 4(b), *infra*). Rather, they merely rely on plaintiffs' statement that they did not rely on the efficiency of that market. In any event, a review of the *Cammer* factors shows that plaintiffs have sufficiently proven that the market was efficient. 711 F. Supp. at 1286-1287.

[p]laintiffs are typical of the claims of persons who traded in . . . securities other than common stock. 136 F.R.D. at 531-532.

In *Cohen*, the court also declined to certify a class including bond purchasers when the proposed lead plaintiff only purchased securities. *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685, 693 (E.D. Pa. 1977). The court stated that, "[i]n the instant case, the only representative plaintiff is holder of common stock. Given the complexity of the factual and legal issues and the length of the class period, this court is mindful that all factions of the class must be fully and adequately represented. Thus, purchasers of securities other than common stock will be excluded from the class." *Id.*

Plaintiffs argue that "[t]his argument, like the other arguments defendants raise, is routinely rejected as an attack on typicality." *See In re Enron Corp., Sec. Litig. ("Enron I")*, 206 F.R.D. 427, 445 (S.D. Tex. 2002).[18] In *Enron Corp.*, the court appointed stock purchasers lead plaintiffs with respect to bond purchasers. *Id*. The court did not, at that time, and as plaintiffs claim, appoint the stock purchasers as class representatives. *Id*. That case, in fact, cited several cases rejecting consolidation of all securities holders at the class-certification stage. *Id.* at 444.

I note, however, that "there is no requirement that the claims of all plaintiffs and class members must be identical." *Enron Corp.*, *surpa*, 206 F.R.D. at 445 (citing *In re Lucent Techs., Inc. Sec. Litig.*, 194 F.R.D. 137, 150 (D.N.J. 2000)). "Rule 23(a)(3) does not require the claims of the Proposed Lead Plaintiffs to be identical to those of the class." *Lucent Techs*, *supra*, 194 F.R.D. at 150. "Rather the typicality requirement is satisfied when the plaintiff's claim arises from the same

---

[18] I agree with plaintiffs that its representatives "admission" regarding whether a stockholder can adequately represent a bondholder cannot bind plaintiffs because the statement amounted to a conclusion of law, rather than an admission of fact.

event or course of conduct that gives rise to the claims of other members and is based on the same legal theory." *Enron Corp.*, *surpa*, 206 F.R.D. at 445.

At this stage, I see no apparent reason why Dana bond purchasers will present different factual allegations, legal issues, or legal theories of liability under Rule 10b-5. However, because I intend to conduct a hearing regarding the efficiency of the Dana bond market during the class period, I refrain from deciding this issue at this time. The parties may, therefore, present argument on this issue at the hearing.

### 3. Materiality

Defendants next argue that plaintiffs have failed to show that, when made, the alleged misrepresentations caused a material change in the total mix of information available to investors impacting the prices at which Dana securities traded. Thus, they contend, the fraud on the market theory, a prerequisite to invocation of a presumption of reliance, is inapplicable and questions of law or fact common to the class will not predominate over individual questions within the meaning of Rule 23(b)(3).

The materiality of an alleged misrepresentation is an essential predicate of the fraud on the market theory. *Basic*, 485 U.S. at 244. However, the Supreme Court has explained that, because the market price of a security in an efficient market will immediately incorporate any material, public misrepresentation, a purchaser who buys a security at the market price has presumptively relied on the misrepresentation:

> In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor,

23

informing him that given all the information available to it, the value of the stock is worth the market price.

*Basic*, *supra*, 485 U.S. at 244 (quoting *In re LTV Sec. Litig.*, 88 F.R.D. 134, 143 (N.D.Tex.1980)).

To invoke the fraud on the market theory and its rebuttable presumption of reliance at the class certification stage, plaintiffs must demonstrate they have met the factual predicates for the presumption. These include the efficiency of the market for the security, the public nature of alleged misrepresentations, and the purchase of the security "between the time the misrepresentations were made and the time the truth was revealed." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185 (2011) (quoting *Basic*, 485 U.S. at 248 n. 27).

