IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF OHIO
WESTERN DIVISION

Plumbers & Pipefitters, etc., et al,            Case No. 3:05CV7393

     Plaintiffs

     v.                                **ORDER**

Michael J. Burns, et al.,

     Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Hawaii Ironworkers, etc., et al,            Case No. 3:10CV371

     Plaintiffs

     v.

Bernard N. Cole, et al., ,

     Defendant

        These are suits by pension funds that owned shares of Dana Corporation. The cases arose in the wake of Dana's bankruptcy, when Dana retroactively revised nearly many years of Dana's financial statements. Plaintiffs claim that malfeasance by the defendants, former Dana officials, caused Dana bankruptcy.

        Shortly after the collapse, the Dana Audit Committee retained the law firm Skadden Arps to investigate what happened and why. As part of that investigation, two Skadden Arps lawyers

interviewed William E. Hennessy, a defendant in the *Hawaii Ironworkers* suit. After the interviews, the attorneys prepared a memorandum of the interview for the Audit Committee.

Dana produced the memorandum during an ensuing SEC investigation. The memorandum likewise is part of the discovery in this case.

Plaintiffs deposed Hennessy. In several instances, he either denied making or qualified the statements attributed to him in the memorandum. This has led to plaintiffs' motion, now pending, to compel Skadden Arps to produce the notes the interviewers took during their interviews with Mr. Hennessy. (Doc. 238 in case no. 3:05CV7393 and Doc. 233 in case no. 3:10CV371).

Plaintiffs want the notes to confirm that Hennessy told the interviewers what their memorandum says he told them. At Dana's direction, Skadden Arps, arguing *inter alia*, attorney work product, has opposed the motion.

There were two interviewers. Only one interviewer's are, at this late date, available. Skadden Arps submitted a copy of the original handwritten notes along with a typewritten rendering for my *in camera* comparison with the memorandum statements.

In form, the notes are cryptic and use only a few words per line and a few lines, at most, per item. They contain nothing in quotation marks.

There is no way of knowing what, if anything, the author of the notes left out. There is also no way of knowing what the author of the unavailable notes wrote down. The long-gone notes might have included the things, even in quotes, that Hennessy denied saying. Or they may have shown he used phrasing that he now disavows.

The interviewers most likely were trying, it is fair to assume, to get it right. That their memorandum would have deliberately misstated what Hennessy told them seems unlikely. The

memorandum, moreover, was nearly contemporaneous with the events. On the other hand, the extant notes, which seem quite detailed, and reference other things that Hennessy does not dispute, raise the possibility of inaccuracies in the memorandum.

In any event, with only one set of notes available, it is impossible to credit or discredit Hennessy's disagreement with what the Skadden lawyers wrote. This makes the utility of the notes for impeachment or other purposes of dubious worth at best. Nonetheless, I have reviewed the typed notes, the Hennessy interview memorandum, and the portions of his deposition, as designated by plaintiffs, in which he disputed or denied making statements the memorandum attributes to him.

## Discussion

Plaintiffs' motion to compel raises interesting and difficult issues. I have concluded, though, that I need not adjudicate those issues to decide the motion.

In many instances in which Hennessy disputed statements the memorandum attributed to him the extant notes do not have underpinnings for those statements. In other instances, Hennessy acknowledged the gist of the memorandum's version, but complained that either the manner of speaking was not, or the words attributed to him were not, his.

Often, however, Hennessy would provide follow-on testimony about what he recalled telling the interviewers on the particular subject.

The fairest way to handle the problem that plaintiffs' motion and the attendant circumstances present is to preclude the parties from using refuted or disputed memorandum statements for which there is no underlying reference in the notes. Where Hennessy nonetheless acknowledged in his deposition having said something, albeit in a different way, about the subject, the parties may, of course, use his deposition testimony in ways that are otherwise permissible.

Likewise, Hennessy, where I am excluding reference to a refuted or disputed statement, shall not contend the memorandum does not reflect accurately what he said to the Skadden Arps lawyers.

I attach my rulings on the specific disputed passages to this Order.

It is, accordingly, hereby

ORDERED THAT:

1. Plaintiffs' motion to compel production of the original interview notes of the Skadden Arps interview of defendant Hennessy (Doc. 238 in case no. 3:05CV7393 and Doc. 233 in case no. 3:10CV371) be, and the same hereby is denied; and

2. Reference at trial to statements attributed to defendant Hennessy in Skadden Arps interview memorandum limited as provided herein.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

**Attachment**

1. Deposition pg. 16, line 23 - pg. 17, line 13:

   This appears to be Hennessy's generalized disclaimer that the memorandum was inaccurate or incorrect in several places. No ruling needed.[1]

2. Deposition pg. 34, line 21 - 24:

   Mr. Hennessy not to be asked re. not trusting Mr. Steimle.

3. Deposition pg. 35, line 6 - 10:

   Mr. Hennessy may not be asked re "he was not happy to learn the Steimle would be his controller."

4. Deposition pg. 36, line 9 - pg. 38, line 2:

   Mr. Hennessy may be asked re. statement in memorandum that Steimle was "a strong leader" (pg. 37, lines 14-16), as that term is in the notes.

5. Deposition pg. 40, line 23 - pg. 41, line 9:

   Mr. Hennessy not to be asked re. learning not to trust accuracy of information received from Steimle.

6. Deposition pg. 141, line 5 - pg. 142, line 16.

   Mr. Hennessy not to be asked re. "The 2005 Plan for CVS was impossible to achieved."

7. Deposition pg. 143, line 5 - pg. 144, line 2:

   Mr. Hennessy not to be asked re. "I don't know how anyone could have approved that Plan."

---

[1] I leave for later, if needed, a ruling on the extent, if at all, to which Hennessy can assert the memorandum "wasn't me" or cast things in different ways and terms than he would have.

5

8. Deposition pg. 145, line 20 - pg. 146, line 3:

   Mr. Hennessy not to be asked re. "Hennessy said he told Cole, Hodge and others at HVTS from the moment he arrived that the Plan was unworkable."

9. Deposition pg. 229, line 21 - pg. 23, line 3:

   Mr. Hennessey not to be asked re. "Hodge would not have personally done the Maxus deal because he was smarter than that."

10. Deposition pg. 263, line 8 - pg. 264, line 8:

    Hennessy may not be asked re. growing "convinced that Cole had lost faith in him. Based on what Dana was telling the street, Hennessey realized that the company was counting entirely or primarily on CVS to pull it out of its financial hole. ASG, whose principal customers were the Big Three, had plenty of problems with the steel inflation."

11. Deposition pg. 269, line 17 - pg. 270, line 22:

    Hennessey shall not be asked re. the statement beginning pg. 269, line 19 ("In the last one and a half years" and ending pg. 27, line 7 ("come back to haunt Dana in the future.").

12. Deposition pg. 275, line 3 - 25:

    Hennessey shall not be asked re. Burns being "hostile with him from the start."

13. Deposition 276, line 6 - 16:

    Hennessey shall not be asked re. Burns's "despite his calm and rational public demeanor."

14. pg. 276, line 24 - pg. 277, line 17:

    Hennessey shall not be asked re. "He said Miller, for all his objections to the Sypris deal, did not seek to scuttle the deal because he did not want to have to tell Burns that he was the one who blocked it.":

15. Deposition pg. 286, line 6 - 15:

    Hennessey shall not be asked re. "Hennessey said such contacts normally were signed without even being read."

16. Deposition pg. 287, line 1 - 16:

    Hennessey shall not be asked re. "Although that would constitute a FIT violation, it was a regular practice at Dana, he said."

17. Deposition pg. 288, line 6 - 12:

    Hennessey shall not dispute the overall accuracy of the memorandum.