# EXHIBIT C

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION (TOLEDO)

-----------------------------------
PLUMBERS & PIPEFITTERS NATIONAL
PENSION FUND; SEIU PENSION PLANS
MASTER TRUST; and WEST VIRGINIA
LABORERS PENSION TRUST FUND,
On Behalf of Themselves and
All Others Similarly Situated,

       Plaintiffs,

 vs.                  CIVIL ACTION
                     NO. 3:05-cv-07393-JGC
MICHAEL J. BURNS and ROBERT C.
RICHTER,

       Defendants.
-----------------------------------
HAWAII IRONWORKERS ANNUITY
TRUST FUND, on Behalf of Itself
and All Others Similarly Situated,

       Plaintiff,

vs.                  CIVIL ACTION
                     NO. 3:10-cv-00371-JGC
BERNARD N. COLE, WILLIAM E.
HENNESSY, DOUGLAS W. HODGE and
ROBERT E. STEIMLE,

       Defendants.
-----------------------------------

SUBJECT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF STEVEN P. FEINSTEIN, Ph.D.
Boston, Massachusetts
June 11, 2015
9:07 a.m.
Reported by:
MaryJo O'Connor, RMR/RPR/CSR
Job No: 39482

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

**Page 2**

Steven P. Feinstein

June 11, 2015

9:07 a.m.

Videotaped Deposition of Steven P. Feinstein, held at the Marriott Boston - Long Wharf, 296 State Street, Boston, Massachusetts 02109, pursuant to Notice, by agreement of counsel, before MaryJo O'Connor, RMR/RPR/CSR and Notary Public in and for the Commonwealth of Massachusetts.

**Page 4**

APPEARANCES, Continued

FOR THE DEFENDANTS MICHAEL J. BURNS and ROBERT C. RICHTER:

KATTEN MUCHIN ROSENMAN, LLP

575 Madison Avenue

New York, NY 10022-2585

212-940-7007

By: Arthur S. Linker, Esq.

arthur.linker@kattenlaw.com

Joel W. Sternman, Esq.

j.sternman@kattenlaw.com

FOR THE DEFENDANT ROBERT E. STEIMLE:

LEVINE & LEVINE

427 South Burdick Street

Kalamazoo, MI 49007

269-382-0444

By: Randall S. Levine, Esq.

rlevine@levine-levine.com

**Page 3**

APPEARANCES

FOR THE PLAINTIFFS:

ROBBINS GELLER RUDMAN & DOWD, LLP

655 West Broadway, Suite 1900

San Diego, California 92101

619-231-1058

By: Debra J. Wyman, Esq.

debraw@rgrdlaw.com

Laurie L. Largent, Esq.

llargent@rgrdlaw.com

FOR THE DEFENDANTS BERNARD N. COLE and DOUGLAS W. HODGE:

STONE, MCGUIRE & SIEGEL

801 Skokie Boulevard, Suite 200

Northbrook, Illinois 60062

312-543-6412

By: Michael L. Siegel, Esq.

michael.siegel@stonemcguire.com

Carlo E. Poli, Esq. (Via LiveDeposition)

carlo.poli@stonemcguire.com

**Page 5**

APPEARANCES, Continued

FOR THE DEFENDANT WILLIAM E. HENNESSY:

GREENFIELD, KILLAM & FRANK, LTD

3450 W. Central Avenue, Suite 370

Toledo, Ohio 43606

419-724-8211

By: Catherine H. Killam, Esq.

ckillam@gkflaw.com

ALSO PRESENT: Sean Budd, Videographer

2 (Pages 2 to 5)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

6

1           P R O C E E D I N G S
2           VIDEO TECHNICIAN: Okay. We are on
3    the record. This is the video operator speaking,
4    Shawn Budd. Today's date is June 11, 2015, and
5    the time is 9:09 a.m.. We are here in Boston,
6    Massachusetts, to take the video deposition of
7    Dr. Steven Feinstein in the matter of Plumbers and
8    Pipefitters National Pension Fund, et al, versus
9    Michael J. Burns and Robert C. Richter. Would
10   counsel please introduce themselves.
11          MR. LINKER: I am Arthur Linker of
12   Katten Muchin Rosenman, LLP. I represent
13   Defendants Michael Burns and Robert Richter in the
14   plumbers' case.
15          MR. STERNMAN: Joel W. Sternman of
16   Katten representing the same defendants as
17   Mr. Linker.
18          MR. SIEGEL: Mike Siegel in the Hawaii
19   Iron Workers versus Cole and Hodge case. I
20   represent Mr. Cole and Mr. Hodge. I want to make
21   certain that the caption of the case for the court
22   reporter and the videographer also includes the
23   Hawaii Iron Workers' case.
24          MR. LEVINE: Randall Levine appearing
25   on behalf of Bob Steimle in the Hawaii case.

7

1           MS. KILLAM: Catherine Killam on
2    behalf of the William Hennessy also in the Hawaii
3    case.
4           MS. LARGENT: Laurie Largent with
5    Robbins Geller Rudman & Dowd for the Plaintiffs.
6           MS. WYMAN: Deborah Wyman from Robbins
7    Geller for Plaintiffs in both cases as well as the
8    witness.
9           VIDEO TECHNICIAN: And would the court
10   reporter please swear in the witness.
11          STEVEN P. FEINSTEIN, Ph.D.,
12   having been satisfactorily identified by a
13   Massachusetts drivers license and duly sworn by
14   the Notary Public, was examined and testified as
15   follows:
16   EXAMINATION
17   BY MR. LINKER:
18       Q. Good morning, Professor Feinstein. We
19   were introduced off of the record prior to the
20   deposition, but I want to introduce myself
21   formally on the record. My name is Arthur Linker.
22   I represent Defendants Michael Burns and Robert
23   Richter in the plumbers' case.
24          Are you familiar with procedures at a
25   deposition generally?

8

1       A. Yes.
2       Q. You have had your deposition taken
3    previously in other matters; is that right?
4       A. Yes.
5       Q. Approximately how many times here
6    previously have you given a deposition?
7       A. I don't have an exact count.
8       Q. What's your best estimate or
9    approximate estimate?
10      A. I really don't think I can give a
11   precise estimate without thinking about it some
12   more or counting. But I can tell you in the
13   report that I submitted in this case, it lists the
14   deposition testimonies in the last four years. So
15   I can look at that and count that for you and
16   estimate based off of that.
17      Q. Well, just based on your recollection
18   without looking at any documents, can you tell us
19   just in ballpark terms approximately how many
20   times you've been deposed in a case?
21      A. Well, ballpark, with the caveat it
22   might be high, might be low, the estimate, but
23   maybe three dozen.
24      Q. Are you taking any medication or
25   experiencing any condition that would interfere

9

1    with your accurately and fully answering questions
2    today?
3       A. No.
4       Q. We will be taking periodic breaks
5    during the course of the deposition. If at any
6    time you need a break, please ask and we'll take a
7    break. Okay?
8       A. Certainly.
9       Q. You've been retained as an expert
10   witness by Plaintiffs' counsel in this case,
11   correct?
12      A. Yes.
13      Q. The report that you submitted in this
14   case references an entity called Crown Shield
15   (sic) Financial Research, Inc., correct?
16      A. Yes.
17      Q. What is Crown Shield (sic) Financial
18   Research, Inc.?
19      A. Crowninshield is a consulting firm
20   that I founded and the sole owner. It's
21   essentially the platform for my consulting work
22   that I do in addition to my academic employment.
23      Q. Has that entity done any work in
24   connection with your expert testimony in this
25   case?

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

10

1    A.   Yes.
2    Q.   What did it do?
3    A.   Well, all of my work is done through
4    Crowninshield.  So, for example, for my own
5    personal billing, I would submit my hours to
6    Crowninshield.  We have a staff person there who
7    consolidates the hours and constructs the invoices
8    and sends those invoices to the client.
9         So I do my invoicing and collections
10   through Crowninshield.  But Crowninshield also
11   employs financial analysts who assisted me on the
12   work in this case, initial analysts and other
13   support people.
14   Q.   And your opinions in this case relate
15   to the issues of loss causation and the
16   quantification of damages, correct?
17   A.   That's right.
18   Q.   Do you intend to offer any opinion on
19   any other issue in the case?
20   A.   Possibly.
21   Q.   Well, on what other issue or issues do
22   you possibly intend to offer expert testimony in
23   this case?
24   A.   Well, I have examined and analyzed the
25   work of Renè Stulz in this case.  So to the extent

11

1    that critique or assessment of his work extends
2    beyond specifically the scope of loss causation
3    and damages, I'd be prepared to do that if asked.
4    Q.   All right.  Other than to the extent
5    to which any critique of Professor Stulz's
6    testimony involves some issue other than loss
7    causation and the quantification of damages, is
8    there any other issue that you intend to offer
9    expert testimony on?
10   A.   Not that I'm aware of now.
11   Q.   You have issued a report dated August
12   4, 2014, and a rebuttal report dated November 19,
13   2014; is that correct?
14   A.   Well, I did issue two reports.  I
15   don't have the dates of submission memorized, but
16   I'll take your word for it.
17        MR. LINKER:  We're going to mark those
18   reports as exhibits so we can use them during this
19   examination.
20        Let's mark as Exhibit 677 a copy of
21   your report dated August 4, 2014.
22        (Document marked for
23   identification as Feinstein Exhibit 677.)
24        MR. LINKER:  Let's also mark as
25   Exhibit 678 a copy of your rebuttal report dated

12

1    November 19, 2014.
2         (Document marked for
3    identification as Feinstein Exhibit 678.)
4    A.   (Reviewing) Okay.
5    Q.   All right.  Would you please look at
6    Exhibit 677 and confirm that it appears to be a
7    copy of your report.
8    A.   (Reviewing) Yes, it does.
9    Q.   And would you please look at
10   Exhibit 678 and confirm that it appears to be a
11   copy of your rebuttal report.
12   A.   (Reviewing) Yes.
13   Q.   Have you done any work relating to
14   this case after you issued your rebuttal report
15   dated November 19, 2014?
16   A.   No.
17   Q.   At this time do you intend to
18   supplement your report or your rebuttal report in
19   any way?
20   A.   No.
21   Q.   Please turn to Page 4 of your report,
22   which is Exhibit 677.
23   A.   Okay.
24   Q.   Specifically to Paragraph 16 of your
25   report.  Now, is it correct that in Paragraph 16

13

1    of your report you state as follows:  "The alleged
2    misrepresentations, omissions and deceptive
3    conduct caused investors and analysts to
4    overestimate the Company's financial strength and
5    profitability over the course of the Class Period.
6    Event study analysis, which considered and
7    accounted for potentially confounding information,
8    proves that the alleged misrepresentations,
9    omissions and deceptive conduct consequently
10   caused the price of Dana stock to be artificially
11   inflated.  The corrective disclosures, which
12   corrected the market's understanding of the
13   Company's financial condition and profitability,
14   caused the inflation to dissipate, which in turn
15   caused the stock price and investor losses."
16        Have I read that correctly?
17   A.   You left out one word I believe.
18   Q.   Which is?
19   A.   "Drop."  "Which caused the stock price
20   drop and investor losses."
21   Q.   All right.  So let me reread the last
22   sentence then.  "The corrective disclosures, which
23   corrected the market's understanding of the
24   Company's financial condition and profitability,
25   caused the inflation to dissipate, which in turn

4  (Pages 10 to 13)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

14

1    caused the stock price drop and investor losses";
2    is that correct?
3        A.   Yes.
4        Q.   Okay.  Which alleged deceptive conduct
5    are you referring to in this paragraph?
6        A.   Well, it's spelled out in the
7    complaint.  It's also paraphrased or summarized in
8    my report, but it has to do with the accounting
9    irregularities, the omission of material
10   information that allegedly should have been
11   provided to investors in the marketplace but
12   wasn't, and making false and misleading statements
13   allegedly.
14       Q.   The deceptive conduct as you've
15   described it, did that involve anything other than
16   or in addition to the alleged misrepresentations
17   and omissions?
18           MS. WYMAN:  Object to form.
19       A.   My understanding from the complaint is
20   it did; that the -- it's the deceptive conduct
21   which essentially constituted the accounting
22   irregularities.  For example, as it's explained in
23   the complaint, false or fictitious invoices being
24   issued.  Those sorts of things are conduct that
25   engendered the issuance of inaccurate financial

15

1    statements.
2        Q.   And as you describe it, that's
3    different from misrepresentations made to public
4    investors or omissions to provide public investors
5    with that information?
6            MS. WYMAN:  Object to the extent that
7    it calls for a legal conclusion.  The witness is
8    not a lawyer.
9        A.   Well, I mean I did not have to make
10   that distinction for my work, because essentially
11   what I analyzed was the omission from having
12   informed the marketplace that there had been
13   deceptive -- alleged deceptive conduct that caused
14   there to be false and misleading financial
15   statements.
16       Q.   So in the first sentence of
17   Paragraph 16 of your report when you refer to "The
18   alleged misrepresentations, omissions and
19   deceptive conduct that caused investors and
20   analysts to overestimate the Company's financial
21   strength and profitability over the course of the
22   Class Period," are you saying that your report
23   only deals with deceptive conduct to the extent
24   that the public was not told about the deceptive
25   conduct?

16

1        A.   Or the ramifications of it.  Or the
2    ramifications and implications of it.
3        Q.   So it was the omission to disclose the
4    deceptive conduct that you say caused investors
5    and analysts to overestimate the company's
6    financial strength and profitability; is that
7    right?
8        A.   In part.  But also in part was the
9    affirmative statements made that were related to
10   having engaged allegedly in deceptive conduct; for
11   example, the financial statements.  But I didn't
12   need for my work to break out inflation or damages
13   among these three areas, because these are not
14   really three distinct areas, as you actually
15   articulated; that the deceptive conduct, as it
16   related to investors, the way it affected
17   investors, is it caused misrepresentations and
18   omissions.
19           So it's the misrepresentations and
20   omissions, essentially, that I analyzed.
21       Q.   So your report, then, is it fair to
22   state is based on the misrepresentations and
23   omissions and not on specifically deceptive
24   conduct that was internal to Dana that the market
25   did not know about?

17

1            MS. WYMAN:  Object to the extent that
2    it misrepresents his report and his testimony.
3            MR. LINKER:  It's a question.
4        A.   Could I hear the question again,
5    please.
6            MR. LINKER:  Reread the question.
7            (Record read as requested.)
8        A.   Well, I don't think it's possible to
9    separate the misrepresentations and omissions from
10   the deceptive conduct that were -- that either
11   caused the misrepresentations and omissions or
12   related to what was misrepresented and omitted.
13   So I see them all as one.
14       Q.   Would you agree that the market was
15   affected only by misrepresentations and omissions
16   and not by internal conduct of which it had no
17   knowledge?
18       A.   It's almost a philosophical question
19   rather than legal or economics.
20           The market can certainly be affected
21   by behavior they don't know about, and then later
22   we learn how they were affected when they do learn
23   about it.
24           So I think to the extent that the
25   market learned about the deceptive conduct which

5  (Pages 14 to 17)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

18

1  fed into the misrepresentations and omissions,
2  that likely reasonably impacted the quantity of
3  reputation effect on the stock price when the
4  market did ultimately learn about the full truth.
5      MR. SIEGEL:  Can I have that question
6  and answer read back, please.
7      (Record read as requested.)
8      Q.  Professor Feinstein, are you offering
9  any opinion on whether the alleged
10 misrepresentations or omissions were in fact made?
11     A.  Well, the opinion that I can offer is
12 that I did accept as an assumption that Plaintiffs
13 will prove their allegations.  I calculated what
14 damages were on the assumption that they will be
15 able to prove their allegations.
16     So, essentially, I accepted the
17 allegations as an assumption.  And also I --
18 however, I inquired as to how and for what
19 evidence there was that this was a reasonable
20 assumption to make.  And so I did conduct some
21 analysis on the reasonableness of that assumption.
22 And I can offer an opinion that when one looks at
23 the evidence to determine whether or not that's a
24 reasonable assumption to make, the evidence
25 compels a conclusion that it is.

19

1      But I'm not offering an opinion
2  specifically that the allegations are true or that
3  the misrepresentations and omissions were in fact
4  misrepresentations and omissions.  I accepted
5  those as an assumption and did some analysis to
6  determine that it was a reasonable assumption.  So
7  it's not exactly a yes-or-no question.
8      Q.  Well, do you intend in this case to
9  offer an opinion that the assumption that the
10 alleged misrepresentations or omissions were in
11 fact made is a reasonable assumption?
12     MS. WYMAN:  Object to form.
13     A.  If asked.  If asked, I'll -- that's
14 part of the whole truth that I'm sworn to tell.  I
15 will say that I did conduct an assessment of how
16 reasonable an assumption that is and concluded
17 that it was a reasonable assumption.
18     Q.  Is that an opinion you intend to offer
19 in this case?
20     A.  If I'm asked the question directly,
21 I'll answer it directly.
22     Q.  Do you assume that the alleged
23 misrepresentations and omissions were made by
24 Defendants Michael Burns and/or Robert Richter?
25     THE WITNESS:  Sorry.  Can I hear that

20

1  again?
2      (Record read as requested.)
3      A.  I am assuming that the
4  misrepresentations and omissions that Plaintiffs
5  have alleged those Defendants made, I've made the
6  assumption that those allegations are true.
7      Q.  Are you offering any opinion on
8  whether Mr. Burns or Mr. Richter made the alleged
9  misrepresentations or omissions?
10     A.  Same answer as previously.  It's
11 not -- it wasn't the center of the analysis and
12 work I did.  But peripheral to that work, it was I
13 thought a prudent thing to do to do some
14 investigation to assess how reasonable an
15 assumption that is.
16     Q.  Do you intend to offer an opinion that
17 that assumption is a reasonable assumption?
18     A.  If asked, I'll answer by telling
19 whoever asks exactly what I did and what I
20 concluded from what I did.
21     Q.  Do you assume that Mr. Burns and
22 Mr. Richter violated the federal securities laws
23 in making the alleged misrepresentations and
24 omissions?
25     MS. WYMAN:  Object to form to the

21

1  extent that it calls for a legal conclusion.  The
2  witness is not a lawyer.
3      A.  And the answer is no.
4      Q.  Are you offering any opinion on
5  whether Mr. Burns or Mr. Richter is liable for any
6  damages?
7      MS. WYMAN:  Objection to the extent it
8  calls for a legal conclusion.
9      A.  I understand that the word "liable"
10 has a very specific legal definition.  So the
11 answer is no.
12     Q.  Now, going back to Paragraph 16 of
13 your report, it's Exhibit 677, you state that,
14 quote, "The alleged misrepresentations, omissions
15 and deceptive conduct consequently caused the
16 price of Dana stock to be artificially inflated,"
17 close quote.  Is that correct?
18     A.  Yes.
19     Q.  Did you perform any analysis regarding
20 whether the price of Dana stock was caused to be
21 artificially inflated by any one specific alleged
22 misrepresentation, omission or deceptive act as
23 distinguished from all of the alleged
24 misrepresentations, omissions and deceptive
25 conduct considered collectively and in the

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

22

1    aggregate?
2         MS. WYMAN:  Object to form.
3         A.   Yes.
4         Q.   Does either your report or your
5    rebuttal report set forth any opinion on whether
6    any specific, one or more but not all, of the
7    alleged misrepresentations, omissions and
8    deceptive acts caused the price of Dana stock to
9    be artificially inflated?
10        MS. WYMAN:  Object to form.
11        A.   It does.
12        Q.   Could you look at Exhibit 677 and
13   Exhibit 678 and point out where you set forth such
14   an opinion?
15        A.   Okay.  This would be in Paragraphs
16   142, 143 and 144 I associate and attribute
17   specific dollar amounts to the ultimately restated
18   financials.
19        The ultimately restated financials are
20   alleged to be false and misleading.  I attributed
21   specific dollar amounts to each of them.  Those
22   dollar amounts being the specific part of the
23   inflation caused by reputation effect caused by
24   those specific individual misleading -- allegedly
25   false and misleading financials.

23

1         So, for example, the inflation that
2    entered when the Q1 2004 financials were issued,
3    the inflation of 62 cents per share, as spelled
4    out in Paragraph 144, stems from the reporting of
5    Q1 2004 results on April 21, 2004, rather than the
6    alleged false and misleading Q2 2004 financials or
7    Q3 2004 financials and so on.
8         So there is a disaggregation of that
9    type.
10        Q.   Are there any other places in your
11   report or your rebuttal report where you set forth
12   an opinion on whether any specific one or more but
13   not all of the alleged misrepresentations,
14   omissions and deceptive acts caused the price of
15   Dana stock to be artificially inflated?
16        A.   Well, yes, there is disaggregation
17   throughout.  I attribute the inflation that was
18   observed to be leaving the stock price on October
19   10, 2004, not to the Q2 2005 financials, for
20   example, but to the earlier five quarters
21   financials and the new information about the
22   deferred tax asset, and revoked guidance and the
23   statement about material weaknesses, for example.
24        So, you know, there is that
25   disaggregation there attributing observed

24

1    inflation to some, but not all, of the alleged
2    misstatements and omissions and false and
3    misleading statements.
4         MS. WYMAN:  Just a clarification, I
5    think he may have misspoke on that year in his
6    answer.
7         A.   2005.  I'm sorry.  October 10, 2005.
8         Q.   Now, when you say there is
9    disaggregation throughout your report, is there
10   any specific disaggregation that you have not
11   already described in your testimony today?
12        A.   Well, I separate out the economic
13   effect from the reputation effect for the
14   October -- for the inflation observed to dissipate
15   on October 10, 2005.
16        For the reputation effect that was
17   observed to leave the stock price on that date, I
18   separate out when that reputation effect entered
19   the stock price attributing it specifically to
20   specific financials that were alleged to be false
21   and misleading.
22        And then because of the nature of the
23   disclosures, it was fairly straightforward to
24   separate out - as I did mention already - the
25   Q2 2005 allegedly false and misleading financials,

25

1    the effect of those from the other five quarters
2    that are at issue in this case.  That's the sort
3    of disaggregation I did, and I can't think of any
4    additional disaggregation as I sit here now.  But
5    maybe later as I answer more questions, something
6    will come to mind.
7         Q.   Are you saying that in your report you
8    disaggregated the stock price impact of the new
9    information about the deferred tax asset from
10   impact of the revoked guidance from impact about
11   the -- from impact of the statement about material
12   weakness?
13        MS. WYMAN:  Object to form.
14        A.   I did not separate out the economic
15   impact of each of those items, but I did separate
16   out the economic impact of those items
17   collectively from the reputation impact of those
18   items collectively.
19        Q.   Now, Paragraph 16 of your report also
20   states, quote "The alleged misrepresentations,
21   omissions and deceptive conduct caused investors
22   and analysts to overestimate the Company's
23   financial strength and profitability over the
24   course of the Class Period," correct?
25        A.   Yes.

7  (Pages 22 to 25)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

26

1      Q.   Did you determine what estimates of
2  the company's strength and profitability were made
3  by investors or analysts during the class period?
4           MS. WYMAN: Object to form.
5      A.   Yes. I certainly did review those and
6  consider those and rely upon those as articulated
7  in my report.
8      Q.   Let me repeat my question.
9           Did you determine what estimates of
10 the company's strength and profitability were made
11 by investors or analysts during the class period?
12     A.   I read what they said was their
13 assessment of the strengths and profitability of
14 the company.
15          So I determined what they believed it
16 to be based on what they said they believed it to
17 be. "It" being the strength and profitability of
18 the company.
19     Q.   When you say you determined it, you
20 mean you gained an understanding yourself through
21 reading this information; is that right?
22     A.   Yes.
23     Q.   Did you formulate or synthesize so
24 that you're able to state and describe what those
25 estimates were?

27

1           MS. WYMAN: Object to the form.
2      A.   I don't understand the distinction
3  you're making.
4      Q.   Let me ask you another question. In
5  what manner were estimates of the company's
6  strength and profitability expressed by investors
7  or analysts during the class period?
8      A.   They had numerous manners. They had
9  ratings of the company in their -- the equity
10 analyst did in their equity analyst reports. The
11 had valuation models. There is the output from
12 the valuation model which is usually a value that
13 incorporates outlook and forecast and assessment
14 of strength and profitabilities and financial
15 condition. But there is also the arguments that
16 any of these analyst reports noted, provided. The
17 arguments that go into the valuation models. So I
18 was able to see what sort of outlooks and
19 assessments the analysts had made.
20          And there is the narrative. The
21 analyst reports will almost always have a
22 narrative that in words expresses the analyst's
23 opinion.
24     Q.   What time period or time periods did
25 those estimates of the company's strength and

28

1  profitability relate?
2      A.   I paid most particular attention to
3  the class period. But, of course, there were
4  analyst reports before the class period and
5  afterwards.
6      Q.   Let me clarify my question.
7           We're talking about estimates by
8  investors and analysts of the company's financial
9  strength and profitability, correct?
10     A.   Yes.
11     Q.   Okay. Those estimates pertained to a
12 certain time period or certain time periods,
13 correct?
14     A.   Various time periods.
15     Q.   So we're not talking about the time
16 period when the estimates were made. We're
17 talking about the time periods that were the
18 subject of the estimates. Do you understand that?
19     A.   Yes.
20     Q.   Okay. So what time period or time
21 periods were the subject of the estimate?
22     A.   And the answer remains; various time
23 periods. Generally -- generally, I mean if we
24 look at a specific analyst report or one of the
25 many that I read which are listed in my report in

29

1  Exhibit 1, you'll see that they generally talk
2  about the present and they talk about the future.
3  Actually, sometimes in this case they would also
4  talk about the change from the past.
5           So I'd have to hold to my answer,
6  which is various time periods.
7      Q.   Do you intend to testify about the
8  estimates that investors and analysts made
9  regarding the company's financial strength and
10 profitability relating to those time periods?
11     A.   One of the elements of my loss
12 causation analysis is to review analyst commentary
13 and identify whether or not -- determine whether
14 or not the analysts considered the information
15 that are the subject of the alleged
16 misrepresentations and omissions to be important
17 information. And I did that here and I actually
18 included some excerpts from analyst reports in my
19 report that confirms that profitability in the
20 financial condition of the company were considered
21 to be very important information to analysts and
22 investors.
23     Q.   We're going to get to that.
24     A.   So, yes, the --
25          MS. WYMAN: Please let him finish his

8 (Pages 26 to 29)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

30

1  answer.
2      A.   The answer is, yes, if asked, I will
3  express exactly the opinion I -- well, exactly the
4  opinion I just expressed just now and perhaps
5  elaborate upon it.
6      Q.   So you've told us that you've read
7  these reports and are prepared to answer questions
8  if asked regarding what the reports show as to
9  what was considered to be important by the authors
10  of the reports; is that right?
11      MS. WYMAN:  Object to form.
12      A.   Well, the way I used that analysis was
13  to show that there is abundant evidence that
14  compels a conclusion that analysts and investors
15  considered this information important.
16          And just so that we're not talking
17  hypothetically or in vague terms, I would just
18  want to cite to Page 36 and subsequent pages.  In
19  Paragraph 91 in particular where I give but one
20  example.  Page 91 -- Page 36 has but one example
21  and Page 37 and 38 have numerous others.
22          Following my conclusion expressed in
23  Paragraph 91, "Analysts deemed information about
24  the Company's earnings and profitability
25  important, as is evident in their commentary and

31

1  valuation models."
2          And the first example I give is a
3  quote from Lehman Brothers' analysts who said,
4  "'We remain excited about Dana's longer-term
5  earnings power.'"  And I'll stop right there
6  because that proves the point.  And it goes on, of
7  course, the quote and the analyst report.
8          So, yes, I will -- I have done
9  analysis that is the basis of a conclusion about
10  how analysts and investors considered important
11  information about profitability and specifically
12  what they determined about profitability.
13      Q.   Now, where in your report do you set
14  forth your opinions about what analysts and
15  investors determined about profitability?
16      A.   Among other places, what I just drew
17  your attention to.
18      Q.   Paragraph 91?
19      A.   Paragraph 91, Page 36 which extends to
20  Page 37 and 38, there is some introductory
21  explanation of how I analyzed that in earlier
22  paragraphs and there is some summary of the
23  conclusions both at the beginning and at the end
24  of the report.
25      Q.   So Paragraph 91 presents your opinion

32

1  concerning in a quantitative way what analysts and
2  investors determined about the company's
3  profitability; is that right?
4      A.   I didn't say in a quantitative way.
5      Q.   Going back to Paragraph 16 of your
6  report, you say that "The alleged
7  misrepresentations, omissions and deceptive
8  conduct caused investors and analysts to
9  overestimate the Company's financial strength and
10  profitability."
11      A.   Yes.
12      Q.   So are any of the investors and
13  analysts' estimates of the company's financial
14  strength and profitability set forth in
15  quantitative form in your report?
16      A.   Well, if we include the company itself
17  as an analyst of its own performance, of course.
18  And they've made guidance, and I relate what
19  company guidance was and how it changed.
20          But specifically if you asked about
21  quantitative --
22      Q.   I'm asking about investors and
23  analysts.  Not the company.
24      A.   Well, before I even look for the
25  specifics of where they cite their outlooks and

33

1  valuations, I do want to say that I accepted the
2  Court's determination and the determination of
3  prior experts working on this case that Dana stock
4  traded in an efficient market.  And because it
5  trades in an efficient market, or traded in an
6  efficient market, it would rapidly incorporate all
7  available information available about the company
8  and its profitability and so on.  And so I was
9  able to make some assessments about what the
10  market had determined by looking at the stock
11  price movements.  So I was able to see
12  specifically quantitatively when the company made
13  disclosures that earnings and profitability were
14  not what they had previously been represented to
15  be.  I was able to observe the stock price
16  falling, which is a clear indication that
17  quantification of market participants' outlook had
18  for profitability had been diminished.
19          So I don't want to say anything that
20  would exclude or rule out or cause one to overlook
21  that analysis that I did; that the price -- in an
22  efficient market, the price captures the market's
23  outlook, and so we can use the price movements to
24  assess the market's outlook.  And that's in the
25  report in very quantitative terms; dollars and

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

34

1    cents.
2            But beyond that, interpreting your
3    question more narrowly, yes, the quotes I give do
4    have quantified outlooks.  For example, on Page
5    16.  This is just one of many that I provided.
6    Second quote from the top, Prudential Equity.  I
7    could just have easily have cited the
8    Lehman Brothers one next, but we already talked
9    about Lehman Brothers.  So here is a different
10   one, Prudential Equity.
11           Skipping to the middle of that quote,
12   they say -- they said on October 12, 2004, "'Our
13   forecast used a conservative contribution margin
14   on incremental revenue of 30 percent (the low-end
15   of management's 30 to 35 percent stated range).'"
16           So these are very specific
17   quantitative statements about their assessment of
18   profitability and financial strength.
19           Before I say I'm finished -- well, I
20   think that's enough.  I could say the same thing
21   about numerous other parts in the report.
22       Q.   So you've referred to excerpts from
23   analyst reports that you've quoted in Paragraphs
24   48 and 91 of your report, right?
25       A.   And, as I mentioned, there are others.

35

1    I mean, it's just an undeniable fact that analysts
2    considered information about the profitability of
3    the company to be extremely important information
4    and they reported with specificity in a
5    quantitative fashion what their views were.
6        Q.   And according to Paragraph 16 of your
7    report, those were overestimates; is that right?
8        A.   What I determined is that as a result
9    of the alleged misstatements and omissions, they
10   overestimated the financial strength of the
11   company during the class period.
12       Q.   But your opinion is that they
13   overestimated the financial strength of the
14   company during the class period, correct?
15       A.   Specifically because of the alleged
16   misrepresentations and omissions.
17       Q.   All right.  So what you've just
18   described is your opinion about the cause of the
19   overestimation, correct?
20       A.   I've expressed an opinion about the
21   impact of the alleged misrepresentations and
22   omissions.
23       Q.   But I just want the record to be
24   clear.  It's your opinion, and you intend to offer
25   that opinion, that investors and analysts

36

1    overestimated the company's financial strength and
2    profitability over the course of the class period,
3    correct?
4        A.   Yes.
5        Q.   And you've referred to Paragraph 48
6    and Paragraph 91 of your report and the excerpts
7    that you quote as examples of that, correct?
8        A.   No.  When I was quoting from the
9    excerpts presented in my report, it was examples
10   of -- I was answering your question about whether
11   or not analysts expressed opinions that were
12   quantified.  And I said, yes, and here are some
13   examples of that.
14           And then I also explained that my
15   conclusion that analysts had overestimated the
16   financial strength and profitability of the
17   company on account of the alleged
18   misrepresentations and omissions was based on a
19   lot of analysis that included reading of these
20   analyst reports, but also included the event study
21   and analysis of the price movements of the stock.
22       Q.   Now, referring specifically to the
23   quantified estimates by analysts in the reports
24   that you referred to, including the ones you
25   specifically quoted in Paragraphs 48 and 91 of

37

1    your report, did you make any determination
2    regarding by what amount any of those specific
3    estimates were overestimates?
4        MS. WYMAN:  Object to form.
5        A.   The work I did was related to that.  I
6    mean that's not the avenue I went down.  It wasn't
7    necessary.  What I did was establish that they
8    considered profitability to be important.  Made
9    the connection that in an efficient market
10   statements about profitability and financial
11   condition and everything related to it would,
12   therefore, be important and would impact the stock
13   price.  And then I did analysis on the stock price
14   itself, the movements when corrective disclosures
15   were made.
16           So that's how I did the quantitative
17   work.  I didn't -- it wasn't necessary, if I'm
18   interpreting your question correctly, to track the
19   stated -- to track the quantified outlook metrics
20   that analysts presented.
21       Q.   And you didn't do that, correct?
22       A.   I don't have a table that shows before
23   and after.  I did look and -- I did look to see
24   how analyst reports and what they said in the
25   reports changed from before the corrective

10  (Pages 34 to 37)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

38

1  disclosures to after, but I didn't prepare -- I
2  didn't feel it was necessary to prepare a table
3  that showed a change in forecasts.
4      Q.   In Paragraph 16 of your report, you
5  assert that certain estimates made by analysts
6  were overestimates, correct?
7          MS. WYMAN:  Object to form.
8      A.   You're saying Paragraph 16?
9      Q.   Yes.
10     A.   They overestimated the company's
11 financial strength and profitability, yes, I say
12 that.
13     Q.   So they made estimates and those
14 estimates were overestimates; is that what you're
15 saying?
16     A.   I didn't -- I did the analysis the way
17 I just described that I did it.  I didn't
18 measure -- it wasn't necessary to measure how
19 precise the expressed profitability metrics
20 forecasted by analysts were or were not.
21     I'm able to conclude based on the work
22 I did do that they had overestimated the financial
23 strength and profitability over the course of the
24 class period specifically on account of the
25 alleged misrepresentations and omissions; and that

39

1  they reassessed, more correctly, the financial
2  strength and profitability after the corrective
3  disclosures?
4      Q.   So is it correct that you didn't look
5  at their individual specific estimates and for
6  each one of those study what that estimate was
7  an accurate estimate or an overestimate and reach
8  a conclusion about whether it was an overestimate;
9  is that right?
10         MS. WYMAN:  Objection.  Asked and
11 answered many, many times.
12     A.   It wasn't necessary to do the analysis
13 that way because I was able to observe how market
14 participants changing assessments caused the stock
15 price to change.  And the link between their
16 assessments and the information in the stock price
17 is market efficiency.
18     Q.   So when you say "It wasn't necessary,"
19 are you by that statement telling us that you
20 didn't do it?
21         MS. WYMAN:  Object to form.  Asked and
22 answered.
23     A.   I can't even say that.  I did read the
24 analyst reports and there was a marked -- there
25 was a marked difference between their views of the

40

1  company before the corrective disclosures and
2  their views of the company after.
3      So I'm aware of that, and I considered
4  that in reaching my conclusions.  And I reported
5  on that profitability was important to analysts on
6  there for material information.
7      Q.   For example, and this is one that you
8  referred to in a previous answer.  In Paragraph 48
9  of your report on Page 16 where you quote from a
10 report by Prudential Equity Group dated 12 October
11 2004, I believe that you read from that excerpt.
12 Quote, "'Our forecast used a conservative
13 contribution margin on incremental revenue of 30
14 percent (the low-end of management's 30 percent to
15 35 percent stated range).'"
16     Do you see that?
17     A.   Yes.
18     Q.   So it's correct that you didn't as
19 part of your work perform an analysis and make a
20 conclusion about whether that estimate was a
21 correct estimate or an overestimate?
22         MS. WYMAN:  Objection.  Asked and
23 answered.  Arthur, he has answered your question
24 many, many times in all your iterations that
25 you've asked it.  You need to move on.

41

1      MR. LINKER:  Well, I think that that's
2  your opinion and you're giving a speech, and
3  that's improper.
4      MS. WYMAN:  Well, I think that you're
5  asking the same question a million times in hopes
6  that you get a different answer, and it's not
7  going to happen.  So we should move on.
8      MR. LINKER:  Well, I think he's tried
9  as hard as he can not to specifically answer the
10 specific question and that's why I'm trying to get
11 the answer.
12     Please reread --
13     MS. WYMAN:  He's given you his basis.
14 He's given you his answer.  And we need to move
15 on.
16     MR. LINKER:  I ask the reporter to
17 read the pending question so that the witness can
18 hear it and answer it.
19     (Record read as requested.)
20     MS. WYMAN:  Same objections.
21     A.   Well, I tell you, I don't want to say
22 that I did no work to assess that this analyst
23 made correct or incorrect -- made correct or
24 incorrect estimates.  I don't want to say that,
25 because I did a lot of work that concluded -- that

11 (Pages 38 to 41)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

42

1  compelled a conclusion that the analysts and
2  investors in general were misled and had
3  overestimated profitability before the corrective
4  disclosures and had revised their estimates of
5  value and profitability after the disclosures.
6  So if I were to say I did nothing to
7  assess whether this analyst was right or wrong,
8  someone could improperly take that statement by me
9  out of context and say, well, then you're really
10 saying that all of your quantitative work in your
11 event study is irrelevant because you weren't able
12 to form any opinion about whether analysts were
13 right or wrong about their estimates prior to the
14 corrective disclosures.
15 So that's why I don't want to say, you
16 know, I did no work to assess whether this analyst
17 was right or wrong.  It just wouldn't be true.  I
18 did work to assess that this analyst, among all
19 the other analysts, collectively in the
20 marketplace were wrong about their forecasts and
21 assessments of profitability going forward and
22 they were specifically wrong because of, perhaps
23 among other things, but specifically because of
24 the alleged misstatements and misrepresentations.
25 I wasn't trying to be evasive in any

43

1  way.  I was just trying to make sure that what I
2  do say is not taken out of context.  I mean that
3  all the analysis I did do to draw my conclusion, I
4  just want to make sure that it's clear that that's
5  relevant to the question you're asking, and I
6  can't rule it out that I did it.  I can't rule it
7  out or say in any way that it was not relevant I
8  think is the point I'm trying to make.
9  MR. SIEGEL:  Arthur, when it's
10 convenient, I'm wondering if you might consider
11 having a five-minute break?
12 MR. LINKER:  Why don't we have a
13 five-minute break.
14 VIDEO TECHNICIAN:  The time is 10:04.
15 We're off the record.
16 (Proceedings recessed at 10:04 a.m.,
17 and reconvened at 10:19 a.m.)
18 VIDEO TECHNICIAN:  Okay.  We are back
19 on the record.  The time is 10:19.
20 BY MR. LINKER:
21 Q.  Now, Professor Feinstein, Paragraph 16
22 of your report refers to an "Event study analysis,
23 which considered and accounted for potentially
24 confounding information," correct?
25 A.  Yes.

44

1  Q.  Is there any distinction between "an
2  event study analysis," as used in your report, and
3  the term "an event study" as that term is used in
4  the financial economics literature?
5  A.  I don't believe so.
6  Q.  Did you perform any analysis other
7  than and in addition to your event study to
8  consider or to account for potentially confounding
9  information?
10 A.  Yes.
11 Q.  And what did you do?
12 A.  I did a news analysis.  I looked very
13 carefully at the information that was coming out
14 on the disclosure dates.  Compared that
15 information to what information came out
16 previously to the marketplace.  And, you know,
17 where there was some question that maybe a piece
18 of information might be confounding information,
19 meaning material information unrelated to the
20 allegations in this case, I performed additional
21 analysis to get at the heart of what that news was
22 and whether it may or may not have caused a stock
23 price reaction.
24 Q.  Where in your report do you describe
25 the news analysis?

45

1  A.  In, again, numerous places.
2  Paragraph 2 I analyze a wide variety
3  of information and documents including Dana press
4  releases, conference call transcripts, equity
5  analyst reports, news articles, SEC filings,
6  company documents obtained through discovery, and
7  so on.
8  But then, specifically, I describe how
9  I applied it - to the question you asked - in the
10 body of the report.  Let me find that for you.
11 Paragraphs 121 through 124 describes
12 how I understood that Delphi -- Delphi's
13 bankruptcy, which was announced on Saturday,
14 October 8th, could not have been what made the
15 stock price move on October 10, 2005.
16 Similarly, Paragraphs 116 and 117.
17 117 specifically says, "I found no other news on
18 that day aside from the fraud-related partially
19 corrective disclosures that would have affected
20 Dana's stock price."  And that's a conclusion
21 having read all the news and all the articles
22 available to me, including analyst reports and
23 filings and so forth, that came out on that day,
24 or surrounding that day.
25 There is also some addressing of that

12  (Pages 42 to 45)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

46

1    same question in the rebuttal report, Pages 18
2    through 22, where I address the question of could
3    other news that may or may not have come out on
4    the relevant dates have been responsible for the
5    stock price movement and comparing it to what --
6    comparing the news that did come out to what was
7    already known to the marketplace, what the market
8    knew about these other pieces of
9    information in the context of fundamental
10   financial valuation principles, I concluded that
11   there was no other confounding information.  There
12   was no confounding information.
13        Q.   So Pages 18 to 22 of your rebuttal
14   report relate specifically to the news about
15   Delphi and Ford, correct?
16        A.   Yes.
17        Q.   And not anything else, correct?
18        A.   Well, that's what Professor Stulz
19   contended was confounding information.  So that's
20   why I addressed those things in particular in the
21   rebuttal.
22        Q.   But those are the only things -- the
23   only other items of potentially confounding
24   information that you addressed in Pages 18 to 22
25   of your rebuttal report that you referred to,

47

1    correct?
2         A.   Yes.  But somewhere else I addressed
3    them.
4              Surprisingly, Professor Stulz contends
5    that the guidance revision on September 15, 2005,
6    itself was confounding information.  So I
7    addressed that as well in my rebuttal report.  In
8    fact, it's not confounding because it's the core
9    to the -- what was alleged to have been
10   misrepresented and omitted.
11        Q.   We're going to get to that.
12             Going back to Paragraphs 116 and 117
13   of your report on Page 44 which I mentioned --
14        A.   And not just specifically the
15   guidance, but elements that Professor Stulz
16   contends may have contributed to the changed
17   guidance, like gasoline and steel prices is also
18   addressed.  And I drew my conclusion from a news
19   analysis identifying, for example, that the
20   marketplace was well aware of what gasoline prices
21   were before Dana's announcements.
22        Q.   Now, Professor Stulz's report was
23   issued approximately one month after your report,
24   correct?
25        A.   I believe so.  I think October.

48

1         Q.   So at the time that you rendered and
2    issued your report, Professor Stulz's report
3    didn't exist, right?
4         A.   I wouldn't know.  Maybe some elements
5    of it did.  I just don't know one way or the
6    other.
7         Q.   But you weren't aware of any report by
8    Professor Stulz at the time you issued your
9    report, correct?
10        A.   Correct.
11        Q.   So the opinions in your report are not
12   in any way based on anything in Professor Stulz's
13   report, correct?
14             MS. WYMAN:  Object to form.
15        A.   You're talking about the August 4th
16   report, yes.  Of course, the November 19th report
17   considered his report.
18        Q.   All right.  And that's the rebuttal
19   report, right?
20        A.   You can call it that, sure.
21        Q.   All right.  Going back to Paragraphs
22   116 and 117 of your report, which is Exhibit 677
23   that you've mentioned in an answer just a minute
24   ago.  What methodology did you use in performing
25   the work described in those paragraphs other than

49

1    reading news reports?
2         A.   Well, like I said, news reports,
3    analyst reports, company filings, company
4    statements.  Anything that came out related to the
5    company from the data sources that I list in my
6    report and identified.
7              I looked to identify any other news
8    that came out about Dana.  And then, applying
9    financial valuation principles, considered --
10   well, no -- first related to the news analysis,
11   considered whether anything that did come out was
12   new or old.  If it's old news or repetition of old
13   news, it can't be considered relevant confounding
14   information.  Because if it's a repetition of old
15   news, it's not going to reasonably move the stock
16   price.
17             And if it was something new, then I
18   had to assess whether, based on financial
19   valuation principles, whether it reasonably could
20   have moved the stock price.
21             And no piece of news -- I determined
22   that no piece of news passed those screens.  There
23   was nothing new, unexpected, valuation relevant
24   that came out on the disclosure dates.
25   Unrelated -- I mean, sorry -- unrelated to the

13  (Pages 46 to 49)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

50

1 allegations.
2 Q. Now, in Paragraph 116 you state,
3 quote, "I examined all of the Company-related news
4 that emerged and assessed the valuation impact, if
5 any, of that potentially confounding information,"
6 correct?
7 A. Yes.
8 Q. So that's an overall description of
9 what you did, correct?
10 A. Yes.
11 Q. All right. In your report do you
12 present the company-related news that you examined
13 in any detail anywhere?
14 A. Well, with respect to September 15th,
15 I didn't find anything that was unrelated to the
16 allegations that came out that day. Well, I mean,
17 I didn't list things that didn't pass the screen.
18 So, as I sit here now, I don't recall that I found
19 anything specific that I then discarded as being
20 either -- as being both unrelated and valuation
21 relevant.
22 With respect to October 10th, that's
23 what I describe in Paragraphs 121 through 124.
24 Q. And Paragraphs 121 to 124 only relate
25 to Delphi, correct?

51

1 A. Right. I mean there were other --
2 you, know, someone -- I know that Professor Stulz
3 brought up some other issues --
4 Q. I didn't ask you about them. I asked
5 you about Paragraphs 121 through 124 of your
6 report.
7 A. Well, I want to be complete and
8 comprehensive in my answer.
9 There were other things that I clearly
10 identified, clearly saw, clearly read about as I
11 read the news, but I made the determination that
12 it could not be -- it was not valuation relevant
13 confounding information.
14 Apparently Professor Stulz -- I don't
15 even know if he concluded, but at least he
16 suggested or speculated that, you know, things
17 like, you know, a one word correction in a Wall
18 Street Journal article may have been confounding
19 valuation relevant information.
20 So, you know, things that were obvious
21 to dismiss, for my analysis, needed more
22 convincing. So I addressed those in my rebuttal
23 report. There were a few other items I recall
24 now.
25 Q. I'm not asking you about your rebuttal

52

1 report. Do you understand that?
2 A. No, but you did ask what else did I
3 read. Well, I know from my rebuttal report, as I
4 sit here now, that there were other things in the
5 news articles that I must have read. I read all
6 the news articles from those days and the days
7 surrounding the dates of the corrective
8 disclosures.
9 So I know I read about The Wall Street
10 Journal article -- Dow Jones, rather, Dow Jones
11 article, Delphi bankruptcy, a few other odds and
12 ends that really aren't legitimate confounding
13 information. So I know I read them because of
14 what I did say in my opening report.
15 I clearly drew the conclusion that
16 they weren't confounding information that
17 mattered, and were challenged on that. I replied
18 in my rebuttal report.
19 Q. I'm not asking you about your rebuttal
20 report. Do you understand that?
21 A. Got it.
22 Q. Okay. Now, in the answer you just
23 gave you said "There were other things that I
24 clearly identified." Do you recall saying that?
25 A. I do.

53

1 Q. Where in your report do you disclose
2 the other things that you clearly identified?
3 A. Well, in 116 I say, "I examined all of
4 the Company-related news that emerged and assessed
5 the valuation impact, if any, of that potentially
6 confounding information." Right there.
7 So all the news articles. All the
8 analyst reports. All Dana-related news of any
9 kind that came out in the period of the disclosure
10 dates and the surrounding dates I reviewed. I
11 didn't include the weather of those days.
12 Clearly, it's not relevant. If Professor Stulz
13 had said the weather was relevant, I would have
14 addressed that in the later report.
15 Q. I didn't ask you about Professor Stulz
16 and the later report, correct?
17 A. No, you actually did. Because you
18 wanted to know how I know -- or you wanted to know
19 where it says that I analyzed all of the news. So
20 I pointed out that I analyzed all of the news.
21 I'll leave it at that. You can ask the questions
22 as you want.
23 Q. So you agree that your report does not
24 identify specifically any of the potentially
25 confounding information that you examined and

14 (Pages 50 to 53)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

54

1  analyzed as referred to in Paragraph 16?
2  MS. WYMAN: Object to form. Misstates
3  his testimony and his reports.
4  A. 116 says I examined all of it.
5  Q. So beyond saying that you examined all
6  of it, your report doesn't identify specifically
7  any one or more items of news that's included
8  within that all; is that correct?
9  MS. WYMAN: Object to form.
10  A. That's not correct.
11  Q. Why?
12  A. Because, as I explained --
13  Q. Delphi?
14  A. -- 120 through 124.
15  Q. Other than Delphi, is it correct?
16  MS. WYMAN: Object to form.
17  A. Well, I describe why the disclosures
18  that I did address were related to the
19  allegations. That's in the report.
20  So, in some sense, that's further
21  analysis of what someone unreasonably
22  might consider to be confounding information I
23  assumed was not -- not assumed -- but concluded
24  was not confounding information.
25  Q. Have you completed your answer to my

55

1  question?
2  A. Now I have.
3  Q. Paragraph 116 of your report states,
4  quote, "The corrective disclosures, which
5  corrected the market's understanding of the
6  Company's financial condition and profitability,
7  caused the inflation to dissipate, which in turn
8  caused the stock price drop and investor losses,"
9  close quote. Is that correct?
10  MS. WYMAN: Which paragraph are you
11  on, Arthur?
12  MR. LINKER: 16.
13  MS. WYMAN: Oh, 16. Pardon me. I
14  thought you said 116. I apologize.
15  A. I believe you read it correctly.
16  Q. Is it correct, therefore, that your
17  opinion on loss causation is premised on your
18  opinions; one, that the alleged
19  misrepresentations, omissions and deceptive
20  conduct caused the price of Dana stock to be
21  artificially inflated during the class period.
22  And, two, that the alleged corrective disclosures
23  caused the inflation to dissipate?
24  A. Those or conclusions, not assumptions.
25  Those are conclusions based on research and

56

1  analysis.
2  Q. I didn't ask you about assumptions.
3  A. You said "is it premised"?
4  Q. Let me ask you the question again.
5  A. Sure.
6  Q. Is it correct, therefore, that your
7  opinion on loss causation is premised on your
8  opinions; one, that the alleged
9  misrepresentations, omissions, and deceptive
10  conduct caused the price of Dana stock to be
11  artificially inflated during the class period.
12  And, two, that the alleged corrective disclosures
13  caused the inflation to dissipate?
14  A. I'd have to answer no, because it's --
15  I wouldn't separate those conclusions out from
16  being the conclusions about loss causation. They
17  are components of the conclusion of loss
18  causation.
19  Q. And your opinion on loss causation is
20  premised on those components, correct?
21  A. No, I wouldn't say it's -- my opinion
22  about loss causation includes those components,
23  not premised on it. It includes it. Comprises
24  it, those conclusions.
25  Q. So my question is do those two

57

1  opinions together amount to the basis for your
2  opinion on loss causation?
3  A. To say that they amount for the basis
4  for my opinion separates them from the opinion on
5  loss causation. My opinion on loss causation
6  comprises those two conclusions as well as the
7  direct statement that the alleged
8  misrepresentations and omissions caused loss.
9  Those sentences explain how the
10  alleged misrepresentations caused loss. What was
11  the mechanism by which the alleged
12  misrepresentations and omissions caused loss.
13  That's what those sentences explain.
14  Q. So your opinion on loss causation is
15  based on your opinion that loss was caused by that
16  mechanism or those mechanisms; is that correct?
17  A. Again, to say one thing is based on
18  the other separates the two things, the conclusion
19  and the basis. The opinion, the conclusion about
20  loss causation, comprises both elements. They're
21  not separate, one from the other. One is a
22  description of how the other occurred.
23  Q. Now, do you agree that any finding of
24  loss causation requires finding both of those
25  elements?

15 (Pages 54 to 57)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

58

1        MS. WYMAN:  Object to form.
2        A.   I hadn't considered that prior to
3    hearing your question.  In this particular case,
4    everything mentioned is true.  I've determined to
5    be true.  I don't know if there might be some
6    exceptional case somewhere where they're separate
7    elements.
8        Q.   Well, if either of those elements was
9    found not to be present, would that impact your
10   opinion about --
11       VIDEO TECHNICIAN:  I'm sorry.  I can't
12   hear -- is it a phone or something going off over
13   there.  I didn't hear the last question.
14       MS. WYMAN:  It's probably the phone
15   that we're using for the mic.
16       VIDEO TECHNICIAN:  It could be.
17       MR. LINKER:  I have a cell phone which
18   is --
19       VIDEO TECHNICIAN:  That might be it.
20       MR. LINKER:  Yeah, but I'm going to
21   turn it off.
22       VIDEO TECHNICIAN:  It's coming from
23   that mic, actually.
24       (Discussion off the record.)
25

59

1    BY MR. LINKER:
2        Q.   If either of those elements was found
3    not to be present, would that impact your opinion
4    about loss causation?
5        MS. WYMAN:  Object to form.
6        A.   Well, just so I'm clear about what
7    you're asking, are you asking, for example, if I
8    had found, or if I'm convinced with new evidence
9    or analysis, that the misrepresentations and
10   omissions did not inflate the stock price, would
11   it affect my opinion about loss causation?  Is
12   that your question?
13       Q.   No.  My question was broader.  My
14   question was:  There are what you've described as
15   the two elements that comprise your opinion on
16   loss causation and set forth the mechanism of loss
17   causation that you say existed in this case.
18       If either of those elements was found
19   not to be present in this case, would that impact
20   your opinion on loss causation?
21       MS. WYMAN:  Object to form.
22       A.   And I'm trying to clarify so that
23   there is no misunderstanding about what elements
24   we're referring to.  So one is that the
25   misrepresentations and omissions inflated the

60

1    stock price.  Do you agree that that's one of the
2    elements?
3        Q.   Professor, it's your report.  You tell
4    us what the elements are.  I thought --
5        MS. WYMAN:  Object to Arthur --
6        MR. LINKER:  Excuse me.  Don't
7    interrupt the question.
8        MS. WYMAN:  He's asking you to clarify
9    your question.  So he's confused about what the
10   elements are.  We had cell phone interference and
11   everything else in between all of that.  So tell
12   him what the elements are and he'll answer your
13   question.
14       MR. LINKER:  Well, he told us what the
15   elements are.  And used the word "elements" to
16   describe --
17       MS. WYMAN:  So clarify your question
18   and he will answer it.
19       MR. LINKER:  I'm trying to be as clear
20   as possible.
21   BY MR. LINKER:
22       Q.   So do you agree that the two elements
23   of your opinion on loss causation that you
24   identified or, to be concise, inflation of Dana's
25   stock price during the class period is the result

61

1    of the alleged misrepresentations, omissions and
2    deceptive conduct.  That's the first element.
3        And dissipation of that inflation
4    resulting from the alleged corrective disclosures.
5    Those are the two elements.
6        Am I correct that that's the way you
7    explained it?
8        A.   Well, there is a third.  And then the
9    third is that dissipation is what caused the stock
10   price to drop, and the stock price drop caused
11   investor losses.
12       Q.   So let's clarify.  So the second
13   element is that dissipation of the inflation --
14       A.   On account of the corrective
15   disclosure.
16       Q.   -- on account of the corrective
17   disclosures.  When you say "dissipation of the
18   inflation," does that mean that the stock dropped?
19       A.   Well, it means that the stock no
20   longer was inflated.  The inflation left the stock
21   price on account of a disclosure.
22       Q.   When the inflation leaves the stock
23   price, does that mean that the stock price drops?
24       A.   Well, not in every case.
25       Q.   In this case.

16  (Pages 58 to 61)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

62

1     A.   In this particular case, that's what
2  happened.
3     Q.   All right.  So can we call those two
4  elements inflation and dissipation, just to be
5  concise?
6     A.   Sure.
7     Q.   Okay.  So if either of those two
8  elements, inflation and dissipation, was found not
9  to be present, would that impact your opinion on
10  loss causation in this case?
11     A.   Well, I need to take them one at a
12  time.  I think I can state that if
13  misrepresentations and omissions, if they had not
14  inflated the stock price ever, I don't see how I
15  would be able to conclude that there was a loss
16  caused by them.
17         As I sit here now, I mean I hope I
18  don't regret saying that.  I don't want to go home
19  and think about it tonight.  But, as I sit here
20  now, I think I would have to agree that if there
21  was no inflation, if there was no impact on the
22  stock price or on inflation of the alleged
23  misrepresentations and omissions, a person would
24  be hard-pressed to say that there was a loss
25  caused by them.  So that would certainly affect my

63

1  conclusion.
2         Now, as far as dissipation is
3  concerned, I think that went up to the Supreme
4  Court.  So I can answer it from an economic point
5  of view, an economist might say, but I can also --
6  I'm not a lawyer, but I can tell you what I
7  understand courts and lawyers have explained to me
8  as being recoverable losses.  And that's the Dura
9  case.
10         I mean one might, just from a purely
11  economic point of view, believe that if a stock
12  price is inflated and, therefore, an investor
13  overpays for the stock, and then for unrelated
14  reasons the company collapses.  An example that
15  sometimes is written in articles about this is an
16  asteroid destroys the company.
17         So investors who paid the fair price,
18  they're wiped out.  And investors who paid the
19  inflated price, they're also wiped out.  I mean,
20  clearly, given that example, investors who
21  overpaid on account of the alleged fraud were
22  harmed by the alleged fraud.  But the Dura case
23  it's my understanding, again I'm not a lawyer, but
24  it's my understanding as a lay person whose had
25  this explained to him, is that -- said that you

64

1  would need a disclosure of the alleged fraud to
2  make those losses actually recoverable.
3         So you've asked a complicated
4  question.  It requires a somewhat involved answer.
5         The first element, as I sit here now,
6  I think you need inflation in order for there to
7  be losses.
8         The second element of dissipation
9  caused by a corrective disclosure, from a purely
10  economic sense, you probably don't need that.  But
11  I understand that the law says that you do.
12         MR. LEVINE:  I object and move to
13  strike that as it relates to an opinion which this
14  witness is not qualified to give on the law.
15  BY MR. LINKER:
16     Q.   All right.  You're testifying here as
17  a financial economist, correct?
18     A.   That's right.  And I presented the
19  caveat that this is having been asked to calculate
20  losses, damages, and recoverable damages.  I've
21  got considerable expertise, specifically applying
22  the conclusion from the Dura case, that
23  recoverable damages have to be losses that are
24  traceable to a corrective disclosure.
25         MR. SIEGEL:  Same objection.

65

1     Q.   Professor Feinstein, as you understand
2  it, are you intending to testify in this case on
3  the question of what losses are recoverable in a
4  securities fraud case under the opinion of the
5  United States Supreme Court in the Dura
6  Pharmaceuticals case?
7     A.   No.  No.  But I'll answer questions
8  about it if asked, based on my expertise, and
9  experience, and knowledge.
10     Q.   So is it your understanding that your
11  opinions in this case, as set forth in your report
12  and your rebuttal report, relate to the issue of
13  what losses are recoverable as damages under the
14  federal securities laws?
15         MS. WYMAN:  Object to form.
16     A.   Can I hear the question again?
17     Q.   Is it your understanding that your
18  opinions in this case, as set forth in your report
19  and your rebuttal report, relate to the issue of
20  what losses are recoverable as damages under the
21  federal securities laws?
22         MS. WYMAN:  Same objection.
23     A.   I think they relate to it, but I think
24  it's not my determination as to whether -- I mean
25  I explained what the calculation of damages was,

17 (Pages 62 to 65)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

66

1  what it entails, what it includes.  And I think
2  it's for the trier of fact to determine whether or
3  not those damages should be awarded to Plaintiffs.
4  It's not my decision.
5      Q.  I think we can all agree on that.  But
6  my question was:  Are you offering an opinion on
7  that subject?
8      MS. WYMAN:  Object to form.
9      A.  Well, I'm not offering an opinion
10 that -- I'm not offering any legal opinions.  I'm
11 not offering any legal opinions.  I'm offering
12 opinions about losses and damages that stem from
13 the application of research and analysis that are
14 within my area of expertise.
15     Q.  So your opinion is confined, as you
16 understand it, to the questions of loss causation
17 and damages under principles of financial
18 economics; is that right?
19     A.  I think that's right.  And I think
20 it's for other people to determine whether that
21 fits the definition of what's allowable under the
22 law.  Someone else will make the legal
23 determination as to whether what I did was
24 relevant to what's needed to assess damages for
25 legal purposes.

67

1      Q.  So is it fair to say that your opinion
2  on this case has two elements which we, for the
3  sake of conciseness, are referring to as inflation
4  and dissipation.  And that, as you sit here today,
5  you do not have an opinion as to whether if both
6  of those elements are not present, there is loss
7  causation?
8      MS. WYMAN:  Object to form.
9      Q.  Or not?
10     A.  I did articulate that opinion.  I said
11 that I don't see how there can be losses if there
12 wasn't inflation, as I sit here now.
13     I said that I can't say the same thing
14 about dissipation.  Although, for the present
15 case, it's moot because there was dissipation.
16     And I don't think we should ignore a
17 third element, that the dissipation has to cause
18 the stock price decline that occurred in this
19 particular case.
20     Q.  We're including that in our use of the
21 word "dissipation" in order to concisely label the
22 two elements that you've described as two
23 elements.
24     A.  Well, I can accept that for purposes
25 as a shorthand in this particular case, but I did

68

1  describe in a prior answer that conceivably,
2  theoretically, there could be dissipation without
3  a stock price decline.  It didn't happen in this
4  case, but it could conceivably happen.
5      Q.  So I'm going to ask you a hypothetical
6  question.  Assume in this case that there was
7  inflation but that there was not dissipation, is
8  there loss causation in this case under that
9  hypothetical?
10     MS. WYMAN:  Objection.  Incomplete
11 hypothetical.
12     A.  I believe from the purely economic
13 point of view, the answer would be it depends.
14     Q.  What does it depend on?
15     A.  It really depends on the definition of
16 loss causation.  I mean if the -- if I'm asked
17 does that engender or does loss causation require
18 that there be dissipation, I would need to know
19 what your definition of "loss causation" is.
20     Q.  What's your definition of "loss
21 causation" as you've used it in this report and
22 rebuttal report?
23     A.  Well, as I used it in this particular
24 report, the definition, the working definition I
25 have is that investors have suffered a loss that

69

1  was caused by the alleged misrepresentations and
2  omissions.  And the experience that led to the
3  loss comprised that the stock price wasn't
4  artificially inflated on account of the alleged
5  misrepresentations and omissions, and the
6  inflation dissipated causing the stock price to
7  drop when corrective disclosures were made.
8  That's the working definition I adopted for this
9  report.
10     Q.  And your testimony in this case about
11 loss causation is based on that working
12 definition, correct?
13     A.  For this case, for this report, yes.
14     Q.  Now, if any element of that definition
15 were found not to be present in this case, do you
16 have any opinion on whether or not there is loss
17 causation in this case as you have defined it?
18     MS. WYMAN:  Object to form.
19     A.  That's a purely hypothetical question,
20 because that's not what I found.
21     So you're saying hypothetically if I
22 were confronted with a fact or asked to assume
23 that there was no inflation and no dissipation,
24 would it affect my opinion about loss causation.
25 Is what you're asking?  Am I right?  Is that what

18  (Pages 66 to 69)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

70

1  you're asking?
2      Q.   No.  No, I'm asking -- you've offered
3  an opinion on loss causation as you have just
4  defined it, correct?
5      A.   Yes.
6      Q.   And you believe that that is the
7  appropriate definition of loss causation for this
8  case, correct?
9      A.   Well, no.  That's for other people to
10  determine.  That is what my definition of loss
11  causation was.
12      Q.   Well, do you believe that that's
13  from --
14          MS. WYMAN:  He's not done with his
15  answer, Arthur.
16      A.   I really think it's up to other people
17  to determine whether or not it's relevant for this
18  case.
19      Q.   So is it correct that you have no
20  opinion about whether or not the definition of
21  loss causation for this case that
22  you've just explained for us and is set forth in
23  your report is appropriate for use in this case?
24          MS. WYMAN:  Object to form.  Misstates
25  his testimony.

71

1      A.   I can't say no to that.  I can't say
2  that I have no -- I mean I can't say -- yes.  I
3  can't say that I have no opinion.
4      Q.   What's your opinion?
5      A.   I mean I have been qualified by the
6  Court's to offer opinions about loss causation.
7  I've asked for clarification from attorneys on
8  both sides and from judges, in fact, you know, for
9  clarification about, you know, whether or not this
10  definition is appropriate.
11          And so based on my experience and
12  knowledge derived from that experience and from
13  sources -- things that I've read in my role as a
14  financial expert and analyst asked to provide
15  informative reports to the Court, I'd have to say
16  that I think what I've done here is relevant.  I
17  can't say I have no opinion.  I think it is
18  relevant.  I think it's relevant and I think it's
19  what the Court wants to know.
20      Q.   I'm asking you as a financial
21  economist, not as somebody whose had some exposure
22  to the legal system but is not a lawyer.  I'm
23  asking as a financial economist whether it's your
24  opinion that the definition of loss causation that
25  you've just explained that you've used in this

72

1  case and for this case is an appropriate
2  definition of loss causation?
3      A.   Yes, I can believe it is.  As a
4  financial economist, I believe that it is.  I
5  believe that what I've described as being loss
6  causation as being the definition of loss
7  causation in this case will determine whether or
8  not investors have suffered losses on account of
9  the issues being addressed in this case.
10      Q.   Do you have an opinion as to whether
11  if it's found that the elements of that definition
12  as you've used it -- let me withdraw that
13  question.
14          Do you have an opinion as to whether
15  if any of the elements of that definition as
16  you've explained it were found not to be present,
17  there is or is not loss causation in this case?
18          MS. WYMAN:  Object to form.
19      A.   I believe that if I had found that
20  there was no inflation, I would also have
21  concluded and presented in my report that there
22  was no loss causation.
23          With respect to dissipation, I just
24  need to think about it more.  I don't know, as I
25  sit here today.

73

1      Q.   So is it correct that as you sit here
2  today, you can say that you believe that
3  dissipation is an element of the definition of
4  loss causation, but you cannot express an opinion
5  on whether from the viewpoint of a financial
6  economist dissipation is a necessary element of
7  the definition?
8      A.   You asked about what I have testified
9  about today.  That's how your question read.  No?
10      Q.   No.  Let me give you the question
11  again, and I'm reading from the Live Note
12  transcript.
13          So is it correct that as you sit here
14  today, you can say that you believe that
15  dissipation is an element of the definition of
16  loss causation, but you cannot express an opinion
17  on whether from the viewpoint of a financial
18  economist dissipation is a necessary element of
19  the definition?
20      A.   I won't say yes to that.  I will say
21  that in this particular case I have determined
22  that dissipation was an element of loss causation,
23  but I cannot say that I'm going to opine that
24  dissipation is -- I cannot say, as I sit here now,
25  that dissipation is always a necessary component

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

74

1    of loss causation.
2        Q.   No, not "always." My question was:
3    In this case, is it a necessary element?
4        A.   Well, it happened. I mean it did
5    occur. So I didn't have to decide whether it
6    would be necessary or not. I mean, dissipation --
7        Q.   So you haven't decided whether it was
8    necessary or not?
9            MS. WYMAN: He wasn't finished with
10   his answer.
11           MR. LINKER: He didn't say that.
12           MS. WYMAN: He was mid-word.
13           MR. LINKER: No, actually there is a
14   period at the end of his statement.
15           MS. WYMAN: He was mid-word.
16           Why don't you finish your answer,
17   Steven.
18       A.   Dissipation of inflation happened in
19   this case. So I wasn't in a position where I had
20   to assess whether dissipation was a necessary
21   element or not. So it's not part of my
22   conclusions. It's not somebody I studied or
23   opined about in this engagement whether or not
24   dissipation would have been a necessary element.
25           What I did opine about is that

75

1    dissipation did occur. And, therefore,
2    determining whether it was necessary or not was
3    not necessary.
4        Q.   And, in your opinion, dissipation was
5    part of the mechanism of loss causation in this
6    case?
7        A.   Yes.
8        Q.   All right. I'd like you to look at
9    Paragraph 126 of your report. It's on Page 46.
10       A.   (Whereupon the witness complies.)
11       Q.   Now, is it correct that in Paragraph
12   126 of your report you state, quote, "Artificial
13   inflation is the difference between what the stock
14   price actually was at a point in time, and what
15   the price would have been absent the alleged
16   fraud," close quote?
17       A.   Yes.
18       Q.   In your opinion, is that the
19   definition of "artificial inflation" that should
20   be used in analyzing loss causation and damages in
21   this case?
22       A.   If you're using all of those terms as
23   legal terms, I don't have an opinion. But I can
24   say it's the definition of "artificial inflation"
25   I adopted for this report.

76

1        Q.   So whenever you talk about artificial
2    inflation in your report, what you mean is
3    artificial inflation as defined in Paragraph 126?
4        A.   Yes.
5        Q.   Now, in Paragraph 149 of your report,
6    you talk about the Dura Pharmaceuticals case
7    decision; is that right?
8        A.   Yes.
9        Q.   And you believe you're qualified to
10   talk about the Dura Pharmaceuticals case decision?
11       A.   With respect to what I have said in my
12   report, yes.
13       Q.   How did you come to be qualified to
14   talk about the Dura Pharmaceuticals case decision
15   as you've discussed it in your report?
16       A.   Well, there are elements of that
17   decision that were specifically addressed at how
18   financial experts should calculate damages when
19   they're asked to calculate damages in a securities
20   case.
21           So there were elements of that
22   decision that were directed towards people like
23   me, as the reader of the decision. So I read
24   that, and then I received guidance and explanation
25   from attorneys about it over the last however many

77

1    years it's been since the Dura decision.
2        Q.   And based on that, you believe that
3    you have an understanding of how the Dura decision
4    says financial experts should calculate damages,
5    correct?
6        A.   Yes. I want to add that there is a
7    literature written by financial experts about the
8    Dura decision.
9            So it's literature in my field of
10   financial economics that I've also read and I
11   believe mastered. So that's another area where
12   I've derived my expertise to offer these opinions.
13       Q.   So you believe that you are qualified
14   to offer an opinion on how financial experts
15   should calculate damages in a securities fraud
16   case as set forth in the Dura Pharmaceuticals
17   decision, correct?
18       A.   Yes.
19       Q.   Is it correct, in your opinion, that
20   recoverable damages in a securities fraud case
21   cannot exceed as an upper limit the artificial
22   inflation which is the amount by which the
23   investor overpaid for the security on account of
24   fraud?
25       A.   It's my understanding, yes.

20  (Pages 74 to 77)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

78

1    Q.   Is it correct in your opinion that the
2  amount of the artificial inflation on the date of
3  purchase depends only on facts that exist on the
4  date of purchase and not on facts that first come
5  into existence or events that occur after the date
6  of purchase?
7    A.   Well, we often are able to best
8  estimate what the artificial inflation was by
9  observing facts, price movements, developments
10 subsequent to the date at issue.  But the
11 inflation itself, the inflation would have existed
12 on account of things that were in existence at the
13 time of the inflation that's at issue.  Our
14 understanding of what that number might have been
15 can be informed, and should be informed, by things
16 that we can observe subsequently.
17   Q.   So, for example, if the company's only
18 manufacturing plant burned down a week after
19 someone purchased the stock, that event could not
20 artificially inflate the price of the stock on the
21 date of purchase, correct?
22       MS. WYMAN:  Object to form.
23 Incomplete hypothetical.
24   A.   I just want to be real clear.  I would
25 say that I agree with you in general.  However,

79

1  the burning down of the factory a week later might
2  inform us about things that could have been
3  disclosed on the day -- might inform us about what
4  the inflation previously was.
5        So the subsequent development might be
6  useful to the analysts trying to understand what
7  the inflation previously was, but the inflation
8  itself was what it was prior.
9    Q.   Based on facts that existed on the
10 prior date, right?
11   A.   That's right.
12   Q.   You're aware that Plaintiffs in this
13 case are relying on the fraud-on-the-market
14 theory?
15   A.   I understand that, yes.
16   Q.   You're also aware that the
17 fraud-on-the-market theory in securities fraud
18 cases is grounded in the Supreme Court's decision
19 in the Basic case?
20   A.   Like I said, I'm not a lawyer, but
21 I've been working in this area for quite some
22 time.  And, yes, I do understand that.
23   Q.   Well, the fraud-on-the-market theory
24 is an economic theory as well as a legal theory,
25 correct?

80

1    A.   I think most economists would say it's
2  a legal theory.  I mean it's a legal theory about
3  economics, which is why economists are asked to
4  opine on it.  You'll find it in legal textbooks.
5  I don't think you'll find it in most economic
6  textbooks.
7    Q.   So, are you saying that the
8  fraud-on-the-market theory is not something which
9  is viewed as a financial economics theory at all?
10   A.   Like I said, it is a financial
11 economic theory.  It's a legal theory about
12 financial economics.  It's a theory of reliance.
13 Reliance is a legal concept.
14   Q.   Are you knowledgeable about the
15 fraud-on-the-market theory as expounded in the
16 Basic case?
17   A.   Yes.
18   Q.   All right.  Do you agree with the
19 following statement:  Quote, "Basic replaces
20 reliance on the misrepresentations with reliance
21 on the market price," close quote?
22   A.   I'm just wondering if that's something
23 I've written.
24       I would have to say that the way that
25 it's written, I don't like that word "replaces."

81

1  I would think that it -- I wouldn't agree with
2  that today.  I would word it differently.
3    Q.   How would you word it?
4    A.   Can I hear again how it's worded
5  there?
6    Q.   "Basic replaces reliance on the
7  misrepresentations with reliance on the market
8  price."
9    A.   I would say that "Basic" means that
10 you can determine that there was reliance on the
11 misrepresentations if you can show there was
12 reliance on the price, or -- no.
13       Because there was reliance on the
14 price in an efficient market, there necessarily
15 must have been reliance on the misrepresentations.
16 That's really what Basic says.
17   Q.   All right.  Do you agree with this
18 statement.  "Under the view articulated in Basic,
19 Plaintiffs are harmed not because they were misled
20 into purchasing but because they purchased at the
21 wrong price."
22   A.   Actually, I just want to -- I'm sorry
23 to do this, but I just want to amend, or clarify
24 my prior answer.
25       Someone could say Basic replaces

21 (Pages 78 to 81)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

82

1 reliance on misrepresentations with reliance on
2 the price, where it means replaces as a necessary
3 element of proof that Plaintiffs have to succeed
4 at in order to prove their case.
5 So, in other words, it's another --
6 instead of jumping the hurdle and proving reliance
7 on the misrepresentations directly, Basic allows
8 that requirement to be replaced by proving market
9 efficiency.
10 So the word "replaced" can be
11 appropriate there if it's with respect to what
12 Plaintiffs would have to prove to prove their
13 case. But from an economic point of view, my
14 prior answer stands.
15 Q. Let's move on to my next question.
16 A. Okay.
17 Q. Do you agree with this statement:
18 "Under the view articulated in basic, Plaintiffs
19 are harmed not because they were misled into
20 purchasing but because they purchased at the wrong
21 price"?
22 A. You know, as a general matter, I would
23 need much more time to think about that. I can't
24 offer an opinion one way or the other right now.
25 Q. Would you agree with this statement,

83

1 that "In a fraud-on-the-market case, the damage
2 involved is a distortion of the market price"?
3 A. No.
4 Q. Why?
5 A. Well, there could be distortion with
6 no damage.
7 Q. Could there be damage without
8 distortion? I think you said no, because that's
9 inflation, correct?
10 A. Yes. By "distortion," we mean impact
11 in causing the price to be what it otherwise
12 wouldn't have been.
13 Q. No, but we're not talking about the
14 causation element. Just the fact of damage; that
15 the quantum of damage is the distortion of the
16 market price. Do you agree with that?
17 A. No.
18 MR. LINKER: Object to form.
19 A. No.
20 Q. Why?
21 A. The quantum of damage for an
22 individual investor would be the change of
23 inflation over their holding period. That's one
24 element of the formula for damages. It's the
25 change. It's not just the magnitude of the

84

1 inflation, but the change of the inflation.
2 Q. Let's look at Paragraph 18 of your
3 report.
4 A. (Whereupon the witness complies.)
5 Q. Now, in Paragraph 18, you say, quote,
6 "The stock price declines that were caused by the
7 corrective disclosures comprised revaluations of
8 the Company's stock stemming from changed
9 financial valuation metrics and economics (the
10 direct economic effect), and also from the
11 market's reassessment of management's reputation
12 and investors' loss of confidence therein (the
13 reputation effect)"; is that right?
14 A. Yes.
15 Q. What does the phrase "financial
16 valuation metrics and economics" mean in this
17 context?
18 A. The kind of valuation -- the kind of
19 metrics, numbers that describe items that are of
20 valuation relevance. How those numbers would
21 change investors' assessment of the present value
22 of future cash flows and economic benefits that
23 they would own if they owned the security.
24 Q. Those are metrics, right?
25 A. No, I'm -- the metrics are the numbers

85

1 relating to certain items of interest. But the
2 direct economic effect is how those numbers affect
3 the assessment of the present value of the future
4 economic benefit that the owner of the security
5 would derive if they owned the security.
6 Q. Now, you refer to "changed financial
7 valuation metrics and economics." You've talked
8 about the metrics. Can you explain what you meant
9 by "changed economics"?
10 A. All of the considerations that are --
11 that apply to determining the present value of the
12 future economic -- of the future benefit from
13 owning the security.
14 I mean, to be more specific, what
15 would be used in the application of a
16 generally-accepted valuation model, such as a
17 discounted cash flow model or a comparable company
18 valuation multiple model, is what I meant by the
19 direct economic effect. And the elements that go
20 into those models are the financial valuation
21 metrics and economics.
22 VIDEO TECHNICIAN: I have five minutes
23 left on the video.
24 MR. LINKER: Thank you.
25

22 (Pages 82 to 85)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

86

BY MR. LINKER:

Q.  When you refer to, quote, "The market's reassessment of management's reputation," close quote, are you referring to a reassessment of what management's reputation was or should have been during the class period or reassessment of management's reputation as of the time of the corrective disclosures?

A.  Well, reasonably how the market reassesses the reputation at the time of the corrective disclosure is an indicator of what the market would have previously assessed reputation should have been if they knew that the management was going to embark upon the program of misrepresentations and omissions that they ultimately embarked upon.

So reasonably you can use the change of assessment at the disclosure as a measure of what the change of assessment would or should have been earlier on, or essentially how much -- how incorrect the assessment was earlier on.

MR. LINKER:  The tape is running out, so let's take a break.

VIDEO TECHNICIAN:  The time is 11:19. We're off the record.

87

(Proceedings recessed at 11:19 a.m., and reconvened at 11:32 a.m.)

VIDEO TECHNICIAN:  Okay.  We're back on the record.  This is DVD number two.  The time is 11:32.

BY MR. LINKER:

Q.  Professor Feinstein, in the last answer that you gave just before the break, you said "reasonably you can use the change of assessment at the disclosure as a measure of what the change of assessment would or should have been earlier," correct?

A.  Correct.

Q.  What is the basis for that opinion?

A.  Well, if we learn that the market had incorrectly assessed reputation and we can see the economic -- if we learn that because we see a commentary from analysts or reactions in the stock price that reflect that, it's reasonable that earlier the assessment was wrong.  And so the correct assessment would have been something different.

Q.  Why do you say that it's reasonable that earlier the assessment was wrong?

A.  If the change in assessment of

88

reputation occurs because the market is told something that should have been allegedly told earlier, that proves that there are -- if we learn that their assessment was wrong, because it changed when they learned that they weren't told something that they should have been told earlier, then the correct assessment earlier would be something different from what the assessment was.

Q.  Now, is there anything in the financial economics literature that discusses that reasoning?  Specifically relating to reassessment of the reputation of management of a company.

A.  Yes.  There is a couple of articles I cited.  There is -- Karpoff studies this.

Q.  He studied the effect on the stock price, correct, of disclosures?

A.  He described how a major component -- major contributor to the effect on stock price is the change in reputation caused by investors and analysts learning the truth about a company and its management.  If they had known the truth about the company and its management earlier, the assessment would have reflected that earlier.

Q.  Does Karpoff say that?

A.  The last step I've got to think about,

89

but he says -- they do say that the reputation is impacted by a disclosure.  They do say that.  They say disclosures impact the reputation.

So the reputation changes to a -- the assessments of reputation changes to be -- to coincide better with what reputation is deserved, which means previously the assessment must have been better than what was deserved.

Q.  Does Karpoff talk about what previously the reputation was or should have been?

A.  Well, Karpoff says that the assessment at that point reflects what's deserved.  It's just logic that previously it must have been greater than what was deserved.

Q.  Now, you say in your opinion that that's logic.  Is there anything in the financial economics literature that discusses that specifically in connection with reassessment of the reputation of management of a company?

A.  I mean I will emphasize that it is logical that if it changes to be correct, then what happened -- what existed prior to the change must have been incorrect.  That's straightforward logic.  But whether the authors in the literature who investigated reputational effects said exactly

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

90

1  that, as I sit here right now, I'm not sure.  But
2  what I do want to check is my Documents Reviewed
3  and Relied Upon list.
4         The other article that I'm familiar
5  with addresses this issue.  I'm not sure -- again,
6  if they state the obvious, if they state the
7  logical obvious, the other article that I would
8  want to check that -- I'm sorry I don't have every
9  detail of it memorized -- is the Palmrose article
10  2004 Journal of Accounting and Economics.
11        Q.   But as you sit here today, you don't
12  remember any article in the financial economics
13  literature which makes the same assertion you've
14  just made as to the logical implications of a
15  reassessment of the reputation of a company's
16  management following a disclosure?
17        MS. WYMAN:  Objection.  It misstates
18  his testimony.
19        MR. LINKER:  That's a question.  He'll
20  tell me if it's correct or not.
21        A.   I mean it's such a basic logical
22  principle that I think if they don't say it, it's
23  because it goes without saying.  That if something
24  changes to be correct, then prior to the change it
25  must have been incorrect.  That's the principle.

91

1        Q.   Now, when you preferred to investors'
2  loss of confidence in management's reputation, are
3  you expressing an opinion that Dana's stock price
4  was inflated during the class period by investors'
5  or analysts' overconfidence in Dana's management?
6        A.   Well, that "overconfidence" -- it's --
7  I just don't want to leave it out there as a
8  loaded question.
9         I mean, overconfidence borne of the
10  misrepresentations and omissions.  That's what I
11  was able to prove with the empirical work.  It
12  wasn't that they just stumbled upon
13  overconfidence.  It was -- and I do a lot of
14  analysis relating the misrepresentations and
15  omissions to financial principles,
16  generally-accepted, widely-used financial
17  principles.
18         So the analysis proves that their
19  overconfidence was borne of misrepresentations and
20  omissions, the alleged misrepresentations and
21  omissions.
22        Q.   So you are expressing an opinion that
23  Dana's stock price was inflated by investors' or
24  analysts' overconfidence in Dana's management; is
25  that right?

92

1        A.   Overconfidence in the -- greater than
2  deserved assessment of their reputation.
3         Yeah, I would say yes.  I'll say yes
4  to what you said, among other things.  I mean it's
5  not exclusive.  But, among other things, yes.
6        Q.   Have you performed any analysis to
7  determine or to measure whether, or the
8  quantitative extent to which investors' or
9  analysts' estimates of Dana's financial strength
10  and profitability during the class period were
11  based on confidence in Dana's management?
12        MS. WYMAN:  Object to form.
13        A.   Well, the research I did indicates
14  that it was based on their confidence in the
15  truthfulness of what the company was saying in
16  part.  And the Plaintiffs' allegation is -- what
17  the Defendants were saying was not truthful.  So I
18  think it follows to some extent, yes.  They were
19  overconfident in the truthfulness of management.
20        Q.   Did you quantify the extent to which
21  investors' or analysts' estimates of Dana's
22  financial strengths and profitability were based
23  on that confidence?
24        A.   I quantified the economic impact, the
25  stock price impact of that overconfidence, if we

93

1  want to call it that.
2         So to that extent, yes.  But the
3  underlying metrics, the underlying valuation
4  metrics, that wasn't necessary.
5        Q.   So you didn't do it?
6        A.   It wasn't necessary because what I was
7  able to do was look at the impact on the market
8  price of the overconfidence and then the
9  reassessment of confidence and reputation.
10        Q.   Professor Feinstein, would you agree
11  that sometimes people do things that are not
12  necessary to be done?
13        MS. WYMAN:  Object to form.
14        A.   Sure.
15        Q.   So you answered my question by saying
16  that it wasn't necessary.  My question was did you
17  do it.  Or please confirm that you did not do it.
18        A.   I just --
19        Q.   So I don't want to -- my question is
20  not as to whether it was necessary to do it but
21  whether you did it.
22         Did you do anything to measure and
23  quantify the extent to which investors' or
24  analysts' estimates of Dana financial strength and
25  profitability were based on confidence in Dana's

24  (Pages 90 to 93)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

94

1 management?
2        MS. WYMAN:  Object to form.
3    A.  Yes.
4    Q.  Where in your report do you quantify
5 the extent to which the investors' or analysts'
6 estimates of Dana financial strength and
7 profitability were based on confidence in Dana's
8 management?
9    A.  In all of the work related to the
10 residual returns following corrective disclosures,
11 and then disaggregating those residual returns and
12 attributing them to various factors including
13 reputation.
14    Q.  Now, earlier in your testimony you
15 pointed out specifically certain paragraphs of
16 your report where you quoted from analysts
17 reports.  Those quotes had various metrics
18 expressed by the analysts, correct?
19    A.  Yes.
20    Q.  It's a fact that you did not do any
21 analysis to determine which of any of those
22 metrics were based on confidence in Dana's
23 management?
24        MS. WYMAN:  Object to form.  Misstates
25 his testimony.

95

1    A.  That's not true.
2    Q.  Why is it not true?
3    A.  Well, for example, when the company
4 cut its guidance in half, I observed that analysts
5 reflected that change in forward guidance and
6 future profitability in their reports and models.
7        So, therefore, I know that prior to
8 the corrective disclosure they had accepted
9 management's representations, ill-advisedly so
10 apparently in retrospect, but that's what we can
11 see that they did.  And then when we saw that the
12 stock price fell subsequently and analysts
13 expressed more pessimism subsequently, it's
14 apparent that they changed their perceptions and
15 assessments of management's reputation and their
16 confidence in what management had told them.
17    Q.  When you say that the analysts
18 accepted the company's guidance, are you saying
19 that the analysts' estimates in the company's
20 guidance were equal numbers?
21    A.  No.
22    Q.  They were different numbers typically,
23 correct?
24    A.  Generally, that's the case.
25    Q.  Did you do any analysis to quantify to

96

1 what extent the analysts' estimates of the
2 company's earnings were based on confidence in
3 Dana's management?
4    A.  Yes.
5        MS. WYMAN:  Objection.  Asked and
6 answered.
7    A.  Yes.
8    Q.  So for any analyst estimate that you
9 studied and cited in your report, do you have some
10 numerical figure in your report which is what you
11 believe is the extent to which that analyst
12 estimate was incorrect because of overconfidence
13 in the company's management?
14        MS. WYMAN:  Object to form.  Asked and
15 answered.
16    A.  With respect to any particular
17 analyst's specific quantification of expected
18 profits -- you know, I think -- I can't -- I mean
19 I was tempted to say no, but that's just not the
20 case here.  Because what happened in this
21 particular case, there wasn't a refinement of
22 guidance on September 15, 2005.  The company
23 slashed guidance by more than half.  And observing
24 that analysts followed suit, maybe not exactly the
25 same dollar and cents amount as the company or,

97

1 you know, maybe not even the same exact percentage
2 amount as the company, or maybe not to the extent
3 so that their forecasts exactly matched the
4 company's, but that you can see that there was a
5 significant downward revision tells me that
6 analysts did previously incorporate what
7 management had told them.  And, subsequently, upon
8 the corrective disclosure, determined that what
9 they had been previously told was wrong.
10        So, I mean, I can't -- it's really a
11 matter of the quantification.  To the extent that
12 you mean by quantification, a precise percentage
13 or a precise dollar amount, no.  But with respect
14 to the direction of change, yes.  And as to the
15 order of magnitude of the change, yes.
16    Q.  All right.  And going back to
17 Paragraph 18 in your report.  Do you have that in
18 front of you?  That's in Exhibit 677.
19    A.  Yes.
20    Q.  In Paragraph 18 of your report, you
21 also state, quote, "Artificial inflation
22 attributed to the reputation effect traces back to
23 the start of the Class Period when earnings were
24 first overstated, and is reasonably estimated to
25 be proportional to the magnitude of the

25  (Pages 94 to 97)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

98

1  accumulated earnings overstatements that had
2  accrued by each point in time."
3      A.  Yes.
4      Q.  Is there any support in the
5  peer-reviewed financial economics literature for
6  estimating artificial inflation attributed to a
7  reputation effect to be proportional to the
8  magnitude of accumulated earnings overstatements
9  that had accrued by each point in time?
10     A.  Yes.
11     Q.  Can you cite any papers in the
12 peer-reviewed financial economics literature that
13 provide that support?
14     A.  Yes.
15     Q.  What are they?
16     A.  Well, Karpoff, for example.
17 Karpoff -- I mean there are a couple of elements
18 in that sentence.
19         So Karpoff does say that the
20 reputation effect is related to the economic
21 effect.  That there is, you know, there is a
22 larger dollar economic effect, there would be a
23 larger reputation effect.  So Karpoff does say
24 that there is some proportionality between the
25 size of the misrepresentation and the deserved

99

1  change in the reputation.
2          And with respect to tracing it back in
3  proportion to the accumulated earnings
4  overstatements, I would cite to the same
5  literature that Professor Stulz cited to in his
6  earnings response coefficient work, where what he
7  concludes from the literature -- and I think it's
8  a fairly reasonable conclusion but an
9  inappropriate application of the model -- the
10 reasonable conclusion is that there is some
11 proportionality variable that relates the
12 impact -- that relates the earnings
13 misrepresentation to a stock price.
14         Greater earnings misrepresentation;
15 greater impact on the stock price.  So those two
16 pieces together tell me that reputation effect
17 should be related to the size of the
18 misrepresentation.
19     Q.  Now, at the time you wrote your
20 report, you were not knowledgeable about what
21 Professor Stulz was going to say, correct?
22     A.  Not specifically what he was going to
23 say, but I was certainly knowledgeable of the
24 models that he ultimately brought to bear.
25     Q.  And you weren't aware of what

100

1  authority he would cite in his report, correct?
2      A.  Correct.
3      Q.  When you made this statement in your
4  report, was there any financial economics
5  literature that you were relying on other than
6  Karpoff that you can identify for us?
7      A.  Karpoff, Palmrose, and all the
8  literature on valuation multiples.  There is a
9  very deep, rich literature on the relationship
10 between earnings and value.
11         So if the literature says there is a
12 proportional relationship between earnings and
13 value, and Karpoff says there is a relationship
14 between value and reputation, it follows
15 mathematically and logically that there is a
16 reputation between the size of the
17 misrepresentations and the -- misrepresentations
18 and the reputation.
19     Q.  So you're relying on the literature
20 relating to earnings misstatements to reach that
21 conclusion and using that in conjunction with
22 Karpoff; is that right?
23     A.  Karpoff is the seminal article in the
24 impact of earnings misstatements on value -- on
25 reputation.  On reputation.  And his finding is

101

1  that it's related to the value.  That the
2  reputational effect is related to the economic
3  effect.
4          There is another literature that
5  relates earnings to value.  So, therefore,
6  earnings misrepresentations affect value and in
7  turn affect reputation.  That's the application of
8  the -- the correct application of the literature.
9      Q.  Other than using the literature in the
10 chain of reasoning that you've just described,
11 you're not aware of anything in the literature
12 that directly talks about allocating reputation
13 effect proportionally to the magnitude of
14 overstatements at each point in time, correct?
15     A.  I think Karpoff does that.  Karpoff
16 says that the size of the -- Karpoff relates the
17 reputation effect to the size of the economic
18 effect.
19     Q.  Let's turn to Paragraph 31 of your
20 report, which is on Page 8.  And it refers to
21 Dana's announcement on October 10, 2005, that it
22 would have to write-down the value of its deferred
23 tax asset, correct?
24     A.  Well, it's in 31.  There are also
25 other items in 31.

26  (Pages 98 to 101)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

102

1    MR. LINKER:  I'm going to mark as an
2  exhibit a copy of a Dana news release dated
3  October 10, 2005 captioned "Dana Corporation to
4  Restate Financial Statements for 2004 & 2005,
5  Write Off U.S. Deferred Tax Assets."  It will be
6  Exhibit 679.
7          (Document marked for
8  identification as Feinstein Exhibit 679.)
9    Q.    Please look at Exhibit 679 and please
10 confirm that that's the Dana announcement of
11 October 10, 2005, that you refer to in
12 Paragraph 31 of your report.
13   A.    It is.
14   Q.    Now, you say in your report that this
15 announcement, quote, "Reflected a severely
16 negative outlook for expected future
17 profitability," close quote, correct?
18   MS. WYMAN:  Object to form.
19   A.    Yes.
20   Q.    Now, what basis do you have for
21 asserting that Dana's announcement regarding the
22 write-down of the value of its deferred tax asset
23 reflected a severely negative outlook for expected
24 future profitability?
25   A.    Well, the nature of the deferred tax

103

1  asset's value.  It can only be utilized if the
2  company's U.S. operations were profitable.  By
3  saying that they would not be able to utilize this
4  asset, it meant that they were not expecting U.S.
5  operations to be profitable.
6    Q.    And that's your basis for saying it
7  reflected a severely negative outlook for expected
8  future profitability, correct?
9    A.    I don't want to say -- it's most of
10 it.  It's most of the reason.  But what also
11 contributes to that finding is that the company
12 postponed third-quarter 2005 earnings release,
13 which is usually not good news, and that they
14 withdrew the earnings guidance for the first full
15 year -- for the full year of 2005 after having
16 slashed it in half a month earlier.
17   Q.    Now, the statement in Paragraph 31 of
18 your report in the last sentence of that
19 paragraph, it relates only to the deferred tax
20 assets, correct?  You say, "Additionally, the
21 Company announced that it would have to write down
22 the value of its deferred tax asset, which not
23 only would have a direct negative impact on future
24 reported earnings, but reflected a severely
25 negative outlook for expected future

104

1  profitability."
2    A.    Yes.
3    Q.    So you're talking only about the
4  deferred tax asset in that sentence, correct?
5    A.    In that sentence.  But I thought you
6  previously asked me what else in this report
7  suggests a severely negative outlook for expected
8  future profitability.
9    Q.    I asked you for the basis for your
10 statement that "Dana's announcement regarding the
11 write-down of the value of its deferred tax asset
12 reflected a severely negative outlook for expected
13 future profitability."
14        Do you understand that's what we're
15 talking about, correct?
16   A.    Sure.
17   Q.    Are you familiar with Financial
18 Accounting Standard that is FAS 109 governing the
19 accounting for income taxes?
20   A.    Now, I'm not an accountant, but I am a
21 financial analyst.  So I'm not a producer of
22 accounting numbers, but I'm a trained consumer of
23 accounting numbers and I understand what an
24 announcement like this means.
25   Q.    My question is:  Are you familiar with

105

1  FAS 109?
2    A.    No.  I mean not by name.  Not by name
3  and number like that.
4    Q.    Are you familiar with the accounting
5  rules regarding accounting for income taxes to the
6  extent that those rules pertain specifically to
7  the valuation of a deferred tax asset?
8    A.    I have some understanding as a
9  financial analyst.
10   Q.    Are you aware that under those rules
11 if the company properly concludes that it is more
12 likely than not that it will have taxable income
13 in the relevant jurisdiction in future years in
14 amounts sufficient to obtain the economic benefits
15 of the deferred tax assets, no write-down is
16 required?
17   A.    That's my understanding.  That is
18 consistent with my understanding.
19   Q.    Therefore, do you agree that if the
20 company properly concludes that there is a 51
21 percent likelihood that it will have taxable
22 income in the relevant jurisdiction in future
23 years in amounts sufficient to obtain the economic
24 benefit of the deferred tax asset, no write-down
25 is required?

27  (Pages 102 to 105)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

106

1      MS. WYMAN:  Object to form.
2      A.   I think with that kind of specificity,
3  I really can't opine whether it's 51 or 52 or
4  50.5.  I'm well aware of the concept that if
5  profitability is expected, they can keep it on the
6  books as an asset.  And if profitability -- and if
7  it's determined that it will not be utilized or
8  could not be utilized, then it has to be written
9  down.
10     Q.   So are you or are you not aware that
11 the standard is a more-likely-than-not standard?
12     A.   I have some awareness of that, and I'm
13 still not sure as I sit here now whether -- well,
14 what the ramifications of a 51 percent assessment
15 are.  That's not within my area of expertise.
16     Q.   Do you agree that if the company
17 concludes that there is a 49 percent likelihood
18 that it will have taxable income in the relevant
19 jurisdiction in future years in an amount
20 sufficient to obtain the economic benefit of the
21 deferred tax asset, a write-down is required?
22     MS. WYMAN:  Object to form.  It's
23 outside of his expertise.  He just said that it
24 was.
25     MR. LINKER:  Is that a form objection

107

1  that he's not --
2      MS. WYMAN:  He just said he -- he said
3  the specific quantification assessments that
4  you're talking about are outside of his area of
5  expertise.
6      MR. LINKER:  So that's an objection to
7  the form of my question?
8      MS. WYMAN:  And an explanation for my
9  objection.
10     MR. LINKER:  Well, I don't think it
11 has anything to do with the form of the question.
12 So let me ask the question again.
13     MS. WYMAN:  How about objection;
14 irrelevant.
15     MR. LINKER:  I didn't know that it was
16 appropriate, but are you saying it's beyond the
17 bounds of discovery under Rule 26 of the Federal
18 Rules of Civil Procedure as applicable in this
19 case?
20     MS. WYMAN:  It's irrelevant to his
21 expertise, Arthur.
22     MR. LINKER:  Well, if he has no
23 expertise about deferred tax assets, why is he
24 expressing opinions about their significance?
25     MS. WYMAN:  He's expressing his

108

1  opinions -- he doesn't have expertise about the
2  accounting rules.  And you can smile and gloat all
3  you want, but you still are asking improper
4  questions that he just said were outside his area
5  of expertise.  So let's move on.
6  BY MR. LINKER:
7      Q.   Subject to counsel's objection, I'm
8  going to ask you to answer the question and I'll
9  just read it again from the Live Note transcript.
10     Do you agree that if the company
11 concludes that there is a 49 percent likelihood
12 that it will have taxable income in the relevant
13 jurisdiction in future years in amounts sufficient
14 to obtain the economic benefit of the deferred tax
15 asset, a write-down is required?
16     A.   Well, I am not prepared to offer an
17 accounting opinion about when they must write it
18 down or when they might choose not to write it
19 down.  I mean I'm not -- I'll admit, I'm not
20 qualified to offer that kind of financial
21 accounting advice to a corporation.  But as a
22 financial analyst, I'm well aware enough of the
23 rules and standards and accounting principles to
24 be able to interpret what it means when a company
25 announces they have to write it down and what kind

109

1  of implications there may have been previously
2  when they chose not to write it down.
3      Q.   All right.  Now, do you agree or not
4  that a 2 percent decrease in the company's
5  assessment of the likelihood that it will have
6  taxable income in the relevant jurisdiction in
7  future years in amounts sufficient to obtain the
8  economic benefit of the deferred tax asset can
9  lead to writing off the deferred tax asset?
10     MS. WYMAN:  Object to form.
11     A.   No, I can't agree or disagree.
12     Q.   Do you believe that securities
13 analysts are generally aware of the accounting
14 rules relating to deferred tax assets?
15     A.   Yes.
16     Q.   Do you believe that professional
17 investors such as mutual funds and investment
18 advisors for pension plans are generally aware of
19 the accounting rules relating to deferred tax
20 assets?
21     A.   Yes.  And I want to add, especially in
22 this case when it was explained to them previously
23 by the company.
24     Q.   Do you believe that securities
25 analysts, professional investors, or investment

28  (Pages 106 to 109)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

110

1    advisors would view a 2 percent reduction in a
2    company's assessment of the likelihood that it
3    will have taxable income in the relevant
4    jurisdiction in future years in amounts sufficient
5    to obtain the economic benefit of its deferred tax
6    asset to be significant?
7        MS. WYMAN: Object to form.
8        A.   I think it depends on specific facts
9    and circumstances of the case.  I think it can be
10   in some cases and it might not be in others.
11       Q.   Do you believe that they would
12   consider an assessment of 51 percent as positive
13   but an assessment of 49 percent to be, in your
14   words, quote, "severely negative"?
15       MS. WYMAN: Object to form.
16       A.   Well, this is all hypothetical.  I
17   want to be clear that we're answering in the realm
18   of hypothetical, because the announcement wasn't
19   that it went from 51 to 49 percent.  The
20   announcement was we're going to be writing --
21   well, I don't want to paraphrase.
22       Q.   Okay.
23       A.   The announcement was that --
24       Q.   I didn't ask you about the
25   announcement.

111

1        MS. WYMAN: He's answering your
2    question.  Please let him finish.
3        A.   "The company now believes that it will
4    be unable to maintain its U.S. deferred tax
5    assets."  That was the announcement.
6        There is a qualitative change between
7    what was known before this announcement and what
8    was known after this announcement.  This tells the
9    public that the company has now fessed up to the
10   fact that profitability in the U.S. has collapsed.
11       Q.   Now I'd like you to answer my
12   question, which was: Do you believe that analysts
13   would consider an assessment of 51 as positive and
14   an assessment of 49 percent to be severely
15   negative?
16       MS. WYMAN: Object to form.
17       A.   It certainly can be.  It can be.  It
18   depends on specific facts and circumstances.
19       Q.   Now, in Paragraph 31 in this regard,
20   you refer to expected future profitability of
21   Dana, correct?
22       A.   What paragraph are we on?
23       Q.   Paragraph 31, the last sentence where
24   you talk about the write-down of the value of the
25   deferred tax asset.

112

1        A.   Yes.
2        Q.   Okay.  Do you agree that the
3    write-down related to Dana's U.S. deferred tax
4    asset, which implicated only Dana's assessment of
5    its likely future taxable income in the United
6    States, and not Dana's global profitability?
7        MS. WYMAN: Object to form.
8        A.   Well, it does -- if I heard you
9    correctly, I would have to say yes.
10       Q.   Do you understand that Dana's reported
11   earnings per share are based on its global
12   profitability and not its U.S. taxable income?
13       A.   I'm not going to say it's not based on
14   U.S. taxable income.  So it's based on both.
15       Q.   When reporting earnings per share, is
16   it your understanding that the earnings that are
17   being reported on a per-share basis are the
18   company's total, that is, its global earnings?
19       A.   Yes.
20       Q.   Now, I'd like you to look at
21   Paragraphs 68 through 70 of your report, which is
22   at Pages 26 and seven.
23       A.   Okay.
24       Q.   Now, in those paragraphs, you describe
25   Dana's September 15, 2005 announcement; is that

113

1    right?
2        A.   Yes.
3        Q.   I'm going to show you what was
4    previously marked in this case as Exhibit 655.
5        Would you look at that and confirm
6    that that's the September 15, 2005, Dana
7    announcement that you discuss at this part of your
8    report.
9        A.   It is.
10       Q.   Now, in Paragraph 69 of your report,
11   specifically in the first sentence of that
12   paragraph, you state, quote, "Moreover, the
13   Company disclosed that the previously released
14   earning guidance for 2005 was also wrong and
15   required revision," correct?
16       A.   Yes.
17       Q.   The September 15, 2005, announcement
18   does not actually say that the previously released
19   earnings guidance for 2005 was wrong, correct?
20       A.   It doesn't use those words, but that's
21   what's clear in the message.
22       Q.   Looking at the words, the words do not
23   say that the previously released earnings guidance
24   for 2005 was wrong, correct?
25       A.   Well, they say that the correct

29 (Pages 110 to 113)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

---

**114**

1  guidance is a magnitude that's different from what
2  was previously announced. If the correct guidance
3  is different from what was previously announced,
4  the previous guidance must be wrong.
5      Q.   And that's an inference that you make,
6  correct?
7      A.   It's logic. If the new number is
8  correct, then the old number must be wrong.
9      Q.   Now, if on June 1, 2005, I were to say
10 that I think that the average temperature during
11 June in Boston, Massachusetts, was going to be
12 70 degrees, and on June 25 I say that the average
13 temperature is expected to be 90 degrees, does
14 that make the first announcement wrong?
15     MS. WYMAN:  Object to form.
16 Incomplete hypothetical.
17     A.   Could I hear the question back?
18     MR. LINKER:  Please reread the
19 question for the witness.
20     (Record read as requested.)
21     A.   It would have been wrong. It would
22 have been incorrect.
23     Q.   Guidance is a prediction?
24     A.   To some extent, yes.
25     Q.   So you're saying that the sense that

---

**115**

1  you use "wrong" in Paragraph 69 is that if a
2  prediction turns out not to be satisfied, the
3  prediction was wrong?
4      A.   I think maybe the -- I don't know if
5  it's up to me to clarify our semantic
6  misunderstanding here, but the prediction did turn
7  out to be wrong, yes. If the prediction did not
8  turn out to be right, then the prediction turned
9  out to be wrong.
10     I mean Plaintiffs are going to -- I
11 don't know if I should clarify or not. It's my
12 understanding that Plaintiffs are going to attempt
13 to prove, or their stated complaint says that they
14 are going to prove that it was wrong to have made
15 it. What I'm just saying is it turned out to be
16 wrong.
17     Q.   What you actually say in Paragraph 69
18 of your report is that the company disclosed that
19 it was wrong. So you're saying that that's what
20 the company said, correct?
21     A.   Yes. I stand by --
22     Q.   Not what Plaintiffs are going to
23 prove, correct?
24     A.   I stand by what I say in Paragraph 69.
25 The company did, in essence, say that the prior

---

**116**

1  guidance was wrong and required revision.
2      Q.   When you say "in essence," you mean
3  that's your interpretation but not the company's
4  words, right?
5      A.   They didn't use the word "wrong," but
6  they said that a different number was right.
7      Q.   They didn't use the word "incorrect";
8  is that true?
9      MS. WYMAN:  Oh, my God, object to
10 form.
11     MR. LEVINE:  (Laugh) Let's not bring
12 him into this.
13     MS. WYMAN:  Sorry.
14     A.   I'm looking to make sure that they
15 didn't use the word "incorrect."
16     In numerous ways they say that a new
17 number is right and the old number is being
18 replaced by the new number.
19     Q.   Professor Feinstein, it is a fact,
20 isn't it, that the September 15, 2005, Dana
21 announcement does not say, either in words or in
22 substance, that the previously released earnings
23 guidance was wrong or incorrect at the time that
24 it was released?
25     MS. WYMAN:  Object to form.

---

**117**

1      A.   Okay. At the time that it was
2  released, it's my understanding that Plaintiffs
3  were -- it's the merits of the case that they seek
4  to prove.
5      Q.   Now, my question is directed not to
6  what Plaintiff's seek to prove about the facts.
7  My question relates to what Dana said in this
8  release, which you've called a corrective
9  disclosure in your report.
10     A.   Yes.
11     Q.   So my question -- let me ask it again.
12 It is a fact, isn't it, that the
13 September 15, 2005, Dana announcement does not
14 say, either in words or in substance, that the
15 previously released earnings guidance was wrong or
16 incorrect at the time that it was released?
17     MS. WYMAN:  Object to form.
18     A.   It doesn't say that it was wrong at
19 the time that it was released, but it says that
20 it's wrong now upon this new disclosure. The old
21 guidance.
22     Q.   I'd like you to look at Paragraph 83
23 of your report, which is on Page 32.
24     A.   (Whereupon the witness complies.)
25     Q.   Now, is it correct that in

30 (Pages 114 to 117)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

118

1  Paragraph 83 of your report, you state that,
2  quote, "It is well-established in the finance and
3  accounting literature that the reliability of
4  accounting data is an important factor that
5  affects the value of a company's securities"? And
6  that quote, "The quality of financial controls,
7  consequently, also bears on valuation," close
8  quote.
9      A.  Yes.
10     Q.  You quote from three papers in certain
11 journals to support that statement, correct?
12     A.  Yes.
13     Q.  It's a fact, isn't it, that none of
14 the language that you quote from those three
15 papers in Paragraph 83 of your report actually
16 mentions either the value of a company's
17 securities or valuation?
18         MS. WYMAN:  Object to form.
19     A.  They talk about how -- no.  I'm going
20 to disagree with that.
21     Q.  Are those words used in any of those
22 excerpts?
23     A.  Well, the first one talks about the
24 cost of equity.  That's valuation.
25     Q.  I'm not asking you about the cost of

119

1  equity.  I asked you about the word "valuation."
2      A.  So you want to draw a distinction
3  between "cost" and "value"; is that right?  I mean
4  it says "cost."  So cost is mentioned.
5      Q.  It mentions cost of equity.
6      A.  Cost of equity is the value -- relates
7  to the value.
8      Q.  It relates to the value.  Is cost of
9  equity the value of a company, or is it a cost?
10         MS. WYMAN:  Object to form.
11     A.  The cost of equity is a metric that
12 bears indisputably on the value of the equity.
13 It's the discount rate used to value the equity.
14 That's what the cost of equity is.
15         The second one talks about cost of
16 capital.  The same thing.  The mechanism by which
17 financial -- reliability of financial data and
18 financial controls affects the value of a company
19 by impacting the discount rate in the valuation
20 model; the cost of equity, the cost of capital.
21 And that's what these articles say.
22     Q.  But your statement in your report
23 talks about affecting the value of a company's
24 securities, right, not its cost of equity?
25         MS. WYMAN:  Oh, my gosh.  Object to

120

1  form.
2      A.  If it affects the cost of equity, it
3  affects the value of the securities.  If a factor
4  affects the cost of equity, generally holding
5  other things equal, it affects the value of the --
6      Q.  But that proposition is not stated in
7  any of the excerpts cited by you in Paragraph 83
8  of your report, correct?
9          MS. WYMAN:  Object to form.  Misstates
10 his testimony and his report.
11     A.  Actually, I would disagree with that,
12 too.  The third quote talks about how these
13 factors will affect the performance in the
14 long-run of the corporation.
15         "Poor corporate governance" -- okay.
16 "Firms with poor corporate governance strategies
17 are more likely to underperform in the long term."
18         That's value; that their securities
19 will underperform.
20     Q.  When a company underperforms, that
21 means its financial results reflect
22 underperformance, correct?
23     A.  It could, but it could also mean that
24 the investment in that company underperforms other
25 investments.

121

1      Q.  The performance of a company and the
2  performance of its securities in the stock market
3  are not the same thing, correct?
4      A.  Correct.
5      Q.  Now, the first paper that you cite in
6  Paragraph 83 of your report, Ashbaugh-Skaife,
7  Collins, Kinney, and LaFond, "The Effect of SOX
8  Internal Control Deficiencies on Firm Risk and
9  Cost of Equity" in the Journal of Accounting and
10 Research, March 2009."
11         That's the first paper that you cite,
12 correct?
13     A.  You said 2009, right?  Yes.
14     Q.  Yes.  It's a fact, isn't it, that that
15 paper states that "academic research is
16 inconclusive as to whether there is a negative
17 market reaction to internal control deficiencies
18 and disclosures"; isn't that correct?
19     A.  I would like to see the paper.  I
20 think you may be taking that out of context.
21     Q.  So you don't remember whether or not
22 that statement is made in the paper?
23     A.  I think what they were saying is that
24 prior to their research, there was questions that
25 needed to be addressed.  And that their research

31  (Pages 118 to 121)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

122

1    illuminates the truth, which is that financial
2    controls and accounting reliability matter.
3        Q.    I just asked you whether they make
4    that statement in their paper, that "academic
5    research is inconclusive as to whether there is a
6    negative market reaction to internal control
7    deficiencies and disclosures"?
8        MS. WYMAN:  Object to form.  Asked and
9    answered.
10       A.    I'd like to see the paper.  I can
11   point out where they say it and --
12       Q.    You don't remember whether they said
13   that or not?
14       MS. WYMAN:  He's not done with his
15   answer, Arthur.  Stop interrupting him.
16       Q.    Finish your answer, please.
17       A.    Well, when people cite this paper, the
18   contribution of this paper is that it illuminates
19   that there is a relationship between financial
20   controls and accounting reliability and value, not
21   that up until this seminal work there were some
22   open questions.
23           I mean maybe they set it up to say
24   that, you know, our paper is important because
25   prior research couldn't -- didn't answer the

123

1    question.  But that's not the contribution of
2    their paper is to say that it's an unanswered
3    question.  They pose the question and the
4    contribution of their research is they answer it.
5        Q.    My question was:  Does their paper
6    make that statement?  Yes or no.
7        A.    I would like to see the paper to
8    answer the question.  And without seeing the
9    paper, I'm not going to answer the question.
10       Q.    You don't remember, correct?
11       A.    Well, what I know from -- what I'm
12   confident is that you would be taking it out of
13   context if you said that was what --
14       Q.    I understand that that's your opinion
15   about the context.  I want to know whether or not
16   you agree that the paper makes that statement.
17       MS. WYMAN:  Show him the paper, if you
18   have it, so he can answer your question.
19       MR. LINKER:  I want my question
20   answered --
21       MS. WYMAN:  He just answered your
22   question three different ways.  He needs to see
23   the paper.  If you have it, show it to him.
24       MR. LINKER:  Thank you.
25

124

1    BY MR. LINKER:
2        Q.    Please answer my question.
3        A.    Do I remember one way or the other if
4    it says that?
5        Q.    Yes.
6        A.    I can't confidently say I remember
7    that those words are in the paper, but I'm also
8    not ruling it out.
9        MR. LINKER:  Let's mark as Exhibit 680
10   a copy of a document from the Journal of
11   Accounting Research, Volume 47, Number 1, March
12   2009, titled "The Effect of SOX Internal Control
13   Deficiencies on Firm Risk and Cost of Equity" by
14   Hollis Ashbaugh-Skaife, Daniel W. Collins, William
15   R. Kinney, Jr., and Ryan LaFond.
16           (Document marked for
17   identification as Feinstein Exhibit 680.)
18       Q.    I would like you to look at Page 15.
19       A.    (Whereupon the witness complies.)
20       Q.    Actually, the last partial sentence at
21   the bottom of Page 14 through the continuation of
22   that sentence on the top of Page 15 which states,
23   quote, "In contrast" --
24       A.    I'm sorry.  Where are we?
25       Q.    Last partial sentence at the bottom of

125

1    Page 14, which states, "In contrast, academic
2    research is inconclusive as to whether there is a
3    negative market reaction to ICD disclosures,"
4    close quote.
5            Does that refresh your recollection
6    that that statement is made in this paper?
7        A.    It also proves that you've taken it
8    out of context.  They go on to say that
9    "Hammersley, Myers and Shakespeare [2008],
10   however, find a significant negative market
11   reaction to material weakness ICDs disclosed under
12   SOX 302."
13           They're pointing out that there are
14   some contradictory evidence, but they weigh in.
15       Q.    All right.  But they make the
16   statement that academic research is inconclusive
17   as to that issue, correct?  Of course, they
18   cite --
19       A.    No.  I'm sorry.
20       Q.    -- materials going one way and
21   materials going the other, because they say "it is
22   inconclusive," correct?
23       A.    No.  The same page, 15, towards the
24   bottom, the last paragraph starts out "Overall,
25   our market reaction tests provide evidence that

32  (Pages 122 to 125)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

126

1   the market reacts negatively to signals that
2   firms' internal controls are ineffective."
3      Q.   That's their research, correct?  When
4   they say "our market reaction tests," they're
5   talking about their research, correct?
6      A.   I think if you read it in context,
7   you'll see that it's, um --
8      Q.   But the statement is made, correct?
9      MS. WYMAN:  He's not done with his
10  answer, Arthur.  Let him finish.
11     A.   They say -- I think -- they cite far
12  more articles that support the finding that poor
13  internal controls hurt a stock price than anything
14  to the contrary.  They say, "Anecdotal evidence
15  presented in the financial press highlights
16  immediate material declines in the stock prices of
17  select firms that report internal control
18  deficiencies, for example, Flowserve's stock price
19  declined 12 percent on the day after the
20  announcement of an internal control problem."  And
21  they cite a Goldman Sachs study 2005.
22        They cite additional articles, and
23  then they cite their own research says that there
24  is a decline.
25        I think part of what you're, maybe

127

1   inadvertently, emphasizing is where it says --
2   where they make a distinction between pre-SOX and
3   post-SOX, Sarbanes-Oxley.  And they say
4   specifically that this one article that found no
5   pre-SOX evidence was focused on reportable events
6   via a change in the auditor report -- via a change
7   in auditor reported on Form 8-K.
8        So this one article that they say
9   weighs against a finding that disclosure and
10  quality of controls and disclosures matter is a
11  study that is focused on 8-K reports of a change
12  in auditor only.
13        So I think when you take the statement
14  in context and look at all the evidence they're
15  providing, it's clear that the consensus in the
16  practitioner world, as well as the academic world,
17  is that good controls and disclosure are good for
18  a stock price.  Deficient controls and poor
19  disclosure hurts a stock price.  And that's what
20  they say.
21     Q.   All right.  My question was:  Is your
22  recollection now refreshed that the following
23  statement is made in this paper, quote, "In
24  contrast, academic research is inconclusive as to
25  whether there is a negative market reaction to ICD

128

1   disclosures"?
2      A.   Well, what's refreshed is that it has
3   to be read within the context in order to
4   understand its true meaning.
5      Q.   But that's the statement they make in
6   this paper, correct?  There is no dispute about
7   the fact that they say that, correct?
8      A.   Those words are in the paper.  I'll
9   admit that those words are in the paper.  But
10  understanding what the contribution the paper
11  makes and the other articles the paper cites,
12  would tell you that you'd be wrong to extract that
13  sentence and say that that's the thesis of these
14  authors.
15     Q.   Now, if the authors of the paper
16  believe that the academic research provided
17  conclusive evidence, do you think they would have
18  said that rather than having said that it was
19  inconclusive?
20     MS. WYMAN:  Object to form.
21     A.   I'd have to ask the authors why they
22  used those words given what they said before those
23  words and after those words.  I mean there could
24  be other motivations.
25     MR. LINKER:  This would be a good time

129

1   to break for lunch.
2      VIDEO TECHNICIAN:  The time it 12:32.
3   We're off the record.
4        (Whereupon, luncheon recess was taken
5   at 12:32 p.m.)
6            *   *   *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

33 (Pages 126 to 129)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

130

```
1          A F T E R N O O N   S E S S I O N
2          (Whereupon, the proceedings resumed at
3   1:34 p.m.; appearances same as noted.)
4   BY MR. LINKER:
5          VIDEO TECHNICIAN:  We are back on the
6   record.  This is DVD number three.  The time is
7   1:34.
8   BY MR. LINKER:
9          Q.   Good afternoon, Professor Feinstein.
10         A.   Good afternoon.
11         Q.   I'd like you to turn to Paragraphs 84
12  through 86 of your report which is at Pages 33 and
13  34.
14         A.   Okay.
15         Q.   In those paragraphs, is it correct
16  that you discuss what you describe as the
17  reputation effect and the negative value impact --
18  negative valuation impact of restatements?
19         A.   Yes.
20         Q.   Is it correct that you quote from a
21  paper by Karpoff, Lee, and Martin titled "The Cost
22  of Firms of Cooking the Books" published in the
23  Journal of Financial and Quantitative Analysis in
24  2008?
25         A.   Yes.
```

131

```
1          Q.   We refer to this paper as the Karpoff
2   paper.  Is that okay?
3          A.   Sure.
4          Q.   I hand you a copy of what previously
5   was marked as Exhibit 676.  Can you look at that
6   and confirm for us that Exhibit 676 is the Karpoff
7   paper?
8          A.   It is.
9          Q.   In Paragraph 85 of your report you
10  quote a statement from the Karpoff paper that,
11  quote, "'For each dollar that a firm misleadingly
12  inflates its market value, on average, it loses
13  this dollar when its misconduct is revealed, plus
14  an additional $2.71, due to reputation loss'"; is
15  that correct?
16         A.   Yes.
17         Q.   Now, do you understand the term
18  "market value," as used in this quotation from the
19  Karpoff paper, is referring to the market price at
20  which the company's stock is trading in an
21  efficient market?
22         A.   Yes.
23         Q.   In Paragraph 86 of your report you
24  state, quote, "According to the published
25  literature, a sizable portion of the decline in
```

132

```
1   stock price following the corrective disclosures
2   are attributable to a loss of reputation"; is that
3   correct?
4          A.   Yes.
5          Q.   Therefore, isn't it a fact that
6   according to your report the decline in stock
7   price following a corrective disclosure of
8   financial fraud exceeds the amount by which the
9   firm misleadingly inflated its market value?
10         MR. SIEGEL:  Can I have that question
11  read back?
12         Q.   I will read it back.  Is it a fact
13  that according to your report the decline in stock
14  price following a corrective disclosure of
15  financial fraud exceeds the amount by which the
16  firm misleadingly inflated its market value?
17         MS. WYMAN:  Object to form.
18         A.   Yes.  The market value for economic
19  reasons, based on economic reasons.  So when there
20  is a decline, $1 would be the economic value and
21  $2.71 of that would be the reputation effect.
22         So for a $3.71 decline, it can be
23  disaggregated into $1 for economic value and $2.71
24  for reputation effects.
25         Q.   In that answer you used the term
```

133

```
1   "economic value"; is that right?
2          A.   Yes.
3          Q.   Karpoff, in the part of the Karpoff
4   paper that you quoted, referred to "market value."
5   Are you using "economic value" to mean something
6   different than "market value"?
7          A.   I'm concerned that maybe you could
8   have misunderstand it.
9          Understanding this article in its
10  entirety, you need to understand -- one would need
11  to understand that he makes a distinction between
12  the value that's derived from the present value of
13  expected future cash flows, for example, and
14  additional diminution of value that's caused by
15  loss of reputation.
16         So by "market value" here, it means
17  the -- it's the former; the value attributable to
18  present value of future cash flows.
19         Q.   Is it your understanding that,
20  according to financial economics literature, the
21  consensus view of the present value of a company's
22  future cash flows is the market price of its
23  security in an efficient market?
24         A.   Generally speaking, yes.
25         In order to understand this article,
```

34  (Pages 130 to 133)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

134

1    one needs to make this distinction, though, and
2    understand that there is a direct economic effect
3    on value, and then there is a less direct effect
4    that stems from reputation. That's the point of
5    their article.
6        Q.  Now, according to your report, the
7    access of the stock price decline over the direct
8    economic effect is what you describe as the
9    reputation loss?
10       A.  The reputation effect, yes.
11       Q.  Now, in Paragraph 86 of your report,
12   on Page 34, you state, quote, "In this case,
13   beyond the direct valuation impact of Dana's
14   overstated earnings, the Company's stock would
15   have been artificially inflated over the course of
16   the Class Period due to the reputation effect"; is
17   that right?
18       A.  That's right.
19       Q.  Now, when you refer to, quote, "The
20   direct valuation impact of Dana's overstated
21   earnings" in Paragraph 86 of your report, you're
22   referring to the same thing as what the Karpoff
23   paper described as "each dollar that a firm
24   misleadingly inflates its market value"?
25       A.  That's right.

135

1        Q.  Now, going back to the first full
2    sentence in Paragraph 86 of your report, quote,
3    "In this case, beyond the direct valuation impact
4    of Dana's overstated earnings, the Company's stock
5    would have been artificially inflated over the
6    course of the Class Period due to the reputation
7    effect," close quote.
8            You base that opinion on the Karpoff
9    paper; is that right?
10       A.  Yes. Well, the Karpoff paper and
11   other papers that are consistent with Karpoff.
12   For example, the Palmrose one that I cited
13   earlier.
14       Q.  So it's your opinion, isn't it, that
15   the Karpoff paper supports your assertion that
16   artificial inflation of Dana's stock price during
17   the class period includes what you call a
18   reputation effect?
19       A.  Can I hear that question back? Sorry.
20           (Record read as requested.)
21       A.  Well, I would disagree with the
22   characterization that it's an assertion. It's a
23   conclusion from based on the literature and based
24   on the empirical work I did and based on the facts
25   of this particular case. So it's a conclusion,

136

1    not simply an assertion. But, yes, the Karpoff
2    paper supports that conclusion.
3        Q.  In fact, doesn't the Karpoff paper
4    state that "The reputation loss exceeds the amount
5    by which firm value is artificially inflated by
6    more than 2.5 times"?
7        A.  No. Because the artificial inflation
8    includes the reputation effect. It exceeds -- did
9    I hear that wrong again? I'm sorry.
10       Q.  Can I ask the question again?
11       A.  Yes, please.
12       Q.  In fact, doesn't the Karpoff paper
13   state that "The reputation loss exceeds the amount
14   by which firm value is artificially inflated by
15   more than 2.5 times"?
16       A.  I heard it correct. I heard it
17   correctly.
18           So wrong. That is a false statement.
19   The artificial inflation includes the reputation
20   effect. The artificial inflation is composed of
21   the direct economic effect stemming from the
22   alleged misrepresentations and omissions and the
23   reputation effect similarly stemming from the
24   alleged misrepresentations and omissions.
25       Q.  All right. Do you have Exhibit 676 in

137

1    front of you?
2        A.  Yes.
3        Q.  Will you please turn to Page 582 of
4    the Journal of Financial and Quantitative
5    Analysis.
6        A.  Okay.
7        Q.  Do you have Page 582?
8        A.  Yes.
9        Q.  Would you look at the last sentence of
10   the second full paragraph on that page? Do you
11   see that?
12       A.  Yes, I see that.
13       Q.  Okay.
14       A.  He's using, Karpoff is using, the term
15   "artificially inflated" differently from how I am
16   using it. Here "artificially inflated" means the
17   direct economic components of artificial
18   inflation. Whereas, what I refer to artificial
19   inflation, includes all of the components of
20   overpricing.
21       Q.  Okay. I just want to make sure I
22   understand what you're saying.
23           Is it correct that you're saying that
24   when Karpoff in his paper on which you rely uses
25   the term "artificially inflated," it has a

35  (Pages 134 to 137)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

138

1  different meaning than the way you use the term,
2  "artificially inflated" in your report and your
3  opinion?
4      A.   Apparently, yes.
5      Q.   So do you agree that in the sentence
6  to which I just directed your attention, the
7  Karpoff paper states that "The reputation loss
8  exceeds the amount by which firm value is
9  artificially inflated by more than 2.5 times"?
10         MS. WYMAN:  Object to form.  Asked and
11  answered.
12      A.   Those are the words that Karpoff uses,
13  but they're defining "artificially inflated" to
14  mean - and you can tell this from the context - to
15  mean the direct economic -- or the inflation
16  stemming from the direct economic effect only.
17      Q.   "Artificial inflation" is a term
18  that's used in this area of financial economics,
19  correct?
20      A.   Not frequently.
21      Q.   Now, is it correct that the authors of
22  the Karpoff paper studied companies that were the
23  subject of enforcement actions initiated by the
24  SEC and the Department of Justice, or DOJ, for
25  violation of provisions of the Securities Exchange

139

1  Act of 1934 requiring companies to keep accurate
2  books and records and to implement assistance of
3  internal accounting controls?
4          MS. WYMAN:  Object to form.
5      A.   That's my understanding, yes.
6      Q.   Now, is it a fact that 95 percent of
7  the enforcement actions in their sample
8  incorporated other charges, including insider
9  trading, civil and criminal fraud, racketeering,
10  and tax evasion?
11      A.   Well, if you can direct me to where it
12  says that in the article, I'll be able to agree or
13  disagree.
14      Q.   All right.  But you don't remember
15  without looking; is that right?
16      A.   Correct.
17      Q.   So would you look at Page 585, please.
18  At the top of the page.
19         Are you there?
20      A.   Yes.
21      Q.   Having looked at the top of Page 585,
22  do you agree that 95 percent of the enforcement
23  action in the Karpoff sample incorporated other
24  charges including insider trading, civil and
25  criminal fraud, racketeering, and tax evasion?

140

1      A.   I see that, yes.
2      Q.   Now, as you understand it, is it
3  correct that the plumbers' case does not involve
4  charges by the SEC or the DOJ that Dana, Burns, or
5  Richter committed insider trading, civil or
6  criminal fraud, racketeering, or tax evasion?
7      A.   Can you please repeat the question?
8         MR. LINKER:  Can you read it back,
9  please.
10         (Record read as requested.)
11      A.   I reviewed some documentation related
12  to the SEC case.  I don't recall all of it
13  specifically, but I know that this case does
14  involve an incorporated charge of civil fraud.
15         So you added to your prior description
16  of what's in paragraph -- that paragraph on
17  Page 585, you added the words "by the SEC or the
18  DOJ."  That's not what Karpoff, Lee, and Martin
19  say.
20         So I can't speak to, without seeing it
21  in front of me, the SEC documents, precisely what
22  they charged or didn't charge.
23      Q.   Let me ask you this.
24      A.   So I really can't answer the question
25  one way or the other without the documents in

141

1  front of me.
2      Q.   Do you know whether the SEC charged
3  Burns or Richter with anything?
4      A.   I, frankly, don't remember as I sit
5  here now.
6      Q.   Part of the loss suffered by investors
7  in Dana's stock in this case was in your opinion
8  caused by Dana's not writing down its deferred tax
9  asset in the second quarter of 2005; is that
10  right?
11      A.   No.  I believe that my opinion is that
12  I measured what the inflation was as of July 20,
13  2005, related to not writing down the asset.  And
14  that's just after the second quarter.
15      Q.   So you make a distinction between just
16  after the second quarter and in the second
17  quarter?
18      A.   Yes.
19      Q.   Well, at July 20th was being disclosed
20  were the results in financial statements of Dana
21  for the second quarter, correct?
22      A.   That's right.
23      Q.   All right.  So let me ask this
24  question again in a slightly different form that
25  might be more clear to you.

36 (Pages 138 to 141)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

142

1    **Is it a fact that part of the loss**
2    **suffered by investors in Dana's stock in this case**
3    **was in your opinion caused by Dana's not writing**
4    **down its deferred tax asset on or about July 20,**
5    **2005?**
6        A.   Not announcing on July 20, 2005, that
7    they would be writing it down, yes.
8        Q.   **It's a fact, isn't it, that Dana's**
9    **deferred tax asset was not the subject of any**
10   **charge of any accounting error or wrongdoing by**
11   **the SEC or the DOJ?**
12       A.   Like I said a moment ago, I can't
13   speak to what's in the SEC complaint or
14   descriptions of their action.
15       Q.   **But you're relying on the Karpoff**
16   **paper where 95 percent of the companies in the**
17   **sample were the subject of SEC or DOJ**
18   **investigations, correct?**
19       **Let me rephrase that.  You're relying**
20   **on the Karpoff paper where the sample consisted of**
21   **companies that were the subject of SEC or DOJ**
22   **investigations; isn't that right?**
23       A.   I know that you're being very careful
24   with your choice of words, and I'm being very
25   careful to hear them correctly.  So I need to hear

143

1    it again, please.
2        Q.   **Let me rephrase the question.**
3        **It's a fact that you're relying on the**
4    **Karpoff paper with a sample that consisted of**
5    **companies that were the subject of SEC or DOJ**
6    **charges; isn't that right?**
7        **Why don't you read --**
8        A.   I need to read this.
9        Q.   Okay.
10       A.   I mean this is the seminal article for
11   decomposing a post-disclosure price drop into
12   economic and reputational effects.  I know that
13   your questions are about how appropriate is this
14   article and the data sample to this particular
15   case.
16       My conclusion, and I carefully
17   considered that as I was doing my work, my
18   conclusion was this is the appropriate article and
19   this application is appropriate.  But I just want
20   to refresh my memory as to why I arrived at that
21   conclusion.  And to do that, I'm reading the
22   paragraph before the one you directed me to.  So
23   it's the last paragraph on 584, and also the first
24   paragraph on 585.  And I just want to refresh my
25   memory and read it carefully.

144

1        MR. LINKER:  If counsel has no
2    objection, I'll withdraw the question.
3        MS. WYMAN:  It's your prerogative to
4    withdraw any question you want, Arthur.
5    BY MR. LINKER:
6        Q.   **Isn't it a fact that you're relying on**
7    **the Karpoff paper in which the sample consisted of**
8    **all enforcement actions initiated by the SEC and**
9    **the DOJ from 1978 through 2002 for violation of**
10   **one or more or three provisions of the Securities**
11   **and Exchange Act of 1934?**
12       MS. WYMAN:  Object to form.
13       A.   I'm relying on the Karpoff article,
14   and that's how they describe their action.
15       Q.   **It's a fact that the deferred tax**
16   **asset was not the subject of Dana's restatements,**
17   **correct?**
18       A.   Well, they're related.  They're
19   obviously related.  The restatements and the
20   treatment of the deferred tax asset are related.
21       Q.   **Do you know for what time periods Dana**
22   **restated its financial statements?**
23       A.   Yes.
24       Q.   **What were they?**
25       A.   All of 2004 and the first two quarters

145

1    of 2005.
2        Q.   **In those restated financial**
3    **statements, was the deferred tax asset written off**
4    **or not?**
5        A.   Actually, I don't recall.  I just
6    don't recall for sure.  If it was, it would have
7    been at the tail end of the period, but I just
8    don't recall for sure.
9        Q.   **If I told you that it wasn't part of**
10   **the restatement, would you have any reason to**
11   **disagree with that statement?**
12       A.   No.
13       Q.   **Don't you agree that the Karpoff paper**
14   **does not apply to the deferred tax asset**
15   **write-down because such an event would not have**
16   **been included in the Karpoff paper event study?**
17       MS. WYMAN:  Object to form.
18       A.   No.  I don't believe that's the case.
19   The Karpoff study states that there is a
20   reputation effect as well as a direct economic
21   effect of corrective disclosures.  And so that's
22   what's -- that's what we need to look at in this
23   particular case in order to measure those two
24   factors.
25       Q.   **What do the two words "corrective**

37  (Pages 142 to 145)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

146

1   disclosure" mean to you?
2       A.   Well, it actually has two different
3   meanings.  One is that it's an event or an
4   announcement that conveys to the marketplace
5   information that was previously either
6   misrepresented or omitted is one definition.
7           Another is that it's an event or an
8   announcement that corrects the economic or pricing
9   impact of prior misrepresentations and omissions.
10          So it could be either be interpreted,
11  the phrase corrective disclosure, could either be
12  an informationally corrective disclosure or an
13  economic valuation corrective disclosure.
14      Q.   Do you disagree that in this field the
15  phrase "corrective disclosure" refers to a
16  disclosure that reveals that there was a previous
17  misrepresentation or omission?
18          MS. WYMAN:  Object to form.
19      A.   Not necessarily, because the
20  corrective disclosure could either inform the
21  marketplace of the truth that was previously
22  misrepresented without putting on notice investors
23  that they had been deceived previously, or,
24  alternatively, sometimes the corrective disclosure
25  can simply correct the valuation impact of a

147

1   previous misrepresentation or omission.
2           In each of those specific examples, it
3   wouldn't be necessary from the corrective
4   disclosure investors concluded that they had been
5   deceived.
6       Q.   Well, does a corrective disclosure
7   disclose the truth about something that was
8   previously misrepresented?
9       A.   It can.  It can, or it can simply
10  correct the economic impact of the falsehood.
11      Q.   Now, it's your opinion that Dana's
12  October 10, 2005, disclosure corrected a previous
13  misstatement about the deferred tax asset; is that
14  true?
15      A.   Which disclosure?
16      Q.   The October 10, 2005.
17      A.   Well, it certainly corrected
18  omissions, prior alleged omissions.  Let me...
19          And it did correct representations
20  that the financial statements were reliable for
21  all of 2004 and the first quarter of 2005.  So,
22  yes.  I would have to answer your question as yes.
23      Q.   What misstatement about the deferred
24  tax asset did the October 10, 2005, disclosure
25  correct?

148

1           MS. WYMAN:  Object to form.  It
2   misstates his testimony.
3       A.   Well, it corrected an omission, an
4   alleged omission.  The alleged omission is that it
5   should have been an announcement on July 20th, or,
6   at latest, July 20, 2005, that the company would
7   not be able to use that deferred tax asset.
8       Q.   So you're saying when you refer to an
9   "alleged omission," namely that Dana should have
10  made an announcement on July 20 that it would not
11  be able to use the deferred tax asset, is that
12  because it's your opinion that Dana knew on
13  July 20 that it would not be able to use its
14  deferred tax asset?
15      A.   No.
16      Q.   So is it your opinion that Dana should
17  have announced on July 20, 2005, that it would not
18  be able to use its deferred tax asset even if it
19  did not know that?
20      A.   That's not my opinion.
21      Q.   All right.  In the Karpoff paper,
22  wasn't the author's goal to examine the reasons
23  for share value losses stemming from public
24  disclosures by companies that trigger or reveal an
25  investigation by the SEC or the DOJ?

149

1           MS. WYMAN:  Object to form.
2       A.   No.
3       Q.   Would you look at Page 592 of the
4   Karpoff article, and the caption "The Total
5   Valuation Effect."
6       A.   Yes.
7       Q.   Do you see the first sentence which
8   says, quote, "The results in Table 5 indicate that
9   large share value losses stem from public
10  disclosures that trigger or reveal an
11  investigation"?
12      A.   Yes.
13      Q.   Do you see the second sentence after
14  that which states, quote, "Our goal is to examine
15  the reasons for these declines in value"?
16      A.   Yes.
17      Q.   Do you agree that the goal of the
18  Karpoff paper was to examine the reasons for the
19  large share value losses that stem from public
20  disclosures that trigger or reveal an
21  investigation?
22      A.   No, it's not defined -- you're
23  conflating their analytic methodology with the
24  scope and objective of their paper.  The scope and
25  objective of their paper is best captured in their

38  (Pages 146 to 149)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

150

1    abstract, or best articulated in their abstract,
2    where they wish to examine reputation losses,
3    whether or not reputation losses impose
4    substantial penalties for cooking the books,
5    whether or not the evidence belies a wide-spread
6    belief that financial misrepresentation is
7    disciplined lightly.
8         Their analytic methodology is to
9    screen for companies based on SEC enforcement
10   actions, but their purpose is to determine whether
11   or not there is a cost to firms of cooking the
12   books and making financial misrepresentations.
13   Q.   So when the authors of the Karpoff
14   paper state at Page 592 of their paper, "Our goal
15   is to examine the reasons for these declines in
16   value," you disagree and say their goal was
17   actually something else; is that right?
18        MS. WYMAN:  Object to form.
19   A.   Not at all.  They have a goal of --
20   they chose the screen for reasons that they
21   describe.  They believe it's representative
22   of companies that meet the screen.  They explain,
23   a representative of companies that have cooked the
24   books or made financial misrepresentations.  They
25   observe large price declines, and their goal is to

151

1    examine the reasons for these large price
2    declines.
3         So, again, their analytic methodology
4    is to choose a screen that's manageable, but the
5    scope of their paper is they state it to be is
6    about -- is firms that cook the books and firms
7    that make financial misrepresentations.
8    Q.   They studied firms that were involved
9    in SEC and DOJ enforcement actions and the reasons
10   for the declines in share value connected with
11   that, but you say that their goal was broader than
12   that?
13        MS. WYMAN:  Object to form.
14   Q.   Correct?
15        MS. WYMAN:  Misstates his testimony.
16   A.   It's not made -- it's not only I
17   that's saying that.  They explain, their paper is
18   about the cost to firms of cooking the books.  It
19   doesn't say the cost to firms of being involved in
20   an SEC enforcement action.
21        They choose a screen that's manageable
22   and objective and replicable but representative of
23   firms that cook the books and make financial
24   misrepresentations.
25   Q.   The Karpoff paper authors performed an

152

1    event study of the normal stock price returns
2    following disclosures that trigger or reveal an
3    investigation, correct?
4    A.   Right.
5    Q.   Is it a fact that the Karpoff paper
6    observed that a portion of the observed loss in
7    share value reflects an adjustment to the value of
8    the company would have had had its financial
9    statements never been cooked?
10   A.   Yes.  Yes.  That's essentially the
11   economic, the direct economic effect.
12   Q.   The Karpoff paper calls this portion
13   of the observed loss the, quote, "Readjustment
14   effect," correct?
15   A.   Okay.  I believe so.
16   Q.   In fact, the Karpoff paper states,
17   does it not, that, quote, "The readjustment effect
18   is the difference between the firm's observed
19   value and its hypothetical value had investors
20   based their values on accurate financial
21   statements"?
22   A.   Well, I couldn't vouch for the
23   accuracy of your quote, but it sounds consistent
24   with what Karpoff said.  That's their analysis.
25   That's their position.

153

1    Q.   Now, is it a fact that the Karpoff
2    paper estimated the readjustment effect for each
3    company in its event study by measuring the book
4    value of assets that each company wrote off during
5    its enforcement period and then multiplying that
6    number by the median market-to-book value ratio
7    for similar companies?
8    A.   Well, it sounds like you're reading
9    from the article or a portion of it.  I don't
10   think -- it's not the only thing they did, but it
11   sounds like it was a part of -- I trust that
12   you're reading accurately from the article.
13   Q.   So --
14        MS. WYMAN:  Let him --
15   A.   And that seems to be part of what they
16   did in their research.
17   Q.   Well, my question is about how the
18   Karpoff paper's authors estimated the readjustment
19   effect for each company in their event study.
20   Okay?  Specifically about that.  Not about
21   anything else that they did or talked about in
22   their paper.
23   A.   Can you tell me --
24   Q.   Page 597.  Why don't we look at
25   Page 597.

39  (Pages 150 to 153)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

154

1      A.   All right.  So I just want to point
2  out in their opening paragraph on this section,
3  they say "The readjustment effect is the amount
4  the share values should decrease" -- "that the
5  readjustment effect is the portion of the observed
6  loss in share values that reflects an adjustment
7  to the value the firm would have had if its
8  financial statements had never been cooked."
9      It's a portion of the decline in the
10  absence of legal penalties or reputation effects.
11  So that's what I've been calling the direct
12  economic effect.
13      Q.   My question really was not about that.
14  I think you answered my question about what you
15  just referred to previously, and we're trying to
16  move on.
17      So I direct your attention to the
18  second paragraph on Page 597 which states, quote,
19  "We estimate the readjustment effect by measuring
20  the book value of assets that each firm writes off
21  during each year of its enforcement period, from
22  the end of the violation period through the
23  resolution proceeding," right?
24      A.   Yes.
25      Q.   So my question was -- I'll repeat the

155

1  question I asked you before.
2      Is it correct that the Karpoff paper
3  estimated the readjustment effect for each company
4  in the event study by measuring the book value of
5  assets that each company wrote off during its
6  enforcement period and then multiplying that
7  number by the median market-to-book value ratio
8  for similar companies?
9      A.   That's what they wrote, yes.
10      Q.   Is it also correct that the Karpoff
11  paper checked the robustness of those estimates by
12  multiplying each company's restated earnings
13  estimates by the median industry price-to-earnings
14  ratio?
15      A.   Where are you reading from now?
16      Q.   I was reading from my notes for this
17  deposition.
18      MS. WYMAN:  Is there a portion of the
19  article you could point him to so he can better
20  understand and answer your question?
21      MR. LINKER:  Yeah.  I would be glad
22  to.
23      Q.   The first full paragraph on Page 608.
24      A.   On 608?
25      Q.   Yes.  Six zero eight.  First full

156

1  paragraph that begins with the words
2  "Nevertheless."
3      A.   Okay.  Yes, it does say that.  It is a
4  robustness check that they run.
5      Q.   It is a fact, isn't it, that in your
6  report, Professor Feinstein, you did not calculate
7  a readjustment effect related to Dana's financial
8  restatements by using either the book value
9  approach or the restated earnings approach that
10  the Karpoff paper's authors performed for each
11  company in their event study?
12      A.   Because I was able to use their work.
13  This is how they arrived at the ratio of
14  reputation effect to direct economic effect.  I
15  didn't have to reinvent the wheel, redo their
16  research and analysis.
17      They provided, based on their
18  analysis, the ratios that I and other people can
19  use to decompose an observed price change and to
20  direct economic and reputational effects.
21      I did not rebuild or replicate the
22  work in their published article, because I was
23  able to use the results for their published
24  article to arrive at informative conclusions for
25  my work.

157

1      Q.   So the answer to my question is, yes,
2  you did not calculate a readjustment effect by
3  using either the book value approach or the
4  restated earnings approach that they used for each
5  company in their event study, right?
6      MS. WYMAN:  Objection.  Asked and
7  answered.
8      A.   Again, it's hard to say yes or no to
9  that.  I did calculate the direct economic and the
10  reputational effects.  I based it on their work,
11  and they did those calculations that you
12  described.  I did not do those calculations
13  independently.
14      Q.   They did -- they used a book value
15  approach confirmed for robustness by a restated
16  earnings approach for each company in their sample
17  individually based on the fact relating to each
18  such company, correct?
19      MS. WYMAN:  Object to form.
20      A.   Yes.
21      Q.   They were able to do that for each
22  company in their sample and they did do that for
23  each company in their sample, correct?
24      MS. WYMAN:  Object to form.
25      A.   Yes.

40  (Pages 154 to 157)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

158

1    Q.   And you were able to do that for Dana
2  but chose not to do that, correct?
3       MS. WYMAN:  Objection.  Argumentative.
4    A.   It wasn't necessary.  I was able to
5  use the output, the results of their research, the
6  ratios that they said are appropriate for
7  decomposing an observed price drop into economic
8  and reputational effects.
9       There are -- I mean the fact that they
10  felt it necessary to average together a large
11  number of individual observations usually stems
12  from the fact that there are challenges and
13  uncertainties and errors in any individual
14  observation, which is why I concluded and this is
15  an approach, methodological approach, I've seen
16  often to use the averages from the literature for
17  the purpose stated.
18    Q.   Now, are you saying that if you had
19  performed either a book value or restated
20  earnings, direct determination of the readjustment
21  effect for Dana, you couldn't not have done that
22  without committing errors?
23       MS. WYMAN:  Object to form.  Misstates
24  his testimony.
25    A.   Well, they described it, in any one

159

1  particular application, there are errors.  They
2  describe this in the last paragraph on Page 607.
3  As a result, the conclusion that they present from
4  their paper is the average from a number of
5  companies.  And that's what I believed was the
6  most reliable approach, was to use the averages
7  from the industrywide study that they completed.
8    Q.   Now, the ratio of readjustment effect
9  to stock price drop for a particular -- for the
10  particular company is the data that they examined,
11  correct?
12    A.   I didn't follow.
13    Q.   The ratio of the readjustment effect
14  that they computed to the stock price drop for the
15  particular companies in their sample is the data
16  that they examined, correct?
17    A.   No.  That's the conclusion they drew
18  from the data that they examined.
19    Q.   All right.  So they calculated a
20  readjustment effect for each company in their
21  sample, correct?
22    A.   Yes.
23    Q.   And they calculated the ratio of that
24  readjustment effect to the stock price drop for
25  each company?

160

1    A.   I think it's they did and they make it
2  very clear that -- what you're reading from is an
3  appendix, not the body of the article, but an
4  appendix.  It talks about alternative ways to
5  measure the readjustment effect and the
6  sensitivity of the estimated reputation lost to
7  these alternatives.
8       So they're not proposing this as the
9  appropriate way to measure reputation loss and
10  readjustment effects on the ratio between the two.
11  They're testing their conclusions to see if
12  they're robust to these additional checks.
13       So, yes, for the purpose of testing
14  the robustness and applicability and reliability
15  of their conclusions, the conclusions that I used,
16  they run these additional tests.
17    Q.   You're saying a restated earnings
18  approach is what they use to do that robustness
19  check, correct?
20    A.   Well, no.  It says there is an
21  asset-based approach, an earnings-based approach.
22  They explain the practical problems with each of
23  these approaches and they conduct -- they describe
24  one of these as irresolvable.  "Firms often use
25  diverse often irresolvable restatement methods."

161

1       So the purpose of this section that
2  you're reading from was to serve as a robustness
3  check to the conclusions that they arrive at and
4  the conclusions that I use.  They were not
5  proposing this as being the correct way to measure
6  readjustment or reputation effects.
7    Q.   All right.  The appendix is titled
8  "Alternative Estimates of the Readjustment Effect
9  and Reputation Analysis," correct?
10    A.   That's right.
11    Q.   And that begins at Page 607?
12    A.   Yes.
13    Q.   Go back to Page 597.  We went through
14  this before, but just so that there is no
15  confusion.  We're not talking about the appendix
16  of Page 597, correct?
17    A.   Correct.
18    Q.   We're not talking about alternative
19  approaches described in the appendix at Page 597,
20  correct?
21    A.   Correct.
22    Q.   And at Page 597 they state, and we
23  went through this before, that they estimated the
24  readjustment effect by measuring the book value of
25  assets that each firm writes off during each year

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

162

1  of its enforcement period.  And that they
2  multiplied that number by the median
3  market-to-book value ratio for similar companies,
4  correct?
5      A.  Yes.
6      Q.  And that's the approach they used for
7  each company in their sample to directly measure
8  the readjustment effect, correct?
9      A.  Yes.
10     Q.  Now, the information that you use from
11 the Karpoff paper in a quantitative sense was
12 their average, correct?
13     A.  That's right.
14     Q.  Now, an average is a statistic
15 describing a population, correct?
16     A.  Yes.
17     Q.  And in a population that has an
18 average, which is a statistic, there also is a
19 variance from the average, correct?
20     A.  Yes.
21     Q.  So not every company in the sample had
22 the average ratio, correct?
23     A.  That's right.
24     Q.  All right.  So some had ratios of
25 readjustment effect to stock price drop different

163

1  from the average?
2      A.  That's reasonable to conclude, yes.
3      Q.  All right.  So for each company in
4  their sample, they calculated directly that ratio,
5  and they knew how that ratio differed from the
6  average, correct?
7      A.  Yes.  But for a variety of reasons,
8  including measurement error, which is one reason
9  why an individual observation is usually not as
10 good as the average from a population.
11     Q.  It's a fact, isn't it, Professor
12 Feinstein, that there is no reason that you could
13 not have performed a calculation of the
14 readjustment effect for Dana in the manner that
15 the Karpoff paper authors did for each company in
16 their sample to directly estimate the difference
17 between Dana's actual stock price during the class
18 period and its hypothetical stock price had the
19 market price been based on actual financial
20 statements?
21     MS. WYMAN:  Object to form.
22     A.  Absolutely false.  There are numerous
23 reasons why the approach that I took was the best
24 approach, including the fact that in this
25 particular case the alleged misrepresentations and

164

1  omissions were both asset-based and
2  earnings-based, not one or the other.
3      Q.  I didn't ask you whether your method
4  was better.  I asked you whether it's a fact that
5  there is no reason that you could not have
6  performed a calculation of the readjustment effect
7  for Dana in the manner that the Karpoff paper
8  authors did for each company in their sample?
9      MS. WYMAN:  Object to form.  Asked and
10 answered.
11     Q.  You could have done it, but you
12 didn't, right?
13     A.  No, that's not true.
14     Q.  You couldn't have done it?
15     A.  It's an inferior method.  It would not
16 be the right thing to do, because the allegations
17 in this case are that the misrepresentations were
18 asset-based and earnings-based, not one or the
19 other.
20     Averages -- this is the seminal
21 article on the subject, and it makes perfect
22 sense -- well, I could explain for a variety of
23 different reasons why what I did was better and
24 doing it any other way would not have been
25 reliable.

165

1      Q.  So if you had measured the direct
2  economic effect in this case for Dana in the
3  manner that the Karpoff paper authors did for each
4  company in their sample, it's your opinion that
5  the result would not have been a reliable result;
6  is that correct?
7      A.  It would not have been as reliable as
8  using the average from the population.  That's my
9  opinion.
10     Q.  It would not have been reliable at
11 all, or it would not have been as reliable?
12     A.  It would not have been as reliable as
13 using the population average, for a variety of
14 reasons.
15     Q.  Is there a reason why you could not
16 have done it?
17     A.  I made a determination that it wasn't
18 the appropriate approach.
19     Q.  But was it possible --
20     MS. WYMAN:  He's not done with his
21 answer, Arthur.  Please let him finish.
22     MR. LINKER:  I'm sorry.  I thought he
23 had finished.
24     A.  Well, I believe there would have been
25 difficult, if not insurmountable, obstacles along

42  (Pages 162 to 165)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

166

1  the way, but I couldn't articulate exactly all of
2  those for you now, because -- except for the fact
3  that the nature of these misrepresentations is
4  that they were both asset- and earnings-based.
5      Q.   Now, you say here there were
6  misrepresentations that were asset-based. Which
7  misrepresentations are you referring to?
8      A.   Well, the deferred tax asset, for one.
9  Receivables, for another. And perhaps others.
10     Q.   So it's your understanding the
11 Plaintiffs allege in this case that Dana's
12 receivables were materially misrepresented during
13 the class period?
14     A.   My understanding from reading the
15 Mintzer report is that receivables - and from
16 reading the complaint - is that receivables was
17 one of the areas, and false invoices resulting in
18 false receivables, was one of the areas of
19 improper accounting.
20     Q.   You got that from the Mintzer report?
21     A.   And the complaint, yes.
22     Q.   Do you have -- withdrawn.
23          What is your understanding, if any, of
24 the approximate percentage amount by which Dana
25 allegedly misrepresented its receivables in its

167

1  financial statements during the class period?
2      A.   I couldn't expound on that. I don't
3  have that information --
4      Q.   Do you have any reason to believe that
5  there was any material misrepresentation of the
6  amount of Dana's receivables in its financial
7  statements during the class period?
8      A.   Well, I accepted the allegations in
9  the complaint as working assumptions. And, as I
10 said earlier today, I tested those assumptions for
11 reasonableness by looking at certain documents
12 myself, including the Mintzer report.
13     Q.   Now, if you had focused on Dana's
14 alleged misstatement of its earnings and not the
15 deferred tax asset, could you have performed a
16 direct calculation of the readjustment effect
17 using the earnings approach described in the
18 Karpoff paper?
19     A.   I'm not sure. I chose the methodology
20 I chose for reasons I've already described. I
21 mean, if you want me to take the time to review
22 the paper again. I mean, it's something I would
23 have to think about whether --
24     Q.   I'm not asking you why you did what
25 you did. I was asking you whether you could have

168

1  done what I asked you about. Let's move on.
2          It's a fact, isn't it, that you are
3  not aware of any court having accepted using the
4  Karpoff study to measure either the direct
5  economic effect or a reputation effect as you say
6  you have done here?
7          MS. WYMAN: Object to form.
8      A.   I'm not sure that's true. I would
9  have to review some notes and review some
10 documentation.
11     Q.   Are you aware of any court having
12 accepted using the Karpoff study to measure either
13 the direct economic effect or a reputation effect,
14 as you say you have done here?
15     A.   Well, it's usually not necessary to
16 sort them out, to separate one from the other.
17          I do know that I testified in court
18 recently about a damage calculation that was
19 accepted by the Court, and I routinely use the
20 Karpoff research and their results in order to
21 disaggregate price drops into reputational and
22 economic effects when necessary. So I would want
23 to check whether I did it in that particular case.
24 That's one case I know about personally.
25     Q.   I understand you're referring to some

169

1  recent testimony. What case was that?
2      A.   Longtop. I went to trial. I
3  testified about damages. Damages were calculated
4  the way I usually do.
5      Q.   Isn't it a fact that you're not aware
6  of any economic researcher who has applied the
7  Karpoff study to estimate either the direct
8  economic effect or a reputation effect of a fraud
9  disclosure by an individual company in the same
10 way that you say you have done here?
11          MS. WYMAN: Object to form.
12     A.   Well, first of all, what I did was I
13 estimated -- I would say no to that. And the
14 reason why -- I mean, I would say, no, that's not
15 true what you said, the way you phrased it is not
16 true. I estimated the economic and reputational
17 effect in the standard way that many financial
18 analysts do, both in forensic settings and
19 academic settings and reports that have been
20 accepted by the Court, by using an event study.
21          I estimated the economic and
22 reputational effect in the aggregate using an
23 event study observing the price drop that occurred
24 when there was a corrective disclosure.
25          So it's not the estimation of the

43 (Pages 166 to 169)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

170

1  loss, or an estimation of the price drop, it's a
2  disaggregation of the loss into those two effects
3  for purposes of constructing the inflation ribbon
4  backwards for purposes of estimating when the
5  inflation entered the stock price.
6       So I just want to be real clear. I
7  estimated the loss using an event study. I use
8  Karpoff for disaggregating the estimated loss into
9  two factors.
10      Q.  Are you aware of any academic
11  researcher who has applied the Karpoff study to
12  disaggregate a loss relating to an individual
13  company in the same way that you say you have done
14  here?
15      A.  An academic study is what you asked
16  for?
17      Q.  An academic researcher.
18      A.  I mean, the -- the academics produce
19  the models. The practitioners then apply them to
20  individual companies. You wouldn't expect to see
21  an academic article applying Karpoff at all to a
22  specific company. It's the application of what
23  was developed in the academic setting.
24          THE WITNESS: If there is no question
25  pending, could we take a break?

171

1           MS. WYMAN: Sure.
2           VIDEO TECHNICIAN: The time is 2:38.
3  We are off the record.
4           (Proceedings recessed at 2:38 p.m.,
5  and reconvened at 2:51 p.m.)
6           VIDEO TECHNICIAN: Okay. We are back
7  on the record. It's 2:51. This is DVD number
8  four.
9  BY MR. LINKER:
10      Q.  Professor Feinstein, do you have your
11  rebuttal report there?
12      A.  Yes, I do.
13      Q.  Would you please look at Page 25,
14  Paragraph 77. Do you have that?
15      A.  Yes.
16      Q.  And in that paragraph you respond to
17  Professor Stulz's criticism of your using the
18  average from the Karpoff paper, correct?
19      A.  Yes.
20      Q.  And in the last sentence of Paragraph
21  77, you say, quote, "Subsequent researchers,
22  practitioners, and even policymakers, justifiably
23  apply the findings to out-of-sample new cases,"
24  close quote.
25      A.  Yes.

172

1       Q.  Is there any subsequent research that
2  you cite here that supports that statement?
3       A.  There is, but it's not cited here.
4       Q.  Can you tell us what it is, please?
5       A.  I don't have it memorized, but I
6  verified that it's the case.
7       Q.  Well, did you make a record of what
8  research you reviewed in preparing your report
9  that you refer to here?
10      A.  Well, I did -- I do have a list of
11  documents reviewed and relied upon, but I've used
12  this Karpoff article this way, and in other cases.
13  So when I verified that fact, it may have been in
14  a prior case, and, therefore, there won't be a
15  list of those articles in this report.
16      Q.  You're saying there was some other
17  report in another case that lists the authorities
18  that support using the Karpoff average in a case
19  of a specific company?
20      A.  No. I'm saying that I previously
21  checked prior to this case whether subsequent
22  researchers, practitioners, and policymakers have
23  applied these findings to out-of-sample new cases.
24  That was work I did not just for this engagement.
25      Q.  But you, as we sit here today, can't

173

1  identify any published research where that was
2  done, correct?
3       A.  I know that -- I mean Karpoff is well
4  cited. I can vouch for it that there are
5  citations to Karpoff. Lots of them.
6       Q.  Oh, that's not what I'm asking you
7  about. I'm not asking about whether Karpoff's
8  study was cited in other research. I'm asking you
9  whether you were saying in Paragraph 77 that there
10  is other published research where the author, or
11  the person performing the research, said that you
12  could apply Karpoff's average to draw conclusions
13  about price impact in the case of a specific
14  company.
15          MS. WYMAN: Object to form.
16      A.  But that's not what it says in
17  Paragraph 77, either. So I can't tell --
18      Q.  Oh, it doesn't say that in Paragraph
19  77?
20      A.  Correct. It does not.
21      Q.  So let me ask you this question, then.
22  Are you aware of any published research in which
23  Karpoff's average was applied to measure or to
24  disaggregate stock price impacts for a specific
25  company?

44  (Pages 170 to 173)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

174

1      MS. WYMAN:  Object to form.  Asked and
2  answered.
3      A.   I'd have to review for that.  I can't
4  tell you as I sit here right now.
5      Q.   So you don't know whether or not there
6  is any such research, correct?
7      A.   Well, that wouldn't be research.  That
8  would be an application.
9      Q.   So you do not know whether there is
10  any publication in the field of financial
11  economics in which the Karpoff average was used to
12  make conclusions about disaggregation of stock
13  price drops for a particular company?
14      A.   Well, as we talked about before,
15  that's not -- I mean, you wouldn't expect to see
16  that.  You wouldn't expect to see an academic
17  article of simply using the Karpoff result.  I
18  mean, I can tell you that other researchers have
19  cited to Karpoff and have used Karpoff's findings
20  in their research, which is what I do say in
21  Paragraph 77.  It's a well-respected reputable
22  conclusion -- a well-regarded study.
23      Policymakers, too, have cited to the
24  Karpoff article, and that's what I said in
25  Paragraph 77.  Exactly how they did and which ones

175

1  might have used it in the manner that you just
2  described, that's something I would have to check.
3      Q.   All right.
4      A.   As I sit here right now today, I
5  couldn't tell you for sure one way or the other.
6      Q.   So you believe that the literature has
7  cited Karpoff's study in the average that he
8  presents in his study, but you can't say whether
9  or not that average was used in the literature to
10  draw conclusions about a particular company?
11      MS. WYMAN:  Object to form.  Misstates
12  his testimony.
13      A.   By researchers in a published academic
14  study, I don't know one way or the other as I sit
15  here right now.
16      Q.   Would you look at Page 599 of the
17  Karpoff article.  In fact, you can start looking
18  at the beginning of section VII(A) which begins at
19  the bottom of Page 598.
20      A.   Yes.
21      Q.   Okay.  Isn't it a fact that the
22  Karpoff paper states that the change in firm value
23  when news of the misconduct is revealed to
24  investors is a sum of several elements?
25      A.   May I please hear the question again?

176

1      Q.   Isn't it a fact that the Karpoff paper
2  states that the change in firm value when news of
3  the misconduct is revealed to investors is a sum
4  of several elements?
5      A.   Yes.
6      Q.   And Karpoff in his paper calls that
7  change in firm value delta V?
8      A.   Yes.
9      Q.   And he says that delta V is the sum of
10  four effects, correct; the fine effect, the class
11  action effect, the readjustment effect, and
12  reputation loss?
13      A.   Later he combines fine and class
14  action to legal effect I believe.
15      Q.   If you look at Page 599, there is a
16  formula for delta V, is there not?
17      A.   Yes.
18      Q.   And it consists of the sum of those
19  four effects, correct?
20      A.   Right.
21      Q.   And is it your understanding that the
22  fine effect is the portion of share value loss
23  attributable to investors' expectations of future
24  monetary penalties that would be imposed by the
25  company by regulators?

177

1      A.   Yes.
2      Q.   And the class action effect, is it
3  your understanding that that is the portion of the
4  share value loss attributable to investors'
5  expectations of future class action settlement
6  payments that will be made by the company?
7      A.   Can you tell me where you're reading
8  from, because I believe it's not only the
9  settlement cost but the cost of the class action
10  act, the legal action in general.
11      Q.   So you believe it's the litigation
12  cost and the settlement cost?
13      A.   That was my understanding.
14      Q.   Do you see the sentence on Page 599
15  that says, quote, "Using a rational expectations
16  assumption, the sizes of the actual fines,
17  class-action settlements, and readjustments are
18  unbiased estimates of investors' expectations of
19  those amounts when news of the financial
20  misconduct becomes public"?
21      A.   Yes, I do.
22      Q.   So he's using the size of the actual
23  class settlement as an unbiased estimate of what
24  he calls the class action effect, correct?
25      A.   Yes.

45  (Pages 174 to 177)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

178

1    Q.   All right.  Now, the third element of
2  delta V that he describes in his paper on Page 599
3  is the readjustment effect, and that's the
4  difference between the firm's observed value and
5  it's hypothetical value had investors based their
6  values on accurate financial statements; is that
7  correct?
8    A.   Yes.
9    Q.   And the fourth element, which he calls
10  reputation loss, is it your understanding that, as
11  he used it in this paper, that reputation loss is
12  the remaining unexplained portion of the overall
13  loss in share value?
14    A.   Yes.
15    Q.   And Karpoff attributes that investors'
16  expectations of additional losses in firm value
17  from impaired operations or higher financing costs
18  caused by harm to the company's reputation?
19    A.   Correct.
20    Q.   All right.  Do you agree that the
21  decline in market price of a company's stock
22  following disclosure of an accounting fraud is
23  comprised of these four elements described and
24  analyzed in the Karpoff paper?
25    A.   Yes.

179

1    Q.   Therefore, do you also agree that the
2  stock price impact of the disclosure of an
3  accounting fraud exceeds the difference between
4  the post-disclosure stock price and what the
5  market price of the company's stock would have
6  been if the company's financial statements had
7  been accurate?
8    A.   No.
9      MS. WYMAN:  Object to form.
10    A.   No.  Read me the question again and I
11  can explain why.
12    Q.   Do you agree that the stock price
13  impact of the disclosure of an accounting fraud
14  exceeds the difference between the post-disclosure
15  stock price and what the market price of company's
16  stock would have been if the company's financial
17  statements had been accurate?
18    A.   No.  Again, you're conflating some
19  issues and I believe not interpreting or reading
20  Karpoff correctly.
21      The decline that we observe may be
22  greater -- the stock price that we ultimately end
23  up with may be lower than the stock price that
24  would ultimately have been ended up with had there
25  been reputable management that never committed the

180

1  alleged fraud.
2      So to that extent, the decline -- so
3  the difference between -- so there is a difference
4  between the stock price we end up with in the real
5  world with actual events when there was a fraud
6  that was then discovered and corrective
7  disclosures were made.  The stock price will be
8  lower in that scenario than if on alternative
9  reality there had been a management that was never
10  set on conducting fraud and misstating financials
11  and making misleading and false statements.
12      So the -- in the former scenario,
13  that's the correct interpretation of what Karpoff
14  means here by saying if there had never been a
15  fraud, if there had never been false statements
16  made; that there was a management in place that
17  deserved the high reputation that was not
18  committed to conducting the fraud that was
19  ultimately discovered.
20      In the actual events, as Plaintiffs
21  allege them to be, where there was a management
22  that was not deserving of that high reputation
23  because they did commit allegedly a fraud and did
24  misstate financials and did make false and
25  misleading statements, we will end up with a lower

181

1  stock price value.
2    Q.   I understand that that's --
3    A.   I mean a lower stock price value.
4    Q.   I understand that that's an argument
5  that you make in your report and that you are
6  making in your testimony today, but that's not
7  what I asked you about in my question?
8      My question did not refer to
9  management's reputation at all.  It referred to
10  the situation, quote, "If the company's financial
11  statements had been accurate," close quote.
12      And I think you agreed a few minutes
13  ago in answering questions about these components
14  of delta V that the readjustment effect was the
15  difference between the actual market price after
16  disclosure and the hypothetical market price had
17  investors based their values on accurate financial
18  statements, correct?
19    A.   I just think you're -- you're
20  interpreting the words in a way that then runs
21  contrary to Karpoff's work and the model in
22  Karpoff.  And I think in order to take your
23  presentation -- you would have to consider, if you
24  want to use those assumptions, that the correct
25  financials also includes a disclosure that

46 (Pages 178 to 181)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

182

1  management was committed to fraud.  Then Karpoff's
2  definitions and yours might coincide better.
3      Q.  Now, the phrase "accurate financial
4  statements," means financial statements that
5  accurately report the company's assets, results of
6  operations, and cash flows, correct?
7      A.  It also includes certifications that
8  the financials in all material respects reflect
9  the true condition of the company.  That's also in
10  the financial statements.
11      So if the company presented accurate
12  financial information but correctly said "We don't
13  believe these are reliable," you're going to end
14  up with a different stock price than if they say
15  it is reliable.
16      Q.  Okay.  Let's move on, because we have
17  a limited amount of time today and we have to
18  cover a number of different issues.
19      I direct your attention to Paragraphs
20  87 through 90 of your report and Pages 34 through
21  36.
22      MS. WYMAN:  Are we back to
23  Exhibit 677?  The original report?
24      MR. LINKER:  When I say "report," I'm
25  distinguishing his report, Exhibit 677, from his

183

1  rebuttal report, Exhibit 678.
2      MS. WYMAN:  Right.  I just want to
3  make sure I'm looking at the right documents.
4      MR. LINKER:  Yes, you are.  His
5  report.
6      MR. LEVINE:  678.
7      MS. KILLAM:  677.
8      MR. LINKER:  No, his report is
9  Exhibit 677.  His rebuttal is Exhibit 678.  I'm
10  asking him to look at Paragraphs 87 through 90 of
11  his report, Exhibit 677, and Pages 34 through 36.
12      MS. WYMAN:  Got it.
13      MR. LEVINE:  Thank you.  Got it.
14      MR. LINKER:  I'm glad we're all on the
15  same page.
16  BY MR. LINKER:
17      Q.  Now, in these paragraphs and the
18  caption that precedes them, more specifically, you
19  state that Dana's own statements during the
20  relevant time period confirm the importance of the
21  alleged misrepresentations, omissions and
22  deceptive conduct, correct?
23      A.  Yes.
24      Q.  Now, in Paragraph 87 of your report,
25  you refer to Dana's, quote, "Own statements

184

1  concerning its past earnings and future
2  profitability, many of which Plaintiffs allege
3  were false and misleading"; is that correct?
4      A.  Yes, I say that.
5      Q.  Which of the statements that you quote
6  in these paragraphs do Plaintiffs allege were
7  false and misleading?
8      A.  As I sit here now, I couldn't tell you
9  for sure.  I know that if I look at the complaint,
10  and I can pull it out of the complaint for you.  I
11  can refer you to the allegation section of my
12  report where I describe Plaintiff's allegations,
13  but that was -- I'm not opining about which
14  statements were false and misleading.  So, as I
15  sit here now today, I can't be confident that I'd
16  be giving you an accurate answer.
17      Q.  Well, do you intend to testify that
18  many of the statements in these paragraphs of your
19  report were false and misleading?
20      A.  No.  I would testify that Plaintiffs
21  allege that these -- many of the statements were
22  false and misleading, and I conducted my analysis
23  to see what the economic impact necessarily would
24  have had to have been if Plaintiffs proved their
25  case, that in fact they were false and

185

1  misleading -- that there were false and misleading
2  statements.
3      Q.  So the statements that you quote in
4  these paragraphs do not necessarily confirm the
5  importance of alleged misrepresentations,
6  omissions and deceptive conduct; is that correct?
7      A.  Oh, I disagree with you.  I can tell
8  you right now that the Plaintiffs are alleging
9  that statements about earnings and revenue and
10  cost, among other things, were false and
11  misleading.  And these are quotes from the company
12  that highlight those very areas.  So that
13  confirms, this is proof, that the company
14  themselves, the company itself and Defendants
15  themselves, thought those topics were -- that that
16  information was important information.
17      Q.  Okay.  Let's move on to Paragraph 88.
18  That's on Page 35 of your report.
19      In Paragraph 88 you state, quote, "The
20  dependence on future profitability of the
21  usability and therefore value of the deferred tax
22  asset that Dana Corp. made reported earnings and
23  future profitability ever more important,"
24  correct?
25      A.  In this particular case, yes.

47  (Pages 182 to 185)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

186

1    Q.   In what sense are you saying that the
2  company's reported earnings were more important?
3    A.   More important than in other cases?
4    Q.   Well, you assert an opinion that
5  reported earnings and future profitability were
6  ever more important.
7    A.   Yes.
8    Q.   That's your opinion?
9    A.   It is.
10   Q.   In what sense were the company's
11 reported earnings more important?
12      MS. WYMAN:  Object to form.
13   A.   Well, there is a cascade effect that
14 occur with Dana.  The company was well aware of
15 it.  Other companies if they have poor earnings,
16 there is an economic effect of poor earnings,
17 there is a valuation, market valuation the company
18 will suffer.
19      But in this particular case, that will
20 happen and they would have to write down a large
21 asset off their books, which essentially poor
22 earnings would trigger even worse earnings.
23 That's what happens in this case.
24   Q.   Do you believe that you are an expert
25 on the subject of what information is important to

187

1  investors?
2    A.   Yes.
3    Q.   What qualifies you as an expert on the
4  subject of what information is important to
5  investors?
6    A.   Well, I have a doctorate in economics
7  with a concentration in finance where I studied
8  specifically this.  I studied financial economics.
9  One of the basic pillars of financial economics is
10 valuation.  And valuation is all about what makes
11 security prices move.  Why are securities priced
12 what they are.  What information is relevant that
13 causes a price to be what it is rather than
14 something else.  That's a core of what I have a
15 doctorate in.
16      In order to receive a doctorate, I had
17 to prove to the faculty at Yale University that I
18 mastered the literature and I had to make a
19 contribution to the literature in that very field
20 of what information is important to investors for
21 assessing what assets are worth.
22      Beyond that, I also earned along the
23 way, subsequent during the Ph.D., the Chartered
24 Financial Analyst designation which is a -- that I
25 earned it represents a determination by the

188

1  Chartered Financial Analyst Institute that I had
2  mastered what they call their body of knowledge.
3      The body of knowledge is a curriculum
4  constructed by members of the CFA Institute about
5  what's important to be a successful practitioner
6  in the field of finance.  And core within that
7  body of knowledge is the field of valuation which,
8  again, is the subject of what information is
9  important.  What information is relevant material.
10 What causes security prices to be what they are.
11 What causes them to go up.  What causes them to go
12 down.
13      For the last 25 years, I've been a
14 full-time faculty member first at Boston
15 University, then at Babson College, teaching this
16 very subject; teaching and conducting research on
17 this very subject.
18      I've published in the area and I've
19 worked as a practicing financial analyst in the
20 area applying these principles.
21   Q.   When you say you've worked as a
22 practicing financial analyst, in what context did
23 you do that work?
24   A.   As a financial analyst first at the --
25 actually, I worked for some time at the Analysis

189

1  Group early on, and then the Michel-Shaked Group,
2  and then I formed my own firm, Crowninshield
3  Financial Research, where we were engaged by
4  corporations, government bodies, law firms to
5  answer the question of what information --
6  generally the question I'm asked is:  Was this
7  information important to investors or not.  Was it
8  this information, and they'll cite some
9  information for me, that made the stock price go
10 up, and then other information I had to determine
11 if it was that information that made the stock
12 price go down.
13   Q.   And were those engagements in
14 connection with litigation?
15   A.   Most were.  Some weren't.
16   Q.   Which ones were?
17   A.   Well, I've been called in to work for
18 Lucent Technologies, Honeywell, IT&T, among other
19 companies, to conduct executive education and
20 answer questions about financial management.
21      Financial management includes both
22 corporate financial management and financial
23 markets.  Financial markets is all about the
24 question that you asked whether I'm an expert in
25 it or not.

48  (Pages 186 to 189)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

190

1    Q.   Were you asked by those companies to
2  perform financial analyses of their businesses or
3  operations or financial statements?
4    A.   Yes.
5    Q.   Have you applied any methodology in
6  reaching conclusions about the importance of
7  Dana's reported earnings and future profitability?
8    A.   I'm sorry.  I need to hear that
9  question again.
10    Q.   Have you applied any methodology in
11  reaching conclusions about the importance of
12  Dana's reported earnings of future profitability?
13    A.   Yes.
14    Q.   What methodology have you applied?
15    A.   Okay.  So you're asking me --
16  basically you're asking me how did I go about
17  doing the loss causation analysis.  How did I
18  determine that information on that subject
19  was important.
20       What I usually do, and what I did in
21  this particular case, is a multi-pronged approach.
22  I looked to see whether the information at issue
23  is considered -- whether it's consistent or
24  inconsistent with financial principles, with
25  fundamental principles of valuation in the

191

1  literature, whether it's consistent or
2  inconsistent that that information is important.
3       And I found in this particular case, I
4  mean the information of what this case is about,
5  earnings, financial reporting, internal controls,
6  financial controls, that the financial literature
7  is in consensus.  That's important information to
8  investors.
9       And I also looked to see whether the
10  company statements and behavior support a finding
11  that that's important information, and that's the
12  section you had me looking at a moment ago.
13       Then I also looked at analyst
14  commentary to see whether analysts considered it
15  important.  And for analysts, I look at
16  essentially four different things.  I look at
17  their commentary before disclosures, and their
18  commentary after their disclosures.  And I looked
19  at their models; their models input before the
20  disclosures and their models after the
21  disclosures.  All of that confirmed in this case
22  that the information at issue in this case was
23  important to analysts and investors.
24       I looked at financial principles,
25  company statements, analyst statements, and then I

192

1  conducted empirical work.  The empirical work is
2  the event studies to see if when there was a
3  change in the mix of this information, was there
4  an identifiable reaction in the stock price.  And
5  in this particular case with respect to the
6  information at issue in this case, I am to a very
7  high -- with very high degree of professional
8  certainty, I found that, yes, it is.
9    Q.   Based on your event study?
10    A.   Based on the event study and the
11  analysis of company statements, analyst
12  statements, and financial principles.
13    Q.   Look at Paragraph 89 of your report,
14  please.  In that paragraph you state that Dana
15  acknowledged "the materiality of its accounting
16  irregularities and restatements in particular"; is
17  that right?
18    A.   It says "The Company acknowledged the
19  importance of accurate accounting in general, and
20  materiality of its accounting irregularities and
21  restatements in particular when it announced it
22  would be required to restate fiscal year 2004,
23  Q1 2005, and Q2 2005."  And I have the company
24  press release from September 15, 2005, as an
25  example of that.

193

1    Q.   You quote the company's press release?
2    A.   Yes.
3    Q.   And that quotation is the basis for
4  your statement "The Company acknowledged" what you
5  say, correct?
6    A.   One moment.
7       It's an 8-K.  I mean, this press
8  release was attached to an 8-K, which is the
9  company's determination that this is material
10  information that the market should be made aware
11  of.
12    Q.   Well, the 8-K doesn't talk about the
13  importance or materiality of accounting
14  irregularities, does it?
15    A.   Sure, it does.  The fact that this was
16  attached to an 8-K speaks to a determination that
17  this is important information.
18    Q.   That's an inference you draw from
19  reading the 8-K; is that right?
20    A.   No.  It's what a -- an 8-K, the rules
21  about an 8-K are that the company determines that
22  information is important and material, and there
23  are other rules.  But, essentially, the gist of it
24  is that if it's important information for
25  investors to have, you need to file an 8-K.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

194

1      Q.   Is that a legal conclusion that you're
2  making?
3      A.   It's financial analysis.  This is what
4  I know from being a financial analyst.
5      Q.   Are you expressing any expert opinion
6  on materiality in this case?
7      A.   Well, I want to be careful here,
8  because in some cases the Court's have asked for
9  my opinion on materiality and in other cases the
10  courts have said that the -- to say something is
11  material is a legal determination, and that they
12  would allow me to speak to the factors -- the
13  factors that, according to the legal scholars or
14  the legal experts, would compel a finding of
15  materiality.
16      So I don't want to go beyond what in
17  this particular circuit I would be allowed to say,
18  but I can tell you that I could speak to whether
19  the information at issue is important to investors
20  in making their valuation and trading decisions,
21  and whether it would materially -- whether it
22  would importantly significantly change the mix of
23  information available to them that may cause them
24  to make certain decisions rather than others about
25  valuation and investments.

195

1      Whether I can connect those dots and
2  then say "material," sometimes I, you know,
3  sometimes the courts are comfortable with me
4  saying that, and sometimes they're not.
5      Q.   But in your report, as you understand
6  it, do you express an opinion about materiality?
7      A.   Let me say yes, but defined from the
8  financial economic perspective rather than
9  implying some legal conclusion.
10      Q.   Why is there no opinion about
11  materiality set forth in the conclusions stated at
12  Pages 4 and 5 of your report?
13      A.   Well, the scope -- it's because of the
14  scope of what I was asked to look at was not a
15  conclusion of materiality, but a conclusion of
16  whether the alleged misrepresentations and
17  omissions caused losses.
18      So my conclusions conform to the
19  scope.  Materiality, defined from the financial
20  economic perspective, is one of the findings --
21  it's a finding that I arrived at which compels the
22  conclusion that there was loss causation.
23      I mean, I make clear at the beginning
24  that this report contains my methodology,
25  findings, and conclusions.  Findings are

196

1  essentially interim truths that I uncovered that
2  compel one conclusion or another.  So materiality
3  is a finding.
4      Q.   So in your report materiality is part
5  of your analysis of loss causation and the
6  quantification of damages and not a subject for an
7  opinion on the issue of materiality itself,
8  correct?
9      A.   I arrived at a finding about
10  materiality as defined from the financial economic
11  perspective, and that's in my report.  And it --
12  and then what else.  After that, what you said
13  there, that it then contributed to my conclusion
14  about loss causation, that is correct.  That's
15  correct that it contributed to my conclusion about
16  loss causation.
17      Q.   Let's look at the section of your
18  report that begins on Page 40 under the caption
19  "Event Study."  It starts at Paragraph 95.
20      A.   (Whereupon the witness complies.)
21      Q.   Are you there?
22      A.   Yes.
23      Q.   All right.  In this part of your
24  report you describe an event study that you
25  performed; is that right?

197

1      A.   Yes.
2      Q.   Now, in this section you state that
3  Tabak and Dunbar in a paper titled "Materiality
4  and Magnitude:  Event Studies in the Courtroom,"
5  quote, "Write about how the methodology is
6  generally accepted and widely used"; is that
7  right?
8      A.   Yes.  I see that.
9      Q.   It's in Paragraph 96, correct?
10      A.   Yes.
11      MR. LINKER:  Mark this, please, as
12  Exhibit 681.
13      (Document marked for
14  identification as Feinstein Exhibit 681.)
15      Q.   Have you been shown Exhibit 681?
16      A.   Yes.
17      Q.   Is this the Tabak and Dunbar paper
18  that you reference?
19      A.   No.  This seems to be an unpublished
20  version of it.  Or, rather, a preliminary working
21  paper version of it.
22      Q.   All right.  So this is a preliminary
23  version of that paper; is that right?
24      A.   That's right.
25      Q.   All right.  With that understanding,

50  (Pages 194 to 197)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

---

198

1  in Exhibit 681 Tabak and Dunbar in describing
2  event studies of the type used in litigation,
3  state that such an event study can be used to
4  analyze the stock and price impact of a news
5  disclosure event if four conditions are present?
6      A.  Where are you reading?
7      Q.  Look at Page 3 of Exhibit 681.
8          MS. WYMAN:  Before you get too far
9  afield with this, I'm going to object to the use
10 of this document.  It's not the document he relied
11 on.  He said it's a preliminary version of the
12 paper he relied on, and I think it's inappropriate
13 for you to be asking him questions about it in the
14 context of his opinions.
15         MR. LINKER:  Your objection is noted.
16 Thank you.
17     A.  I just also want to point out that
18 what I used this paper for is captured in the
19 first full paragraph on Page 2 where it says,
20 "Event studies" -- it says, "Although commonly
21 utilized in securities litigation, the use of
22 event studies in other types of commercial
23 litigation would be somewhat novel."
24         So this is Dunbar and Tabak.  Tabak
25 still is, Dunbar used to be, experts that work

---

199

1  primarily on the defense side.  They were at NERA.
2  And for them to agree with me that event studies
3  are commonly used in securities litigation is what
4  I wanted to point out in my report.
5      Q.  Your report in Paragraph 96 says that
6  Tabak and Dunbar in what I understand you are now
7  saying is the published version of the paper,
8  which this is a preliminary version, write about
9  how the methodology is generally accepted and
10 widely used in forensic applications, correct?
11     A.  That's right.
12     Q.  Okay.  Now, my question was:  In
13 Exhibit 681, it's a fact that they say that stock
14 price impacts of an event can reveal the effects
15 of the event on future cash flows if four
16 conditions are present.
17         MS. WYMAN:  I'm going to make a
18 continuing objection to any questions that you ask
19 him in specifics about this paper.  It is two
20 years younger than the one that he relied on.
21 It's not the one he relied on.  There is no way to
22 know whether this is the final version of it, and
23 it's totally and completely improper for you to
24 ask him any substantive questions about this
25 paper.

---

200

1          So those are my continuing objections
2  to every question you ask him in this deposition
3  about this Exhibit 681.
4          MR. LINKER:  Your objection is noted.
5  And did not hear you say that you know that
6  Exhibit 681 differs in any respect from the
7  version published that he cites in his paper.
8          MS. WYMAN:  I said there is no way to
9  know whether this version is different or not.
10 You haven't shown him the version he relied on.
11 You're asking him about a version that he says is
12 preliminary that's dated 1999 when the published
13 article is dated 2001, and I'm thinking that there
14 is probably a possibility that in that two years
15 there is revisions made to this version of the
16 paper.
17         It's totally inappropriate for you to
18 ask him any questions about it.  You can continue
19 to ask him those questions.  I'm not going to pull
20 him out of this room, but I'm not going to
21 continue to make the same objection.  It is a
22 continuing --
23         MR. LINKER:  You have a continuing
24 objection.
25         MS. WYMAN:  -- objection.

---

201

1          MR. LINKER:  You have a continuing
2  objection, that's fine.
3          MS. WYMAN:  That's right.  I do have a
4  continuing objection.  So you are free to waste
5  your time talking about this article.
6          MR. LINKER:  Well, that's your view.
7          In any event, it should be noted that
8  in footnote 61 the 2001 date relates to a legal
9  services handbook in which the Tabak and Dunbar
10 paper was published.  It does not state that the
11 date of the paper published in the handbook is
12 2001, but that the date of the handbook is 2001.
13 But let's go on.
14 BY MR. LINKER:
15     Q.  Now, Exhibit 681 says that an event
16 study can reveal the relevant effects if four
17 conditions are present:
18         "1. The event is a well-defined news
19 item.
20         "2. The time that the news reaches the
21 market is known.
22         "3. There is no reason to believe that
23 the market anticipated the news.  And;
24         "4. It is possible to isolate the
25 effect of the news from market, industry, and

---

51 (Pages 198 to 201)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

202

1    other firm-specific factors simultaneously
2    affecting the firm's stock price."
3        Do you agree that those are the
4    conditions that, if satisfied, permit an event
5    study to be used to analyze the stock price impact
6    of a news disclosure?
7        A.  It's not why I relied on this article.
8    I relied on this article to show that it's
9    generally accepted and widely used.  We already
10   saw how they talked about widely used, and in this
11   page here it also says that there are several
12   well-defined steps.  He cites numerous examples of
13   event studies being used.
14       So I think for what I used this
15   article for, it's clear that it was an appropriate
16   reference.  That it was the generally-accepted and
17   widely-used methodology in securities litigation.
18   That's what I cited to this article for.
19       I certainly don't agree with
20   everything that they say in this article, and I
21   have to think carefully about whether I want to
22   agree with the section you just read.
23       Q.  All right.  So, as we sit here today,
24   you cannot tell us whether you agree or disagree
25   that if these four conditions are satisfied, an

203

1    event can reveal the effects of a disclosure
2    event?
3        A.  Well, that's different from how you
4    phrased it before.
5        First of all, the preamble sentence to
6    the list of four conditions was "Consequently, the
7    stock price impacts of an event can reveal the
8    effects of the event on future cash flows if the
9    following conditions are present."
10       I will not agree that that's always
11   possible with an event study or that that's only
12   what's possible with an event study.
13       It's not just about the effect on
14   future cash flows.  You wouldn't only learn the
15   effect on future cash flows from running an event
16   study.  You can also learn the effect on the
17   reputation of the firm and the reputation effect
18   from an event study, for example.
19       Q.  Now, in Paragraph 98 of your report at
20   Page 40 you state, quote, "If the stock return is
21   deemed statistically significant, it indicates
22   that the stock price movement cannot be attributed
23   to market and sector factors, or to random
24   volatility, but rather was caused by new
25   company-specific information."

204

1        A.  Yes.
2        Q.  Paragraph 99 of your report says,
3    quote, "If the new information is a disclosure
4    that corrects previous misrepresentations,
5    omissions and deceptive conduct then a
6    statistically significant price decline
7    establishes that the misrepresentations, omissions
8    and deceptive conduct had previously inflated the
9    stock price and then caused investor losses when
10   disclosed," correct?
11       A.  Yes.
12       Q.  Now, is it correct that Paragraph 99
13   of your report does not say anything about a
14   disclosure of new company-specific information
15   that does not correct previous misrepresentations,
16   omissions and deceptive conduct?
17       A.  That's correct.  There is nothing
18   wrong with that.
19       Q.  And Paragraph 99 doesn't say anything
20   about a disclosure of new company-specific
21   information that includes both, one, the
22   correction of previous misrepresentations
23   omissions and deceptive conduct, and, two, other
24   company-specific information that does not
25   constitute such a correction?

205

1        MS. WYMAN:  Object to form.
2        A.  Are you asking about -- well, I don't
3    know whether to ask you to reread the question or
4    just tell me whether you're asking about
5    confounding information and the role of
6    confounding information.  Maybe I should just hear
7    the question again.
8        Q.  Is it a fact that Paragraph 99 doesn't
9    saying anything about a disclosure of new
10   company-specific information that includes both,
11   one, the correction of previous
12   misrepresentations, omissions and deceptive
13   conduct, and, two, other company-specific
14   information that does not constitute such a
15   correction?
16       A.  Well, as I've explained in my report,
17   if there is -- if that is the case, if there is a
18   mix of information, fraud-related and
19   nonfraud-related on the same day, then another
20   step is called for, which is to disaggregate or
21   address whether or not the other information is
22   potentially confounding information.  And I did
23   that for my -- in my work here.
24       Q.  So in Paragraph 99 you're talking
25   about a disclosure that does not contain

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

206

1    potentially confounding information, correct?
2        MS. WYMAN:  Object to form.  Misstates
3    the report.
4        A.   It says, "If the new information is a
5    disclosure that corrects previous
6    misrepresentations, omissions and deceptive
7    conduct."
8        Okay.  So by definition there, we're
9    talking about unconfounded new information.
10   Unconfounded fraud-related information.  If the
11   new information released on a particular day is a
12   disclosure that corrects previous
13   misrepresentations omissions and deceptive
14   conduct, then if we observe a statistically
15   significant price decline, one can conclude that
16   that disclosure caused the price decline.  We can
17   also conclude that the misrepresentations and
18   omissions and deceptive conduct had previously
19   inflated the stock price.
20       So 99 the way it's written does cover
21   the issue of confounding information.  It
22   essentially rules it out.
23       Q.   All right.  So in 99 you're saying the
24   situation where confounding information has been
25   ruled out, a statistically significant price

207

1    decline establishes causation; is that right?
2        A.   Yes.
3        Q.   So you agree that if the disclosure
4    contains information affecting the firm's stock
5    price that is confounding, you have to
6    disaggregate?
7        A.   You may have to.  There is a number of
8    different ways of dealing with confounding
9    information.
10       Q.   I thought you said you then performed
11   the second step, which is to disaggregate?
12       A.   Well, the second step may be to
13   disaggregate it, but there are other conditions
14   that may obviate the need to disaggregate.
15       Q.   What are those other conditions?
16       A.   Well, if the confounding information,
17   it actually countervails against a movement in the
18   direction of the fraud-related information.  So if
19   at the same time there is a disclosure that's very
20   negative, if at the same time there is an
21   announcement that's positive and we still see a
22   statistically significant decline, we can
23   conclude -- one can conclude with a high degree of
24   certainty that the fraud-related information
25   caused a loss.  So that's an example where you

208

1    wouldn't have to separate out the effects because
2    you know that the confounding information has an
3    effect in the opposite direction and yet the price
4    still fell significantly.  That's one example.
5        Another example would be where maybe
6    you could determine what appears to be confounding
7    information is actually old news already
8    understood by the market.  And if you've already
9    established that the market is efficient, the old
10   news won't move the stock price at all.
11       Q.   So old news is not news for this
12   purpose?
13       A.   Correct.  Um --
14       Q.   So address -- have you finished?
15       A.   Well, there are other examples of how
16   to deal with potentially confounding information.
17   There are other categories of potentially
18   confounding information and how one might deal
19   with them in addition to simply -- in addition to
20   doing a valuation disaggregation.
21       Q.   Now, if the disclosure contains
22   potentially confounding news that presumptively
23   would have a negative impact on stock price, in
24   that situation, would you have to disaggregate?
25       A.   You may.  I can think of examples

209

1    where you might not have to.
2        Q.   Such as?
3        A.   If the order of magnitude of the
4    alternative or confounding news is so much smaller
5    than the order of magnitude of importance of the
6    subject information, you might not have to do a
7    formal disaggregation to conclude that the
8    fraud-related information caused loss.
9        Q.   Would you have to do a disaggregation
10   to determine a quantification of the loss caused
11   by the fraud?
12       A.   If you wanted a precise -- if you
13   wanted a precise measure of the loss.  This is
14   more of a damage analysis than a loss causation
15   analysis.
16       If we move to that realm, then if the
17   confounding information is in fact new and
18   relevant and based on financial principles would
19   reasonably have an impact on the stock price, then
20   generally you would want to disaggregate them and
21   value the pieces of information to see how much of
22   the decline was caused by each piece of
23   information.
24       Q.   Now, in your event study, you analyzed
25   two disclosure events; namely, Dana's

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

210

1  announcements on September 15, 2005, and October
2  10, 2005, correct?
3      A.  Yes.
4      Q.  You found statistically significant
5  declines in Dana's stock price following each of
6  those disclosures?
7      A.  That's right.  I just want to also say
8  that the disclosures were compound disclosures.
9  Whether you call October 10th to be one disclosure
10 or a bundle of disclosures is a personal
11 preference.  It could be described either way.
12     Q.  So if I referred to the September 15th
13 disclosure, you understand we're talking about
14 everything that Dana disclosed on September 15th?
15     A.  Yes.
16     Q.  And same for October 10?
17     A.  Fair enough.
18     Q.  Now, you concluded in Paragraph 112 of
19 your report at Page 43, that, quote "The
20 statistical significance of these declines
21 indicates, to a high degree of statistical
22 certainty, that Company-specific information
23 caused declines in the price of Dana's stock on
24 those dates"?
25     A.  Yes.

211

1      Q.  All right.  Let's talk about the Dana
2  news disclosure on September 15, 2005.
3          Do you have that?
4      A.  Well, I'm looking in two places.  I'm
5  looking at my report on Page 26 and I'm looking at
6  Exhibit 655 that has the news release.
7      Q.  Okay.  Do you agree that Dana's
8  September 15, 2005 announcement contained
9  essentially three news items:  First, Dana reduces
10 2005 full-year earnings outlook to a range of $90
11 million to $105 million, or approximately 60 to 70
12 cents per share, from its previous announced range
13 of $196 million to $219 million, or $1.30 to $1.45
14 per share.
15         Second, Dana was assessing whether, as
16 the result of the change in earnings outlook, it
17 will be required to write down its U.S. deferred
18 tax assets.
19         And, third, Dana was likely to restate
20 its second-quarter 2005 financial statements,
21 primarily to correct inappropriate recognition of
22 price increases in its commercial vehicle business
23 during the second quarter.  And based on a
24 preliminary review, Dana believed that the
25 potential restatement could result in an after-tax

212

1  income reduction of approximately $10 million to
2  $15 million in second-quarter income?
3      A.  So just to recap, I'll say yes if the
4  recap is the reduction in guidance, the
5  consideration of writing down the deferred tax
6  asset, and need to restate Q2 2005 financials.
7      Q.  So you agree that we could view it as
8  comprising those three news items, correct?
9      A.  Right.  And then the other things in
10 there are implications of those same news items.
11     Q.  Now, at Page 44 of your report --
12     A.  Okay.
13     Q.  -- in Paragraphs 116 and 117 --
14     A.  Yes.
15     Q.  -- you state that you examined all of
16 the Company-related news that emerged and assessed
17 the valuation impact, if any, of that potentially
18 confounding information and found no other news on
19 those days aside from fraud-related partially
20 corrective disclosures that would have affected
21 Dana's stock price?
22     A.  Yes.
23     Q.  What methodology did you use in
24 performing that examination?
25     A.  I described it earlier today.  And

213

1  it's described here.  I read the news articles for
2  the periods surrounding this date and on this
3  date.  Similarly, analyst reports, any company
4  announcements and press releases, to see what
5  other news developments there may or may not have
6  been.  And then I don't recall that I found any
7  that were of any significance.
8      Q.  And in your report you express your
9  conclusion based on reading those materials,
10 correct?
11     A.  Yes.  Reading those materials with an
12 eye towards financial valuation principles.
13     Q.  And that's all that you did, correct?
14     A.  To determine what other news may have
15 come out that day or just before that day or just
16 after, yes.
17     Q.  What reliable methods exist for
18 isolating the stock price impact of fraud-related
19 corrective disclosures from other confounding
20 company-specific news?
21     A.  I just described them a few answers
22 ago.  There is essentially a fairly broad tool kit
23 where there is an appropriate tool for each
24 potential type of scenario.
25     Q.  What you describe was reading the news

54  (Pages 210 to 213)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

214

1    and drawing a conclusion, correct?
2         A.    No.  That was in order to determine
3    that there was no potentially confounding
4    information.  You asked, if there was, how would I
5    sort it out from the fraud-related information.
6         Q.    Yes.
7         A.    That's a different question, but it's
8    a --
9         Q.    So how would you sort it?
10        A.    It's a different question than you
11   asked earlier.
12             Well, it wouldn't be necessary under
13   certain -- some circumstances.  It wouldn't be
14   necessary if the confounding information had a
15   directional impact opposite of the fraud-related
16   information.  You can arrive at a conservative
17   estimate of the economic impact of the
18   fraud-related news by essentially -- by
19   understanding that the impact of the
20   countervailing positive news was to mitigate the
21   still significantly -- still statistically
22   significant drop.  So that's one approach.
23             But suppose that it's material
24   confounding information and, in fact, it's
25   legitimate confounding information, meaning it's

215

1    valuation relevant, it's company-specific, and
2    it's new, you could perform some valuation
3    analyses.
4         Q.    Well, describe what reliable methods
5    exist for performing such valuation analyses?
6         A.    Well, you know, it's not an opinion I
7    need to express in this particular case.  It
8    wasn't necessary to do that.  I mean it just
9    wasn't the case.  I mean, sure, it's challenging
10   sometimes.  But in this particular case, there was
11   no such challenge.  There was no legitimate
12   confounding information that had to be dealt with.
13        Q.    Did you perform any such analysis
14   using the methods that you just referred to to see
15   what the disaggregated stock price impact would be
16   if any of the news items disclosed on
17   September 15th and October 10th were found to be
18   non-fraudulent?
19             MS. WYMAN:  Object to form.
20        A.    So, first of all, I want to be real
21   clear.  We're talking about a hypothetical.
22        Q.    Yes.
23        A.    You're asking -- I think what you're
24   asking is did I disaggregate the economic impact
25   of at least one of the three news items from the

216

1    other two.
2         Q.    Yes.
3         A.    I did not do that.
4         Q.    Let's turn to Paragraph 132 of your
5    report.  That's on Page 47.
6         A.    Okay.  Which?
7         Q.    Paragraph 132 of your report at
8    Page 47.
9         A.    (Whereupon the witness complies.)
10        Q.    Now, is it correct that you state
11   there, quote, "It is my understanding that expert
12   accounting testimony will establish that the
13   corrective disclosures made on 15 September 2005
14   could and should have been made on 20 July 2005.
15   That is, the warning that reported Q2 2005
16   earnings required revision, the correction to
17   forward guidance, and the warning regarding the
18   write down of the deferred tax asset would have
19   been unnecessary on 15 September 2005 had there
20   been full and truthful disclosure on 20 July
21   2005"; is that accurate?
22        A.    That's what I wrote.
23        Q.    How did you obtain that understanding
24   regarding what expert testimony will establish?
25        A.    I asked counsel -- well, actually I

217

1    asked them at one point were they relying on me to
2    make that conclusion, and would they be relying on
3    my analysis.  Was that part of the scope of my
4    engagement.  And they told me that it was not part
5    of the scope of my engagement to opine about
6    whether the corrective disclosures could or should
7    have been made on July 20, 2005.
8              I asked -- I clarified that I would be
9    assuming the truthfulness -- the truth of that
10   allegation.  And I also -- and then I asked, you
11   know, what -- could I examine or could I -- what
12   could I examine that would make that assumption,
13   that would give me comfort that that was a
14   reasonable assumption.  And I was told that at the
15   same time I was preparing my report, there was a
16   report being prepared by Andrew Mintzer who was
17   going to testify to that.  To those facts.
18        Q.    So the understanding that you set
19   forth in Paragraph 132 of your report comprises
20   assumptions that were provided to you by
21   Plaintiffs' counsel and that you used in
22   formulating your opinion?
23        A.    Essentially, yes.  I mean, there
24   was -- the scope of my engagement was to assume
25   the allegations -- to assume the allegations were

55 (Pages 214 to 217)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

218

1  true. So I don't know if that means that I was
2  provided with the assumptions. My understanding
3  is that the scope was provided to me by counsel.
4  And my clarification of what that scope included
5  was that I would be assuming the truth of the
6  allegations.
7      Q.  You say "the allegations."
8      A.  Pardon?
9      Q.  You say "the allegations."  Are you
10  referring to the allegations in the complaint in
11  the plumbers' case?
12      A.  Yes.  And the Hawaii case.
13      Q.  Is it your understanding that what's
14  set forth in Paragraph 132 of your report is
15  alleged in the plumbers' complaint?
16      A.  Essentially, yes.  My understanding is
17  that Plaintiffs' allegations include that the
18  corrective disclosures made on September 15, 2005,
19  could and should have been made earlier.
20      Q.  Now, Paragraph 132 doesn't talk about
21  allegations, right?  It talks about expert
22  accounting testimony that will establish certain
23  facts, correct?
24      A.  That's right.
25      Q.  All right.  Were you asked by

219

1  Plaintiffs' counsel to assume that expert
2  accounting testimony would establish the facts
3  alleged in the complaint that you just referred
4  to?
5      A.  Yes.
6          THE WITNESS:  Actually, it's been
7  about an hour since the last break.  Can we take a
8  quick break?
9          MR. LINKER:  Yes, we can.  Let's take
10  a break.
11          VIDEO TECHNICIAN:  The time is 4 p.m..
12  We are off the record.
13          (Proceedings recessed at 4:00 p.m.,
14  and reconvened at 4:12 p.m.)
15          VIDEO TECHNICIAN:  We are back on the
16  record.  This is DVD number five.  The time is
17  4:12.
18  BY MR. LINKER:
19      Q.  Professor Feinstein, at the time that
20  you wrote your report, did you obtain any
21  information about what was to be set forth in the
22  reports of Plaintiffs' accounting expert?
23      A.  Some.  Some information, sure.  I mean
24  that's expressed in its entirety in the paragraph
25  we were just looking at.

220

1      Q.  All right.  So the information that
2  you obtained is expressed in its entirety in
3  Paragraph 132 of your report, correct?
4      A.  Yes.
5      Q.  At the time that you wrote your
6  report, did you review any draft or final version
7  of the report of either or both of Gary Holstrum
8  and Andrew Mintzer?
9      A.  No.
10      Q.  At the time you wrote your report,
11  were you aware of any proposed expert testimony by
12  Holstrum or Mintzer regarding Dana not reducing
13  its earnings guidance prior to September 15, 2005?
14      A.  I believe so.  I mean it's -- that's
15  just more specific about what's written in
16  Paragraph 132.  That's more specific
17  information -- this was more specificity about
18  what I wrote in Paragraph 132.
19      Q.  Do you agree that if Plaintiffs cannot
20  prove that Burns or Richter is liable for
21  securities fraud as a result of Dana's not
22  reducing its earnings guidance prior to
23  September 15, 2005, the guidance reduction, the
24  September 15, 2005 announcement, would be
25  confounding information unless it is found to be

221

1  corrective of some other alleged misrepresentation
2  or omission for which Burns or Richter is liable?
3          MS. WYMAN:  Object to form.
4      A.  I just think it's kind of on the fence
5  there whether that's an economics or legal
6  question.
7          My thinking - and I'll think out loud
8  on this - if someone had said that to me as a
9  statement rather than as a question, I would have
10  to ask follow-up questions about what they meant,
11  because there are parts of that are legal rather
12  than economics.
13          So I would have to say that posed as a
14  question, I couldn't answer it one way or the
15  other.
16      Q.  This is a hypothetical question also.
17  Making the assumption that the earnings guidance
18  reduction announced on September 15, 2005, is
19  confounding news, do you agree that your event
20  study in the analysis in your report does not
21  isolate the stock price impact of the alleged
22  fraud-related news in the September 15, 2005,
23  announcement from the stock price impact of the
24  earnings guidance reduction confounding news?
25          MS. WYMAN:  Object to form.

56  (Pages 218 to 221)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

222

1      A.   I just need to hear it again.  It's a
2  well-crafted question.  I want to make sure I
3  really understand it well.  I think it will be a
4  very short answer if I understand it.
5      Q.   Making the assumption that an earnings
6  guidance reduction announced on September 15,
7  2005, is confounding news, do you agree that your
8  event study and the analysis in your report does
9  not isolate the stock price impact of the alleged
10  fraud-related news in the September 15, 2005,
11  announcement from the stock price impact of the
12  earnings guidance reduction confounding news?
13      MS. WYMAN:  Same objection.
14      A.   So we're making the assumption -- in
15  this hypothetical, we're making an assumption that
16  the earnings guidance is confounding news not
17  fraud-related.
18      And then the question is in that
19  hypothetical, given that assumption, would it be
20  the case that in my work I haven't separated out
21  the fraud-related from nonfraud-related economic
22  impacts, or the economic impacts from the
23  fraud-related and nonfraud-related news.
24      Q.   Yes.
25      A.   That would be the case.  Under the

223

1  hypothetical where it's established that one of
2  the three pieces, that particular piece, was not
3  fraud-related.
4      Q.   Now, in Paragraph 39 of your rebuttal
5  report.  Do you have your rebuttal report?
6      That's at Page 12, right?
7      A.   Yes.
8      Q.   You state that, quote, "The guidance
9  cut was therefore a partially corrective
10  disclosure of the alleged fraud, not unrelated
11  confounding information," correct?
12      A.   Yes, given all the other assumptions
13  I've already articulated.
14      Q.   When you make that statement, did you
15  intend it to apply even if the guidance cut was
16  not found to involve any fraudulent misstatement
17  or omission?
18      MS. WYMAN:  Object to form.
19      A.   When I wrote the report, I wasn't
20  considering your hypothetical.  So I didn't
21  consider it one way or the other.
22      I would have to think about -- I
23  still, at this point, I would have to think a
24  little bit more about whether the guidance cut
25  conveyed information that relates to other alleged

224

1  misrepresentations and omissions.
2      Let me hear your question again,
3  please.  Then I can be really responsive to just
4  your question.
5      Q.   Well, in Paragraph 39 you criticize
6  Professor Stulz for concluding that the guidance
7  reduction was confounding information, correct?
8      A.   Right.  Because it's showing that he's
9  not accepting -- I mean it's a merits question
10  that he's opining on about whether or not the
11  guidance cut could have -- the guidance cut and
12  what it conveyed to the marketplace could have
13  been conveyed earlier.
14      He is clearly not accepting -- he's
15  not conducting any kind of analysis under the
16  assumption that Plaintiffs will prove their
17  allegations.  That's what the criticism is.
18      Q.   My question to you is:  In the last
19  sentence of Paragraph 39 of your rebuttal report,
20  were you addressing a situation where Plaintiffs
21  would not prove liability for not announcing a
22  guidance cut before September 15th?
23      MS. WYMAN:  Object to form.
24      A.   I'm having a hard time understanding
25  the question.

225

1      Q.   Well, here is the question.  One of
2  the fraud claims in this case is that the
3  Defendants violated the securities laws by not
4  cutting guidance earlier than they did on
5  September 15th.  Do you understand that?
6      A.   Yes.
7      Q.   All right.  You assumed that the
8  Plaintiffs would prove that, correct, in your
9  report?
10      A.   It's that.  And that they did not
11  disclose the true condition of the company that
12  would have compelled the guidance cut is my
13  understanding of what the allegation is.  And
14  that's what I assumed; that that was true.
15      Q.   So you assumed the Plaintiffs can
16  prove that prior to September 15th there was
17  information that compelled Dana to cut its
18  guidance?  And that's an assumption you're making?
19      MS. WYMAN:  Object to form.  It
20  misstates his testimony and report.
21      A.   That there was information -- I
22  assumed that there was information omitted that
23  would have conveyed to the marketplace a better
24  understanding of the true condition of the
25  company.  And when the company did not cut its --

57 (Pages 222 to 225)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

226

1  when the company maintained its guidance on
2  July 20th, that was an opportunity where they
3  could have conveyed this additional information
4  that would have better informed the marketplace
5  about the true condition of the company.  And
6  that, therefore, it was a false and misleading
7  statement.
8      Q.   Okay.  So you assume that Plaintiffs
9  will prove in this case that the company's
10  reaffirmation of guidance on July 20th was a false
11  and misleading statement; is that right?
12      A.   Because -- I just want to -- I mean --
13  I didn't really need to make the assumption
14  whether it in isolation was a false and misleading
15  statement or whether it was the opportunity to
16  make full forthcoming disclosures about
17  information that was omitted that would have
18  better informed the marketplace about the true
19  condition of the company.
20          So it was sort of an either/or.  But
21  my assumption was that as of July 20th there were
22  statements made and omissions made that misled the
23  marketplace about the true condition of the
24  company.  And the truth was ultimately disclosed
25  or conveyed to the marketplace via the --

227

1  partially disclosed and conveyed via the
2  disclosures made on September 15th.
3      Q.   So you reached the opinions about loss
4  causation and damages in your report without
5  assuming that the re-affirmation of guidance on
6  July 20th was false or misleading, correct?
7          MS. WYMAN:  Object to form.  Misstates
8  his testimony.
9      A.   I mean, false and misleading in the --
10  as a term of art, as a legal term, I didn't make a
11  conclusion whether it fit the -- whether it was --
12  I didn't make any determination as to whether it
13  was an actionable false and misleading statement.
14          I made the assumption that it was
15  misleading to the marketplace, especially in light
16  of the omissions that would have better informed
17  the marketplace about the true condition of the
18  company.
19      Q.   So is it a fact that in reaching the
20  conclusions in your report about loss causation
21  and damages, you assumed that the reaffirmation of
22  guidance on July 20, 2005, was either a false
23  statement or was misleading because of the failure
24  to disclose other information needed to prevent
25  that statement from being misleading; is that

228

1  correct?
2      A.   Let me check.  I think the answer to
3  that is yes, but I just want to check one thing
4  before I say yes.
5          (Pause.)
6      A.   Unless I'm missing something, I think
7  a yes will do it.  Unless I'm misunderstanding
8  your question.  Yes.
9      Q.   It sounds to me like you understand my
10  question.  Let's go on to the next question.
11          The statement in the last sentence of
12  Paragraph 39 of your rebuttal report, quote, "The
13  guidance cut was therefore a partially corrective
14  disclosure of the alleged fraud and not unrelated
15  confounding information" --
16      A.   Where are we reading?
17      Q.   Paragraph 39 of your rebuttal report
18  which appears at the bottom of Page 12 of your
19  rebuttal report.
20      A.   Actually, just to make sure that my
21  prior yes answer is understood correctly.  Not all
22  of my conclusions, not all of my conclusions stem
23  from that assumption or rely on that assumption,
24  but some do.
25          Okay.  So now we're looking at

229

1  Paragraph 39?
2      Q.   Paragraph 39 of your rebuttal report
3  which appears at the bottom of --
4      A.   Got it.
5      Q.   Specifically, the last sentence of
6  Paragraph 39 it states, quote "The guidance cut
7  was therefore a partially corrective disclosure of
8  the alleged fraud, not unrelated confounding
9  information."
10      A.   Yes.
11      Q.   In making that statement, did you make
12  the assumption that was the subject of the last
13  series of questions or not?
14          MS. WYMAN:  Object to form.
15      A.   Just to be clear, that either the
16  guidance was false and misleading on its own, or
17  the guidance -- or the omission of other
18  information that would have better informed the
19  marketplace of the true condition of the company,
20  that that occurred, yes.  Those are assumptions I
21  made that there was either -- that either the
22  guidance was false and misleading or that there
23  were other information that could have been
24  disclosed at that time that would have better
25  informed the marketplace of the true condition of

58  (Pages 226 to 229)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

230

1    the company at that time.
2         I made the assumption that that was
3    the case in drawing the conclusion expressed in
4    the last sentence of Paragraph 39.
5         Q.   All right.  I think that perhaps there
6    is not a common understanding as to what I was
7    asking you.  I want to explore that some more.
8         The assumption that we were just
9    discussing a few minutes ago in several questions
10   was that Plaintiffs could prove that the
11   reaffirmation of guidance on July 20, 2005, was
12   false or misleading because of an omission to
13   state other facts needed to make the statement not
14   misleading.
15        A.   Well, let me be clear, then, what my
16   assumption was.  My assumption was that that
17   statement, the reaffirmation of guidance or the
18   omission of other information that could have been
19   disclosed on July 20th, concealed from investors
20   the true condition of the company.  And that that
21   concealment of the true condition of the company
22   is what was partially corrected by the later
23   guidance cut.
24        Q.   So that assumption or set of
25   assumptions does not necessarily require a finding

231

1    that the reaffirmation of guidance is itself false
2    or misleading; is that right?
3         A.   Because I said "or," yes.  Or other
4    information was omitted.
5         I mean, what I can tell you as a
6    financial analyst is that when I do the news
7    analysis, I kind of put myself in the position of
8    a financial analyst reading these things in real
9    time.  What I would have understood about the
10   company after the announcements on July 20th would
11   have been a false portrayal of the profitability
12   and financial strength of the company.  That's
13   what I concluded from reading the news.
14        And I made the assumption that
15   Plaintiffs will be able to prove that on account
16   of false and misleading statements and
17   omissions -- that there were false and misleading
18   statements and omissions that caused the
19   marketplace -- there were false and misleading
20   statements and omissions made on July 20th.
21        Q.   So is it fair to say in what you state
22   in your report, the guidance cut was a partially
23   corrective disclosure of the alleged fraud
24   regardless of whether or not the reaffirmation of
25   guidance was false or misleading?

232

1         MS. WYMAN:  Object to form.
2         A.   I think I said it best in
3    Paragraph 39, "The guidance cut on September 15th
4    conveyed to investors a better understanding of
5    the true condition of the Company, specific
6    information about the Company's condition that
7    Plaintiffs allege could have been communicated
8    earlier."
9         So I conclude, as a financial analyst,
10   the first half of that sentence, that the guidance
11   cut conveyed to investors a better understanding
12   of the true condition of the company.  And I
13   accept as an assumption Plaintiffs' allegation
14   that the information that was conveyed could have
15   been communicated earlier.
16        So that breaks apart which part I
17   concluded as a financial analyst and which part I
18   assumed Plaintiffs will prove.  And then based on
19   what I concluded from financial analysis and what
20   Plaintiffs are alleging, therefore, the guidance
21   cut must be interpreted as a partially corrective
22   disclosure of the alleged fraud, not unrelated
23   confounding information.  I think that's as clear
24   as I can make it.
25        Q.   What goes through the financial

233

1    analysis that you performed to reach that
2    conclusion?
3         A.   That's all spelled out in my report,
4    in the original report.  I looked at the
5    information that was conveyed on September 15th
6    and I made a determination -- first, I understood
7    that it's already established that this is an
8    efficient market.  And so information is quickly
9    absorbed into the stock price.
10        Then I assessed the information that
11   was conveyed was important information to
12   investors because the company said so, financial
13   principles say so, and analysts said so, and I
14   observed the stock price dropping significantly
15   upon the dissemination of that information.
16        So that's the information -- that's
17   how I drew the conclusion that this information
18   conveyed on September 15th conveyed to investors a
19   better understanding of the true condition of the
20   company.
21        Q.   Okay.  Is there any peer-reviewed
22   literature that you rely on in performing that
23   analysis?
24        A.   Yes.
25        Q.   What?

59  (Pages 230 to 233)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

234

1      A.   The entire body of literature on
2   valuation principles.  There are textbooks and
3   articles and libraries.
4      Q.   Can you point to anything in specific?
5      A.   Take any textbook or take "Valuation"
6   by Dan Madoran (Phonetics), mentions that earnings
7   and profitability are determinants of value.  That
8   when it -- yes.  I'll leave it at that.
9      Q.   All right.  Is it your opinion that
10  any information disclosed by a company about its
11  true financial condition is non-confounding when
12  the company previously has made any representation
13  or omission concerning its financial condition?
14      MS. WYMAN:  Objection to form.
15  Incomplete hypothetical.
16      A.   I don't think I can make a blanket
17  statement like that for every possible case.  I'm
18  sure we can find some perverse anomalies.  But
19  this case is not a perverse anomaly.  This was --
20  they slashed guidance in half.
21      In this case, it's clear that the
22  slash of guidance about future earnings convey to
23  the marketplace an understanding that
24  profitability was collapsing or had collapsed.
25      Q.   Let me ask you this:  In your view,

235

1   did the cut in guidance on September 15, 2004,
2   convey to the market an understanding that Dana
3   had misstated its earnings for the first quarter
4   of 2004 on April 21, 2004?
5      MS. WYMAN:  I think you might mean
6   2005.
7      MR. LINKER:  Okay.  That's right.  I
8   misspoke.  Everybody is more alert at this late
9   hour in the day than I am.
10      MS. WYMAN:  I'm sure you're getting
11  tired.  Why don't you repeat the question with the
12  right number.
13      MR. LINKER:  I am going to.
14      MS. WYMAN:  Okay.
15  BY MR. LINKER:
16      Q.   Is it your view that the September 15,
17  2005, announcement by Dana that it was cutting its
18  guidance conveyed to the market a correction that
19  Dana's first-quarter 2004 financial results
20  reported on April 21, 2004, were false and
21  misleading?
22      A.   The way it works is the financial
23  performance, the financial results, are
24  information that analysts and investors take into
25  account in understanding the condition of the

236

1   company.  And prior guidance and revised guidance
2   are also elements.
3      So while the cut in guidance may not
4   have informed the marketplace that the prior
5   results were reported incorrectly, they would have
6   contributed towards correcting the economic impact
7   of prior incorrect reportage.
8      So within my answer, I said that they
9   may not have corrected informationally that --
10  informationally and independently that prior
11  reporting was incorrect, but it would have
12  contributed to correcting economically the impact
13  of prior incorrect reportage.
14      Q.   How would it have contributed
15  economically to correcting -- well, let me
16  withdraw that.
17      How would it have contributed to
18  correcting economically the impact of prior
19  incorrect financial reporting?
20      A.   Prior incorrect financial reporting
21  portrayed a company -- the company is being more
22  profitable and more financially sound than it
23  really was.  And there are economic ramifications
24  of that.  There are valuation ramifications of
25  that, which are corrected in part by new

237

1   information that informs the public about the true
2   condition of the company.  New information
3   conveyed by a cut in guidance going forward about
4   the true condition of the company.
5      Q.   Does a cut in guidance in September
6   2005 have anything at all to do with what the
7   company's financial performance was in the first
8   quarter of 2004?
9      A.   Yes.
10      Q.   Explain that.
11      A.   Well, people learn about -- well,
12  valuation is forward-looking.  That's an essential
13  principle I want to put out on the table.
14  Valuation is forward-looking.  People value the
15  company based on how it will perform going
16  forward, what kind of cash flows it will generate
17  for its investors going forward.
18      But in order to do the valuation, in
19  order to form expectations of future cash flows,
20  investors and analysts look at a number of things.
21  One of the things they look at is past
22  performance.  Another thing they look at is the
23  company's statements about guidance.
24      So whatever conclusion was drawn by
25  the mix of information before correction, whatever

60  (Pages 234 to 237)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

238

1  conclusion was drawn from the mix of information
2  before correction was a conclusion based on the
3  guidance uncorrected and the performance figures
4  uncorrected.
5       Subsequently when there is a revision
6  in the guidance, the mix of information changes.
7  People have a better understanding, and there is
8  less -- there would reasonably be more skepticism
9  about the consistency of the revised guidance and
10  the prior reporting of financial results.
11      Q.  Does cutting guidance in September
12  2005 reveal that the first-quarter 2004 financial
13  statements were false?
14      MS. WYMAN:  Objection.  Asked and
15  answered.
16      A.  It does not reveal that they are
17  false, but it reveals that the conclusion that
18  reasonably would have been arrived at by analyzing
19  it may have been false.
20      Q.  Look at Page 8 of your rebuttal
21  report, please.
22      A.  (Whereupon the witness complies.)
23      Q.  Now, on Page 8, do you assert that
24  Professor Stulz ignores evidence that Defendants
25  knew that fiscal year 2005 guidance was

239

1  unattainable?
2      A.  I say that, yes.
3      Q.  Is a statement that
4  "Previously-announced guidance was unattainable"
5  the same as "Cutting the guidance by 50 percent"?
6      MS. WYMAN:  Object to form.
7      A.  They're related.  They convey some of
8  the same information, but they're not exactly the
9  same statement.
10      Q.  So they're not the same?
11      A.  They're not exactly the same, but they
12  convey some of the same information; in
13  particular, that the condition of the company is
14  not what it was previously portrayed to be.
15      Q.  In Paragraph 30 of your rebuttal
16  report on Page 8 you state that the Mintzer report
17  shows that Dana's fiscal year 2005 guidance was in
18  jeopardy as early as July 20, 2005, correct?
19      A.  Yes.
20      Q.  It's a fact, isn't it, that the
21  Mintzer report does not discuss or express any
22  opinion about guidance?
23      MS. WYMAN:  Object to form.
24      A.  I don't think that's accurate.
25  Mr. Mintzer concluded that the deferred tax asset

240

1  should have been written down on July 20, 2005.
2  Therefore, he was concluding that profitability
3  was impaired as of July 20, 2005.  And that does
4  say something about guidance.
5      Q.  When you say "that does say
6  something," you mean you construe it as having
7  that implication, not that he said it, correct?
8      MS. WYMAN:  Object to form.
9      A.  Well, remember, there is two effects
10  of the DTA -- of a DTA write-down.  One is that it
11  conveys information about profitability.  The
12  other is that it in and of itself would cause an
13  offset to earnings.
14      If Mr. Mintzer said that the DTA
15  should have been written down, then it follows
16  necessarily that there would be a large hit to
17  earnings from the write-down.
18      Q.  So those are inferences that you're
19  making.  My question was whether Mintzer said that
20  Dana's fiscal year 2005 guidance was in jeopardy
21  as early of July 2005.
22      A.  He said that the DTA should have been
23  written down as late as -- at the latest, July 20,
24  2005.
25      Q.  So in your rebuttal report when you

241

1  say "His report shows that the guidance was in
2  jeopardy," you're not saying that it says that.
3  You're saying that you infer that from what he
4  says, correct?
5      MS. WYMAN:  Object to form.
6      A.  I don't think he used those -- well, I
7  don't know actually one way or the other.  I don't
8  recall whether he says it was in jeopardy.  But if
9  he said that -- I know that he did say that the
10  DTA should have been written down then, July 20,
11  2005, therefore, he is saying that forward
12  guidance would have to take into account the hit
13  to earnings from a write-down.
14      Q.  He's saying that in those words, or
15  you're saying that in your words based on what you
16  read in his report?
17      MS. WYMAN:  Object to form.
18      A.  I don't know what words he used, but
19  that is the meaning of this conclusion.
20      Q.  There is a statement in your rebuttal
21  report that Dana's fiscal year 2005 guidance was
22  in jeopardy as early as July 20, 2005, an
23  assumption or an opinion?
24      A.  I'm sorry.  Which statement of mine
25  are we referring to?  Where is it written?

61 (Pages 238 to 241)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

242

1  Paragraph 30, right?
2      Q.  Paragraph 30.
3      A.  Well, my opinion is that "Internal
4  company documents, the Mintzer report, and
5  Defendants deposition testimony show that Dana's
6  fiscal year 2005 EPS guidance was in jeopardy as
7  early as 20 July 2005."  And then I present the
8  specific evidence that I was referring to.
9      Q.  And that's in subparagraphs (i)
10 through (vi) of Paragraph 30?
11     A.  Yes.
12     Q.  Did you perform any investigation or
13 analysis of the facts in this case yourself in
14 order to reach the conclusion set forth in
15 Paragraph 30 of your rebuttal report?
16     A.  I just want to add that it's
17 subparagraphs (i) through (vi) and Paragraph 31.
18 1 through 6, subparagraphs 1 through 6 of
19 Paragraph 30, and also Paragraph 31.
20     Q.  Thank you.  Did you perform --
21     A.  And footnotes 16 through 22.
22     Q.  Did you perform any investigation or
23 analysis of the facts in this case yourself in
24 order to reach the conclusions set forth in that you
25 Paragraphs 30 and 31 and the footnotes that you

243

1  mentioned of your rebuttal report?
2      A.  As I said earlier today, I performed
3  analysis to determine whether accepting
4  Plaintiffs' allegation as an assumption was
5  reasonable to do; was this a reasonable assumption
6  consistent with the facts.
7      Q.  Did you review a significant group of
8  relevant documents significant in the case and
9  determine that the ones you cite here in
10 Paragraphs 30 and 31 of your rebuttal report
11 support your opinion that earnings guidance was in
12 jeopardy as early as July 20, or did somebody
13 provide you with these specific documents and you
14 looked at them; and, based on the documents that
15 you were provided, expressed that opinion?
16     MS. WYMAN:  Object to form.  To the
17 extent it asks for attorney work product
18 information, I instruct the witness not to answer.
19     A.  But I do want to say that you
20 mischaracterized my opinion.  My opinion is that
21 there is evidence that show that Dana's fiscal
22 year 2005 EPS guidance was in jeopardy as early as
23 July 20, 2005.  That's what I write in
24 Paragraph 30.  I didn't state as a conclusion in
25 my report, rebuttal or original, that it's my

244

1  conclusion that Dana's fiscal year 2005 EPS
2  guidance was in jeopardy as early as July 20,
3  2005.  And the reason why I'm even addressing this
4  question here in this section is just to draw a
5  contrast between the work that I did and the work
6  that Professor Stulz did; where he is purporting
7  to have drawn his own conclusion that the guidance
8  revision was not a corrective disclosure,
9  contradicting, rather than accepting as an
10 assumption, Plaintiffs' allegations.
11     Q.  Professor Feinstein, in Paragraph 30
12 of your rebuttal report, you cite an internal Dana
13 e-mail dated July 5, 2005, which stated that the
14 latest trend numbers were well below Dana's
15 guidance, namely $1.13 versus a $1.30, which was
16 the then bottom of the current guidance range; is
17 that correct?
18     A.  Yes.
19     Q.  Is it your opinion that reducing
20 earnings guidance from $1.30 to $1.13 on July 20,
21 2005, would have had the same stock price impact
22 as Dana's reducing earnings guidance to 60 to 70
23 cents and September 15, 2005?
24     MS. WYMAN:  Object to form.
25     A.  No, I didn't draw that conclusion.  I

245

1  didn't draw that conclusion.  I'm not stating an
2  opinion one way or the other about that.  But I
3  want to be real clear about what my conclusion is
4  in this section, which is that Professor Stulz
5  is -- his conclusion, his opinion, is untenable
6  when he says that what ultimately was revealed
7  could not have been revealed earlier, because
8  apparently he's ignoring at least this evidence.
9      Q.  Do you assume that the earnings
10 guidance reduction announced on September 15,
11 2005, was known on July 20, 2005?
12     A.  Let me hear it again.
13     Q.  Do you assume that the earnings
14 guidance reduction announced on September 15,
15 2005, was known on July 20, 2005?
16     A.  My assumption is that information
17 could have been provided on July 20, 2005, which
18 would have made the correct guidance provided on
19 September 15, 2005, unsurprising.
20     Q.  What information?
21     A.  Information about the true condition
22 of the company, information about what was
23 happening with financial controls, of the
24 reliability or unreliability of factors that went
25 into the Q2 2005 results that were reported.  But

62 (Pages 242 to 245)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

246

1  information about the true condition of the
2  company.
3      Q.  Are you expressing any opinion about
4  what guidance Dana should have announced on July
5  20, 2005?
6      A.  Not specifically, but there are a
7  number of ways the company could have conveyed to
8  the public the truth about the condition of the
9  company on July 20, 2005.  There are a number of
10  ways they could have conveyed that information.
11      Q.  Paragraph 32 of your rebuttal report
12  at Page 9, you state, quote, "Consequently,
13  Defendants knew or should have known as early as
14  20 July 2005 that they would not be able to meet
15  their FY 2005 guidance, and that the Deferred Tax
16  Assets ('DTA') needed to be written down,"
17  correct?
18      A.  Yes.
19      Q.  What is the basis for that statement?
20      A.  Well, specifically, it was written in
21  Paragraph 31, that the DTA -- that there was a
22  conclusion of an accounting expert that the DTA
23  needed to be written down, which not only would
24  have impacted future earnings directly, but would
25  have reflected a collapse of profitability.

247

1      Q.  All right.  Paragraph 31 referenced an
2  opinion by Plaintiffs' accounting expert,
3  Mr. Andrew N Mintzer that Dana should have
4  recognized the valuation allowance on July 20,
5  correct?
6      A.  Yes.  Which both would have had a
7  direct impact on earnings for the rest of the year
8  causing a reported income number to be less than
9  what was being forecasted in the official company
10  guidance, but also it would have reflected a
11  collapse in profitability in the U.S. operations.
12      Q.  Is it --
13      A.  That the market wasn't yet fully aware
14  of.
15      Q.  It's a fact, isn't it, that
16  Mr. Mintzer has rendered no opinion that Dana knew
17  or should have known that the DTA needed to be
18  written down?
19      MS. WYMAN:  Object to form.
20      A.  I don't think that's true.
21  Mr. Mintzer did say that it should have been
22  written down.
23      Q.  No.  My question was:  It's a fact,
24  isn't it, that Mr. Mintzer has not expressed an
25  opinion that Defendants Burns and Richter knew or

248

1  should have known that the DTA was required to be
2  written down; his opinion is only that it was
3  required to be written down?
4      MS. WYMAN:  Object to form.  You can
5  ask Mr. Mintzer what his opinions are.
6      MR. LINKER:  We certainly can.
7      MS. WYMAN:  You certainly can.  So why
8  don't we move on.
9      MR. LINKER:  You can express an
10  opinion about form.
11      Q.  So let me ask the question again,
12  subject to the objection.
13      Isn't it a fact that Mr. Mintzer has
14  not expressed an opinion that Defendants Burns and
15  Richter knew or should have known that the DTA was
16  required to be written down; his opinion is only
17  that it was required to be written down?
18      A.  I actually don't recall one way or the
19  other, I mean, who he essentially blamed for these
20  occurrences.
21      Q.  In fact, he didn't blame anybody.  He
22  just said that the accounting was wrong; correct?
23      MS. WYMAN:  Object to form.
24      A.  I don't know.  I mean, I don't know as
25  I sit here now.  I've read his report.

249

1      Q.  Are you --
2      A.  I think for my purposes, that kind of
3  distinction wasn't necessary to make.
4      Q.  Are you, Professor Feinstein,
5  expressing an opinion about what Defendants knew
6  or should have known?
7      A.  I don't see how anywhere in my report
8  there is any reliance.  No, I think -- I'm not
9  opining about what they -- independent of the
10  assumptions I've made and independent of the
11  assumptions on the allegations, I'm not expressing
12  an opinion based on my own work about what they
13  legally should have known in order to avoid
14  liability, or did know or didn't know.  That's not
15  what my work is about.
16      As far as what they did know, I think
17  throughout my report there are some references to
18  what they did know.  So I can't say that I have no
19  opinion about what they did know.
20      Q.  So the statements in your report about
21  what Defendants knew, assumptions about what the
22  evidence shown to the Jury will prove or the
23  opinions that you express based on facts that
24  you've seen?
25      MR. SIEGEL:  Can you limit this to

63  (Pages 246 to 249)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

250

1   which Defendants you're talking about?
2       MR. LINKER:  I'm talking about the
3   Defendants he refers to in Paragraph 32 of his
4   rebuttal report.
5       MR. SIEGEL:  I don't see any
6   Defendants mentioned or named.
7       MR. LINKER:  That's right.
8       MR. SIEGEL:  So, I mean, all I'm
9   asking is are you asking about Defendants Burns
10  and Richter?  Are you asking about Defendant --
11      MR. LINKER:  I certainly am asking
12  about Defendants Burns and Richter.  To make
13  Mr. Siegel more comfortable, I'll limit the
14  question.
15      MR. SIEGEL:  Thank you, sir.
16      A.   I just want to be clear, Paragraph 32
17  is based on an assumption incorporating, accepting
18  an implication of what's in Paragraph 31, which I
19  am accepting as an assumption to be true, is the
20  conclusion expressed in Paragraph 32.
21      Q.   So in Paragraph 32 you're pressing an
22  opinion on what Defendants knew or should have
23  known on the basis of facts and information that
24  you set forth in your Paragraph 31; is that
25  correct?

251

1       MS. WYMAN:  Object to form.  Misstates
2   his testimony.
3       A.   Let me be real clear about what's here
4   and what's not here.  Like I said before, this is
5   a rebuttal.  It's in response to Professor Stulz
6   saying that guidance revision is confounding
7   information rather than a corrective disclosure.
8   I observed, I conclude, I opine that his saying so
9   either means that he's purporting to have done
10  independent analysis that proves that Plaintiffs'
11  allegations are false or that he's -- that he's --
12  actually, I should say and that he is just not
13  accepting Plaintiffs' allegations to be true which
14  suggests that all of his analysis is, therefore,
15  irrelevant to the question of what are damages
16  should Plaintiffs prove their case.
17      And so I point out here that had he
18  assumed the allegations, he would have had to have
19  concluded that Defendants knew or should have
20  known as early as 20 July 2005 that they would not
21  be able to meet their fiscal year 2005 guidance
22  and that the deferred tax asset needed to be
23  written down.
24      I mean, so the word "consequently" at
25  the beginning of 32 is very important.

252

1   "Consequently" means that this is essentially a
2   logical statement; that this conclusion follows
3   from the assumptions that a financial expert in
4   this case needs to make.  Okay.
5       Q.   All right.  So am I correct that
6   everything you say in Paragraphs 29 through 32 of
7   your report is a rebuttal to Professor Stulz?
8       I'm sorry.  Paragraph 29 to 32 of your
9   rebuttal report.  Let me rephrase that.
10      Is it correct that everything you say
11  in Paragraphs 29 to 32 of your rebuttal report is
12  a rebuttal to Professor Stulz?
13      A.   I think that's fair to say.
14      Q.   So is it also fair to say that you
15  don't intend to offer expert testimony in this
16  case that in your opinion Defendants knew or
17  should have known as early as 20 July 2005 that
18  they would not be able to meet their fiscal year
19  2005 guidance?
20      A.   That's correct.
21      Q.   By how much should Dana have reduced
22  its guidance on July 20, 2005?
23      A.   I have no opinion about that.
24      Q.   I'd like you to look back to your
25  report, specifically to Page 48.

253

1       A.   (Whereupon the witness complies.)
2       Q.   And footnote 70.  Go to the footnote.
3       A.   Which paragraph?
4       Q.   Footnote 70.
5       A.   Okay.
6       Q.   Do you see that?
7       A.   Yes.  I'm looking for where
8   footnote 70 is cited in the --
9       MR. LEVINE:  At the very top of the
10  page.
11      THE WITNESS:  Okay.  Thank you.
12  (Pause.)
13      Q.   Are you ready to answer a question
14  about that?
15      A.   Not yet.
16  (Pause.)
17      A.   Actually, I was wondering if I could
18  have just a piece of paper to write a, just brief
19  notes to help me analyze it.  You probably want to
20  mark it as an exhibit.  I'm fine with that.
21  (Pause.)
22      A.   Okay.
23      Q.   All right.  You've had a chance to
24  review footnote 70 of your report, correct?
25      A.   Yes.

64  (Pages 250 to 253)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

254

1    MR. SIEGEL:  Could we have marked
2    whatever he has just written?
3    MR. LINKER:  Well, I don't know
4    whether he intends to write some more.
5    MR. SIEGEL:  Well, I would like the
6    paper marked and then he can add to it.
7    MR. LINKER:  Why don't we mark it when
8    he's done with it.  So whatever it is.  Do you
9    want to --
10   MR. LEVINE:  Just as long as it gets
11   in the record, Arthur, that's fine.
12   MS. WYMAN:  We'll mark it.  I'll
13   remind him.
14   MR. SIEGEL:  Okay, that's fine.
15   Whatever works.
16   Q.   Now, it's a fact --
17   MR. LEVINE:  Excuse me.  I think the
18   record should also show that in response to the
19   question "Look at footnote 70," Professor
20   Feinstein has made some kind of calculations that
21   appear on the top of the blank sheet of paper.
22   With that, I'm prepared to move forward.
23   MR. LINKER:  All right.
24   BY MR. LINKER:
25   Q.   Subject to those various observations

255

1    of counsel, it's a fact, isn't it, that in
2    footnote 70, which appears at Page 48 of your
3    report, you state "With respect to Dana's
4    September 15, 2005 announcement" --
5    A.   I'm sorry.  Where are you reading?
6    MS. WYMAN:  Footnote 70.
7    Q.   Let me start again.  We've been
8    talking about -- I asked you to look at
9    footnote 70.  You took some time studying it and
10   you told me that you had studied it and were ready
11   to answer my questions about it, correct?
12   A.   Then you used the words "With respect
13   to," and I don't see that.
14   Q.   "With respect to" wasn't -- you're
15   talking about the September 15, 2005, announcement
16   in that footnote, correct?
17   A.   Yes.
18   Q.   Okay.  My question will put quote
19   marks around words that I'm asking you whether
20   they appear in the footnote.  Okay?  So let me
21   start again.
22   It's a fact, isn't it, that in
23   footnote 70 of your report which appears at
24   Page 48 of your report, you state with respect to
25   Dana's September 15, 2005, announcement that you,

256

1    quote, "cannot disaggregate, with a reasonable
2    degree of scientific certainty, that piece of the
3    $2.82 residual stock price decline that relates
4    solely to the announcement that Dana's Q205
5    financial statements were being restated"; is that
6    correct?
7    A.   Yes.
8    Q.   Is it also correct that you,
9    therefore, state that you are not including any
10   portion of that $2.82 residual price decline in
11   your opinion concerning loss causation and damages
12   in the Hawaii case?
13   A.   Yes.
14   Q.   And is that because it is your
15   understanding that the Defendants in the Hawaii
16   case are not alleged to have liability for
17   Plaintiffs' securities fraud claims in the
18   plumbers' case based on Dana's not reducing its
19   earnings guidance and not writing down it's U.S.
20   deferred tax asset on July 20, 2005?
21   A.   Yes.
22   Q.   And is it also because of your
23   understanding that Plaintiffs' claims against the
24   Hawaii Defendants are based only on the
25   inappropriate recognition of price increases in

257

1    Dana's commercial vehicle business which was the
2    only one -- which was only one of the three
3    company-specific news items in the September 15,
4    2005, announcement?
5    MS. WYMAN:  Object to form.
6    A.   No.
7    Q.   Why do you say "no" to that question?
8    A.   You said -- because you said that it
9    was -- that there was -- you were asking is it my
10   understanding that the liability only pertains to
11   price increases in the truck division.  And my
12   understanding was that it was more general; that
13   it pertains to accounting irregularities and
14   accounting restatements.
15   Q.   Is it your understanding that
16   Plaintiffs' claims against the Hawaii Defendants,
17   to the extent they relate to matters discussed in
18   the September 15, 2005, announcement, relate only
19   to the part of the September 15, 2005,
20   announcement that referenced inappropriate
21   requisition of price increases in Dana's
22   commercial vehicle business and the resulting need
23   to restate the second-quarter financials?
24   A.   My understanding is that they related
25   to the division in which those Defendants worked,

65 (Pages 254 to 257)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

258

1  but the complaint detailed a number of accounting
2  irregularities.
3      Q.   And is it a fact that the other two
4  company-specific news items in the September 15,
5  2005, announcement were the earnings guidance
6  reduction and the resulting need to assess whether
7  it required Dana to write down it's U.S. deferred
8  tax asset with respect to which Plaintiffs don't
9  allege that the Hawaii Defendants have any
10  liability; is that correct?
11      MR. LINKER:  Object to form.
12      A.   I believe so.
13      Q.   What are the specific reasons that you
14  cannot perform the disaggregation relating to
15  Dana's September 15, 2005 announcement as stated
16  in footnote 70 of your report?
17      A.   Well, the most reliable method for
18  measuring the economic impact of the new news is
19  the event study, but the announcements of the
20  three components were absolutely simultaneously.
21  So I can't separate out that amount temporally.
22      Another reason is that, which is
23  conceptually, they're highly related.  The DTA is
24  a function of, and a cause of, future
25  profitability.

259

1      So guidance and DTA are inextricably
2  related together.  And, as we discussed earlier,
3  results, similarly, are inextricably linked.
4      Q.   And you can't disaggregate those from
5  the news about the problems in the commercial
6  vehicle division in the second-quarter restatement
7  based thereon; is that right?
8      A.   That's correct.  I could not.
9      Q.   Now, in the plumbers' case in opining
10  on loss causation resulting from Dana's September
11  15, 2005, announcement, do you assume that
12  Plaintiffs will be able to fully prove liability
13  for all of their securities frauds claims against
14  Defendants Burns and Richter?
15      A.   I need to hear that again.
16      Q.   In the plumbers' case in opining on
17  loss causation resulting from Dana's September 15,
18  2005, announcement, do you assume that Plaintiffs
19  will be able to fully prove liability for all of
20  their securities fraud claims against Defendants
21  Burns and Richter?
22      A.   Maybe one more time slower, because I
23  think you said "from the plumbers'."  I need to
24  hear it one more time very slowly, please.
25      Q.   In the plumbers' case in opining on

260

1  loss causation resulting from Dana's September 15,
2  2005, announcement, do you assume that Plaintiffs
3  will be able to fully prove liability for all of
4  their securities fraud claims against Defendants
5  Burns and Richter?
6      A.   Well, I just want to say there is a
7  premise in your question I don't agree with, which
8  is the loss causation stemmed from the disclosure.
9  The loss stemmed from misrepresentations and
10  omissions that inflated the stock price and were
11  then later corrected by the disclosure.
12      So it's not the disclosure alone that
13  caused the loss.  It was the inflation and the
14  disclosure.  The misrepresentations and omissions,
15  and then ultimately the disclosure, caused those
16  losses to be realized.
17      I have been assuming, or I had been
18  assuming that Plaintiffs' allegations would be
19  proved.  I hadn't considered how I would need to
20  amend my report if only some were and some
21  weren't.
22      MS. WYMAN:  Arthur, please don't
23  forget to mark that note.  And when you get a
24  chance, can we take a break.
25      MR. LINKER:  All right.  So why don't

261

1  we mark the note, number one.  And take a break,
2  number two.
3      MR. LEVINE:  What's it going to be
4  marked as?
5      MR. LINKER:  Let me see what the
6  reporter has here.  Exhibit 682.
7      (Document marked for
8  identification as Feinstein Exhibit 682.)
9      VIDEO TECHNICIAN:  The time is 5:18.
10  We're off the record.
11      (Proceedings recessed at 5:18 p.m.,
12  and reconvened at 5:27 p.m.)
13      VIDEO TECHNICIAN:  We're back on the
14  record.  The time is 5:27.
15  BY MR. LINKER:
16      Q.   Professor Feinstein, is it correct
17  that in Paragraphs 135 and 136 of your report at
18  Page 48 you parse Dana's October 10, 2005,
19  announcement into two categories:  First, the
20  announcement that the first tax asset would be
21  written down.  And, second, the other components
22  of the announcement which you state, "relate to
23  the unreliability of company accounting and
24  guidance," close quote?
25      A.   Yes.

66  (Pages 258 to 261)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

262

1    Q.   Is it correct that according to your
2  report the only new information in the October 10,
3  2005, announcement that had a direct economic
4  impact was the write-down of the deferred tax
5  asset?
6    A.   No.
7    Q.   Look at Paragraph 135 of your report.
8    A.   (Whereupon the witness complies.)
9    Q.   You first say in that paragraph that
10  you understand that expert accounting testimony
11  will establish that the revelation on 10 October
12  2005 that the deferred tax asset would indeed be
13  written down could and should have been made on 20
14  July 2005, correct?
15    A.   Yes.
16    Q.   Then you say "The direct economic
17  impact of this information represents artificial
18  inflation," right?
19    A.   Yes.
20    Q.   So when you refer to "this
21  information" that had a direct economic impact,
22  aren't you referring to what you say in the
23  preceding sentence?
24    A.   Well, there is a direct economic
25  impact of the deferred tax asset being written

263

1  down.  Right.
2    Q.   Now, is there any other information in
3  the October 10, 2005, announcement that you say in
4  your report had a direct economic impact?
5    A.   Yes.  The, essentially, revoking of
6  prior financials.
7    Q.   All right.  In Paragraph 135 you say,
8  "The economic impact of the confirmation that the
9  deferred tax asset would be written down was $0.73
10  per share," correct?
11    A.   One moment.
12       (Pause.)
13    A.   The question pending right now is -- I
14  would --
15    Q.   The question pending right now is
16  whether in Paragraph 135 you say that "The
17  economic impact of the confirmation that the
18  deferred tax asset would be written down was $0.73
19  per share."
20    A.   I see that.
21       I'd like to ask for another break.  I
22  know we just had a break.  I mean it's 5:30, and
23  this is very complicated financial analysis.  And
24  if I'm going to be able to give good answers that
25  are informative, I'm going to need a little bit of

264

1  time to review my report.  I mean, if this was
2  brought up first thing in the morning, I wouldn't
3  have needed that time.  But after being here for
4  eight and a half hours answering difficult
5  questions, I'm going to need a little bit of time
6  just to review this section.
7    Q.   Do you feel tired?
8    A.   Yes.
9    Q.   Would you prefer to resume your
10  deposition on another day?
11    A.   Yes.
12       MR. LINKER:  I suggest to counsel
13  present that we adjourn the deposition to another
14  day because the witness has said he's tired.
15       MR. SIEGEL:  I'm agreeable with that.
16       MS. KILLAM:  No objection.
17       MS. WYMAN:  That's fine.  We actually
18  have been, Mr. Siegel and I, have been talking.
19  And we talked about resuming his deposition the
20  day after Tavy Ronen's deposition in August, since
21  it's going to be in New York and we'll all be back
22  in the same area.  So that would be something that
23  we could do.  Because Professor Feinstein has a
24  summer school class that he's going to be teaching
25  through the end of our discovery period that we

265

1  have left for experts.
2       MR. LINKER:  Is Professor Feinstein
3  willing to come to New York for that?
4       THE WITNESS:  Yes.
5       MS. WYMAN:  Yes.  He's agreed to do
6  that.
7       MR. LINKER:  Subject to confirming
8  with Mr. Sternman and checking my own calendar
9  that we have no conflict, which I think it is
10  likely that we have no conflict, that sounds okay.
11       MS. WYMAN:  Okay.  Why don't we plan
12  on doing that.  And if we have to change plans,
13  then we can figure it out.
14       MR. SIEGEL:  We'll work it around.
15       MR. LINKER:  Okay.  Thank you.  So I
16  guess we're off the record.
17       THE WITNESS:  Thank you, very much.
18  Thank you.
19       VIDEO TECHNICIAN:  The time is 5:35.
20  We are off the record.
21       (Time noted:  5:35 p.m..)
22           *    *    *
23
24
25

67  (Pages 262 to 265)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

**266**

1
2  STATE OF _____ )
3                          ) :ss
4  COUNTY OF _____ )
5
6
7      I, STEVEN P. FEINSTEIN, Ph.D., the
8  witness herein, having read the foregoing
9  testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15      _____
16      STEVEN P. FEINSTEIN, Ph.D.
17
18
19
20  Sworn and subscribed to before me,
21  this _____ day of _____, 2015.
22
23  _____
24      Notary Public
25

**268**

1  ------------PREVIOUSLY MARKED EXHIBITS------------
2  EXHIBIT                              PAGE
3  Exhibit 655   News Release titled "Dana      113
4                Corporation Revises 2005
               Earnings Outlook, Restatement
5                of Second-Quarter 2005
               Financial Statements Likely,"
6                Bates DANA00023699 through
               DANA00023700
7  Exhibit 676   Article from the Journal of    131
8                Financial and Quantitative
               Analysis titled "The Cost to
               Firms of Cooking the Books,"
9                by Jonathan M. Karpoff,
10               D. Scott Lee, and Gerald S.
                Martin
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**267**

1  ------------------I N D E X--------------------
2
3  WITNESS          EXAMINATION BY      PAGE
3  STEVEN FEINSTEIN, Ph.D.  MR. LINKER     7
4
5
6  --------------------EXHIBITS--------------------
7  FEINSTEIN EXHIBIT                     PAGE
8  Exhibit 677   Document entitled "Report of    11
               Professor Steven P. Feinstein,
9                Ph.D., CFA, August 4, 2014"
10  Exhibit 678   Document entitled "Report of    12
               Professor Steven P. Feinstein,
11               Ph.D., CFA, November 19, 2014"
12  Exhibit 679   Document entitled "Dana        102
               Corporation To Restate
13               Financial Statements For 2004
               & 2005 Write Off U.S. Deferred
14               Tax Assets"
15  Exhibit 680   Article entitled "The Effect   124
               of SOX Internal Control
16               Deficiencies on Firm Risk and
               Cost of Equity"
17
18  Exhibit 681   Document entitled "Materiality 197
               and Magnitude: Event Studies
               in the Courtroom, April 2009,"
19               by David I. Tabak and Frederick
               C. Dunbar
20
21  Exhibit 682   Handwritten notes of the       261
               witness
22
23
24
25

**269**

1        C E R T I F I C A T E
2
3  COMMONWEALTH OF MASSACHUSETTS
4  SUFFOLK, SS.
5      I, MaryJo O'Connor, a Notary Public in
6  and for the Commonwealth of Massachusetts, do
7  hereby certify:
8      That STEVEN P. FEINSTEIN, Ph.D., the
9  witness whose testimony is hereinbefore set forth,
10  was duly sworn by me and that such testimony is a
11  true and accurate record of my stenotype notes
12  taken in the foregoing matter to the best of my
13  knowledge, skill and ability.
14      IN WITNESS WHEREOF, I have hereunto set
15  my hand and Notarial Seal this 16th day of June
16  2015.
17
18
19
20      MARYJO O'CONNOR, RMR/RPR/CSR
           Notary Public
21
22
       My Commission expires:
23      September 28, 2018
24
25

68  (Pages 266 to 269)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

270

```
1        INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over carefully
4    and make any necessary corrections. You should state
5    the reason in the appropriate space on the errata
6    sheet for any corrections that are made.
7       After doing so, please sign the errata sheet
8    and date it.
9       You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12      It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

271

```
1          E R R A T A
2
3
4
5       I wish to make the following changes,
6    for the following reasons:
7
8    PAGE LINE
9    ___ ___ CHANGE:_____
10   REASON:_____
11   ___ ___ CHANGE:_____
12   REASON:_____
13   ___ ___ CHANGE:_____
14   REASON:_____
15   ___ ___ CHANGE:_____
16   REASON:_____
17   ___ ___ CHANGE: _____
18   REASON:_____
19   ___ ___ CHANGE: _____
20   REASON:_____
21
22   _____  _____
23    WITNESS' SIGNATURE        DATE
24
25
```

69 (Pages 270 to 271)

272

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION (TOLEDO)

```
------------------------------------
PLUMBERS & PIPEFITTERS NATIONAL
PENSION FUND; SEIU PENSION PLANS
MASTER TRUST; and WEST VIRGINIA
LABORERS PENSION TRUST FUND,
On Behalf of Themselves and
All Others Similarly Situated,

          Plaintiffs,
  vs.                                CIVIL ACTION
                                     NO. 3:05-cv-07393-JGC
MICHAEL J. BURNS and ROBERT C.
RICHTER,

          Defendants.
------------------------------------
HAWAII IRONWORKERS ANNUITY
TRUST FUND, on Behalf of Itself
and All Others Similarly Situated,

          Plaintiff,
vs.                                  CIVIL ACTION
                                     NO. 3:10-cv-00371-JGC
BERNARD N. COLE, WILLIAM E.
HENNESSY, DOUGLAS W. HODGE and
ROBERT E. STEIMLE,

          Defendants.
------------------------------------
```

SUBJECT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF STEVEN P. FEINSTEIN, Ph.D.
New York, New York
August 27, 2015
10:00 a.m.

Reported by:
Maureen Ratto
Job No: 40456

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

273

```
1              August 27, 2015
2              10:00 a.m.
3
4                * * *
5
6        Deposition of STEVEN P. FEINSTEIN,
7    Ph.D., held at the offices of Katten,
8    Muchin, Rosenman, LLP, 575 Madison Avenue,
9    New York, NY 10022, pursuant to notice,
10   before Maureen Ratto, Registered
11   Professional Reporter, License No. 817125,
12   and Notary Public.
13
14               * * *
15
16
17
18
19
20
21
22
23
24
25
```

274

```
1       A P P E A R A N C E S :
2
3    For the Plaintiffs - West Virginia Laborers
4    Pension Trust Fund:
5       ROBBINS GELLER RUDMAN & DOWD, LLP
6       665 West Broadway, Suite 1900
7       San Diego, CA 92101
8       619-231-1058
9       BY: LAURIE LARGENT, ESQ.
10         llargent@rgrdlaw.com
11         DEBRA J. WYMAN, ESQ.
12         debraw@rgrdlaw.com
13
14   For the Defendants - Michael J. Burns and
15   Robert C. Richter
16      KATTEN MUCHIN ROSENMAN, LLP
17      575 Madison Avenue
18      New York, NY 10022
19      212-940-7007
20      BY: ARTHUR S. LINKER, ESQ.
21         arthur.linker@kattenlaw.com
22         JOEL W. STERNMAN, ESQ.
23         j.sternman@kattenlaw.com
24
25
```

275

```
1            VIDEOGRAPHER: Good morning.
2    Here begins the video recorded Volume
3    II deposition of Professor Steven P.
4    Feinstein, Ph.D. taken by the
5    Defendants in the Class action matters:
6    Plumbers and Pipefitters National
7    Pension Fund, et al, on behalf of
8    themselves and all others similarly
9    situated, Plaintiffs versus Michael J.
10   Burns and Robert C. Richter,
11   Defendants, Civil Action No. 305 CV
12   7393 JGC and Hawaii Ironworkers Annuity
13   Trust Fund, on behalf of itself and all
14   others similarly situated, Plaintiff
15   versus Bernard M. Cole et al,
16   Defendants Civil Action No. 310 CV 371
17   JGC in the United States District
18   Court, Northern District of Ohio,
19   Western Division, Toledo.
20       This deposition is proceeding at
21   Katten Muchin Rosenman, LLP, 575
22   Madison Avenue, New York, New York,
23   10022 on Thursday, August 27, 2015 at
24   approximately 10:00.
25       My name is Howard Brodsky and
```

276

```
1    I'm the Legal Video Specialist in
2    association with David Feldman
3    Worldwide Incorporated, with offices
4    located in New York, New York. The
5    court reporter is Maureen Ratto, in
6    association with David Feldman
7    Worldwide Incorporated.
8        Will counsel please state their
9    appearances for the record.
10       MS. WYMAN: Debra Wyman from
11   Robbins Geller Rudman & Dowd on behalf
12   of the Plaintiffs and the Witness.
13       MS. LARGENT: Laurie Largent,
14   same firm, same parties.
15       MR. LINKER: Arthur Linker,
16   Katten Muchin & Rosenman on behalf of
17   Defendants Burns and Richter in the
18   Plumbers' case.
19       MR. STERNMAN: Joel W. Sternman,
20   same -- same firm and same parties as
21   Mr. Linker.
22       VIDEOGRAPHER: Will the court
23   reporter please swear in the witness.
24               * * *
25   S T E V E N  P.  F E I N S T E I N,
```

2 (Pages 273 to 276)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

277

1  having been first duly sworn according
2  to law by the Officer, resumes:
3  DIRECT EXAMINATION BY MR. LINKER:
4  Q.  Good morning, Professor
5  Feinstein.
6  A.  Good morning.
7  Q.  Is there anything today that we
8  should know that might prevent you from
9  fully and completely answering my
10  questions?
11  A.  No.
12  Q.  This is a continuation of your
13  deposition the first day of which
14  occurred in June, correct?
15  A.  That's right.
16  Q.  At the end of the day, the first
17  day of your deposition, you were asked
18  a question which you did not complete
19  your answer to.
20  The question was, I'm reading
21  from 263 of the transcript:
22  "QUESTION: The question pending
23  right now is whether in paragraph 135
24  you say that 'The economic impact of
25  the confirmation that the deferred tax

278

1  asset would be written down was $.73
2  per share?'"
3  And you answered:
4  ANSWER: "I see that."
5  And then you said you'd like to
6  ask for a break, and at your request
7  and with the agreement of all counsel
8  present we agreed to adjourn the
9  deposition to today.
10  Do you remember that?
11  A.  I do.
12  Q.  All right. I'd like to put
13  before you what was marked at the first
14  session of your deposition as Exhibit
15  677, which is a copy of the report
16  dated August 4, 2014 that you submitted
17  in this case.
18  I'd like you to please turn to
19  page 48 and paragraph 135 of your
20  report which appears on page 48. Tell
21  me when you're ready.
22  A.  I'm ready.
23  Q.  So I'm going to repeat the
24  question that was pending at the end of
25  the day of the first date of your

279

1  deposition.
2  Is it true that in paragraph 135
3  of your report you say that "The
4  economic impact of the confirmation
5  that deferred tax asset would be
6  written down was $.73 per share?"
7  A.  It does say that, but that
8  requires a correction.
9  Q.  What correction does it require?
10  A.  What's described in 137 better,
11  in paragraph 137 I write, "I estimate
12  that $1.98 was due to the reputational
13  fact, $.73 was caused by the direct
14  economic effect of the new information,
15  and it's all of the new information."
16  What 135 should have said is,
17  "The economic impact of the
18  confirmation that the deferred tax
19  asset would be written off was included
20  in the $.73 per share." It wasn't the
21  entirety of the $.73 per share.
22  Q.  But why was it that when you
23  submitted this report you did not state
24  that, but instead said that the direct
25  economic impact of the deferred tax

280

1  asset being written down was $.73?
2  A.  Well, it was a poorly worded.
3  137 is more correctly worded and what I
4  just stated for 135 is how it should
5  have been worded.
6  There are other places in the
7  report as well, I believe, that
8  emphasize what I have in 137 is correct
9  and the way it's stated in 135 is not.
10  Q.  Now, in 137 you refer to the
11  direct economic effect of the new
12  information, correct?
13  A.  That's right.
14  Q.  But you don't say in paragraph
15  137 that the new information was a
16  direct economic impact and anything
17  else, correct?
18  A.  Well, throughout the report and
19  in several places I write about what
20  the new information was on October 10,
21  2005, and I say that throughout the
22  report in several places. I write that,
23  "The information included the
24  confirmation that the DTA would be
25  written down but also that there would

3 (Pages 277 to 280)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

281

1   be a restatement of five additional
2   quarters of financials, as well as
3   postponement of Q3 results and recision
4   of guidance for the rest of the year."
5       Q.   Now, when you say now, given
6   that correction, which you've just
7   proffered, that the direct economic
8   effect of what you just described in
9   your previous answer was $.73 per
10  share, did you, when you did that
11  analysis, assign any discreet portion
12  of the $.73 per share to any one or
13  more of the items that you just
14  described in your previous answer?
15      A.   No, I didn't -- I didn't
16  disaggregate the direct effect into
17  components.
18      Q.   Why did you not disaggregate the
19  direct effect of the components?
20      A.   I described in the report that
21  because all of the news of the four
22  components of the announcement were
23  simultaneous, that it was infeasible to
24  do so.
25      Q.   By saying it was infeasible to

283

1       A.   Yes.
2       Q.   Now, is it true that the Karpoff
3   paper parses a company's stock price
4   decline into direct economic effect,
5   legal penalties and reputational effect
6   for announcement of the same fraudulent
7   accounting issues not different ones?
8           MS. WYMAN: Object to form.
9       A.   I don't know what you mean by
10  "of the same fraudulent accounting
11  issues not different ones."
12          My understanding is that, what
13  this article does is it decomposes, it
14  allows for decomposition for a stock
15  price decline into direct and
16  reputation effects.
17      Q.   Now, if there were several
18  issues in an announcement, the Karpoff
19  article, when it -- it does its study,
20  does not assign a direct economic
21  effect to one part of an announcement
22  and a legal penalty or reputational
23  effect to another part of an
24  announcement, it assigns or partitions
25  economic effect legal penalties and

282

1   do so, are you saying in substance that
2   there is not a scientifically valid way
3   to disaggregate because of what you
4   just said?
5       A.   Well, in this particular case
6   the methodology I chose was the
7   empirical method. I observed the stock
8   price decline and then decomposed the
9   stock price decline into direct effects
10  and reputation effects using the
11  literature, as we talked about last
12  time.
13          Using the empirical method, no,
14  it doesn't disaggregate. There is --
15  that method does not allow for
16  disaggregation given these facts of how
17  the information came out.
18      Q.   Now, let me put before you,
19  again, a copy of Exhibit 676. This was
20  originally marked as an exhibit at the
21  Stulz deposition and it was shown to
22  you and you identified it in the first
23  session of your deposition. It's a copy
24  of the Karpoff article, The Cost of
25  Firms Cooking the Books.

284

1   reputational effect to the same
2   announcement or relevant part of an
3   announcement, correct?
4           MS. WYMAN: Object the to form.
5       A.   You mean to the aggregate
6   announcement?
7       Q.   Yes.
8       A.   Yes. That's correct.
9       Q.   The Karpoff paper doesn't
10  explain how to assign a reputational
11  effect to one part of an announcement
12  but not all of an announcement,
13  correct?
14          MS. WYMAN: Object to form.
15      A.   Well, it would apply -- that
16  goes beyond the scope of the Karpoff
17  article.
18          If it were possible to parse the
19  announcement into component parts -- if
20  it were possible to parse the direct
21  effect into component parts, then you
22  can parse the reputation effects
23  similarly, as in the Karpoff results.
24      Q.   But if you can't parse -- if you
25  can't parse the direct effect of

4 (Pages 281 to 284)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

285

1  component parts, then you could not,
2  using your application of the Karpoff
3  article, parse the reputational effect
4  as the component parts either, correct?
5      MS. WYMAN: Object to form.
6  A.   Well, it would require
7  additional analyses such as -- or
8  approaches such as what I did do in my
9  work.
10  Q.   What additional analyses or
11  approaches could you use to partition
12  or disaggregate the reputational
13  effect?
14  A.   Okay.  Well, I pointed out that
15  in my report that, reasonably, the
16  inflated reputation or the inflation in
17  the stock price on account of
18  reputation should reasonably have been
19  or should be treated as if it was in
20  the stock price as of the first day of
21  the Class period because that's when
22  the company essentially was on -- was
23  in the process of misstating its
24  financials and other misdeeds,
25  accounting and otherwise, that caused

286

1  the financials and the valuation of
2  assets to be misstated.
3      So reasonably, as I said in the
4  report, all of the reputation effects
5  should have been treated as inflation
6  that entered at the start of the Class
7  period. Any attribution of a growing
8  reputation effect over the course of
9  the Class period would be extremely
10  conservative.
11      So that's what I explained and
12  that's why the methodology I chose is
13  actually a conservative methodology,
14  allocating a growing reputation effect
15  over the course of the Class period,
16  rather than assigning all of it at the
17  beginning of the Class period,
18  regardless whether it's from the DTA or
19  the misstated financials.
20  Q.   But that doesn't address the
21  question of disaggregating the
22  reputational effect among different
23  components of the announcement,
24  correct?
25  A.   Well, it does. It does address

287

1  it.
2  Q.   How?
3  A.   Because I do a disaggregation.
4  However, I would do -- I mean, I do an
5  attribution, a temporal attribution
6  showing how that reputation effect
7  impacts the inflation ribbon over time.
8      Any approach or assumptions that
9  I make in that calculation will be
10  extremely conservative, given that it's
11  reasonable that all of the reputation
12  effect should have been accounted for
13  as of the start of the Class period. So
14  it does.
15  Q.   All right. Now, is it true that
16  the Karpoff paper does not discuss any
17  judgmental assignment of the three
18  categories of effects; economic effect,
19  legal penalties and reputational effect
20  to different components in the
21  disclosure?
22      MS. WYMAN: Object to form.
23  A.   Correct. It, itself, does not do
24  a disaggregation.  The Karpoff article
25  does not do a disaggregation of that

288

1  type for the cases that it examines.
2  Q.   All right. I want to go to a
3  subject that you just mentioned a
4  couple of minutes ago.
5      You were parsing the
6  reputational effect as it, according to
7  your report, applies to different time
8  periods within the Class period.
9  A.   Okay.
10  Q.   Now, is it true that even though
11  you assume that the corrective
12  disclosures made in September and
13  October, 2005 should have been made on
14  July 20, 2005 you allocate varying
15  portions of the 1.98 share reputation
16  effect component of the October 10,
17  2005 stock price decline to the entire
18  Plumber Class period, going back to
19  April 21, 2004?
20      MS. WYMAN: Object to form.
21  A.   That's a question?
22  Q.   Yes.
23  A.   Well, you said that I -- I
24  believe either assume or conclude, I
25  forget which word you used -- that all

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

289

1    of the information that came out on
2    both September 15th and October 10th
3    should have been disclosed on July 20th
4    and that's incorrect. Part of -- the
5    premise part of your question is
6    incorrect two reasons; one, it's not my
7    conclusion, I'm relying on
8    Dr. Mintzer's conclusion that
9    components of the September and October
10   disclosure should have been. And I'm
11   not making a judgment about what should
12   or couldn't have been.  I'm assessing
13   what the inflation result was of the
14   behavior that actually did occur, what
15   that was.
16        Dr. Mintzer says that the DTA
17   and other components could and should
18   have been announced on July 20th but
19   beyond that, I didn't -- even he
20   doesn't say that he doesn't -- it's not
21   the case that the misstatements that go
22   back to the First Quarter of 2004 could
23   only have been correctly reported to
24   the marketplace on July 20th for the
25   accounting misstatements by virtue of

290

1    what they are, accounting
2    misstatements.  They could have been
3    corrupted, they could have been
4    reasonably correct on the dates that
5    they were originally released and that
6    goes back to the dates that I used for
7    the stepping up of reputation effect,
8    going back to the beginning of the
9    Class period and the announcement dates
10   thereafter.
11   Q.   My question was: Even though you
12   assume that the corrective disclosures
13   made in September should have been made
14   on July 20 -- not that you conclude but
15   that you assume -- is it true that you
16   assume that the corrective disclosures
17   made in September and October, 2005
18   should have been made on July 20?
19        MS. WYMAN: Object to form.
20   A.   I did not assume that the
21   disclosures made in October should have
22   and could have been made only as late
23   as July 20th, 2005.
24   Q.   You did -- you assume that they
25   should have been made by July 20, 2005?

291

1    A.   No. With respect to the
2    accounting misstatements, they could
3    have been made earlier.
4    Q.   Now, look at paragraph 142 of
5    your report.  On page 49 you say that,
6    **"All artificial inflation that entered
7    the stock price on 20 July 2005 is
8    assumed to have dissipated on September
9    15, 2005."**
10        Is that a correct statement of
11   your assumptions?
12   A.   What I mean to say, and we went
13   over this last time, is that all
14   inflation that dissipated on September
15   15, 2005 entered on July 20th, 2005.
16   Q.   Okay. Withdrawn.
17        So is it a correct statement of
18   **your opinion that even if Defendants
19   Burns and Richter were found not liable
20   for any statements or omissions prior
21   to July 20, 2005 you, nevertheless,
22   would conclude that artificial price
23   inflation, loss causation and damages
24   are shown for investors who purchased
25   Dana stock prior to July 20, 2005?**

292

1        MS. WYMAN: Object to form.
2    A.   It's a complicated question. Can
3    I hear it back?
4        MR. LINKER:  Please reread the
5    question.
6        (Whereupon, the pending question
7    is read back by the reporter.)
8        MS. WYMAN: Same objection.
9    A.   I believe so, because -- well, I
10   think you're making distinction of
11   whose responsible.
12        The facts that I relied on were
13   that there were accounting
14   misstatements stemming back to the
15   First Quarter of 2004 and that those
16   misstatements, those irregular,
17   incorrect financial results caused
18   reputation effect and inflation in the
19   stock price. So, yes, someone would
20   have been responsible.
21   Q.   **All right. Please look at
22   paragraphs 140 and 141 of your report.
23   It's on page 49.**
24        **Now, is it correct that you
25   state in paragraphs 140 and 141 of your**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

293

1  report that, "It is reasonable and more
2  conservative to allocate parts of the
3  1.98 reputation effect component of the
4  October 10, 2005 stock price decline to
5  earlier portions of the Plumbers Class
6  period because, quote, it would be
7  reasonable to conclude that the entire
8  $1.98 of per share artificial inflation
9  due to the reputation effect that
10  exited the stock price on 10 October
11  2005 had been in the stock price from
12  the start of the Class period on 21
13  April 2004." Is that correct?
14  A.   Yes.
15  Q.   Would you look at paragraph 143
16  of your report, on page 50?
17  Is it correct in paragraph 143
18  of your report you state that,
19  "Earnings per share was overstated in
20  the First Quarter of 2004 by $.05 per
21  share"?
22  A.   Yes.  But I just want to add
23  something, I want to be clear about
24  something.  I've identified when
25  inflation entered the stock price using

294

1  this methodology and I stated that
2  someone was responsible on those dates
3  for the inflation entering the stock
4  price but every subsequent day that the
5  accounting is not corrected someone's
6  responsible for maintaining the
7  inflation in the stock price on those
8  days, and it's essentially an omission
9  then that the correction didn't take
10  place until -- it's an omission on
11  every day up until October 10th, 2005
12  that it was only on October 10th, 2005
13  that the market was made aware that
14  those five quarters needed to be
15  corrected.
16  So maybe someone is responsible
17  for it going in in the first place but
18  others, maybe the same people, were
19  responsible for maintaining it
20  subsequently.  But your question about
21  does it say 143 EPS was overstated by
22  $.05 in Q1 2004, that is what it says
23  and those are the facts I relied on.
24  Q.   Now, in paragraph 144 you
25  attributed $.62 per share of that

295

1  reputation effect to the First Quarter
2  2004. Correct?
3  A.   Yes.
4  Q.   And so you are saying that
5  because the earnings were overstated by
6  $.05 per share for the First Quarter
7  2004 the inflation was $.62 per share?
8  A.   Based on the reputation effect.
9  As of that point in time there were
10  accounting irregularities, the company
11  was embarked on a year and a half of
12  accounting -- of a path of a year and a
13  half of accounting irregularities.
14  It's conservative to say it's only
15  $.62.
16  I mean, it's as of that point in
17  time there were undisclosed weaknesses,
18  financial and control weaknesses, and
19  the methodology uses the empirics of
20  what the stock price decline was when
21  the truth came out and reasonably steps
22  up the reputation effect in proportion
23  to the accumulating earnings
24  overstatements.
25  Q.   So the reputation effect on

296

1  October 10, 2005 is the only basis that
2  you had for estimating that the $.05
3  per share overstatement as of April 21,
4  2004 resulted in inflation of $.62. Is
5  that correct?
6  MS. WYMAN: Object to form.
7  A.   I explained the methodology. I
8  explained it in the report, that I can
9  observe what the stock price decline is
10  when the truth comes out, I use the
11  literature to decompose the decline in
12  direct and the reputation effects, I
13  reasonably conclude that all of the
14  reputation effects should have been in
15  there when the accounting
16  irregularities and weak financial
17  controls were in place, but I
18  conservatively opted instead for a
19  method that steps up the growing
20  reputation effect in portion to the
21  accumulating earnings overstatements.
22  And that's not just one thing, it's all
23  of that.
24  Q.   But it's based on your
25  reputation effect analysis --

7 (Pages 293 to 296)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

297

1    MS. WYMAN: Object to form.
2    A.   In part --
3    Q.   -- resulting -- without your
4    reputation effect analysis related to
5    the October 10th disclosure you could
6    not reach that conclusion. Correct?
7        MS. WYMAN: Object to form.
8    A.   The $.62 quantification relies
9    on, among other things, that piece.
10   Yes.
11   Q.   What do you assume Dana should
12   have announced internal regarding its'
13   controls on April 21, 2004?
14   A.   I don't make any assumption. I
15   calculate the inflation and damages on
16   -- that resulted from what they did do.
17       If they had been -- I can tell
18   you this much, if they had been
19   completely forthcoming and truthful and
20   honest about the condition of the
21   company and the condition of their
22   financial controls, the price reaction
23   would have occurred earlier and there
24   would have been no inflation subsequent
25   to when the announcements in this

298

1    hypothetical, alternative, "but for"
2    world would have been made.
3    Q.   But my question was about
4    internal controls, and your response
5    talked about truth and honesty about
6    the condition of the company and the
7    condition of their financial controls?
8        So in that answer, what did you
9    mean by the "condition of the company",
10   if it's not the condition of the
11   financial controls?
12   A.   Well, both, both the
13   profitability of the company.  So if
14   they had released a correct number, but
15   also if they had told the marketplace
16   that they had weak internal controls
17   and financial controls such that the
18   next six quarters of financials should
19   not be relied upon, my conclusion is
20   that the stock price would have fallen
21   by more than $.62.  I mean, $.62 for
22   the -- at least $.62, let's say it that
23   way, for the reputation effect when
24   they made that announcement, when they
25   would have made that announcement.

299

1    Q.   Just so the record is clear, it
2    is a fact that you do not make any
3    assumption as to what Dana should have
4    announced regarding its internal
5    controls on April 21, 2004?  That is
6    what you said, correct?
7        MS. WYMAN: Objection to form.
8    That misstates the testimony.
9    A.   It's beyond the scope of my
10   engagement.  I'm not advising the
11   company what is legal or illegal.
12       What I'm doing is calculating
13   what losses occurred, what losses were
14   sustained by investors on account of
15   what they did do.  And I've concluded
16   that had they told the full truth at
17   the start of the Class period previous
18   investors would have sustained losses,
19   but the Class members would not have.
20   Q.   All right.
21   A.   And so based on that maybe
22   someone should advise them that they
23   tell the truth, but that's not my job.
24   Q.   What was the earliest date on
25   which Dana was required by the

300

1    Sarbanes-Oxley Act to report on its
2    assessment of its internal controls?
3        MS. WYMAN: Object to form.
4    A.   I -- that's something I would
5    have to look up. You know, when I do
6    analysis like that or answer questions
7    like that, I would need to look it up,
8    but they were putting out financials.
9        The first day of this Class
10   period was the day that they released
11   financials that later turned out to be
12   incorrect, and were incorrect by the
13   company's own admission on account of
14   weak internal and financial controls.
15       MR. LINKER: Just in case we have
16   a time problem today, I just want to
17   note for the record right now that this
18   examination is being unduly prolonged
19   by non-responsive answers. Let's
20   continue.
21       MS. WYMAN: No. It's not being
22   prolonged by non-responsive answers.
23   He's answering your question.
24       You asked him a question just a
25   minute ago about an accounting thing

8 (Pages 297 to 300)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

301

1    that he said that he needed to look up.
2    So ask your questions, Arthur, because
3    you got 7 minutes and 30 seconds left.
4        MR. LINKER:  The last answer was
5    totally non-responsive.
6        MS. WYMAN: That's your opinion.
7    **Q.   I'm asking you for a date.**
8    **That's the sole subject of this**
9    **question.**
10       **When did Dana publicly disclose**
11   **that it assessed the effectiveness of**
12   **its internal controls and concluded**
13   **that its internal controls were**
14   **effective?**
15       MS. WYMAN: Object to form. Asked
16   and answered.
17    A.   That's a different question than
18   you asked before.  Can I please hear
19   that question?
20       (Whereupon, the pending question
21   is read back by the reporter.)
22    A.   And again, to be a fully
23   responsive answer I need to point out
24   that there is implicit acknowledgment
25   that internal controls are effective

302

1    and explicit and Sarbanes-Oxley calls
2    for an explicit statement of that fact,
3    but any time that you release
4    financials to the marketplace there is
5    an implicit assertion or statement that
6    these are reliable financials that one
7    can rely upon.
8        So as far as the explicit,
9    mandated by Sarbanes-Oxley statement, I
10   don't know the date. As far as the
11   implicit, an implicit guarantee,
12   essentially, that the financials are
13   reliable, that would occur every time
14   the company released financials to the
15   marketplace.
16   **Q.   I show you Exhibit 678, which is**
17   **a copy of your report dated November**
18   **19, 2014. Would you turn to page 29?**
19    A.   Okay.
20   **Q.   Paragraph 89.**
21    A.   Okay.
22   **Q.   And the fourth line of paragraph**
23   **89 you refer to authorities in the**
24   **field.**
25    A.   Right.

303

1    **Q.   Would you please identify those**
2    **authorities?**
3     A.   Well, I do. In this report I
4    cite a number of articles that -- in
5    paragraph 88 I cite Kothari, et al.
6    And Kothari et al in the second quote
7    saying, "Numerous studies replicate
8    these results and it has become an
9    industry standard now in the capital
10   markets literature to control for the
11   effects of persistence risk in growth
12   on earnings response coefficients."
13       So I'm citing to Kothari and the
14   numerous studies that Kothari cites to
15   and, frankly, the other two quotes in
16   paragraph 88 reinforce that.
17       So it's not just me, it's also
18   Kothari and it's not just Kothari, it's
19   also the numerous studies that Kothari
20   cites to that a lack of persistence or
21   stability in the company makes the
22   earnings response coefficient study
23   unreliable.
24   **Q.   Would you turn to page 13 in**
25   **your Rebuttal Report, the caption**

304

1    **before paragraph 41?**
2     A.   Okay.
3    **Q.   That caption refers to financial**
4    **principles.**
5     A.   Yes.
6    **Q.   What financial principles are**
7    **you referring to?**
8     A.   Again, this section is a
9    critique of Professor Stulz's work.  So
10   I'm focused on his erroneous conclusion
11   that uncertainty caused by the
12   company's announcement was confounding
13   information and to the financial
14   principles that -- well, in order to
15   understand that the statement to be
16   confounding information it would have
17   to be unrelated to the information that
18   was announced, and the financial
19   principle is that the uncertainty from
20   a statement is not unrelated to the
21   statement, whether it's a statement
22   about earnings or asset valuation.
23       MR. LINKER:  Okay. Where are we
24   on time?
25       MS. WYMAN: You have two and a

9  (Pages 301 to 304)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

305

1    half minutes.
2        VIDEOGRAPHER:  Time is 10:36. We
3    are off the record.
4        (Whereupon, a recess is taken.)
5        VIDEOGRAPHER: The time is 10:43.
6    We are on the record.
7        Q.   Could you look at paragraph 96
8    of your report, page 40?
9        A.   Yes.
10       Q.   And I asked you about this last
11   session. You refer there to an article
12   by David Tabak and Frederick Dunbar
13   called Materiality and Magnitude of
14   Event Studies in the Courtroom.
15       A.   Yes.
16       Q.   I show you what was marked
17   previously as Exhibit 703.
18       Would you look at that and
19   confirm that that is the Tabak and
20   Dunbar article referenced on page 40,
21   paragraph 96 of your report?
22       A.   Yes, it is.
23       Q.   All right. I'd like you to look
24   at a question and an answer that
25   appeared starting at page 202, line 23

306

1    of the transcript in the last session.
2        A.   Page?
3        Q.   202, line 23.
4        (Whereupon, the Deponent reviews
5    the document.)
6        A.   And you're asking --
7        Q.   I just wanted you to look at --
8        A.   -- line 23?
9        Q.   That question and your answer.
10   Okay?
11       A.   "You cannot tell us whether you
12   agree or disagree that if these four
13   conditions are satisfied an event can
14   reveal the effects of a disclosure
15   event."
16       Well, I will tell you that if
17   their conditions are satisfied --
18       MS. WYMAN: Of course, I put it
19   on and can't figure how to turn it off.
20       A.   An event study can reveal the
21   events of a disclosure event, but there
22   is a lot of interpretation for how
23   their statements about what the four
24   conditions are and I also believe that
25   if there are -- some of these

307

1    conditions are not strictly met there's
2    still a lot of value in an event study
3    for revealing to the researcher the
4    economic impact of a disclosure.
5        Q.   So I take it that you don't
6    agree that these four conditions need
7    to be satisfied for an event study to
8    be valid?
9        A.   It depends how they're defined
10   and how strictly -- what you mean by
11   satisfied, how strictly satisfied they
12   must be. And just for example, just so
13   you know I'm not being evasive, so I'm
14   trying to elucidate what the issues are
15   here, their Condition No. 1, "Is the
16   event is a well-defined news event?"
17   What do they mean by "a well-defined
18   news event"?  It's not defined what
19   they mean by "well-defined news event."
20   "The time that the news reaches the
21   market is known", is Condition No. 2.
22   Well, most event studies use end of day
23   data and it doesn't matter whether the
24   news came at 12:01 or 12:02.  I mean,
25   there could be some uncertainty as to

308

1    what time during the day the news came
2    out if you're using end of day data.
3    So No. 2 does not need to be satisfied
4    precisely and strictly in order for the
5    event study to be valid and
6    informative, as McKinley describes in
7    the other article that I cited.
8        Their Condition No. 3 is, "There
9    is no reason to believe that the market
10   anticipated the news?"  Well, do they
11   mean there is no anticipation
12   whatsoever of the news, or that there
13   was some anticipation and then there is
14   -- the news is actually that
15   anticipations were confirmed?  They're
16   not clear on that.  So I can't be clear
17   as to whether I agree or disagree with
18   what they intended, because I'm not
19   entirely sure what they intended by
20   that statement.
21       No. 4 I clearly disagree with
22   because they wrote it wrong.  I mean,
23   it says here that, "It's necessary to
24   isolate the effective news from market,
25   industry and other firm-specific

10 (Pages 305 to 308)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

309

1  factors simultaneously."
2      Well, the event study, itself,
3  is the methodology for separating the
4  market and industry components from the
5  firm specific component.
6      So you -- you don't need that
7  condition satisfied before you can run
8  an event study.  The event study helps
9  you satisfy that disaggregation.
10     So there is things I agree with
11 and there is things that I disagree
12 with.  What I stated in my prior
13 testimony and I want to reaffirm here,
14 is that the purpose for citing the
15 article was to point out that it's a
16 widely used and generally accepted
17 methodology for exactly this purpose.
18     MR. LINKER:  All right.  I have
19 one more question.  It relates to a
20 potential typographical error in the
21 Rebuttal Report.  And I just want to,
22 since the Professor's corrected
23 something in his original report, I
24 just want to give him the opportunity
25 to address this one.

310

1      MS. WYMAN:  Okay.
2      Q.    So in your Rebuttal Report would
3  you turn to paragraph 87 on page 28 and
4  read that?  In particular, I direct
5  your attention to the last sentence
6  which we're having trouble
7  understanding because there may be
8  something missing.
9      (Whereupon, the Deponent reviews
10 the document.)
11     A.   Oh, yeah.  A verb.
12     Q.    All right.  So what should that
13 sentence actually say?
14     A.   "Despite acknowledging that such
15 events are likely to have impacted the
16 properties of the time series of the
17 company's earnings, which are important
18 to consider when estimating earnings
19 response coefficients, Professor Stulz
20 simply assumes, with no reliable basis,
21 that these changes will have no impact
22 on his model or his estimates.  In fact,
23 Professor Stulz acknowledges but
24 disregards that the company (pause) may
25 have changed --" the word "changed".

311

1      Q.    Is that what you intend to say?
2      A.   Yes. -- "during the period of
3  time over which he estimated his
4  model."
5      MR. LINKER:  We reserve our
6  rights but have no further questions.
7      MS. WYMAN:  We have no further
8  questions.  This deposition is over.
9      MR. STERNMAN:  Before we go off
10 the record, the last I had heard about
11 whether any of the Hawaii Defendants
12 would be examining Professor Feinstein
13 was that there was some agreement being
14 discussed that in some circumstances
15 there maybe no examination by them, in
16 some circumstances there might be.
17 Could you update us on where that
18 stands?
19     And then my second question is,
20 the reservation of rights would include
21 the rights to attend any continuation
22 of Professor Feinstein's deposition and
23 to exercise whatever rights that gives
24 us in a continued deposition in the
25 event there are questions by any of the

312

1  Hawaii Defendants or by you or
2  Ms. Largent.
3      MS. WYMAN: I can't tell you
4  exactly where the underlying
5  negotiations stands with the Hawaii
6  Defendants because I haven't spoken
7  with them, but the agreement is that --
8  is that should those negotiations fail,
9  that we will be resuming
10 Dr. Feinstein's deposition for the
11 purposes of the Hawaii Defendants
12 examining him.
13     I understand that you guys have
14 requested to attend and, quote,
15 participate. That's not something that
16 we're agreeing to. You can come but we
17 feel that you have taken more than your
18 seven hours under the Federal Rules and
19 your examination of him for purposes of
20 the Plumbers case is now concluded.
21     MR. LINKER:  I think everyone
22 reserves their rights, recognizing
23 there are differences in view.
24     MS. WYMAN:  Correct.
25     MR. STERNMAN: Thank you.

11  (Pages 309 to 312)

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

313

1    VIDEOGRAPHER:  This concludes
2  Volume II of the video recorded
3  deposition of Steven B. Feinstein,
4  Ph.D. taken by the Defendants on
5  Thursday, August 27, 2015. The time is
6  10:53 and we are going off the record.
7    (Whereupon, the proceedings were
8  adjourned at 10:53 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

315

1      C E R T I F I C A T E
2    I, MAUREEN M. RATTO, a
3  Registered Professional Reporter, do
4  hereby certify that prior to the
5  commencement of the examination, STEVEN
6  P. FEINSTEIN, Ph.D. was sworn by me to
7  testify the truth, the whole truth and
8  nothing but the truth.
9    I DO FURTHER CERTIFY that the
10  foregoing is a true and accurate
11  transcript of the proceedings as taken
12  stenographically by and before me at
13  the time, place and on the date
14  hereinbefore set forth.
15    I DO FURTHER CERTIFY that I am
16  neither a relative nor employee nor
17  attorney nor counsel of any of the
18  parties to this action, and that I am
19  neither a relative nor employee of such
20  attorney or counsel, and that I am not
21  financially interested in this action.
22  _____
23    MAUREEN M. RATTO, RPR
24    License No. 817125
25

314

1
2  STATE OF _____ )
3          ) :ss
4  COUNTY OF _____)
5
6
7    I, STEVEN P. FEINSTEIN, Ph.D., the
8  witness herein, having read the foregoing
9  testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15  _____
16    STEVEN P. FEINSTEIN, Ph.D.
17
18
19
20  Sworn and subscribed to before me,
21  this _____ day of _____, 2015.
22
23  _____
24    Notary Public
25

316

1      I N D E X
2  WITNESSS: STEVEN P. FEINSTEIN  276
3  DIRECT EXAMINATION BY        277
4  MR. LINKER
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

12  (Pages 313 to 316)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

STEVEN P. FEINSTEIN, Ph.D. - SUBJECT TO PROTECTIVE ORDER

317

1        INSTRUCTIONS TO WITNESS

2

3    Please read your deposition over carefully

4 and make any necessary corrections. You should state

5 the reason in the appropriate space on the errata

6 sheet for any corrections that are made.

7    After doing so, please sign the errata sheet

8 and date it.

9    You are signing same subject to the changes

10 you have noted on the errata sheet, which will be

11 attached to your deposition.

12    It is imperative that you return the original

13 errata sheet to the deposing attorney within thirty

14 (30) days of receipt of the deposition transcript by

15 you. If you fail to do so, the deposition transcript

16 may be deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25

318

1        E R R A T A

2

3

4

5    I wish to make the following changes,

6 for the following reasons:

7

8 PAGE LINE

9 ___ ___ CHANGE:_____

10 REASON:_____

11 ___ ___ CHANGE:_____

12 REASON:_____

13 ___ ___ CHANGE:_____

14 REASON:_____

15 ___ ___ CHANGE:_____

16 REASON:_____

17 ___ ___ CHANGE: _____

18 REASON:_____

19 ___ ___ CHANGE: _____

20 REASON:_____

21

22 _____ _____

23  WITNESS' SIGNATURE    DATE

24

25

13  (Pages 317 to 318)