# EXHIBIT 36

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION (TOLEDO)

-----------------------------------
PLUMBERS & PIPEFITTERS NATIONAL
PENSION FUND; SEIU PENSION PLANS
MASTER TRUST; and WEST VIRGINIA
LABORERS PENSION TRUST FUND,
On Behalf of Themselves and
All Others Similarly Situated,

        Plaintiffs,
 vs.                       CIVIL ACTION
                              NO. 3:05-cv-07393-JGC
MICHAEL J. BURNS and ROBERT C.
RICHTER,

        Defendants.
-----------------------------------
HAWAII IRONWORKERS ANNUITY
TRUST FUND, on Behalf of Itself
and All Others Similarly Situated,

        Plaintiff,
vs.                       CIVIL ACTION
                              NO. 3:10-cv-00371-JGC
BERNARD N. COLE, WILLIAM E.
HENNESSY, DOUGLAS W. HODGE and
ROBERT E. STEIMLE,

        Defendants.
-----------------------------------

SUBJECT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF RENÉ M. STULZ, Ph.D.
Columbus, OH
May 20, 2015
9:07 a.m.

Reported by:
Stacy M. Upp, RMR, CRR
Job No: 39041

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

**Page 2**

```
1
2
3
4              René M. Stulz, Ph.D.
5              May 20, 2015
6              9:07 a.m.
7
8
9        Videotaped deposition of RENÉ M. STULZ,
10   Ph.D., held at the Renaissance Hotel, 50 North
11   Third Street, Columbus, Ohio 43215, pursuant to
12   Notice, by agreement of counsel, before Stacy M.
13   Upp, RMR, CRR and Notary Public within and for the
14   State of Ohio.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1              Wednesday Morning Session
2              May 20, 2015, 9:07 a.m.
3                    - - - - -
4              S T I P U L A T I O N S
5                    - - - - -
6        It is stipulated by counsel in attendance that
7    the deposition of René M. Stulz, Ph.D., a witness
8    herein, called by the Plaintiffs for
9    cross-examination, may be taken at this time by
10   the notary pursuant to notice and subsequent
11   agreement of counsel that said deposition may be
12   reduced to writing in stenotypy by the notary,
13   whose notes may thereafter be transcribed out of
14   the presence of the witness; that proof of the
15   official character and qualification of the notary
16   is waived.
17                    - - - - -
18
19
20
21
22
23
24
25
```

**Page 3**

```
1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFFS:
4        Robbins Geller Rudman & Dowd, LLP
         655 West Broadway, Suite 1900
5        San Diego, CA 92101
         619-231-1058
6        By: Debra J. Wyman, Esq.
             debraw@rgrdlaw.com
7            Laurie L. Largent, Esq.
             llargent@rgrdlaw.com
8
9    FOR THE DEFENDANT:
10       Stone, McGuire & Siegel
         801 Skokie Boulevard, Suite 200
11       Northbrook, IL 60062
         312-543-6412
12       By: Michael L. Siegel, Esq.
             michael.siegel@stonemcguire.com
13
14   ON BEHALF OF DEFENDANT:
15       Katten Muchin Rosenman, LLP
         575 Madison Avenue
16       New York, NY 10022-2585
         212-940-7007
17       By: Arthur S. Linker, Esq.
             arthur.linker@kattenlaw.com
18
19   ON BEHALF OF DEFENDANT:
20       Levine & Levine
         427 South Burdick Street
21       Kalamazoo, MI 49007
         269-382-0444
22       By: Randall S. Levine, Esq.
             rlevine@levine-levine.com
23
24   ALSO PRESENT:
25       Michael Rogers - Videographer
```

**Page 5**

```
1        THE VIDEOGRAPHER:  The following
2    deposition of René Stulz is being taken on
3    May 20th, 2015 at 50 North Third Street in the
4    matter of Plumbers & Pipefitters National Pension
5    Fund, et al., v. Michael J. Burns, et al., in the
6    USDC Northern District, Western Division, Case
7    No. 503 -- correction, 3:05-cv-07393-JGC.  The
8    court reporter is Stacy Upp and the videographer
9    is Michael Rogers.
10       We are here on behalf of David Feldman
11   Worldwide.  Would counsel please announce their
12   presence.
13       MS. WYMAN:  Debra Wyman from Robbins
14   Geller Rudman & Dowd, on behalf of the plaintiffs
15   in both cases.
16       MS. LARGENT:  Laurie Largent, Robbins
17   Geller Rudman & Dowd, on behalf of plaintiffs in
18   both cases.
19       MR. LINKER:  Arthur Linker, Katten
20   Muchin Roseman LLP, on the behalf of defendants
21   Burns and Richter in the Plumbers case.
22       MR. STERNMAN:  Joel Sternman of Katten
23   Muchin Roseman on behalf of the same parties as
24   Mr. Linker.
25       MR. LEVINE:  Randall Levine appearing
```

2 (Pages 2 to 5)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

6

1   on behalf of Robert Steimle in the Hawaii case.
2        MR. SIEGEL:  Mike Siegel on behalf of
3   Bernard Cole and Douglas Hodge in the Hawaii case.
4             - - - - -
5             RENÉ M. STULZ, Ph.D.
6   being first duly sworn, testifies and says as
7   follows:
8             CROSS-EXAMINATION
9   BY MS. WYMAN:
10  Q.    Good morning, Professor Stulz.
11  A.    Morning.
12  Q.    We met off the record, but for the
13  record my name is Debra Wyman.  I represent both
14  the plaintiffs in the case that you are here to
15  testify about today.
16        Can you please state your full name and
17  give the -- and your address, your current address
18  for the record?
19  A.    My full name is René, R-E-N-E, M.
20  Stulz, S-T-U-L-Z.  And my address is 3419 River
21  Seine, S-E-I-N-E, Columbus, Ohio.
22  Q.    And you've had your deposition taken on
23  a number of occasions; is that right?
24  A.    That's correct.
25  Q.    Okay.  And you're -- so you therefore

7

1   are familiar with the rules?
2   A.    Yes.
3   Q.    Do you have any questions about those
4   rules before we get started?
5   A.    No.
6   Q.    Okay.  Is there any reason that you
7   can't testify fully and truthfully today?
8   A.    No.
9   Q.    Before we went on the record, I handed
10  you what I've marked as Exhibit 645 -- 675, pardon
11  me.  And I want to ask you, is that a copy of the
12  report that you've tendered in this case?
13            - - - - -
14        Thereupon, Exhibit 675 is marked for
15  purposes of identification.
16            - - - - -
17  A.    It appears to be, yes.
18  Q.    Okay.  And does your signature appear
19  on the last page before the exhibits begin?  I
20  think it's page 138.
21  A.    Yes, it does.
22  Q.    Okay.  If you would please turn to
23  Exhibit 1 of your report.
24        Is that a copy of your CV?
25  A.    It's a copy of the CV as of the time

8

1   that I filed the report.
2   Q.    Okay.  And what has changed about your
3   CV between the time you filed the report and now?
4   A.    I'm not sure that I can remember
5   everything.  I -- I think what happened is that I
6   have some additional publications that would be on
7   page -- I mean 13.  The last paper that is listed
8   here is a paper that is in -- in print, so an
9   up-to-date CV would have the page numbers.  The
10  paper on page 15 titled, "Corporate Acquisition,
11  Diversification, and the Firm's Lifecycle" is now
12  forthcoming in the Journal of Finance.  And the
13  paper on "Do U.S. Firms Hold More Cash?" is now
14  forthcoming in the Review of Financial Studies.
15  There is also a paper that is not listed on page
16  15.  I am not sure I remember the exact title, but
17  I -- I think it's risk management governance in
18  financial institutions.  There are two versions of
19  that paper, one that is forthcoming in a
20  publication of the Federal Reserve Bank of New
21  York and a shorter version that is in the Journal
22  of Applied Corporate Finance.  There might be some
23  changes in the list of keynote speeches.  I'm
24  trying to remember ones -- I'm not on sure
25  exactly.

9

1   Q.    Okay.
2   A.    I can get you that.
3   Q.    All right.  Thank you.
4        Now, are you still a -- let's see where
5   are we here?  Are you still the Everett D. Reese
6   Chair of Banking and Monetary Economics at Ohio
7   State University?
8   A.    That's correct.  I still have that
9   position and I still have the position lower down
10  of director of the Dice Center for research in
11  financial economics.  I'm also the director of the
12  Ph.D. program.
13  Q.    Is -- are those positions your current
14  primary source of employment?
15  A.    Well, the -- the position of Chair of
16  Banking and Monetary Economics is my academic
17  position, yes.
18  Q.    Okay.  Does your CV list all of the
19  academic and employment experience that is
20  relevant to your expert testimony in this case?
21  A.    Well, I -- I'm not sure what you mean
22  by that.  No, it doesn't list the instances where
23  I would have taught executives in various programs
24  over the world.  And -- and -- and so it
25  doesn't -- I mean it -- now, if you look on

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

10

1    page 2, it says top executives in Europe, Asia and
2    North America.  And -- and, no, it doesn't -- it
3    doesn't really give the details of that, so.  And
4    it doesn't give none of the Ph.D. programs that I
5    taught in and things like that, so -- now, it has
6    a lot of information, but it doesn't have all the
7    information in that sense.
8    Q.      Are you relying on your teaching
9    experiences that you just described in teaching
10   executives in Europe and all over the world to
11   help inform your opinion that you've made in this
12   case?
13   A.      I'm -- I'm not sure that I have am
14   relying on that to inform my opinion.
15   Q.      Are you relying on your work with the
16   Ph program that you just -- Ph.D. program, pardon
17   me, that you've just described to help inform your
18   opinions in this case?
19   A.      No.  Again, I mean those are situations
20   where I would be hired because -- hired because of
21   my expertise.
22   Q.      Uh-huh.  And what area is your
23   expertise in?
24   A.      I always state that my expertise is in
25   financial economics.

11

1    Q.      Any particular discipline of financial
2    economics?
3    A.      No.  If you look at my resumé, I've
4    done research in all the areas of financial
5    economics.  In my various functions, I have
6    interest in all aspects of financial economics.
7    Q.      Okay.  Are all the opinions that you
8    intend to testify about at trial contained within
9    your report that we've marked as Exhibit 675?
10   A.      The expert report has the opinions that
11   I held at the time that I submitted the report.
12   Now, since then, there have been additional
13   developments, and my understanding is that the
14   experts have not been deposed.  Now, as a result I
15   expect that I may be asked to development opinions
16   on what they say in their deposition and obviously
17   read rebuttal reports, and I -- I obviously have
18   opinions about those.
19   Q.      All right.  Are those opinions any
20   different than the ones that are contained in 675?
21   A.      Well, I mean, the rebuttal reports make
22   a number of statements with which I disagree,
23   which statements that did not exist at the time I
24   wrote my report.
25   Q.      Did any of the statements with which

12

1    you disagree change the opinions that you have
2    stated in the report?
3    A.      No.
4    Q.      Have you been asked to tender any
5    additional opinions that aren't stated in your
6    report?
7    A.      I have been asked to read the report --
8    rebuttal reports on -- and I may be asked to read
9    the depositions.  I don't know.
10   Q.      Okay.  Have you done any additional
11   research or work since re -- reading the rebuttal
12   reports that you're prepared to testify about
13   today?
14   A.      Not on the topics that I address in
15   this report.
16   Q.      Okay.  Are there new topics that --
17   that you've done research and work on that are not
18   contained in your report that you did in response
19   to the rebuttal reports that you were asked to
20   read?
21   A.      Well, I mean I read the rebuttal
22   reports carefully on experts and issues that --
23   that they raise.  And so you might call that
24   additional research and -- I don't know what you
25   want to call it, but now I checked what -- what

13

1    they were saying and made sure that I understood
2    it and that -- and I thought about the way it
3    affected what I had said in my own report or not.
4    Q.      Does your report that's 675 contain the
5    complete basis upon which your opinions are
6    expressed?
7           MR. LINKER:  Objection to form.
8    A.      Well, I mean, now in forming my
9    opinions, I obviously used all the knowledge and
10   expertise that I have accumulated over time and
11   that obviously played a big role in what -- what
12   I'm saying.  So that's -- you know, that's part of
13   the basis in that sense.
14   Q.      Are there any academic or other studies
15   that you've relied on that you haven't noted in
16   your report?
17   A.      I don't believe so.
18   Q.      Okay.  Now, if you turn to Exhibit 3 of
19   your report.  Have you found Exhibit 3?
20   A.      Yes.
21   Q.      Okay.  Does Exhibit 3 contain a listing
22   of all the documents that you -- or documents and
23   materials that you considered in forming your
24   opinions?
25          MR. LINKER:  Does that question relate

4  (Pages 10 to 13)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

14

1   to the opinions in the report?  Because he
2   testified about things he did subsequent to seeing
3   the rebuttal reports.
4   Q.      Okay.  I'll ask you a better question
5   then.
6          Does Exhibit 3 contain all the -- a
7   listing of all the materials and documents that
8   you relied on and considered in forming the
9   opinions that are contained in Exhibit 675?
10  A.      Well, it's my best attempt at listing
11  those documents.  I mean as -- the list -- the
12  list goes for 27 pages and so hopefully it
13  includes everything.  But I -- now, as I said
14  already, I mean, I -- all -- all of my knowledge
15  in financial economics, obviously, is part of the
16  basis of -- of my opinions.
17  Q.      And how did -- did you construct
18  Exhibit 3?
19  A.      I asked for it to be constructed.  I
20  did not type it myself.  I went through it and I
21  checked and I didn't find anything that I thought
22  was -- was missing or that shouldn't be there.
23  But, again, as I said, it's a long list.
24  Q.      And who did you ask to construct
25  Exhibit 3 for you?

15

1   A.      Cornerstone did that.
2   Q.      Anyone in particular at Cornerstone?
3   A.      I don't -- I don't remember who I
4   interacted with for -- for this document.
5   Q.      Did folks at Cornerstone assist you in
6   the work that you did to create your opinions that
7   are in 675?
8   A.      I'm not quite sure how you frame the
9   question.  Now, the -- the people at Cornerstone
10  did work that I asked them to do that was work
11  that was helpful to me in the process of writing
12  the report.
13  Q.      And who --
14          MR. SIEGEL:  Excuse me.  I'm just going
15  to make a continuing objection to questions framed
16  in terms of Cornerstone in general.  So please
17  note that as a continuing objection, the people at
18  Cornerstone in general.
19  Q.      Who at Cornerstone did you work with in
20  this case?
21  A.      I -- I don't remember all -- all the
22  names of the people involved.  The senior people
23  who were involved were Cindy Zollinger.
24  Q.      Who is that?
25  A.      Cindy Zollinger, Z-O-L-L-I-N-G-E-R, and

16

1   Dan Garrett, G-A-R-R-E-T-T.
2   Q.      And there were others you say that you
3   just don't remember their names?
4   A.      That's correct.
5   Q.      And what did Ms. Zollinger do to assist
6   you in this matter?
7   A.      Well, the relationship with Cornerstone
8   is very similar to the relationship I have with
9   research assistants in my academic work in the
10  sense that now there will be data that I need to
11  see, there will be programings that I need to get
12  done, there will be documents that I need to have
13  collected, there would be tables that need to be
14  typed and so on.
15  Q.      What is Ms. Zollinger's position at
16  Cornerstone?
17  A.      I'm not quite sure what her current
18  position is.  I believe she's the chairman of the
19  board, actually, of Cornerstone and her exact
20  title, I don't know.  She was CEO for a number of
21  years and she stopped being CEO and I -- I don't
22  know what her exact title is.
23  Q.      Okay.  Was she your main contact on
24  this engagement?
25  A.      I'm not sure what you mean by "main

17

1   contact."  I --
2   Q.      If you needed data collected or
3   programming done or documents collected or tables
4   typed, who did you call at Cornerstone to help
5   you?
6   A.      Most likely Dan Garrett.
7   Q.      Okay.  And what was Mr. Garrett's
8   position at Cornerstone?
9   A.      I'm not sure that I know his exact
10  title.  He might be principal or vice president
11  but I don't know.
12  Q.      Okay.  And what did Mr. Garrett do for
13  you in assisting you on this matter?
14  A.      The type of activities that I
15  described.
16  Q.      Okay.  Did either Ms. Garrett,
17  Ms. Zollinger or anybody else at Cornerstone draft
18  portions of your report?
19          MR. SIEGEL:  Objection.
20  A.      Well, I mean it's my report and I, you
21  know, worked on -- worked on that report.  I
22  started it, at times they filled in places where I
23  asked them to fill in places, like footnotes on
24  stuff like that, and -- so that's, that's part of
25  the role they played.

5 (Pages 14 to 17)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

18

1    MR. SIEGEL:  Just to make my objection
2  clear, it's to the compound nature of the
3  question.
4  Q.      Did you -- did you sit down at the
5  computer and type your report?
6  A.      Well, the report started and finished
7  on my computer, yes.
8  Q.      Did you have -- did you dictate any
9  portions of the report to anybody that actually
10  did the physical typing for you?
11  A.      No.  No.  I'm -- I do my own typing for
12  my report.
13  Q.      Okay.  Did Cornerstone or anyone at
14  Cornerstone draft sections of your report to send
15  to you for your review?
16    MR. SIEGEL:  Objection.
17  A.      No, they kind of work the data -- now,
18  they filled in footnotes as I said; they filled in
19  some parts of the report where I directed them to
20  put in some material that we talked about.
21  Q.      You directed them to do what?  I'm
22  sorry.  I didn't understand what you said.
23    MR. LINKER:  Please reread the answer.
24    MR. SIEGEL:  Objection.
25    (The answer is read as requested.)

19

1  Q.      I didn't understand what he said.
2  That's all I was --
3    MR. LINKER:  So, I'm sorry.  What's the
4  pending question?
5  Q.      My pending question was:  I didn't
6  understand what you said.  Can you repeat it?
7    MR. LINKER:  Okay.  The reporter just
8  reread it.  So next question, please.
9    MS. WYMAN:  Just because it's your
10  birthday, Arthur, doesn't mean that you --
11    MR. LINKER:  I -- I just want to make
12  sure the witness knows what the pending question
13  is.  My birthday has nothing to do with it.
14  Q.      Did Cornerstone -- did you ask
15  Cornerstone to help you gather materials that you
16  might need to review in order to inform the
17  opinions that you were going to give in this
18  matter?
19    MR. SIEGEL:  Objection.
20  A.      That's part of the work that I
21  described, yes.
22  Q.      Okay.  And did you direct them on what
23  kind of materials you wanted them to gather?
24    MR. SIEGEL:  Objection.
25  A.      Yes.

20

1  Q.      Okay.  And what direction did you give
2  them?
3    MR. SIEGEL:  Objection.
4    MR. LINKER:  Objection to form.
5  A.      I'm not sure that I would be able to
6  answer this question at this point.  I mean it was
7  next standard process and there were many
8  different requests for materials.
9  Q.      When did you start working on the
10  opinions that you express in 675?
11  A.      I am not sure of the exact time.  I --
12  I think it's sometime in the spring of last year.
13  But I'm not completely sure.
14  Q.      So you received materials from
15  Cornerstone that you asked them for, correct?
16  A.      Correct.
17    MR. SIEGEL:  Objection.
18  Q.      Did you receive materials directly from
19  counsel?
20  A.      I believe that initially I might have.
21  In general, I prefer that Cornerstone collects the
22  material and then makes a list and so on.
23  Q.      Okay.  And was Cornerstone -- did you
24  rely on Cornerstone to keep an accurate list of
25  the materials that you had requested and were

21

1  considering as part of your work here?
2  A.      That's correct.
3  Q.      Okay.  And -- and is it your
4  understanding that from that listing that they
5  kept is where Exhibit 3 was born?
6  A.      It started from -- it started from that
7  list.  I may have added materials that they had
8  not provided to me but that I considered.
9  Q.      Okay.  Were -- besides counsel and
10  Cornerstone, did you get any other materials that
11  you considered and relied on for your opinions
12  from any other source?
13  A.      My recollection is that I looked at a
14  number of academic articles and some of those
15  articles I looked up myself or already had and
16  they were added to the list at some point.
17  Q.      Okay.  How much time would you say
18  you've spent on this engagement?
19  A.      I really don't know.
20  Q.      More than 100 hours?
21  A.      I think that's likely, yes.
22  Q.      More than 200 hours?
23  A.      I can't say for sure.
24  Q.      Have you submitted bills for your time
25  that you've spent working on this case?

6 (Pages 18 to 21)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

22

1    A.    I did last year, yes.
2    Q.    And last year you say?
3    A.    Yes.
4    Q.    And do you recall what the total
5    billing was for that you submitted?
6    A.    No.
7    Q.    Who did you submit it to?
8    A.    I unfortunately don't remember the name
9    of the person.
10   Q.    Okay. Did you submit it to Cornerstone
11   for payment?
12   A.    No.
13   Q.    Did you submit it to counsel for
14   payment?
15   A.    No.
16   Q.    Did you submit it to one of Dana's
17   insurance carriers for payment?
18   A.    I don't remember sending them to an
19   insurance company, no.
20   Q.    Okay. And you just don't know who you
21   sent your bill to?
22   A.    I remember that it was an attorney.
23   That's -- that's about it.
24   Q.    Okay. And according to paragraph 8 of
25   your report, your hourly rate is $900 an hour; is

23

1    that right?
2    A.    That's correct.
3    Q.    And do you have any recollection of
4    what the total due to you was on the bill that you
5    submitted last year?
6    A.    I submitted more than one bill. But I
7    -- I truly don't -- don't remember the detailed
8    amounts. Now, my recollection is that it's more
9    than a hundred hours, but that's -- that's the
10   extent of what I remember.
11   Q.    Okay. Have you been paid?
12   A.    Yes.
13   Q.    Okay. Do you know how many hours
14   Cornerstone has spent assisting you in this
15   matter?
16   A.    I have no idea.
17   Q.    Okay. Do you see any billings that
18   Cornerstone prepares for their work in assisting
19   you to review for accuracy?
20   A.    No.
21   Q.    And do you know who Cornerstone submits
22   their billings to for their assistance of you in
23   this matter?
24   A.    No.
25   Q.    Okay. And if you look at your report

24

1    on page 3 in Exhibit -- in paragraph 8?
2    A.    Yes.
3    Q.    It says -- I think it's the third
4    sentence. It says, "I receive compensation from
5    Cornerstone research based on its collected staff
6    billings for its support of me in this matter."
7    Do you see that?
8    A.    Yes.
9    Q.    What does that mean?
10   A.    It means that I received a percentage
11   on some of the billings of Cornerstone, not all of
12   them, and I'm not quite sure exactly how that
13   works.
14   Q.    Okay. And -- and that's in addition to
15   your hourly rate of $900 an hour; is that right?
16   A.    That's correct.
17   Q.    Okay. And -- and so is it your
18   testimony that you haven't done anything to verify
19   that Cornerstone has paid you the appropriate
20   compensation it's supposed to pay you under that
21   arrangement?
22   A.    I don't receive any amounts that are
23   traceable to individual cases, so I would have no
24   way to verify that.
25   Q.    So the compensation that you receive

25

1    from Cornerstone is a percentage of all the hours
2    they work on any case that you've been engaged in,
3    not just this one?
4    A.    It's not all the hours. I think it
5    depends on who is spending the hours, and it comes
6    as a payment for not -- a fraction of the hours.
7    Q.    Okay. So does -- I just want to make
8    sure that it's clear. So in this matter you are
9    billing your time out at $900 per hour for the
10   work that you do; is that correct?
11   A.    That's correct.
12   Q.    And in addition to that, you're being
13   paid some kind of payment from Cornerstone based
14   on a percentage of hours certain people at
15   Cornerstone spend working on engagements that
16   you're involved in?
17   A.    That's correct.
18   Q.    Okay. Do you know what Mr. Garrett's
19   background is?
20   A.    I'm sure that I -- I knew at some
21   point. I don't remember it at this point.
22   Q.    Does he have a background in finance?
23         MR. SIEGEL: I'm sorry. Could you
24   repeat?
25         MS. WYMAN: Sure. I said does he have

7 (Pages 22 to 25)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

26

1    a background in finance.
2         MR. SIEGEL:  Thank you.
3    A.    Yeah, in general people at Cornerstone
4    have MBAs or Ph.D.s.  Clearly with my
5    conversations with them, he has an extremely
6    extensive background.
7    Q.    Okay.  And what about Ms. Zollinger,
8    what's her background?
9    A.    I -- she was at the University of
10   Chicago as a graduate student in business, and I
11   believe that she received a Ph.D. or stopped
12   shortly before the Ph.D.
13   Q.    And how long have you known
14   Ms. Zollinger?
15   A.    I don't know exactly, but it might be
16   between 15 and 20 years.
17   Q.    And -- and how long have you worked
18   with Cornerstone?
19   A.    I think it's about 20 years.
20   Q.    And approximately -- in a given year,
21   approximately how much time do you spend on expert
22   witness activities?
23   A.    I'm -- I'm not sure.  I'm not sure the
24   -- now, the University allows me to spend a day of
25   the week on consulting, and I have not exceeded

27

1    that during the week.
2    Q.    So would you say it's approximately
3    20 percent of your time in a year?
4    A.    I'm -- I'm not sure.  I would -- I
5    would have to figure it out.  The -- I tend to
6    work on Saturdays and Sundays as well, so -- so I
7    don't know.
8    Q.    Okay.  Now, going back to Exhibit 3,
9    did you personally review all of the materials
10   considered that are listed on that exhibit?
11   A.    No.  I mean I reviewed a -- a lot of
12   materials.  They were valuable to me and -- and in
13   some cases I asked Cornerstone to review them.
14   And in other cases, I reviewed them myself and --
15   now, if it turned out that Cornerstone found
16   something that was -- that was relevant to me, I
17   would then go to the -- go to the document.
18   Q.    What do you -- what do you remember
19   having reviewed personally that's listed on
20   Exhibit 3?
21        MR. LINKER:  Objection to form.
22   A.    Well --
23        MR. LINKER:  Are you asking him to go
24   through it line by line and for each line tell you
25   whether or not?

28

1         MS. WYMAN:  No.  He doesn't need to do
2    that, but his answer was quite vague.  And so I
3    want to know if he remembers in particular looking
4    at any piece of information that's on this
5    exhibit.
6         MR. LINKER:  Objection to form.
7    A.    Well, I mean, I -- I know I remember
8    reading -- reading a lot of -- a lot of materials.
9    When I -- when I look at now the depositions that
10   are listed on page 3, my recollection is that I
11   read every single one of those depositions.  And
12   the -- all right.  Now, on the next page we have
13   the expert reports, and my recollection is that I
14   read all the expert reports for class cert.  Then
15   I read the expert reports on -- obviously, of
16   Professor Ronen and Feinstein, as well as the two
17   accounting reports that are listed there.
18   Q.    Okay.
19   A.    I mean with the academic articles, I
20   know some of them I obviously knew before I got
21   started on them and I may not have gone back to
22   them.  Some, I may have.  I -- the analyst
23   reports, my recollection is that I looked at all
24   of them.
25   Q.    Okay.  In the listing of the

29

1    depositions that you say on Exhibit 3 that you
2    read?
3    A.    Uh-huh.
4    Q.    How did you choose which depositions to
5    request to read?
6    A.    Well, different reasoning for -- for
7    different depositions.  I wanted to understand
8    what had happened in the case before the phase
9    that I am involved with, and so I asked for the
10   depositions for class cert.  I wanted to read the
11   depositions of the defendants, and so they're
12   all -- they're all on there.  My recollection is
13   that some of the other depositions that I looked
14   at I discovered -- I mean I concluded that they
15   would be useful based on materials that I had
16   seen.
17   Q.    I wasn't sure if you were done.
18   A.    Yes.  I'm sorry.
19   Q.    Okay.  Now, in Exhibit 3 in the
20   depositions you list sometimes exhibit numbers.
21   Does that indicate that for that particular
22   deposition transcript that you also looked at and
23   considered the exhibit numbers that are listed?
24   A.    Well, I mean I -- I have the exhibits,
25   the whole collection of exhibits, that goes with I

8  (Pages 26 to 29)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

30

1  think most of the -- of the depositions that are
2  listed here.  Now, they came to me as depositions
3  plus exhibits.  And so I -- it may well be that
4  the decision here was to list the ones that I --
5  that I cite in my report, the -- no, I believe
6  that I had -- I had files with -- with all the
7  exhibits.
8  Q.      Okay.  I was just confused because some
9  transcripts are noted with exhibits and some
10  aren't.  I just wanted to be sure.  So your
11  testimony is that you received the transcripts and
12  the exhibits that were marked at that, and the
13  ones that you list here are the ones that you
14  either cite to or relied on; is that right?
15  A.      I believe that that's -- that's
16  correct, yes.
17  Q.      Okay.  And -- can you give me an
18  approximation of how much time you spent reviewing
19  the depositions and the expert reports that you
20  just testified that you reviewed personally?
21  A.      I -- I really have no -- no idea.  I
22  know that -- I mean some of the expert reports I
23  read multiple times and some I read only one time,
24  so --
25  Q.      Did you -- when reading the expert

31

1  reports in this case, did you also look at the
2  documents that were cited by the experts that they
3  relied on -- that they were relying on for their
4  opinions?
5  A.      I certainly looked at documents that
6  they cited.  I'm not sure whether I looked at
7  every one of them or not.  I -- I don't know.
8  Q.      Okay.  And have you had any
9  communications with any of the defendants in
10  either of the Hawaii case or the Plumbers' case?
11  A.      No.
12  Q.      Have you had any communications with
13  any former Dana employees?
14  A.      No.
15  Q.      What about any current Dana employees?
16  A.      No.
17  Q.      Okay.  If you look at Exhibit 2, does
18  Exhibit 2 list all of the reports and expert
19  testimony that you've given in the last four
20  years?
21  A.      As of the time that I submitted the
22  report.
23  Q.      Okay.  So it was -- you anticipated my
24  next question.  Are there additions that need to
25  be made to this list of testimony?

32

1  MR. LINKER:  Of materials -- of
2  testimony he had given -- of the date of your
3  report or do you mean are there ones subsequent to
4  the date of the report?
5  Q.      Are there other additions that -- that
6  need to be made to this exhibit since you've
7  provided your report that you've provided either
8  deposition testimony or reports on?
9  A.      Yes.  I'm not sure that I could
10  remember the exact case names at -- at this point,
11  but there are at least -- at least three cases.
12  Q.      Okay.  And is it your recollection that
13  in these three additional cases that you've
14  provided reports?
15  A.      I provided reports in each one of them,
16  yes.
17  Q.      Okay.  And have you provided any
18  testimony in the three cases that you're thinking
19  of?
20  A.      In one case I provided a deposition.
21  In one case there was a hearing where I testified.
22  In the third case the deposition has not yet
23  happened.
24  Q.      Okay.  And can you remember the -- the
25  companies that are involved or anything about the

33

1  case names?
2  A.      The -- the first one was a company
3  called Delcath.
4  Q.      What's that?
5  A.      Delcath, D-E-L-C-A-T-H.  The second one
6  involved Goldman Sachs.  The third one involved
7  Bear Stearns.
8  Q.      And are these three cases, any of these
9  three cases class action matters?
10  A.      One for sure.  The Bear Stearns case,
11  my understanding is that it's an opt-out case.
12  The Goldman Sachs case is not a class action.
13  Q.      Okay.  And do you remember anything
14  about the Delcath case?
15  A.      It's a class action.
16  Q.      That's a class action.  Oh, I'm sorry.
17  I didn't understand.
18  A.      Yeah.
19  Q.      And in which of these cases do you
20  remember giving a deposition?
21  A.      Delcath.
22  Q.      And in which of the cases did you
23  testify at a hearing?
24  A.      The Goldman Sachs case.
25  Q.      And was the hearing an evidentiary

9  (Pages 30 to 33)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

34

1  hearing?
2  A.      No, it was a FINRA arbitration.
3  Q.      Okay.  And just generally looking at
4  your Exhibit 2, in any of these matters were you
5  retained by the plaintiff?
6  A.      Well, in the ABN AMRO Bank I was
7  retained by the plaintiffs.  In the Casino case, I
8  guess I was retained by somebody who was both a
9  plaintiff and a defendant.
10  Q.      Okay.
11  A.      The -- and in the Postova case I was
12  retained a plaintiff.
13  Q.      Were any of the cases that you just
14  mentioned where you were retained by the plaintiff
15  individual or class actions for securities fraud?
16  A.      I don't believe so.
17  Q.      Okay.  Are any of the cases on here on
18  your Exhibit 2, can you identify which ones are
19  securities class action cases?
20  A.      The first one, Moody's.  The Bank of
21  America case at the bottom.
22  Q.      Uh-huh.
23  A.      The case against Wachovia, to be frank,
24  I don't remember whether it was or not.
25  Q.      Okay.

35

1  A.      I believe that REFCO had a securities
2  piece.  The Denver case I think started as a class
3  action but the Denver Employees Retirement Plan
4  may have been an opt-out in that litigation.
5  Q.      Okay.
6  A.      The Dodona was a class action.  BP was
7  a class action.  China MediaExpress was a class
8  action.
9  Q.      And in -- let's just take Moody's
10  first.  What topics did you provide testimony and
11  opinions on?
12  A.      I don't remember the details of my
13  report, except that it addressed issues having to
14  do with conflicts, alleged conflicts of interest
15  in the waiting process on disclosures to investors
16  about those conflicts.
17  Q.      In any of the cases that you identified
18  that were class actions, did you provide testimony
19  about causation and damages?
20  A.      I -- in the Dodona, I did.  I -- I
21  would have to go back to Bank of America to -- to
22  remember exactly what -- whether there was any
23  portion concern -- I mean I believe that there
24  were issues that I addressed that concerned
25  damages, but I'm not absolutely sure.  Now, the --

36

1  the BP litigation was as a class cert stage, but
2  the issues that ended up being critical in that
3  case had to do with damages and damages models.
4  Q.      Okay.  Are you done with your answer?
5  A.      Yes.  I mean, none -- I mean the other
6  cases did not -- did not go beyond the class cert
7  stage.  The Dodona is not finished at this point.
8  But the other ones either settled or class cert
9  was denied.
10  Q.      Okay.  And what about the Delcath case
11  that you just were telling me about.  You said
12  that was a class action and you provided a
13  deposition.  Was that one where you provided
14  opinions concerning loss causation or damages?
15  A.      So -- so the -- the phase of the
16  litigation where I was involved was a class cert
17  phase.  Now, as you know, at this point it's
18  common for class cert reports to have opinions on
19  the feasibility of damages analysis and issues
20  related to damages models.  I don't quite remember
21  the details of my -- of my report, but I believe
22  that there was discussion of that.
23  Q.      Okay.  But your recollection is that
24  your report and your deposition were at the class
25  certification stage of the case?

37

1  A.      That's correct.
2  Q.      Okay.  Now, let's turn back to the body
3  of your report.  And for purposes of this matter,
4  you agree that the market for Dana stock was
5  efficient during the class period, correct?
6  A.      That's correct.  I assume efficiency,
7  yes.
8  Q.      Okay.  And do you also assume
9  efficiency for the markets for Dana's bonds?
10  A.      That's correct.
11  Q.      Okay.  If you turn to page 11 of your
12  report, paragraph 21, in that paragraph you say
13  that -- it's about the third line up from the
14  bottom, "...only unanticipated news has an impact
15  on stock price."  Do you see that?
16  A.      That's correct.
17  Q.      Okay.  And -- and so what could be
18  source of news that could impact stock prices?
19  Could it be statements from the company?
20  A.      Well, it can be all sorts of things,
21  you know.  It can be statements from the company;
22  it can be news reports that involve the company or
23  involve competitors; it -- it can be new rules,
24  new regulations.  It can be a wide variety of --
25  of things.

10  (Pages 34 to 37)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

38

1  Q.  And all those things enter the market,
2  is that right, once they're publically stated,
3  correct?
4  A.  That's correct.
5  Q.  And when the market receives that
6  information, the market then valuates the company
7  based on it, is that right, if it's an efficient
8  market?
9  A.  If it's an efficient market, yes.
10  Q.  Okay.  And if there's material
11  information that's not provided publically and not
12  publically disseminated, that can't impact the
13  market's valuation of the security; is that right?
14  A.  Well, I think you have to be careful
15  here.  It has to be information that the market
16  would not have been able to have information about
17  by other means.  Now, it has to be something that
18  the market doesn't know about or can't inform
19  expectations about.
20  Q.  Okay.  And if there is such information
21  and it's omitted from the market's knowledge, then
22  that isn't part of the valuation that the market
23  -- that's not part of the information that the
24  market uses to valuate the security; is that
25  right?

39

1  MR. LINKER:  Objection to form.
2  A.  If there is material information that
3  the market knows nothing about and doesn't --
4  doesn't have expectations about or doesn't have,
5  you know, some way of assessing otherwise, then --
6  then, yes.
7  Q.  Okay.  And with regard to bond
8  securities, bonds have different characteristics
9  about them, don't they?
10  A.  That's correct.
11  Q.  Okay.  And I think on Exhibit 11 of
12  your report you list some of the different bond
13  characteristics for Dana's bonds; is that right?
14  A.  Exhibit --
15  Q.  11?
16  A.  -- 11 does -- does show some of the
17  characteristics of the bonds.
18  Q.  Okay.  And those characteristics,
19  different characteristics are the bonds' maturity
20  date, for example; is that right?
21  A.  Well, bonds will differ according to
22  maturity date.  I mean they may have different
23  maturities, that's correct.
24  Q.  And -- and the coupon rates are
25  different from bond to bond; is that right?

40

1  A.  That's what Exhibit 11 shows.
2  Q.  Okay.  And -- and so bonds and stocks
3  don't necessarily react the same way to the same
4  kind of information, do they?
5  A.  That's correct.  You can have the stock
6  price go up and the bond price go down on the same
7  day; that's right.
8  Q.  And the -- and the way the bond prices
9  react are at least in part due to the different
10  characteristics that the bond has?
11  MR. LINKER:  Objection to form.
12  A.  The bonds will react differently, if
13  they do, for -- for a wide range of possible
14  reasons.
15  Q.  And -- and can you give me some
16  examples of what might those reasons be?
17  A.  Well, this -- I mean the -- the ones
18  that is -- is the most important is now with a
19  bond you can only get up to the promised payments
20  and you can't get more than that.  Whereas with
21  equities, it's nonprincipal, no limit to the
22  upside.
23  Q.  So information that may impact the
24  value of a stock may not necessarily impact the
25  value of a bond?

41

1  A.  That's a possibility, yes.
2  Q.  Okay.  And it's largely dependant upon
3  the individual characteristics of the bond and the
4  information that is out there; is that right?
5  MR. LINKER:  Object to the form.
6  A.  It's largely the result of the fact
7  that now you don't have the upside with the bond,
8  whereas you have the upside with the equity.
9  Q.  This is a good place for us to take a
10  break.  If you'd like to get up and stretch your
11  legs, we can go off the record.
12  THE VIDEOGRAPHER:  We are off the
13  record at 10:02.
14  (A short recess is taken.)
15  THE VIDEOGRAPHER:  We are back on the
16  record at 10:12.
17  Q.  If you wouldn't mind, please, turning
18  to page 19 of your report.  And on that page do
19  you see a heading that says Analysis of Factors
20  Effecting Dana's Securities During the Class
21  Period?
22  A.  Correct.
23  Q.  Okay.  What did you do in forming this
24  analysis that you describe in the -- in the
25  ensuing paragraphs?

11  (Pages 38 to 41)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

42

1        MR. LINKER: Objection to form.
2  A.    I did a number of things. I tried to
3  learn about the company. I looked at 10-Ks on
4  various articles on -- on the company. I looked
5  at analyst reports. And I looked at conference
6  calls and so on. So I looked at an extensive set
7  of materials.
8  Q.    And everything that you looked at and
9  relied on you've cited here in the footnotes to
10  your report? For example, if you look on -- on
11  the next page, on page 20?
12  A.    Well, if I rely on it explicitly in the
13  sense that I -- I'm referring to some statement or
14  to some piece of data, there would be a footnote
15  and there would be a reference. Now, as -- as we
16  discussed earlier, there is that 27-page list of
17  materials that obviously are part of what I looked
18  at as well.
19  Q.    Okay. And so if there's a particular
20  citation, you've made it. If there's no citation,
21  then -- then it's not something that you have a
22  document for listed on your Exhibit 3; is that
23  what you're saying?
24        MR. LINKER: Objection to form.
25  A.    No, that's not what I said. Now, if I

43

1  have reference here to support some statement or
2  if I have a quote, now there would be a footnote
3  that would reference a document, not necessarily
4  all the documents that I saw concerning that
5  topic. But now forming my understanding of the
6  topics that I had read in this section, now that
7  includes all the materials that I saw obviously.
8  Q.    Okay. If you turn please to page 22 in
9  paragraph 43, at the bottom of the page there's a
10  -- a sentence that says, "Dana believed its
11  restructuring plan was working but also recognized
12  that it needed to do more." Do you see that
13  sentence?
14  A.    That's right.
15  Q.    Okay. Theres no citation to that
16  sentence, is there?
17  A.    That's correct.
18  Q.    Okay. Where did you get this
19  understanding that Dana believed its restructuring
20  plan was working?
21  A.    Well, that was discussed in some of the
22  conference calls early on in -- in the class
23  period.
24  Q.    And why didn't you cite the conference
25  calls where you saw that?

44

1  A.    I don't know. I mean I'm happy to
2  provide you with the cite if you want the cite.
3  Q.    Okay. Did you interview anyone from
4  Dana or that used to work at Dana to gain an
5  understanding of what Dana believed or didn't
6  believe regarding its restructuring plan?
7  A.    Now, we discussed that before. I did
8  not talk to anybody at -- at Dana. Now, that
9  comes from having read the -- the conference calls
10  and the presentations, the strategy of Dana.
11  Q.    Did you see any materials that
12  indicated that Dana didn't think its restructuring
13  plan was working?
14  A.    The -- obviously when we get towards
15  the end of the class periods, there are a variety
16  of issues surrounding how it -- its strategy on
17  how it was planning to evolve.
18  Q.    Did you ask Cornerstone or counsel to
19  do any searches for you to -- let me back up.
20        You understand that there were
21  thousands and thousands of pages of documents
22  produced by Dana in this case, correct?
23  A.    That's correct.
24  Q.    Okay. Did you ask counsel or
25  Cornerstone to do any searches of the document

45

1  database to help you better understand what Dana's
2  belief was concerning its restructuring plan?
3        MR. SIEGEL: Objection.
4        MR. LINKER: Objection.
5  Attorney/client privilege as to -- and work
6  product privilege as to any communications with
7  counsel. I direct you not to answer any -- any
8  questions about communications with counsel.
9        MR. SIEGEL: Objection to form.
10  Q.    Did you ask Cornerstone to do any
11  document searches for you -- searches of the
12  document database to help you better understand
13  Dana's beliefs concerning its restructuring plan?
14        MR. SIEGEL: Objection.
15  A.    So the statement here is much more
16  limited than I -- you make it out to be. Now,
17  what I'm referring to is statements by the
18  executive of Dana in conference calls where they
19  indicate -- where they indicate that belief. So
20  it would be the -- I guess a stated belief of
21  those executives.
22  Q.    Okay. But for whatever reason, you
23  didn't put any citation for that statement in your
24  report, right?
25        MR. LEVINE: Objection.

12 (Pages 42 to 45)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

46

1    A.    That -- that's correct.
2    Q.    If you would please turn to page 50 of
3   your report.
4         MR. SIEGEL:  5-0?
5         MS. WYMAN:  5-0.
6         MR. SIEGEL:  Thank you.
7    Q.    Are you there?
8    A.    Yep.
9    Q.    Okay.  Do you see a -- a point heading
10  that says, The Information Environment Changed
11  Substantially Between July 20th, 2005 and
12  September 15th, 2005?
13   A.    That's correct.
14   Q.    Okay.  And in paragraph 101 below that,
15  one of the things that you indicate changed was
16  gasoline prices as a result of the impacts of
17  Hurricane Katrina; is that right?
18   A.    That's correct.
19   Q.    Okay.  Did you do any analysis to
20  determine if Dana was impacted by the rise in
21  gasoline prices prior to September 15th?
22   A.    Well, as you know, analysts thought so,
23  and so that -- on -- now, I quote one -- I mean I
24  refer to one of the analyst reports.
25   Q.    But you didn't do any analysis of your

47

1   own to determine whether or not Dana was actually
2   impacted by the rise in gasoline prices that you
3   cite here?
4         MR. LINKER:  Objection to form.
5    A.    As -- no, I said I looked at all the
6   information that was available over that period of
7   time, and now I note that market participants
8   thought that it was affected.
9    Q.    Did you ask Cornerstone to do any
10  search of the document database to determine
11  whether or not Dana had done any analysis of its
12  -- of its own at the time to determine whether or
13  not it was being impacted by the gasoline prices
14  that were rising as a result of Hurricane Katrina?
15        MR. SIEGEL:  Objection.
16   A.    No.  The analysis that -- that I did is
17  the one that I report on in -- in this section.
18   Q.    Okay.  Now, if you turn, please, to
19  page 52.  In paragraph 105, you also in paragraph
20  105 talk about higher steel prices, do you not?
21   A.    That is correct.
22   Q.    And in your report on paragraph -- on
23  page 53, pardon me, you have a figure G that
24  purports to show over time the rise in the scrap
25  steel prices between April of 2004 and December of

48

1   2005; is that right?
2         MR. LINKER:  Objection --
3    A.    That's correct.
4         MR. LINKER:  -- to form.
5    Q.    I'm sorry, what was your answer?
6    A.    Can you -- can you repeat the question,
7   please.
8    Q.    Sure.  Sure.
9         Does figure G purport to show the --
10  the changing prices for scrap steel No. 1 heavy
11  melting between April 2004 and December 2005?
12        MR. LINKER:  Objection to form.
13   A.    That's correct.
14   Q.    Okay.  Do you know what kind of steel
15  Dana used in its manufacturing of its products?
16   A.    I know that they used different types
17  of steel and I know that not all types of steel
18  evolved in the same way.  But I know that
19  non-evolution of the steel prices was an issue for
20  the industry as well as for Dana.
21   Q.    Okay.  Did you do any research to
22  determine what other kinds of steel Dana used and
23  if those types of steel also -- prices of those
24  kinds of steel also rose during the September time
25  frame as you indicate in paragraph 105?

49

1    A.    My recollection is that I looked at a
2   number of different indices for steel besides this
3   one.  I don't remember the names of them.  My
4   recollection is that it -- there was a consistent
5   phenomenon of kind of changing direction in steel
6   prices.
7    Q.    Okay.  But you don't list those other
8   types of steel that -- and the indices that you
9   just mentioned in your report, do you?
10   A.    That's correct.
11   Q.    Okay.  Okay.  If you would please turn
12  to page 74.  Excuse me.  And paragraph 157 of page
13  74.  The first sentence of that paragraph says,
14  "Dana's September 15th guidance cut of about
15  50% was in response to new information that Dana
16  received about its operating financial results for
17  July and August 2005."  Do you see that?
18   A.    That's right.
19   Q.    Okay.  And -- and what's the basis for
20  that particular statement?  There's no citation to
21  it, is there?
22   A.    No.  So there is no citation to it.
23  And what the statement is saying is that when this
24  cut takes place, Dana -- Dana has information that
25  it didn't have as of -- of July.  Now, so there is

13  (Pages 46 to 49)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

50

1  new information and that that information is part
2  of what Dana -- Dana is looking at as of September
3  15.
4  Q.    But your report says that the guidance
5  cut was made in response to new information. And
6  my question to you is how did you determine that
7  the guidance cut was made in response to new
8  information as opposed to information that Dana
9  had prior to July 20th, 2005?
10 A.    So what this is in response to refers
11 to the size of the cut and the disclosures by Dana
12 at that time specify now kind of the new
13 information that did affect the size of the cut.
14 Q.    So you're not -- you're not rendering
15 an opinion that Dana did not have any information
16 before July 20th, 2005 or anybody at Dana had any
17 information before July 20th, 2005 that would have
18 indicated to them that they needed to make a
19 guidance cut at that time?
20 A.    That's correct. Contrary to what
21 Professor Ronen and Feinstein claim, I have no
22 opinion on -- on this issue.
23 Q.    Okay. Okay. Would you please turn to
24 page 83. And looking at page 1 -- or paragraph
25 126, you say "I Understand that management

51

1  acquired a considerable amount of new information
2  from July 20th to September 15th and October
3  10th." Where did you get that understanding?
4  A.    I read a lot of e-mails and a lot of
5  documents and I read depositions, and all of these
6  sources of information that I looked at talk about
7  new information that is acquired during that
8  period of time.
9  Q.    Which e-mails did you look at that
10 informed your opinion that management acquired a
11 considerable amount of new information from July
12 20th?
13 A.    Well, I mean there are a variety of
14 e-mails trying to make sense of new data that was
15 puzzling to them and there are a variety of
16 e-mails trying to make sense of production
17 difficulties, so those types of e-mails.
18 Q.    Did you also review e-mails that
19 indicated that they were having problems making
20 forecasts in each quarter of 2005?
21       MR. LINKER: Objection, lack of
22 foundation.
23 A.    I'm not sure what -- what you're
24 referring to.
25 Q.    Do you remember reading in either

52

1  Mr. Burns or Mr. Richter's transcripts testimony
2  that Dana had not made a forecast in any quarter
3  in 2004 or the first two quarters of 2005?
4        MR. LINKER: Objection to form, lack of
5  foundation.
6  A.    If you -- if you mean by that that the
7  performance of Dana did not match the forecasts
8  during that period of time, yes, I've read that.
9  Q.    Okay. And did that do anything to
10 inform your opinion about whether or not
11 management had new information after July 20th
12 concerning Dana's financial performance?
13 A.    I'm sorry. I can't connect the two
14 issues, so you'll have to help me.
15 Q.    Okay. Well, your opinion seems to be
16 that management acquired new information that it
17 didn't have prior to July 20th that caused it to
18 make the changes to guidance that it made; is that
19 right?
20 A.    My opinion is that management acquired
21 much information between July 20 and September 15,
22 and in general that was the information and the
23 only one change during that period, the industry
24 changed, the microeconomic environment changed.
25 That information played a role in the size of --

53

1  of the cut.
2  Q.    Okay. Paragraph 176, go on -- goes on
3  to say, "During that time, management discovered
4  that there were issues with Dana's operating
5  performance...." Do you see that?
6  A.    Yes.
7  Q.    Is that new information that it -- is
8  it your opinion that Dana had new information
9  about -- pardon me, let me back up.
10       Is it your opinion that management
11 acquired new information that it did not have and
12 could not get before July 20th that called into
13 question Dana's operating performance?
14       MR. LINKER: Objection to form.
15 A.    I have no opinion as to what it could
16 or could not get before July 20. Now, as I said,
17 there are a number of documents that discuss
18 things that are happening at the plants that
19 indicate there are difficulties that at that
20 -- at that point are new to management and play a
21 role in its understanding of the evolution of the
22 company.
23 Q.    Are you done with your answer?
24 A.    Yes.
25 Q.    Okay. If you would please turn to the

14 (Pages 50 to 53)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

54

1  next page, actually, page 84. And specifically
2  paragraph 178 on page 84.
3  A.     Yes.
4  Q.     Okay. The second sentence of that
5  paragraph says: It would make no sense for them,
6  being plaintiff's experts, to claim that this
7  reduction in Dana's guidance could or should have
8  been announced on July 20th, because at that time
9  management did not have information that it
10  acquired later and that was important in its
11  assessment of the prospects of the firm.
12        Do you see that?
13  A.     That's correct.
14  Q.     What information are you saying that
15  management did not have that was important to its
16  assessment of the prospects of the firm that it
17  acquired after July 20th?
18  A.     In my reading, now, obviously
19  management didn't know as of July 20 that there
20  would be what analysts called a gas shock
21  following Katrina, for instance. Now, that would
22  be a piece of information that it didn't have.
23  Management didn't have information about the
24  change in direction in the steel prices. And so
25  those are pieces of information that management

55

1  didn't have as of July 20.
2  Q.     Are those the only pieces of
3  information in your opinion that management didn't
4  have before July 20?
5  A.     No.
6  Q.     What are the other pieces of
7  information?
8  A.     Now, we talked about what management
9  learned about operational difficulties, what
10  management learned about its ability to cut costs.
11  Q.     And it's your opinion that they didn't
12  have information about those two issues prior to
13  July 20th?
14        MR. LINKER: The same information, any
15  information, all information?
16        MS. WYMAN: It's -- it's --
17        MR. LINKER: Objection to form.
18        MS. WYMAN: It's his report. It's his
19  use of information --
20        MR. LINKER: Your question is vague.
21        MS. WYMAN: -- that I'm trying to
22  understand what information it is that he says
23  that they didn't have.
24        MR. LINKER: I object to the form. The
25  question is vague as to the information you're

56

1  referring to in that question.
2  A.     So from my reading now during that
3  period of time they learned about cost cutting and
4  they learned about operational difficulties and
5  the information that they -- was apparently new to
6  them.
7  Q.     And how did you determine that it was
8  "apparently new to them"?
9        MR. LINKER: Object to form.
10  A.     From the ways that the e-mails were
11  phrased. I mean the -- now, obviously I am
12  assuming it's based on the information that --
13  that I have seen.
14  Q.     So you reviewed the information and
15  made assessment about what management did or
16  didn't have prior to July 20th as far as
17  information went?
18        MR. SIEGEL: Could I have that question
19  read back? I'm sorry. I couldn't hear it.
20        (The record is read as requested.)
21        MR. SIEGEL: Objection, form.
22  A.     No. So what I did see is in e-mails
23  and in pieces of informations about things that
24  were happening at that point in time and hence
25  hadn't happened before. And so there is new

57

1  information between July 20 and September 15.
2  Now, what is relevant to me here is we have a
3  guidance cut of 50 percent, and the question is
4  now where -- where did that cut come from, could
5  it have -- you know, did part of it -- was part of
6  it the result of -- of new information? Or all of
7  it.
8  Q.     So is it your opinion that all of it
9  was the result of new information?
10  A.     No. My opinion is much more limited
11  than that. My opinion is that I have not seen in
12  the plaintiff's reports any evidence indicating
13  what size of cut could or should have been made on
14  July 20.
15  Q.     In paragraph 178 of your report, toward
16  the middle it says -- you say: This information
17  could not cause inflation in the stock on July
18  20th because management could not have disclosed
19  that information, as it did not have it. Do you
20  see that?
21  A.     That's correct.
22  Q.     All right. So are you now saying that
23  your opinion is not that management didn't have
24  information but that plaintiff's haven't proved
25  what information they did or didn't have?

15  (Pages 54 to 57)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

58

1          MR. LINKER:  Objection to form.
2    A.      No.  There are two different issues.
3    There is the issue of the -- of there being no
4    expert evidence on what the size of the cut should
5    have been earlier according to the theory of the
6    plaintiffs.  And then there is the issue that
7    between July 20 and September 15 there is new
8    information, and that new information was part of
9    the information that helps understand the size of
10   the cut.
11   Q.      But your report says that the
12   information that they got after July 20th could
13   not have caused the inflation on July 20th because
14   management didn't have it.
15           MR. LINKER:  Read that question back,
16   please.
17           (The record is read as requested.)
18           MR. LINKER:  Objection to the form.
19   The report speaks for itself.
20   A.      I mean this sentence says that
21   information that management didn't have on July 20
22   couldn't cause in -- inflation on July 20.  That's
23   all it says.
24   Q.      Isn't your determination that
25   management didn't have the information it needed

59

1    to cut guidance on July 20th really an evaluation
2    in your assessment of the evidence in this case?
3    A.      I don't have an opinion on what
4    management should or should not have done on July
5    20.  The opinion I have is that nowhere in the
6    plaintiff's experts' report is there any analysis
7    showing what size of a cut management should have
8    done on July 20 given the plaintiff's theory.
9    Q.      Don't Dr. Feinstein and Dr. Ronen's
10   report state very clearly that on July 20th that
11   management should have disclosed everything that
12   was disclosed both on September 15th and on
13   October 10th?
14           MR. SIEGEL:  Hypothetical.
15           MR. LINKER:  Objection.
16           MR. SIEGEL:  Sorry.  I apologize for
17   interrupting.  I'm just having a lot of trouble
18   hearing your question.
19           MS. WYMAN:  I'm sorry.  I -- I did
20   speak softly.  I apologize.
21           So can you read back the question?
22           MR. SIEGEL:  But I apologize for
23   interrupting.
24           (The record is read as requested.)
25           MR. LINKER:  Objection.

60

1    A.      My recollection is that Professor
2    Feinstein says that plaintiff's experts will show
3    evidence about the cut of guidance.  But then when
4    you look at the plaintiff's experts, it don't have
5    any evidence on that.
6    Q.      All right.  If you'd please turn to
7    page 86 of your report.  Looking at paragraph 181,
8    you fault Professors Feinstein and Ronen for not
9    taking into consideration certain information that
10   came out after July -- or pardon me, after October
11   10th that clarified, in your words, information
12   about the restatement; is that right?
13   A.      That's correct.
14   Q.      Okay.  And doesn't Dr. Feinstein's
15   causation opinion factor in the 90-day lookback
16   period that's outlined in the PSLRA?
17   A.      But that's really a different issue
18   from what I'm talking about here.
19   Q.      What are you talking about there and
20   how is it different?
21   A.      It's different in the sense that the
22   90-day period is a mechanical period that is not
23   based on new information arriving to the market
24   about litigation issues.
25   Q.      And how is it that that information

61

1    should have been used by Dr. Feinstein and
2    Dr. Ronen in their assessment of the inflation in
3    the stock?
4    A.      Well, if you have a situation where
5    there are a number of days close to the period
6    that you are looking at with positive abnormal
7    returns and some of them being quite sizeable, now
8    such a situation is consistent with more
9    information coming to the market about the -- the
10   issues of the litigation.  And so you should be
11   looking at that to see whether there are
12   corrections of information or whether the market
13   learns more precisely what is going on through
14   additional disclosures.  And in this case there
15   are additional disclosures.  And if you ignore
16   them, now you effectively are just having the
17   worst information but not taking into account the
18   better information that comes subsequently.
19   Q.      Doesn't the 90-day lookback period
20   mitigate the calculated damages because it does
21   take into consideration price changes that occur
22   within the three months after the corrective
23   disclosure?
24   A.      Well, it doesn't do so in the way that
25   a financial expert would want to do so or in the

16  (Pages 58 to 61)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

62

1  way that Professor Feinstein thinks about
2  information in the other parts of his report.
3  Now, I mean with the 90-day lookback, you can have
4  all sorts of things happen that have nothing to do
5  with the litigation.
6  Q.    Do you disagree that the 90-day
7  lookback period at least considers the positive
8  results that you have outlined in your report?
9  A.    Well, the 90-day lookback period in --
10  now will incorporate all sorts of information, a
11  lot of it that is not related at all to the
12  litigation or to the alleged fraud or to the
13  disclosures.
14  Q.    But it provides a cap of what the
15  damages cannot exceed, doesn't it?
16  A.    But it doesn't -- no, it doesn't
17  provide you with an estimate that is focused on
18  news related precisely to the allegation.
19  Q.    Professor Stulz, would you agree that a
20  company's value is equal to the present value of
21  its future cash flows?
22  A.    Yes, that's correct.
23  Q.    Okay.  And -- and then you would also
24  agree that a company's guidance is important
25  information that's incorporated into analysts'

63

1  valuation models, would you not?
2  A.    Yes.  Let me just qualify my previous
3  answer, which is that now that requires a market
4  to be efficient.
5  Q.    Oh, sure.  Assuming the market's
6  efficient, then you would agree that a company's
7  value is equal to its present value of its future
8  cash flows?
9  A.    That's correct.
10  Q.    And did you do an attribution analysis
11  that looked at the relationship -- the average
12  relationship between Dana's guidance revisions and
13  its stock price movements?
14  A.    No.  I -- I looked at a number of
15  issues surrounding how the market assessed
16  guidance and guidance changes during -- during the
17  class period.
18  Q.    Okay.  And what did you -- what was
19  your methodology?  What did you do?
20  A.    Well, I -- as you know, I have a figure
21  in my report showing that, you now, analysts had
22  different expectations on the guidance and the
23  analysts thought that the guidance was too
24  optimistic.
25  Q.    And what did you do to -- I think --

64

1  let me back up.
2  So is your opinion that Dr. Feinstein
3  overestimates the inflation that's in -- that's in
4  the stock related to the -- to the company's
5  guidance?
6  MR. LINKER:  Objection, lack of
7  foundation.
8  A.    Well, my opinion would be that
9  Dr. Feinstein really doesn't estimate inflation.
10  Q.    In what sense?
11  A.    Well, in the sense that there is no
12  direct analysis of inflation in his report.
13  Q.    Okay.  And you did an analysis of -- of
14  Dr. Feinstein's lack of inflation analysis with
15  regard at least to the September 15th disclosure;
16  is that right?
17  A.    Well, when we are looking at September
18  15, we are looking at the stock price reaction to
19  a disclosure.  And my report has an analysis of
20  knowing the information revealed in the disclosure
21  and how the market reacted to it.
22  Q.    Okay.  If you look at Exhibit 16 of
23  your report, please.
24  MR. SIEGEL:  Is that 15 or 16?
25  MR. LEVINE:  16.

65

1  MS. WYMAN:  16.
2  MR. SIEGEL:  Thank you.
3  Q.    What is Exhibit 16 showing us?
4  A.    So what -- now, what Exhibit 16 is
5  focused on is providing evidence of how the market
6  reacted to previous changes in guidance by Dana
7  and looks at the three instances during the class
8  period where guidance had been changed.
9  Q.    Okay.  So does Exhibit 16 present the
10  average relationship between Dana's guidance
11  changes and the stock price movements that were
12  resulting from them?
13  A.    Yes.  Exhibit 16 shows the average.  I
14  mean I just want to point out one issue with that
15  exhibit, which is that the number of $1.61 on --
16  for 2-23-05 is actually a first call number and
17  not an I/B/E/S number and everything else is
18  I/B/E/S.  If we replace that number by I/B/E/S, it
19  would be $1.58.  Obviously none of my conclusions
20  would change.
21  Q.    Are you talking about the 1.61 that's
22  associated with the 10-13-04 on the exchange?
23  A.    I -- I would -- I'm talking about
24  the --
25  Q.    Oh, I'm sorry.  I see the other 161.

17 (Pages 62 to 65)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

66

1    Pardon me.
2    A.    Right.
3    Q.    So if we look at your Exhibit 16 and we
4    look at the guidance revision on February 23rd,
5    '05, it shows that there was a change in consensus
6    of a negative 25 cents?
7    A.    That's correct.
8    Q.    Is that right?
9          And the resulting change in the stock
10   price was a negative 48 cents?
11   A.    That's correct.
12   Q.    And so the total price change you
13   calculate on here is 1.92 price change, yes?
14   A.    No.  So that's the ratio of the stock
15   price change using the -- the residual, not the
16   abnormal -- what I typically call the abnormal
17   return but here we call it the residual, divided
18   by the change in consensus.
19   Q.    So then does your -- am I reading your
20   document correctly that -- that you have
21   calculated the residual stock price change to
22   negative 48 cents as a result of the guidance
23   revision?
24   A.    That's correct.
25   Q.    Okay.  And then the same would be true

67

1    -- the same methodology would be true for the
2    other two observations that you make on here.  So
3    therefore for October 13th, the residual stock
4    price change you've calculated as 1.49, negative
5    1.49 and for March 23rd, '05 the residual stock
6    price change is negative 36 cents; is that right?
7    A.    That's correct.
8    Q.    Okay.  And you only have three
9    observations here; is that right?
10   A.    As I said, those are the only
11   observations during the class period.
12   Q.    Are there any empirical or academic
13   studies that -- that you have cited or that you
14   can tell me about where there are findings that
15   are based on just three observations?
16   A.    I'm not sure what you are getting at
17   here in the sense that there are plenty of
18   academic studies that would look at the impact on
19   the market of one event, which that would be one
20   -- one observation.  So I'm -- I'm not quite sure
21   what -- you're what trying to get at.
22   Q.    My question was pretty straightforward
23   I thought.  I just wanted to know if you cited to
24   or could tell me of any academic studies where a
25   model like this was used based on three

68

1    observations?
2          MR. LINKER:  Objection to form.
3    A.    Well, I mean with academic studies you
4    do the best you can with the data that -- that is
5    available.  Now, so here if we think of September
6    15, that's one observation.  And now most of the
7    report of Dr. Feinstein is on September 15 and
8    October 10.  We are talking about two
9    observations.
10   Q.    Okay.  If you look, please, at your
11   Residual Price Change/Change in Consensus column
12   at the very end where it says 6.48, it's in
13   relation to the October 13th change in guidance?
14   A.    That's right.
15   Q.    Okay.  And again remind me, you said
16   that was a ratio?
17   A.    That's correct.
18   Q.    Okay.  And that ratio that you
19   calculated there is three times bigger than the
20   February and -- and roughly March ones; is that
21   right?
22   A.    That's correct.
23   Q.    Did you do any test or run any analysis
24   to determine if the -- that ratio was accurate?
25   A.    I'm not sure what you mean by

69

1    "accurate."
2    Q.    Well, I mean since it's three times
3    larger, did you do anything to make sure that that
4    wasn't an outlier?
5    A.    Well, I mean we have three
6    observations.  Those are the observations that are
7    available to us.  Those are the observations I
8    used.  I am not aware of there being any mistake
9    besides the one I mentioned about the 158.
10   Q.    Does have -- does having the 6.48 in
11   any way skew your total analysis?
12   A.    I wouldn't say that it skews.  No,
13   there is no evidence that -- that you could reach
14   that conclusion, and -- and I know Professor
15   Feinstein has no evidence either.  What is true is
16   that, no, the result is different if you have the
17   6.48 or if you don't.  But now there's no basis to
18   think that that's an outlier as opposed to the
19   other two.  The point, though, is that now, if --
20   if you are like Professor Feinstein and you don't
21   like that observation, well, you can exclude it.
22   And if you exclude it, my conclusion still holds.
23   It really doesn't affect my conclusion at all.
24   Q.    Does the analysis that you did here
25   control in any way for the market Dana's in?

18  (Pages 66 to 69)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

70

1  Market factors?
2  A.    Well, the residual change does control
3  for the market.
4  Q.    How is that -- how does it do that?
5  A.    The residual comes from the event
6  study.
7  Q.    And so the residual then would control
8  for industry factors?
9  A.    That's correct.
10  Q.    And does it also control for
11  non-guidance Dana-specific information?
12  A.    No, it does not.  I mean it's -- it's a
13  residual on those days.
14  Q.    Okay.  If you look at the column that
15  says New Analyst Consensus --
16  A.    That's correct.
17  Q.    -- the -- first entry is -- is
18  $1.61.  Do you see that?
19  A.    Uh-huh.
20  Q.    Where did you get that information?
21  A.    It comes from I/B/E/S.
22  Q.    Wasn't there an I/B/E/S entry for 1.68
23  that was made on October 15th, 2004?
24  A.    That's correct.
25  Q.    And isn't the 1.61 the I/B/E/S update

71

1  from November 18th?
2  A.    That's correct.
3  Q.    And why did you use an November 18th
4  update as opposed to the update that came two days
5  after this announcement?
6  A.    Well, first thing to note is if I used
7  the numbers that you are mentioning, now the
8  impact that I am talking about would be bigger.
9  And so from that perspective, I am presenting
10  conservative numbers.
11        The second issue is, you know, I've --
12  I've done academic research on analysts' reports
13  and their impacts and I have a lot of experience
14  with those numbers.  Now, if you look at analyst
15  consensus very close to an event, some of the
16  forecasts are not going to be updated.
17  Q.    Okay.  Are the other analyst consensus
18  numbers that you used -- for example, February
19  23rd, 2005, what -- what was the update -- what
20  was the date of the update for the 1.36 that you
21  use in your study?
22  A.    My recollection is that it would be on
23  March 15, if I'm correct.  But I -- no, I don't
24  have a footnote for that, but I think that's when
25  it would be.

72

1  Q.    Okay.  And do you happen to remember
2  the date of the update for the 1.17 that's
3  associated with the March 23rd entry?
4  A.    It would be April 15, I -- I believe.
5  Q.    April 15?
6  A.    Around April 15, I think so, yeah.
7  Q.    Are the analysts consensus I/B/E/S
8  information updated monthly?
9  A.    That's right.
10  Q.    And what, if anything, did you do to
11  control for any kind of intervening information
12  that may be included in the new analyst consensus
13  numbers that you were getting from I/B/E/S?
14  A.    So -- so my recollection is that I
15  looked at the evolution of the analyst forecasts
16  over that period, day-by-day, and was comfortable
17  of using that approach.
18  Q.    And so did you look to see what else
19  was informing the analyst consensus numbers that
20  you were using that was received -- and
21  information that was received into the market
22  after the date of Dana's guidance revision and
23  before the update that you're using?
24  A.    I would have to go back to know the
25  evolution of the analyst forecasts.  When I --

73

1  when I looked at the individual forecasts and the
2  evolution, I didn't think that there was an issue
3  there that would change the points that I am
4  making with this document -- I mean this table.
5  Now, remember that the issue here is that the size
6  of the guidance revision matters in terms of the
7  abnormal return.  And that gets us back to another
8  point made in the report, which everything here
9  gets back to, which is that there is no expert
10  opinion as to the size of the cut.
11  Q.    Do you mind if we take a break?  I have
12  a frog in my throat.  I need to take a break.
13        THE VIDEOGRAPHER:  We are -- we are off
14  the record at 10:59.
15        (A short recess is taken.)
16        THE VIDEOGRAPHER:  We are back on the
17  record at 11:13.
18  Q.    Professor Stulz, would you please turn
19  to page 75 of your report, and in paragraph 160
20  you discuss Delphi's bankruptcy announcement, in
21  particular Dr. Feinstein's consideration of it in
22  his work in this case; is that right?
23  A.    Right.  So I address -- I address
24  Delphi's bankruptcy announcement; that's correct.
25  Q.    Did you take into consideration that

19  (Pages 70 to 73)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

74

1 there was news in the market as early as August
2 that it seemed as Delphi was going to be filing
3 bankruptcy?
4 A.     There was a lot of news about Delphi
5 and there were lots of discussions about
6 circumstances under which it would file for
7 bankruptcy, yes.
8 Q.     So it wasn't a total surprise when
9 Delphi did finally announce that it was going to
10 be filing for bankruptcy or that it had filed for
11 bankruptcy I should say?
12 A.     Well, it was a surprise if you look at
13 the prices of the securities and how they reacted
14 to the announcement.  But compared to most
15 companies, it obviously was more likely that
16 Delphi would file for bankruptcy than most
17 companies.
18 Q.     I'm sorry.  I didn't understand your
19 last answer.
20 A.     Right.  So the probabilities that
21 Delphi would file for bankruptcy was higher than
22 the probabilities than a lot of other companies
23 would file for bankruptcy.
24 Q.     And that was because of the earlier
25 reports that it was likely that that was -- that

75

1 Delphi would file for bankruptcy at some point in
2 time?
3 A.     That there was that possibility, you
4 know, that they were a company that was closer to
5 bankruptcy than is typical for company, yes.
6 Q.     Okay.  But so what I was saying,
7 though, is that the market wasn't taken completely
8 off guard when Delphi did in fact file for
9 bankruptcy and had announced that it had done so;
10 is that right?
11 A.     I'm not sure what you mean by saying
12 the market was not taken completely off guard.
13 You know, I mean the security prices reacted very
14 sharply for Delphi on that day.  So it's not like
15 the markets thought that the bankruptcy filing was
16 going to take place for sure.  There was a
17 surprise.  But I know it was a surprise from a
18 point that was different from what it would be for
19 most companies.  You know, I mean there was a
20 distinct possibility that they could file for
21 bankruptcy.
22 Q.     And do you know how or if Delphi's
23 stock reacted to the earlier news that there was a
24 likelihood that Delphi would file for bankruptcy?
25      MR. LINKER: Object to the form.

76

1 A.     Well --
2      MR. LINKER: Lack of foundation.
3 A.     No, I'm sure that the stock of Delphi
4 fell over that period of time and had been falling
5 for quite a period of time.
6 Q.     Okay.  And is it your opinion that
7 Dr. Feinstein's event study didn't adequately
8 account for the impact for Delphi's
9 bankruptcy filing announcement?
10 A.     Well, no, that's -- that's the opinion
11 I have in my report in the sense that he doesn't
12 make any attempt to look at what the effect would
13 have been on -- was on Dana, Dana.
14 Q.     But he includes Delphi in his -- in his
15 industry component of his event study, doesn't he?
16      MR. LINKER: Object to form.
17 A.     So the model for the stock return that
18 he has -- which seems to be the model that was
19 used in class cert in this case contrary to
20 Professor Ronen, but the model that he has allows
21 for the stock to -- to evolve as a function of two
22 factors which would be the market on a large
23 portfolio of firms -- I mean businesses related to
24 Dana.
25 Q.     I don't know that that answered my

77

1 question.  My question was simply:
2 Dr. Feinstein's event study included within it an
3 industry component that took into consideration
4 the impact of Delphi's stock changes on -- on
5 Dana; that right?
6 A.     Yes.  So my -- my answer actually, I
7 think was -- was on point.  The only thing that he
8 does is to have a model of stock return that
9 allows for the return of Dana to evolve as a
10 function of the market and as a function of the
11 industry.  That's the only -- the only thing he
12 does.  He does not investigate whether there was
13 any affect of Delphi's bankruptcy on Dana.
14 Q.     Do you do anything to determine whether
15 or not Delphi's news had a more negative impact on
16 Dana than on any other member of the industry?
17 A.     Well, I -- I give a number of
18 references and citations to analysts reports.
19 Now, the bankruptcy of Delphi was a big event on
20 that day, and if you were studying the
21 determinants of Dana's stock and attempt to draw
22 inferences from the drop in the stock price, you
23 certainly would want to look at the impact of
24 Delphi which is something that he doesn't do.
25 Q.     It's not something you did either, is

20 (Pages 74 to 77)

78

1  it?
2  A.      I did it enough to be assured that it's
3  something that he should have looked into.
4  Q.      Your report in paragraph 161 indicates
5  that -- you say toward the middle, "...it is much
6  more plausible to conclude that Delphi's
7  bankruptcy made Dana's October 10 return worse
8  because Dana was making its announcements in a
9  more challenging environment for its industry."
10         MR. LINKER: What paragraph now was
11 that?
12         MS. WYMAN: 161.
13         MR. LINKER: Oh, 161.
14         Would you read the question back? I
15 thought --
16         MS. WYMAN: On page: --
17         MR. LINKER: I thought you said 151.
18         MS. WYMAN: On page -- No, I'm sorry.
19 It's on page 76. 161.
20         MR. LINKER: Please reread the
21 question.
22 Q.      Sure, I'll just repeat it.
23         In paragraph 161 of your report do you
24 say: "...it is much more plausible to conclude
25 that Delphi's bankruptcy made Dana's October 10

79

1  return worse because Dana was making its
2  announcement in a more challenging environment for
3  its industry"?
4  A.      So that's the sentence in my report.
5  Now, the -- the situation of Dana in October is --
6  now is one where it -- it is facing difficulties
7  where it's highly levered and there are a lot of
8  good reasons to think that it would be quite
9  sensitive to that type of announcement, and the
10 analysts on that day, you know, seemed -- seemed
11 to think that.
12 Q.      Did you make any scientific
13 confirmation that the industry component of
14 Dr. Feinstein's event study was inadequate to
15 account for the impact of Delphi's bankruptcy
16 announcement on Dana's October 10 return?
17 A.      Well, you know, there are a number of
18 issues with how he deals with that. Now, as you
19 know, his model is estimated on a period of time
20 that ends before the class period and is a period
21 of time that's quite different. His industry is
22 kind of broadly defined. So that his industry
23 doesn't reflect as much of an adverse effect of
24 Delphi as a more narrow industry measure, and
25 so -- and there are problems with -- with that.

80

1  And -- and then as I explained in my report, you
2  know, we know from the literature that there are
3  things to -- that would have made the impact of
4  Delphi different from Dana than for the industry
5  as a whole.
6  Q.      How much did Delphi's bankruptcy
7  announcement impact Dana's return on October 10th?
8  A.      I haven't done an estimate of that.
9  No, I expected Professor Feinstein to provide such
10 an estimate, and he hasn't.
11 Q.      So it could be zero, right?
12 A.      No, it could not be zero.
13 Q.      Why couldn't it be zero?
14 A.      That wouldn't be sensible given what
15 the analysts are doing, are saying given what we
16 know from the literature. It just wouldn't --
17 wouldn't make sense.
18 Q.      But you don't know for a fact because
19 you haven't done any scientific tests to conclude
20 how much Delphi's bankruptcy announcement impacted
21 Dana's October 10 return?
22         MR. LINKER: Objection.
23 A.      Well, what I know is that the impact of
24 Delphi on the industry as I measure it is actually
25 extremely, extremely large. And we know that that

81

1  impact varies across firms, typically depending on
2  the leverage. And we know that Delphi at that
3  time -- I mean Dana at that time is quite highly
4  levered. Now, we are talking about Dana which in
5  the other industries it's different than the time
6  that Professor Feinstein is estimating in his
7  model.
8  Q.      But to answer my question, you did not
9  run any scientific test or analysis to quantify
10 how much impact Delphi's bankruptcy announcement
11 had on Dana's October 10 return?
12 A.      What I did was look at a number of
13 indicia showing that it is an issue that is
14 important and that should have been taken into
15 account.
16 Q.      But you didn't run any test to quantify
17 that impact, did you?
18 A.      Well, I mean, it depends what you call
19 test. Now, my report has an estimate of the
20 impact of the Delphi announcement on the
21 competitors of Dana and shows that that impact is
22 quite high.
23 Q.      But you didn't do any test to quantify
24 that impact on Dana, did you?
25 A.      Well, what I did is a type of analysis

21 (Pages 78 to 81)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

82

1  that you would expect to be done in a situation
2  like this, to what I thought was the effective
3  material or not and the conclusion that it is.
4  Q.    Where is that in your report?
5  A.    It is in the discussion of -- of the
6  Delphi announcement.
7  Q.    Which paragraph is that?
8  A.    Well, we have -- we have a subsection
9  of that that we -- we have been talking about.
10  It's not -- it's not what you referred to, but
11  it's -- let me -- I will have to find it.
12        Okay. It's page 60 point --
13  subsection a).
14  Q.    Is that the section?
15  A.    Where I reference some -- some
16  discussion showing that this is an important
17  issue.
18  Q.    Okay. Where is it in this subsection
19  that you pointed me to that shows that you've done
20  any kind of scientific analysis to determine that
21  the Delphi announcement had a greater impact and
22  caused Dana's October 10 return to be worse?
23  A.    Well, I mean, here we have no
24  discussion of the impact of Delphi. You know, as
25  Professor Feinstein himself shows in his rebuttal,

83

1  no greater leverage is associated with a greater
2  effect and Dana had a higher leverage than the
3  other firms in the industry. So by his own
4  argument in his rebuttal report, there is a bigger
5  effect. And also to be -- if he had been
6  consistent with his rebuttal -- for his argument
7  in his rebuttal report, he would have had to look
8  more.
9  Q.    Did you do any scientific analysis to
10  determine whether or not the industry component of
11  Dr. Feinstein's event study properly or didn't
12  properly account for the Delphi announcement as it
13  relates to the October 10 Dana return?
14  A.    Well, I mean, his model is estimated of
15  a period when there is no bankruptcy of the type
16  of Delphi. And so even if you looked at his model
17  as kind of a model describing the return of Dana
18  under normal times, it wouldn't account for any
19  effects similar to bankruptcy. But we also know
20  that another type of model is not designed to
21  capture kind of the type of event risks that --
22  that we are talking about which could have
23  differential effects across firms in an industry.
24  Q.    And why do we know that?
25  A.    Well, we know that from, you know,

84

1  studies in finance generally that look at the fact
2  that within an industry announcements can have
3  differential impacts, you know, depending on the
4  characteristics of the firms within the industry.
5  Q.    What should Dr. Feinstein have done to
6  determine whether or not Delphi's bankruptcy
7  announcement had a greater impact on Dana on
8  October 10th?
9        MR. LINKER: Objection to form.
10  A.    Well, I mean the first approach that
11  would have made sense is to start by using
12  economic analysis to assess how Dana was affected
13  by the adverse news of -- of Delphi.
14  Q.    And how would he have done that?
15  A.    Well, using the tools of -- of an
16  economist and using what we know from the
17  literature.
18  Q.    In particular, what should he have
19  done? What kind of test should he have run? What
20  kind of model should he have made?
21  A.    Have --
22        MR. LINKER: Objection to form.
23  A.    No, he says that he can conduct
24  attribution and analysis to decompose the effect
25  of abnormal returns on specific days. So now

85

1  conducting that type of attribution analysis would
2  have -- would have been one way to go.
3  Q.    Do you cite any analyst reports that
4  specifically say that Dana was particularly
5  impacted by Delphi's bankruptcy announcement on
6  October -- in relation to its October 10th return?
7  A.    I -- no, I know that there are articles
8  and I know that the analyst reports that discuss
9  how October 10 was -- was worse for Dana because
10  of what was going on with -- with Delphi. Whether
11  I cite them -- I don't seem to cite some things
12  that are very explicit about that, but there are
13  such.
14  Q.    What article is that that you're
15  thinking of that you failed to cite in your
16  report?
17        MR. LINKER: Objection to form.
18  A.    At this point I can't -- I mean I would
19  have to have the collection of analyst reports
20  with me. I -- I saw it recently, so --
21  Q.    Okay. With regard to the calculation
22  of inflation in Dana's stock, counsel asked you to
23  do an analysis to determine if there was inflation
24  based on a couple of different scenarios; is that
25  right?

22 (Pages 82 to 85)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

86

1    A.    That's correct.
2    Q.    Okay.  And in response to that request,
3    you did an earnings response model; is that right?
4    A.    That's correct.
5    Q.    Okay.  Explain to me -- and -- and an
6    earnings response model is designed to measure the
7    expected reaction of a company's stock price to an
8    earnings surprise, right?
9    A.    That's correct.
10   Q.    Okay.  And an earnings surprise is --
11   is a new, unexpected news about the company's
12   earnings; that would be an example?
13   A.    That's correct.
14   Q.    Okay.  And if you look, please, at page
15   43 of your report.  In figure E, do you see the
16   entry for February 23rd, 2005?
17   A.    Yes, I do.
18   Q.    Okay.  And that's the fourth quarter
19   '04 entry; is that right?
20   A.    That's correct.
21   Q.    And does your figure show that there
22   was an announcement of -- by Dana that it reported
23   41 cents EPS for that quarter?
24   A.    That's correct.
25   Q.    And you also show that the analyst

87

1    consensus forecast for that quarter was 29 cents?
2    A.    That's correct.
3    Q.    And the reported versus consensus
4    column shows a 12 cent difference; is that right?
5    A.    That's correct.
6    Q.    And is that 12 cent difference an
7    example of an earnings surprise?
8    A.    That's correct.
9    Q.    Okay.  And in constructing your
10   earnings response model, you looked at Dana's
11   quarterly earnings announcements over a period of
12   time; is that right?
13   A.    That's correct.
14   Q.    And that period of time you looked at
15   was the first quarter of '98 through the second
16   quarter of 2005?
17   A.    That's correct.
18   Q.    Okay.
19   A.    Wait.  No.  I don't think that's
20   correct.  I would have to --
21   Q.    Look at paragraph 279 of your report.
22   It's on page 132.
23   A.    Yes, that's correct.
24   Q.    Okay.  So I think your report indicates
25   there were 30 quarterly observations that you

88

1    made?
2    A.    That's correct.
3    Q.    And why did you limit your study to 30
4    earnings announcements?
5    A.    Well, what -- what you would hope to
6    get is a period that is not too dissimilar to the
7    one for which you are doing the analysis, and so
8    now you face a trade off.  You could look at a
9    longer period of time, but then you would include
10   in that period more times that are quite different
11   from the current one.  Or you can have fewer -- a
12   shorter period of time but the estimates would be
13   less -- less reliable.  So my assessment looking
14   at the history of Dana was that that was a
15   sensible period to look at.  And, as you know, the
16   earnings response coefficient I get is quite
17   large, which now is another way to say that it
18   leads to high inflation.  And as a result now the
19   concerns that I would have had had -- if you,
20   know, the estimate had been very small -- it leads
21   to greater measure of inflation.  And so if there
22   is a bias, it would have appeared to be one
23   towards high inflation rather than lower.
24   Q.    Okay.  And your earnings response
25   results are outlined in Exhibit 17 to your report,

89

1    right?
2    A.    Right.  So I -- I just want to say one
3    -- one more thing here is that I also conducted,
4    you know, an analysis for the industry.  Now, to
5    have a sense of my -- of my estimates of kind of
6    calibrating my estimates on when I did it for the
7    industry's coefficient was substantially lower
8    which would lead to less lower inflation and so I
9    didn't use those.
10        I also compared my coefficients to the
11   literature.  And as you know, my coefficients are
12   quite large compared to the literature, more than
13   twice what is typical in the literature, and again
14   this makes this whole exercise to lead to -- to
15   quite high inflation compared to what you would
16   get if you used the industry or if you used the
17   literature.
18   Q.    Okay.  So based on your findings then,
19   looking at Exhibit 17, am I correct in
20   understanding that for each cent of earnings
21   surprise there is, you've calculated a -- a
22   residual price reaction of 8 cents?
23   A.    That's correct.
24   Q.    And so it's an 8-to-1 ratio?
25   A.    That's correct.

23  (Pages 86 to 89)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

90

1    Q.    Okay.  So if we use our fourth quarter
2  of -- of '04 example just because the math's easy,
3  there's a 12 cent earnings surprise.  If we
4  multiply that by 8 cents, then you would expect
5  that your model would spit out a 96 cent positive
6  stock reaction on that date as a result of that
7  information; is that right?
8    A.    Based on the estimated coefficients
9  which are averages, you know, so you would not
10  expect it to be a perfect -- not to tell you
11  exactly what happens on every day.  You would
12  expect it to tell you what happens on average.
13    Q.    Okay.  Now, if you look at your
14  Exhibit 7, which I think is your -- the returns
15  for your event study; is that right?
16    A.    Well, it -- it gives a number of
17  different types of data, including -- including
18  the regression results.
19    Q.    Okay.  And are these regression results
20  the ones that you relied on for your earnings
21  response model?
22    A.    That's correct.
23    Q.    Okay.  If you turn to page 8 of
24  Exhibit 7, and look for the entry for February
25  23rd, 2005?

91

1    A.    Yes.
2    Q.    It shows that the residual return on
3  that day was a negative 48 cents.  Do you see
4  that?
5    A.    Yes, that's correct.
6    Q.    Okay.  And -- and why wouldn't the
7  model show a positive stock price reaction on that
8  day if there was a positive earnings surprise that
9  was given to the market then?
10    A.    I -- I'm not quite sure why you are
11  concerned about individual data points.  You know,
12  what the model tells you is what the reaction is
13  on average, using all the 30 data points, that's a
14  reaction on average.  None of those models will --
15  no, I mean neither will the models that Professor
16  Feinstein used give you, you know, the exactly
17  what happened on every day.  You know, I mean, so
18  I -- I don't quite see the problem here.
19    Q.    Well, your earnings response model says
20  that for each cent of earnings surprise there's an
21  8 cent price reaction, residual price reaction,
22  correct?  You just testified to that.
23    A.    That's correct, yeah.
24    Q.    Okay.  So in using our fourth quarter
25  of '04 example, there was a 12 cent earnings

92

1  surprise.  So according to your earnings response
2  models, we would expect to see a positive 96 cent
3  residual return as a result, right?
4    A.    That's what the models would predict on
5  average with --
6    Q.    Okay.  My question -- let me finish --
7    MR. SIEGEL:  Excuse me.  I'm not sure
8  he finished his answer.
9    MS. WYMAN:  Well, he needs to let me
10  finish my question.  It's in pieces.
11    MR. SIEGEL:  No, no.  He was
12  answering --
13    MS. WYMAN:  It's in pieces.  Just let
14  me finish my question.
15    MR. SIEGEL:  No, let's go back to the
16  transcript.  I don't believe he had finished his
17  answer when you started asking your next question.
18  Can we have the question and the answer that was
19  previously given read, and if I'm wrong, I
20  apologize; if I'm right, he needs to be able to
21  finish his answer.
22    (The record is read as requested.)
23    MR. SIEGEL:  Thank you.
24    MS. WYMAN:  Were you done with your
25  answer?

93

1    A.    Well, I mean I -- now, what I wanted to
2  stress is that this type of model, like the model
3  estimated by Professor Feinstein, now gives you an
4  average reaction, and obviously there are other
5  factors influencing the stock price on a specific
6  day.  There are lots of different factors.
7    Q.    Okay.  Well, let me finish what I was
8  going to ask you.  If you look at Exhibit 7 on --
9  in page 8 and look at the entry for February 23rd,
10  you've calculated a residual return of negative 48
11  cents.  And I want to understand why that can be
12  if your earnings response model should have
13  indicated a positive response to the information
14  received.
15    A.    The model that I estimate gives you an
16  average relationship and the actual relationship
17  will be the average plus, you know, whatever else
18  influences the stock price on that day.
19    Q.    Now, I think you mentioned in your --
20  in your answer earlier that you looked at the
21  literature to compare your earnings response
22  coefficient to what had -- had been published by
23  other researchers; is that right?
24    A.    That's right.
25    Q.    Is the literature that you were

24  (Pages 90 to 93)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

94

1  referring to the -- the Beaver article that you
2  cite in paragraph 29, which is on page 132 of your
3  report?
4  A.      Well, I mean it -- it includes a number
5  of papers, including review papers on this
6  relationship.  You know, the typical -- typical
7  result is between 1 and 3, and the ones that we
8  have here is -- is much larger and -- so that's --
9  that's what I did.
10  Q.      Okay.  And -- and it looks like in
11  paragraph 279 that you say that in -- in the
12  Beaver study that their -- their coefficient that
13  they had found was 2 cents for every penny in
14  earnings -- earnings per share surprise that
15  resulted in a 2 cent share response; is that
16  correct?
17  A.      I -- I mean one of the studies has
18  that -- that estimate, yes.
19  Q.      Okay.  And -- and how does this Beaver
20  article help inform your opinion about Dana and
21  the coefficient that you calculated?
22  A.      Well, I mean the larger issue here is
23  that I estimate an average relationship between
24  earnings surprises and stock price reactions using
25  an approach that is well-established in the

95

1  literature; therefore, there was a natural
2  benchmark in the literature to try to see whether
3  the estimates were -- were reasonable and credible
4  and, you know, how -- by looking at how they're
5  different from the literature.
6  Q.      And in this case your estimate is four
7  times bigger than at least the article that Beaver
8  and his colleagues published?
9          MR. LINKER:  Objection.  Misstates the
10  facts.
11  A.      So the estimate is much larger, you
12  know, which leads to higher inflation.  If the
13  estimate had gone in the other direction and had
14  led to much less inflation than you would expect,
15  I would have been -- I would have been concerned
16  about problems.  But in this case, given that it
17  is a large estimate that leads to high inflation,
18  I wasn't -- I wasn't concerned.
19  Q.      And then I think you said a little
20  earlier that you also performed the same analysis,
21  this earnings response analysis, with regard to
22  Dana's competitors?
23  A.      That's right.
24  Q.      Okay.  And I think that if you look at
25  footnote 234 that's on page 132, it -- your --

96

1  your report speaks to those findings; is that
2  right?
3  A.      I have to find it.  I'm sorry.
4  Q.      Oh, it's on page 132 in footnote 234.
5  A.      That's correct.  And I also show the
6  results in the exhibit.
7  Q.      And so your results when you looked at
8  Dana's competitors was basically a one-to-one
9  ratio?
10  A.      That's correct.
11  Q.      Okay.  Did you do anything to ensure
12  that your model was -- was appropriately
13  calibrated given that your calculation for Dana
14  was eight times greater than its competitors?
15  A.      Well, I mean I looked at the model and,
16  you know, we -- we did various robustness and
17  sensitivity tests.  Given that now to the extent
18  that if there was a bias, it would -- it was
19  highly favorable to the plaintiff, I obviously
20  wasn't as concerned as -- as I would have been
21  otherwise.  You know, the estimate is -- is large,
22  leads to high inflation.  Now, it's -- it would be
23  very hard to argue here that somehow the estimate
24  is too low given the literature, and so to the
25  extent that there is a bias in the estimate, it

97

1  would be in favor of the plaintiffs.  I -- I
2  didn't -- I mean looking at the data, looking at
3  everything that I looked at, I had no reason to be
4  concerned.
5  Q.      Okay.  You mentioned that you did
6  sensitivity and robustness tests just a minute
7  ago?
8  A.      Right.
9  Q.      What -- what in particular did you do?
10  A.      Well, I mean we -- we report one -- I
11  report one in the -- in the table.  Now, I looked
12  at whether the fourth quarter -- accounting
13  separately for the fourth quarter would lead to
14  different results.  Now, my recollection -- I mean
15  I don't remember exactly what -- what I did, that
16  was close -- almost a year ago.  But I remember
17  that we wanted to make sure that we were
18  comfortable or I was comfortable with -- with the
19  estimates.
20  Q.      So if I look at -- at Exhibit 17, which
21  is a summary of your earnings response model
22  finding, does it somewhere in -- on there indicate
23  this robustness test on the fourth quarter that
24  you were just talking about?
25  A.      Yes.  Oh, I mean we have both for the

25  (Pages 94 to 97)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

98

1    industry -- now, when -- when I did the analysis
2    you said that I did it for competitors.  I should
3    have corrected you.  No, it's for the industry,
4    including Dana.
5    Q.      Okay.
6    A.      That's the columns 3 and 4.  And then
7    for Dana we have columns 1 and 2.  And I performed
8    the analysis in -- you know, the 1 is the one that
9    I used in the inflation estimates.  Column 2
10   allows for a different effect of the fourth
11   quarter and you can see that the different effect
12   is not significant.
13   Q.      Is it for fourth quarter of 2005 or
14   fourth quarter of 2004 that you're referring to?
15   A.      I'm referring to all the fourth
16   quarters in the periods that I'm estimating the
17   inflation.
18   Q.      So fourth quarter from '98 through
19   2005.
20   A.      That's correct.  That's correct.
21   Q.      And just the fourth quarter
22   announcements.
23   A.      No.  So I'm sorry if I was not -- not
24   clear.  What I'm doing here is to allow for a
25   different effect for the fourth quarter from the

99

1    other quarters.
2    Q.      I'm sorry.  I don't understand you.
3    A.      Right.  So the regression in column 1,
4    now for irrespective of when the announcement is
5    made, it has the same coefficient.  So it leads to
6    a -- now it corresponds to the assumption that any
7    earnings surprise has the same effect on -- I mean
8    in the regression model.
9           The second column says that the effect
10   is the same for all quarters except the fourth
11   quarter where the effect might be different.  And
12   then it attempts to estimate whether that effect
13   is different.  Now, the argument for looking at
14   the fourth quarter separately is that it
15   corresponds to the annual results.  And so the
16   literature has -- you know, has looked at the
17   fourth quarter separately.  Here we find that the
18   fourth quarter is not different and so there's no
19   reason to treat it differently.
20   Q.      Okay.  Now, your report -- in your
21   report you say that the period before the first
22   quarter of 2004 that Dana was in a period of
23   turmoil and disruption I think is what you say; is
24   that right?
25   A.      Well, it goes through a number of

100

1    changes in the period before; that's correct.
2    Q.      Okay.  And -- and you list some of
3    those changes if you look at paragraph 39 of your
4    report, which it is page 21.
5    A.      That's correct.
6    Q.      And -- or I'll correct.  You say that
7    Dana was emerging from a period of disruption and
8    turmoil.  And among the things that you list are a
9    hostile takeover bid, right?
10   A.      That's correct.
11   Q.      The unexpected death of Dana's chairman
12   and CEO?
13   A.      That's correct.
14   Q.      A restructuring effort that included
15   plant closures?
16   A.      That's correct.
17   Q.      And workforce reductions?
18   A.      That's correct.
19   Q.      And the sale by Dana of a couple of its
20   businesses, right?
21   A.      That's correct.
22   Q.      So before the first quarter of 2004, is
23   it fair to say that Dana was going through some
24   structural changes?
25   A.      That's correct.  But when you look at

101

1    the list that I give you here, that list is much
2    more of a problem for Professor Feinstein than it
3    is for the analysis that I have here.
4    Q.      And why is that?
5    A.      Because events like a takeover bid are
6    going to have a big effect on the stock return.
7    Now, we know that you have normal returns
8    associated with takeover bids are very large
9    typically, and so now create problems in
10   estimating the type of model that he uses.  Now,
11   it's frequent to actually take out the takeover
12   bid a -- a return from such -- such estimations.
13   So the events we're talking about here are events
14   that are more of a problem for the stock returns
15   than the reactions to earnings.  I mean, now to
16   argue that there is a problem with the earnings
17   announcements here, you have to argument that
18   somehow earnings means something else during that
19   period of time.
20   Q.      And I think you -- you testified
21   earlier that in crafting your earnings response
22   model you wanted to choose a period of time that
23   was as like to the period that you were studying
24   as possible; is that right?
25   A.      That's correct.

26  (Pages 98 to 101)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

102

1    Q.      Okay.  And in your report, don't you
2    also say that there was a lot of volatility in --
3    in Dana's stock before the class period?
4    A.      That's right.  But it's volatility
5    that's brought about by things like the takeover
6    bid.  Now, if you have a takeover bid, you are
7    going to have a very large return and that's going
8    to put -- put in a lot of volatility in the stock
9    return.  It's not --
10   Q.      And -- and -- I'm sorry.
11   A.      Sorry.
12   Q.      Go ahead.
13   A.      No, and so unless the takeover bid is
14   on the day of the announcement of earnings, it's
15   not going to effect the results that I'm looking
16   at.
17   Q.      Okay.  And even though you determined
18   that the period before the fourth quarter -- or
19   the first quarter, pardon me, of 2004 was
20   volatile, you still choose to use earnings
21   announcements from that period in your earnings
22   response model, right?
23   A.      Right.  But so we -- now, as I -- as I
24   just tried to say but -- in paragraph 39 the
25   issues I am -- I'm talking about are issues that

103

1    are much more relevant for estimating model of
2    stock return than they are for estimating an
3    earnings response model.  Now, with the earnings
4    response model, you are focused on how does the
5    market react to earnings, and a lot of the events
6    that we are talking about here are not events that
7    -- or all of them are not events that take place
8    on days of earnings announcements.
9    Q.      Is it your testimony that none of the
10   events that you list in paragraph 39 have an
11   impact on Dana's earnings?
12   A.      No, they do have an impact on the
13   earnings.  The question that you have tried to ask
14   with the earnings response model is, is there a
15   reason to believe that earnings announcements have
16   systematically different information before 2004
17   than they do -- than they do later on.
18   Q.      And did you ask yourself that question?
19   A.      Yes, obviously, I did.
20   Q.      And your -- and your answer to yourself
21   was?
22   A.      My -- my answer to myself was that I
23   was comfortable with providing the estimates that
24   I did, given that those estimates led to results
25   that were extremely favorable to plaintiff.

104

1    Q.      And in constructing an earnings
2    response model, is there a way to control for the
3    volatility that you say existed in Dana's stock
4    prior to the class period?
5    A.      Well, so to the extent that you are
6    concerned about volatility impinging on the stock
7    price reactions, it will do that through the
8    models that I use in the sense that if there is --
9    you know, suppose it's tremendous volatility in
10   stock returns that is unrelated to the earnings.
11   Now, if it's related to the earnings, then that's
12   what you want to get, so that's not a problem.  If
13   it's unrelated to the earnings, then it will be
14   difficult for me to find a significant
15   coefficient.  And so the model effectively takes
16   care of that.
17   Q.      Does the earnings response model that
18   you used control for the effects of the earnings
19   guidance revisions that were given?
20   A.      No.  I estimate a model that is
21   estimated as is typical in the literature, which
22   is you want to look at the impact of earnings and
23   announcements on the stock returns on -- on the
24   days that those announcements are made.  Now, the
25   guidance revision would be something that now

105

1    related to -- to the earnings as well.  So that's
2    -- that's the way the literature typically
3    proceeds.
4    Q.      So is it your testimony then -- to make
5    sure I understand what you're saying then, that
6    your earnings response model takes into
7    consideration the effect of guidance changes?
8    A.      Not separately.  What it does is that
9    it looks at the total effect associated with an
10   earnings announcement on a specific day.
11   Q.      And by total effect, do you mean that
12   that includes any other information that may have
13   been disseminated by the -- the company or from
14   any other source on the same day as the earnings
15   announcement was made?
16   A.      It estimates a model in the traditional
17   way in the literature, which is to look at the
18   earnings announcement and what happens to the
19   stock price, yes.
20   Q.      And so it accounts for market changes
21   or market information that was announced that day?
22        MR. LINKER:  Objection to form.
23   A.      That's -- that's correct.
24   Q.      And industry information that was
25   announced that day?

27 (Pages 102 to 105)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

106

1   A.      In the form of the abnormal returns but
2   not beyond that, that's correct.
3   Q.      Okay.  What about other
4   company-specific but nonearnings-related
5   information that is shared at the same time the
6   earnings announcement is made?
7   A.      No, I does not do that.  That's not --
8   no, as I said, I proceed in the ways that is
9   standard in the literature.
10  Q.      Okay.  Are there -- doesn't the
11  literature also indicate that a properly specified
12  model should take into account both the earnings
13  forecast errors and earnings forecast revisions?
14  A.      Well, it depends.  No, the literature
15  says that it depends.  Now, you can add the
16  focused revisions to the model and, you know,
17  there are obviously versions where you can do
18  that.  There are both benefits and problems with
19  doing that.  And -- now, it -- if you assume that
20  the forecast revisions are the results of the
21  earnings announcement and are related to the
22  earnings announcement in a predictable way,
23  there's no problem with -- with what I did.  I
24  mean there are no problems more generally.  Now,
25  the problem with taking into account the earnings

107

1   revision separately -- now it's not like my model
2   even knows them.  They are taken into account by
3   the coefficients and earnings.  But taking them
4   into account separately is that then you would
5   have to now make assumptions about how the
6   inflation in earnings -- the change in inflation
7   in earnings would affect earnings forecasts.
8   Whereas with the way I've done it, now which is a
9   perfectly acceptable way in the literature, the
10  way I have done it now everything is captured
11  through the impact of -- of the earnings
12  coefficient.
13          And the last thing I would say is now
14  the literature would say is that when you have
15  relatively few observations, which is what we have
16  here, the ways that I did it is -- is -- is the
17  way that you should do it.
18  Q.      And why is that?
19  A.      Well, because now as you add variables
20  to the model, you consume degrees of freedom, and
21  that doesn't improve the reliability when you have
22  relatively few observations.
23  Q.      And you would consider 30 observations
24  relatively few in terms of earnings response
25  model?

108

1   A.      Not in terms of an earnings response
2   model, but now if I were to do this with thousands
3   of observations, you know, things -- I would do
4   things that would be different because of the
5   benefit of those observations.
6   Q.      Okay.  Well, this is a good point for
7   us to stop and take our lunch break.
8           THE VIDEOGRAPHER:  We are off the
9   record at 12:04.
10          - - - - -
11          Thereupon, a luncheon recess is taken
12  at 12:04 p.m.
13          - - - - -

109

1           Wednesday Afternoon Session
2           May 20, 2015, 1:03 p.m.
3           - - - - -
4           THE VIDEOGRAPHER:  We are back on the
5   record at 1:03.
6   BY MS. WYMAN:
7   Q.      Professor Stulz, you understand that
8   you're still under oath, right?
9   A.      Yes, I do.
10  Q.      Okay.  Before the break for lunch we
11  were talking about your earnings response model
12  and I want to shift topics a little bit to discuss
13  Dr. Feinstein's use of the Karpoff article to
14  valuate the reputational effect.
15  A.      Uh-huh.
16  Q.      Now, you agree that a portion of a
17  negative stock price reaction in response to a
18  restatement announcement is due to future legal
19  expenses, correct?
20  A.      Yes.
21  Q.      Okay.  And you'd also agree that a
22  management's reputation affects the value of the
23  firm; is that right?
24  A.      Insofar as it affects with future cash
25  flows, yes.

28  (Pages 106 to 109)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

---

110

1  Q.      Okay.  Now, you fault Dr. Feinstein for
2  relying on the Karpoff article to quantify some of
3  the inflation that he says came out of Dana's
4  stock; is that right?
5  A.      No, I don't think that's correct.  No.
6  The problem is that -- I mean there are numerous
7  problems with what he does, including that he
8  doesn't really rely on that paper.
9  Q.      And what do you mean by that he doesn't
10 really rely on the paper?
11 A.      Well, he never computes the direct
12 economic impact of which he's talking about.
13 Q.      So am I correct in understanding that
14 you don't have an issue with Karpoff and his
15 colleagues' article and their findings in that
16 article; is that right?
17 A.      Well, the article is -- is what it is.
18 Now, the Professor Feinstein seems to think that
19 it's somehow a seminal paper in the finance
20 literature, I mean that's for him to -- to judge.
21 There are obviously questions that have been
22 raised about that paper and I mentioned some.  But
23 you know, my criticism has more to do with kind of
24 what Professor Feinstein does with this article
25 and kind of the flaws in his analysis.

---

111

1  Q.      One of the criticisms that you have is
2  that the Karpoff article was looking at companies
3  that had based their disclosures on fraud, not on
4  disclosures of different earnings; is that right?
5  A.      That's -- I'm not sure that that's
6  quite how I put it, but there are a number of
7  different points here.  And -- now, the Karpoff
8  article is very clear about what it -- it looks at
9  on how the sample is constructed on what the
10 sample means.  Now, the sample starts from
11 complaints from the SEC concerning various actions
12 by corporations.
13 Q.      And if look at your report on page 94,
14 at the top of the page it -- it's in paragraph
15 200, which actually starts on page 93.  But the
16 very top of the page on page 94 your report says,
17 "The Karpoff study offers no basis for this
18 conclusion, because the reputation effect it
19 measures is based on the disclosure of fraud, not
20 on the disclosure of different earnings."  Do you
21 see that?
22 A.      That's -- yes.
23 Q.      Okay.
24 A.      I mean for -- for this issue, yes.
25 Q.      Okay.  And so one of your criticisms of

---

112

1  Dr. Feinstein's choice in using the Karpoff
2  article is that the Karpoff study was based on
3  disclosures of just fraud, right?
4  A.      In terms of using his estimate of
5  reputation effect to direct economic cost.  But
6  no, as I said, Dr. Fin -- Professor Feinstein
7  never estimates a direct economic cost on -- for
8  the example that we just talked about of the 0.05
9  cents per share, he has no direct economic cost.
10 You know, so even if you were to think that the
11 Karpoff article can be applied and -- now, I
12 criticize that.  He would need to have a direct
13 economic cost for that quarter which he doesn't
14 have.
15 Q.      Okay.  Now, you mentioned a few minutes
16 ago that Karpoff sample of companies was made up
17 of firms that had been, you know -- I don't know
18 why you if you used the word sued, but that action
19 had been taken against by the SEC?
20 A.      That's correct.
21 Q.      Okay.  And I think that in paragraph
22 188 of your report on page 89, actually in
23 footnote 191 on that page, you describe Karpoff's
24 sample.  Is that an accurate description of your
25 recollection of Karpoff's sample?

---

113

1  A.      Well, that's a cite from his paper that
2  now says that he starts from enforcement actions.
3  Q.      Okay.  Do you know how many enforcement
4  actions he looked at?
5  A.      I think it at this point you're taxing
6  my memory.  I have a vague recollection of 150,
7  but I might be completely wrong.
8  Q.      Okay.  It's actually a little bit more
9  than that.  I'll give you the article because it's
10 not fair for you to try to have to remember the
11 details.  So I'm going to mark this as
12 Exhibit 676.  It is a copy of the Karpoff article,
13 The Cost to Firms of Cooking the Books.
14           - - - - -
15           Thereupon, Exhibit 676 is marked for
16 purposes of identification.
17           - - - - -
18 Q.      Professor Stulz, is that a copy of the
19 Karpoff article that we've been talking about?
20 A.      Yes, it is.
21 Q.      And if you would please turn to
22 page 585 of the article.  In the third full
23 paragraph at the top, doesn't it indicate that
24 they -- that the sample that Karpoff used was of
25 585 enforcement actions?

29 (Pages 110 to 113)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

114

1    A.    That's right. My memory wasn't quite
2  accurate in this. I agree.
3    Q.    And is it your testimony that in each
4  of the 585 enforcement actions that Karpoff
5  studied that the firm was accused of committing a
6  fraud?
7    A.    Well, that -- the sample is constructed
8  from the SEC also DOJ initiating enforcement
9  actions. Now, it doesn't -- it doesn't follow
10  from that that there was trial and a conclusion
11  that fraud had been committed, I believe, but --
12    Q.    So is it your testimony that each of
13  the companies that were included in Karpoff's
14  study was subject to an enforcement action in
15  which it had been accused at least of committing
16  fraud?
17    A.    It's a -- no, it was being accused by
18  the SEC or the Department of Justice of having
19  done some things that didn't meet the requirement
20  of the SEC and the DOJ.
21    Q.    Okay. And isn't it a fact, though,
22  that Karpoff's sample included companies that
23  hadn't been accused of committing fraud?
24    A.    I mean the sample includes only firms
25  that were subject to enforcement actions. Whether

115

1  those enforcement actions might include issues
2  that would not be described as fraud by an
3  attorney, that's possible.
4    Q.    Okay. If you look on page 588 of the
5  Karpoff article that I gave you, the very bottom
6  of the page in the last paragraph, do you see that
7  paragraph that starts with "These financial
8  reporting violations"? Do you see that?
9    A.    I'm sorry. Where am I supposed to --
10    Q.    The very last paragraph on page 588.
11  It starts with "These financial reporting
12  violations...."
13    A.    Yes.
14    Q.    Okay. It says, "These financial
15  reporting violations are often invoked in
16  conjunction with other charges:" And then it
17  says, "454 of the enforcements action include
18  fraud charges brought under the 1933 Securities
19  Act or the 1934 Securities Exchange Act." That --
20  so in Karpoff's sample, not all of the companies
21  have been accused of fraud; is that right?
22    A.    Well, all he says that -- charges were
23  brought under those two acts. I don't know what
24  that -- whether that now excludes other types of
25  -- of fraud. Now, the -- what Karpoff is looking

116

1  at is a very specific set of circumstances that
2  involve intervention by the SEC or the Justice
3  Department.
4    Q.    And the SEC and the Justice Department
5  intervene even when there's no fraud, right?
6    A.    Well, no, obviously the SEC often will
7  send letters to companies asking them about some
8  practices and to justify those practices. Those
9  wouldn't be included as enforcement action in the
10  sample. Those would be different actions.
11    Q.    So is it your testimony that all SEC
12  enforcement actions are -- include charges of
13  fraud?
14    A.    No. No. In the sense that the SEC
15  might have actions where it asks a company to
16  change practices with respect to the -- to
17  disclosures. My understanding is that that's not
18  what the sample here is reflecting.
19    Q.    And your understanding is what? That
20  the sample is reflecting what?
21    A.    Well, I mean that it is a sample about
22  firms that are cooking the books, as -- as the
23  title describes it.
24    Q.    And is it your testimony then that the
25  585 enforcement actions that Karpoff looked at, in

117

1  each one of those actions the company was accused
2  of fraud in some way, shape or form by the SEC?
3    A.    I mean I can't say whether that's the
4  case for every single one of them. But when you
5  look at table 3 and you look at the description,
6  the -- the typical -- the typical case involves
7  civil charges, a lot of them involve criminal
8  proceedings.
9    Q.    Isn't it true that Karpoff studied the
10  impact of the revelation of financial misconduct
11  without regard to whether the firm had been
12  accused of fraud or not?
13    A.    He studies financial misconduct that
14  now comes from enforcement actions from the SEC or
15  the justice department.
16    Q.    And whether those enforcement actions
17  include fraud or not is something you can't tell
18  me?
19    A.    Well, what I can tell you is that now
20  based on the tables that I just noticed that I
21  just mentioned, now the typical case that he looks
22  at is one that involves civil and criminal
23  actions. I would describe that as fraud, but I
24  mean that may not be the accurate term from the
25  perspective of an attorney. But now the typical

30 (Pages 114 to 117)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

---

118

1    situation is that one.
2    Q.    Okay.  You can put that one aside.
3          We are going to shift and start talking
4    about bonds instead of stock.  Okay?  Now, in
5    Professor Ronen's event study that she adopted for
6    purposes of her report, she uses matrix prices; is
7    that right?
8    A.    Well, I'm going to not agree with
9    something you said in the question.  Now, you said
10   that she adopted an event study -- event study is
11   actually different from the ones that was used in
12   class cert.
13   Q.    Okay.  Well, then I will rephrase the
14   question.
15         The event study that Professor Ronen
16   includes in her report uses matrix prices; is that
17   right?
18   A.    That's correct.
19   Q.    And that's something that you don't
20   agree with, right?
21   A.    Well, no, I -- I raise a number of
22   issues with the use of matrix prices.
23   Q.    Do you agree with her use of matrix
24   prices?
25   A.    No.  My conclusion is that the results

---

119

1    that she gets that when now make an unnecessary
2    use of matrix prices are not reliable given that
3    she doesn't account for any of the problems with
4    matrix prices.
5    Q.    And what problems with matrix prices
6    are you referring to?
7    A.    Well, in -- in this case neither
8    Ms. Nettesheim nor Professor Ronen can describe
9    how these prices came about.  There is no way for
10   anybody to examine those prices and ascertain the
11   validity and especially so on the days that are
12   most relevant to this litigation.
13   Q.    Matrix prices are -- are prices that
14   are used in -- in general in evaluating prices for
15   not frequently traded securities; isn't that
16   right?
17   A.    Well, that's not -- no, it's correct
18   that those are prices used to now value portfolios
19   at times that include bonds that are not
20   frequently traded or include derivatives and so
21   on, in which case there would be not enough matrix
22   prices but they would be provided by similar
23   services.  That -- that is correct, but that
24   doesn't change the fact that here we are talking
25   about returns on very specific days where you

---

120

1    would want to get the best possible estimate of
2    the abnormal return since that corresponds to --
3    now a measure of losses by investors.  In cases
4    like that you would want to use the best possible
5    prices you can.  Those wouldn't be matrix prices.
6    Q.    And if you had no data, what would you
7    be left to do?
8          MR. LINKER:  Objection, vague as to the
9    assumption contained in the question.
10   A.    Well, in many ways that's an academic
11   question here, because for the bonds that involve
12   most of the damages, there is data.
13   Q.    Is there data for each day that those
14   bonds traded?
15   A.    No, there's no data for each day.  But
16   now there is data for both September 15 and
17   October 10 that -- that is quite -- quite close
18   for the bonds and that is most important to the
19   damages.
20   Q.    In your report on page 113 in
21   paragraph 235, in the second sentence of that
22   paragraph you say, "The issue of using matrix
23   prices to estimate damages is separate from using
24   matrix prices to establish market efficiency."  Do
25   you see that?

---

121

1    A.    That's correct.
2    Q.    Why is that the case?
3    A.    Well, it's the case because with
4    damages you are focused on the magnitude of the
5    change in price in a way that you are not
6    necessarily focused on when you look at market
7    efficiency.  Now, the exact magnitude with damages
8    is important because it corresponds to what
9    somebody will have to pay and that should
10   corresponds to all transactions.
11   Q.    And what should a researcher do if they
12   want to measure damages in this case when there is
13   insufficient trading data to calculate the
14   abnormal returns?
15         MR. LINKER:  Objection.  Lack of
16   foundation.
17   A.    Well, I mean, so now as I said for the
18   bonds that -- as the bonds were most of the
19   potential damages would be, now there is data that
20   allows you to estimate abnormal returns from
21   transactions.  So now, again, in this case for
22   those bonds, it is -- it is somewhat of an
23   academic issue.  Now, what -- what we certainly
24   know is that you wouldn't just use matrix prices
25   without accounting for the fact that those prices

---

31 (Pages 118 to 121)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

122

1  have -- can have substantial error in them.
2  Q.      And it's your opinion in this case that
3  the matrix prices that Professor Ronen used had
4  substantial error in them?
5  A.      Well, I -- I have a table where I
6  provide, you know, standard deviation of the
7  transaction prices which is -- transaction returns
8  versus the matrix returns on those standard
9  deviations are substantially different.
10 Q.      And is that Exhibit 12 that you're
11 talking about?
12 A.      I don't remember the number of the
13 exhibit, but I would assume that that's what it
14 is.
15        MR. LINKER:  Why don't you look at your
16 report and see if it helps you answer the
17 question.
18 A.      It is Exhibit 12.
19 Q.      Okay.  And in looking at Exhibit 12,
20 the last two rows, 13 and 14, the Ronen -- in row
21 No. 13 it says Ronen transaction return minus
22 matrix returns mean, and then you have three
23 additional columns for -- for the different bonds.
24 And the -- for the AK bond it looks like you've
25 calculated a mean difference of minus .02 percent;

123

1  is that right?
2  A.      That's correct.
3  Q.      Okay.  And then for the AL bond you've
4  calculated a mean difference of .06 percent?
5  A.      That's correct.
6  Q.      And for the AY and BA bond, you've
7  calculated a mean difference of zero percent,
8  right?
9  A.      That's correct.  But --
10 Q.      How --
11 A.      -- so --
12 Q.      Let me finish.  Let me finish.
13        My question to you is how is that a
14 substantial difference between transaction and
15 matrix data if you've calculated very small
16 fraction of a percent changes?
17 A.      Well, on the days of curative
18 disclosures for the type of analysis that is being
19 conducted here, you are not concerned about the
20 mean.  The mean is completely uninformative; it
21 doesn't tell you anything, okay.  What -- in the
22 sense that what you would expect with matrix
23 prices is that -- now, over periods of time the
24 mistakes will largely cancel out.  What you are
25 worried about is what is a mistake on a specific

124

1  day that could lead to large errors in the
2  damages.  And so that's not given by the mean.
3  The mean doesn't tell you anything about that.
4  Q.      Well, where is it on Exhibit 12 that
5  tells us what the differences is on the disclosure
6  days that you just described?
7  A.      Exhibit 12 doesn't give you any
8  information about the disclosure days.  It gives
9  you -- it gives you data for the periods that we
10 are looking at more generally in this litigation.
11 What is relevant here in terms of data is that the
12 standard deviation of the difference between the
13 transaction returns under matrix return is very
14 large compared to the transaction -- I mean to the
15 standard deviation of the matrix returns.  So when
16 you look at this, you know, kind of the range of
17 variation of the error is large compared to the
18 range of variation of the matrix returns
19 themselves.  You know, that tells you that there
20 is a substantial error, though I -- I know you
21 pointed out the means being small, which I mean
22 obviously I agree that the means are small, but
23 the means just tell you that over periods of time
24 now you have positive and you have my -- negative
25 mistakes and they kind of cancel out.

125

1  Q.      Did you calculate what the difference
2  between the matrix and transaction prices were for
3  the September 15th and October 10th days?
4  A.      So I have a table in my report where I
5  show data for the cases where Professor Ronen had
6  both transaction and had matrix prices, and you
7  can see that there can be very substantial
8  differences.
9  Q.      And which table is that that you're
10 talking of?
11 A.      It's not an exhibit.  It's part of the
12 report itself on -- figure L it gives you that
13 kind of information.
14 Q.      And what page are you looking at?
15 A.      106.
16 Q.      Oh, sorry.  Is that the one -- so what
17 is -- what is it that you mean when you say, for
18 example, the simple average is 1.10 percentage
19 points overestimated, what does that mean?
20 A.      That would be the average of those four
21 observations.  What I would focus on is much more
22 the fact that when you look at those numbers,
23 there can be substantial differences between the
24 matrix return and the transaction return on those
25 days.

32  (Pages 122 to 125)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

126

1   Q.      And in Professor Ronen's event study
2   when she had a transaction on consecutive days,
3   she used the transaction returns, didn't she?
4   A.      When -- when she had on consecutive
5   days, she did.  She did not when she had a
6   transaction price on the disclosure days that
7   wasn't proceeded by a transaction price the
8   previous day.
9   Q.      Okay.  So in her event study she used
10  transaction prices when available on consecutive
11  days.  And when they weren't, she used matrix
12  prices as a result, right?
13  A.      That's correct.
14  Q.      Okay.  And she didn't use transaction
15  and matrix prices mixed together; is that right?
16  A.      That's correct.
17  Q.      Okay.  Have you ever used matrix prices
18  when you've provided any kind of opinion on
19  causation, loss causation?
20  A.      I have never performed an -- no, I
21  haven't used matrix prices in my academic work for
22  -- and I haven't used them in, you know, analysis
23  of transactions or valuations in terms of
24  litigation.  I -- now, you cite -- I'm sorry.  I
25  didn't mean you.  I meant Professor Ronen cites an

127

1   instance where now I looked at various indicia of
2   credit markets having changed over a period of
3   time and she focuses on one of those indicia
4   whereas rather than focusing on the whole
5   paragraph.  The paragraph talks about a change in
6   credit indices in general on -- and then I
7   concluded by saying even for SADIA, it changed as
8   well there.  I provided prices that were available
9   when I was doing that.  Now, given the nature of
10  the argument, it didn't -- that was -- what I did
11  was just fine.  It's not at all comparable to what
12  is going on here.
13  Q.      So is -- is your answer to the --
14  simple answer to my question, yes, you've used
15  matrix or evaluation prices in prior expert
16  witness evaluations that you've done?
17  A.      Not in a context like this.
18  Q.      But, yes, you have used them?
19  A.      Well, now --
20  Q.      It's a simple question.
21  A.      It's a simple question that I have
22  mentioned such prices in -- in a case in a very
23  different context for a very different analysis
24  and certainly not in a case where one would do an
25  event study or evaluate an abnormal return.

128

1   Q.      And you did an event study for the
2   bonds in this case, right?
3   A.      That's correct.
4   Q.      And you didn't use matrix prices in
5   your event study here, correct?
6   A.      I use transaction prices.
7   Q.      And therefore since you used
8   transaction prices, I think you mentioned earlier
9   that -- that you did not have transaction data for
10  each day that you studied, right?
11  A.      That's correct.
12  Q.      Okay.  And I think if you look at
13  Exhibit 14 to your report, that's a summary of
14  your bond event study, right?
15  A.      Well, now the question is, then, what
16  is it that you call the event study?  Now, this is
17  a -- this reports estimates of the models for bond
18  prices that I estimated.
19  Q.      Okay.  Your Exhibit 14 says Summary of
20  Bond Event Study Model?
21  A.      Right.  By -- and by model meaning the
22  return model.
23  Q.      Okay.  How is that different in your
24  mind from a bond -- the bond event study that you
25  did?

129

1   A.      Well, this estimates a model.  I mean
2   if you do an event study where you focus on a
3   specific day, that is an additional part to the
4   study which is now looking at confounding events
5   and all of those issues.
6   Q.      Okay.
7   A.      So here we just have the -- the
8   regression model.
9   Q.      Okay.  And looking at Exhibit 14, you
10  have each of the bonds broken out individually,
11  right, except for the AY and the BA bond?
12  A.      That's correct.
13  Q.      Okay.  And you have a column, or I'm
14  sorry, a row, fourth row down, for the number of
15  observations?
16  A.      That's correct.
17  Q.      And are those corresponding numbers, 57
18  for AH for example, the number of transaction data
19  that you had?
20  A.      That's a number of returns that I used,
21  yes.
22  Q.      Okay.  And so does that mean that there
23  were 57 either buys or sells that you looked at
24  for the AH bonds?
25  A.      No.  Those are 57 returns.

33 (Pages 126 to 129)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

130

1    Q.    What is the difference?
2    A.    A return would be going from one price
3  to another price.
4    Q.    Does that mean that you had 57
5  instances where there was a buy and a sell that
6  you were able to calculate a return from?
7    A.    No.  That would be 57 instances where I
8  would have a price on a given day followed by a
9  price on another day.
10    Q.    I see.
11       And there could be any number of days
12  in between those two events, right?
13       MR. LINKER:  Objection.
14    A.    That's -- that's correct.
15    Q.    Okay.  So they're not necessarily 57
16  consecutive days?
17    A.    That's right.
18    Q.    Okay.  And -- and is that same
19  methodology true for each of the other bonds that
20  you list on Exhibit 14?
21       MR. LINKER:  Objection to form.
22    A.    So for the number of observations
23  varies across -- across the bonds and you can see
24  that there are now three bonds that have more than
25  150 observations which are the bonds with -- with

131

1  more trades and you have bonds with a lot fewer
2  observations.  Now, the -- when you have fewer
3  observations, it also means that there are fewer
4  trades hence there are fewer investors bought on
5  that, so the damages issue is, in essence, less.
6    Q.    Okay.  My question simply was:  For
7  each of the other bonds the observation number
8  that you note on Exhibit 14 is indicating the same
9  kind of information that we talked about for the
10  AH bond?
11    A.    Yes.
12    Q.    Okay.  Now, I hate to make you flip
13  around, but if you go back to page 121 of your
14  report, on the top of the page is the figure Q.
15  Is that your event study results for the September
16  15th date?
17    A.    That's correct.
18    Q.    Okay.  And in looking at figure Q,
19  you're not able to calculate returns for two of
20  the bonds, right?
21    A.    That's okay -- I'm sorry.  I didn't
22  mean that's okay.  That's -- that's right.  Those
23  are bonds that trade very little, and if bonds
24  trade very little, it means that there are very
25  few buys or sells during the class period but also

132

1  very few prices.
2    Q.    So you have insufficient data to
3  calculate a return for your event study purposes
4  in this case for those two bonds?
5    A.    That's right.  I want to mention that
6  even in Professor Ronen's study, now the abnormal
7  returns on those days are not significant, and so
8  in that sense, no, we are not talking about bonds
9  that are important as a discussion.
10    Q.    Now, if you look at your column for the
11  AH -- AH bond?
12    A.    Uh-huh.
13    Q.    And in the very last row it says
14  Trading Gap in Trading Days.  Do you see that row?
15    A.    Well --
16    Q.    And there is a 16 associated with a AH
17  bond; do you see that?
18    A.    That's right.
19    Q.    Does that indicate that there were 16
20  trading days between the two prices that you had
21  that you used to calculate the return that you
22  show?
23    A.    That's correct.
24    Q.    And is that same methodology the case
25  for the AJ bond in that there were 23 trading days

133

1  in between the two prices that you used to
2  calculate your return?
3    A.    That's correct.
4    Q.    Okay.  And what, if anything, did you
5  do to evaluate any information that may have
6  impacted the AH or the AJ bond in the trading gap
7  days that you show?
8    A.    I now say explicitly in paragraph 254
9  that I'm giving the abnormal return on them, to
10  draw for the inferences you would need to -- to
11  look at confounding events.
12    Q.    And what did you do to look at the
13  confounding events for the AH bond in those 16
14  trading days between the two prices that you had?
15    A.    Well, paragraph 254 says that you would
16  have to -- to do that.  Now, with -- that analysis
17  hasn't -- hasn't been conducted, not even a normal
18  return, and that's the extent of what I do here.
19    Q.    Okay.  And -- and did you do any
20  analysis of the confounding information as it
21  relates to the AJ bond that would have effected
22  the prices in the 23 trading gap days that you
23  show?
24    A.    No, what I -- what I'm doing here is to
25  show that you can obtain an abnormal return.  Now,

34  (Pages 130 to 133)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

134

1  as you know, Professor Ronen doesn't look at
2  confounding information anyway, so in that sense
3  the results are comparable to the ones she has.
4  Q.    So you didn't do anything to look at
5  **the confounding information that may have affected**
6  **the price of either one of those bonds between the**
7  **two transaction data points that you used to**
8  **calculate the residual return?**
9  A.    Not when I'm doing --
10       MR. LINKER:  Objection, hypothetical
11  with assumptions for which there's no foundation.
12  A.    I'm sorry.  Can you repeat the
13  question?
14  Q.    **Sure.**
15       **My question was -- was simply this:**
16  **For the AH and the AJ bonds, you performed no**
17  **analysis of any confounding information that may have**
18  **effected the price of the bonds that may have**
19  **entered the market during the trading gap days**
20  **that you note on Exhibit -- or figure Q in your**
21  **report?**
22       MR. LINKER:  Same objection.
23  A.    I say in my report that I didn't do
24  that.  That was not what I -- what I did and say
25  so very explicitly it measures the abnormal

135

1  returns.
2  Q.    **Okay.  And if you turn the page please**
3  **to figure R.  That's on page 122.  Is that your**
4  **event study analysis as it relates to the October**
5  **10th disclosure?**
6  A.    **Yes.**
7  Q.    **Okay.  And for this disclosure, you are**
8  **only able to calculate returns for three of the**
9  **eight bonds, right?**
10  A.    That's right.  Remember that I -- you
11  know, I require -- and that applies to figure Q as
12  well, I require an actual price on the day of the
13  event.
14  Q.    **Okay.  And so --**
15  A.    And --
16  Q.    **I'm sorry.  Go ahead.  I didn't mean to**
17  **interrupt you.**
18  A.    And so that's -- no, that's why we
19  don't have -- that's why we don't have estimates
20  for -- for the other days.  And also to show
21  returns where somebody -- the trade corresponds to
22  an actual trade on -- on that day.
23  Q.    **And you didn't do an event study**
24  **analysis for October 11th, right?**
25  A.    That's correct.

136

1  Q.    **Okay.**
2  A.    In the -- I mean I followed
3  Mr. Nettesheim on this.
4  Q.    **Okay.  Now, just like with the stock,**
5  **counsel asked you to do an alternative damage**
6  **analysis related to the bonds too; is that right?**
7  A.    That's correct.  I just want to point
8  out if I can -- now, you -- a lot of those bonds
9  on both, on the 15th and the 10th that I show
10  abnormal returns, have very short windows for the
11  returns.  Now, the AK bond has -- has no trading
12  gap.
13  Q.    **Okay.  So getting back to my -- to my**
14  **previous question.  As with the stock, counsel**
15  **asked you to estimate an alternative damage**
16  **scenario with regard to the bonds; is that right?**
17  A.    That's right.
18  Q.    **Okay.  And in doing so with regard to**
19  **the bonds, you didn't use your bond event study as**
20  **part of that analysis, right?**
21  A.    That's -- that's correct in the same
22  ways that I did not use it for the stock.
23  Q.    **Okay.  And instead you used your stock**
24  **event study?**
25  A.    No.

137

1  Q.    **Oh, you didn't use your stock event**
2  **study?**
3  A.    No.
4  Q.    **Okay.  If you look, please, at page 137**
5  **of your report in paragraph 287, at the top of the**
6  **page second line -- well, first line:  "For the**
7  **purposes of estimating inflation in the eight Dana**
8  **bonds as of July 20th, 2005, I use as an import my**
9  **estimates of alleged inflation in the Dana stock**
10  **as of July 20th."**
11  A.    That's right.
12  Q.    **And --**
13  A.    But that's -- I'm sorry.  I -- we may
14  -- we may be referring to different things here.
15  Q.    **What is it -- what is it that you used?**
16  A.    So what I use in the stock damages
17  study is the earnings response coefficient model.
18  Q.    **I see.**
19  A.    And what I use in the bond damages is,
20  again, the earnings response coefficient model.
21  Q.    **Okay.  So you used the earnings**
22  **response model that you calculated for the Dana**
23  **stock in your evaluation and estimate for the Dana**
24  **bonds?**
25  A.    That's correct.

35 (Pages 134 to 137)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

138

1    Q.    Okay.  Why didn't you use your bond
2    event study?
3    A.    For the same reason that I don't use my
4    stock event study for the damages analysis that I
5    conducted.  Now, I was asked to estimate inflation
6    associated with different restatement assumptions,
7    and therefore I had to estimate what would be the
8    impact on the stock price of different restatement
9    assumptions.  To do that, you need to have a model
10   like the one that I used and apply that model to
11   the different assumptions.  I was focused on
12   estimating inflation during the class period and
13   that's what I do.  And the same applies to the
14   bond study in the sense that what I was asked is
15   to show the impact on the bonds of making
16   different -- of having different accounting
17   numbers being disclosed.  And to do that you need
18   to follow the approach that I did.
19   Q.    Did all of Dana's bonds react in the
20   same exact way to the information that was
21   disclosed on September 15th and/or September --
22   and/or October 10th?
23   A.    Well, I mean, no, bonds could react
24   differently for a whole host of issues, some
25   having to do with the disclosures, some not having

139

1    to do with the disclosure, some having to do with
2    the nature of trading and so on.  The -- now,
3    Professor Ronen doesn't provide evidence that the
4    reactions are statistically different.  So in that
5    sense I don't know what -- what the answer is for
6    -- for her data.
7         But now whether they responded in the
8    same way or not is completely irrelevant to the
9    analysis that I do.
10   Q.    How could you measure the inflation
11   from bond to bond not knowing if bond 1 reacted
12   differently to the information than bond 2 did
13   based on its coupon rate or -- some other
14   characteristic that may be different between the
15   two bonds?
16        MR. LINKER:  Objection.  The question
17   is vague in that it specifies no date.
18   A.    Well, I mean Professor Ronen doesn't do
19   it -- do that either.  No, she doesn't look at the
20   price impact of disclosures about the restatement.
21   So she hasn't -- she hasn't done that and she
22   hasn't shown that there are differences.  But now,
23   what I did on -- was to use my own model of the
24   impact of changes in equity prices on bonds and
25   apply that model.  So what I'm doing is exactly

140

1    what she does.  Now, you might say that's too
2    simplistic, but then that criticism applies to her
3    as well.  Now, you obviously could have a much
4    more complicated model at the bond level.  She
5    chose not to do that and I decided to follow her.
6    And --
7    Q.    What part of -- I'm sorry.  I thought
8    you were done.
9    A.    Yeah, to follow her in that so that
10   there wouldn't be a debate about bond valuation
11   models used.
12   Q.    What part of Professor Ronen's bond
13   estimate includes an evaluation of Dana's equity
14   performance?
15   A.    Every piece of analysis that she does
16   that involves what now in this litigation has been
17   called the equity question, every piece of that
18   proceeds exactly the same way as I -- as I do.  It
19   makes the same assumptions and is exactly the
20   same.
21   Q.    And how is it exactly the same?  Give
22   me a reason.
23   A.    Well, she has one adjustment
24   coefficient that is exactly the same for every
25   bond that she has.

141

1    Q.    And is that because there's just one
2    equity cushion that applies to the bonds?
3    A.    Well, that's not because of that.
4    That's because of the assumptions she makes on the
5    model she chooses to use.
6    Q.    Which assumptions are those?
7    A.    Well, she uses to -- she chooses to use
8    the Black-Scholes model applied to all of the
9    bonds together of the firm, and so she's assuming
10   in that that the equity cushion has the same
11   impact on every single bond that she's looking at.
12   Q.    And she uses that Black-Scholes model
13   to adjust the inflation rates per bond that she's
14   calculated in her bond event study; isn't that
15   right?
16   A.    That's right.  But she's making exactly
17   the same proportional adjustment that doesn't take
18   into account the characteristics of the bonds.
19   Q.    And her bond -- and your testimony then
20   is her bond event study doesn't accommodate the
21   different characteristics of the bond and measure
22   how those characteristics would impact that
23   particular bond?
24   A.    My testimony is that any adjustment
25   that she makes taking it -- to take into account

36  (Pages 138 to 141)

142

1  the equity cushion assumes that the effect is
2  exactly the same across all of the bonds of the
3  equity cushion. That's exactly the same as what I
4  do. I did this because she had done it.
5  Q. And how is it that starting with your
6  earnings response model for the stock accounts for
7  the different characteristics and responses that
8  each of the bonds may have experienced?
9  MR. LINKER: Objection. Lack of
10 foundation. Misstates the prior testimony.
11 A. What I said on -- is now the approaches
12 that she takes is based on the theory that the
13 value of the bonds depends on the magnitude of the
14 equity cushion. She has a model to take that into
15 account which she calls a Black-Scholes model, and
16 that's a model that I use. So I do absolutely
17 exactly what -- what she does. Where we differ is
18 that she backcasts from the matrix abnormal
19 returns, now, which -- without taking into account
20 confounding information that she backcasts from
21 that to July 20. I don't do that because I am
22 focused on direct measures of inflations. And so
23 what I want to know is what's the difference in
24 bonds given that the company makes a different
25 announcement about accounting earnings than what

143

1  it did.
2  Q. Now, you say that you used the
3  Black-Scholes calculation in exactly the same way
4  that Professor Ronen does.
5  A. Absolutely.
6  Q. Right?
7  Okay. Now, Professor Ronen, we can
8  agree, applied her Black-Scholes calculation to
9  the returns that she calculated using her bond
10 event study, right?
11 A. Well, what she does has two pieces.
12 Now, she looks at abnormal returns using an event
13 study and then she backcasts those abnormal
14 returns taking into account the impact of the
15 equity cushion, okay. And so she assumes that
16 changes in the equity cushion are going to affect
17 bond prices. And that assumption that she makes
18 and the way that she determines it is exactly the
19 same as what I do. There is no difference.
20 Q. Now, paragraph 9 of your report when
21 you're summarizing your opinions with regard to
22 this alternative analysis -- if you look it's on
23 page 7. It's the last bullet point in paragraph
24 9. It says that -- that you conducted your
25 analysis based on academic research in financing

144

1  and accounting. And I look at paragraph 87
2  through the end of your report, which is where you
3  talk about your alternative damages for Dana
4  bonds, and I don't see any academic articles
5  cited. What is your authority for the model that
6  you used to do this alternate estimate of damages
7  for the bonds?
8  A. I -- no, I didn't expect to hear back
9  from Professor Ronen in the way that I did. I
10 think I was a bit naive. Now, in the sense that
11 in the first report she said, well, it's widely
12 accepted that we have this equity cushion and that
13 it plays a role and that we can use a
14 Black-Scholes model. Now, that's what she says in
15 the first report.
16 Q. Uh-huh.
17 A. And so my reaction was, okay, let's go
18 from that. And so given that she said it's widely
19 accepted in her first report, why would I need to
20 provide citations for what I am doing given that
21 she has done it and she says it's widely accepted.
22 Q. Well, because your report in one place
23 says you did it according to, you know, academic
24 research, and then the area where your opinions
25 are explained, it's absent. So I was curious why

145

1  there was no citation there. If there's -- if
2  you're telling me that there's no citation because
3  Professor Ronen said it's widely accepted and you
4  -- and you are adopting that, then that's fine.
5  But that's what I --
6  A. Okay.
7  Q. -- need to know.
8  A. Yeah, I mean I'm using the
9  Black-Scholes model, which is the one that she's
10 using. I mean, now in terms of understanding the
11 equity cushion, that's -- now, that's been a
12 reference that -- that you would give, or a Merton
13 model which is probably a better reference. But
14 now what I did was follow her and I didn't think I
15 needed to justify the role of the equity cushion
16 given that she said it was widely accepted.
17 Q. You just mentioned another model and I
18 didn't understand what you said.
19 A. Oh, Merton.
20 Q. Merton?
21 A. M-E-R-T-O-N.
22 Q. And you said that that one was a -- was
23 it a better model?
24 A. Well, I mean it's closely related.
25 Now, I have a textbook on those issues and there

37 (Pages 142 to 145)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

146

1  is a chapter in that textbook that talks about
2  them, so I could have cited my textbook.
3  **Q.    Okay. Well, I didn't understand the --**
4  A.    Right.
5  **Q.    -- name.**
6  A.    Merton.
7  **Q.    Merton.**
8        Okay. And then so your use of -- your
9  **methodology here is an attempt to just mimic what**
10 **Professor Ronen did?**
11 A.    No. So what I want to do in my
12 analysis is estimate the impact on bond prices of
13 different earnings releases from the ones that
14 actually took place. Now, so my attempt is to
15 estimate what the bond prices would have been in
16 three different sets of "but for" world, okay. To
17 do that, I need to be able to go from different
18 equity prices to different bond prices, okay. And
19 so there are a number of different ways that you
20 could do that having different bond valuation
21 models, okay. And so the way I decided to do that
22 was to do it using the approach that Professor
23 Ronen had used which was what she calls the
24 Black-Scholes model. And so that's what I did.
25 **Q.    Okay. Let me take a minute. I'm going**

147

1  **to go back and make sure that I don't have**
2  **anything else to ask you, okay?**
3        MR. LINKER: Off the record.
4        MS. WYMAN: Let's go off the record for
5  five minutes. Let me go back through all of this
6  stuff.
7        THE VIDEOGRAPHER: We are off the
8  record at 1:58.
9        (A short recess is taken.)
10       THE VIDEOGRAPHER: We are back on the
11 record at 2:05.
12 **Q.    Professor Stulz, thank you very much**
13 **for your time. I just have a couple final**
14 **questions for you.**
15 **On how many occasions can you estimate**
16 **that you've provided a causation or damages**
17 **opinion not relating to bonds?**
18 A.    I'm not quite sure what the answer is.
19 At least one, but there may be more than that.
20 **Q.    Is it fair to say that most of the**
21 **expert analysis that you've done involves stock?**
22 A.    Yeah, there are some cases -- well,
23 that's -- that's not right. That's not right. I
24 have been involved in many cases involving bonds
25 and bond markets and derivatives on bonds, so I've

148

1  done plenty of cases involving fixed income.
2  **Q.    Okay. And -- and you've provided**
3  **expert opinion on causation issues and damage**
4  **issues related to bonds for a particular company**
5  **on at least one other occasion; is that what you**
6  **said?**
7  A.    Right. Now, so -- now, a number of
8  those cases involved damages analysis. And on
9  some -- some of them are in securities litigation
10 and some -- some are not.
11 **Q.    Can you remember any of the companies**
12 **that were involved in the cases that you're**
13 **thinking of where you gave causation or damages**
14 **opinions related to bonds?**
15 A.    Well, in -- I mean in that -- I would
16 have to look at a more extensive list than the one
17 we have at the back of the report, but the Dodona
18 reports on the Lehman bonds now where analysis
19 involving damages on losses involving bonds.
20 **Q.    And -- and you gave opinions in the**
21 **Lehman Brothers -- in a Lehman Brothers case**
22 **concerning damage related to bonds?**
23 A.    In a -- so in -- in the case that is
24 listed in the testimony, yeah.
25 **Q.    Okay. Are there any others that you**

149

1  **can remember off the top of your head?**
2  A.    So, I'm trying to -- I mean I remember
3  a number of cases involving bonds and losses
4  involving bonds and I'm trying to -- I mean I'm
5  not sure I can remember which ones were class
6  actions as opposed to other litigation.
7  **Q.    Okay. Have you ever testified at trial**
8  **concerning causation or damage issues related to**
9  **bond opinions that you've given?**
10 A.    Well, of the cases that I can think of,
11 they -- they all settled. There was one case
12 where I testified on bond securities that went to
13 trial, but the part that went to trial wasn't the
14 securities class action if I remember -- it wasn't
15 the securities class action.
16 **Q.    Okay. And have you ever had an opinion**
17 **or a portion of an opinion that you've tendered to**
18 **a Court excluded?**
19 A.    Well, I'm not sure what you mean by
20 "excluded." Now, there's never been a successful
21 Daubert challenge if that's what you're asking.
22 **Q.    That -- that's a fair reading of my**
23 **question. So you've never had a successful**
24 **Daubert challenge against any opinion that you've**
25 **offered?**

38 (Pages 146 to 149)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

150

1  A.    Not that I know of.
2  Q.    Okay.  I have no more questions for
3  you.  Unless I have follow-up questions if these
4  gentlemen have questions for you, I think we're
5  done.
6        MR. LINKER:  No questions.
7        MR LEVINE:  No questions.
8        MR. SIEGEL:  No questions.
9        MS. WYMAN:  Thank you very much,
10  Professor, for your time.
11       THE VIDEOGRAPHER:  This concludes the
12  deposition.  We are off the record at 2:10.
13       - - - - -
14       Thereupon, the foregoing proceedings
15       concluded at 2:10 p.m.
16       - - - - -
17
18
19
20
21
22
23
24
25

152

1  State of Ohio   :   C E R T I F I C A T E
   County of Franklin: SS
2
3      I, Stacy M. Upp, a Notary Public in and for
   the State of Ohio, certify that René M. Stulz,
   Ph.D. was by me duly sworn to testify to the whole
4  truth in the cause aforesaid; testimony then given
   was reduced to stenotype in the presence of said
5  witness, afterwards transcribed by me; the
   foregoing is a true record of the testimony so
6  given; and this deposition was taken at the time
   and place specified on the title page.
7
8      Pursuant to Rule 30(e) of the Federal Rules of
   Civil Procedure, the witness and/or the parties
9  have not waived review of the deposition
   transcript.
10     I certify I am not a relative, employee,
   attorney or counsel of any of the parties hereto,
11  and further I am not a relative or employee of any
   attorney or counsel employed by the parties
12  hereto, or financially interested in the action.
13     IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal of office at Columbus,
14  Ohio, on May 29, 2015.
15
16
17
18
19
20  _____
   Stacy M. Upp, Notary Public - State of Ohio
21  My commission expires August 6, 2016.
22
23
24
25

151

1
2  STATE OF _____ )
3                          ) :ss
4  COUNTY OF _____ )
5
6
7      I, RENÉ M. STULZ, Ph.D., the
8  witness herein, having read the foregoing
9  testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15       _____
16       RENÉ M. STULZ, Ph.D.
17
18
19
20  Sworn and subscribed to before me,
21  this _____ day of _____, 2015.
22
23  _____
24    Notary Public
25

153

1           I N D E X
2  Examination By              Page
3  Ms. Wyman - Cross              6
4
   Exhibits                    Page
5
   Exhibit 675 - Stulz's report, 10-8-14        7
6
   Exhibit 676 - The Cost to Firms of         117
7       Cooking the Books
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

39 (Pages 150 to 153)

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

154

1        INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over carefully
4  and make any necessary corrections. You should state
5  the reason in the appropriate space on the errata
6  sheet for any corrections that are made.
7      After doing so, please sign the errata sheet
8  and date it.
9      You are signing same subject to the changes
10  you have noted on the errata sheet, which will be
11  attached to your deposition.
12      It is imperative that you return the original
13  errata sheet to the deposing attorney within thirty
14  (30) days of receipt of the deposition transcript by
15  you. If you fail to do so, the deposition transcript
16  may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

155

1           E R R A T A
2
3
4
5      I wish to make the following changes,
6  for the following reasons:
7
8  PAGE LINE
9  ___ ___ CHANGE:_____
10  REASON:_____
11  ___ ___ CHANGE:_____
12  REASON:_____
13  ___ ___ CHANGE:_____
14  REASON:_____
15  ___ ___ CHANGE: _____
16  REASON:_____
17  ___ ___ CHANGE: _____
18  REASON:_____
19  ___ ___ CHANGE: _____
20  REASON:_____
21
22  _____  _____
23    WITNESS' SIGNATURE        DATE
24
25

40  (Pages 154 to 155)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

156

**A**

ability 55:10
able 20:5
  38:16 92:20
  130:6
  131:19
  135:8
  146:17
ABN 34:6
abnormal
  61:6 66:16
  66:16 73:7
  84:25 106:1
  120:2
  121:14,20
  127:25
  132:6 133:9
  133:25
  134:25
  136:10
  142:18
  143:12,13
absent
  144:25
absolutely
  35:25
  142:16
  143:5
academic
  9:16,19
  13:14 16:9
  21:14 28:19
  67:12,18,24
  68:3 71:12
  120:10
  121:23
  126:21
  143:25
  144:4,23
acceptable
  107:9
accepted
  144:12,19
  144:21
  145:3,16
accommod...

141:20
account
  61:17 76:8
  79:15 81:15
  83:12,18
  106:12,25
  107:2,4
  119:3
  141:18,25
  142:15,19
  143:14
accounting
  28:17 97:12
  121:25
  138:16
  142:25
  144:1
accounts
  105:20
  142:6
accumulated
  13:10
accuracy
  23:19
accurate
  20:24 68:24
  69:1 112:24
  114:2
  117:24
  154:16
accused
  114:5,15,17
  114:23
  115:21
  117:1,12
acquired
  51:1,7,10
  52:16,20
  53:11 54:10
  54:17
Acquisition
  8:10
Act 115:19
  115:19
action 1:7,13
  33:9,12,15
  33:16 34:19

35:3,6,7,8
  36:12
  112:18
  114:14
  115:17
  116:9
  149:14,15
  152:12
actions 34:15
  35:18
  111:11
  113:2,4,25
  114:4,9,25
  115:1
  116:10,12
  116:15,25
  117:1,14,16
  117:23
  149:6
activities
  17:14 26:22
acts 115:23
actual 93:16
  135:12,22
add 106:15
  107:19
added 21:7
  21:16
addition
  24:14 25:12
additional
  8:6 11:12
  12:5,10,24
  32:13 61:14
  61:15
  122:23
  129:3
additions
  31:24 32:5
address 6:17
  6:17,20
  12:14 73:23
  73:23
addressed
  35:13,24
adequately
  76:7

adjust 141:13
adjustment
  140:23
  141:17,24
adopted
  118:5,10
adopting
  145:4
adverse
  79:23 84:13
affect 50:13
  69:23 77:13
  107:7
  143:16
affixed
  152:13
aforesaid
  152:4
Afternoon
  109:1
ago 97:7,16
  112:16
agree 37:4
  62:19,24
  63:6 109:16
  109:21
  114:2 118:8
  118:20,23
  124:22
  143:8
agreement
  2:12 4:11
AH 129:18
  129:24
  131:10
  132:11,11
  132:16
  133:6,13
  134:16
ahead 102:12
  135:16
AJ 132:25
  133:6,21
  134:16
AK 122:24
  136:11
al 5:5,5 123:3

allegation
  62:18
alleged 35:14
  62:12 137:9
allow 98:24
  76:20 77:9
  98:10
  121:20
alternate
  144:6
alternative
  136:5,15
  143:22
  144:3
America 10:2
  34:21 35:21
amount 51:1
  51:11
amounts 23:8
  24:22
AMRO 34:6
analysis
  36:19 41:19
  41:24 46:19
  46:25 47:11
  47:16 59:6
  63:10 64:12
  64:13,14,19
  68:23 69:11
  69:24 81:9
  81:25 82:20
  83:9 84:12
  84:24 85:1
  85:23 88:7
  89:4 95:20
  95:21 98:1
  98:8 101:3
  110:25
  123:18
  126:22
  127:23
  133:16,20
  134:17
  135:4,24
  136:6,20
  138:4 139:9

140:15
  143:22,25
  146:12
  147:21
  148:8,18
analyst 28:22
  42:5 46:24
  70:15 71:14
  71:17 72:12
  72:15,19,25
  85:3,8,19
  86:25
analysts
  46:22 54:20
  62:25 63:21
  63:23 71:12
  72:7 77:18
  79:10 80:15
and/or
  138:21,22
  152:8
announce
  5:11 74:9
announced
  54:8 75:9
  105:21,25
announcem...
  71:5 73:20
  73:24 74:14
  76:9 79:2,9
  79:16 80:7
  80:20 81:10
  81:20 82:6
  82:21 83:12
  84:7 85:5
  86:22 99:4
  102:14
  105:10,15
  106:6,21,22
  109:18
  142:25
announcem...
  78:8 84:2
  87:11 88:4
  98:22
  101:17
  102:21

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

157

103:8,15
104:23,24
105:18
**annual** 99:15
**ANNUITY**
1:11
**answer** 18:23
18:25 20:6
28:2 36:4
45:7 48:5
53:23 63:3
74:19 77:6
81:8 92:8
92:17,18,21
92:25 93:20
103:20,22
122:16
127:13,14
139:5
147:18
**answered**
76:25
**answering**
92:12
**anticipated**
31:23
**anybody**
17:17 18:9
44:8 50:16
119:10
**anyway**
134:2
**apologize**
59:16,20,22
92:20
**apparently**
56:5,8
**appear** 7:18
**appeared**
88:22
**appearing**
5:25
**appears** 7:17
**applied** 8:22
112:11
141:8 143:8
**applies**

135:11
138:13
140:2 141:2
**apply** 138:10
139:25
**approach**
72:17 84:10
94:25
138:18
146:22
**approaches**
142:11
**appropriate**
24:19 154:5
**appropriat...**
96:12
**approxima...**
26:20,21
27:2
**approxima...**
30:18
**April** 47:25
48:11 72:4
72:5,6
**arbitration**
34:2
**area** 10:22
144:24
**areas** 11:4
**argue** 96:23
101:16
**argument**
83:4,6
99:13
101:17
127:10
**arrangement**
24:21
**arriving**
60:23
**Arthur** 3:16
5:19 19:10
**arthur.link...**
3:17
**article** 85:14
94:1,20
95:7 109:13

110:2,15,16
110:17,24
111:2,8
112:2,11
113:9,12,19
113:22
115:5
**articles** 21:14
21:15 28:19
42:4 85:7
144:4
**ascertain**
119:10
**Asia** 10:1
**aside** 118:2
**asked** 11:15
12:4,7,8,19
14:19 15:10
17:23 20:15
27:13 29:9
85:22 136:5
136:15
138:5,14
**asking** 27:23
92:17 116:7
149:21
**asks** 116:15
**aspects** 11:6
**assess** 84:12
**assessed**
63:15
**assessing**
39:5
**assessment**
54:11,16
56:15 59:2
61:2 88:13
**assist** 15:5
16:5
**assistance**
23:22
**assistants**
16:9
**assisting**
17:13 23:14
23:18
**associated**

65:22 72:3
83:1 101:8
105:9
132:16
138:6
**assume** 37:6
37:8 106:19
122:13
**assumes**
142:1
143:15
**assuming**
56:12 63:5
141:9
**assumption**
99:6 120:9
143:17
**assumptions**
107:5
134:11
138:6,9,11
140:19
141:4,6
**assured** 78:2
**attached**
151:12
154:11
**attempt**
14:10 76:12
77:21 146:9
146:14
**attempts**
99:12
**attendance**
4:6
**attorney**
22:22 115:3
117:25
152:10,11
154:13
**Attorney/cl...**
45:5
**attribution**
63:10 84:24
85:1
**August** 49:17
74:1 152:21

**authority**
144:5
**available**
47:6 68:5
69:7 126:10
127:8
**Avenue** 3:15
**average**
63:11 65:10
65:13 90:12
91:13,14
92:5 93:4
93:16,17
94:23
125:18,20
**averages** 90:9
**aware** 69:8
**AY** 123:6
129:11
**a.m** 1:20 2:6
4:2

_____
**B**
**BA** 123:6
129:11
**back** 27:8
28:21 35:21
37:2 41:15
44:19 53:9
56:19 58:15
59:21 64:1
72:24 73:7
73:9,16
78:14 92:15
109:4
131:13
136:13
144:8 147:1
147:5,10
148:17
**backcasts**
142:18,20
143:13
**background**
25:19,22
26:1,6,8
**Bank** 8:20

34:6,20
35:21
**Banking** 9:6
9:16
**bankruptcy**
73:20,24
74:3,7,10
74:11,16,21
74:23 75:1
75:5,9,15
75:21,24
76:9 77:13
77:19 78:7
78:25 79:15
80:6,20
81:10 83:15
83:19 84:6
85:5
**based** 24:5
25:13 29:15
38:7 56:12
60:23 67:15
67:25 85:24
89:18 90:8
111:3,19
112:2
117:20
139:13
142:12
143:25
**basically** 96:8
**basis** 13:5,13
14:16 49:19
69:17
111:17
**Bear** 33:7,10
**Beaver** 94:1
94:12,19
95:7
**behalf** 1:5,11
3:13,18
5:10,14,17
5:20,23 6:1
6:2
**belief** 45:2,19
45:20
**beliefs** 45:13

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

158

**believe** 13:17
16:18 20:20
26:11 30:5
30:15 34:16
35:1,23
36:21 44:6
72:4 92:16
103:15
114:11
**believed**
43:10,19
44:5
**benchmark**
95:2
**benefit** 108:5
**benefits**
106:18
**Bernard** 1:14
6:3
**best** 14:10
68:4 120:1
120:4
**better** 14:4
45:1,12
61:18
145:13,23
**beyond** 36:6
106:2
**bias** 88:22
96:18,25
**bid** 100:9
101:5,12
102:6,6,13
**bids** 101:8
**big** 13:11
77:19 101:6
**bigger** 68:19
71:8 83:4
95:7
**bill** 22:21
23:4,6
**billing** 22:5
25:9
**billings** 23:17
23:22 24:6
24:11
**bills** 21:24

**birthday**
19:10,13
**bit** 109:12
113:8
144:10
**Black-Scho...**
141:8,12
142:15
143:3,8
144:14
145:9
146:24
**board** 16:19
**body** 37:2
**bond** 39:7,12
39:25,25
40:6,8,10
40:19,25
41:3,7
122:24
123:3,6
128:14,17
128:20,24
128:24
129:11
131:10
132:11,17
132:25
133:6,13,21
136:11,19
137:19
138:1,14
139:11,11
139:11,12
140:4,10,12
140:25
141:11,13
141:14,19
141:20,21
141:23
143:9,17
146:12,15
146:18,20
147:25
149:9,12
**bonds** 37:9
39:8,13,17

39:19,21
40:2,12
118:4
119:19
120:11,14
120:18
121:18,18
121:22
122:23
128:2
129:10,24
130:19,23
130:24,25
131:1,7,20
131:23,23
132:4,8
134:6,16,18
135:9 136:6
136:8,16,19
137:8,24
138:15,19
138:23
139:15,24
141:2,9,18
142:2,8,13
142:24
144:4,7
147:17,24
147:25
148:4,14,18
148:19,22
149:3,4
**books** 113:13
116:22
153:7
**born** 21:5
**bottom** 34:21
37:14 43:9
115:5
**bought** 131:4
**Boulevard**
3:10
**BP** 35:6 36:1
**break** 41:10
73:11,12
108:7
109:10

**broadly**
79:22
**Broadway**
3:4
**broken**
129:10
**Brothers**
148:21,21
**brought**
102:5
115:18,23
**bullet** 143:23
**Burdick** 3:20
**Burns** 1:8 5:5
5:21 52:1
**business**
26:10
**businesses**
76:23
100:20
**buy** 130:5
**buys** 129:23
131:25
———————
**C**
**C** 1:8 3:1
152:1,1
**CA** 3:4
**calculate**
66:13
121:13
125:1 130:6
131:19
132:3,21
133:2 134:8
135:8
**calculated**
61:20 66:21
67:4 68:19
89:21 93:10
94:21
122:25
123:4,7,15
137:22
141:14
143:9
**calculation**

85:21 96:13
143:3,8
**calibrated**
96:13
**calibrating**
89:6
**call** 12:23,25
17:4 65:16
66:16,17
81:18
128:16
**called** 4:8
33:3 53:12
54:20
140:17
**calls** 42:6
43:22,25
44:9 45:18
142:15
146:23
**cancel** 123:24
124:25
**cap** 62:14
**capture**
83:21
**captured**
107:10
**care** 104:16
**careful** 38:14
**carefully**
12:22 154:3
**carriers**
22:17
**case** 5:6,21
6:1,3,14
7:12 9:20
10:12,18
15:20 21:25
25:2 29:8
31:1,10,10
32:10,20,21
32:22 33:1
33:10,11,12
33:14,24
34:7,11,21
34:23 35:2
36:3,10,25

44:22 59:2
61:14 73:22
76:19 95:6
95:16 117:4
117:6,21
119:7,21
121:2,3,12
121:21
122:2
127:22,24
128:2 132:4
132:24
148:21,23
149:11
**cases** 5:15,18
24:23 27:13
27:14 32:11
32:13,18
33:8,9,19
33:22 34:13
34:17,19
35:17 36:6
120:3 125:5
147:22,24
148:1,8,12
149:3,10
**cash** 8:13
62:21 63:8
109:24
**Casino** 34:7
**causation**
35:19 36:14
60:15
126:19,19
147:16
148:3,13
149:8
**cause** 57:17
58:22 152:4
**caused** 52:17
58:13 82:22
**cent** 87:4,6
89:20 90:3
90:5 91:20
91:21,25
92:2 94:15
**Center** 9:10

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

159

cents 66:6,10
66:22 67:6
86:23 87:1
89:22 90:4
91:3 93:11
94:13 112:9
**CEO** 16:20
16:21
100:12
**cert** 28:14
29:10 36:1
36:6,8,16
36:18 76:19
118:12
**certain** 25:14
60:9
**certainly**
31:5 77:23
121:13
127:24
**certification**
36:25
**certify**
151:10
152:3,10
**Chair** 9:6,15
**chairman**
16:18
100:11
**challenge**
149:21,24
**challenging**
78:9 79:2
**change** 12:1
52:23 54:24
65:20 66:5
66:9,12,13
66:15,18,21
67:4,6
68:13 70:2
73:3 107:6
116:16
119:24
121:5 127:5
155:9,11,13
155:15,17
155:19

changed 8:2
46:10,15
52:24,24
65:8 127:2
127:7
**changes** 8:23
52:18 61:21
63:16 65:6
65:11 77:4
100:1,3,24
105:7,20
123:16
139:24
143:16
154:9 155:5
**Change/Ch...**
68:11
**changing**
48:10 49:5
**chapter**
146:1
**character**
4:15
**characteris...**
139:14
**characteris...**
39:8,13,17
39:18,19
40:10 41:3
84:4 141:18
141:21,22
142:7
**charges**
115:16,18
115:22
116:12
117:7
**checked**
12:25 14:21
**Chicago**
26:10
**China** 35:7
**choice** 112:1
**choose** 29:4
101:22
102:20
**chooses** 141:5

141:7
**chose** 140:5
**Cindy** 15:23
15:25
**circumstan...**
74:6 116:1
**citation** 42:20
42:20 43:15
45:23 49:20
49:22 145:1
145:2
**citations**
77:18
144:20
**cite** 30:5,14
43:24 44:2
44:2 47:3
85:3,11,11
85:15 94:2
113:1
126:24
**cited** 31:2,6
42:9 67:23
67:23 144:5
146:2
**cites** 126:25
**civil** 1:7,13
117:7,22
152:8
**claim** 50:21
54:6
**clarified**
60:11
**class** 28:14
29:10 33:9
33:12,15,16
34:15,19
35:2,6,7,7
35:18 36:1
36:6,8,12
36:16,18,24
37:5 41:20
43:22 44:15
63:17 65:7
67:11 76:19
79:20 102:3
104:4

118:12
131:25
138:12
149:5,14,15
**clear** 18:2
25:8 98:24
111:8
**clearly** 26:4
59:10
**close** 61:5
71:15 97:16
120:17
**closely**
145:24
**closer** 75:4
**closures**
100:15
**coefficient**
88:16 89:7
93:22 94:12
94:21 99:5
104:15
107:12
137:17,20
140:24
**coefficients**
89:10,11
90:8 107:3
**Cole** 1:14 6:3
**colleagues**
95:8 110:15
**collected**
16:13 17:2
17:3 24:5
**collection**
29:25 85:19
**collects** 20:21
**Columbus**
1:19 2:11
6:21 152:13
**column** 68:11
70:14 87:4
98:9 99:3,9
129:13
132:10
**columns** 98:6
98:7 122:23

come 57:4
comes 25:5
44:9 61:18
70:5,21
117:14
**comfortable**
72:16 97:18
97:18
103:23
**coming** 61:9
**commission**
152:21
**committed**
114:11
**committing**
114:5,15,23
**common**
36:18
**communica...**
31:9,12
45:6,8
**companies**
32:25 74:15
74:17,22
75:19 111:2
112:16
114:13,22
115:20
116:7
148:11
**company**
22:19 33:2
37:19,21,22
38:6 42:3,4
53:22 75:4
75:5 105:13
116:15
117:1
142:24
148:4
**company's**
62:20,24
63:6 64:4
86:7,11
**company-s...**
106:4
**comparable**

127:11
134:3
**compare**
93:21
**compared**
74:14 89:10
89:12,15
124:14,17
**compensati...**
24:4,20,25
**competitors**
37:23 81:21
95:22 96:8
96:14 98:2
**complaints**
111:11
**complete**
13:5
**completely**
20:13 75:7
75:12 113:7
123:20
139:8
**complicated**
140:4
**component**
76:15 77:3
79:13 83:10
**compound**
18:2
**computer**
18:5,7
**computes**
110:11
**concern**
35:23
**concerned**
35:24 91:11
95:15,18
96:20 97:4
104:6
123:19
**concerning**
36:14 43:4
45:2,13
52:12
111:11

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

160

148:22
149:8
**concerns**
88:19
**conclude**
78:6,24
80:19
**concluded**
29:14 127:7
150:15
**concludes**
150:11
**conclusion**
69:14,22,23
82:3 111:18
114:10
118:25
**conclusions**
65:19
**conduct**
84:23
**conducted**
89:3 123:19
133:17
138:5
143:24
**conducting**
85:1
**conference**
42:5 43:22
43:24 44:9
45:18
**confirmation**
79:13
**conflicts**
35:14,14,16
**confounding**
129:4
133:11,13
133:20
134:2,5,17
142:20
**confused**
30:8
**conjunction**
115:16
**connect**

52:13
**consecutive**
126:2,4,10
130:16
**consensus**
66:5,18
68:11 70:15
71:15,17
72:7,12,19
87:1,3
**conservative**
71:10
**consider**
107:23
**considerable**
51:1,11
**considerati...**
60:9 61:21
73:21,25
77:3 105:7
**considered**
13:23 14:8
21:8,11
27:10 29:23
**considering**
21:1
**considers**
62:7
**consistent**
49:4 61:8
83:6
**construct**
14:17,24
**constructed**
14:19 111:9
114:7
**constructing**
87:9 104:1
**consulting**
26:25
**consume**
107:20
**contact** 16:23
17:1
**contain** 13:4
13:21 14:6
**contained**

11:8,20
12:18 14:9
120:9
**context**
127:17,23
**continuing**
15:15,17
**contrary**
50:20 76:19
**control** 69:25
70:2,7,10
72:11 104:2
104:18
**conversatio...**
26:5
**cooking**
113:13
116:22
153:7
**copy** 7:11,24
7:25 113:12
113:18
**Cornerstone**
15:1,2,5,9
15:16,18,19
16:7,16,19
17:4,8,17
18:13,14
19:14,15
20:15,21,23
20:24 21:10
22:10 23:14
23:18,21
24:5,11,19
25:1,13,15
26:3,18
27:13,15
44:18,25
45:10 47:9
**Corporate**
8:10,22
**corporations**
111:12
**correct** 6:24
9:8 16:4
20:15,16
21:2 23:2

24:16 25:10
25:11,17
30:16 37:1
37:5,6,10
37:16 38:3
38:4 39:10
39:23 40:5
41:22 43:17
44:22,23
46:1,13,18
47:21 48:3
48:13 49:10
50:20 54:13
57:21 60:13
62:22 63:9
66:7,11,24
67:7 68:17
68:22 70:9
70:16,24
71:2,23
73:24 86:1
86:4,9,13
86:20,24
87:2,5,8,13
87:17,20,23
88:2 89:19
89:23,25
90:22 91:5
91:22,23
94:16 96:5
96:10 98:20
98:20 100:1
100:5,6,10
100:13,16
100:18,21
100:25
101:25
105:23
106:2
109:19
110:5,13
112:20
118:18
119:17,23
121:1 123:2
123:5,9
126:13,16

128:3,5,11
129:12,16
130:14
131:17
132:23
133:3
135:25
136:7,21
137:25
151:11
**corrected**
98:3
**correction**
5:7
**corrections**
61:12
151:12
154:4,6
**corrective**
61:22
**correctly**
66:20
**correspond...**
129:17
**corresponds**
99:6,15
120:2 121:8
121:10
135:21
**cost** 56:3
112:5,7,9
112:13
113:13
153:6
**costs** 55:10
**counsel** 2:12
4:6,11 5:11
20:19 21:9
22:13 44:18
44:24 45:7
45:8 85:22
136:5,14
152:10,11
**County** 151:4
152:1
**couple** 85:24
100:19

147:13
**coupon** 39:24
139:13
**court** 1:1 5:8
149:18
154:16
**crafting**
101:21
**create** 15:6
101:9
**credible** 95:3
**credit** 127:2
127:6
**criminal**
117:7,22
**critical** 36:2
**criticism**
110:23
140:2
**criticisms**
111:1,25
**criticize**
112:12
**Cross** 153:3
**cross-exam...**
4:9 6:8
**CRR** 1:21
2:13
**curative**
123:17
**curious**
144:25
**current** 6:17
9:13 16:17
31:15 88:11
**cushion**
141:2,10
142:1,3,14
143:15,16
144:12
145:11,15
**cut** 49:14,24
50:5,7,11
50:13,19
53:1 55:10
57:3,4,13
58:4,10

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

59:1,7 60:3
73:10
**cutting** 56:3
**CV** 7:24,25
8:3,9 9:18

**D**
**D** 9:5 153:1
**damage**
136:5,15
148:3,22
149:8
**damages**
35:19,25
36:3,3,14
36:19,20
61:20 62:15
120:12,19
120:23
121:4,7,12
121:19
124:2 131:5
137:16,19
138:4 144:3
144:6
147:16
148:8,13,19
**Dan** 16:1
17:6
**Dana** 31:13
31:15 37:4
43:10,19
44:4,4,5,8
44:10,12,22
45:18 46:20
47:1,11
48:15,20,22
49:15,24,24
50:2,2,8,11
50:15,16
52:2,7 53:8
65:6 76:8
76:13,13,24
77:5,9,13
77:16 78:8
79:1,5 80:4
81:3,4,21

81:24 83:2
83:13,17
84:7,12
85:4,9
86:22 88:14
94:20 96:13
98:4,7
99:22 100:7
100:19,23
137:7,9,22
137:23
144:3
**Dana's** 22:16
37:9 39:13
41:20 45:1
45:13 49:14
52:12 53:4
53:13 54:7
63:12 65:10
69:25 72:22
77:21 78:7
78:25 79:16
80:7,21
81:11 82:22
85:22 87:10
95:22 96:8
100:11
102:3
103:11
104:3 110:3
138:19
140:13
**Dana-speci...**
70:11
**data** 16:10
17:2 18:17
42:14 51:14
68:4 90:17
91:11,13
97:2 120:6
120:12,13
120:15,16
121:13,19
123:15
124:9,11
125:5 128:9
129:18

132:2 134:7
139:6
**database**
45:1,12
47:10
**date** 32:2,4
39:20,22
71:20 72:2
72:22 90:6
131:16
139:17
154:8
155:23
**Daubert**
149:21,24
**David** 5:10
**day** 26:24
40:7 75:14
77:20 79:10
90:11 91:3
91:8,17
93:6,18
102:14
105:10,14
105:21,25
120:13,15
124:1 126:8
128:10
129:3 130:8
130:9
135:12,22
151:21
**days** 61:5
70:13 71:4
84:25 103:8
104:24
119:11,25
123:17
124:6,8
125:3,25
126:2,5,6
126:11
130:11,16
132:7,14,20
132:25
133:7,14,22
134:19

135:20
154:14
**day-by-day**
72:16
**deals** 79:18
**death** 100:11
**debate**
140:10
**Debra** 3:5
5:13 6:13
**debraw@r...**
3:6
**December**
47:25 48:11
**decided**
140:5
146:21
**decision** 30:4
**decompose**
84:24
**deemed**
154:16
**defendant**
3:8,13,18
34:9
**defendants**
1:10,16
5:20 29:11
31:9
**defined** 79:22
**degrees**
107:20
**Delcath** 33:3
33:5,14,21
36:10
**Delphi** 74:2,4
74:9,16,21
75:1,8,14
75:24 76:3
76:14 77:19
77:24 79:24
80:4,24
81:2,20
82:6,21,24
83:12,16
84:13 85:10
**Delphi's**

73:20,24
75:22 76:8
77:4,13,15
78:6,25
79:15 80:6
80:20 81:10
84:6 85:5
**denied** 36:9
**Denver** 35:2
35:3
**department**
114:18
116:3,4
117:15
**dependant**
41:2
**depending**
81:1 84:3
**depends** 25:5
81:18
106:14,15
142:13
**deposed**
11:14
**deposing**
154:13
**deposition**
1:19 2:9 4:7
4:11 5:2
6:22 11:16
29:22 32:8
32:20,22
33:20 36:13
36:24
150:12
151:9 152:6
152:8 154:3
154:11,14
154:15
**depositions**
12:9 28:9
28:11 29:1
29:4,7,10
29:11,13,20
30:1,2,19
51:5
**derivatives**

119:20
147:25
**describe**
41:24
112:23
117:23
119:8
**described**
10:9,17
17:15 19:21
115:2 124:6
**describes**
116:23
**describing**
83:17
**description**
112:24
117:5
**designed**
83:20 86:6
**detailed** 23:7
**details** 10:3
35:12 36:21
113:11
**determinants**
77:21
**determinat...**
58:24
**determine**
46:20 47:1
47:10,12
48:22 50:6
56:7 68:24
77:14 82:20
83:10 84:6
85:23
**determined**
102:17
**determines**
143:18
**development**
11:15
**developme...**
11:13
**deviation**
122:6
124:12,15

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

162

| | | | | | |
|---|---|---|---|---|---|
| **deviations** | 141:21 | 135:7 139:1 | 14:7,11 | **E** 1:14,15 3:1 | 142:6,25 |
| 122:9 | 142:7,24 | **disclosures** | 16:12 17:3 | 3:1 86:15 | 146:13 |
| **Dice** 9:10 | 146:13,16 | 35:15 50:11 | 31:2,5 43:4 | 152:1,1 | **easy** 90:2 |
| **dictate** 18:8 | 146:17,18 | 61:14,15 | 44:21 51:5 | 153:1 155:1 | **economic** |
| **Diego** 3:4 | 146:19,20 | 62:13 111:3 | 53:17 | **earlier** 42:16 | 84:12 |
| **differ** 39:21 | **differential** | 111:4 112:3 | **Dodona** 35:6 | 58:5 74:24 | 110:12 |
| 142:17 | 83:23 84:3 | 116:17 | 35:20 36:7 | 75:23 93:20 | 112:5,7,9 |
| **difference** | **differently** | 123:18 | 148:17 | 95:20 | 112:13 |
| 87:4,6 | 40:12 99:19 | 138:25 | **doing** 80:15 | 101:21 | **economics** |
| 122:25 | 138:24 | 139:20 | 88:7 98:24 | 128:8 | 9:6,11,16 |
| 123:4,7,14 | 139:12 | **discovered** | 106:19 | **early** 43:22 | 10:25 11:2 |
| 124:12 | **difficult** | 29:14 53:3 | 127:9 | 74:1 | 11:5,6 |
| 125:1 130:1 | 104:14 | **discuss** 53:17 | 133:24 | **earnings** 86:3 | 14:15 |
| 142:23 | **difficulties** | 73:20 85:8 | 134:9 | 86:6,8,10 | **economist** |
| 143:19 | 51:17 53:19 | 109:12 | 136:18 | 86:12 87:7 | 84:16 |
| **differences** | 55:9 56:4 | **discussed** | 139:25 | 87:10,11 | **effect** 76:12 |
| 124:5 125:8 | 79:6 | 42:16 43:21 | 144:20 | 88:4,16,24 | 79:23 83:2 |
| 125:23 | **direct** 19:22 | 44:7 | 154:7 | 89:20 90:3 | 83:5 84:24 |
| 139:22 | 45:7 64:12 | **discussion** | **DOJ** 114:8 | 90:20 91:8 | 98:10,11,25 |
| **different** | 110:11 | 36:22 82:5 | 114:20 | 91:19,20,25 | 99:7,9,11 |
| 11:20 20:8 | 112:5,7,9 | 82:16,24 | **Douglas** 1:15 | 92:1 93:12 | 99:12 101:6 |
| 29:6,7 39:8 | 112:12 | 132:9 | 6:3 | 93:21 94:14 | 102:15 |
| 39:12,19,22 | 142:22 | **discussions** | **Dowd** 3:3 | 94:14,24 | 105:7,9,11 |
| 39:25 40:9 | **directed** | 74:5 | 5:14,17 | 95:21 97:21 | 109:14 |
| 48:16 49:2 | 18:19,21 | **disruption** | **Dr** 59:9,9 | 99:7 101:15 | 111:18 |
| 58:2 60:17 | **direction** | 99:23 100:7 | 60:14 61:1 | 101:16,18 | 112:5 142:1 |
| 60:20,21 | 20:1 49:5 | **disseminated** | 61:2 64:2,9 | 101:21 | **effected** |
| 63:22 69:16 | 54:24 95:13 | 38:12 | 64:14 68:7 | 102:14,20 | 133:21 |
| 75:18 79:21 | **directly** | 105:13 | 73:21 76:7 | 102:21 | 134:18 |
| 80:4 81:5 | 20:18 | **dissimilar** | 77:2 79:14 | 103:3,3,5,8 | **Effecting** |
| 85:24 88:10 | **director** 9:10 | 88:6 | 83:11 84:5 | 103:11,13 | 41:20 |
| 90:17 93:6 | 9:11 | **distinct** 75:20 | 109:13 | 103:14,15 | **effective** 82:2 |
| 95:5 97:14 | **disagree** | **District** 1:1,1 | 110:1 112:1 | 104:1,10,11 | **effectively** |
| 98:10,11,25 | 11:22 12:1 | 5:6 | 112:6 | 104:13,17 | 61:16 |
| 99:11,13,18 | 62:6 | **Diversifica...** | **draft** 17:17 | 104:18,22 | 104:15 |
| 103:16 | **discipline** | 8:11 | 18:14 | 105:1,6,10 | **effects** 83:19 |
| 108:4 111:4 | 11:1 | **divided** 66:17 | **draw** 77:21 | 105:14,18 | 83:23 |
| 111:7,20 | **disclosed** | **Division** 1:2 | 133:10 | 106:6,12,13 | 104:18 |
| 116:10 | 57:18 59:11 | 5:6 | **drop** 77:22 | 106:21,22 | **efficiency** |
| 118:11 | 59:12 | **document** | **due** 23:4 40:9 | 106:25 | 37:6,9 |
| 122:9,23 | 138:17,21 | 15:4 27:17 | 109:18 | 107:3,6,7,7 | 120:24 |
| 127:23,23 | **disclosure** | 42:22 43:3 | **duly** 6:6 | 107:11,24 | 121:7 |
| 128:23 | 61:23 64:15 | 44:25 45:11 | 152:3 | 108:1 | **efficient** 37:5 |
| 137:14 | 64:19,20 | 45:12 47:10 | **D-E-L-C-A...** | 109:11 | 38:7,9 63:4 |
| 138:6,8,11 | 111:19,20 | 66:20 73:4 | 33:5 | 111:4,20 | 63:6 |
| 138:16,16 | 124:5,8 | **documents** | | 137:17,20 | **effort** 100:14 |
| 139:4,14 | 126:6 135:5 | 13:22,22 | **E** | 137:21 | **eight** 96:14 |

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

135:9 137:7
**either** 17:16
30:14 31:10
32:7 36:8
51:25 69:15
77:25
129:23
134:6
139:19
**emerging**
100:7
**empirical**
67:12
**employed**
152:11
**employee**
152:10,11
**employees**
31:13,15
35:3
**employment**
9:14,19
**ended** 36:2
**ends** 79:20
**enforcement**
113:2,3,25
114:4,8,14
114:25
115:1 116:9
116:12,25
117:14,16
**enforceme...**
115:17
**engaged** 25:2
**engagement**
16:24 21:18
**engagements**
25:15
**ensuing**
41:25
**ensure** 96:11
**enter** 38:1
**entered**
134:19
**entry** 70:17
70:22 72:3
86:16,19

90:24 93:9
**environment**
46:10 52:24
78:9 79:2
**EPS** 86:23
**equal** 62:20
63:7
**equities**
40:21
**equity** 41:8
139:24
140:13,17
141:2,10
142:1,3,14
143:15,16
144:12
145:11,15
146:18
**errata** 154:5
154:7,10,13
**error** 122:1,4
124:17,20
**errors** 106:13
124:1
**especially**
119:11
**Esq** 3:5,6,11
3:16,21
**essence** 131:5
**establish**
120:24
**estimate**
62:17 64:9
80:8,10
81:19 88:20
93:15 94:18
94:23 95:6
95:11,13,17
96:21,23,25
99:12
104:20
112:4 120:1
120:23
121:20
136:15
137:23
138:5,7

140:13
144:6
146:12,15
147:15
**estimated**
79:19 83:14
90:8 93:3
104:21
128:18
**estimates**
88:12 89:5
89:6 95:3
97:19 98:9
103:23,24
105:16
112:7
128:17
129:1
135:19
137:9
**estimating**
81:6 98:16
101:10
103:1,2
137:7
138:12
**estimations**
101:12
**et** 5:5,5
**Europe** 10:1
10:10
**evaluate**
127:25
133:5
**evaluating**
119:14
**evaluation**
59:1 127:15
137:23
140:13
**evaluations**
127:16
**event** 67:19
70:5 71:15
76:7,15
77:2,19
79:14 83:11

83:21 90:15
118:5,10,10
118:15
126:1,9
127:25
128:1,5,14
128:16,20
128:24
129:2
131:15
132:3 135:4
135:13,23
136:19,24
137:1 138:2
138:4
141:14,20
143:10,12
**events** 101:5
101:13,13
103:5,6,7
103:10
129:4
130:12
133:11,13
**Everett** 9:5
**evidence**
57:12 58:4
59:2 60:3,5
65:5 69:13
69:15 139:3
**evidentiary**
33:25
**evolution**
53:21 72:15
72:25 73:2
**evolve** 44:17
76:21 77:9
**evolved** 48:18
**exact** 8:16
16:19,22
17:9 20:11
32:10 121:7
138:20
**exactly** 8:25
24:12 26:15
35:22 90:11
91:16 97:15

139:25
140:18,19
140:21,24
141:16
142:2,3,17
143:3,18
**Examination**
153:2
**examine**
119:10
**example**
39:20 42:10
71:18 86:12
87:7 90:2
91:25 112:8
125:18
129:18
**examples**
40:16
**exceed** 62:15
**exceeded**
26:25
**exchange**
65:22
115:19
**exclude** 69:21
69:22
**excluded**
149:18,20
**excludes**
115:24
**Excuse** 15:14
49:12 92:7
**executive**
45:18
**executives**
9:23 10:1
10:10 45:21
**exercise**
89:14
**exhibit** 7:10
7:14,23
11:9 13:18
13:19,21
14:6,9,18
14:25 21:5
24:1 27:8

27:10,20
28:5 29:1
29:19,20,23
31:17,18
32:6 34:4
34:18 39:11
39:14 40:1
42:22 64:22
65:3,4,9,13
65:15 66:3
88:25 89:19
90:14,24
93:8 96:6
97:20
113:12,15
122:10,13
122:18,19
124:4,7
125:11
128:13,19
129:9
130:20
131:8
134:20
153:5,6
**exhibits** 7:19
29:24,25
30:3,7,9,12
153:4
**exist** 11:23
**existed** 104:3
**expect** 11:15
82:1 90:4
90:10,12
92:2 95:14
123:22
144:8
**expectations**
38:19 39:4
63:22
**expected** 80:9
86:7
**expenses**
109:19
**experience**
9:19 71:13
**experienced**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

164

142:8
**experiences** 10:9
**expert** 9:20 11:10 26:21 28:13,14,15 30:19,22,25 31:18 58:4 61:25 73:9 127:15 147:21 148:3
**expertise** 10:21,23,24 13:10
**experts** 11:14 12:22 31:2 54:6 59:6 60:2,4
**expires** 152:21
**Explain** 86:5
**explained** 80:1 144:25
**explicit** 85:12
**explicitly** 42:12 133:8 134:25
**express** 20:10
**expressed** 13:6
**extensive** 26:6 42:6 148:16
**extent** 23:10 96:17,25 104:5 133:18
**extremely** 26:5 80:25 80:25 103:25
**e-mails** 51:4 51:9,14,16 51:17,18 56:10,22

**F**

**F** 152:1
**face** 88:8
**facing** 79:6
**fact** 41:6 75:8 80:18 84:1 114:21 119:24 121:25 125:22
**factor** 60:15
**factors** 41:19 70:1,8 76:22 93:5 93:6
**facts** 95:10
**fail** 154:15
**failed** 85:15
**fair** 100:23 113:10 147:20 149:22
**falling** 76:4
**familiar** 7:1
**far** 56:16
**fault** 60:8 110:1
**favor** 97:1
**favorable** 96:19 103:25
**feasibility** 36:19
**February** 66:4 68:20 71:18 86:16 90:24 93:9
**Federal** 8:20 152:7
**Feinstein** 28:16 50:21 59:9 60:2,8 61:1 62:1 64:2,9 68:7 69:15,20 80:9 81:6

82:25 84:5 91:16 93:3 101:2 110:1 110:18,24 112:6
**Feinstein's** 60:14 64:14 73:21 76:7 77:2 79:14 83:11 109:13 112:1
**Feldman** 5:10
**fell** 76:4
**fewer** 88:11 131:1,2,3,4
**figure** 27:5 47:23 48:9 63:20 86:15 86:21 125:12 131:14,18 134:20 135:3,11
**file** 74:6,16 74:21,23 75:1,8,20 75:24
**filed** 8:1,3 74:10
**files** 30:6
**filing** 74:2,10 75:15 76:9
**fill** 17:23
**filled** 17:22 18:18,18
**Fin** 112:6
**final** 147:13
**finally** 74:9
**finance** 8:12 8:22 25:22 26:1 84:1 110:19
**financial** 8:14 8:18 9:11 10:25 11:1

11:4,6 14:15 49:16 52:12 61:25 115:7,11,14 117:10,13
**financially** 152:12
**financing** 143:25
**find** 14:21 82:11 96:3 99:17 104:14
**finding** 97:22
**findings** 67:14 89:18 96:1 110:15
**fine** 127:11 145:4
**finish** 92:6,10 92:14,21 93:7 123:12 123:12
**finished** 18:6 36:7 92:8 92:16
**FINRA** 34:2
**firm** 54:11,16 109:23 114:5 117:11 141:9
**firms** 8:13 76:23 81:1 83:3,23 84:4 112:17 113:13 114:24 116:22 153:6
**Firm's** 8:11
**first** 6:6 33:2 34:20 35:10 49:13 52:3 65:16 70:17 71:6 84:10 87:15 99:21

100:22 102:19 137:6 144:11,15 144:19
**five** 147:5
**fixed** 148:1
**flaws** 110:25
**flip** 131:12
**flows** 62:21 63:8 109:25
**focus** 125:21 129:2
**focused** 62:17 65:5 103:4 106:16 121:4,6 138:11 142:22
**focuses** 127:3
**focusing** 127:4
**folks** 15:5
**follow** 114:9 138:18 140:5,9 145:14
**followed** 130:8 136:2
**following** 5:1 54:21 155:5 155:6
**follows** 6:7
**follow-up** 150:3
**footnote** 42:14 43:2 71:24 95:25 96:4 112:23
**footnotes** 17:23 18:18 42:9
**forecast** 52:2 87:1 106:13 106:13,20
**forecasts** 51:20 52:7

71:16 72:15 72:25 73:1 107:7
**foregoing** 150:14 151:8 152:5
**form** 13:7 20:4 27:21 28:6 39:1 40:11 41:5 42:1,24 45:9 47:4 48:4,12 52:4 53:14 55:17,24 56:9,21 58:1,18 68:2 75:25 76:16 84:9 84:22 85:17 105:22 106:1 117:2 130:21
**former** 31:13
**forming** 13:8 13:23 14:8 41:23 43:5
**forthcoming** 8:12,14,19
**found** 13:19 27:15 94:13
**foundation** 51:22 52:5 64:7 76:2 121:16 134:11 142:10
**four** 31:19 95:6 125:20
**fourth** 86:18 90:1 91:24 97:12,13,23 98:10,13,14 98:15,18,21 98:25 99:10 99:14,17,18 102:18

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

123:16
**frame** 15:8
48:25
**framed** 15:15
**frank** 34:23
**Franklin**
152:1
**fraud** 34:15
62:12 111:3
111:19
112:3 114:6
114:11,16
114:23
115:2,18,21
115:25
116:5,13
117:2,12,17
117:23
**freedom**
107:20
**frequent**
101:11
**frequently**
119:15,20
**frog** 73:12
**full** 6:16,19
113:22
**fully** 7:7
**function**
76:21 77:10
77:10
**functions**
11:5
**Fund** 1:4,5
1:11 5:5
**further**
152:11
**future** 62:21
63:7 109:18
109:24

**G**

**G** 47:23 48:9
**gain** 44:4
**gap** 132:14
133:6,22
134:19

136:12
**Garrett** 16:1
17:6,12,16
**Garrett's**
17:7 25:18
**gas** 54:20
**gasoline**
46:16,21
47:2,13
**gather** 19:15
19:23
**Geller** 3:3
5:14,17
**general** 15:16
15:18 20:21
26:3 52:22
119:14
127:6
**generally**
34:3 84:1
106:24
124:10
**gentlemen**
150:4
**getting** 67:16
72:13
136:13
**give** 6:17
10:3,4
19:17 20:1
30:17 40:15
77:17 91:16
101:1 113:9
124:7
140:21
145:12
**given** 26:20
31:19 32:2
59:8 80:14
80:15 91:9
92:19 95:16
96:13,17,24
103:24
104:19
119:2 124:2
127:9 130:8
142:24

144:18,20
145:16
149:9 152:4
152:6
**gives** 90:16
93:3,15
124:8,9
125:12
**giving** 33:20
133:9
**go** 27:17,17
27:23 35:21
36:6 40:6,6
41:11 53:2
72:24 85:2
92:15
102:12
131:13
135:16
144:17
146:17
147:1,4,5
**goes** 14:12
29:25 53:2
99:25
**going** 15:14
19:17 27:8
61:13 71:16
74:2,9
75:16 85:10
93:8 100:23
101:6 102:7
102:7,15
113:11
118:3,8
127:12
130:2
143:16
146:25
**Goldman**
33:6,12,24
**good** 6:10
41:9 79:8
108:6
**governance**
8:17
**graduate**

26:10
**greater** 82:21
83:1,1 84:7
88:21 96:14
**guard** 75:8
75:12
**guess** 34:8
45:20
**guidance**
49:14 50:4
50:7,19
52:18 54:7
57:3 59:1
60:3 62:24
63:12,16,16
63:22,23
64:5 65:6,8
65:10 66:4
66:22 68:13
72:22 73:6
104:19,25
105:7
**G-A-R-R-E-**
16:1

**H**

**hand** 152:13
**handed** 7:9
**happen** 62:4
72:1
**happened** 8:5
29:8 32:23
56:25 91:17
**happening**
53:18 56:24
**happens**
90:11,12
105:18
**happy** 44:1
**hard** 96:23
**hate** 131:12
**Hawaii** 1:11
6:1,3 31:10
**head** 149:1
**heading**
41:19 46:9
**hear** 56:19

144:8
**hearing**
32:21 33:23
33:25 34:1
59:18
**heavy** 48:10
**held** 2:10
11:11
**help** 10:11,17
17:4 19:15
45:1,12
52:14 94:20
**helpful** 15:11
**helps** 58:9
122:16
**HENNESSY**
1:15
**hereto** 152:10
152:12
**hereunto**
152:13
**high** 81:22
88:18,23
89:15 95:17
96:22
**higher** 47:20
74:21 83:2
95:12
**highly** 79:7
81:3 96:19
**hired** 10:20
10:20
**history** 88:14
**Hodge** 1:15
6:3
**Hold** 8:13
**holds** 69:22
**hope** 88:5
**hopefully**
14:12
**host** 138:24
**hostile** 100:9
**Hotel** 2:10
**hour** 22:25
24:15 25:9
**hourly** 22:25
24:15

**hours** 21:20
21:22 23:9
23:13 25:1
25:4,5,14
**hundred** 23:9
**Hurricane**
46:17 47:14
**hypothetical**
59:14
134:10

**I**

**idea** 23:16
30:21
**identification**
7:15 113:16
**identified**
35:17
**identify**
34:18
**ignore** 61:15
**IL** 3:10
**impact** 37:14
37:18 38:12
40:23,24
67:18 71:8
76:8 77:4
77:15,23
79:15 80:3
80:7,23
81:1,10,17
81:20,21,24
82:21,24
84:7 103:11
103:12
104:22
107:11
110:12
117:10
138:8,15
139:20,24
141:11,22
143:14
146:12
**impacted**
46:20 47:2
47:13 80:20

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

85:5 133:6
**impacts**
46:16 71:13
84:3
**imperative**
154:12
**impinging**
104:6
**import** 137:8
**important**
40:18 54:10
54:15 62:24
81:14 82:16
120:18
121:8 132:9
**improve**
107:21
**inadequate**
79:14
**include** 88:9
115:1,17
116:12
117:17
119:19,20
**included**
72:12 77:2
100:14
114:13,22
116:9
**includes**
14:13 43:7
76:14 94:4
105:12
114:24
118:16
140:13
**including**
90:17,17
94:5 98:4
110:7
**income** 148:1
**incorporate**
62:10
**incorporated**
62:25
**indicate**
29:21 45:19

45:19 46:15
48:25 53:19
97:22
106:11
113:23
132:19
**indicated**
44:12 50:18
51:19 93:13
**indicates**
78:4 87:24
**indicating**
57:12 131:8
**indices** 49:2,8
127:6
**indicia** 81:13
127:1,3
**individual**
24:23 34:15
41:3 73:1
91:11
**individually**
129:10
**industries**
81:5
**industry**
48:20 52:23
70:8 76:15
77:3,11,16
78:9 79:3
79:13,21,22
79:24 80:4
80:24 83:3
83:10,23
84:2,4 89:4
89:16 98:1
98:3 105:24
**industry's**
89:7
**inferences**
77:22
133:10
**inflation**
57:17 58:13
58:22 61:2
64:3,9,12
64:14 85:22

85:23 88:18
88:21,23
89:8,15
95:12,14,17
96:22 98:9
98:17 107:6
107:6 110:3
137:7,9
138:5,12
139:10
141:13
**inflations**
142:22
**influences**
93:18
**influencing**
93:5
**inform** 10:11
10:14,17
19:16 38:18
52:10 94:20
**information**
10:6,7 28:4
38:6,11,15
38:16,20,23
39:2 40:4
40:23 41:4
46:10 47:6
49:15,24
50:1,1,5,8,8
50:13,15,17
51:1,6,7,11
52:11,16,21
52:22,25
53:7,8,11
54:9,14,22
54:23,25
55:3,7,12
55:14,15,15
55:19,22,25
56:5,12,14
56:17 57:1
57:6,9,16
57:19,24,25
58:8,8,9,12
58:21,25
60:9,11,23

60:25 61:9
61:12,17,18
62:2,10,25
64:20 70:11
70:20 72:8
72:11,21
90:7 93:13
103:16
105:12,21
105:24
106:5 124:8
125:13
131:9 133:5
133:20
134:2,5,17
138:20
139:12
142:20
**informations**
56:23
**informed**
51:10
**informing**
72:19
**initially**
20:20
**initiating**
114:8
**Insofar**
109:24
**instance**
54:21 127:1
**instances**
9:22 65:7
130:5,7
**institutions**
8:18
**INSTRUC...**
154:1
**insufficient**
121:13
132:2
**insurance**
22:17,19
**intend** 11:8
**interacted**
15:4

**interest** 11:6
35:14
**interested**
152:12
**interrupt**
135:17
**interrupting**
59:17,23
**intervene**
116:5
**intervening**
72:11
**intervention**
116:2
**interview**
44:3
**investigate**
77:12
**investors**
35:15 120:3
131:4
**invoked**
115:15
**involve** 37:22
37:23 116:2
117:7
120:11
**involved**
15:22,23
25:16 29:9
32:25 33:6
33:6 36:16
147:24
148:8,12
**involves**
117:6,22
140:16
147:21
**involving**
147:24
148:1,19,19
149:3,4
**IRONWO...**
1:11
**irrelevant**
139:8
**irrespective**

99:4
**issue** 48:19
50:22 58:3
58:6 60:17
65:14 71:11
73:2,5
81:13 82:17
94:22
110:14
111:24
120:22
121:23
131:5
**issues** 12:22
35:13,24
36:2,19
44:16 52:14
53:4 55:12
58:2 60:24
61:10 63:15
79:18
102:25,25
115:1
118:22
129:5
138:24
145:25
148:3,4
149:8
**I/B/E/S** 65:17
65:18,18
70:21,22,25
72:7,13

_____
**J**

**J** 1:8 3:5 5:5
**Job** 1:22
**Joel** 5:22
**Journal** 8:12
8:21
**judge** 110:20
**July** 46:11
49:17,25
50:9,16,17
51:2,11
52:11,17,21
53:12,16

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

54:8,17,19
55:1,4,13
56:16 57:1
57:14,17
58:7,12,13
58:21,22
59:1,4,8,10
60:10 137:8
137:10
142:21
**justice**
114:18
116:2,4
117:15
**justify** 116:8
145:15

**K**

**Kalamazoo**
3:20
**Karpoff**
109:13
110:2,14
111:2,7,17
112:1,2,11
112:16
113:12,19
113:24
114:4 115:5
115:25
116:25
117:9
**Karpoff's**
112:23,25
114:13,22
115:20
**Katrina**
46:17 47:14
54:21
**Katten** 3:14
5:19,22
**keep** 20:24
**kept** 21:5
**keynote** 8:23
**kind** 18:17
19:23 25:13
40:4 48:14

49:5 50:12
72:11 79:22
82:20 83:17
83:21 84:19
84:20 89:5
110:23,25
124:16,25
125:13
126:18
131:9
**kinds** 48:22
48:24
**knew** 25:20
28:20
**know** 12:9,24
13:12 16:20
16:22 17:9
17:11,21
21:19 22:20
23:13,21
25:18 26:15
27:7 28:3,7
28:20 30:22
31:7 36:17
37:21 38:18
39:5 44:1
46:22 48:14
48:16,17,18
54:19 57:5
63:20 67:23
69:14 71:11
72:24 75:4
75:13,17,19
75:22 76:25
79:10,17,19
80:2,2,16
80:18,23,25
81:2 82:24
83:19,24,25
83:25 84:3
84:16 85:7
85:8 88:15
88:20 89:4
89:11 90:9
91:11,16,17
93:17 94:6
95:4,12

96:16,21
98:8 99:16
101:7 104:9
106:16
108:3
110:23
112:10,17
112:17
113:3
115:23
121:24
122:6
124:16,19
124:20
126:22
134:1
135:11
139:5
142:23
144:23
145:7 150:1
**knowing**
64:20
139:11
**knowledge**
13:9 14:14
38:21
**known** 26:13
**knows** 19:12
39:3 107:2

**L**

**L** 3:6,11 4:4
125:12
**LABORERS**
1:5
**lack** 51:21
52:4 64:6
64:14 76:2
121:15
142:9
**large** 76:22
80:25 88:17
89:12 95:17
96:21 101:8
102:7 124:1
124:14,17

**largely** 41:2,6
123:24
**Largent** 3:6
5:16,16
**larger** 69:3
94:8,22
95:11
**Laurie** 3:6
5:16
**lead** 89:8,14
97:13 124:1
**leads** 88:18
88:20 95:12
95:17 96:22
99:5
**learn** 42:3
**learned** 55:9
55:10 56:3
56:4
**learns** 61:13
**led** 95:14
103:24
**left** 120:7
**legal** 109:18
**legs** 41:11
**Lehman**
148:18,21
148:21
**letters** 116:7
**let's** 9:4 35:9
37:2 92:15
144:17
147:4
**level** 140:4
**leverage** 81:2
83:1,2
**levered** 79:7
81:4
**Levine** 3:19
3:19,21
5:25,25
45:25 64:25
150:7
**Lifecycle**
8:11
**likelihood**
75:24

**limit** 40:21
88:3
**limited** 45:16
57:10
**line** 27:24,24
27:24 37:13
137:6,6
155:8
**Linker** 3:16
5:19,19,24
13:7,25
18:23 19:3
19:7,11
20:4 27:21
27:23 28:6
32:1 39:1
40:11 41:5
42:1,24
45:4 47:4
48:2,4,12
51:21 52:4
53:14 55:14
55:17,20,24
56:9 58:1
58:15,18
59:15,25
64:6 68:2
75:25 76:2
76:16 78:10
78:13,17,20
80:22 84:9
84:22 85:17
95:9 105:22
120:8
121:15
122:15
130:13,21
134:10,22
139:16
142:9 147:3
150:6
**list** 8:23 9:18
9:22 14:11
14:12,23
20:22,24
21:7,16
29:20 30:4

30:13 31:18
31:25 39:12
42:16 49:7
100:2,8
101:1,1
103:10
130:20
148:16
**listed** 8:7,15
27:10,19
28:10,17
29:23 30:2
42:22
148:24
**listing** 13:21
14:7,10
21:4 28:25
**literature**
80:2,16
84:17 89:11
89:12,13,17
93:21,25
95:1,2,5
96:24 99:16
104:21
105:2,17
106:9,11,14
107:9,14
110:20
**litigation**
35:4 36:1
36:16 60:24
61:10 62:5
62:12
119:12
124:10
126:24
140:16
148:9 149:6
**little** 95:19
109:12
113:8
131:23,24
**llargent@r...**
3:7
**LLP** 3:3,14
5:20

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

168

long 14:23
26:13,17
longer 88:9
look 9:25
11:3 23:25
28:9 31:1
31:17 42:10
51:9 60:4
64:22 66:3
66:4 67:18
68:10 70:14
71:14 72:18
74:12 76:12
77:23 81:12
83:7 84:1
86:14 87:21
88:8,15
90:13,24
93:8,9
95:24 97:20
100:3,25
104:22
105:17
111:13
115:4 117:5
117:5 121:6
122:15
124:16
125:22
128:12
132:10
133:11,12
134:1,4
137:4
139:19
143:22
144:1
148:16
lookback
60:15 61:19
62:3,7,9
looked 21:13
21:15 28:23
29:13,22
31:5,6 42:3
42:4,5,6,8
42:17 47:5

49:1 51:6
63:11,14
72:15 73:1
78:3 83:16
87:10,14
93:20 96:7
96:15 97:3
97:11 99:16
113:4
116:25
127:1
129:23
looking 28:3
34:3 50:2
50:24 60:7
61:6,11
64:17,18
88:13 89:19
95:4 97:2,2
99:13
102:15
111:2
115:25
122:19
124:10
125:14
129:4,9
131:18
141:11
looks 65:7
94:10 105:9
111:8
117:21
122:24
143:12
loss 36:14
126:19
losses 120:3
148:19
149:3
lot 10:6 27:11
28:8,8 51:4
51:4 59:17
62:11 71:13
74:4,22
79:7 102:2
102:8 103:5

117:7 131:1
136:8
lots 74:5 93:6
low 96:24
lower 9:9
88:23 89:7
89:8
lunch 108:7
109:10
luncheon
108:11

———— M ————

M 1:19,21 2:4
2:9,12 4:7
6:5,19
151:7,16
152:2,3,20
Madison 3:15
magnitude
121:4,7
142:13
main 16:23
16:25
making 51:19
73:4 78:8
79:1 138:15
141:16
management
8:17 50:25
51:10 52:11
52:16,20
53:3,10,20
54:9,15,19
54:23,25
55:3,8,10
56:15 57:18
57:23 58:14
58:21,25
59:4,7,11
manageme...
109:22
manufactu...
48:15
March 67:5
68:20 71:23
72:3

mark 113:11
marked 7:10
7:14 11:9
30:12
113:15
market 37:4
38:1,5,6,8,9
38:15,18,22
38:24 39:3
47:7 60:23
61:9,12
63:3,15
64:21 65:5
67:19 69:25
70:1,3
72:21 74:1
75:7,12
76:22 77:10
91:9 103:5
105:20,21
120:24
121:6
134:19
markets 37:9
75:15 127:2
147:25
market's
38:13,21
63:5
MASTER
1:4
match 52:7
material
18:20 20:22
38:10 39:2
82:3
materials
13:23 14:7
19:15,23
20:8,14,18
20:25 21:7
21:10 27:9
27:12 28:8
29:15 32:1
42:7,17
43:7 44:11
math's 90:2

matrix 118:6
118:16,22
118:23
119:2,4,5
119:13,21
120:5,22,24
121:24
122:3,8,22
123:15,22
124:13,15
124:18
125:2,6,24
126:11,15
126:17,21
127:15
128:4
142:18
matter 5:4
16:6 17:13
19:18 23:15
23:23 24:6
25:8 37:3
matters 33:9
34:4 73:6
maturities
39:23
maturity
39:19,22
MBAs 26:4
McGuire 3:9
mean 8:7
9:21,25
10:19 11:21
12:21 13:8
14:11,14
16:25 17:20
19:10 20:6
24:9 27:11
28:7,19
29:14,24
30:22 32:3
35:23 36:5
36:5 39:22
40:17 44:1
46:23 51:13
52:6 56:11
58:20 62:3

65:14 68:3
68:25 69:2
69:5 70:12
73:4 75:11
75:13,19
76:23 81:3
81:18 82:23
83:14 84:10
85:18 91:15
91:17 93:1
94:4,17,22
96:15 97:2
97:10,14,25
99:7 101:15
105:11
106:24
110:6,9,20
111:24
114:24
116:21
117:3,24
121:17
122:22,25
123:4,7,20
123:20
124:2,3,14
124:21
125:17,19
126:25
129:1,22
130:4
131:22
135:16
136:2
138:23
139:18
145:8,10,24
148:15
149:2,4,19
meaning
128:21
means 24:10
38:17
101:18
111:10
124:21,22
124:23

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

169

131:3,24
**meant** 126:25
**measure**
79:24 80:24
86:6 88:21
120:3
121:12
139:10
141:21
**measures**
111:19
134:25
142:22
**mechanical**
60:22
**MediaExpr...**
35:7
**meet** 114:19
**melting** 48:11
**member**
77:16
**memory**
113:6 114:1
**mention**
132:5
**mentioned**
34:14 49:9
69:9 93:19
97:5 110:22
112:15
117:21
127:22
128:8
145:17
**mentioning**
71:7
**Merton**
145:12,19
145:20
146:6,7
**met** 6:12
**methodology**
63:19 67:1
130:19
132:24
146:9
**MI** 3:20

**Michael** 1:8
3:11,25 5:5
5:9
**michael.sie...**
3:12
**microecono...**
52:24
**middle** 57:16
78:5
**Mike** 6:2
**mimic** 146:9
**mind** 41:17
73:11
128:24
**minus** 122:21
122:25
**minute** 97:6
146:25
**minutes**
112:15
147:5
**misconduct**
117:10,13
**missing** 14:22
**Misstates**
95:9 142:10
**mistake** 69:8
123:25
**mistakes**
123:24
124:25
**mitigate**
61:20
**mixed** 126:15
**model** 67:25
76:17,18,20
77:8 79:19
81:7 83:14
83:16,17,20
84:20 86:3
86:6 87:10
90:5,21
91:7,12,19
93:2,2,12
93:15 96:12
96:15 97:21
99:8 101:10

101:22
102:22
103:1,3,4
103:14
104:2,15,17
104:20
105:6,16
106:12,16
107:1,20,25
108:2
109:11
128:20,21
128:22
129:1,8
137:17,20
137:22
138:9,10
139:23,25
140:4 141:5
141:8,12
142:6,14,15
142:16
144:5,14
145:9,13,17
145:23
146:24
**models** 36:3
36:20 63:1
91:14,15
92:2,4
104:8
128:17
140:11
146:21
**Monetary** 9:6
9:16
**monthly** 72:8
**months** 61:22
**Moody's**
34:20 35:9
**morning** 4:1
6:10,11
**movements**
63:13 65:11
**Muchin** 3:14
5:20,23
**multiple**

30:23
**multiply** 90:4
**M-E-R-T-...**
145:21
_____
**N**
**N** 1:14 3:1
4:4 153:1
**naive** 144:10
**name** 6:13,16
6:19 22:8
146:5
**names** 15:22
16:3 32:10
33:1 49:3
**narrow** 79:24
**National** 1:3
5:4
**natural** 95:1
**nature** 18:2
127:9 139:2
**necessarily**
40:3,24
43:3 121:6
130:15
**necessary**
154:4
**need** 16:10
16:11,12,13
19:16 28:1
31:24 32:6
73:12
112:12
133:10
138:9,17
144:19
145:7
146:17
**needed** 17:2
43:12 50:18
58:25
145:15
**needs** 92:9,20
**negative** 66:6
66:10,22
67:4,6
77:15 91:3

93:10
109:17
124:24
**neither** 91:15
119:7
**Nettesheim**
119:8 136:3
**never** 110:11
112:7
126:20
149:20,23
**new** 3:15
8:20 12:16
37:23,24
49:15 50:1
50:5,7,12
51:1,7,11
51:14 52:11
52:16 53:7
53:8,11,20
56:5,8,25
57:6,9 58:7
58:8 60:23
70:15 72:12
86:11
**news** 37:14
37:18,22
62:18 74:1
74:4 75:23
77:15 84:13
86:11
**nonearning...**
106:4
**nonprincipal**
40:21
**non-evoluti...**
48:19
**non-guidan...**
70:11
**normal** 83:18
101:7
133:17
**North** 2:10
5:3 10:2
**Northbrook**
3:10
**Northern** 1:1

5:6
**notary** 2:13
4:10,12,15
151:24
152:2,20
**note** 15:17
47:7 71:6
131:8
134:20
**noted** 13:15
30:9 154:10
**notes** 4:13
**notice** 2:12
4:10
**noticed**
117:20
**November**
71:1,3
**number** 6:23
11:22 16:20
21:14 42:2
49:2 53:17
61:5 63:14
65:15,16,17
65:18 77:17
79:17 81:12
90:16 94:4
99:25 111:6
118:21
122:12
129:14,18
129:20
130:11,22
131:7
146:19
148:7 149:3
**numbers** 8:9
29:20,23
71:7,10,14
71:18 72:13
72:19
125:22
129:17
138:17
**numerous**
110:6
**NY** 3:15

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

170

**O**

**O** 4:4
**oath** 109:8
**object** 41:5
  55:24 56:9
  75:25 76:16
**objection**
  13:7 15:15
  15:17 17:19
  18:1,16,24
  19:19,24
  20:3,4,17
  27:21 28:6
  39:1 40:11
  42:1,24
  45:3,4,9,14
  45:25 47:4
  47:15 48:2
  48:12 51:21
  52:4 53:14
  55:17 56:21
  58:1,18
  59:15,25
  64:6 68:2
  80:22 84:9
  84:22 85:17
  95:9 105:22
  120:8
  121:15
  130:13,21
  134:10,22
  139:16
  142:9
**observation**
  67:20 68:6
  69:21 131:7
**observations**
  67:2,9,11
  67:15 68:1
  68:9 69:6,6
  69:7 87:25
  107:15,22
  107:23
  108:3,5
  125:21
  129:15

130:22,25
131:2,3
**obtain** 133:25
**obviously**
  11:16,17
  13:9,11
  14:15 28:15
  28:20 42:17
  43:7 44:14
  54:18 56:11
  65:19 74:15
  93:4 96:19
  103:19
  106:17
  110:21
  116:6
  124:22
  140:3
**occasion**
  148:5
**occasions**
  6:23 147:15
**occur** 61:21
**October** 51:2
  59:13 60:10
  67:3 68:8
  68:13 70:23
  78:7,25
  79:5,16
  80:7,21
  81:11 82:22
  83:13 84:8
  85:6,6,9
  120:17
  125:3 135:4
  135:24
  138:22
**offered**
  149:25
**offers** 111:17
**office** 152:13
**official** 4:15
**Oh** 1:19
  33:16 63:5
  65:25 78:13
  96:4 97:25
  125:16

137:1
145:19
**Ohio** 1:1 2:11
  2:14 6:21
  9:6 152:1,3
  152:14,20
**okay** 6:25 7:6
  7:18,22 8:2
  9:1,18 11:7
  12:10,16
  13:18,21
  14:4 16:23
  17:7,12,16
  18:13 19:7
  19:22 20:1
  20:23 21:3
  21:9,17
  22:10,20,24
  23:11,13,17
  23:25 24:14
  24:17 25:7
  25:18 26:7
  27:8 28:18
  28:25 29:19
  30:8,17
  31:8,17,23
  32:12,17,24
  33:13 34:3
  34:10,17,25
  35:5 36:4
  36:10,23
  37:2,8,11
  37:17 38:10
  38:20 39:7
  39:11,18
  40:2 41:2
  41:23 42:19
  43:8,15,18
  44:3,24
  45:22 46:9
  46:14,19
  47:18 48:14
  48:21 49:7
  49:11,11,19
  50:23,23
  52:9,15
  53:2,25

54:4 60:14
62:23 63:18
64:13,22
65:9 66:25
67:8 68:10
68:15,18
70:14 71:17
72:1 75:6
76:6 82:12
82:18 85:21
86:2,5,10
86:14,18
87:9,18,24
88:24 89:18
90:1,13,19
90:23 91:6
91:24 92:6
93:7 94:10
94:19 95:24
96:11 97:5
98:5 99:20
100:2 102:1
102:17
106:3,10
108:6
109:10,21
110:1
111:23,25
112:15,21
113:3,8
114:21
115:4,14
118:2,4,13
122:19
123:3,21
126:9,14,17
128:12,19
128:23
129:6,9,13
129:22
130:15,18
131:6,12,18
131:21,22
133:4,19
135:2,7,14
136:1,4,13
136:18,23

137:4,21
138:1 143:7
143:15
144:17
145:6 146:3
146:8,16,18
146:21,25
147:2 148:2
148:25
149:7,16
150:2
**omitted**
  38:21
**once** 38:2
**ones** 8:24
  11:20 30:4
  30:13,13
  32:3 34:18
  36:8 40:17
  68:20 90:20
  94:7 118:11
  134:3
  146:13
  149:5
**one-to-one**
  96:8
**operating**
  49:16 53:4
  53:13
**operational**
  55:9 56:4
**opinion** 10:11
  10:14 50:15
  50:22 51:10
  52:10,15,20
  53:8,10,15
  55:3,11
  57:8,10,11
  57:23 59:3
  59:5 60:15
  64:2,8
  73:10 76:6
  76:10 94:20
  122:2
  126:18
  147:17
  148:3

149:16,17
149:24
**opinions**
  10:18 11:7
  11:10,15,18
  11:19 12:1
  12:5 13:5,9
  13:24 14:1
  14:9,16
  15:6 19:17
  20:10 21:11
  31:4 35:11
  36:14,18
  143:21
  144:24
  148:14,20
  149:9
**opposed** 50:8
  69:18 71:4
  149:6
**optimistic**
  63:24
**opt-out** 33:11
  35:4
**order** 1:18
  19:16
**original**
  154:12
**outlier** 69:4
  69:18
**outlined**
  60:16 62:8
  88:25
**overestima...**
  125:19
**overestima...**
  64:3

**P**

**P** 3:1,1 4:4
**page** 7:19,20
  8:7,9,10,15
  10:1 24:1
  28:10,12
  37:11 41:18
  41:18 42:11
  42:11 43:8

43:9 46:2
47:19,23
49:12,12
50:24,24
54:1,1,2
60:7 73:19
78:16,18,19
82:12 86:14
87:22 90:23
93:9 94:2
95:25 96:4
100:4
111:13,14
111:15,16
111:16
112:22,23
113:22
115:4,6,10
120:20
125:14
131:13,14
135:2,3
137:4,6
143:23
151:13
152:6 153:2
153:4 155:8
**pages** 14:12
44:21 151:9
**paid** 23:11
24:19 25:13
**paper** 8:7,8
8:10,13,15
8:19 110:8
110:10,19
110:22
113:1
**papers** 94:5,5
**paragraph**
22:24 24:1
37:12,12
43:9 46:14
47:19,19,22
48:25 49:12
49:13 50:24
53:2 54:2,5
57:15 60:7

73:19 78:4
78:10,23
82:7 87:21
94:2,11
100:3
102:24
103:10
111:14
112:21
113:23
115:6,7,10
120:21,22
127:5,5
133:8,15
137:5
143:20,23
144:1
**paragraphs**
41:25
**pardon** 7:10
10:16 47:23
53:9 60:10
66:1 102:19
**part** 13:12
14:15 17:24
19:20 21:1
38:22,23
40:9 42:17
50:1 57:5,5
58:8 125:11
129:3
136:20
140:7,12
149:13
**participants**
47:7
**particular**
11:1 15:2
28:3 29:21
42:19 49:20
73:21 84:18
97:9 141:23
148:4
**particularly**
85:4
**parties** 5:23
152:8,10,11

**parts** 18:19
62:2
**pay** 24:20
121:9
**payment**
22:11,14,17
25:6,13
**payments**
40:19
**pending** 19:4
19:5,12
**penny** 94:13
**Pension** 1:4,4
1:5 5:4
**people** 15:9
15:17,22,22
25:14 26:3
**percent** 27:3
57:3 122:25
123:4,7,16
**percentage**
24:10 25:1
25:14
125:18
**perfect** 90:10
**perfectly**
107:9
**performance**
52:7,12
53:5,13
140:14
**performed**
95:20 98:7
126:20
134:16
**period** 37:5
41:21 43:23
47:6 51:8
52:8,23
56:3 60:16
60:22,22
61:5,19
62:7,9
63:17 65:8
67:11 72:16
76:4,5
79:19,20,20

83:15 87:11
87:14 88:6
88:9,10,12
88:15 99:21
99:22 100:1
100:7
101:19,22
101:23
102:3,18,21
104:4 127:2
131:25
138:12
**periods** 44:15
98:16
123:23
124:9,23
**person** 22:9
**personally**
27:9,19
30:20
**perspective**
71:9 117:25
**Ph** 10:16
**phase** 29:8
36:15,17
**phenomenon**
49:5
**phrased**
56:11
**physical**
18:10
**Ph.D** 1:19 2:4
2:10 4:7 6:5
9:12 10:4
10:16 26:11
26:12 151:7
151:16
152:3
**Ph.D.s** 26:4
**piece** 28:4
35:2 42:14
54:22
140:15,17
**pieces** 54:25
55:2,6
56:23 92:10
92:13

143:11
**Pipefitters**
1:3 5:4
**place** 41:9
49:24 75:16
103:7
144:22
146:14
152:6
**places** 17:22
17:23
**plaintiff** 1:13
34:5,9,12
34:14 96:19
103:25
**plaintiffs** 1:7
3:2 4:8 5:14
5:17 6:14
34:7 58:6
97:1
**plaintiff's**
54:6 57:12
57:24 59:6
59:8 60:2,4
**plan** 35:3
43:11,20
44:6,13
45:2,13
**planning**
44:17
**PLANS** 1:4
**plant** 100:15
**plants** 53:18
**plausible**
78:6,24
**play** 53:20
**played** 13:11
17:25 52:25
**plays** 144:13
**please** 5:11
6:16 7:22
15:16 18:23
19:8 41:17
43:8 46:2
47:18 48:7
49:11 50:23
53:25 58:16

60:6 64:23
68:10 73:18
78:20 86:14
113:21
135:2 137:4
154:3,7
**plenty** 67:17
148:1
**Plumbers** 1:3
5:4,21
31:10
**plus** 30:3
93:17
**point** 20:6
21:16 25:21
25:21 32:10
36:7,17
46:9 53:20
56:24 65:14
69:19 73:8
75:1,18
77:7 82:12
85:18 108:6
113:5 136:7
143:23
**pointed** 82:19
124:21
**points** 73:3
91:11,13
111:7
125:19
134:7
**portfolio**
76:23
**portfolios**
119:18
**portion** 35:23
109:16
149:17
**portions**
17:18 18:9
**position** 9:9,9
9:15,17
16:15,18
17:8
**positions**
9:13

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

172

**positive** 61:6
62:7 90:5
91:7,8 92:2
93:13
124:24
**possibility**
41:1 75:3
75:20
**possible**
40:13
101:24
115:3 120:1
120:4
**Postova**
34:11
**potential**
121:19
**practices**
116:8,8,16
**precisely**
61:13 62:18
**predict** 92:4
**predictable**
106:22
**prefer** 20:21
**prepared**
12:12
**prepares**
23:18
**presence** 4:14
5:12 152:4
**present** 3:24
62:20 63:7
65:9
**presentatio...**
44:10
**presenting**
71:9
**president**
17:10
**pretty** 67:22
**previous** 63:2
65:6 126:8
136:14
**previously**
92:19
**price** 37:15

40:6,6
61:21 63:13
64:18 65:11
66:10,12,13
66:15,21
67:4,6
68:11 77:22
86:7 89:22
91:7,21,21
93:5,18
94:24 104:7
105:19
109:17
121:5 126:6
126:7 130:2
130:3,8,9
134:6,18
135:12
138:8
139:20
**prices** 37:18
40:8 46:16
46:21 47:2
47:13,20,25
48:10,19,23
49:6 54:24
74:13 75:13
118:6,16,22
118:24
119:2,4,5,9
119:10,13
119:13,14
119:18,22
120:5,5,23
120:24
121:24,25
122:3,7
123:23
125:2,6
126:10,12
126:15,17
126:21
127:8,15,22
128:4,6,8
128:18
132:1,20
133:1,14,22

139:24
143:17
146:12,15
146:18,18
**primary** 9:14
**principal**
17:10
**print** 8:8
**prior** 46:21
50:9 52:17
55:12 56:16
104:4
127:15
142:10
**privilege** 45:5
45:6
**probabilities**
74:20,22
**probably**
145:13
**problem**
91:18 101:2
101:14,16
104:12
106:23,25
110:6
**problems**
51:19 79:25
95:16 101:9
106:18,24
110:7 119:3
119:5
**Procedure**
152:8
**proceed**
106:8
**proceeded**
126:7
**proceedings**
117:8
150:14
**proceeds**
105:3
140:18
**process** 15:11
20:7 35:15
**produced**

44:22
**product** 45:6
**production**
51:16
**products**
48:15
**Professor**
6:10 28:16
50:21 60:1
62:1,19
69:14,20
73:18 76:20
80:9 81:6
82:25 91:15
93:3 101:2
109:7
110:18,24
112:6
113:18
118:5,15
119:8 122:3
125:5 126:1
126:25
132:6 134:1
139:3,18
140:12
143:4,7
144:9 145:3
146:10,22
147:12
150:10
**Professors**
60:8
**program**
9:12 10:16
10:16
**programings**
16:11
**programmi...**
17:3
**programs**
9:23 10:4
**promised**
40:19
**proof** 4:14
**properly**
83:11,12

106:11
**proportional**
141:17
**prospects**
54:11,16
**PROTECT...**
1:18
**proved** 57:24
**provide**
35:10,18
44:2 62:17
80:9 122:6
139:3
144:20
**provided**
21:8 32:7,7
32:14,15,17
32:20 36:12
36:13 38:11
119:22
126:18
127:8
147:16
148:2
**provides**
62:14
**providing**
65:5 103:23
**PSLRA**
60:16
**Public** 2:13
151:24
152:2,20
**publically**
38:2,11,12
**publication**
8:20
**publications**
8:6
**published**
93:22 95:8
**purport** 48:9
**purports**
47:24
**purposes**
7:15 37:3
113:16

118:6 132:3
137:7
**pursuant**
2:11 4:10
152:7
**put** 18:20
45:23 102:8
102:8 111:6
118:2
**puzzling**
51:15
**p.m** 108:12
109:2
150:15

---

**Q**

**qualification**
4:15
**qualify** 63:2
**quantify** 81:9
81:16,23
110:2
**quarter**
51:20 52:2
86:18,23
87:1,15,16
90:1 91:24
97:12,13,23
98:11,13,14
98:18,21,25
99:11,14,17
99:18,22
100:22
102:18,19
112:13
**quarterly**
87:11,25
**quarters** 52:3
98:16 99:1
99:10
**question**
13:25 14:4
15:9 18:3
19:4,5,8,12
20:6 31:24
48:6 50:6
53:13 55:20

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

55:25 56:1
56:18 57:3
58:15 59:18
59:21 67:22
77:1,1
78:14,21
81:8 92:6
92:10,14,17
92:18
103:13,18
118:9,14
120:9,11
122:17
123:13
127:14,20
127:21
128:15
131:6
134:13,15
136:14
139:16
140:17
149:23
**questions** 7:3
15:15 45:8
110:21
147:14
150:2,3,4,6
150:7,8
**quite** 15:8
16:17 24:12
28:2 36:20
61:7 67:20
76:5 79:8
79:21 81:3
81:22 88:10
88:16 89:12
89:15 91:10
91:18 111:6
114:1
120:17,17
147:18
**quote** 43:2
46:23
———————
**R**
**R** 3:1 135:3

152:1 155:1
155:1
**raise** 12:23
118:21
**raised** 110:22
**Randall** 3:21
5:25
**range** 40:13
124:16,18
**rate** 22:25
24:15
139:13
**rates** 39:24
141:13
**ratio** 66:14
68:16,18,24
89:24 96:9
**reach** 69:13
**react** 40:3,9
40:12 103:5
138:19,23
**reacted** 64:21
65:6 74:13
75:13,23
139:11
**reaction**
64:18 86:7
89:22 90:6
91:7,12,14
91:21,21
93:4 109:17
144:17
**reactions**
94:24
101:15
104:7 139:4
**read** 11:17
12:7,8,20
12:21 18:25
28:11,14,15
29:2,5,10
30:23,23
43:6 44:9
51:4,5 52:8
56:19,20
58:15,17
59:21,24

78:14 92:19
92:22 151:8
154:3
**reading**
12:11 28:8
28:8 30:25
51:25 54:18
56:2 66:19
149:22
**really** 10:3
21:19 30:21
59:1 60:17
64:9 69:23
110:8,10
**reason** 7:6
45:22 97:3
99:19
103:15
138:3
140:22
154:5
155:10,12
155:14,16
155:18,20
**reasonable**
95:3
**reasoning**
29:6
**reasons** 40:14
40:16 79:8
155:6
**rebuttal**
11:17,21
12:8,11,19
12:21 14:3
82:25 83:4
83:6,7
**recall** 22:4
**receipt**
154:14
**receive** 20:18
24:4,22,25
**received**
20:14 24:10
26:11 30:11
49:16 72:20
72:21 93:14

**receives** 38:5
**recess** 41:14
73:15
108:11
147:9
**recognized**
43:11
**recollection**
21:13 23:3
23:8 28:10
28:13,23
29:12 32:12
36:23 49:1
49:4 60:1
71:22 72:14
97:14
112:25
113:6
**record** 6:12
6:13,18 7:9
41:11,13,16
56:20 58:17
59:24 73:14
73:17 92:22
108:9 109:5
147:3,4,8
147:11
150:12
152:5
**reduced** 4:12
152:4
**reduction**
54:7
**reductions**
100:17
**Reese** 9:5
**REFCO** 35:1
**refer** 46:24
**reference**
42:15 43:1
43:3 82:15
145:12,13
**references**
77:18
**referred**
82:10
**referring**

42:13 45:17
51:24 56:1
94:1 98:14
98:15 119:6
137:14
**refers** 50:10
**reflect** 79:23
**reflecting**
116:18,20
**regard** 39:7
64:15 85:21
95:21
117:11
136:16,18
143:21
**regarding**
44:6
**regression**
90:18,19
99:3,8
129:8
**regulations**
37:24
**relate** 13:25
**related** 36:20
62:11,18
64:4 76:23
104:11
105:1
106:21
136:6
145:24
148:4,14,22
149:8
**relates** 83:13
133:21
135:4
**relating**
147:17
**relation**
68:13 85:6
**relationship**
16:7,8
63:11,12
65:10 93:16
93:16 94:6
94:23

**relative**
152:10,11
**relatively**
107:15,22
107:24
**releases**
146:13
**relevant** 9:20
27:16 57:2
103:1
119:12
124:11
**reliability**
107:21
**reliable** 88:13
119:2
**relied** 13:15
14:8 21:11
30:14 31:3
42:9 90:20
**rely** 20:24
42:12 110:8
110:10
**relying** 10:8
10:14,15
31:3 110:2
**remember**
8:4,16,24
15:3,21
16:3 22:8
22:18,22
23:7,10
25:21 27:18
28:7 32:10
32:24 33:13
33:20 34:24
35:12,22
36:20 49:3
51:25 72:1
73:5 97:15
97:16
113:10
122:12
135:10
148:11
149:1,2,5
149:14

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

174

remembers
  28:3
remind 68:15
Renaissance
  2:10
rendering
  50:14
RENÉ 1:19
  2:9 6:5
  151:7,16
René 2:4 4:7
  5:2 6:19
  152:3
repeat 19:6
  25:24 48:6
  78:22
  134:12
rephrase
  118:13
replace 65:18
report 7:12
  7:23 8:1,3
  11:9,10,11
  11:24 12:2
  12:6,7,15
  12:18 13:3
  13:4,16,19
  14:1 15:12
  17:18,20,21
  18:5,6,9,12
  18:14,19
  22:25 23:25
  30:5 31:22
  32:3,4,7
  35:13 36:21
  36:24 37:3
  37:12 39:12
  41:18 42:10
  45:24 46:3
  47:17,22
  49:9 50:4
  55:18 57:15
  58:11,19
  59:6,10
  60:7 62:2,8
  63:21 64:12
  64:19,23

68:7 73:8
73:19 76:11
78:4,23
79:4 80:1
81:19 82:4
83:4,7
85:16 86:15
87:21,24
88:25 94:3
96:1 97:10
97:11 99:20
99:21 100:4
102:1
111:13,16
112:22
118:6,16
120:20
122:16
125:4,12
128:13
131:14
134:21,23
137:5
143:20
144:2,11,15
144:19,22
148:17
153:5
reported 1:21
  86:22 87:3
reporter 5:8
  19:7
reporting
  115:8,11,15
reports 11:17
  11:21 12:8
  12:12,19,22
  14:3 28:13
  28:14,15,17
  28:23 30:19
  30:22 31:1
  31:18 32:8
  32:14,15
  36:18 37:22
  42:5 46:24
  57:12 71:12
  74:25 77:18

85:3,8,19
  128:17
  148:18
represent
  6:13
reputation
  109:22
  111:18
  112:5
reputational
  109:14
request 29:5
  86:2
requested
  18:25 20:25
  56:20 58:17
  59:24 92:22
requests 20:8
require
  135:11,12
requirement
  114:19
requires 63:3
reread 18:23
  19:8 78:20
research 9:10
  11:4 12:11
  12:17,24
  16:9 24:5
  48:21 71:12
  143:25
  144:24
researcher
  121:11
researchers
  93:23
Reserve 8:20
residual
  66:15,17,21
  67:3,5
  68:11 70:2
  70:5,7,13
  89:22 91:2
  91:21 92:3
  93:10 134:8
respect
  116:16

responded
  139:7
response
  12:18 49:15
  50:5,7,10
  86:2,3,6
  87:10 88:16
  88:24 90:21
  91:19 92:1
  93:12,13,21
  94:15 95:21
  97:21
  101:21
  102:22
  103:3,4,14
  104:2,17
  105:6
  107:24
  108:1
  109:11,17
  137:17,20
  137:22
  142:6
responses
  142:7
restatement
  60:12
  109:18
  138:6,8
  139:20
restructuri...
  43:11,19
  44:6,12
  45:2,13
  100:14
result 11:14
  41:6 46:16
  47:14 57:6
  57:9 66:22
  69:16 88:18
  90:6 92:3
  94:7 126:12
resulted
  94:15
resulting
  65:12 66:9
results 49:16

62:8 88:25
90:18,19
96:6,7
97:14 99:15
102:15
103:24
106:20
118:25
131:15
134:3
resumé 11:3
retained 34:5
  34:7,8,12
  34:14
Retirement
  35:3
return 66:17
  73:7 76:17
  77:8,9 78:7
  79:1,16
  80:7,21
  81:11 82:22
  83:13,17
  85:6 91:2
  92:3 93:10
  101:6,12
  102:7,9
  103:2 120:2
  122:21
  124:13
  125:24,24
  127:25
  128:22
  130:2,6
  132:3,21
  133:2,9,18
  133:25
  134:8
  154:12
returns 61:7
  84:25 90:14
  101:7,14
  104:10,23
  106:1
  119:25
  121:14,20
  122:7,8,22

124:13,15
124:18
126:3
129:20,25
131:19
132:7 135:1
135:8,21
136:10,11
142:19
143:9,12,14
revealed
  64:20
revelation
  117:10
review 8:14
  18:15 19:16
  23:19 27:9
  27:13 51:18
  94:5 152:8
reviewed
  27:11,14,19
  30:20 56:14
reviewing
  30:18
revision 66:4
  66:23 72:22
  73:6 104:25
  107:1
revisions
  63:12
  104:19
  106:13,16
  106:20
Richter 1:9
  5:21
Richter's
  52:1
right 6:23 9:3
  11:19 23:1
  24:15 28:12
  30:14 38:2
  38:7,13,25
  39:13,20,25
  40:7 41:4
  43:14 45:24
  46:17 48:1
  49:18 52:19

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

57:22 60:6
60:12 64:16
66:2,8 67:6
67:9 68:14
68:21 72:9
73:22,23
74:20 75:10
77:5 80:11
85:25 86:3
86:8,19
87:4,12
89:1,2 90:7
90:15 92:3
92:20 93:23
93:24 95:23
96:2 97:8
99:3,24
100:9,20
101:24
102:4,22,23
109:8,23
110:4,16
111:4 112:3
114:1
115:21
116:5 118:7
118:17,20
119:16
123:1,8
126:12,15
128:2,10,14
128:21
129:11
130:12,17
131:20,22
132:5,18
135:9,10,24
136:6,16,17
136:20
137:11
141:15,16
143:6,10
146:4
147:23,23
148:7
**rise** 46:20
47:2,24

**rising** 47:14
**risk** 8:17
**risks** 83:21
**River** 6:20
**rlevine@le...**
3:22
**RMR** 1:21
2:13
**Robbins** 3:3
5:13,16
**Robert** 1:8
1:15 6:1
**robustness**
96:16 97:6
97:23
**Rogers** 3:25
5:9
**role** 13:11
17:25 52:25
53:21
144:13
145:15
**Ronen** 28:16
50:21 60:8
61:2 76:20
118:15
119:8 122:3
122:20,21
125:5
126:25
134:1 139:3
139:18
143:4,7
144:9 145:3
146:10,23
**Ronen's** 59:9
118:5 126:1
132:6
140:12
**rose** 48:24
**Roseman**
5:20,23
**Rosenman**
3:14
**roughly**
68:20
**row** 122:20

129:14,14
132:13,14
**rows** 122:20
**Rudman** 3:3
5:14,17
**Rule** 152:7
**rules** 7:1,4
37:23 152:7
**run** 68:23
81:9,16
84:19
**R-E-N-E**
6:19

**S**
**S** 3:1,16,21
4:4,4
**Sachs** 33:6,12
33:24
**SADIA** 127:7
**sale** 100:19
**sample** 111:9
111:10,10
112:16,24
112:25
113:24
114:7,22,24
115:20
116:10,18
116:20,21
**San** 3:4
**Saturdays**
27:6
**saw** 43:4,7,25
85:20
**saying** 13:1
13:12 42:23
49:23 54:14
57:22 75:6
75:11 80:15
105:5 127:7
**says** 6:6 10:1
24:3,4
41:19 43:10
46:10 49:13
50:4 54:5
55:22 57:16

58:11,20,23
60:2 68:12
70:15 84:23
91:19 99:9
106:15
110:3
111:16
113:2
115:14,17
115:22
122:21
128:19
132:13
133:15
143:24
144:14,21
144:23
**scenario**
136:16
**scenarios**
85:24
**scientific**
79:12 80:19
81:9 82:20
83:9
**scrap** 47:24
48:10
**seal** 152:13
**search** 47:10
**searches**
44:19,25
45:11,11
**SEC** 111:11
112:19
114:8,18,20
116:2,4,6
116:11,14
117:2,14
**second** 33:5
54:4 71:11
87:15 99:9
120:21
137:6
**section** 43:6
47:17 82:14
**sections**
18:14

**securities**
34:15,19
35:1 39:8
41:20 74:13
115:18,19
119:15
148:9
149:12,14
149:15
**security**
38:13,24
75:13
**see** 9:4 16:11
23:17 24:7
37:15 41:19
43:12 44:11
46:9 49:17
53:5 54:12
56:22 57:20
61:11 65:25
70:18 72:18
86:15 91:3
91:18 92:2
95:2 98:11
111:21
115:6,8
120:25
122:16
125:7
130:10,23
132:14,17
137:18
144:4
**seeing** 14:2
**seen** 29:16
56:13 57:11
**Seine** 6:21
**SEIU** 1:4
**sell** 130:5
**sells** 129:23
131:25
**seminal**
110:19
**send** 18:14
116:7
**sending**
22:18

**senior** 15:22
**sense** 10:7
13:13 16:10
42:13 51:14
51:16 54:5
60:21 64:10
64:11 67:17
76:11 80:17
84:11 89:5
104:8
116:14
123:22
132:8 134:2
138:14
139:5
144:10
**sensible**
80:14 88:15
**sensitive** 79:9
**sensitivity**
96:17 97:6
**sent** 22:21
**sentence** 24:4
43:10,13,16
49:13 54:4
58:20 79:4
120:21
**separate**
120:23
**separately**
97:13 99:14
99:17 105:8
107:1,4
**September**
46:12,21
48:24 49:14
50:2 51:2
52:21 57:1
58:7 59:12
64:15,17
68:5,7
120:16
125:3
131:15
138:21,21
**services**
119:23

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

176

| | | | | | |
|---|---|---|---|---|---|
| **Session** 4:1 | 18:16,24 | 58:4,9 59:7 | 116:1 | **state** 2:14 | 77:22 85:22 |
| 109:1 | 19:19,24 | 73:5,10 | 119:25 | 6:16 9:7 | 86:7 90:6 |
| **set** 42:6 116:1 | 20:3,17 | **sizeable** 61:7 | 123:25 | 10:24 59:10 | 91:7 93:5 |
| 152:13 | 25:23 26:2 | **skew** 69:11 | 129:3 | 151:2 152:1 | 93:18 94:24 |
| **sets** 146:16 | 45:3,9,14 | **skews** 69:12 | **specifically** | 152:3,20 | 101:6,14 |
| **settled** 36:8 | 46:4,6 | **Skokie** 3:10 | 54:1 85:4 | 154:4 | 102:3,8 |
| 149:11 | 47:15 56:18 | **small** 88:20 | **specified** | **stated** 12:2,5 | 103:2 104:3 |
| **shape** 117:2 | 56:21 59:14 | 123:15 | 106:11 | 38:2 45:20 | 104:6,10,23 |
| **share** 94:14 | 59:16,22 | 124:21,22 | 152:6 | **statement** | 105:19 |
| 94:15 112:9 | 64:24 65:2 | **softly** 59:20 | **specifies** | 42:13 43:1 | 109:17 |
| **shared** 106:5 | 92:7,11,15 | **somebody** | 139:17 | 45:15,23 | 110:4 118:4 |
| **sharply** 75:14 | 92:23 150:8 | 34:8 121:9 | **specify** 50:12 | 49:20,23 | 136:4,14,22 |
| **sheet** 154:6,7 | **sign** 154:7 | 135:21 | **speeches** 8:23 | **statements** | 136:23 |
| 154:10,13 | **signature** | **somewhat** | **spend** 25:15 | 11:22,23,25 | 137:1,9,16 |
| **shift** 109:12 | 7:18 155:23 | 121:22 | 26:21,24 | 37:19,21 | 137:23 |
| 118:3 | **significant** | **sorry** 18:22 | **spending** | 45:17 | 138:4,8 |
| **shock** 54:20 | 98:12 | 19:3 25:23 | 25:5 | **STATES** 1:1 | 142:6 |
| **short** 41:14 | 104:14 | 29:18 33:16 | **spent** 21:18 | **statistically** | 147:21 |
| 73:15 | 132:7 | 48:5 52:13 | 21:25 23:14 | 139:4 | **stocks** 40:2 |
| 136:10 | **signing** 154:9 | 56:19 59:16 | 30:18 | **Stearns** 33:7 | **Stone** 3:9 |
| 147:9 | **similar** 16:8 | 59:19 65:25 | **spit** 90:5 | 33:10 | **stop** 108:7 |
| **shorter** 8:21 | 83:19 | 74:18 78:18 | **spring** 20:12 | **steel** 47:20,25 | **stopped** |
| 88:12 | 119:22 | 96:3 98:23 | **ss** 151:3 | 48:10,14,17 | 16:21 26:11 |
| **shortly** 26:12 | **Similarly** 1:6 | 99:2 102:10 | 152:1 | 48:17,19,22 | **straightfor...** |
| **show** 39:16 | 1:12 | 102:11 | **Stacy** 1:21 | 48:23,24 | 67:22 |
| 47:24 48:9 | **simple** | 115:9 | 2:12 5:8 | 49:2,5,8 | **strategy** |
| 60:2 86:21 | 125:18 | 125:16 | 152:2,20 | 54:24 | 44:10,16 |
| 86:25 91:7 | 127:14,20 | 126:24 | **staff** 24:5 | **Steimle** 1:15 | **Street** 2:11 |
| 96:5 125:5 | 127:21 | 129:14 | **stage** 36:1,7 | 6:1 | 3:20 5:3 |
| 132:22 | **simplistic** | 131:21 | 36:25 | **stenotype** | **stress** 93:2 |
| 133:7,23,25 | 140:2 | 134:12 | **standard** | 152:4 | **stretch** 41:10 |
| 135:20 | **simply** 77:1 | 135:16 | 20:7 106:9 | **stenotypy** | **structural** |
| 136:9 | 131:6 | 137:13 | 122:6,8 | 4:12 | 100:24 |
| 138:15 | 134:15 | 140:7 | 124:12,15 | **Sternman** | **student** 26:10 |
| **showing** 59:7 | **single** 28:11 | **sorts** 37:20 | **start** 20:9 | 5:22,22 | **studied** 114:5 |
| 63:21 65:3 | 117:4 | 62:4,10 | 84:11 118:3 | **stipulated** 4:6 | 117:9 |
| 81:13 82:16 | 141:11 | **source** 9:14 | **started** 7:4 | **stock** 37:4,15 | 128:10 |
| **shown** 139:22 | **sit** 18:4 | 21:12 37:18 | 17:22 18:6 | 37:18 40:5 | **studies** 8:14 |
| 151:12 | **Situated** 1:6 | 105:14 | 21:6,6 | 40:24 57:17 | 13:14 67:13 |
| **shows** 40:1 | 1:12 | **sources** 51:6 | 28:21 35:2 | 61:3 63:13 | 67:18,24 |
| 65:13 66:5 | **situation** 61:4 | **South** 3:20 | 92:17 | 64:4,18 | 68:3 84:1 |
| 81:21 82:19 | 61:8 79:5 | **space** 154:5 | **starting** | 65:11 66:9 | 94:17 |
| 82:25 87:4 | 82:1 118:1 | **speak** 59:20 | 142:5 | 66:14,21 | 117:13 |
| 91:2 | **situations** | **speaks** 58:19 | **starts** 111:10 | 67:3,5 | **study** 70:6 |
| **Siegel** 3:9,11 | 10:19 | 96:1 | 111:15 | 75:23 76:3 | 71:21 76:7 |
| 6:2,2 15:14 | **size** 50:11,13 | **specific** 84:25 | 113:2 115:7 | 76:17,21 | 76:15 77:2 |
| 17:19 18:1 | 52:25 57:13 | 93:5 105:10 | 115:11 | 77:4,8,21 | 79:14 83:11 |

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

88:3 90:15
94:12
111:17
112:2
114:14
118:5,10,10
118:15
126:1,9
127:25
128:1,5,14
128:16,20
128:24
129:2,4
131:15
132:3,6
135:4,23
136:19,24
137:2,17
138:2,4,14
141:14,20
143:10,13
**studying**
77:20
101:23
**stuff** 17:24
147:6
**Stulz** 1:19 2:4
2:9 4:7 5:2
6:5,10,20
62:19 73:18
109:7
113:18
147:12
151:7,16
152:3
**Stulz's** 153:5
**subject** 1:18
114:14,25
151:11
154:9
**submit** 22:7
22:10,13,16
**submits**
23:21
**submitted**
11:11 21:24
22:5 23:5,6

31:21
**subscribed**
151:20
**subsection**
82:8,13,18
**subsequent**
4:10 14:2
32:3
**subsequently**
61:18
**substantial**
122:1,4
123:14
124:20
125:7,23
**substantially**
46:11 89:7
122:9
**successful**
149:20,23
**sued** 112:18
**Suite** 3:4,10
**summarizing**
143:21
**summary**
97:21
128:13,19
**Sundays** 27:6
**support** 24:6
43:1
**suppose**
104:9
**supposed**
24:20 115:9
**sure** 8:4,16
8:24 9:21
10:13 13:1
15:8 16:17
16:25 17:9
19:12 20:5
20:11,13
21:23 24:12
25:8,20,25
26:23,23
27:4 29:17
30:10 31:6
32:9 33:10

35:25 48:8
48:8 51:23
63:5 67:16
67:20 68:25
69:3 75:11
75:16 76:3
78:22 91:10
92:7 97:17
105:5 111:5
134:14
147:1,18
149:5,19
**surprise** 74:8
74:12 75:17
75:17 86:8
86:10 87:7
89:21 90:3
91:8,20
92:1 94:14
99:7
**surprises**
94:24
**surrounding**
44:16 63:15
**sworn** 6:6
151:20
152:3
**systematic...**
103:16
**S-E-I-N-E**
6:21
**S-T-U-L-Z**
6:20
_____
**T**
**T** 4:4,4 152:1
152:1 155:1
**table** 73:4
97:11 117:5
122:5 125:4
125:9
**tables** 16:13
17:3 117:20
**take** 35:9
41:9 61:21
73:11,12,25
75:16

101:11
103:7
106:12
108:7
141:17,25
142:14
146:25
**taken** 4:9 5:2
6:22 41:14
73:15 75:7
75:12 81:14
107:2
108:11
112:19
147:9 152:6
**takeover**
100:9 101:5
101:8,11
102:5,6,13
**takes** 49:24
104:15
105:6
142:12
**talk** 44:8
47:20 51:6
144:3
**talked** 18:20
55:8 112:8
131:9
**talking** 60:18
60:19 65:21
65:23 68:8
71:8 81:4
82:9 83:22
97:24
101:13
102:25
103:6
109:11
110:12
113:19
118:3
119:24
122:11
125:10
132:8
**talks** 127:5

146:1
**taught** 9:23
10:5
**taxing** 113:5
**teaching** 10:8
10:9
**tell** 27:24
67:14,24
90:10,12
117:17,19
123:21
124:3,23
**telling** 36:11
145:2
**tells** 91:12
124:5,19
**tend** 27:5
**tender** 12:4
**tendered**
7:12 149:17
**term** 117:24
**terms** 15:16
73:6 107:24
108:1 112:4
124:11
126:23
145:10
**test** 68:23
81:9,16,19
81:23 84:19
97:23
**testified** 14:2
30:20 32:21
91:22
101:20
149:7,12
**testifies** 6:6
**testify** 6:15
7:7 11:8
12:12 33:23
152:3
**testimony**
9:20 24:18
30:11 31:19
31:25 32:2
32:8,18
35:10,18

52:1 103:9
105:4 114:3
114:12
116:11,24
141:19,24
142:10
148:24
151:9 152:4
152:5
**tests** 80:19
96:17 97:6
**textbook**
145:25
146:1,2
**thank** 9:3
26:2 46:6
65:2 92:23
147:12
150:9
**theory** 58:5
59:8 142:12
**Theres** 43:15
**thing** 71:6
77:7,11
89:3 107:13
**things** 10:5
14:2 37:20
37:25 38:1
42:2 46:15
53:18 56:23
62:4 80:3
85:11 100:8
102:5 108:3
108:4
114:19
137:14
**think** 7:20
8:5,17
20:12 21:21
24:3 25:4
26:19 30:1
35:2 38:14
39:11 44:12
63:25 68:5
69:18 71:24
72:6 73:2
77:7 79:8

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

178

79:11 87:19
87:24 90:14
93:19 95:19
95:24 99:23
101:20
110:5,18
112:10,21
113:5 128:8
128:12
144:10
145:14
149:10
150:4
**thinking**
32:18 85:15
148:13
**thinks** 62:1
**third** 2:11 5:3
24:3 32:22
33:6 37:13
113:22
**thirty** 154:13
**thought** 13:2
14:21 46:22
47:8 63:23
67:23 75:15
78:15,17
82:2 140:7
**thousands**
44:21,21
108:2
**three** 32:11
32:13,18
33:8,9
61:22 65:7
67:8,15,25
68:19 69:2
69:5 122:22
130:24
135:8
146:16
**throat** 73:12
**time** 4:9 7:25
8:3 11:11
11:23 13:10
20:11 21:17
21:24 25:9

26:21 27:3
30:18,23
31:21 47:7
47:12,24
48:24 50:12
50:19 51:8
52:8 53:3
54:8 56:3
56:24 75:2
76:4,5
79:19,21
81:3,3,5
87:12,14
88:9,12
101:19,22
106:5
123:23
124:23
127:3
147:13
150:10
152:6
**times** 17:22
30:23 68:19
69:2 83:18
88:10 95:7
96:14
119:19
**title** 8:16
16:20,22
17:10
116:23
152:6
**titled** 8:10
**today** 6:15
7:7 12:13
**TOLEDO**
1:2
**tools** 84:15
**top** 10:1
111:14,16
113:23
131:14
137:5 149:1
**topic** 43:5
**topics** 12:14
12:16 35:10

43:6 109:12
**total** 22:4
23:4 66:12
69:11 74:8
105:9,11
**traceable**
24:23
**trade** 88:8
131:23,24
135:21,22
**traded**
119:15,20
120:14
**trades** 131:1
131:4
**trading**
121:13
132:14,14
132:20,25
133:6,14,22
134:19
136:11
139:2
**traditional**
105:16
**transaction**
122:7,7,21
123:14
124:13,14
125:2,6,24
126:2,3,6,7
126:10,14
128:6,8,9
129:18
134:7
**transactions**
121:10,21
126:23
**transcribed**
4:13 152:5
**transcript**
29:22 92:16
151:11
152:9
154:14,15
**transcripts**
30:9,11

52:1
**treat** 99:19
**tremendous**
104:9
**trial** 11:8
114:10
149:7,13,13
**tried** 42:2
102:24
103:13
**trouble** 59:17
**true** 66:25
67:1 69:15
117:9
130:19
151:10
152:5
**truly** 23:7
**TRUST** 1:4,5
1:11
**truth** 152:4
**truthfully** 7:7
**try** 95:2
113:10
**trying** 8:24
51:14,16
55:21 67:21
149:2,4
**turmoil** 99:23
100:8
**turn** 7:22
13:18 37:2
37:11 43:8
46:2 47:18
49:11 50:23
53:25 60:6
73:18 90:23
113:21
135:2
**turned** 27:15
**turning** 41:17
**twice** 89:13
**two** 8:18
28:16 52:3
52:13 55:12
58:2 67:2
68:8 69:19

71:4 76:21
115:23
122:20
130:12
131:19
132:4,20
133:1,14
134:7
139:15
143:11
**type** 14:20
17:14 18:5
79:9 81:25
83:15,20,21
85:1 93:2
101:10
123:18
**typed** 16:14
17:4
**types** 48:16
48:17,23
49:8 51:17
90:17
115:24
**typical** 75:5
89:13 94:6
94:6 104:21
117:6,6,21
117:25
**typically**
66:16 81:1
101:9 105:2
**typing** 18:10
18:11

_____

U

**U** 4:4
**Uh-huh**
10:22 29:3
34:22 70:19
109:15
132:12
144:16
**unanticipat...**
37:14
**understand**
18:22 19:1

19:6 29:7
33:17 44:20
45:1,12
50:25 55:22
58:9 74:18
93:11 99:2
105:5 109:7
145:18
146:3
**understand...**
11:13 21:4
33:11 43:5
43:19 44:5
51:3 53:21
89:20
110:13
116:17,19
145:10
**understood**
13:1
**unexpected**
86:11
100:11
**unfortunat...**
22:8
**uninformat...**
123:20
**UNITED** 1:1
**University**
9:7 26:9,24
**unnecessary**
119:1
**unrelated**
104:10,13
**update** 70:25
71:4,4,19
71:20 72:2
72:23
**updated**
71:16 72:8
**Upp** 1:21
2:13 5:8
152:2,20
**upside** 40:22
41:7,8
**up-to-date**
8:9

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

**USDC** 5:6
**use** 55:19
71:3,21
89:9 90:1
102:20
104:8
109:13
118:22,23
119:2 120:4
121:24
126:14
128:4,6
136:19,22
137:1,8,16
137:19
138:1,3
139:23
141:5,7
142:16
144:13
146:8
**useful** 29:15
**uses** 38:24
101:10
118:6,16
141:7,12
**U.S** 8:13

**V**

**v** 5:5
**vague** 28:2
55:20,25
113:6 120:8
139:17
**validity**
119:11
**valuable**
27:12
**valuate** 38:24
109:14
**valuates** 38:6
**valuation**
38:13,22
63:1 140:10
146:20
**valuations**
126:23

**value** 40:24
40:25 62:20
62:20 63:7
63:7 109:22
119:18
142:13
**variables**
107:19
**variation**
124:17,18
**varies** 81:1
130:23
**variety** 37:24
44:15 51:13
51:15
**various** 9:23
11:5 42:4
96:16
111:11
127:1
**verify** 24:18
24:24
**version** 8:21
**versions** 8:18
106:17
**versus** 87:3
122:8
**vice** 17:10
**videograph...**
3:25 5:1,8
41:12,15
73:13,16
108:8 109:4
147:7,10
150:11
**Videotaped**
1:19 2:9
**violations**
115:8,12,15
**VIRGINIA**
1:4
**volatile**
102:20
**volatility**
102:2,4,8
104:3,6,9
**vs** 1:7,13

**W**

**W** 1:15
**Wachovia**
34:23
**Wait** 87:19
**waiting** 35:15
**waived** 4:16
152:8
**want** 7:11
12:25 19:11
25:7 28:3
44:2 61:25
65:14 77:23
89:2 93:11
104:12,22
109:12
120:1,4
121:12
132:5 136:7
142:23
146:11
**wanted** 19:23
29:7,10
30:10 67:23
93:1 97:17
101:22
**wasn't** 29:17
69:4 70:22
74:8 75:7
95:18,18
96:20 114:1
126:7
149:13,14
**way** 13:2
24:24 39:5
40:3,8
48:18 61:24
62:1 69:11
69:25 85:2
88:17 104:2
105:2,17
106:22
107:8,9,10
107:17
117:2 119:9
121:5

138:20
139:8
140:18
143:3,18
144:9
146:21
**ways** 56:10
106:8
107:16
120:10
136:22
146:19
**Wednesday**
4:1 109:1
**week** 26:25
27:1
**well-establi...**
94:25
**went** 7:9
14:20 56:17
149:12,13
**weren't**
126:11
**West** 1:4 3:4
**Western** 1:2
5:6
**we're** 101:13
150:4
**we've** 11:9
113:19
**WHEREOF**
152:13
**wide** 37:24
40:13
**widely**
144:11,18
144:21
145:3,16
**WILLIAM**
1:14
**windows**
136:10
**wish** 155:5
**witness** 4:7
4:14 19:12
26:22
127:16

151:8 152:5
152:8,13
154:1
155:23
**word** 112:18
**words** 60:11
**work** 10:15
12:11,17
15:6,10,10
15:19 16:9
18:17 19:20
21:1 23:18
25:2,10
27:6 44:4
45:5 73:22
126:21
**worked** 17:21
17:21 26:17
**workforce**
100:17
**working** 20:9
21:25 25:15
43:11,20
44:13
**works** 24:13
**world** 9:24
10:10
146:16
**Worldwide**
5:11
**worried**
123:25
**worse** 78:7
79:1 82:22
85:9
**worst** 61:17
**wouldn't**
41:17 69:12
80:14,16,17
83:18 91:6
116:9 120:5
121:24
140:10
**writing** 4:12
15:11
**wrong** 92:19
113:7

**wrote** 11:24
**Wyman** 3:5
5:13,13 6:9
6:13 19:9
25:25 28:1
46:5 55:16
55:18,21
59:19 65:1
78:12,16,18
92:9,13,24
109:6 147:4
150:9 153:3

**X**

**X** 153:1

**Y**

**yeah** 26:3
33:18 72:6
91:23 140:9
145:8
147:22
148:24
**year** 20:12
22:1,2 23:5
25:6 26:20
27:3 97:16
**years** 16:21
26:16,19
31:20
**Yep** 46:8
**York** 3:15
8:21

**Z**

**zero** 80:11,12
80:13 123:7
**Zollinger**
15:23,25
16:5 17:17
26:7,14
**Zollinger's**
16:15
**Z-O-L-L-I-...**
15:25

**$**

RENÉ M. STULZ, Ph.D. - SUBJECT TO PROTECTIVE ORDER

180

**$1.58** 65:19
**$1.61** 65:15
70:18
**$900** 22:25
24:15 25:9

_____
**0**
**0.05** 112:8
**02** 122:25
**04** 86:19 90:2
91:25
**05** 66:5 67:5
**06** 123:4

_____
**1**
**1** 7:23 48:10
50:24 94:7
98:7,8 99:3
139:11
**1.10** 125:18
**1.17** 72:2
**1.36** 71:20
**1.49** 67:4,5
**1.61** 65:21
70:25
**1.68** 70:22
**1.92** 66:13
**1:03** 109:2,5
**1:58** 147:8
**10** 68:8 78:7
78:25 79:16
80:21 81:11
82:22 83:13
85:9 120:17
**10th** 51:3
59:13 60:11
80:7 84:8
85:6 125:3
135:5 136:9
138:22
**10-Ks** 42:3
**10-13-04**
65:22
**10-8-14** 153:5
**10:02** 41:13
**10:12** 41:16
**10:59** 73:14

**100** 21:20
**10022-2585**
3:15
**101** 46:14
**105** 47:19,20
48:25
**106** 125:15
**11** 37:11
39:11,15,16
40:1
**11th** 135:24
**11:13** 73:17
**113** 120:20
**117** 153:6
**12** 87:4,6
90:3 91:25
122:10,18
122:19
124:4,7
**12:04** 108:9
108:12
**121** 131:13
**122** 135:3
**126** 50:25
**13** 8:7 122:20
122:21
**13th** 67:3
68:13
**132** 87:22
94:2 95:25
96:4
**137** 137:4
**138** 7:20
**14** 122:20
128:13,19
129:9
130:20
131:8
**15** 8:10,16
26:16 50:3
52:21 57:1
58:7 64:18
64:24 68:6
68:7 71:23
72:4,5,6
120:16
**15th** 46:12,21

**150** 113:6
130:25
**151** 78:17
**157** 49:12
**158** 69:9
**16** 64:22,24
64:25 65:1
65:3,4,9,13
66:3 132:16
132:19
133:13
**160** 73:19
**161** 65:25
78:4,12,13
78:19,23
**17** 88:25
89:19 97:20
**176** 53:2
**178** 54:2
57:15
**18th** 71:1,3
**181** 60:7
**188** 112:22
**19** 41:18
**1900** 3:4
**191** 112:23
**1933** 115:18
**1934** 115:19

_____
**2**
**2** 10:1 31:17
31:18 34:4
34:18 94:13
94:15 98:7
98:9 139:12
**2-23-05** 65:16
**2:05** 147:11
**2:10** 150:12
150:15
**20** 1:20 2:5
4:2 26:16

26:19 27:3
42:11 52:21
53:16 54:19
55:1,4 57:1
57:14 58:7
58:21,22
59:5,8
109:2
142:21
**20th** 5:3
46:11 50:9
50:16,17
51:2,12
52:11,17
53:12 54:8
54:17 55:13
56:16 57:18
58:12,13
59:1,10
137:8,10
**200** 3:10
21:22
111:15
**2004** 47:25
48:11 52:3
70:23 98:14
99:22
100:22
102:19
103:16
**2005** 46:11
46:12 48:1
48:11 49:17
50:9,16,17
51:20 52:3
71:19 86:16
87:16 90:25
98:13,19
137:8
**2015** 1:20 2:5
4:2 5:3
109:2
151:21
152:14
**2016** 152:21
**21** 37:12
100:4

**212-940-7007**
3:16
**22** 43:8
**23** 132:25
133:22
**23rd** 66:4
67:5 71:19
72:3 86:16
90:25 93:9
**234** 95:25
96:4
**235** 120:21
**25** 66:6
**254** 133:8,15
**269-382-0444**
3:21
**27** 14:12
**27-page**
42:16
**279** 87:21
94:11
**287** 137:5
**29** 87:1 94:2
152:14

_____
**3**
**3** 13:18,19,21
14:6,18,25
21:5 24:1
27:8,20
28:10 29:1
29:19 42:22
94:7 98:6
117:5
**3:05-cv-073...**
1:8 5:7
**3:10-cv-003...**
1:14
**30** 87:25 88:3
91:13
107:23
154:14
**30(e)** 152:7
**312-543-6412**
3:11
**3419** 6:20
**36** 67:6

**39** 100:3
102:24
103:10
**39041** 1:22

_____
**4**
**4** 98:6
**41** 86:23
**427** 3:20
**43** 43:9 86:15
**43215** 2:11
**454** 115:17
**48** 66:10,22
91:3 93:10
**49007** 3:20

_____
**5**
**5-0** 46:4,5
**50** 2:10 5:3
46:2 57:3
**50%** 49:15
**503** 5:7
**52** 47:19
**53** 47:23
**57** 129:17,23
129:25
130:4,7,15
**575** 3:15
**585** 113:22
113:25
114:4
116:25
**588** 115:4,10

_____
**6**
**6** 152:21
153:3
**6.48** 68:12
69:10,17
**60** 82:12
**60062** 3:10
**619-231-1058**
3:5
**645** 7:10
**655** 3:4
**675** 7:10,14
11:9,20

13:4 14:9
15:7 20:10
153:5
**676** 113:12
113:15
153:6

**7**

**7** 90:14,24
93:8 143:23
153:5
**74** 49:12,13
**75** 73:19
**76** 78:19

**8**

**8** 22:24 24:1
89:22 90:4
90:23 91:21
93:9
**8-to-1** 89:24
**801** 3:10
**83** 50:24
**84** 54:1,2
**86** 60:7
**87** 144:1
**89** 112:22

**9**

**9** 143:20,24
**9:07** 1:20 2:6
4:2
**90-day** 60:15
60:22 61:19
62:3,6,9
**92101** 3:4
**93** 111:15
**94** 111:13,16
**96** 90:5 92:2
**98** 87:15
98:18