However, the Court has also state that "[a]ny showing that severs the link between the misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, *supra*, 485 U.S. at 248. Thus, a buyer does not rely on the market if it ignored a misrepresentation because the truth was well-known to the market, or did not rely on the misrepresentation because it bought the security after the truth had already entered the market and dissipated the effects of the fraud. *Id.* at 248–249. If the defendant can establish these facts, the plaintiff did not rely on the market price, and "the basis for finding that the fraud had been transmitted through market price would be gone." *Id.* Likewise, if a defendant shows the plaintiff knew about the misrepresentation but purchased the security despite it, the plaintiff would not have relied on the integrity of the market price. *Id.* at 249.

Although these cases initially led to confusion regarding the extent to which a defendant could rebut materiality at the class certification stage. The Supreme Court recently clarified that, although the plaintiff must establish the other prerequisites to invoking the fraud-on-the-market presumption (purchase timing, publicity, and market efficiency) at class certification, the plaintiffs

24

need not establish materiality. *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, --- U.S. ----, 133 S.Ct.1184, 1198-1199 (2013). The Court held that, "[w]hile [a proposed class] certainly must prove materiality to prevail on the merits, we hold that such proof is not a prerequisite to class certification." *Id.* at 1191.

"The Court thus made clear that what is required for a plaintiff to 'invoke' the fraud-on-the-market presumption on the merits is not necessarily what is required for the plaintiff to benefit from the presumption at class certification." *Halliburton Co.*, *supra*, 2013 WL 1809760, at *5. "The Court determined that because materiality is established by evidence common to all plaintiffs, and because a failure to prove materiality will cause all plaintiffs' individual claims to fail, materiality evidence was not relevant at class certification." *Id.* (citing *Amgen*, 133 S.Ct. at 1197). I therefore reject defendants' argument that it has shown the statements were not material as irrelevant to the inquiry regarding whether the class should be certified.[19] I also decline defendants' invitation to consider, at this stage, and for the purpose of determining materiality, evidence of whether the alleged misrepresentations had an impact on the price the securities.

### 4. Predominance[20]

---

[19] There is no apparent reason to treat Dana stocks and bonds differently in this respect. Materiality is irrelevant to both inquiries.

[20] Before certifying a class, a court must find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The parties did not argue the issue of whether a class action is proper because it presents a superior method for adjudication of the claims.

After considering the Rule 23(b)(3) factors, I find that a class action represents the superior method of resolving this case. *See Bankcorp*, 136 F.R.D. at 533 ("This Court concurs with the numerous cases that have discussed the desirability and utility of the class action device in the context of federal securities law litigation.").

25

Defendants finally argue that the fraud on the market theory does not apply to the claims of absent class members who purchased Dana bonds because plaintiffs have failed to show that those bonds traded in an efficient market. Thus, they claim, they cannot rely on the fraud on the market presumption in representing class members who bought bonds, and individual questions regarding reliance will predominate.

As discussed in § 3, *supra*, plaintiffs must show that the market in which the Dana bonds traded was efficient. *See Erica P. John Fund*, 131 S. Ct. at 2185; *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 198 (6th Cir. 1990) ("The fraud on the market theory cannot be applied logically to securities that are not traded in efficient markets.").

Plaintiffs and defendants have filed contradicting expert opinions regarding whether Dana bonds traded in an efficient market. Defendants claim plaintiffs' expert, in concluding the market was efficient, relied on unsound economic principles and that her analysis was biased. Defendants' expert, citing other factors, contends that the market was not efficient. I must, therefore, decide whether plaintiffs have met their burden of proving, by a preponderance of the evidence, that Dana bonds traded in an efficient market. In doing so, I must evaluate the experts' evidence. On review, I conclude that I cannot do so without hearing from the experts firsthand.

I reserve judgment on the issue of the efficiency of the market *vis-a-vis* Dana bond so that I may conduct a hearing on this issue.

## Conclusion

For the foregoing reasons, plaintiffs' motion for class certification (Doc. 166) shall be, and the same hereby is, granted with respect to purchasers of Dana stock during the class period. I will

issue another order with a final class definition after resolution of the remaining issue regarding Dana bond purchasers.

The Clerk shall schedule a date for further hearing in accordance with this opinion.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge